**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| WALMART INC. | |
|      Plaintiff, | |
| v. | **COMPLAINT** |
| Actavis Elizabeth, LLC, | |
| Actavis Holdco U.S., Inc., | |
| Actavis Pharma, Inc., | |
| Alvogen, Inc., | |
| Amneal Pharmaceuticals, Inc., | |
| Amneal Pharmaceuticals LLC, | |
| Aurobindo Pharma U.S.A., Inc. | |
| Bausch Health Americas, Inc., | |
| Bausch Health US, LLC, | |
| Bausch & Lomb, Inc. | |
| Camber Pharmaceuticals, Inc., | |
| Citron Pharma, LLC, | **Civil Action No. _____** |
| Cosette Pharmaceuticals, Inc., | |
| Dr. Reddy's Laboratories, Inc., | |
| Epic Pharma, LLC | |
| Fougera Pharmaceuticals Inc., | **Jury Trial Demanded** |
| G&W Laboratories, Inc., | |
| Glenmark Pharmaceuticals Inc., USA, | |
| Greenstone, LLC., | |
| Hikma Labs Inc., | |
| Hikma Pharmaceuticals USA, Inc., | |
| Impax Laboratories, LLC | |
| Jubilant Cadista Pharmaceuticals Inc., | |
| Lannett Company, Inc. | |
| Lupin Pharmaceuticals, Inc., | |
| Mallinckrodt Inc., | |
| Mallinckrodt LLC, | |
| Mallinckrodt plc, | |
| Mayne Pharma Commercial, LLC, | |
| Morton Grove Pharmaceuticals, Inc., | |
| Mylan Inc., | |
| Mylan Institutional Inc., | |
| Mylan Pharmaceuticals, Inc., | |
| Novartis AG, | |
| Oceanside Pharmaceuticals, Inc., | |
| Padagis U.S., LLC, | |
| Perrigo New York, Inc., | |
| Pfizer Inc., | |
| Rising Pharma Holdings, Inc., d/b/a Rising | |
| Pharmaceuticals | |

Sandoz AG,
Sandoz Inc,
Teva Pharmaceuticals USA, Inc.,
Upsher-Smith Laboratories, LLC,
Viatris, Inc.,
West-Ward Columbus Inc.,
West-Ward Pharmaceuticals, Corp.,
Wockhardt USA LLC,
Zydus Pharmaceuticals (USA) Inc.,

      Defendants.

TABLE OF CONTENTS

I.     Summary of the case ............................................................................................1

       A.     Overview of the "Fair Share" Conspiracy .............................................2

       B.     Government Enforcement Actions..........................................................4

       C.     Private Enforcement Actions .................................................................6

       D.     Walmart as a Target and Victim of Defendants' Conspiracy ..............7

II.    Jurisdiction and Venue .......................................................................................9

III.   Drugs at Issue...................................................................................................10

IV.    Parties...............................................................................................................10

       A.     Walmart ...............................................................................................10

       B.     Defendants ...........................................................................................10

              1.     Actavis .....................................................................................10

              2.     Alvogen ....................................................................................11

              3.     Amneal .....................................................................................12

              4.     Aurobindo .................................................................................12

              5.     Bausch/Oceanside/Valeant......................................................13

              6.     Cadista......................................................................................14

              7.     Camber .....................................................................................14

              8.     Citron/ACETO/Rising .............................................................15

              9.     Dr. Reddy's ..............................................................................15

              10.    Epic Pharma, LLC....................................................................16

              11.    G&W/Cosette............................................................................16

              12.    Glenmark...................................................................................17

              13.    Greenstone/Pfizer.....................................................................17

              14.    Hikma/Roxane/West-Ward .......................................................18

              15.    Impax ........................................................................................19

              16.    Lannett ......................................................................................20

              17.    Lupin ........................................................................................20

              18.    Mallinckrodt.............................................................................21

              19.    Mayne .......................................................................................22

              20.    Mylan/Viatris............................................................................23

              21.    Perrigo/Padagis.........................................................................23

              22.    Sandoz Inc./Sandoz AG/Novartis AG/Fougera.......................24

              23.    Teva ..........................................................................................35

              24.    Upsher-Smith ...........................................................................35

              25.    Wockhardt/Morton Grove.........................................................36

              26.    Zydus ........................................................................................36

       C.     Additional Co-Conspirators .................................................................37

V.     The Generic Drug Market ................................................................................38

       A.     The Hatch-Waxman Act .......................................................................40

       B.     The Importance of Generic Drugs ........................................................40

       C.     The Generic Drug Distribution System ................................................43

D.    The Cozy Nature of the Industry and Opportunities for Collusion ................45
   1.    Trade Association and Customer Conferences .....................................45
   2.    Industry Dinners and Private Meetings.................................................46

E.    Generic Drug Prices Skyrocket in 2013.........................................................49

VI.    Defendants' Restraint of Trade ...........................................................................50

A.    The Overarching "Fair Share" Conspiracy Between Drug Manufacturers ..............51
   1.    The Parameters of the Overarching Conspiracy — "Playing Nice in the Sandbox"
         52
   2.    Evidence of the Overarching Conspiracy .............................................57

B.    Walmart Is a Repeated Target and Victim of Defendants' Anticompetitive Conduct 61

C.    The Heritage Sub-Conspiracy ........................................................................65
   1.    The Heritage Sub-Conspiracy Illegal Schemes .....................................67

D.    The Teva Sub-Conspiracy...............................................................................123
   1.    Teva's Central Role in the "Fair Share" Conspiracy..............................124
   2.    The Teva Sub-Conspiracy Illegal Schemes .........................................126

E.    The Taro Sub-Conspiracy ..............................................................................322
   1.    The "Fair Share" Conspiracy in Topical Generics ...............................323
   2.    Taro's Role in the Topical Generic Drug Conspiracy ...........................325
   3.    Agreements Among All Topical Generic Drug Manufacturers Were Widespread
         328
   4.    The Taro Sub-Conspiracy Illegal Schemes ..........................................332
   5.    Other Defendants' Revenues and Profits Also Multiply .......................599

F.    Additional Anticompetitive Behavior Captured by the Private Complaints............600
   1.    Albuterol ..............................................................................................601
   2.    Allopurinol ...........................................................................................603
   3.    Amantadine HCL ..................................................................................604
   4.    Amitriptyline.........................................................................................606
   5.    Atenolol Chlorthalidone.......................................................................609
   6.    Atropine Sulfate ...................................................................................610
   7.    Balsalazide Disodium, Butorphanol Tartrate, and Captopril ................611
   8.    Cefuroxime Axetil.................................................................................613
   9.    Chlorpromazine HCL............................................................................615
   10.    Cholestyramine ...................................................................................616
   11.    Digoxin ................................................................................................617
   12.    Diphenoxylate Atropine .......................................................................620
   13.    Divalproex ER ......................................................................................621
   14.    Doxy IR ................................................................................................623
   15.    Exemestane ..........................................................................................627
   16.    Hydralazine ..........................................................................................628
   17.    Hydrocodone Acetaminophen...............................................................629
   18.    Isosorbide Dinitrate..............................................................................630
   19.    Lidocaine HCL .....................................................................................631
   20.    Lidocaine-Prilocaine ............................................................................632
   21.    Metformin ER .......................................................................................634
   22.    Methadone HCL....................................................................................635

23.    Methylprednisolone ...............................................................635
24.    Naproxen Sodium ..................................................................637
25.    Neomycin Polymyxin Hydrocortisone ..................................638
26.    Oxycodone/Acetaminophen ...................................................639
27.    Oxycodone HCL .....................................................................640
28.    Permethrin ..............................................................................642
29.    Perphenazine ..........................................................................644
30.    Pilocarpine HCL .....................................................................645
31.    Potassium Chloride .................................................................646
32.    Prednisolone Acetate ..............................................................647
33.    Prednisone ...............................................................................648
34.    Spironolactone HCTZ ............................................................649
35.    Timolol Maleate .....................................................................650
36.    Tobramycin Dexamethasone ..................................................651
37.    Trazodone HCL .......................................................................652
38.    Triamterene HCTZ .................................................................653
39.    Ursodiol ..................................................................................654

VII.    Trade and Commerce ...................................................................656

VIII.    Market Effects ..............................................................................656

IX.    The Statute of Limitations are Tolled .........................................657

X.    Antitrust Violations .....................................................................661

   A.    Count One – Overarching Conspiracy on all Operative Generic Drugs Against all Defendants ....................................................................................661

   B.    Count Two (Pled in the Alternative to Count One) Against Actavis, Amneal, Aurobindo, Dr. Reddy's, Fougera/Sandoz, Glenmark, Greenstone/Pfizer, Lannett, Lupin, Mylan, Upsher-Smith, Wockhardt, Teva, and Zydus .......................................670

   C.    Counts Three through Two Hundred Twelve (Individual Conspiracies) .................675

XI.    Prayer for Relief..........................................................................689

## I.     SUMMARY OF THE CASE

1.     Walmart Inc. and its subsidiaries, affiliates, assigns, predecessors and related companies (collectively "Walmart") file this Complaint seeking damages against the manufacturers of generic drugs for engaging in a wide-ranging conspiracy to fix, maintain, and/or stabilize the prices, rig bids, and engage in market and customer allocations of hundreds of different generic drugs from at least May 2009 to the present, in violation of federal antitrust laws. This unlawful conduct caused Walmart to pay more than it should have for those drugs.[1]

2.     Generic medications make up a critical part of the U.S. healthcare system. Accounting for nearly 90 percent of all prescriptions filled in the United States, these medications treat a wide range of medical conditions and improve the health of hundreds of millions of Americans each year. Generic medications are also relatively inexpensive as compared to other health care expenses and have traditionally been a bargain available to consumers.

3.     However, since at least mid-2009, the Defendants have deprived the public of the benefit of that bargain by entering into a series of illegal "fair share" agreements to allocate customers and markets, engage in bid rigging, and fix the prices of hundreds of pharmaceutical products. These agreements, which are illegal per se under federal antitrust laws, led to staggering price increases for critical medications and forced consumers and their health plans to shoulder the cost of Defendants' illegal activities.

4.     Walmart is one of the largest pharmacy providers in the United States. As such, it purchases hundreds of millions of dollars of prescription drugs every year. As shown below, Walmart was a specific target of the conspiracy described in this Complaint.

---

[1] The allegations in this Complaint are made on personal knowledge as to Walmart's own activities, on information and belief as to the activities of others, on information made public from state and federal government investigations and actions involving Defendants and the generic drug industry, and on the documents filed in the pending multidistrict litigation before the Honorable Cynthia M. Rufe, styled *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, No. 2:15-MD-2724 (E.D. Pa.), and related actions.

A.    **Overview of the "Fair Share" Conspiracy**

5.    In a competitive marketplace, as additional generic manufacturers enter the market for a given drug, prices are expected to fall as new entrants compete for share. And if any one company decided to raise prices for a given drug, it would do so at the risk of losing customers and sales to its rivals with more competitive prices.

6.    And yet, between at least 2009 and 2016, hundreds of generic drugs in established drug markets not only did not decrease in price, as expected, but increased significantly—sometimes by well over 1,000 percent (or 10x).

7.    The size and frequency of these increases grew exponentially in 2013 and 2014. For example, the average market price for a bottle of 500 tablets of doxycycline, a decades-old antibiotic, rose to $1,849 in April 2014, from $20 in October 2013, an increase of 8,281 percent. Similarly, the average market price of a bottle of 100 tablets of albuterol sulfate, which is used to treat asthma and other lung conditions, increased by 4,014 percent (from $11 to $434) during the same period.[2] All in all, the prices of more than 1,200 generic medications increased an average of 448 percent between July 2013 and July 2014, according to the Centers for Medicare and Medicaid Services.

8.    These price increases were the direct result of the conduct of Defendants named in this Complaint, along with other co-conspirators, who entered into a single, overarching, and industry-wide conspiracy to unreasonably restrain trade. The conspirators did so by illegally allocating markets and customers for their products, which artificially raised the prices of hundreds of generic drugs, including at least the Operative Generic Drugs identified in Exhibit A to this Complaint.

---

[2] Elisabeth Rosenthal, Officials Question the Rising Costs of Generic Drugs, N.Y. Times (Oct. 7, 2014), https://www.nytimes.com/2014/10/08/business/officials-question-the-rising-costs-of-generic-drugs.html.

9.    Defendants' illegal activities began as early as May 2009, with the conspiracy broadly in place by the Spring of 2011, and continuing in force or effect (or both) through the date of the filing of this Complaint (hereinafter the "Relevant Time Period").

10.    There are no market forces that explain the Defendants' pricing activities other than anticompetitive collusion. To the contrary, the generic pharmaceutical industry has a number of features that make it highly susceptible to collusion. The generic drug market is controlled by Defendants and subject to high barriers to entry, including substantial manufacturing costs and regulatory requirements. Federal regulations require generic products to contain the same type and amount of active pharmaceutical ingredient and to be therapeutically equivalent to one another, making them commodities. That interchangeability facilitates collusion, as cartel members can easily monitor and detect deviations from a price-fixing or market allocation agreement.

11.    The goal of this conspiracy was clear—to increase Defendants' profits at the expense of purchasers of generic drugs by minimizing and thwarting true market competition, which would have driven down the prices of generic drugs. Defendants accomplished this goal by systematically and routinely communicating with each other directly about bids, pricing, and market entries and exits for hundreds of generic drugs and agreeing to divvy up customers to create an artificial equilibrium in the generic drugs market.

12.    As explained in further detail below, this artificial equilibrium was known across the generic pharmaceutical industry as "fair share." Pursuant to the "fair share" conspiracy, every Defendant was entitled to its specified allocation of market share for each drug identified in this Complaint that it manufactured. When a corporate Defendant in the market for that same generic drug raised prices, the rules of the "fair share" conspiracy provided that other Defendants would follow the price increase and also not seek to add market share—*i.e.*, to not compete—which allowed the price

increases to stick (and Defendants' profits to rise across the board even though market share was arguably less).

13.     The Defendants' "fair share" understanding was not limited to a single drug or group of drugs, nor was it isolated to a group of specific manufacturers. It was a pervasive, industry-wide strategy to allocate customers and markets based on an agreed- upon code. Though the particulars of that code might differ based on the drug or the specific conspirators involved, the essential features— allocation of customers and markets on the basis of "fair share" to control prices—were the same, and the success of each individual conspiracy depended on the success of the others.

**B.     Government Enforcement Actions**

14.     The Defendants' massive price increases caught the attention of federal and state enforcement authorities. Specifically, the Antitrust Division of the United States Department of Justice opened a criminal investigation, while a coalition of State Attorneys General launched their own investigation which eventually led to a trio of civil enforcement actions.

15.     As part of the federal criminal investigation, seven different companies have entered deferred prosecution agreements with the DOJ, admitting criminal wrongdoing and paying over $900 million in criminal fines, civil penalties, and restitution to date.

16.     Specifically, Glenmark Pharmaceuticals, Inc., USA, Kavod Pharmaceuticals LLC (f/k/a Rising Pharmaceuticals LLC) (f/k/a Rising Pharmaceuticals, Inc.), Sandoz, Inc. ("Sandoz"), and Teva Pharmaceuticals USA Inc. ("Teva"), as well as co-conspirators Apotex Corp. ("Apotex"), Heritage Pharmaceuticals, Inc. ("Heritage"), and Taro Pharmaceuticals U.S.A., Inc. ("Taro"), each admitted to conspiring to suppress and eliminate competition by allocating customers, rigging bids,

and fixing and maintaining prices for one or more of the Operative Generic Drugs and paid the following criminal fines and civil penalties:[3]

| Company | Criminal Fine | False Claims Act Settlement | Restitution |
|---|---|---|---|
| Apotex | $24.1 million | $49 million | |
| Glenmark | $30 million | | |
| Heritage | $225,000 | $7.1 million | |
| Kavod (Rising) | $1.5 million | $1.1 million | $438,066 |
| Sandoz | $195 million | $185 million | |
| Taro | $205.6 million | $213 million | |
| Teva | $225 million | | |

17.    The DOJ also secured individual indictments and guilty pleas from Jeffrey Glazer, the former CEO of co-conspirator Heritage, Jason Malek, the former senior vice president of commercial operations at co-conspirator Heritage, and Hector Kellum, the former senior director of pricing and contracts at Defendant Sandoz. As part of their plea agreements, all three men admitted to participating in a conspiracy to allocate customers, rig bids, and fix and maintain the prices of one or more Operative Generic Drugs.[4]

18.    In addition to the criminal enforcement actions, the Attorney General for the State of Connecticut, joined by the Attorneys General of 48 additional jurisdictions (the "States"), have provided the most comprehensive account of the rampant collusion in the generic drug industry. Evidence unearthed by the States included many thousands of documents produced by dozens of companies and individuals, more than 11 million telephone call records from hundreds of individuals at various levels of the corporate Defendants and co-conspirators, and information provided by several cooperating witnesses, including, but not limited to, Messrs. Glazer, Malek, and Kellum.

---

[3] Glenmark and Teva were also forced to divest their pravastatin business lines, which the DOJ called central to their anticompetitive misconduct. In addition, the DOJ required Teva to donate $50 million worth of clotrimazole and tobramycin, which the company admitted to price fixing, to humanitarian organizations.

[4] In 2020, the DOJ also secured a criminal indictment against Ara Aprahamian, the former VP of sales and marketing at co-conspirator Taro, which it voluntarily dismissed with prejudice in late 2023.

19.    The States' civil investigation has led to three separate civil lawsuits (the "State AG Complaints") against 30 generic drug manufacturers alleging collusion that distorted the prices of over 200 generic drugs.

20.    The structure of the industry-wide conspiracy that emerges from the State AG Complaints is complex and involves at least three overlapping and interlocking clusters of co-conspirators: One revolving around co-conspirator Heritage ("the Heritage Sub- Conspiracy"), one revolving around Defendant Teva ("the Teva Sub-Conspiracy"), and one revolving around co-conspirator Taro ("the Taro Sub-Conspiracy").

21.    Most of the Defendants were involved in more than one of three major sub-conspiracies. Actavis, Aurobindo, Glenmark, Lannett, Mylan, Sandoz, and Zydus were involved in all three of the State AG sub-conspiracies. In addition, Teva, Dr. Reddy's, Par, Amneal, Greenstone/Pfizer, Upsher-Smith, Wockhardt, Rising, and Lupin and Co-conspirator Versapharm were each involved in two of the State AG sub-conspiracies.

22.    Each of the State AG actions was originally filed in the United States District Court for the District of Connecticut and subsequently transferred to this Court by the Judicial Panel on Multidistrict Litigation, where they remained for several years. On January 31, 2024, the JPML remanded the cases back to the District of Connecticut for further proceedings.

**C.    Private Enforcement Actions**

23.    On the heels of the criminal enforcement actions and State AG Complaints, numerous class actions have also been filed, as well as now more than 20 separate direct actions. These actions have all been consolidated in the Eastern District of Pennsylvania as part of MDL 2724.

24.    These actions have revealed at least three dozen additional drugs that were involved in Defendants' overarching conspiracy to unreasonably restrain trade, artificially inflate and maintain prices, and reduce competition in the generic pharmaceutical industry throughout the United States.

Most of the class actions, including those brought by direct purchasers, indirect resellers, and end-payers (collectively, "Class Action Complaints") have survived motions to dismiss. So, too, have many of the direct actions and the three State AG Complaints. *See In re Generic Pharms. Pricing Antitrust Litig.*, 394 F. Supp. 3d 509, 526 (E.D. Pa. 2019) (denying motions to dismiss overarching conspiracy claims); *In re Generic Pharms. Pricing Litig.*, 368 F. Supp. 3d 814, 852 (E.D. Pa. 2019) (denying, with certain limited exceptions, motions to dismiss state law indirect purchaser claims); *In re Generic Pharms. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 458 (E.D. Pa. 2018) (denying, with a single limited exception, motions to dismiss Sherman Act direct purchaser claims).

25. In denying the Defendants' motions to dismiss the overarching "fair-share" conspiracy claims, the MDL Court noted that the allegations in the various complaints "plausibly allege[d] that Defendants engaged in a conspiracy regarding the broader market for generic drugs, and not just the market for any individual drug." 394 F. Supp 3d at 526. The Court further observed that the plaintiffs' allegations formed a "connective tissue" that demonstrated that the individual drug conspiracies were joined by "common goals, methods, or actors so as to form a broader overarching conspiracy." *Id.* As a result, Defendants face "joint and several liability . . . not just for their participation in any individual drug conspiracy, but also for their participation in the alleged overarching scheme." *Id.* at 515.

**D.    Walmart as a Target and Victim of Defendants' Conspiracy**

26. Working together to manipulate the market for generic drugs, Defendants coordinated their actions in a way that directly impacted direct purchasers of the Operative Generic Drugs, including Walmart. According to the DOJ's criminal enforcement actions, and the State Attorneys

General's civil enforcement actions, Defendants targeted Walmart specifically on many occasions. Walmart was a direct victim of Defendants' conspiracy.

27.     As explained in greater detail below, Defendants targeted Walmart through bid rigging, market allocation, agreements to cede Walmart's business to competitors, and exchanges of price points and bid information.

28.     Defendants rigged their bids and high-bid Walmart's business to ensure competitors' bids would win. Defendants exchanged price points and bid information between each other for the benefit of the conspiracy. Defendants concealed and lied about their inventory and supply for the benefit of the conspiracy, and to allow their competitors to raise prices. In short, Defendants passed around Walmart's business instead of competing for it.

29.     As an example, in 2012, Defendant Teva Pharmaceuticals USA, Inc. ("Teva") and Defendant Sandoz Inc. ("Sandoz") conspired to allocate Walmart's purchases of ethinyl estradiol and levonorgestrel (marketed as Portia and Jolessa), with Teva abruptly pulling out of a bidding war after coordinating with Sandoz. Similarly, in 2013, Teva and Defendant Greenstone LLC ("Greenstone") conspired to allocate Walmart's purchases of oxaprozin (marketed as Daypro). In the lead up to Greenstone's entry into the oxaprozin market, Teva agreed to concede its business with CVS and Cardinal to Greenstone and, in exchange, Greenstone agreed to not bid Walmart's business. And yet another example, in 2013 and 2014, Teva, Sandoz, and co-conspirator Taro Pharmaceuticals U.S.A., Inc. ("Taro"), the three primary manufacturers of fluocinonide (marketed as Lidex), coordinated price increases, and Teva declined to bid on Walmart's business to avoid interfering with Taro's market share.

30.     Defendants' conspiracy and anticompetitive practices were specifically designed to inflate prices and limit Walmart's access to cheaper alternatives.

31.     As a victim of Defendants' conspiracy, Walmart was forced to pay inflated prices for products that would otherwise have been sold at competitive rates in a free market. Defendants' collusion forced Walmart to purchase the Operative Generic Drugs at artificial premiums. Walmart seeks treble damages and other relief as outlined below.

## II.     JURISDICTION AND VENUE

32.     This action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15(a), and seeks to recover treble damages, costs of suit, and reasonable attorneys' fees for the injuries sustained by Walmart resulting from Defendants' conspiracy to restrain trade. The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a), 1407, and 15 U.S.C. § 15.

33.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C. § 1391 because during the Relevant Time Period, Defendants transacted business throughout the United States, including in this District; Defendants resided, transacted business, were found, and/or had agents within this District; and a portion of the affected interstate trade and commerce discussed herein was carried out in this District.

34.     This Court has personal jurisdiction over each Defendant because, among other reasons, each Defendant: (a) transacted business throughout the United States, including in this District; (b) participated in the selling and distribution of the generic drugs at issue throughout the United States, including in this District; (c) had, and maintained, substantial contacts within the United States, including in this District; and/or (d) was engaged in an unlawful conspiracy to inflate the prices for the generic drugs at issue that was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

### III.    DRUGS AT ISSUE

35.    As used in this Complaint, the term "Operative Generic Drugs" (individually or collectively, as context requires) refers to all dosages, strengths, and formulations (if none are specified) of the generic drugs listed in Exhibit A to this Complaint.

### IV.    PARTIES

#### A.    Walmart

36.    Plaintiff Walmart Inc. ("Walmart") is a Delaware corporation with its headquarters in Bentonville, Arkansas. Walmart is defined to include Walmart Inc. and its subsidiaries, affiliates, assigns, predecessors, and related companies. Walmart is a retail corporation that operates discount grocery, department, and pharmacy, and warehouse stores across the United States and internationally.

37.    Walmart owns and operates retail stores and warehouse clubs that sell prescription drugs. During the relevant period, Walmart directly purchased generic drugs at inflated prices in the United States from one or more of the Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the antitrust violations alleged in this complaint.

#### B.    Defendants

##### 1.    Actavis

38.    Defendant Actavis Holdco U.S., Inc. ("Actavis Holdco") is a Delaware corporation with its principal place of business in Parsippany, New Jersey. In August 2016, Defendant Teva Pharmaceuticals USA, Inc. acquired the Actavis generics business of Allergan plc, including Actavis, Inc. (f/k/a Watson Pharmaceuticals).

39.    Upon this acquisition, Actavis, Inc. was renamed Allergan Finance, LLC, which in turn assigned all of the assets and liabilities of the former Allergan plc generics business to the newly formed Actavis Holdco, including subsidiaries Actavis Pharma, Inc. and Actavis Elizabeth LLC (a research and development and manufacturing entity for Actavis's generic operations), among others.

10

Actavis Holdco is a wholly owned subsidiary of Teva Pharmaceuticals USA, Inc., which is also a defendant and is further defined below.

40.     Defendant Actavis Pharma, Inc. ("Actavis Pharma") is a Delaware corporation with its principal place of business in Parsippany, New Jersey. It is a wholly owned subsidiary of Actavis Holdco and is a principal operating company in the United States for generic products acquired from Allergan plc. It manufactures, markets, and/or distributes generic pharmaceuticals. Actavis Pharma is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

41.     Defendant Actavis Elizabeth LLC ("Actavis Elizabeth") is a Delaware company with its principal place of business in Elizabeth, New Jersey. It is a wholly owned subsidiary of Actavis Holdco and is a research, development, and manufacturing entity for Actavis generic operations.

42.     Unless addressed individually, Actavis Holdco, Actavis Inc., Actavis Pharma, and Actavis Elizabeth are collectively referred to herein as "Actavis." Actavis is collectively defined to include its managers, officers, employees, and agents acting on its behalf. During the Relevant Time Period, Actavis directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Operative Generic Drugs throughout the United States and its territories, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint.

**2.     <u>Alvogen</u>**

43.     Defendant Alvogen, Inc. ("Alvogen") is a Delaware corporation with its principal place of business in Morristown, New Jersey. Alvogen was founded by the former CEO of Actavis, Robert Wessman, in 2009. Alvogen is collectively defined to include its managers, officers, employees, and agents acting on its behalf. During the Relevant Time Period, Alvogen directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Operative

Generic Drugs throughout the United States and its territories knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint.

**3.    <u>Amneal</u>**

44.    Defendant Amneal Pharmaceuticals, Inc. ("Amneal Inc.") is a Delaware corporation with its principal place of business in Bridgewater, New Jersey.

45.    Defendant Amneal Pharmaceuticals LLC ("Amneal LLC") is a Delaware limited liability company with its principal place of business in Bridgewater, New Jersey. Amneal LLC is registered with the Pennsylvania Department of State as a foreign limited liability company and maintains a registered agent in Pennsylvania.

46.    Amneal, Inc. is the parent company of Amneal LLC and was formed for the purpose of facilitating the merger between Amneal LLC and Defendant Impax, which is further defined below. The merger between Amneal LLC and Defendant Impax was completed on or about May 2018.

47.    Unless addressed individually, Amneal LLC and Amneal Inc. are collectively referred to herein as "Amneal." Amneal is defined to include its managers, officers, employees, and agents acting on its behalf. During the Relevant Time Period, Amneal directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Operative Generic Drugs throughout the United States and its territories, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint.

**4.    <u>Aurobindo</u>**

48.    Defendant Aurobindo Pharma U.S.A., Inc. ("Aurobindo") is a Delaware corporation with its principal place of business in Dayton, New Jersey. Aurobindo is a subsidiary of Aurobindo Pharma Limited, a corporation based in Hyderabad, India.

49.    Aurobindo is collectively defined to include its managers, officers, employees, and agents acting on its behalf. During the Relevant Time Period, Aurobindo directly participated in the

conspiracy alleged in this Complaint, produced and sold one or more Operative Generic Drugs throughout the United States and its territories, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint.

**5.**      **Bausch/Oceanside/Valeant**

50.     Defendant Bausch Health Americas, Inc. (formerly Valeant Pharmaceuticals International) ("Bausch Health Americas") is a Delaware corporation with its principal place of business in Bridgewater, New Jersey.

51.     Defendant Bausch Health US, LLC (formerly Valeant Pharmaceuticals North America LLC) ("Bausch Health LLC") is a Delaware limited liability company with its principal place of business in Bridgewater, New Jersey. Bausch Health LLC is registered with the Pennsylvania Department of State as a foreign limited liability company and maintains a registered agent in Pennsylvania.

52.     Bausch Health LLC and Bausch Health Americas are wholly owned subsidiaries of Bausch Health Companies, Inc., a Canadian entity.

53.     Defendant Bausch & Lomb, Inc (also referred to as "Bausch + Lomb Corporation" or "B&L"), is a company incorporated under the Canada Business Corporations Act and headquartered in Vaughan, Ontario, Canada. B&L is a wholly owned subsidiary of Bausch Health Companies, Inc.

54.     Defendant Oceanside Pharmaceuticals, Inc. ("Oceanside") is a Delaware corporation with its principal place of business in Bridgewater, New Jersey. Oceanside is a wholly owned subsidiary of Bausch Health Americas.

55.     Unless addressed individually, Bausch Health Americas, Valeant Pharmaceuticals International, Bausch Health LLC, Valeant Pharmaceuticals North America LLC, B&L, and Oceanside are collectively referred to herein as "Bausch." Bausch is collectively defined to include its managers, officers, employees, and agents acting on its behalf. During the Relevant Time Period,

Bausch directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Operative Generic Drugs throughout the United States and its territories, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint.

**6.    Cadista**

56.    Defendant Jubilant Cadista Pharmaceuticals Inc. ("Cadista") is a Delaware corporation with its principal place of business in Salisbury, Maryland. It is a wholly-owned subsidiary of Jubilant Life Sciences Company, an Indian pharmaceutical company. Cadista is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

57.    Cadista is defined to include its managers, officers, employees, and agents acting on its behalf. During the Relevant Time Period, Cadista directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Operative Generic Drugs throughout the United States and its territories, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint.

**7.    Camber**

58.    Defendant Camber Pharmaceuticals, Inc. ("Camber") is a Delaware corporation with its principal place of business in Piscataway, New Jersey. Camber is a wholly owned subsidiary of Hetero Labs Limited, an Indian pharmaceutical company.

59.    Camber is defined to include its managers, officers, employees, and agents acting on its behalf. During the Relevant Time Period, Camber directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Operative Generic Drugs throughout the United States and its territories, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint.

14

**8.**    **Citron/ACETO/Rising**

60.    During the Relevant Time Period, Defendant Citron Pharma LLC ("Citron Pharma") was a New Jersey company with its principal place of business located in East Brunswick, New Jersey. Many of the drugs marketed and sold by Citron Pharma were manufactured by Defendant Aurobindo.

61.    On or about December 2016, ACETO Corporation ("ACETO"), a New York corporation with its principal place of business in Port Washington, New York, acquired Citron Pharma through its wholly owned subsidiary Rising Pharmaceuticals, Inc., a New Jersey corporation.

62.    ACETO filed for Chapter 11 bankruptcy on or about February 2019 and eventually sold the Rising Pharmaceuticals, Inc. portion of its business portfolio to HIG Capital and Shore Suven Pharma on or about April 2019. Shore Suven Pharma is a joint venture between Suven Life Sciences Limited, an Indian company, and Shore Pharma Investments LLC, a Delaware company founded by the former CEO of Citron Pharma, Vimal Kavuru. The post-bankruptcy company is now known as Rising Pharma Holdings, Inc. (d/b/a Rising Pharmaceuticals), a Delaware corporation with its principal place of business in East Brunswick, New Jersey.

63.    Unless addressed individually, Citron Pharma, ACETO, Rising Pharmaceuticals, Inc., and Rising Pharma Holdings, Inc. are collectively referred to herein as "Citron." Citron is defined to include its managers, officers, employees, and agents acting on its behalf. During the Relevant Time Period, Citron directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Operative Generic Drugs throughout the United States and its territories, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint.

**9.**    **Dr. Reddy's**

64.    Defendant Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's") is a New Jersey corporation with its principal place of business located in Princeton, New Jersey. Dr. Reddy's is a wholly owned subsidiary of Dr. Reddy's Laboratories Ltd., an Indian pharmaceutical company. Dr. Reddy's is

registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

65.     Dr. Reddy's is defined to include its managers, officers, employees, and agents acting on its behalf. During the Relevant Time Period, Dr. Reddy's directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Operative Generic Drugs throughout the United States and its territories, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint.

### 10.     Epic Pharma, LLC

66.     Defendant Epic Pharma, LLC ("Epic") is a Delaware limited liability company with its principal place of business in Laurelton, New York. Epic is defined to include its managers, officers, employees, and agents acting on its behalf. During the Relevant Time Period, Epic directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Operative Generic Drugs throughout the United States and its territories, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint.

### 11.     G&W/Cosette

67.     Defendant G&W Laboratories, Inc. ("G&W Labs") was a New Jersey Corporation with its principal place of business in South Plainfield, New Jersey.

68.     Avista Capital Partners acquired G&W Labs's topicals and dermatology product lines on or about November 2018 and launched Defendant Cosette Pharmaceuticals, Inc., ("Cosette") a Delaware corporation with its principal place of business in Bridgewater, New Jersey, thereafter. Cosette acquired G&W's generics manufacturing plant in North Carolina on or about November 2019.

69.     Unless addressed individually, G&W Labs and Cosette are collectively referred to herein as "G&W." G&W is defined to include its managers, officers, employees, and agents acting on its behalf. During the Relevant Time Period, G&W directly participated in the conspiracy alleged in

this Complaint, produced and sold one or more Operative Generic Drugs throughout the United States and its territories, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint.

### 12.    **Glenmark**

70.    Defendant Glenmark Pharmaceuticals Inc., USA ("Glenmark Pharma") is a Delaware corporation with its principal place of business located in Mahwah, New Jersey. Glenmark is a wholly owned subsidiary of Glenmark Pharmaceuticals Ltd., an Indian pharmaceutical company.

71.    Glenmark is defined to include its managers, officers, employees, and agents acting on its behalf. During the Relevant Time Period, Glenmark directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Operative Generic Drugs throughout the United States and its territories, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint.

### 13.    **Greenstone/Pfizer**

72.    Defendant Greenstone LLC ("Greenstone") is a Delaware limited liability company with its principal place of business in Greensboro, North Carolina. Until November 2020, Greenstone was a wholly owned subsidiary of Defendant Pfizer Inc. ("Pfizer"), a Delaware corporation with its principal place of business in New York, New York, and operated as the generic drug division of Pfizer until that time. Pfizer is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

73.    On or about November 2020, Greenstone became a wholly owned subsidiary of Defendant Viatris after Defendant Mylan merged with Defendant Pfizer's Upjohn division, which included Greenstone. Defendants Mylan and Viatris are further defined below.

17

74.     Until on or about April 12, 2023, Greenstone operated out of Pfizer's Peapack, New Jersey campus, and a majority of Greenstone's employees were also employees of Pfizer's Essential Health Division, including Greenstone's President.

75.     Greenstone employees also used Pfizer for financial analysis, human resources, and employee benefit purposes, making the two companies essentially indistinguishable. During the Relevant Time Period, Greenstone has—under the direction and control of Pfizer—marketed and sold generic pharmaceuticals in this District and throughout the United States.

76.     Greenstone and Pfizer are defined to include their managers, officers, employees, and agents acting on their behalf. During the Relevant Time Period, Greenstone and Pfizer directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Operative Generic Drugs throughout the United States and its territories, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint.

**14.     Hikma/Roxane/West-Ward**

77.     Defendant Hikma Pharmaceuticals USA, Inc. ("Hikma USA") is a Delaware corporation with its principal place of business in Berkeley Heights, New Jersey. Hikma USA is a wholly owned subsidiary of Hikma Pharmaceuticals PLC ("Hikma Pharm" and collectively with Hikma USA, "Hikma"), a British company with headquarters in London, United Kingdom.

78.     Defendant West-Ward Columbus Inc. ("West-Ward Columbus") is a Delaware corporation with its principal place of business located in Eatontown, New Jersey. West-Ward Columbus is a wholly-owned subsidiary of Hikma USA.

79.     Defendant West-Ward Pharmaceuticals, Corp. ("West-Ward Pharm") is a Delaware corporation with its principal place of business located in Eatontown, New Jersey.

80.     Hikma USA acquired West-Ward Pharm and West-Ward Columbus in the 1990s, and they essentially operate as Hikma's generics division in the United States. On or about June 26, 2018, Hikma rebranded West-Ward Pharm as Hikma USA.

81.     Defendant Hikma Labs Inc. ("Hikma Labs") is a Nevada corporation with its principal place of business in Columbus, Ohio. Hikma Labs was previously known as Roxane Laboratories ("Roxane") before being acquired by Hikma in 2015.

82.     Unless addressed individually, Roxane, Hikma USA, Hikma Pharm, West-Ward Columbus, West-Ward Pharm, and Hikma Labs are collectively referred to herein as "West-Ward." West-Ward, is collectively defined to include its managers, officers, employees, and agents acting on its behalf. During the Relevant Time Period, West-Ward directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Operative Generic Drugs throughout the United States and its territories, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint.

**15.    Impax**

83.     Defendant Impax Laboratories, LLC ("Impax"), f/k/a Impax Laboratories, Inc., is a Delaware company with its principal place of business located in Bridgewater, New Jersey. As noted above, Defendant Amneal acquired Impax on or about May 2018. Impax is registered with the Pennsylvania Department of State as a foreign limited liability company and maintains a registered agent in Pennsylvania.

84.     Impax is defined to include its managers, officers, employees, and agents acting on its behalf. During the Relevant Time Period, Impax directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Operative Generic Drugs throughout the United States and its territories, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint.

19

16.     **Lannett**

85.     Defendant Lannett Company, Inc. ("Lannett") is a Delaware corporation with its principal place of business located in Trevose, Pennsylvania. Lannett is registered with the Pennsylvania Department of State as a foreign corporation.[5]

86.     Lannett is defined to include its managers, officers, employees, and agents acting on its behalf. During the Relevant Time Period, Lannett directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Operative Generic Drugs throughout the United States and its territories, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint.

17.     **Lupin**

87.     Defendant Lupin Pharmaceuticals, Inc. ("Lupin") is a Virginia corporation with its principal place of business located in Baltimore, Maryland. Lupin is a wholly owned subsidiary of Lupin Limited, an Indian company with its principal place of business in Mumbai, India. Lupin is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

88.     Lupin is defined to include its managers, officers, employees, and agents acting on its behalf. During the Relevant Time Period, Lupin directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Operative Generic Drugs throughout the United States and its territories, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint.

---

[5] Upon information and belief, Lannett filed for Chapter 11 bankruptcy protection in May 2023 and emerged from bankruptcy approximately one month later, in June 2023.

18.    **Mallinckrodt**

89.    Defendant Mallinckrodt Inc. is a Delaware corporation with its principal place of business in Webster Groves, Missouri.

90.    Defendant Mallinckrodt LLC is a Delaware limited liability company and wholly owned subsidiary of Mallinckrodt Inc., with its principal place of business also in Webster Groves, Missouri.

91.    Both Mallinckrodt LLC and Mallinckrodt Inc. are registered with the Pennsylvania Department of State as foreign entities and maintain registered agents in Pennsylvania.

92.    On information and belief, Defendant Mallinckrodt plc, a United Kingdom entity, was created in 2013 as part of a corporate tax inversion so that Mallinckrodt Inc. would not have to pay income taxes in the United States (where it is headquartered and where it derives 90% of its revenue). Accordingly, Mallinckrodt plc is now the corporate parent of its wholly owned subsidiary, Mallinckrodt Inc.

93.    Mallinckrodt Inc., Mallinckrodt LLC, and Mallinckrodt plc are collectively referred to herein as "Mallinckrodt." Mallinckrodt is defined to include its managers, officers, employees, and agents acting on its behalf. During the Relevant Time Period, Mallinckrodt directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Operative Generic Drugs throughout the United States and its territories, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint.

94.    Prior to the 2013 corporate tax inversion, the unlawful conduct of the Mallinckrodt employees detailed in this Complaint was done on behalf of both Mallinckrodt Inc. and Mallinckrodt LLC, but for the ultimate benefit of Mallinckrodt Inc. After the corporate tax inversion, the unlawful conduct of the Mallinckrodt employees was done on behalf of each of the three Mallinckrodt entities, but for the ultimate benefit of Mallinckrodt plc. However, at all times during the Relevant Time

Period, each of the named Mallinckrodt entities acted as a single entity, without regard to corporate formalities.

     **19.**    **<u>Mayne</u>**

95.    Defendant Mayne Pharma Commercial LLC, f/k/a Mayne Pharma, Inc. ("Mayne Pharma") is a Delaware corporation with its principal place of business in Raleigh, North Carolina. Mayne Pharma is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania. It is a wholly owned subsidiary of Mayne Pharma Group Ltd., a publicly-listed company in Australia.

96.    In 2012, Mayne Pharma acquired Metrics, Inc. and its division, Midlothian Laboratories, and has also operated under the name Midlothian since that time. In 2013, Mayne Pharma acquired Libertas Pharma.

97.    Unless addressed individually, Mayne Pharma, Mayne Pharma Group Ltd., Metrics, Inc., Midlothian Laboratories, and Libertas Pharma are collectively referred to herein as "Mayne." Mayne is collectively defined to include its managers, officers, employees, and agents acting on its behalf. During the Relevant Time Period, Mayne directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Operative Generic Drugs throughout the United States and its territories, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint.

98.    Mayne sold its United States generics portfolio to Defendant Dr. Reddy's on or about April 2023 for approximately $90 million.

20.    **Mylan/Viatris**

99.    Defendant Mylan Inc. ("Mylan Inc.") is a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania.

100.    Defendant Mylan Pharmaceuticals, Inc. ("Mylan Pharma") is a West Virginia corporation with its principal place of business in Morgantown, West Virginia. Mylan Pharma is registered with the Pennsylvania Secretary of State as a foreign corporation and maintains a registered agent in Pennsylvania.

101.    Defendant Mylan Institutional Inc., f/k/a UDL Laboratories Inc., ("Mylan Institutional") is an Illinois corporation with its principal place of business in Rockford, Illinois. Mylan Institutional is a subsidiary of Defendant Mylan Inc.

102.    Mylan Inc. was previously the parent company of Mylan Pharma, but now both corporations are subsidiaries of Defendant Viatris, Inc., a Delaware corporation with its principal place of business in Canonsburg, Pennsylvania. Viatris was formed on or about November 2020 by a merger between Mylan Inc. and Upjohn, a division of Defendant Pfizer that included Defendant Greenstone. Defendants Mylan Inc., Mylan Pharma, Mylan Institutional, and Viatris are collectively referred to herein as "Mylan."

103.    Mylan is defined to include its managers, officers, employees, and agents acting on its behalf. During the Relevant Time Period, Mylan Inc. directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Operative Generic Drugs throughout the United States and its territories, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint.

21.    **Perrigo/Padagis**

104.    Defendant Perrigo New York, Inc. ("Perrigo NY") is a Delaware corporation with its principal place of business in Allegan, Michigan. Perrigo is a subsidiary of Perrigo Company, plc, an

Irish company. Perrigo NY is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

105.    Defendant Padagis US LLC ("Padagis") is a Delaware company with its principal place of business in Allegan, Michigan. On or about July 2021, Perrigo NY sold the generics portion of its business for $1.55 billion to investment firm Altaris Capital Partners, and it now operates as Padagis.

106.    Perrigo NY and Padagis are collectively referred to herein as "Perrigo." Perrigo is defined to include its managers, officers, employees, and agents acting on its behalf. During the Relevant Time Period, Perrigo directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Operative Generic Drugs throughout the United States and its territories, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint.

### 22.    <u>Sandoz Inc./Sandoz AG/Novartis AG/Fougera</u>

107.    Defendant Sandoz Inc. ("Sandoz") is a Delaware corporation with its principal place of business in Princeton, New Jersey. Sandoz is registered with the Pennsylvania Department of State as a foreign corporation.

108.    Defendant Fougera Pharmaceuticals Inc. ("Fougera") is a New York corporation with its principal place of business in Melville, New York. Fougera is a wholly- owned subsidiary of Defendant Sandoz. In 2012, Sandoz acquired and integrated Fougera into its US-based generic pharmaceutical business.

109.    Defendant Novartis AG ("Novartis") is a global pharmaceutical company organized and existing under the laws of Switzerland with its principal place of business is in in Basel, Switzerland.

110.    Defendant Sandoz AG is a company organized and existing under the laws of Switzerland with its principal place of business is in in Basel, Switzerland.

      a.    <u>The Relationship Between Novartis and Sandoz:  Prior to the Sandoz Spinoff, Sandoz and Novartis Operated as a Single Entity, and Novartis Exercised Control Over Sandoz's Actions</u>

111.    Prior to October 4, 2023, Sandoz was an indirect, wholly owned subsidiary of Novartis through which Novartis operated its generic pharmaceutical business in the United States and Sandoz AG was an indirect, wholly owned subsidiary of Novartis through which Novartis operated its global generic pharmaceutical business.

112.    More specifically, Novartis was formed in 1996 by the merger of Ciba- Geigy AG and Sandoz AG. After the merger, the Sandoz name became dormant, with Novartis operating its generic business as Novartis generics. Novartis relaunched its global generics businesses under the Sandoz brand in 2003. Novartis operated its generics business under the revived Sandoz brand through various subsidiary companies, including Sandoz, Inc., Sandoz AG, and Sandoz International GmbH, but all these companies acted as a single functioning entity without regard to corporate formalities.

113.    For all practical purposes, and upon information and belief, Novartis treated Sandoz as part of a larger integrated company and exercised control over its actions, including its decisions related to the manufacture and sale of the generic drugs at issue in this litigation.

114.    For example, and upon information and belief, prior to October 4, 2023, Novartis performed important business functions for Sandoz that an independent corporate entity would typically perform on its own, including accounting, finance, quality and pharmacovigilance, human resources operations, pension administration, legal, real estate and facility services, procurement, information technology, information security, commercial and medical support services, financial reporting, and accounting operations.

115.    Furthermore, and upon information and belief, prior to October 4, 2023, Novartis' technical operations unit also managed the production, supply chain, and quality of the Sandoz division.

116.    In August 2022, Novartis announced its intention to "separate Sandoz, its generics and biosimilars division into a new publicly traded standalone company, by way of a 100% spin-off."

117.    That transaction, known as the Sandoz spin-off, closed on October 4, 2023. On or about that date, Sandoz became a direct subsidiary of Defendant Sandoz AG, alongside of Sandoz International GmbH, and an indirect, wholly owned subsidiary of a new, standalone entity named Sandoz Group AG.

118.    The true nature and extent of Novartis' control over Sandoz was not disclosed to the public. Instead, it was revealed only recently through discovery and motion practice in the *In re generic pharmaceuticals pricing antitrust litigation* MDL (most of which remains under seal or subject to protective order restrictions even today). That discovery shows that for all practical purposes, Novartis treated Sandoz, Inc. as part of a larger integrated company and exercised control over its actions, often through the Sandoz Global entities. Importantly, Novartis' near-complete control over Sandoz extended to its decisions related to the manufacture and sale one or more Operative Generic Drugs at issue in this litigation.

119.    Prior to the spinoff, Sandoz and Novartis maintained common officers and directors, commonly used each other's employees, and freely interchanged their managerial and supervisory personnel.

120.    Novartis' internal corporate infrastructure also drew no distinction between Sandoz and Novartis employees. During the Relevant Time Frame, Sandoz and Novartis both used the Lotus Notes software platform for business collaboration functions such as email, calendars, contact management, and file sharing.

121. Both internally and externally, Novartis continually identified Sandoz as its generics "division" or "segment" or part of the "Novartis Group."

122. More broadly, prior to the Sandoz spin-off, Novartis performed important business functions for Sandoz that an independent corporate entity would typically perform on its own, including accounting, finance, quality and pharmacovigilance, human resources operations, pension administration, legal, real estate and facility services, procurement, information technology, information security, commercial and medical support services, financial reporting and accounting operations.

123. The tight integration between the Sandoz and Novartis businesses facilitated Novartis' ability to benefit from Sandoz's illegal activities. From an accounting perspective, Sandoz's revenues and financial successes were rolled up into the financial results of Sandoz's global operations, and then further consolidated into Novartis's financial statements. In addition, in 2023, Novartis revealed that it had also been limiting Sandoz's ability to maintain cash on hand, by subjecting Sandoz to a cash pooling arrangement where "cash balances were swept by Novartis regularly" from Sandoz's bank accounts. Novartis and the Sandoz entities undertook these activities with the ultimate objective of transferring value and profits to the Novartis organization as a whole, including the illegal profits that arose from the conspiracy alleged herein. The most compelling evidence that Novartis and Sandoz operated as a single entity prior to the spinoff, however, is the fact that Novartis strictly controlled the Sandoz generics business, providing frequent instructions to officers and employees of its Sandoz subsidiaries. With respect to Sandoz, Inc., Novartis AG exercised this control directly as well as indirectly through the Sandoz Global entities (including Sandoz AG) and its other subsidiaries.

124. Novartis controlled and directed nearly every material aspect of the Sandoz business, down to how Sandoz employees were allowed to use computers, how they could share information

with each other, when data would be purged from their computers, and even how and when to communicate externally, including with the media or government.

125.    Novartis also dictated Sandoz's financial targets and how Sandoz needed to achieve those targets in order for Novartis to reap the profits.

126.    Prior to the spin-off, Novartis' technical operations unit also managed the production, supply chain and quality of the Sandoz division.

127.    Moreover, Novartis was heavily involved in—and exercised control over—the conduct at issue in this case. Not only did Novartis control the prices Sandoz could charge, but it determined which customers Sandoz could solicit by participating in, and exercising control over, bidding decisions at Sandoz.

128.    Not only did Novartis control the prices Sandoz could charge, but it determined which customers Sandoz could solicit by participating in, and exercising control over, bidding decisions at Sandoz.

129.    T.O., in particular, was acutely aware of, and involved in dictating, Sandoz's corporate strategies relating to "fair share," and understood the illegal agreements Sandoz had in place with certain competitors regarding fair share. Indeed, CW-3 at Sandoz made it clear to T.O. that he was communicating with competitors and could get any market intelligence that T.O. needed. At times, CW-3 also copied T.O. directly when reporting competitive pricing intelligence he received from competitors.

130.    In addition, as discussed further herein, Novartis personnel were also heavily involved in Sandoz's launch of generic drugs, including drugs that were subject to collusion, particularly with respect to drugs for which Novartis was the brand manufacturer.

131.    Novartis exercised control over Sandoz's strategy for authorized generics, and dictated the timing of Sandoz launches in order to protect its own branded sales. Novartis placed immense

pressure on Sandoz to be successful with these drugs, and directed Sandoz to provide Novartis with competitive intelligence on these drugs so that Novartis could use the information in its business plans.

132.    Finally, in regulatory filings issued in August 2023 in connection with the spinoff described below, Sandoz and Novartis also admitted that the Sandoz business did not, in all prior years, form a separate legal group. The companies also disclosed at that time that Sandoz had in the past been prevented from pursuing certain business development activities, which put it at a competitive disadvantage compared to other generic manufacturers, further demonstrating the control and dominance Novartis exercised over its longtime subsidiaries.

b.    Novartis Took an Active Role in the Government Investigations and Resulting Litigation Related to Sandoz's Illegal Price-Fixing Activities

133.    As evidence of Sandoz's illegal price-fixing activities began to come to light, Novartis AG, working in coordination with its subsidiaries (including Sandoz AG), took an increasingly active role first in covering up Sandoz's conduct, and then later in the resulting government investigations and eventual litigation. As with its involvement in Sandoz's underlying illegal conduct, Novartis and its other subsidiaries (including Sandoz AG) kept their involvement in these activities largely shielded from public view.

134.    Initially, Novartis personnel were involved in formulating responses to media inquiries about the dramatic price increases of generic drugs at issue in this case. This had the effect of fraudulently concealing the fact that these increases were caused by Defendants' unlawful and anticompetitive activities.

135.    Then, in March 2016, Sandoz, Inc. received a criminal subpoena from the Antitrust Division of the United States Department of Justice seeking information related to its ongoing probe of price fixing in the generic drug industry. Even though the subpoena was directed to only Sandoz, Inc.

136.     As litigation over Sandoz's price fixing activities continued in the MDL, Novartis and Sandoz took additional steps to conceal the involvement of Sandoz, Inc.'s corporate parents and affiliates (including Sandoz AG) from the public. Sandoz designated most of documents and testimony it produced in the MDL as "Highly Confidential" under the applicable protective orders, requiring those materials to be kept under seal whenever attached to an otherwise public filing. In addition, in March 2023, Sandoz, Inc. refused to provide a Rule 30(b)(6) witness to testify about its corporate structure and its ability to withstand judgment.

137.     Since that time, both Novartis AG and Sandoz AG have continued to participate in the MDL, albeit more publicly. In September and October 2023, Novartis AG and Sandoz AG both filed briefs, declarations, and letters with the Court opposing a motion for a temporary restraining order related to the Sandoz spinoff. In addition, in April and May 2024, Sandoz AG submitted to the Court two letters and a full brief in opposition to several motions to amend and supplement other MDL complaints under Rule 15 to add Sandoz AG and Novartis AG as defendants. In addition, Sandoz AG sent a lawyer to appear and argue at the Court's May 9, 2024 general status conference.

138.     Finally, and perhaps most significantly, Novartis AG and Sandoz AG have been involved in, and have benefited from, class settlements in this MDL. On February 28, 2024, Sandoz, Inc. and Fougera, Inc. entered into a class settlement with the Direct Purchaser Plaintiffs. Paragraph 13 of that agreement explicitly provides that the DPP's release of claims shall extend to Novartis AG. In addition, Paragraph 13 also provides that the release shall extend to any past or present parents of Sandoz, Inc., which includes Sandoz AG. As such, both Novartis AG and Sandoz AG are "Releasees" under the Sandoz settlement.

139.     Paragraph 26 of the agreement further provides that, as Releasees, Novartis AG and Sandoz AG are intended beneficiaries of the Sandoz Settlement and entitled to enforce its provisions, jurisdiction over which is vested exclusively in this Court.

c.    Novartis and Sandoz Used the Sandoz Spin-Off as a Means to Protect Ill Gotten Gains from the Conspiracy.

140.    By late 2021, Sandoz had already agreed to pay nearly $400 million in criminal fines and civil penalties as a result of its anticompetitve conduct. Specifically, under the March 2020 Deferred Prosecution Agreement discussed above, Sandoz agreed to pay a criminal fine of $195 million, which the DOJ described at the time as the largest criminal fine in history for a domestic antitrust case. Then, in October 2021, Sandoz agreed to pay an additional $185 million in civil penalties to resolve alleged violations of the False Claims Act. By this point, dozens of new private antitrust lawsuits had been filed in the MDL against Sandoz.

141.    As Sandoz, Inc.'s defense to the antitrust charges stretched on, Novartis and Sandoz AG were faced with the harsh reality that their U.S. subsidiary would likely be facing many more years of costly litigation. The magnitude of the company's liability led Novartis, Sandoz AG, and their affiliates to develop other strategies to protect what was left of their ill-gotten gains from the conspiracy.

142.    Chief among these was a scheme to cleave off the Novartis generics business (*i.e.*, Sandoz) into an undercapitalized, debt-laden entity that would ostensibly be separate and independent from Novartis. This effort became known as the Sandoz spinoff, which Novartis announced publicly for the first time on August 25, 2022. While described to the public as a corporate reorganization justified by a shifting business landscape, Novartis and the Sandoz entities were in fact planning to use the spinoff to further the conspiracy described herein by entering into a series of transactions that could, if needed, insulate from judgment the billions of dollars in illegal conspiracy profits that Novartis had siphoned from its U.S. subsidiary and stashed overseas.

143.    After making the August 2022 announcement, Novartis and the Sandoz entities kept the details of the spinoff secret for nearly a year. Then, on August 18, 2023, Novartis issued a Prospectus in which it described, for the first time, how the spinoff would work:

144.    Under the plan, Novartis's old corporate predecessor, Sandoz AG, would hold the shares of Sandoz, Inc. Sandoz AG, in turn, would be held by a new entity, Sandoz Group AG, which would remain a Novartis subsidiary until just before the conclusion of deal. Then, Sandoz, Inc., Sandoz AG, Novartis AG, and many of their affiliates, would engage in a series of complex internal transactions that would, among other things, divide up the assets and liabilities of the two respective businesses, govern employment and tax matters, and define an ongoing development and collaboration relationship. Once these internal transactions and transfers were complete, Novartis AG would distribute the shares of Sandoz Group AG to its own shareholders, making the new Sandoz Group AG an independent entity

145.    Regulatory requirements associated with the spin forced Novartis to release detailed information about the finances and activities of the Sandoz entities, information it had concealed for years. Those disclosures showed that from 2020 to 2022, the years immediately preceding the spinoff, the global Sandoz organization's net sales had fallen by nearly $400 million, a figure that roughly corresponds to a similar decline in net sales from the United States during the same period. Novartis did not separately report out information on the financial health of its U.S. subsidiary, Sandoz, Inc.

146.    Despite Sandoz's declining sales, the terms of the spinoff required Sandoz AG and Sandoz, Inc. to incur massive financial obligations for the benefit of Novartis. Specifically, Sandoz AG and Sandoz, Inc. were required to take out $3.75 billion in new debt, which they did on September 18, 2023.

147.    But almost all of this money went right back to Novartis. On or before October 3, 2023—the day before the spin—the Sandoz entities paid approximately $3.3 billion in cash to Novartis and its affiliates to satisfy the internal transactions required to effectuate the spin. To make matters worse, separate provisions of the spin required Sandoz to pay $600 million in fees to Novartis and others in the future for unspecified technology transfers

148.    Debt was not the only liability that Sandoz assumed as part of the spinoff. Under the terms of the parties' Separation and Distribution Agreement, it appears that Sandoz assumed all of the liabilities associated with the price-fixing activities described herein. Yet, as described above, for years Novartis had been secretly directing those activities and controlling the Sandoz business, while at the same time regularly transferring the proceeds of the illegal conspiracy into its own coffers. The agreement also appears to require Sandoz to assume the liabilities related to opioid litigation in the United States and Canada. Furthermore, the agreement required Sandoz to indemnify and release Novartis and each of its each of its directors, officers, managers, members, agents, and employees against those liabilities.

149.    Novartis and Sandoz also grossly underestimated what Sandoz's contingent liabilities would be after the spin. Specifically, prior to the spin, the companies allocated only $87 million to cover *all* of Sandoz's contingent liabilities related to product liabilities, government investigations, and other legal matters. Those liabilities include not only this price-fixing litigation (where Sandoz is facing billions in potential exposure), but also the ongoing opioid litigation, where Sandoz is named as a defendant in nearly 650 state and federal lawsuits. While Sandoz later increased its litigation reserve to $132 million at the end of 2023, that number still pales in comparison to the potential liability it continues to face. Sandoz has publicly admitted that these liabilities pose a far greater operational risk to a newly-independent Sandoz than when the company operated as a division of Novartis. In addition, Sandoz has also admitted that the new insurance policies it would be able to secure as an independent entity may not be sufficient to cover all of its liability risks.

150.    Finally, the transaction placed a catastrophic tax risk on the newly independent Sandoz entities. As part of the spin, Sandoz and Novartis agreed that should any tax authorities later deem any of the transactions a taxable event, Sandoz must indemnify Novartis and hold it harmless from

any liability. In addition, Sandoz was prohibited from engaging in certain share transfers, business combinations, asset sales, and other transactions for a period of two years following the spinoff.

151. Despite all of this, the spinoff proceeded as planned. On October 4, 2023, after concluding a series of internal transactions and transfers between, among others, Sandoz, Inc., Sandoz AG, and Novartis AG, shares of the newly formed Sandoz Group AG were distributed to existing shareholders of Novartis AG. At that point, Sandoz, Inc. became a direct subsidiary of Sandoz AG and an indirect, wholly owned subsidiary of Sandoz Group AG. In all, only 47 days had passed between the time Novartis first disclosed any meaningful details of the spin (August 18, 2023) to its completion (October 4, 2023).

152. According to its public filings, Novartis shed roughly $14 billion in liabilities to the Sandoz entities as a result of the spin. This number was far in excess of the carrying value of the Sandoz business's net assets at the time of the spin, which Novartis reported to be roughly $8.6 billion.

153. Since then, the current Sandoz organization continues to roll up the profits of Sandoz, Inc. onto the balance sheets of its European parents, Sandoz AG and Sandoz Group AG. And as has been done previously, in the face of substantial liability in this MDL, Sandoz, Inc. continues to funnel cash from its operations up through the new standalone Sandoz organization to Sandoz AG and/or Sandoz Group AG. And to this day, Sandoz AG and its affiliates continue to conceal from the public any detailed information on the financial health of Sandoz, Inc.

154. The parties involved in the Sandoz spinoff, which include Sandoz, Inc., Sandoz AG, and Novartis AG, took these actions in furtherance of the ongoing overarching conspiracy and in service of the conspiracy's aims and goals. Specifically, the parties succeeded in creating a thinly capitalized, debt-ridden generics business holding the liabilities for Sandoz's and Novartis' illegal conduct, while Novartis was able to escape with the ill-gotten gains of the conspiracy and protect them overseas.

155.    Unless addressed individually, Sandoz, Fougera, Sandoz AG, and Novartis AG are collectively referred to herein as "Sandoz" or "Fougera/Sandoz." Sandoz, and Fougera/Sandoz, is defined to include its managers, officers, employees, and agents acting on its behalf. During the Relevant Time Period, Sandoz directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Operative Generic Drugs throughout the United States and its territories, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint.

### 23.    **Teva**

156.    Defendant Teva Pharmaceuticals USA, Inc. ("Teva") is a Delaware corporation with its principal place of business in Parsippany, New Jersey. Teva is a wholly owned subsidiary of Teva Pharmaceutical Industries, Ltd., an Israeli corporation. Teva is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

157.    Teva is defined to include its managers, officers, employees, and agents acting on its behalf. During the Relevant Time Period, Teva directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Operative Generic Drugs throughout the United States and its territories, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint.

### 24.    **Upsher-Smith**

158.    Defendant Upsher-Smith Laboratories, LLC (f/k/a Upsher-Smith Laboratories, Inc.) ("Upsher-Smith") is a Minnesota company with its principal place of business located in Maple Grove, Minnesota. Upsher-Smith is a wholly owned subsidiary of Sawai Pharmaceutical Co., Ltd., a Japanese company headquartered in Osaka, Japan.

159.    Upsher-Smith is defined to include its managers, officers, employees, and agents acting on its behalf. During the Relevant Time Period, Upsher-Smith directly participated in the

conspiracy alleged in this Complaint, produced and sold one or more Operative Generic Drugs throughout the United States and its territories, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint.

### 25.    <u>Wockhardt/Morton Grove</u>

160.    Defendant Wockhardt USA LLC ("Wockhardt USA") is a Delaware corporation with its principal place of business in Parsippany, New Jersey. Wockhardt USA was established by Wockhardt Limited, an Indian pharmaceutical company based in Mumbai, India.

161.    On or about October 2007, Wockhardt Limited acquired Defendant Morton Grove Pharmaceuticals, Inc. ("Morton Grove"), a Delaware corporation with its principal place of business in Morton Grove, Illinois. Morton Grove is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

162.    Wockhardt USA's parent company is Morton Grove, whose parent company is Wockhardt Holding Corp., who is in turn owned by Wockhardt Bio AG, who is owned by Wockhardt Limited. Wockhardt USA and Morton Grove are collectively referred to herein as "Wockhardt."

163.    Wockhardt is defined to include its managers, officers, employees, and agents acting on its behalf. During the Relevant Time Period, Wockhardt directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Operative Generic Drugs throughout the United States and its territories, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint.

### 26.    <u>Zydus</u>

164.    Defendant Zydus Pharmaceuticals (USA) Inc. ("Zydus") is a New Jersey corporation with its principal place of business located in Pennington, New Jersey. Zydus is a wholly owned

subsidiary of Zydus Pharmaceuticals, a global company based in Ahmedabad, India. Zydus is registered with the Pennsylvania Department of State as a foreign corporation.

165.    Zydus is defined to include its managers, officers, employees, and agents acting on its behalf. During the Relevant Time Period, Zydus directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Operative Generic Drugs throughout the United States and its territories, knowingly received conspiracy proceeds, and engaged in the unlawful conduct alleged in this Complaint.

## C.    Additional Co-Conspirators

166.    Although not named as Defendants in this lawsuit, various other persons, firms, corporations, and entities have participated as co-conspirators with Defendants during the Relevant Time Period. Examples of such co-conspirators include, without limitation: Akorn Operating Company LLC ("Akorn LLC"), which was previously known as Akorn, Inc. prior to a Chapter 11 bankruptcy filing on or about May 2020, and its subsidiaries Akorn Sales, Inc., Hi-Tech Pharmacal Co., Inc., and Versapharm, Inc.; Apotex Corp. ("Apotex"); Breckenridge Pharmaceutical, Inc. ("Breckenridge"); Heritage Pharmaceuticals, Inc. ("Heritage"), which was acquired by Emcure Pharmaceuticals, Ltd. ("Emcure") in 2011; Strides Pharma, Inc. ("Strides"). Sun Pharmaceutical Industries, Inc. (f/k/a Caraco Pharmaceutical Laboratories, Ltd.) ("Sun Pharma"), a wholly owned subsidiary of Sun Pharmaceutical Industries, Ltd. ("Sun Ltd."), and which acquired URL Pharma, Inc. ("URL") and Mutual Pharmaceutical Company, Inc. ("Mutual") in 2012[6]; Taro Pharmaceuticals U.S.A., Inc. ("Taro"); Teligent, f/k/a IGI Laboratories, Inc. ("Teligent"), which filed for Chapter 11 bankruptcy on or about October 2021, and which  as part of its restructuring, sold its topical generic drugs in the United States to Pharmaceutical Associates Inc. ("PAI Pharma") on or about February

---

[6] Unless addressed individually, Sun Pharmaceutical Industries, Ltd, Caraco Pharmaceutical Laboratories, Ltd. URL Pharma, Inc., and Mutual Pharmaceutical Company, Inc. are collectively referred to herein as "Sun."

2022; Torrent Pharma, Inc. ("Torrent"); Par Pharmaceutical, Inc. ("Par Pharma") and its parent company Endo International plc ("Endo"), an Irish company with its global headquarters in Dublin, Ireland and its United States headquarters in Malvern, Pennsylvania;[7] Endo's other subsidiaries, including Generics Bidco I LLC ("Qualitest") and DAVA Pharmaceuticals, LLC ("DAVA"); and any and all of the individuals alleged to commit conspiratorial acts in this Complaint, including without limitation any person listed in Exhibit B to this Complaint.[8]

167.    The above examples of co-conspirators are not intended to be an exhaustive list. Defendants' co-conspirators for whom they are jointly and severally liable include any person or entity alleged herein to have committed any act or to have made any statement in furtherance of the antitrust violations and conspiracies alleged herein, as well as other individuals and entities whose identities are not currently known to Walmart. Walmart may amend this Complaint to allege the names of additional co-conspirators as they are discovered.

## V.    THE GENERIC DRUG MARKET[9]

168.    When a drug company releases a new branded product on the market, it typically enjoys a period of exclusivity—whether by statute or as a result of patent protection—where it is the only manufacturer of a drug and can set prices without regard to competition. As these legal

---

[7] Endo acquired Par Pharma on or about September 2015. After Endo acquired Par Pharma in September 2015, Par Pharma was the United States generics business unit of Endo. Endo and certain of its affiliates, including Par Pharma, filed for Chapter 11 bankruptcy protection in August 2022. On March 19, 2024, Endo announced the bankruptcy court's approval of its reorganization plan. Upon information and belief, under that plan, substantially all of the company's assets will be transferred to a new entity, Endo, Inc. That transaction was expected to close in April 2024, which will complete the company's restructuring and permit it to emerge from bankruptcy. As a result, Walmart reserves the right to add Endo, Inc. as a defendant in this matter. Par Pharma, Endo, Qualitest, and DAVA are collectively referred to herein as "Par" for the time period after September 2015. Prior to September 2015, Par refers solely to Par Pharma.

[8] Apotex, Breckenridge, Heritage, Sun, and Taro settled with the direct purchaser class. Walmart did not opt out of those settlements. Sandoz also settled with the direct purchaser class. Walmart timely opted out of that settlement.

[9] As a general rule throughout this Complaint, where multiple allegations in a given paragraph rely on the same source, a single footnote at the end of the paragraph is provided instead of individual citations after each sentence.

monopolies expire, generic drug companies enter the market to provide much-needed competition that lowers prices and improves access to medications for patients.

169.    According to the U.S. Food & Drug Administration ("FDA"), "generic medicines work in the same way and provide the same clinical benefit and risks as their brand-name counterparts." To obtain FDA approval, a generic medicine must be the same as a brand-name medicine in dosage, safety, effectiveness, strength, stability, and quality, as well as in the way it is taken. Generic medicines also have the same risks and benefits as their brand-name counterparts.[10]

170.    In a competitive market, generic drugs cost substantially less than branded drugs. According to the FDA, within a year of the first generic approval, "we often see prices fall by more than 75 percent compared to the brand price."[11] And a 2010 study by the Federal Trade Commission ("FTC") found that in a mature generic market, generic prices are, on average, 85 percent lower than the pre-entry branded drug price.[12] Mature generic markets typically have several manufacturers that compete for sales, hence keeping prices in check.

171.    Because generics of the same brand-name drug are readily substitutable, pricing is the main differentiating feature. As recognized by the FTC, "generic drugs are commodity products" and, as a consequence, are marketed "primarily on the basis of price."[13] In a competitive market, generic manufacturers cannot significantly increase prices (or maintain high prices in the face of a competitor's lower price) without losing a significant volume of sales.

---

[10] Generic Drug Facts, FDA (Nov. 1, 2021), https://www.fda.gov/drugs/generic- drugs/generic-drug-facts.

[11] Estimating Cost Savings from New Generic Drug Approvals in 2021, FDA (Sept. 2023), https://www.fda.gov/media/172608/download.

[12] Pay-For-Delay: How Drug Company Pay-offs Cost Consumers Billions, Federal Trade Comm'n (Jan. 2010), http://www.ftc.gov/os/2010/01/100112payfordelayrpt.pdf.

[13] Authorized Generic Drugs: Short-Term Effects and Long-Term Impact, Fed. Trade Comm'n (Aug. 2011), http://www.ftc.gov/os/2011/08/2011genericdrugreport.pdf.

A.    **The Hatch-Waxman Act**

172.    In 1984, Congress enacted the Drug Price Competition and Patent Term Restoration Act, commonly known as the Hatch-Waxman Act. Its intention was to encourage innovation while at the same time promoting competition between brand and generic drugs to lower drug prices. To encourage innovation, Hatch-Waxman gave branded drug manufacturers longer periods of statutory market exclusivity (independent of their patent protection) for newly approved products, which increased the companies' financial returns for investment in drug research and development.

173.    To promote price competition, the law established a new regulatory approval pathway for generic products, known as the Abbreviated New Drug Application (or ANDA). These applications rely on the safety and efficacy evidence previously submitted by the branded drug manufacturer, permitting generic manufacturers to avoid conducting costly and duplicative clinical trials that a branded drug company must incur as part of a "New Drug Application" or "NDA." If an ANDA was submitted during the term of a branded company's patent exclusivity, the statute also provided a mechanism under which the branded drug company's patent rights could be tested in court. Last year, the FDA approved or tentatively approved 956 ANDAs.[14]

174.    Since the law was passed in 1984, generic drugs have moved from being less than 20 percent of prescriptions filled in the United States to over 90 percent of prescriptions filled.[15]

B.    **The Importance of Generic Drugs**

175.    Like their branded counterparts, generic drugs are utilized in the diagnosis, cure, mitigation, treatment, and/or prevention of disease and, thus, are integral components in modern healthcare and improving the health and quality of life for people in the United States. But they do so at a fraction of the cost, making them a critical component of the U.S. healthcare system.

---

[14] Office of Generic Drugs 2023 Annual Report 1, FDA (Jan. 2024), https://www.fda.gov/media/176440/download.

[15] Office of Generic Drugs 2022 Annual Report 1, FDA (Jan. 2023), https://www.fda.gov/media/165435/download.

176.    A branded drug manufacturer that develops an innovative drug can enjoy exclusive rights to market and sell the drug in the United States, whether through its patent rights or through certain types of statutory exclusivity provided by the FDA. During this period, the manufacturer markets and sells its drug under a brand name, and the lack of competition can permit the manufacturer to set extremely high prices as a result of monopoly power.

177.    Once the brand-name drug's exclusivity period ends, competition from generic manufacturers often leads to dramatic price reductions, delivering a critical benefit to consumers. In fact, generic drugs are so important to the health care system that every state has adopted substitution laws requiring or permitting pharmacies to automatically substitute generic drug equivalents for branded drug prescriptions (unless the prescribing physician specifically orders otherwise by writing "dispense as written" or similar language on the prescription).

178.    Generic medications offer substantial savings to consumers because—in a competitive market—as lower-priced generics become available, the brand drug quickly loses market share as purchasers switch to the less expensive alternatives. Over time, as more firms enter the market and compete with each other on price in order to capture market share, the price of a generic drug approaches the manufacturers' marginal costs.

179.    In fact, as each new generic manufacturer enters the market, the relative price of a generic drug to its branded counterpart falls conspicuously, as shown by the following analysis from the FDA in 2005:[16]

---

[16] William S. Comanor, Pharmaceutical Markets in Japan and the United States, 16 Int'l J. of Econ. Policy Studies 355, 360 (Aug. 2022).



**Fig. 2** Generic competition and drug prices. Source: FDA analysis of retail sales data from IMS Health, IMS National Sales Perspective (TM), 1999–2004, extracted February 2005

180.     In 2016, a government report confirmed this phenomenon in interviews with generic manufacturers, who admitted that "as each new manufacturer enters an established generic drug market the price of that generic will fall, with one manufacturer noting that it is typically a 20 percent price decline per entrant."[17]

181.     Thus, when there are multiple generic manufacturers in an established generic market, prices should remain low and stable, and should not increase absent a market disruption or, as is the case here, anticompetitive conduct.

---

[17]    Generic Drugs Under Medicare 23, U.S. Government Accountability Office (August 2016), https://www.gao.gov/assets/680/679022.pdf.

C.      **The Generic Drug Distribution System**

182.    At a high level, the generic pharmaceutical supply chain can be summarized as follows: Manufacturers sell drugs to wholesalers or to large retail pharmacies like Walmart. Pharmacies dispense the drugs to consumers, who pay the full retail price if they are uninsured, or a portion of the retail price (e.g., a co-pay or co-insurance) if they are insured. The insured consumers' health plans (or their plan sponsors) then pay the pharmacies additional amounts that are specified in agreements between them and the pharmacies. These agreements and payments are sometimes arranged and intermediated by middlemen known as Pharmacy Benefit Managers ("PBMs").

183.    Drug manufacturers are the source of the prescription drugs in the pharmaceutical supply chain. Unlike branded drug manufacturers, generic manufacturers typically do not develop new drug therapies, but instead, manufacture generic drugs that can be substituted (often automatically under state law) for the branded drug after expiration of the brand's exclusivity. Generic pharmaceuticals can be manufactured in a variety of forms, including tablets, capsules, injectables, liquids, ointments, and creams. A manufacturer seeking to sell a "new drug" in the United States (including generic versions of previously approved branded drugs) must obtain approval from the FDA, which evaluates many factors, including drug safety, efficacy, raw material suppliers, manufacturing processes, labeling, and quality control.

184.    Generic drug manufacturers operate manufacturing facilities and compete with each other to sell the generic drugs they produce to wholesalers, distributors, retail pharmacy chains, mail-order and specialty pharmacies, hospital chains, and some health plans.

185.    In marketing their generic drugs, manufacturers often do not attempt to differentiate their products because a generic drug is a commodity. Consequently, competition is dictated by price and supply. As a result, generic drug manufacturers usually all market the drug under the same name, which is the name of the active ingredient (e.g., Lidocaine).

43

186.    In a competitive commodity market, a new manufacturer must offer prices lower than the competition to win customers. In the anticompetitive, "fair share" market created by Defendants, the Defendants made room for new entrants in the market for each of the Operative Generic Drugs to ensure that newcomers would not attempt to win market share by offering lower, more competitive prices. The "fair share" market newcomers were thus able to enter the particular generic drug's market at an artificially elevated price, and thereafter, Defendants were able to raise their prices, customer-by-customer, with knowledge that their "fair share" of the market was safe from competition.

187.    Drug suppliers include the manufacturers themselves, as well as other companies that have agreements to sell or distribute certain generic pharmaceutical drugs manufactured by another company. The Defendants in this action are all drug manufacturers and suppliers who compete with one another for the sale of generic pharmaceutical drugs which are ultimately sold to healthcare providers and others in the United States.

188.    Drugs sold in the United States may be manufactured either domestically or abroad. Many manufacturers that produce drugs for the United States market are owned by, or are, foreign companies. Generic drugs may be manufactured by the same companies that manufacture branded drugs or may come from companies that manufacture generics exclusively. Drug manufacturers typically sell their products through supply agreements negotiated with their customers.

189.    The Defendants are among the largest generic pharmaceutical manufacturers in the industry. Each has a broad portfolio of generic drugs which it sells to distributors, retailers and group purchasing organizations, many of whom have a nationwide presence. Competitors for particular pharmaceutical products vary given the shifting pharmaceutical landscape as drugs lose exclusivity, and as manufacturers decide to enter or exit an existing drug market. At all times relevant to this Complaint, every Defendant's portfolio remained broad, and was marketed to customers in virtually every state across the United States.

190.    The Defendants' customers supply generic pharmaceuticals to a wide swath of patient populations, including but not limited to Medicaid recipients; private and public sector employees with commercial payor, employer-funded, or self-funded health plans; patients in nonprofit, for-profit, and/or public hospitals or long-term care facilities and uninsured "cash pay" patients.

191.    The generic pharmaceutical portfolios of the Defendants run the gamut of indications, servicing a wide range of health needs. These include potentially less common health problems such as such as human immunodeficiency virus (HIV) treated with Lamivudine/Zidovudine (generic Combivir) or parasitic infections of the gastrointestinal system treated with Paromomycin, as well as medications utilized every day like birth control (e.g., generic Kariva, Portia, Jolessa, Balziva) or antibiotics (e.g., Azithromycin, Doxycycline, Tobramycin).

**D.    The Cozy Nature of the Industry and Opportunities for Collusion**

192.    The generic drug market is structured in a way that allows generic drug manufacturers, including but not limited to the Defendants, to interact and communicate with each other directly and in person, on a frequent basis.

**1.    <u>Trade Association and Customer Conferences</u>**

193.    Many large wholesalers and distributors hold multi-day conferences throughout the year in various locations throughout the United States. Generic drug manufacturers from across the United States are invited to attend.

194.    Additionally, generic drug manufacturers also attend various industry trade shows throughout the year, including those hosted by the National Association of Chain Drug Stores ("NACDS"), the Healthcare Distribution Management Association ("HDMA") (now the Healthcare Distribution Alliance), the Generic Pharmaceutical Association ("GPhA") (now the Association for Accessible Medicines), and the Efficient Collaborative Retail Marketing Company, LLC ("ECRM"), in locations throughout the United States.

45

195.    At these conferences and trade shows, sales representatives from many generic drug manufacturers, including Defendants, interact with each other and discuss their respective businesses and customers. Many of these conferences and trade shows include organized recreational and social events such as golf outings, lunches, cocktail parties, and dinners that provide additional opportunities to meet with competitors. Defendants use these opportunities to discuss and share competitively sensitive information concerning upcoming bids, specific generic drug markets, pricing strategies, and pricing terms in their contracts with customers.

196.    These trade shows and customer conferences provide generic drug manufacturers, including Defendants, with ample opportunity to meet, discuss, devise, and implement a host of anticompetitive schemes that unreasonably restrain competition in the United States' market for generic drugs.

### 2.    Industry Dinners and Private Meetings

197.    In addition to these frequent conferences and trade shows, senior executives and sales representatives gather in smaller groups, allowing them to further meet face-to-face with their competitors and discuss competitively sensitive information.

198.    Many generic drug manufacturers, including several of the Defendants, are headquartered near one another in New Jersey or eastern Pennsylvania, giving them additional opportunities to foster connections and meet and collude. At least forty-one (41) different generic drug manufacturers are concentrated between New York City and Philadelphia, including, among others, Defendants Actavis, Amneal, Aurobindo, G&W, Glenmark, Greenstone, Lannett, Pfizer, Sandoz, and Wockhardt.

199.    High-level executives of many generic drug manufacturers get together periodically for "industry dinners." For example, in January 2014, at a time when the prices of numerous generic drugs were reportedly soaring, at least thirteen (13) high-ranking executives, including CEOs,

Presidents, and Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey. Executives from Defendants Actavis, Aurobindo, Lannett, and Perrigo (including Douglas Booth, a former CEO of Defendants Impax and Actavis and former Executive VP of Defendant Perrigo), among executives from many other generic manufacturers, were invited to this dinner.[18]

200.    At these industry dinners, one company is usually responsible for paying for all the attendees. For example, in a group email conversation among competitors in December 2013, one of the participants joked: "You guys are still buying for Mark and I right?" The response from another executive: "Well . . . I didn't think the topic would come up so quickly but . . . we go in alphabetical order by company and [a generic drug manufacturer not identified in this Complaint] picked up the last bill. . . . PS. no backing out now! Its [sic] amazing how many in the group like 18 year-old single malt scotch when they aren't buying."

201.    Other groups of competitors gather routinely for golf outings, where they have the opportunity to spend several days at a time together without interruption. One such annual event was organized by a packaging contractor in Kentucky. From September 17-19, 2014, for example, high-level executives from Defendants Actavis, Amneal, Lannett, Wockhardt, and others were invited to a gathering at a Country Club in Bowling Green, Kentucky where they would play golf all day and socialize at night.

202.    Some generic pharmaceutical sales representatives also get together regularly for what they refer to as a "Girls Night Out" ("GNO"), or alternatively "Women in the Industry" meetings or dinners. During these events, the sales representatives meet with their competitors and discuss competitively sensitive information.

---

[18] For ease of reference, an index of the individuals discussed herein, along with their company affiliations and job titles during the Relevant Time Frame, is included in Exhibit B to this Complaint.

203.    Many "Women in the Industry" dinners were organized by A.S.,[19] a salesperson from Heritage Pharmaceuticals, Inc. who resides in the State of Minnesota. Other participants in these meetings were employees of generic drug manufacturers located in Minnesota, or salespeople residing in the area. However, out-of-town sales representatives were also aware of these dinners and were included when in the area. For example, in November 2014, Tracy Sullivan DiValerio, a sales executive at Defendant Lannett, sent A.S. a text message asking "[w]hen is your next industry women event? I'm due for a trip out there and I'd love to plan for it if possible." A.S. responded: "There is an XMas [sic] party at Tanya's house on Dec 6th. Yes that is a Saturday. We do it about once a quarter and usually it is during the week—this was an exception."

204.    Sometimes dinners were also planned around visits of out-of-town competitors. As A.S. stated in organizing one such dinner: "Sorry if the meeting/dinner invite is a little short notice, but [K.N., a National Account Representative at Dr. Reddy's] will [be] in MN on Sept 29th and it would be a great time for everyone to get together! So much has been happening in the industry too— we can recap all our findings from NACDS [trade show] over a martini or glass of wine! :) Plus the food is super Yummy!" Representatives from Defendant Perrigo, among others, were also invited to this dinner.

205.    Several different GNOs were held in 2015, including: (1) at the ECRM conference in February (involving Defendants Greenstone, Lannett, and Bausch, among others); and (2) in Baltimore in May (involving Defendants Lupin and G&W, including Erika Vogel-Baylor, G&W's vice president of sales and marketing, among others); and (3) at the NACDS conference in August (involving Defendant Bausch, among others).

---

[19] Initials are utilized throughout this Complaint to identify individuals whose involvement in the overarching conspiracy may be subject to protective and/or confidentiality orders. Where multiple individuals share the same initials, they are identified as "X.X.," "X.X.1," "X.X.2" and so on. These individuals are also listed in Exhibit B for ease of reference.

206.    As a result of these communications, sales and marketing executives in the generic pharmaceutical industry are well aware of their competitors' current and future business plans. This reciprocal sharing of inside information greatly facilitates agreements among competitors to allocate markets to avoid price competition.

E.    **Generic Drug Prices Skyrocket in 2013**

207.    Against this industry backdrop, the prices for a large number of generic pharmaceutical drugs skyrocketed throughout at least 2013 and 2014. According to the Centers for Medicare and Medicaid Services, the prices of more than 1,200 generic medications increased an average of 448 percent between July 2013 and July 2014. A separate analysis conducted by Defendant Sandoz showed that during the calendar years 2013 and 2014, there were 1,487 "large price increases" (increases of the wholesale acquisition cost ("WAC") price greater than 100 percent), of which 12 percent (178) were increased by greater than 1,000 percent.

208.    These increases in 2013 and 2014 were staggering compared to prior years. The following table (which contains information about WAC pricing changes through October 2014 only) demonstrates the dramatic surge in the number of large drug price increases per year in 2013 and 2014:

|  | Year | Total Number of Increases | Increases Greater than 100% | Increases Greater than 50% |
|---|---|---|---|---|
|  | 2010 | 3820 | 125 | 260 |
|  | 2011 | 4265 | 255 | 409 |
|  | 2012 | 4071 | 223 | 433 |
|  | 2013 | 5694 | 739 | 1072 |
| YTD Oct. | 2014 | 4461 | 637 | 1521 |

209.    A January 2014 survey of 1,000 members of the National Community Pharmacists Association ("NCPA") found that more than 75 percent of the pharmacists surveyed reported higher

49

prices on more than 25 generic drugs, with the prices spiking by 600 percent to 2,000 percent in some cases.

210.    More than $500 million of Medicaid drug reimbursement during the twelve months ending on June 30, 2014 was for generic drugs whose prices had increased by over 100 percent.

## VI.    DEFENDANTS' RESTRAINT OF TRADE[20]

211.    The staggering price increases detailed above sparked outrage from politicians, payers, and consumers across the country whose costs have doubled, tripled, or even increased by 1,000 percent or more. Generic drug manufacturers argued publicly that the significant price increases were due to a myriad of lawful factors, such as industry consolidation, FDA-mandated plant closures, or elimination of unprofitable generic drug product lines. However, as government investigations and plea bargains have revealed, these reasons were far from the truth.

212.    In fact, these price increases—and others that followed—were not the result of market forces present in a competitive market. They were, instead, the carefully calculated result of widespread anticompetitive conduct across an entire industry to allocate markets and customers in order to artificially drive up the price of hundreds of generic drugs to supra-competitive levels.

213.    The bulk of this Complaint is dedicated to conspiracy allegations regarding over 200 individual drugs, many of which revolve around key conspirators such as Heritage, Teva, and Taro. These interlocking and overlapping conspiracies are not independent from one another. They are joined by what this Court has previously called the "connective tissue" of an overarching "fair share" conspiracy, whereby each of the conspirators engaged in a broad agreement to allocate markets for its products and artificially raise prices, which in turn permitted other members of the cartel to do the

---

[20] Many of the allegations in this Complaint cite to evidence, including call records and excerpts of documents, that has been made public in other lawsuits, including the three State AG actions as well as the class cases and direct-action cases that are part of the MDL. Such allegations herein are made upon information and belief that the underlying documents and records contain the evidence that is cited.

same. *See In re Generic Pharmaceuticals Pricing Litig.*, 394 F. Supp. 3d 509, 525 (E.D. Pa. 2019) (denying motion to dismiss overarching conspiracy allegations).

## A.    The Overarching "Fair Share" Conspiracy Between Drug Manufacturers

214.    The overarching conspiracy among generic manufacturers—which ties together all the agreements on individual drugs identified in this Complaint—is an agreed-upon code that each competitor is entitled to its "fair share" of the market, whether that market is a particular generic drug or a number of generic drugs.

215.    Coined "fair share," the term is generally understood as an approximation of how much market share each competitor is entitled to, based on the number of competitors in the market, with a potential adjustment based on the timing of entry. Rather than compete vigorously for new business, both the new competitors and existing firms engage in a variety of anticompetitive practices to ensure that each manufacturer obtains and maintains the agreed-upon share. Once a manufacturer has achieved its "fair share," it is generally understood that the competitor will no longer compete for additional business. The common goal or purpose of this overarching agreement is to keep prices high, avoid price erosion, and serve as the basis for further supra-competitive price increases.

216.    From this broad agreement among all Defendants to market and sell their products under a "fair share" understanding sprang subsidiary agreements among the Defendants relating to each of the Operative Generic Drugs.

217.    As illustrated throughout this Complaint, this scheme to minimize competition and allocate "fair share" is typically implemented as follows. First, Defendants allocate the market for an individual drug based on the number of competitors and the timing of their entry so that each competitor obtains an acceptable share of the market. Then, the competitors agree on ways to avoid competing on price and, at times, significantly raise price. This pattern is frequently followed even in

51

the absence of direct communication between the competitors, demonstrating the universal code of conduct agreed to by Defendants.

218.    Although these general parameters are well-known, there is no precise method for apportioning "fair share" because market share is ultimately determined by either winning or maintaining the business of various customers, which is inherently variable in a given year. The shared objective, however, is to attain a state of equilibrium, where no competitors are incentivized to compete for additional market share by eroding price.

219.    This common goal was stated succinctly by Ara Aprahamian, who advised the Taro Pricing Department in training documents from September and November 2013 that "[g]iving up share to new entrant (as warranted) shows responsibility and will save us in the long run" and "[d]on't rock the boat - [g]reedy hogs go to slaughter." As demonstrated throughout the Complaint, Aprahamian's idea of "responsibility" meant constantly reaching out to competitors in order to coordinate giving up share to reach a "fair" allocation and keep prices high.

220.    Further, because of this "fair share" understanding, it was not essential for the competitors to communicate with each other in advance of every price increase, although they often did so anyway. So long as the competitor knew before it was approached by customers that the reason for the solicitation was due to a price increase by the incumbent supplier, the competitor knew not to compete for the business. Similarly, the competitor knew it would have the opportunity, which it often took, to follow the increase with a comparable price increase of its own.

1.    **The Parameters of the Overarching Conspiracy — "Playing Nice in the Sandbox"**

221.    When a generic manufacturer participates in this scheme, and prices stay high, this is viewed as "playing nice in the sandbox." As D.K., a senior Fougera executive, explained in an internal e-mail from July 2011 regarding sales of Imiquimod Cream: "it was an outstanding month as everyone is playing nicely in the sandbox and the price has stayed way above plan." Similarly, in December

2014, Defendant Teva was approached by a customer on behalf of one of Teva's competitors. The large retail customer indicated that Teva's competitor was entering the market for a particular drug not identified in this Complaint and was seeking to target specific customers. The customer specifically requested that Teva give up a specific large customer to the new entrant and indicated that the new entrant—Teva's competitor—"has promised to play nice in the sandbox." After discussing the matter internally, a Teva representative responded to the customer: "[t]ell [the competitor] we are playing nice in the sandbox and we will let them have [the targeted customer.]"

222.    When a generic manufacturer is "playing nice in the sandbox," it is generally referred to as a "responsible" or "rational" competitor. For instance, in May 2013, R.T., a senior sales and marketing executive at Sandoz, sent an internal e-mail to the CEO of Sandoz, stating: "My sense is that Sandoz is viewed by customers and competition as a respectful/responsible player in the market, which we should be proud of and has taken years to develop. I would be very careful [not] to destroy this through behavior that is too aggressive or desperation."

223.    Sandoz, in turn, uses that same terminology to refer to its competitors that are acting in accordance with "fair share" principles. For example, in internal company presentations throughout 2014, Sandoz consistently referred to Defendant Actavis as a "responsible competitor" and to Co-conspirator Taro as a "very responsible price competitor."

224.    Adherence to the rules regarding "fair share" is critical to maintaining high prices. Indeed, that is the primary purpose of the agreement. If even one competitor does not participate (and thus behave in accordance with) the larger understanding, it can lead to unwanted competition and lower prices. In the relatively few instances where a competitor prioritizes gaining market share over the larger understanding of maintaining "fair share," that competitor is viewed as "irresponsible," and may be reprimanded by other competitors.

225.    "Fair share," "playing nice in the sandbox," and similar terminology have become part of the industry lexicon, and thus part of the larger understanding among Defendants. Generic drug manufacturers actively and routinely monitor their fair share and that of their competitors, as well as discuss market allocation among each other within the context of agreements on specific drugs, as set forth more fully below.

226.    This "fair share" understanding has been particularly effective when a new competitor enters the market—a time when, in a free-functioning, competitive market for generic drugs, prices would be expected to go down. The new competitor will either approach or be approached by the existing competitors. Indeed, new and existing entrants know that they can call each other, as necessary, to discuss how to implement the "fair share" agreement to an expanded number of competitors. As a result of these communications, existing competitors will agree to "walk away" from a specific customer or customers by either refusing to bid or submitting a cover bid. These agreements to allocate specific customers between incumbents and new entrants means that the new competitor's transition into the market is seamless; the new entrant is ceded market share and immediately charges a supra-competitive price. The competitors then continue this process of dividing up customers until the market reaches a new artificial equilibrium. Defendants and their co-conspirators refer to this as a "stable" market.

227.    Co-conspirator Taro went so far as to create a graphic representation of that understanding, considering both the number of competitors and order of entry to estimate what its "fair share" should be in any given market:



228.    "Fair share" principles also dictate how generic drug manufacturers respond when a competitor experiences supply issues. If a manufacturer's supply disruption is temporary, contrary to the ordinary unilateral behavior that would occur in a competitive market, its competitors will refrain from using the disruption to win that manufacturer's business from the customers it can no longer supply or taking any other action that might upset the agreed-upon fair share arrangement. By contrast, if the disruption is for a longer term, the competitors will divide up customers until each player achieves a revised "fair share" based on the number of players remaining in the market.

229.    The "fair share" agreement was not limited to a specific drug or even a subset of drugs. Instead, the agreement between all Defendants was premised on the understanding that they are current or future competitors with each other across numerous generic drugs. All of these Defendants market and sell multiple products. The effectiveness of an agreement on any one drug would be limited and unstable without a broader agreement that encompassed other drugs as well. For example, an agreement between two Defendants to raise prices or to allocate market share on one drug would not likely hold where those same two Defendants engaged in vigorous price competition on another drug, or where a third manufacturer not party to that agreement entered the market with an intent to compete on price. Therefore, Defendants understood that in order to be effective, their agreement needed to extend to multiple manufacturers and drugs.

230.    In fact, each of the Defendants are competitors or potential competitors with each other for every Operative Generic Drug. That is because Defendants can buy, trade, or license each others' already-approved ANDAs. Because many of the Defendants do not make all the drugs they sell but instead subcontract to third party factories, they are always industry competitors of one another even if they are not product competitors at a certain moment. When current manufacturers learn that a new entrant has an ANDA, but has not yet announced prices or begun production, conspirators use the time before the newcomer's debut to coordinate fair share details.

231.    As a result, decisions on "fair share" were, at times, based on conduct that occurred between competitors across more than one generic drug market. To maintain the artificial equilibrium, customers in one drug market might be traded for customers in another drug market in an effort to arrive at a more global "fair share" outcome. Alternatively, competitors might allow price increases on one or more generic drugs without competing based on a quid pro quo from other competitors on different drugs.

232.    For example, in August 2013, Sandoz created a "Projected Behavior – Competition Database" which came "to fruition as a concept" when Sandoz was "looking for additional share in the NT cream market" and was "afraid of any potential 'retaliation' of Taro on other market[s] where Sandoz and Taro compete." The database allowed Sandoz to analyze whether taking share from a competitor in one product market would cause that competitor to retaliate in another product market where the competitors overlapped. Sandoz measured the "likelihood of retaliation" on whether the competitor had its "fair share" in the other product markets.

233.    Further, in October 2013, CW-1, a senior pricing executive at Sandoz, sent an internal e-mail stating that Sandoz had decided not to bid at a large retail customer on two products on which it overlapped with Mylan. CW-1 explained his reasoning as follows: "We have been running up against Mylan a lot lately (Nadolol/Benaz/Hctz) and fear blowback if we take any more products at

this moment. Trying to be responsible in the sandbox." Further, in June 2014, Sandoz again chose not to bid on a product at a Mylan customer out of concern that Mylan would retaliate. As CW-1 explained: "I do not want to pursue, I believe this is due to a Mylan increase. We have a lot of products crossing over with Mylan right now, I do not want to ruffle any feathers."

234.    Similarly, as discussed more fully below, Rajiv Malik, the President of Mylan, told the CEO of Heritage that Mylan would "play fair" as Heritage entered the Doxy DR market and agreed that Mylan would give up two large accounts to Heritage. Malik specifically cited Heritage's prior agreement to allow Mylan to enter the market for another drug without competition as a reason that Mylan would cede share to Heritage in this instance.

235.    As these examples make clear, the agreement among generic manufacturers transcends product markets as these companies make decisions not only based on what impact their actions will have in a given product market, but also on how those actions will impact other product markets where the competitors overlap, and any future markets where they might eventually compete.

## 2.    Evidence of the Overarching Conspiracy

236.    The public record—as well as this Complaint—is replete with evidence of this overarching fair-share conspiracy. Indeed, much of the evidence is contained in each of the three State AG Complaints, which are the result of government investigations that are themselves traditional conspiracy evidence implying the existence of the overarching conspiracy alleged herein. *See In re Generic Pharmaceuticals Pricing Litig.*, 394 F. Supp. 3d 509, 525 (E.D. Pa. 2019) (declining to dismiss overarching conspiracy allegations, in part, due to the existence of "state and federal investigations into generic drug pricing").

237.    Further evidence of the overarching conspiracy is implied by the structure of the market for generic drugs, which motivated Defendants to enter into actions against self-interest, as

well as frequent contact and opportunities for collusion at industry events, both of which are described above.

238.    In fact, these business and social events occurred with such great frequency that there was an almost constant ability for Defendants to meet in person and discuss their business plans. For example, between February 20, 2013, and December 20, 2013 (a 41-week period), there were at least forty-four (44) different tradeshows or customer conferences where Defendants had the opportunity to meet in person. These in-person meetings gave Defendants the opportunity and cover to have these conversations, and reach these agreements, without fear of detection.

239.    As described in more detail below, when necessary, the overarching conspiracy was reinforced through phone calls and text messages between Defendants to discuss "fair share" and the desire to maintain or raise prices with respect to specific drugs. These types of communications occur with great frequency across the industry, including among Defendants.

240.    For example, from the period of July 1, 2013 through July 30, 2014, senior sales executives and other individuals responsible for the pricing, marketing, and sales of generic drugs at Co-conspirator Heritage spoke to representatives of other Defendants at least 513 times.

241.    Similarly, during this same time period, senior sales executives and other individuals responsible for the pricing, marketing, and sales of generic drugs at Defendant Teva spoke by phone and/or exchanged text messages with representatives of other Defendants at least 1,501 times.

242.    It was not just Teva and Heritage personnel speaking to their competitors, however. All of these individuals were speaking to each other, when needed, hundreds or even thousands of times to ensure adherence to the overarching conspiracy. Because it would be too voluminous to list the total number of calls among all of the Defendants, the following graphic, which appeared in the State AG's Teva-centric complaint, shows the interlocking web of communications and relationships between just a subset of the Defendants. Each line in the graphic below demonstrates at least one

phone call or text message sent between competitors. In many instances, there were hundreds of calls and texts with competitors, but the volume of those communications is not captured by this graphic.



243.    Moreover, many of the personnel employed by Defendants have worked at multiple companies—including other Defendants—during their careers. These employees maintained contact with people at their prior employers. This facilitated the ease with which conspiratorial agreements could be reached.

244.    The specific drug agreements often involve overlapping sets of Defendants and Co-conspirators in communication with each other, all following their agreed-upon "fair share" code of conduct. For example, at least eight generic manufacturers—Actavis, Apotex, Aurobindo, Glenmark, Lannett, Mylan, Sandoz, and Zydus—were involved in all three of the major sub-conspiracies alleged herein. At least another 12 manufacturers—Teva, Dr. Reddy's, Par, Sun, Taro, Amneal, Greenstone, Upsher-Smith, Versapharm, Wockhardt, Rising, and Lupin-were in involved in two of the major sub-conspiracies.

245.    Finally, there are numerous examples throughout this Complaint of anticompetitive behavior, such as competitors refusing to compete in the face of a price increase so as not to "punish" the leader or "steal" market share. As just one example, when Defendant Teva was approached by a

large retail customer in May 2013 to bid on a drug for which Greenstone had increased prices, Kevin Green, the company's director of national accounts, expressed caution stating, "not sure I want to steal it on an increase." Teva later declined to bid on the business.

246.   The concept of "fair share" and price increases went hand in hand. For example, Sandoz and Mylan had an ongoing understanding that they would follow each other's price increases, which in turn was predicated on an agreement that the follower would not poach the leader's customers after the increase. Specifically, James Nesta at Mylan specifically cautioned CW-4 (Sandoz) that Mylan did not appreciate having its prices challenged after an increase—i.e., Mylan did not want Sandoz to steal its business by underbidding its customers. Similarly, Ara Aprahamian of Taro often spoke with CW-3 of Sandoz about coordinating price increases between the two companies. Almost invariably, he would conclude the conversations with phrases like "don't take my fucking customers," "don't take my business" or "don't be stupid."

247.   CW-3 of Sandoz, who is now cooperating with the State AGs, had a central role in the conspiracy. Because of Sandoz's size, and the fact that it was an active participant in many different product markets, many competitors reached out to CW-3 because they viewed it as a strategic opportunity to collude on overlapping products. For example, Mitchell Blashinsky, then a senior executive at Defendant Glenmark, approached CW-3 at an industry event in August 2012 and told him, "we can make a lot of money" and "we can work together on pricing."

248.   Over the ensuing years, CW-3 would leverage his competitor relationships—including his contacts at many of the corporate Defendants—to prove his worth to Sandoz management by using those relationships to allocate customers and increase prices on dozens of products. His competitor contacts included Blashinsky (Glenmark), Aprahamian (Taro, Actavis), and Walter Kaczmarek (Mallinckrodt, Fougera), but there were many others. Indeed, CW-3 took contemporaneous notes to keep track of all the different prices and products he was discussing at any given time. CW-3

maintained this direct evidence of anticompetitive conduct in a notebook (of which there are two volumes) ("Notebook") that his colleague, CW-1, coined the "Diary of Collusion." Various excerpts from the notebooks are referred to throughout this Complaint to support the allegations herein.

249. These are only a few examples of the widespread anticompetitive activity that pervaded the generic drug industry since 2009. Additional examples follow, but each are linked together by the overarching conspiracy outlined above.

**B.    Walmart Is a Repeated Target and Victim of Defendants' Anticompetitive Conduct**

250. Defendants engaged in a wide-ranging conspiracy to undermine competition in the generic drug market. In many instances during the relevant time frame, Defendants directly targeted Walmart as part of the overarching "fair share" conspiracy. The following are examples of instances where Defendants targeted Walmart and caused Walmart to pay artificially inflated prices for the Operative Generic Drugs.

251. In 2009, Sandoz and Taro conspired to divide the market for Carbamazepine ER, also known by the brand name Tegretol XR, including discussing who would target Walmart.

252. In 2011, Sandoz, Perrigo, Fougera, and Taro colluded regarding Taro's entry into the Imiquimod Cream market, also known by the brand names Aldara and Zyclara, to avoid competition and minimize price erosion considering the large number of competitors. As part of the conspiracy, Fougera ceded Walmart's business to Taro.

253. In 2011, Fougera declined to bid Walmart's business for Clotrimazole Betamethasone Dipropionate ("CBD"), also known by brand name Lotrisone, to cede its share of the market to Taro.

254. In 2012, Fougera and Hi-Tech conspired to divide the market for Lidocaine Ointment ("Lidocaine" or "Lido"), also known by brand names such as Xylocaine Topical Solution, among others. Fougera conceded customers to Hi-Tech but declined to concede Walmart because it had already given up significant market share.

255.    In 2012, Perrigo conspired with Sandoz and conceded to Sandoz Walmart's Erythromycin Base/Ethyl Alcohol Solution business.

256.    In 2012, Fougera and G&W conspired to allocate the market for Fluocinolone Acetonide. Fougera gave up its Walmart business to G&W.

257.    In 2012, Fougera high-bid Walmart's business to give G&W market share on Betamethasone Valerate ("Beta Val"), also known by brand names such as Betamethacot, Beta-Val and Betacort Scalp Lotion. Fougera engaged in a significant price increase, G&W failed to match it in its bid to Walmart, and then G&W about-faced and increased its bid to match Fougera's higher price.

258.    In 2012, Actavis and Sandoz conspired to divide the market for Desonide Lotion, also known by various brand names such as DesOwen and LoKara. To preserve high prices, Sandoz conceded several of its Desonide Lotion customers, including Walmart, to Actavis in order to allow Actavis to regain its market share without eroding the high market pricing.

259.    In 2012, Teva conspired with Mylan regarding the Clonidine-TTS Patch (marketed as Catapres-TTS) to allocate the market around Mylan's supply issues. Mylan and Teva maintained regular contact as former Mylan customers—including Walmart—came to Teva because of Mylan's supply issues.

260.    In 2012, Teva and Sandoz conspired to allocate Walmart's purchases of ethinyl estradiol and levonorgestrel (marketed as Portia and Jolessa), with Teva abruptly pulling out of a bidding war after coordinating with Sandoz.

261.    In 2012 and 2013, Lupin and G&W coordinated price increases on Ethambutol HCL Tablets ("Ethambutol"), also known by the brand name Myambutol. Consistent with the plan, on February 6, 2013, G&W reached out to its customers—including Walmart—to advise them of the Ethambutol price increases.

262.    In 2012 and 2013, Glenmark, Sandoz, and Taro allocated the market for Desoximetasone Ointment ("Desoximetasone"), also known by the brand name "Topicort." Sandoz entered the market in September 2012, and consistent with the agreement between the two competitors, Taro immediately started conceding customers—including Walmart—to Sandoz. Glenmark, Taro and Sandoz spoke frequently to coordinate Glenmark's entry to the market in 2013.

263.    In 2013, Teva and Greenstone conspired to allocate Walmart's purchases of oxaprozin (marketed as Daypro). In the lead-up to Greenstone's entry into the oxaprozin market, Teva agreed to concede its business with CVS and Cardinal to Greenstone and, in exchange, Greenstone agreed to not bid Walmart's business.

264.    In 2013, Taro, colluding with Rising, declined to bid Walmart's business for Triamcinolone Acetonide Paste ("Triam Paste"), also known by the brand name Oralone, to increase the price of Triam Paste by 25%. Taro later published increased prices that matched Rising's pricing exactly.

265.    In 2013, Sandoz and Perrigo discussed allocating the market for Adapal Cream, also known by the brand name Differin. After Walmart declined Sandoz's bid for reasons unrelated to pricing, Perrigo promptly conceded Walgreens as a customer to Sandoz to maintain a "fair" division of the market.

266.    In 2013, Rising and Sandoz colluded to allocate the market for Griseofulvin Microsize Tablets ("Griseofulvin"), also known by the brand name Grifulvin V. Rising and Sandoz coordinated Sandoz's entry into the market. As part of this conspiracy, Rising agreed to relinquish Walmart as a customer. Sandoz prepared its offer to Walmart the next day and was awarded Walmart's business.

267.    In 2013, Sandoz and Perrigo coordinated allocating the market for Halobetasol Propionate, also known by the brand name Ultravate. Perrigo agreed to give up Walmart's business

to Sandoz and shared with Sandoz its price points, which Sandoz then used to craft its own anticompetitive bid for Walmart's business.

268.    In 2013, Glenmark, Perrigo, and G&W coordinated price increases on Ciclopirox Olamine Cream, also known by the brand name Loprox. As part of the conspiracy, G&W notified Walmart of its price increase for Ciclopirox Cream.

269.    In 2013, Sandoz, Greenstone, Perrigo, and Taro colluded to divide the market for Clindamycin Phosphate ("Clindamycin"), also known by the brand names Cleocin T, Clinda Max, and Clinda-Derm. When Perrigo entered the market in 2013, the colluding Defendants agreed to allocate Walmart to Perrigo. When Taro subsequently entered the market, Taro avoided competing with Perrigo for Walmart's business so that each competitor would retain no more than its "fair" share of the market.

270.    In 2013 and 2014, Perrigo and G&W allocated the market for Hydrocortisone Acetate Suppositories ("Hydrocortisone Acetate"), also known by the G&W brand name Anucort-HC and colluded to increase prices. County Line Pharmaceuticals decided to withdraw from the market, and Perrigo and G&W colluded on how to split up newly available market share. It was agreed that G&W would approach Walmart. Some time later, the competing suppliers coordinated price increases.

271.    In 2013 and 2014, Teva, Sandoz, and Taro, the three primary manufacturers of fluocinonide (marketed as Lidex), coordinated price increases, and Teva declined to bid on Walmart's business to avoid interfering with Taro's market share.

272.    In 2014, Teva and Zydus conspired regarding Zydus' entrance to the paricalcitol market and agreed that Teva would retain Walmart's business.

273.    In 2014, Sandoz declined repeated bid requests from Walmart to protect Taro's price increase on Carbamazepine ER, also known by the brand name Tegretol XR.

64

274.    In 2014, Mylan refused Walmart's bid request for Phenytoin Sodium Extended Release Capsules ("Phenytoin Sodium)," known by its brand name Dilantin, which was prompted by Taro's price increase. Mylan, Taro, and Amneal coordinated price increases through numerous phone calls. Walmart's attempts to negotiate a lower price with Taro failed, as Taro held firm on its price increase. In the months that followed, the competing suppliers all increased their prices.

275.    In 2014, Sandoz and Taro colluded to allocate the market for Metronidazole 1% Gel, also known by the brand name Metrogel 1%. Sandoz and Taro exchanged several calls, during which they discussed Sandoz's allocation of customers to the new market entrant, Taro. When Walmart was unexpectedly reluctant to stop ordering Metro Gel 1% from Sandoz, a Sandoz internal email noted that Sandoz "would not push to keep the Walmart business."

276.    In 2014, Sandoz and Perrigo were preparing to enter the market for Calcipotriene Betamethasone Dipropionate Ointment ("CBD Ointment" or "Cal Beta"), also known by the brand name Taclonex Ointment. The competitors allocated their customers, agreeing to allot Walmart's business to Perrigo.

277.    In 2015, Sandoz colluded with Taro to allocate the market for Fluocinonide .1% Cream, also known by the brand name Vanos. Sandoz ceded Walmart's business to Taro, a new entrant.

278.    In 2015, Sandoz and Taro colluded to allocate the market for Clotrimazole Cream, also known by the brand name Lotrimin AF Cream. Sandoz informed its competitors that it was planning to target only Walmart and Walgreens. After Walmart invited a bid from Taro, Taro colluded with Sandoz and ceded the Walmart business to Sandoz.

C.    **The Heritage Sub-Conspiracy**

279.    In *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, Case No. 17- CV3768- CMR (E.D. Pa.), the States sued 18 corporate and two individual defendants for entering into

numerous contracts, combinations, and conspiracies that unreasonably restrained trade, artificially inflated and maintained prices, and reduced competition in the generic pharmaceutical industry throughout the United States in violation of the Sherman Act, 15 U.S.C. § 1 (Counts 1-18) and various supplemental state law claims (Count 19).

280.    As set forth below, co-conspirator Heritage is a consistent participant in certain conspiracies identified in this Complaint, but the conspiratorial conduct is pervasive and industry-wide, and the schemes identified herein are part of a larger, overarching understanding about how generic manufacturers fix prices and allocate markets to suppress competition.

281.    For example, from the period of July 1, 2013 through July 30, 2014, senior sales executives and other individuals responsible for the pricing, marketing, and sales of generic drugs at Heritage spoke to representatives of every other U.S.-based corporate Defendant by phone and/or text on multiple occasions. Phone calls and text messages with several of those key competitors during that timeframe are set forth below in the following table that the State AGs published in their Heritage-centric complaint. The table is also conservative because it is based on phone and text message records from only some of the executives and salespeople at issue, and therefore shows only some of the phone calls and text messages between Defendants during that period.

| | Jul-13 | Aug-13 | Sep-13 | Oct-13 | Nov-13 | Dec-13 | Jan-14 | Feb-14 | Mar-14 | Apr-14 | May-14 | Jun-14 | Jul-14 | Jul-13 to Jul-14 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actavis | | | | | | | | | | 2 | | | | 2 |
| Apotex | | | | | | | | | | | 17 | 2 | 1 | 20 |
| Ascend | | | | | | | | | | | 1 | | | 1 |
| Aurobindo | | | | | 1 | 1 | | 1 | | 5 | 2 | 1 | 3 | 14 |
| Citron | | | | 6 | 1 | 12 | | 7 | 1 | | 2 | 29 | 52 | 110 |
| DRL | 1 | 6 | 3 | 2 | | | | | 1 | 5 | 3 | | | 21 |
| Glenmark | | | | | | | | | 1 | | | | | 4 |
| Lannett | 0 | 35 | | 27 | | | 21 | 8 | | 3 | 3 | 14 | 2 | 113 |
| Mayne | | | | | | | | 1 | | 2 | 7 | 3 | | 13 |
| Mylan | 3 | 1 | | | 1 | | | 1 | | 2 | 8 | | 2 | 18 |
| Par | | | | | | | | | | | 3 | 6 | | 9 |
| Sandoz | | | | | | | | | | | 4 | 3 | | 7 |
| Sun | 1 | 2 | | 1 | | | | 3 | | 3 | 10 | 32 | 7 | 59 |
| Teva | 7 | 9 | | | | | 5 | 5 | 3 | | | 1 | 5 | 35 |
| Zydus | | 61 | 19 | 6 | | | | | | | | | 1 | 87 |
| | | | | | | | | | | | | | | 513 |

282.    Through its senior-most executives and account managers, Heritage participated in a wide-ranging series of restraints with more than a dozen generic drug manufacturers, all of whom knowingly and willingly participated. The overarching goal of this conduct was to allow Defendants to avoid price erosion and maintain inflated pricing within and across their respective broad product portfolios and, at times, increase pricing for targeted products without triggering a "fight to the bottom" among existing competitors.

283.    As a result of these conspiracies, Defendants reaped substantial monetary rewards. The Heritage cluster of co-conspirators includes Actavis,Aurobindo, Citron, Dr. Reddy's, Glenmark, Lannett, Mayne, Mylan, Par, Sandoz,  Teva, and Zydus, and Emcure, as well as several other named and unnamed coconspirators, who entered into numerous contracts, combinations, and conspiracies that had the effect of unreasonably restraining trade, artificially inflating and maintaining prices, and reducing competition in the generic pharmaceutical industry throughout the United States, including but not limited to, the markets for at least fifteen of the Operative Generic Drugs.[21]

**1.      The Heritage Sub-Conspiracy Illegal Schemes**

284.    Defendants' anticompetitive conduct in the Heritage sub-conspiracy, like Defendants' illegal conduct generally, falls principally into two categories:

285.    **Market Allocation.** First, to avoid competing with one another and thus eroding the prices for a myriad of generic drugs, Defendants—either upon their entry into a given generic market or upon the entry of a new competitor into that market—communicated with each other to determine and agree on how much market share and which customers each competitor was entitled to. They then implemented the agreement by either refusing to bid for particular customers or by providing a cover bid that they knew would not be successful. Defendants in the Heritage sub-conspiracy agreed to

---

[21] Acetazolamide, Doxy DR, Doxy Mono, Fosinopril HCTZ, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Leflunomide, Meprobamate, Nimodipine, Nystatin, Paromomycin, Theophylline, Verapamil, and Zoledronic Acid.

allocate the market for Meprobamate, Zoledronic Acid, and Doxycycline Hyclate Delayed Release, among others. These schemes reduced or eliminated competition for particular drugs and allowed Defendants to maintain artificially supra-competitive prices in these markets throughout the United States.

286.    **Price Fixing.** Second, and often in conjunction with the market allocation schemes, competitors in a particular market communicated—either in person, by telephone, or by text message—and agreed to collectively raise and/or maintain prices for a particular generic drug. Defendants in the Heritage sub-conspiracy collectively agreed to raise and/or maintain prices for Acetazolamide, Doxycycline Monohydrate, Fosinopril-Hydrochlorothiazide, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Leflunomide, Meprobamate, Nystatin, Paromomycin, Theophylline, and Verapamil, among others.

a.    <u>Market Allocation Agreements</u>

287.    When entering a generic drug market, Defendants routinely sought out their competitors in an effort to reach agreement to allocate market share, maintain high prices, and/or avoid competing on price. These agreements had the effect of artificially maintaining high prices for a large number of generic drugs and creating an appearance of competition where in fact little to none existed.

288.    Some examples of this illegal behavior are set forth below, organized for each generic drug and describing examples of specific agreements as to that drug.

i.    <u>Zoledronic Acid</u>

289.    Zoledronic Acid, also known by the brand names Zometa and Reclast, is a biophosphate drug used for treatment of certain bone diseases. Given intravenously, Zoledronic Acid treats high blood calcium levels that may occur with cancer.

290.    Heritage began selling a 5mg formulation of Zoledronic Acid in the spring of 2013, when the product was first coming off patent. The brand manufacturer, Novartis, had previously marketed two formulations of the drug: a 5mg injection called Reclast, and a 4mg injection called Zometa. Heritage initially sought to launch only on the 5mg formulation. Even before the product was officially launched, Heritage began communicating with its potential competitors to divvy up the market and avoid price competition.

291.    For example, on January 21, 2013, Malek sent an email to N.O., Associate Director of National Accounts at Heritage, asking N.O. to reach out to Dr. Reddy's, the only other competitor that Malek believed would be selling the product on the first day it could be made available. The email from N.O. read:

> Would like you to have a call with [J.A., Vice President, Sales & Marketing at Dr. Reddy's], on Zoledronic.
> Right now, only us and DRI have a tentative on the 5mg (reclast).
> Need to know if he's going to be there day one and see if he's willing to discuss strategy at all.
> This is huge right now if it's only a two player market and we need to lock in our strategy. The information from customers and competitors will be key in our ricing and bidding decisions.

292.    The next day. N.O. attempted to contact J.A., but J.A. was on a conference call. N.O. informed Malek that J.A. would call him back later that morning. Malek then outlined exactly what he wanted N.O. to say when J.A. called him back:

> Ok. Here are the questions if you would.
>
> Are they going to be there day one (March 4) Have they heard of any others there say [sic] one? Are they launching the 4mg (zometa) at risk?[22]
>
> Have they heard of anyone else launching the 4mg at risk?
> What's their market share goal?

---

[22] An "at risk" generic launch refers to a scenario where a generic manufacturer launches product sales after the FDA has reviewed and approved its ANDA, but while patent litigation is still ongoing.

293.    N.O. immediately called J.A. and they spoke for ten (10) minutes. N.O. then reported his findings to Malek that Dr. Reddy's would be launching on day one for the 4mg product, but that it was not yet certain about the 5mg. In response to Heritage's questions about market share, N.O. generally described J.A.'s willingness to divide the market: "he views it this way. If they are first and others come out after, he deserves 60%. If he launches with others on day [one], he considers fair share 2-50%, 3-33%, 4-25% etc." Less than an hour later, J.A. called N.O. and they spoke again for nearly nine (9) minutes. N.O. spoke to J.A. again on January 24, 2013 for nearly twenty-four (24) minutes.

294.    Even though he believed that Dr. Reddy's would be Heritage's only competition for Zoledronic Acid, Malek did not take anything for granted. On January 22, 2013, Malek also asked A.S. to reach out to several individuals, including her "friend at caraco", S.K., to see "if they are launching zoledronic day one?" He provided A.S. with the same list of questions to ask S.K. that he had provided to N.O.

295.    Malek also asked A.S. to contact a large wholesaler and ask whether the wholesaler was aware of any other manufacturers that would be entering the market for Zoledronic Acid on "day one." Lastly, Malek asked A. S. to reach out to a representative at another company as well. A.S. reached out to each of those competitors and confirmed that they would not be entering the market for Zoledronic Acid.

296.    As the launch approached, Heritage continued to communicate with Dr. Reddy's to refine their agreement on market share and initial pricing for Zoledronic Acid, acutely aware that what they were doing was illegal. For example, on March 1, 2013, N.O. emailed Malek informing him that N.O. had left J.A. a message "to have him call me back. Did not leave anything that would incriminate me-very generic." N.O. then spoke to J.A. for almost eight (8) minutes on March 4, 2013.

297.     At the same time, M.E., a Senior National Account Manager at Heritage, was communicating with his counterpart at Dr. Reddy's. M.E. called his counterpart and left a message on March 3, 2013. Two days later, the Dr. Reddy's National Account representative returned the call and the two spoke for fifteen (15) minutes.

298.     Malek was concerned that Dr. Reddy's initial pricing to at least one customer appeared to be lower than he hoped. On March 6, 2013, he emailed N.O. expressing this concern and asking "[a]ny chance you can talk to them and educate them on supply and demand economics?" N.O.'s response was "[y]es, they were working on it yesterday, but [I] will give him a call and discuss."

299.     Malek also asked M.E. to speak again with his counterpart at Dr. Reddy's about Zoledronic Acid while they were attending a customer conference together in March 2013. They spoke by phone twice and exchanged numerous text messages on March 12, 2013. On March 13, 2013, Malek emailed M.E. asking "Did you talk zoledronic with anyone?" M.E's response was: "There were a bunch of people around us before and during dinner. After dinner I was supposed to go gamble with him but I started talking to [a customer representative] and ended up talking to him for an hour. By that time, it was late and I went to bed." M.E. indicated that he had called his counterpart at Dr. Reddy's and they would "talk about it soon." M.E. spoke with his counterpart at Dr. Reddy's on April 3, 2013, and confirmed that Dr. Reddy's had just begun shipping the 5mg product that day and would be pricing "in the 500 range." The two continued to speak numerous times throughout the rest of that month.

300.     As Heritage continued to discuss the matter internally, Malek sent a text message to his entire sales team on April 19, 2013, reminding them to keep their discussions out of writing: "Team: please hold off on emails regarding zoledronic indication, insert, prescribing, etc. take all questions off line. We will have a call today with Jeff [Glazer, CEO of Heritage] to discuss."

301.    Whenever there were challenges between Heritage and Dr. Reddy's for specific customers, those disagreements were resolved through direct communications between the companies. For example, in November 2013, Dr. Reddy's offered a lower price to one of Heritage's customers. When Malek learned of this, he immediately emailed M.E., saying "When you spoke to [your counterpart at Dr. Reddy's], weren't they going to chill on share[?]" M.E. replied: "He told me that he was going to speak to their injectable people and let them know that they should chill."

302.    Despite these occasional challenges, the general agreement regarding market share allocation between Heritage and Dr. Reddy's continued. For most of 2013 and 2014, the market remained stable with Dr. Reddy's maintaining roughly 60 percent market share to Heritage's 40 percent for the 5mg Reclast formulation.

303.    This agreement between Heritage and Dr. Reddy's was part of an overarching conspiracy of the Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

ii.    Meprobamate

304.    Meprobamate, also known by the brand-names Miltown and Equanil, is a generic pharmaceutical drug used to treat short-term anxiety, tension, and insomnia.

305.    In 2013, Heritage and Dr. Reddy's were the only manufacturers in the market for Meprobamate. The two companies had an agreement in place to allocate market share between them and not compete on price.

306.    Heritage decided it wanted to increase price significantly. On March 21, 2013, Malek sent an email to N.O. and M.E. titled "mepro." In the email, Malek stated "Looking to take a price increase on this. Only other competition is DRL. We don't want to make any waves and we are not looking for additional share, just want to maintain what we have at a minimum of a 4x price. Anyone want to reach out to DRL [Dr. Reddy's] and communicate to feel out?"

307.    N.O. responded: "I will try to reach out to [J.A.]." Malek added: "[M.E.], maybe you can touch base with your buddy too." M.E. responded: "Will do."

308.    N.O. spoke with J.A. the next day for nine (9) minutes, and the two companies reached an agreement to raise the price of Meprobamate. N.O. confirmed the agreement in an email that same day, stating: "DRL is on board with price increase. I will fill you in later."

309.    On March 25, 2013, Malek responded: "Great news. So if we move forward we shouldn't expect any backlash?" N.O. once again confirmed the agreement in his response: "No, they were actually thinking about it as well, but lack of inventory kept them stationary. I think they will follow suit and not pursue others if we raise."

310.    Only two days later, on March 27, 2013, Heritage received a request from a large national wholesaler for a bid on Meprobamate. Malek immediately forwarded the email to N.O., asking "This DRL?" In response, N.O. said "Yes, they are on a tight supply schedule, thus the reason they have not increased pricing yet. Due to my conversation with [J.A.] the other day, I think we should tread lightly or else bid a high price to show them where we are going."

311.    Malek agreed. His response clearly reflected the agreement that existed between Heritage and Dr. Reddy's, and Heritage's intention to abide by it:

> Unless [the large national wholesaler] calls you and asks for supply, I recommend letting the market dry up a bit and showing DRL we stayed away from their business. We are taking the price up asap everywhere else.

N.O. then had a four-and-a-half-minute conversation with J.A. on March 29, 2013.

312.    Subsequently, in April 2013, Dr. Reddy's approached Heritage to discuss its desire to get additional market share on Meprobamate. Dr. Reddy's specifically asked Heritage "to walk from one large national pharmacy chain." Heritage then sent an email to the large pharmacy chain on April 24, 2013, stating: "Hate to do this, but due to API and manufacturing increases, we are increasing all prices of Meprobamate across the board. Please review and contact me with any questions."

313.    In response, the large pharmacy chain responded that it had "made a business decision to name another manufacturer as our primary supplier of Meprobamate tablets." M.E. forwarded the email to Malek stating "We knew this was coming."

314.    On May 17, 2013, after some initial confusion about exactly which business Heritage had agreed to give up to Dr. Reddy's, Malek told M.E. "Please call [your counterpart who was a National Accounts Director at Dr. Reddy"] and tell him we walked from this for them but that's it." Malek then provided M.E. with more detail to convey to Dr. Reddy's:

This is what you say.

We know you bid at [the large national pharmacy chain] and although we had a ROFR [Right of First Refusal] we decided to walk based on the conversation we had two weeks ago.

This makes the playing field for market share more even and I assume since you were looking for one more customer that you are good now.

Tell him you don't think the team is going to walk from anymore share at this point.

315.    M.E. called his counterpart at Dr. Reddy's that day and left a message. The two subsequently spoke on May 21, 2013 for nearly seven (7) minutes.

316.    Both Heritage and Dr. Reddy's were able to significantly raise prices across the board-nearly simultaneously-as a result of this agreement. Heritage price increases became effective in late April 2013. Dr. Reddy's price increases became effective May 10, 2013.

317.    Over the next several years, the market for Meprobamate remained very stable because of the agreement between Heritage and Dr. Reddy's. Prices and profit margins for the two companies remained very high, due to the lack of competition in the market.

318.    This agreement between Heritage and Dr. Reddy's was part of an overarching conspiracy of Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

iii.    Doxy DR

1)    The Heritage/Mylan Agreement

319.    Doxycycline Hyclate Delayed Release ("Doxy DR"), also known by the brand name Dory, is a tetracycline-class antimicrobial indicated as adjunctive therapy for severe acne.

320.    Heritage entered the market for Doxy DR on or about July 2, 2013. The only other generic manufacturer selling Doxy DR at that time was Defendant Mylan.

321.    Even before Heritage began selling Doxy DR, representatives of the company began to communicate with Mylan to divide the market and refrain from competing with each other on price. Because Mylan was the only manufacturer of Doxy DR in the generic market at that time, pricing for the drug was still very profitable.

322.    In April 2013, Malek and then-Heritage CEO Jeffrey Glazer traveled to India and met with two executives of Heritage's parent company, Co-conspirator Emcure, to discuss, among other things, their plans to enter the Doxy DR market and to coordinate how Heritage and Mylan could minimize competition between them. It was decided that Satish Mehta, the CEO of Emcure, would reach out first to a high-level counterpart at Mylan, Rajiv Malik, to facilitate subsequent communications between Glazer and Malek and their Mylan counterparts.

323.    In early May, Heritage employees at many levels began to reach out to their counterparts at Mylan to discuss Doxy DR.

324.    On May 3, 2013, Malek asked N.O. to set up a call between Malek and his counterpart, the Vice President of Sales at Mylan. The next day, N.O provided Malek with contact information for Nesta, a Vice President and Executive Director at Mylan. Malek promptly connected with Nesta through the website LinkedIn.

325.    Similarly, on May 7, 2013, Glazer emailed Malik, President and Executive Director at Mylan. Glazer stated: "Rajiv: Would like to schedule a time for a call to catch up and discuss some

recent Heritage news. Please let me know when you are available and we'll pencil it in." Malik responded with a phone number where he could be reached in England, and the two spoke the next day.

326.    During that phone call, Glazer explained to Malik that Heritage had strong business relationships with two of Mylan's Doxy DR customers − a large wholesaler and a large retail pharmacy – and that Heritage intended to pursue Mylan's business at those two accounts. Heritage's goal was to achieve significant market penetration − the two customers discussed represented approximately thirty-percent (30%) of the market − without aggressive (low) pricing.

327.    Malik responded that Mylan would "play fair" and agreed to give up the two accounts to Heritage. Malik specifically cited Heritage's prior agreement to allow Mylan to enter the market for another drug without competition as a reason that Mylan would cede share to Heritage in this instance. The competitors understood that this agreement would allow Heritage to gain market share without eroding the lucrative Doxy DR pricing in the market at that time. Malik told Glazer that he would let others at Mylan know of the plan.

328.    Over the coming months, Mylan gave up those two customers to Heritage in accordance with the agreement.

a)    The Large Wholesaler Account ("Wholesaler A")

329.    In June 2013, Malek met at an HDMA conference in Orlando with a senior executive from Wholesaler A to discuss potential product opportunities, including Doxy DR. Very shortly thereafter, Heritage submitted a detailed product proposal to the wholesaler. Over the succeeding days, Malek reiterated the company's keen interest in entering into a supply agreement with Wholesaler A for Doxy DR.

330.    During the same period, Heritage and Mylan executives continued to discuss the market allocation scheme. For example, on June 11, 2013, M.A., a National Account Manager at

Mylan, called N.O. and the two spoke for nearly ten (10) minutes. Immediately following that call, N.O. called Malek to report his conversation and left him a voicemail. The two connected fifteen (15) minutes later and spoke for seven (7) minutes.

331.    On June 18, 2013, a senior manager at Wholesaler A emailed L.W., a National Account Manager at Mylan, informing him that he had received an unsolicited bid for Doxy DR from a new entrant. The manager asked that Mylan submit a bid to retain the business by close of business on June 21, 2013. This process is a customary practice in the industry and is often referred to as a "Right of First Refusal" ("ROFR"). An ROFR is often included as a term in supply contracts between manufacturers and their customers, giving the incumbent manufacturer the right to beat a competitor's price and retain the business.

332.    In keeping with the agreement Mylan had reached with Heritage to cede Wholesaler A's business, Mylan did not exercise its ROFR and failed to submit a counter bid to retain the Doxy DR business at the wholesaler.

333.    On June 27, 2013, having received no bid from Mylan, Wholesaler A entered into a distribution agreement with Heritage for Heritage to serve as Wholesaler A's primary supplier of Doxy DR.

b)    The Large Retail Pharmacy Account ("The Pharmacy")

334.    On July 8, 2013, Heritage submitted a product proposal letter to The Pharmacy seeking to obtain its Doxy DR business. The next morning, on July 9, 2013, The Pharmacy rejected Heritage's bid because the proposed pricing was too high.

335.    On July 11, 2013, Heritage e-mailed a revised bid to The Pharmacy and lowered its proposed pricing in a continued effort to obtain the Doxy DR business.

336.    While Heritage was attempting to secure an agreement with The Pharmacy, both Heritage and its parent company Emcure continued to communicate with Mylan to keep its competitor

77

updated on the company's efforts. Heritage wanted to make sure that Mylan was still committed to the agreement and would cede the very important large retail pharmacy account to Heritage if challenged. To further this effort, Mehta of Emcure spoke to Malik of Mylan on July 18, 2013. Shortly thereafter, V.T., the President of Corporate Development and Strategy at Emcure, emailed Glazer, stating "Satish spoke to Rajiv. Call me when free."

337.    After speaking to V.T., Glazer e-mailed Malik, asking whether the Mylan President had time that day for a call. Malik responded that he could call Glazer later in the evening. That evening, Malik called Glazer and left a voicemail. Fifteen minutes later, Glazer called Malik back and the two spoke for four minutes.

338.    During the call, Glazer conveyed Heritage's strategy and position to Malik about The Pharmacy as well as Doxy DR in general. Glazer told Malik directly that Mylan's reaction to Heritage's bid with The Pharmacy would "set the tone of whether this is a high- priced item or more erosion." As set forth more fully below, Mylan's reaction was to cede the business to Heritage and avoid price erosion. After speaking to Glazer, Malik immediately spoke to certain Mylan employees.

339.    On August 6, 2013, M.A. of Mylan called N.O. and the two spoke for nearly thirteen (13) minutes.

340.    On August 15, 2013, an executive at The Pharmacy contacted G.T., a National Account Manager at Mylan, to inform him that The Pharmacy had received an unsolicited bid for the Doxy DR business. The executive gave Mylan a very short turnaround time to submit a counter bid to retain the business.

341.    In accordance with the agreement between Mylan and Heritage, Mylan submitted a bid for Doxy DR but lowered its price by only $10, knowing that this price adjustment would not be enough to retain the business.

342.    Later that day, The Pharmacy contacted G.T., notifying him that Mylan's price reduction was not enough to retain the Doxy DR business, and offered Mylan a second opportunity to lower its pricing. G.T. responded that he would let The Pharmacy know by the next morning if Mylan intended to Submit a revised bid.

343.    Mylan declined to submit a revised bid to retain the Doxy DR business at The Pharmacy. As a result, in September 2013, The Pharmacy awarded the agreement to Heritage to serve as the retailer's primary supplier of Doxy DR.

c)    Other Customer Accounts

344.    Even after Heritage obtained the Doxy DR business at the two former Mylan accounts, the competitors continued to coordinate their efforts to maintain artificially high prices for Doxy DR. In furtherance of that goal, on several occasions, Heritage walked away and/or refrained from competing with Mylan for the Doxy DR business at other customer accounts so as not to upset the market share understanding between the two companies.

345.    For example, on November 25, 2013, after Mylan sought to protect its business with another large account, Malek sent an email to N.O. asking "can you reach out?" N.O. responded: "I have tried with [M.A., Director of National Accounts at Mylan] and nothing. Will try again."

346.    That same day, Malek also emailed Glazer, saying that "Mylan is trying to protect [the one large account at issue]. We should reach out to rajiv [sic], we need one more account and we are done." Glazer's response made clear the purpose of the agreement with Mylan (maintain high prices) and questioned whether Heritage should take any action that would disrupt that agreement: "We need to look at our market share, current biz and pricing with and without [the one large account at issue] and make a decision. You don't want them retaliating and lowering prices at other accounts."

347.    After conducting the evaluation, Heritage determined not to risk altering the Doxy DR market-share balance between the two companies and, thus, declined to further pursue the Doxy DR business at the large retailer.

348.    Similarly, in February 2014, a new competitor, Defendant Mayne (formerly Midlothian Labs), entered the Doxy DR market.

349.    Shortly thereafter, Heritage was solicited by a large wholesaler requesting a bid for Doxy DR. A.S. learned from the wholesaler that Mayne had provided an unsolicited bid for the Doxy DR business, which prompted the wholesaler to approach the incumbent supplier, Mylan, to see if Mylan would match the price to retain the contract. Because the unsolicited Mayne bid essentially re-opened the bid process, the wholesaler asked Heritage if it would like to bid on the Doxy DR as well.

350.    In discussing the issue internally, Malek conceded that Heritage had the Doxy DR supply to fulfill the contract but wanted "to be careful." Providing a bid would be perceived as an attack on Mylan's business and could have resulted in retaliation. A.S. agreed, adding that "we may want to allow Midlothian to have [the large wholesaler's business] since we have [a different, very large wholesale account], and others, already."

351.    The next day A.S. responded to the wholesaler and declined to provide a bid. The reason A.S. gave to the customer for the inability to provide the bid was that Heritage might not have enough supply to fulfill a contract with the wholesaler. A.S.'s explanation, however, was a lie, because three days later, she solicited a different customer - a pharmacy chain - and asked if Heritage could bid for that company's Doxy DR business, saying "we have the opportunity to add another customer."

352.    Finally, in August 2014, Heritage refused to bid for the Doxy DR business on an RFP issued by yet another Mylan customer. After deciding against submitting a proposal, Malek sent an internal email to N.O. titled "doxy dr." In the email Malek stated "[f]eel free to let your contact at mylan know we are not bidding on the rfp."

80

353. As a result of Heritage's unlawful agreement with Mylan, pricing for Doxy DR has been substantially higher than it would have been in a competitive market.

354. This agreement between Heritage, Emcure, and Mylan was part of an overarching conspiracy of the corporate Defendants and Co-conspirators named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

2)    The Heritage/Mayne Agreement

355. Defendant Mayne entered the market for Doxy DR in or about February 2014. Even before launching the product, Mayne approached Heritage to discuss its plans. For example, on January 7, 2014, G.S.2, a Director of National Accounts at Mayne, spoke by phone with A.S., a National Accounts Manager at Heritage, for 12 minutes.

356. As a result of that conversation, Mayne's initial strategy was to avoid bidding on Heritage customers and to instead target Mylan, which at the time had roughly 60 percent of the Doxy DR market. That strategy was not entirely successful, however. In an internal Mayne email discussion on February 21, 2014, after learning from a wholesaler that Mylan had retained its business with that wholesaler, C.S., Executive Vice President of Generic Products at Mayne, gave G.S.2 his understanding of the situation based on his experience in the industry: "How I read this is Mylan has given up several large customers to Heritage and they are not giving any more. We need to go after business at Heritage also." G.S.2 replied "Perhaps…………..."

357. G.S.2 continued to communicate with A.S. about Doxy DR. They spoke by phone on March 13, 2014, and again four days later on March 17, 2014 for 17 minutes. Later that day, in an email to Malek and others at Heritage entitled "Midlothian intel on Doxy DR," A.S. recounted their latest conversation, as well as her current understanding with G.S.2:

> I just spoke with [G.S.2] of Midlothian (Mayne Pharma) about Doxy DR. She is the "one-man" show for that company − she has all accounts including GPOs. She has not been able to get much share on the product yet, so she says.

81

She did not bid OneStop, we have that customer.

She did not bid Optisource, we have that customer, and she was aware that Rick had no interest in switching.

She has been shut down at WalMart (Walmart said they couldn't go back to Mylan to reduce price again after we bid; and she was shut down at Rite Aid, Cardinal and ABC - - stating Mylan does not seem to want to give up any share. I shared info that we chose not to bid at Cardinal when asked.

She will be bidding it on the HD Smith RFP.

She will be targeting M&D now. She may go after NC Mutual but the usage is very small there.

She already has some GPO business and they already have Publix and WinnDixie business. (Important for tracking reports).

They are no where near a contract with WAG yet so she feels like that is not an option.

She is feeling pressure from the Mayne Pharma folks to get some share on this product asap. I let her know what accounts we had locked up − and I got the impression she would not target those folks.

358.    Malek responded: "[t]hanks for the notes below. How well do you know [G.S.2]?" A.S.'s response was "I know her pretty well from over the years in the industry."

359.    Only two weeks later, however, Heritage learned that Mayne had made an unsolicited bid for Doxy DR to one of Heritage's large retail pharmacy accounts. On March 31, 2014, Malek emailed A.S. stating that Mayne "took a shot at our doxy dr [at the large pharmacy account]. Can you reach out?" A.S. responded: "Yes − I can."

360.    The next day, on April 1, 2014, A.S. spoke with G.S.2 for 27 minutes. Immediately thereafter, A.S. sent a text message to Malek, stating "[s]poke with [G.S.2] of Midlothian. Said she had to go to [the large pharmacy customer]. Just got declined at Walgreens and went back a second time to cardinal and got declined again." Malek responded that Heritage "can't walk from [the large pharmacy customer.] Tell her to try Walmart."

361.    G.S.2 called A.S. again the next day and they spoke for 11 minutes. Malek also emailed the CEO Glazer, stating "[w]e are going to have to take doxy dr 30% lower at [the large pharmacy customer]. They don't pick up the phone for less than 20% difference. In this case, we spoke with Midlothian and they have struck out completely on getting share. They have gone to wag [Walgreens] and cah [Cardinal Health] twice and mylan won't budge. Please let me know your thoughts."

362.    A.S. and G.S.2 spoke again on April 9, 2014 for 3 minutes. A.S. then reported the conversation to Malek and N.O: "Just got a call from [G.S.2] at Midlothian and she said she has offers in to [McKesson] One Stop and Econdisc."

363.    The next day, A.S. and G.S.2 exchanged a series of text messages:

(1:14pm) A.S.: "Hi! It is [A.S.]! Just getting back to you on our discussion yesterday. I don't have either account but my boss said since we are strategically aligned with both they will probably not move. We will protect. Sorry - I know it is not the news you wanted to hear."

(1:16pm) G.S.2: "Thanks. Had he given up CVS we would not have gone after the other two. We'll just keep going back as soon as we can."

(1:18pm) A.S.: "I am bummed for you. I am keeping my ears open to understand the landscape too. I will let you know what I find out. Best bets are the RFPs that are out now."

(1:19pm) G.S.2: "Need volume. Need one Large account."

364.    Mayne continued to look for a large account over the next several months. Heritage did walk away from one account in May 2014 when Mayne underbid Heritage's price. Upon learning of the unsolicited bid from Mayne, K.F, Associate Director of Pricing and Contracts at Heritage, asked Malek, "[l]et me know what you want me to do on this. Would like to keep, but at the same time, Midlothian will keep going after accounts." To that, Malek responded, "we will walk."

365.    In November 2014, Mayne again put in offers to McKesson One Stop and Econdisc. On November 20, 2014, M.E. sent an email to Malek and others at Heritage stating, "Midlothian has

taken another shot at our business on the Doxy 150mg at Econdisc and we have to respond to this in a timely manner."

366.    The next morning, A.S. sent a text message to G.S.2 stating "Happy Friday! Do you have a minute to talk about Econdisc?" G.S.2 responded, "Yes. Call me." A.S. then called G.S.2 and the two spoke for 15 minutes.

367.    A.S.'s notes reflect that when they spoke, she asked G.S.2 what her goals were with respect to Doxy DR. G.S.2, responded that Mayne was looking for market share; she told A.S. that Mayne had to get a "big customer like Econdisc." G.S.2 told A.S. that she had also submitted an offer to McKesson 10 days ago. A.S. floated the idea that Heritage may be willing to walk from Econdisc if Mayne would agree not to price Doxy DR aggressively, and if Mayne would also agree to withdraw its offer to McKesson.

368.    Immediately after speaking with G.S.2, A.S. sent an email to Malek with a subject line, "spoke with [G.S.]," and stating, "[c]an discuss any time."

369.    After conveying to Malek what she had discussed with G.S.2, A.S and G.S.2 exchanged several voicemails and text messages over the course of the day.

370.    Later in the afternoon on November 21, 2014, N.O. sent an email to Malek and others at Heritage, stating "Midlothian coming after us @ McKesson. Will discuss with you on Monday." Malek immediately forwarded the email to A.S, who responded, "[G.S.2] and I played phone tag after I had spoken to you for the second time so we will definitely connect Monday."

371.    On November 24, 2014, A.S. and G.S.2 connected by phone and spoke for six (6) minutes. After speaking with G.S.2, A.S emailed Malek, stating "Just spoke with her ... can you call me anytime?" Within a half hour, after speaking with Malek, A.S. made a formal offer to G.S.2 by text message: "If you retract McK[esson] - we will give up Econ[disc]. I can talk anytime."

372.    The next day, November 25, 2014, Malek emailed A.S., asking "[d]id you speak with [G.S.2]?" A.S. responded "Yes − told her exactly what we talked about. She is on vacation this week but was going to try to rescind McKesson.   " Malek ended the conversation by saying, "[s]ounds like we know what we need to do."

373.    In internal email communications in the weeks following this agreement, Heritage CEO Glazer confirmed that Heritage was "walking away from one [customer] so pricing would stabilize" and that Heritage "wanted to give Midlothian market share so they stop eroding" the price for Doxy DR.

374.    A.S. and G.S.2 continued to communicate throughout December 2014, by text message and even in person at the American Society of Health-System Pharmacists ("ASHP") conference on December 9, 2014.

375.    When Econdisc put the Doxy DR business out to bid again in January 2015, Heritage made sure that it bid a higher price than Mayne (a "cover bid"), which fulfilled Heritage's end of the agreement by "walking" from Econdisc. As one Heritage employee described it in March 2015, "[w]e basically walked from Doxy DR" at Econdisc.

376.    This anticompetitive agreement between Heritage and Mayne continued until at least December 2015, and the effects were felt for much longer. For example, in September 2015, Heritage was approached by a large nationwide pharmacy chain requesting a bid on Doxy DR. A.S., initially excited about the opportunity, confirmed internally that Heritage had the capacity to bid. Malek cautioned, however, that "[w]e need to know why this is out to bid and find out who the incumbent is" before providing a response.

377.    After finding out that the incumbent supplier was Mayne, A.S. reached out to G.S.2 by text message. G.S.2 confirmed that Mayne had no supply issues and that the pharmacy chain was simply shopping for a better price. In accordance with their agreement not to compete with each other

and avoid price erosion, Heritage refused to provide a bid. That same day, A.S. sent another text message to G.S.2 reiterating Heritage's intent to abide by the agreement, stating: "Confirming we are not bidding." G.S.2 responded: "Thank you."

378.    As a result of Heritage's unlawful agreement with Mayne, pricing for Doxy DR has been substantially higher than it would have been in a competitive market.

379.    This agreement between Heritage and Mayne was part of an overarching conspiracy of the Defendants and Co-conspirators named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

  b.    Agreements to Fix Prices

380.    In addition to reaching agreements with competitors to allocate markets for several different generic drugs, Defendants routinely, and as part of their regular course of business, sought and obtained agreements with competitors to fix and raise prices.

381.    This was often done by "socializing" a competitor to a price increase. This process involved a generic manufacturer reaching out to its competitors to first raise the possibility of a price increase, and then getting an assurance from the competitors of a willingness or agreement to engage in a price increase of some sort − or an assurance that the competitor would cooperate and not seek to take advantage of the manufacturer's price increase by bidding to take that manufacturer's customers. Such an agreement would allow each competitor to maintain its market share and avoid competition despite the price increases.

382.    Often, a generic manufacturer would identify a potentially larger group of drugs for which it would like to increase prices, and then seek to socialize its competitors to obtain illegal agreements allowing that company to raise prices for as many of those drugs as possible without the threat of competition.

i.    Heritage 2013 Price Increase

1)    Doxycycline Monohydrate (2013)

383.    Doxycycline Monohydrate ("Doxy Mono"), also known by the brand names Acticlate and Monodox, among others, is an oral medication used to treat a wide variety of bacterial infections, including those that cause acne. Doxy Mono is known as a tetracycline antibiotic and is also used to prevent malaria.

384.    In February 2013, Heritage heard from a customer that there would be a significant increase in demand for Doxy Mono due to a large price increase that had recently occurred with a different form of Doxycycline, as well as supply problems that certain manufacturers were experiencing.

385.    Shortly thereafter, Heritage decided to increase the price it charged for Doxy Mono. Heritage's competitors at that time were Defendants Lannett, Mylan and Par. To ensure a successful increase, Heritage began reaching out to certain competitors.

386.    On March 7, 2013, A.S. spoke to Tracy Sullivan DiValerio, the Director of National Accounts at Lannett, for fourteen (14) minutes.

387.    On March 13, 2013, A.S. sent an email to DiValerio at Lannett stating: "Hi [DiValerio]! I just had a question for you on Doxycycline Monohydrate. Would you have a chance to chat today? Or tomorrow? Let me know a convenient time for you." They spoke later the same day for five (5) minutes and discussed Heritage's intent to increase Doxy Mono prices.

388.    On March 17, 2013, Malek created a spreadsheet, which he then forwarded to himself by email, which included various items on which he wanted to follow up. Included was a reference for "Price Increases: Take Doxy Mono up more than 3x asap." On March 21, 2013, Malek emailed Glazer expressing his intention to increase the price for Doxy Mono by as much as four (4) times the current price and asking for Glazer's thoughts.

87

389.    On March 25, 2013, DiValerio sent an email to her boss, the Vice President of Sales at Lannett, titled "Recap." In that email, she indicated that she was "working on a WAC & SWP review" for certain drugs, including Doxy Mono, but had heard that "there will be a price increase on Doxycycline from Heritage soon. We are waiting to find out when and why." DiValerio continued to communicate with A.S. about Doxy Mono, through numerous phone conversations, text messages and in-person meetings over the next several months.

390.    Also on March 25, 2013, Malek sent an email to his sales team indicating that Heritage would be "taking a price increase in the market this week" for Doxy Mono and another drug.

391.    Heritage kept in contact with its Doxy Mono competitors throughout 2013. A.S., in particular, spoke, texted, and met in person with several different Lannett employees over the period. She called DiValerio on April 25, 2013 and left a message. DiValerio returned the call the next day, and they spoke for more than eight (8) minutes. They spoke again on May 13, 2013 for almost six (6) minutes.

392.    The next day, A.S. and DiValerio attended a conference together, where they again discussed Doxy Mono. During the day on May 14, 2013, they exchanged the following text messages:

A.S.: "Meeting in parking lot at Cardinal at 5:45 to carpool over. Can meet you at Cardinal then or at the bar? Should be to bar a little after 6."

DiValerio: "I have a conference call in a half hour about a market wide increase. I might have to meet you at the bar."

A.S.: "Ok sounds good - see u there"

A.S.: "Is it doxy mono?"

DiValerio: "Headed over now."

393.    Similarly, on June 4, 2013, A.S. called and texted with G.W., a Director of National Accounts at Lannett. On June 5, 2013, while at a conference with DiValerio, A.S. and DiValerio exchanged numerous calls and text messages.

394.    Lannett increased its pricing for Doxy Mono effective June 12, 2013. When it was asked by one customer in July 2013 whether Lannett could provide a lower price for Doxy Mono, a Lannett National Account Manager stated: "We just took a price increase on this item effective 6/12/13. This is our standard pricing across the board going forward. Any pricing you see out there right now will not be that low for long."

395.    During this same time period, the four competitors selling Doxy Mono were all communicating frequently. For example, the day before Lannett raised its price − June 11, 2013 − N.O. of Heritage spoke to M.A. of Mylan for nearly ten (10) minutes. T.S, of Lannett, was also communicating with K.O, the Vice President of National Accounts at Par, during this time period. The two were friends who frequently saw each other and spoke in person at trade shows and customer conferences. K.O, in turn, was in frequent communication with M.A. of Mylan during June and July 2013, speaking numerous times, including several calls on June 7, 2013 and June 13, 2013—the day after Lannett raised its prices for Doxy Mono. K.O. was also in frequent communication with G.W. at Lannett, exchanging nine (9) text messages on June 11 and 12, 2013.

396.    Heritage was slower to raise its prices for Doxy Mono, due to supply problems throughout 2013. But A.S. continued to keep in frequent communication with Lannett and other competitors. She met in person with DiValerio and K.O. from Par during a conference in Arizona on August 1 and 2, 2013. This was followed by a flurry of communications between the four competitors in August 2013.

397.    At some point thereafter, as Heritage was evaluating its planned price increase, Malek asked A.S. to obtain specifics regarding Lannett's price increase for Doxy Mono. That resulted in the following text message exchange between A.S. and DiValerio on August 12, 2013, after they had again met in person together at a conference:

A.S.: "From our conversation, [increasing WAC too?" T.S.: "Yes"

A.S.: "When are you guys changing WAC or have u already?" DiValerio: "Are you free at 4:30?"
A.S.: "Yes but still need to hang around for 5pm mtg"
DiValerio: "OK I'll swing by"

398.    The next day, August 13, 2013, while still together at the conference, A.S. texted DiValerio, saying "Let's connect sometime today—need a little more specifics on the $ we discussed." That same day, A.S. also exchanged several text messages and phone calls with L.C., another National Accounts Representative at Lannett. G.W. of Lannett also sent a text message to K.O. of Par.

399.    Later that evening, the Senior Vice President of Generic Sales at Par sent an internal email to the Vice President of Marketing and Business Analytics, stating: "I hear that Lannett is taking a price increase on doxy mono and Heritage will follow." The email was forwarded internally at Par with the instruction: "FYI . . .we will follow……No new opps until we see where pricing ends up."

400.    One week later, on August 20, 2013, A.S. confirmed via email to Malek that Lannett had "tripled WACs and did/will do similar to contract prices."

401.    In October, A.S. informed a customer that "we are expecting continued supply issues with" Doxy Mono and that "supply will be tight through Oct and Nov."

402.    On January 23, 2014, A.S. informed a large supermarket chain customer that "I also wanted to let you know that we are looking to take a price increase on all the Doxy Monohydrate skus some time in 2014."

403.    As of March 2014, Heritage increased its price to at least one customer, with an eye toward a much larger, across-the-board increase on Doxy Mono (as well as other drugs) later in 2014, which is discussed more fully below.

404.    This agreement among Heritage, Lannett, Par, and Mylan was part of an overarching conspiracy of the Defendants and Co-conspirators named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

ii.     Heritage 2014 Price Increases

405.     On April 22, 2014, Heritage held a "Price Increase Discussion" teleconference. Present on the teleconference were members of the Heritage sales team as well as Malek. Malek ran the call and dictated the strategy for Heritage.

406.     During the teleconference, Malek identified 18 different drugs that Heritage would target for price increases. Prior to the call, Malek had circulated to his sales team a spreadsheet which listed each drug, the competitors for each and their respective market shares. The list included Acetazolamide ER, Carisoprodol ASA, Cidofovir, Doxy Mono (which was slated for a "big price increase"), Fosinopril-HCI/HCTZ, Glipizide-Metformin HCI, Glyburide, Glyburide-Metformin HCI, Leflunomide, Meprobamate, Methimazole, Nystatin, Paromomycin, Theophylline ER and Verapamil HCI, among others. In order to accomplish the price increases, Malek instructed members of the sales team to immediately reach out to their contacts at each competitor for the drugs on the list and attempt to reach agreement on the price increases. Different Heritage employees were identified as being primarily, although not exclusively, responsible for communications with different competitors.

407.     Malek had been working on the price increases for weeks before holding this meeting with his sales team. He held a meeting with K.F. and D.L. of Heritage during the week of April 14, 2014, and asked them to begin analyzing the impact of the planned price increases.

408.     Malek also began communicating with competitors even before he instructed his sales team to start doing so during the April 22, 2014 price increase discussion. He was responsible for communicating with Teva, which was a competitor on seven (7) of the drugs on the list: Acetazolamide, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Leflunomide, Nystatin, and Theophylline. Malek had a direct relationship with Nisha Patel, Teva's Director of Strategic Customer Marketing. He called her on April 15, 2014, and they had a seventeen (17) minute phone conversation

during which Patel agreed that if Heritage increased prices for the drugs on the list, Teva would follow

or, at a minimum, would not challenge Heritage's price increases by underbidding Heritage.

409.    For two of the drugs − Nystatin and Theophylline ER − Teva had already been planning

a price increase, and Malek and Patel agreed that Teva would take the lead on those increases.

410.    In the next few months after April 2014, Malek spoke to Patel several more times, and

Malek kept Patel informed with more details about when Heritage would be increasing prices for

those drugs.

411.    In response to Malek's directive, the Heritage sales team started contacting their

competitors immediately. A.S, for example, communicated with three counterparts at different

competitors shortly after the call, reaching agreements with all of them to raise prices. First, she spoke

to S.K. at Caraco for forty-five (45) minutes, and they agreed to increase prices for Nystatin and

Paromomycin. She then spoke to M.D., a National Account Manager at Actavis, for more than nine

(9) minutes and they agreed to increase prices for Glyburide-Metformin HCI and Verapamil. Last, she

spoke to DiValerio at Lannett for nearly twenty-nine (29) minutes, during which they agreed to raise

prices of Doxy Mono.

412.    Similarly, N.O. was able to reach an agreement the next day with his counterpart at

Mylan to raise prices on at least 3 different drugs: Doxycycline Monohydrate, Glipizide-Metformin,

and Verapamil. As he stated to Malek and A.S. in an email titled "Mylan," dated April 23, 2014: "Just

let me know a day before we price adjust on the three Mylan products and they will put the word out

to the reps to leave us alone. They are looking at price increases as well on a number of products."

N.O. had spoken to M.A., a Director of National Accounts at Mylan, shortly before sending the email.

413.    Over the coming days and weeks, both Malek and Glazer pushed other Heritage

employees to communicate with their competitors and obtain agreements to raise prices. On April 28,

2014, Malek sent an email to Heritage employee D.L., titled "bindo", referring to Defendant

Aurobindo Pharma, a manufacturer of generic drugs. In the email, Malek stated "Let me know when you speak with [P.M., the Senior Director of Commercial Operations at Aurobindo]." On the list of 18 generic drugs identified for price increases, D.L. had been charged with the responsibility for communicating about the drug Fosinopril/Hydrochlorothiazide ("Fosi/HCTZ"), for which Aurobindo was a competitor. Aurobindo was also a competitor with Heritage for the drugs Glyburide and Glyburide-Metformin. D.L. exchanged several voicemails with P.M. on April 28 and 29, 2014, but they were unable to connect.

414.    The next day, Glazer followed up with an email to D.L. titled "Aurobindo", stating "JM wanted me to ask you if we are all set so we can implement pricing?" D.L. responded saying "we have been playing phone tag. I have reached someone internally but would like to get it up the ladder." One day later, Malek followed up with D.L. again, asking "[a]ny contact?"

415.    D.L. was finally able to connect with P.M. on May 8, 2014 for a sixteen (16) minute phone call. They also spoke on June 25, 2014 for eighteen (18) minutes, and again on July 7, 2014 for three-and-a-half minutes.

416.    In an email exchange between A.S. and Malek on May 6 and 7, 2014, Malek explained that he had been able to successfully obtain agreements to raise the price of the drug Acetazolamide. Malek had previously asked A.S. to hold off on a price reduction request on Acetazolamide from a large GPO customer. Malek told her "[w]e have buy in from all to go up" and that Heritage would not agree to reduce its price. As Malek stated: "We are going to pass [on reducing the price] and most likely are taking an increase within the next week."

417.    On May 8, 2014, Malek sent an email to N.O., asking "Did you ever to [sic] with [M.B.] at Par?" Par was a competitor with Heritage for two of the drugs on the target list: Doxy Mono and Methimazole. N.O. was identified as a Heritage employee primarily responsible for

communicating on both of those drugs. N.O. and M.B. were finally able to communicate by phone on June 2, 2014.

418.    Also on May 8, 2014, Malek sent an email to the Heritage sales team, stating:

> Two weeks back we had a teleconference regarding 13 [sic] products where the pricing dynamics may change.
>
> We each had takeaways, can everyone confirm or not who they have/not spoken with since our call?
>
> Need to move forward with the plan asap.

419.    M.E. responded immediately: "Spoke with everyone and waiting in [sic] feedback on Mepro[bamate]." M.E. had been tasked with communicating with Defendant Dr. Reddy's about Meprobamate and also with Co-conspirator Apotex regarding Leflunomide. He had initially exchanged six text messages with his counterpart at Dr. Reddy's, J.A., on April 24, 2014, and then the two spoke briefly on May 6, 2014.

420.    A.S. responded with a similar message: "Jason: I made contact with all my take aways - with positive results. I can resend those notes or talk with you on any details." A.S. had been tasked with communicating with Defendants Lannett (a competitor for Doxy Mono), Actavis (Glyburide/Metformin and Verapamil), and Sun (Nystatin and Paromomycin), among others.

421.    K.B., an Associate Director of Institutional Sales at Heritage, also replied that she had spoken with two different Mylan individuals about the drug Cidofovir:

> I spoke with my friend who is NA [National Accounts] at Mylan and just alluded to the fact that we may take a price increase on Cidofovir and he said I have no control over these types of things.
>
> . . so I told him to just be on the lookout for it and convey to his internal people that we had taken an increase ... he said they would most likely follow. I also talked to one of the Regional Reps at the HICP show and mentioned it to him . . . he said if it's not already on our 'to do list' it will be.

422.    On May 9, 2014, Heritage had another teleconference to discuss the price increases for the 18 targeted drugs. During this teleconference, the Heritage sales team shared their results in seeking agreement from competitors to raise prices on the various drugs.

423.    The following week, A.S. met in person and discussed the price increase strategies with a number of different competitors at the MMCAP conference. During that conference, she was able to personally reach and/or confirm agreements with at least Aurobindo (Fosinopril/HCTZ, Glyburide and Glyburide/Metformin), Sandoz (Carisoprodol and Fosi-HCTZ) and Lannett (Doxy Mono), among other competitors. She advised Malek of her success via email on May 15, 2014:

> Hi Jason: At the MMCAP meeting yesterday, spoke with some other industry reps and found similar like minding on the pricing strategies we discussed. Overall, spoke with Aurobindo ([T.G.]), Sandoz ([C.B.]), Perrigo (Colistimethate), Xgen ([B.P.]) (Colistimethate), and Lannett ([DiValerio])……………………………………………I will try to meet with the Teva rep, LP., today. Supposedly, Midlothian is here too − but I have not seen G.S.2 yet. . . .

424.    On June 3, 2014, while at another customer conference, A.S. met in-person for dinner and drinks with two of Heritage's competitors on Doxy Mono − K.O. of Par and DiValerio of Lannett − as well as other competitors, including C.B., a Director of National Accounts at Sandoz.

425.    On June 23, 2014, Heritage employees had a "Price Change Call," to discuss the specific percentage amounts by which they would seek to increase the pricing of certain drugs, including drugs for which they had already obtained agreement from all competitors (or potential future competitors), and the strategies for doing so. Included on the list were: Acetazolamide (75 percent increase); Paromomycin (100 percent increase); Glyburide (200 percent increase); Theophylline (150 percent increase); and Nystatin (95 percent increase). It was discussed on the call that those six increases alone would amount to an additional $16 million in profit per year for Heritage, assuming no loss in market share.

426.    Malek continued to push Heritage employees to discuss the planned price increases with competitors, and he continued to do the same. On June 25, 2014, Malek spoke with Patel at Teva for nearly fourteen (14) minutes and informed Patel that Heritage would be increasing prices for a number of drugs sold by Teva shortly.

427.    On June 26, 2014, A.S. sent a text message to a contact at a large wholesaler customers stating that "As of 7/1, [m]arket wide we are increasing prices on: Paromomycin, Nimodipine, Acetazolamide ER, Fosi/HCTZ, Glip/Met, Glyburide and Theophylline ER. You will see only the Paro and Nimo increases -you have those letters." Moments later, she followed up with another text message: "Here are the approximate/average $ increases on the other items: Acetazolamide. 75% increase, Fosi/HCTZ 200%, Glip/Met 100%, Glyburide 200%, Theo ER . . . 150%."

428.    On July 1, 2014, Malek sent an email to the Heritage sales team titled "update − price increase." The email read:

> Team:
>
> Looks like you are making good traction with our July 1 price increase.
>
> Going forward, send a summary to [K.F.] and me at each cob of who is not yet signed with a status and plan.
>
> Please send each day until further notice or until all or [sic] accounted for.
>
> Any questions please call me directly.

429.    Over the next several weeks, Heritage employees continued to reach out to their competitors to obtain additional agreements to raise prices. Ultimately, Heritage was able to increase prices on at least nine (9) of the drugs: Acetazolamide ER; Fosi/HCTZ; Glipizide-Metformin; Glyburide; Leflunomide; Nimodipine; Nystatin; and Paromomycin. Examples are set forth below.

1)      Acetazolamide ER

430.    Acetazolamide ER, also known by the brand name Diamox, among others, is an extended-release version of a medication used to treat glaucoma, epilepsy, altitude sickness, periodic paralysis, and heart failure.

431.    Heritage's main competitor for Acetazolamide was Teva. As of April 2014, Heritage and Teva combined for approximately 78 percent of the market. The only other competitor in the market was Zydus.

432.    Jason Malek was responsible for obtaining Teva's agreement to the price increases. Malek spoke with Patel, his contact at Teva, on April 15, 2014 for more than seventeen (17) minutes, and they discussed Heritage's intention to raise the price of Acetazolamide and other drugs. During that phone call, Patel agreed that if Heritage did raise the price of Acetazolamide (and/or the other drugs), Teva would follow with its own price increase or, at least, would not challenge Heritage's price increases by seeking to underbid and take Heritage's accounts. Malek and Patel spoke several more times over the next several months and confirmed the agreement to raise prices, and Malek updated Patel on the progress of the Heritage increases.

433.    The day after Malek spoke to Patel, April 16, 2014, Patel called Kevin Green, the Senior Director of National Accounts at Zydus, and the two spoke for nearly twenty (20) minutes. Green called Patel back a day later, and they spoke again for nearly twelve (12) minutes. Patel and Green continued to communicate frequently over the next several months. Other Teva and Zydus employees were also in close communication. For example, J.P., an Associate Director of National Accounts at Teva, exchanged numerous text messages with K.R., the Vice President of Sales at Zydus, on May 14, 2014.

434.    For Heritage, Malek was also responsible for communicating with Zydus. On April 24, 2014, he contacted K.R., the Vice President of Sales at Zydus through the website LinkedIn,

saying: "Hi Kristy, I hope this email finds you doing well. I wanted to see if you have a few minutes to chat. Let me know when you are free." K.R. responded later that day: "Hi Jason − I'm out in Arizona. I can give you a call tomorrow afternoon or call me anytime."

435.    By May 7, 2014, Malek confirmed to A.S. that Heritage had already obtained "buy in from all to go up" on Acetazolamide pricing, which A.S. referred to as "one of our strategic items," and expressed an intention to raise prices within the next week.

436.    During this time period Heritage also avoided bidding on any potential customers to which Zydus was already supplying Acetazolamide, in order to maintain market share among the competitors.

437.    On June 23, 2014, Heritage had a "Price Change Call," during which Malek and members of the Heritage sales team discussed an intention to raise prices for Acetazolamide by 75 percent.

438.    Three days later, on June 26, 2014, Heritage began sending out price increase notices to its customers of Acetazolamide. That same day, A.S. sent a text message to her contact at a large wholesaler customer, informing her that Heritage would be increasing prices on Acetazolamide ER and a number of other drugs "market wide." She informed her contact that Acetazolamide prices would be increasing by 75 percent.

439.    By July 9, 2014, Heritage was able to raise Acetazolamide prices to at least 17 different customers nationwide.

440.    This agreement among Heritage, Teva, and Zydus was part of an overarching conspiracy of the Defendants and Co-conspirators named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

2)    Fosi-HCTZ

441.    Fosinopril-Hydrochlorothiazide ("Fosi-HCTZ"), also known by the brand name Monopril HCT, is a combination medicine used to treat hypertension.

442.    As of April 2014, Heritage had a 47 percent market share for Fosi-HCTZ. At the time, Heritage's main competitors for that drug were Defendants Aurobindo, Sandoz, and Glenmark.

443.    On May 2, 2014, M.E. of Heritage was able to connect with James Brown, the Vice President of Sales and Marketing at Glenmark, through the website LinkedIn.

444.    D.L. of Heritage was tasked with primary responsibility for communicating with Aurobindo about Fosi-HCTZ price increases. After several attempts, he spoke by phone with P.M. at Aurobindo on May 8, 2014 for sixteen (16) minutes. The same day, P.M. called the Executive Vice President of Generics at Glenmark, Grauso, and they spoke for more than fourteen (14) minutes. The next day, May 9, 2014, T.G. of Aurobindo spoke with J.J.2, the Director of Sales and Marketing at Glenmark, for more than nine (9) minutes.

445.    Also on May 9, 2014, Heritage held another internal call about "Price Increases." Fosi-HCTZ was again on the list of drugs slated for a price increase.

446.    Less than a week later, A.S. spoke to representatives from both Aurobindo and Sandoz about the Heritage "price increase strategies," for Fosi-HTCZ and other drugs, during an MMCAP conference in Minnesota. In particular, she spoke to T.G., the Director of National Sales at Aurobindo, and C.B., a National Accounts Executive at Sandoz. After meeting in person with both competitors on May 14, 2014, A.S. reported to Malek that she had found "similar like minding on the pricing strategies we discussed."

447.    The next day, May 15, 2014, T.G. of Aurobindo and C.B. of Sandoz spoke by phone and texted multiple times.

448.    Also on May 15, 2014, Heritage received notification from a large pharmacy customer that Aurobindo had recently provided a lower bid for Fosi-HCIZ. In discussing internally whether Heritage should reduce its price to retain the business, A.S. recommended that Heritage "walk" from Fosi-HCTZ with this particular customer because, based on her conversation one day prior with T.G., Aurobindo was on board with the price increase strategy. A.S. explained that "the Fosi/HCTZ has some other pricing strategies at work − I spoke with a rep from Aurobindo yesterday and moving forward there should be better synergies; this bid was from earlier this year before new strategies were discussed."

449.    On May 21, 2014, A.S. exchanged text messages with C.B. of Sandoz, confirming that she had his correct cell phone number.

450.    On June 3, 2014, A.S. again exchanged text messages with C.B. and invited him to meet with her and a group of friends and competitors for drinks at the Sandbar Restaurant while at an HDMA conference in Phoenix, Arizona.

451.    These approaches by Heritage to Aurobindo and Sandoz sparked a flurry of communications between T.G. of Aurobindo and his counterparts at both Sandoz and Glenmark. In a one-week period between June 3, 2014 and June 10, 2014, T.G. had three (3) phone calls with C.B. at Sandoz. and five (5) phone calls and multiple text messages with J.J.2 of Glenmark. Other than one phone call with J.J.2 on August 26, 2014, T.G. did not text or speak with either of them again by phone until April 8, 2015. On June 16, 2014, James Grauso of Glenmark called P.M. at Aurobindo and they spoke for more than twenty-two (22) minutes.

452.    D.L. of Heritage also spoke again with P.M. of Aurobindo on June 25, 2014 for eighteen (18) minutes, and on July 7, 2014 for three-and-a-half minutes.

453.    Also on June 25, 2014, A.S. texted her friend K.A. of Citron, inquiring whether Citron would be entering the market for Glyburide. During that text message exchange, A.S. learned that

Citron was also entering the market for Fosi-HCTZ in addition to Glyburide. A.S informed K.A. of Heritage's plan to increase pricing on Fosi-HCTZ, and that Aurobindo was a competitor for that drug.

454.    On June 26, 2014, A.S. informed her contact at a large wholesaler customer that Heritage's prices would be going up for Fosi-HCTZ market wide by 200 percent as of July 1, 2014.

455.    Shortly after this text message exchange, on July 1, 2014, K.S., the Executive Vice President of Sales & Marketing at Citron, called D.L. at Heritage, informing him that she had been "looped" in on Heritage's plan. They spoke for nearly thirteen (13) minutes. According to A.S.'s notes, K.S. told D.L, that Heritage employees should not try to communicate with Citron through email. She also told D.L. that A.S. should not communicate through K.A., but should instead call L.S., Vice President of Sales at Citron, if she had sensitive information to convey about Fosi-HCTZ or the other price increase drugs.

456.    The next day, July 2, 2014, L.S. of Citron called A.S., and they spoke for nearly twenty-two (22) minutes. They continued to speak frequently through July and August 2014 about Fosi-HCTZ and other drugs.

457.    D.L. of Heritage also spoke directly with Grauso at Glenmark on July 18, 2014 for nearly twenty-three (23) minutes, and on July 30, 2014 for more than five (5) minutes.

458.    Citron also communicated directly with Aurobindo. On July 28, 2014, L.S. of Citron called and texted P.M. at Aurobindo several times, until they were finally able to speak by phone later that day for more than twenty-four (24) minutes. These were the first and only communications ever between the two by phone or text.

459.    Heritage began sending out Price Increase Notices to its customers for Fosi-HCTZ on June 26, 2014. The next day, P.M. of Aurobindo and Grauso of Glenmark spoke twice, with one call lasting almost eighteen (18) minutes. They continued to speak with some frequency over the next several months.

460.    By July 9, 2014, Heritage had successfully been able to increase prices to at least 18 different customers nationwide for Fosi-HCTZ. That same day, Citron confirmed internally that Heritage had increased its WAC prices for Fosi-HCTZ and two other drugs, and that it (Citron) was trying to match those price increases.

461.    On July 14, 2014, K.S. of Citron spoke with Grauso of Glenmark twice—once for seven (7) minutes and again shortly after for more than thirteen (13) minutes. The next day, Citron increased its pricing for Fosi-HCTZ to be in line with the price increases adopted by Heritage.

462.    Sandoz also increased its pricing for Fosi-HCTZ. By early January of 2015, Sandoz was charging twice as much for Fosi-HCTZ as it had been one year before.

463.    This agreement among Heritage, Aurobindo, Citron, Glenmark and Sandoz was part of an overarching conspiracy of Defendants and Co-conspirators named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

### 3)    Glipizide-Metformin

464.    Glipizide-Metformin ("Glip-Met"), also known by the brand name Metaglip, is a combination medicine used to treat high blood sugar levels that are caused by a type of diabetes mellitus or sugar diabetes called type 2 diabetes.

465.    As of April 2014, Heritage's only two competitors for Glip-Met were Defendants Teva and Mylan.

466.    Jason Malek was responsible for communicating with Teva about Glip-Met price increases. Malek spoke with Patel, his contact at Teva, on April 15, 2014 for more than seventeen (17) minutes, and they discussed Heritage's intention to raise the price of Glip-Met and other drugs. During that phone call, Patel agreed that if Heritage did raise the price of Glip-Met (and/or the other drugs), Teva would follow with its own price increase or, at least, would not challenge Heritage's price increases by seeking to underbid and take Heritage's accounts. Malek and Patel spoke several more

times over the next several months and confirmed the agreement, and Malek updated Patel on the progress of the Heritage increases.

467.    N.O. was primarily responsible for communicating with Mylan about Glip-Met. N.O. spoke to M.A. of Mylan on April 23, 2014, and reached an agreement to raise prices for Glip-Met and two other drugs. Shortly after speaking to M.A., N.O. sent an email to Malek and A.S. titled "Mylan," stating: "Just let me know a day before we price adjust on the three Mylan products and they will put the word out to the reps to leave us alone. They are looking at price increases as well on a number of products."

468.    Teva and Mylan were also in frequent communication during this time period. For example, James Nesta, Vice President of Sales at Mylan, spoke with David Rekenthaler, a National Accounts Director at Teva, multiple times on May 9, 2014, including one call that lasted more than seven (7) minutes. The two continued to stay in close contact throughout the rest of 2014.

469.    On May 9, 2014, Heritage held another internal call about "Price Increases." Glip-Met was again on the list of drugs slated for a price increase.

470.    On June 26, 2014, A.S. informed her contact at a large wholesaler customer that prices would be going up for Glip-Met market wide by 100 percent as of July 1, 2014. Heritage began sending out Price Increase Notices to its customers for Glip-Met the same day.

471.    By July 9, 2014, Heritage had successfully been able to increase prices nationwide to at least 27 different customers for Glip-Met.

472.    As promised, neither Teva nor Mylan significantly challenged Heritage on its price increases. Teva, in fact, increased its bid prices to potential customers, and by November of 2014, K.F. reported to Malek internally that "a majority" of the Heritage price increases for Glip-Met "had stuck un to [that] point."

473.    This agreement among Heritage, Mylan, and Teva was part of an overarching conspiracy of Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

4)    <u>Glyburide</u>

474.    Glyburide is an oral diabetes medication used to treat Type 2 diabetes. Also known by the brand names DiaBeta or Micronaise, it is used to control blood sugar levels.

475.    As of April 2014, Heritage's only two competitors for Glyburide were Teva and Aurobindo.

476.    Jason Malek was responsible for communicating with Teva regarding Glyburide price increases. Malek spoke with Patel, his contact at Teva, on April 15, 2014 for more than seventeen (17) minutes, and they discussed Heritage's intention to raise the price of Glyburide and other drugs. During that phone call, Patel agreed that if Heritage did raise the price of Glyburide (and/or the other drugs), Teva would follow with its own price increase or, at least, would not challenge Heritage's price increases by seeking to underbid and take Heritage's accounts. Malek and Patel spoke several more times over the next several months and confirmed the agreement to raise prices, and Malek updated Patel on the progress of the Heritage increases.

477.    Several different Heritage employees were also able to successfully communicate with their counterparts at Aurobindo and reach agreements to raise the price of Glyburide.

478.    For example, on May 8, 2014, D.L. of Heritage spoke by phone with P.M. of Aurobindo for sixteen (16) minutes.

479.    On May 9, 2014, Heritage held another internal call about "Price Increases." Glyburide was again on the list of drugs slated for a price increase.

480.    Less than a week later, A.S. spoke to T.G. from Aurobindo about the Heritage "price increase strategies" for Glyburide and other drugs, during an MMCAP conference in Minnesota. After

meeting with the Aurobindo representative on May 14, 2014, A.S, reported to Malek that T.G. had expressed "similar like minding on the pricing strategies we discussed."

481.    On June 23, 2014, Heritage employees held a "Price Change Call," where they discussed the specific percentage amounts by which they would seek to increase certain drugs, and the strategies for doing so. Among those included on the list was Glyburide, which was slated for a 200 percent increase.

482.    Around this time Heritage also learned that there may be a new entrant in the Glyburide market. On June 25, 2014, A.S. texted her friend K.A., a Corporate Account Specialist at Citron. A.S. wanted to determine whether Citron would be selling Glyburide in the near future:

A.S.: "Work question: is Citron launching Glyburide anytime soon?"
K.A.: "Yes we currently have the product in our warehouse."

A.S.: "We are raising the price right now - just letting you know. Teva says they will follow."
A.S.: "Aurobindo agrees too." K.A.: "?"

K.A.: "You have micronaise brand equivalent." K.A.: "And are you also raising your wacs?"

A.S.: "Sorry - - was on conference call. Ours is Micronase? Is yours Micro or Diabeta?"
K.A.: "Micro"
A.S.: "I don't think we changing WAC - verifying now"
K.A.: "Okay i talked to [K.S., Executive Vice President, Sales & Marketing at Citron] we are def in to raise pricing... are doing this immediately, i know she was mentioning teva can take a while to raise prices"
A.S.: "Teva is slow but conversations have been good." A.S.: "No change to WAC for us"

A.S.: "We are raising our customers 200% over current market price"
K.A.: "Okay ill make sure the appropriate people find out"
A.S.: "Teva has 66% of mkt- great target for share! By [sic] [t]hey should play fair. Aurobindo and us each have about 18% share. Good luck!"
K.A.: "Thanks! Is this something you will be doing like this week?"
A.S.: "Letters going out this week! A lot of customers have 30 day notices and price protection so real price will be felt in 30+ days"
K.A.: "Perfect makes sense... Your not doing anything with glyb/met pricing right?"
A.S.: "Not yet- but is on a short list!"
A.S.: "Glyburide and Fosi/HCTZ are increasing too- those are Aurobindo items too"

105

K.A.: "Okay yeah we have that too... Thanks for the info!"

483.    Shortly after this text message exchange, A.S. reported to the Heritage sales team, in an email titled "Citron: Glyburide," that "Citron is launching soon—product is in their warehouse now. They have our version−rated to Micronase. They are on board − communication is good." In a reply the next day, N.O. cautioned that "[t]hey will still need to get some market share. May keep away initially, but we need to be prepared to lose some."

484.    On June 26, 2014, A.S. informed her contact at a large wholesaler customer that Heritage's prices would be going up for Glyburide market wide by 200 percent as of July 1, 2014.

485.    On July 1, 2014, K.S. of Citron, called D.L. at Heritage, confirming Citron's agreement to raise prices and informing him that she had been "looped" in on Heritage's plan. They spoke for nearly thirteen (13) minutes. According to A.S.'s notes, K.S told D.L. that Heritage employees should not try to communicate with Citron through email. She also told D.L. that A.S. should not communicate through K.S., but should instead call L.S., Vice President of Sales at Citron, if she had sensitive information to convey about Glyburide or the other price increase drugs.

486.    The next day, July 2, 2014, L.S. of Citron called A.S., and they spoke for nearly twenty-two (22) minutes. They continued to speak frequently through July and August 2014 about Glyburide and other drugs.

487.    After reaching agreement with competitors Aurobindo, Citron, and Teva to raise prices for Glyburide, Heritage began implementing the price increases. Price Increase Notices were sent out to customers beginning on June 26, 2014. By July 9, 2014, Heritage had been able to successfully increase prices for Glyburide to at least seventeen (17) different customers.

488.    The unlawful agreement resulted in specific price increases to customers who sold Glyburide to customers nationwide. For example, on July 9, 2014, Teva was contacted by a large national retail chain requesting a bid on both Glyburide and Nystatin, due to the Heritage price

106

increases. The request was forwarded to Patel, with the questions: "Are you aware of the below? Should we engage?"

489.    Patel responded by reiterating her understanding of the agreement between Heritage and Teva on the two drugs at issue: "I am aware. Heritage is likely following Teva on the Nystatin. They are likely leading Glyburide Micronase. Per our conversation, please enter in Delphi for tracking purposes, but we will not be bidding. Thanks."

490.    By July 9, 2014, Teva had also increased its WAC pricing on Glyburide. On July 15, 2014, Citron increased its WAC and AWP pricing for Glyburide to be in line with the price increases adopted by Heritage.

491.    After Heritage raised its price to one large wholesaler in July 2014, that wholesaler solicited bids from both Teva and Aurobindo in an effort to obtain lower pricing. On July 25, 2014, for example, the large wholesaler sent an email to Patel at Teva indicating that there had been a "change in market dynamics" for Glyburide and certain other drugs and requesting a bid. The same day, the wholesaler sent an identical email to T.G. at Aurobindo.

492.    This sparked immediate communication between the competitors as they tried to ensure uniformity and compliance with the scheme. For example, on July 25, 2014, Malek sent a text message to N.O. with the following direction: "Tell [T.G. at Aurobindo] to stay away from [the wholesaler]." N.O. then called T.G., and they spoke for more than thirteen (13) minutes. During that call N.O. conveyed the direction that Aurobindo should not provide a bid to the wholesaler. After conveying this message, N.O. responded to Malek's text message simply: "Done."

493.    Malek also called Patel at Teva the same day, and they spoke for more than fifteen (15) minutes.

494.    After speaking with Heritage, both Teva and Aurobindo declined to provide a bid to the wholesaler.

107

495.    By mid-July, Teva also added Glyburide to its list of potential customer price increase items for the third quarter of 2014 and began to evaluate its own price increases.

496.    As Citron entered the market in July 2014, it set a target of less than 10 percent market share. During this time and over the next several months, it remained in frequent contact with Heritage to discuss Glyburide pricing, bidding strategies, and how Citron might be able to acquire additional market share without eroding the price increases.

497.    Citron also communicated directly with Aurobindo. On July 28, 2014, L.S. of Citron called and texted P.M. at Aurobindo several times until they were finally able to speak by phone for more than twenty-four (24) minutes. These were the first and only communications ever between the two by phone or text.

498.    This anticompetitive agreement to avoid competition and unlawfully increase prices for Glyburide continued until at least December 2015, and the effects continue to this day.

499.    This agreement among Heritage, Teva, Aurobindo, and Citron was part of an overarching conspiracy of the Defendants and Co-conspirators named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

5)    Glyburide-Metformin

500.    Glyburide-Metformin, also known by the brand name Glucovance, is an oral medication used to treat Type 2 diabetes.

501.    As of April 2014, Heritage's competitors in the market for Glyburide-Metformin were Teva, Aurobindo, and Actavis. Heritage had only 5 percent market share at that time, but nonetheless wanted to raise prices.

502.    Jason Malek was responsible for communicating with Teva regarding Glyburide-Metformin price increases. Malek spoke with Patel, his contact at Teva, on April 15, 2014 for more than seventeen (17) minutes, and they discussed Heritage's intention to raise the price of Glyburide-

Metformin and other drugs. During that phone call, Patel agreed that if Heritage did raise the price of Glyburide-Metformin (and/or the other drugs), Teva would follow with its own price increase or, at least, would not challenge Heritage's price increases by seeking to underbid and take Heritage's accounts. Malek and Patel spoke several more times over the next several months and confirmed the agreement to raise prices, and Malek updated Patel on the progress of the Heritage increases.

503.    A.S. was responsible for communicating with Defendant Actavis about Glyburide-Metformin and one other drug. On April 22, 2014, shortly after the initial Heritage "Price Increase Discussion," A.S. called M.D., Director of National Accounts at Actavis, and they spoke for more than nine (9) minutes. Upon information and belief, during that call A.S. and M.D. reached an agreement to raise the price of Glyburide-Metformin and the other drug, Verapamil.

504.    M.D. conveyed the message internally to the sales and pricing team at Actavis that Heritage was looking to take a price increase on Glyburide-Metformin and the other drug. Immediately after speaking to A.S., M.D. called two different Senior Pricing Managers at Actavis, J.R. and C.K. The information spread quickly throughout the sales and pricing teams at Actavis. In an internal email dated April 28, 2014 regarding potential price increases for a list of different drugs, an Actavis pricing manager added: "[M.D.] made mention of keeping an eye out for an increase on Glyburide/Met and Verapamil IR."

505.    Only a few days later, on May 1, 2014, Marc Falkin, the Vice President of Marketing, Pricing and Contracts at Actavis, who had also received the April 28 email discussed above, called Rekenthaler at Teva, and they spoke for five (5) minutes. They spoke three more times on May 6, 2014, with one of the calls lasting fifteen (15) minutes and continued to communicate frequently over the next several months.

506.    Several different Heritage employees were also able to successfully communicate with their counterparts at Aurobindo and reach agreements to raise the price of Glyburide-Metformin.

507.    For example, on May 8, 2014, D.L. of Heritage spoke by phone with P.M. of Aurobindo for sixteen (16) minutes. Similarly, on May 14, 2014, A.S. spoke in person with T.G. at Aurobindo, and reported that she had "found similar like minding on the pricing strategies we discussed."

508.    On May 8, 2014, Malek also emailed the Heritage sales team asking them to confirm which competitors they had each been able to obtain agreements from in order to move forward with price increases discussed during the April 22, 2014 conference call. A.S. responded: "Jason: I made contact with all my take aways − with positive results. I can resend those notes or talk with you on any details."

509.    On May 9, 2014, Heritage held another internal call about "Price Increases." Glyburide-Metformin was still on the list of drugs slated for a price increase.

510.    On May 12, 2014, Falkin of Actavis spoke twice with the CEO of Aurobindo, B.C. Between May 19 and May 22, 2014, Falkin also exchanged thirty (30) text messages with Teva's Rekenthaler.

511.    Through at least June 2014, Heritage still planned to increase prices for Glyburide-Metformin. On June 25, 2014, A.S. had a text message exchange with K.A. at Citron about raising prices for Glyburide. After K.A. had agreed to raise prices on Glyburide, she asked A.S., "Your [sic] not doing anything with glyb/met pricing right?" To which A.S, responded: "Not yet-but is on a short list!" Although Citron had approval to sell Glyburide-Metformin, it was not actively selling the drug and had zero market share throughout this time period.

512.    Although Heritage did not increase customer prices for Glyburide- Metformin in July 2014, like it did for many other drugs, it did increase its WAC prices. In an internal Citron email dated July 9, 2014, K.S. of Citron noted that both Heritage and Teva had increased their WAC pricing on 3

different drugs, including Glyburide-Metformin. In that same internal conversation, a Citron employee involved in pricing reiterated the company's intent to "match their price increases."

513.    On August 20, 2014, A.S. exchanged text messages with S.K. at Sun. During this text message exchange, A.S described agreements that Heritage had reached with Actavis to increase prices of both Glyburide/Metformin and Verapamil:

> S.K.: "Have you heard anything about an Actavis price increase"
> A.S.: "I heard they were on board with it. What item specifically?"
> S.K. "I don' know. I am just hearing about an increase but no details. What product have you heard about!
> A.S.: "We were communicating on Glyburide/Metformin and Verapamil"

514.    This agreement among Heritage, Teva, Aurobindo, and Actavis was part of an overarching conspiracy of Defendants and Co-Conspirators named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

6)    Leflunomide

515.    Leflunomide, also known by the brand name Arava, is an immunosuppressive disease-modifying antirheumatic drug used to treat active moderate-to-severe rheumatoid arthritis and psoriatic arthritis.

516.    As of April 2014, Heritage was a dominant player in the market for Leflunomide, holding a 61 percent share. Its main competitors at that time were Defendant Teva and Co-conspirator Apotex.

517.    Jason Malek was responsible for communicating with Teva about Leflunomide price increases. Malek spoke with Patel, his contact at Teva, on April 15, 2014 for more than seventeen (17) minutes, and they discussed Heritage's intention to raise the price of Leflunomide and other drugs. During that phone call, Patel agreed that if Heritage did raise the price of Leflunomide (and/or the other drugs), Teva would follow with its own price increase or, at least, would not challenge Heritage's price increases by seeking to underbid and take Heritage's accounts. Malek and Patel spoke several

more times over the next several months and confirmed the agreement to raise prices, and Malek updated Patel on the progress of the Heritage increases.

518.   M.E. was responsible for communicating with Co-conspirator Apotex about Leflunomide. On May 2, 2014, M.E. placed his first-ever phone call to D.V., a Sales Manager at Apotex. They spoke for more than thirteen (13) minutes.

519.   On May 6, 2014, A.S. sent an email to Malek about several topics, one of which was Leflunomide. Heritage had recently learned that Teva might be leaving the market for Leflunomide. A.S. commented that "the Teva discontinuation of Leflunomide has everyone in a fuss! Wow - can we take more share???" Malek responded that, with regard to Leflunomide, "we may give some to apotex and follow our strategy we discussed. Will have clarity by tomorrow."

520.   That same day, M.E. had two (2) more phone calls with D.V. Shortly after those calls, M.E. also sent an email to Malek, noting that Apotex "has taken another shot at our Leflunomide . . . I am waiting for a callback from the VP of Apotex before we do anything" Malek replied to M.E's email and confirmed the strategy he mentioned to A.S., telling M.E., "Let's walk from leflunomide." B.H., the Vice President of Sales at Apotex, then called M.E. and left a voicemail. M.E. returned her call and they spoke for more than nine (9) minutes, followed by another call shortly after that for almost eight (8) minutes. M.E. and B.H. followed up those phone conversations with two more the next day, May 7, 2014. Upon information and belief, during these conversations Heritage and Apotex agreed to avoid competition and increase prices on Leflunomide.

521.   On May 8, 2014, Malek sent an email to the Heritage sales team asking each of them to confirm which competitors they had been able to speak to because Heritage needed "to move forward with the plan asap." M.E. responded immediately that he had spoken "with everyone," and he was only waiting for feedback from one competitor with regard to the drug Meprobamate.

522.    On May 9, 2014, Heritage held another internal call about "Price Increases." Leflunomide was still on the list of drugs slated for a price increase. On May 27, 2014, Heritage learned that Apotex took a price increase on Leflunomide. When M.E. passed this information along to Malek, Malek confirmed that "we are going to increase."

523.    Heritage began sending out Price Increase Notices to its customers for Leflunomide in late June. By July 9, 2014, Heritage had been able to successfully increase prices to at least fifteen different customers nationwide.

524.    Teva began to exit the market for Leflunomide in or around July 2014, and therefore did not ultimately raise its price, despite its initial agreement to follow the Heritage price increase.

525.    This agreement among Heritage, Teva, and Apotex was part of an overarching conspiracy of the Defendants and Co-Conspirators named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

7)    <u>Nystatin</u>

526.    Nystatin, also known by the brand name Mycostatin, among others, is a medication used to fight fungal infections.

527.    In 2013 and 2014, Heritage's two main competitors for Nystatin were Teva and Sun, through its division Mutual Pharmaceuticals ("Mutual").

528.    Communications among Heritage, Teva and Mutual/Sun about Nystatin preceded Heritage's "Price Increase Discussion" in April 2014.

529.    In or about June 2013, Teva began to consider raising its price of Nystatin. Co-Conspirator Sun, through its division Mutual, had increased Nystatin prices on April 15, 2013. When it was suggested internally to Patel in June 2013 that Teva might want to add Nystatin to its current list of price increase items, Patel initially responded negatively.

530.    Patel began speaking to Malek shortly thereafter. On July 9, 2013, Patel called Malek and they spoke for more than twenty-one (21) minutes. This was the first call between Patel and Malek since Patel had been hired by Teva in April 2013 to "run the pricing team." They spoke again on July 23, 2013 for nearly ten (10) minutes, and twice on July 30, 2013, with the second of those two calls lasting more than twelve (12) minutes. In the short time between Malek's two July 30 calls with Patel of Teva, A.S. of Heritage also spoke to S.K. of Sun/Mutual for nearly eleven (11) minutes.

531.    Heritage and Mutual/Sun were in close contact, both before and after Mutual took the Nystatin price increase in April 2013. In fact, the day after Mutual increased its price for Nystatin − April 16, 2013 − S.K. of Sun called A.S., and they spoke for nearly forty (40) minutes. They continued to communicate regularly throughout the summer of 2013.

532.    By late July 2013, Nystatin appeared on a list of potential "Price Increase Candidates," at Teva, created by Patel, with the following comments: "Heritage involved; follow Mutual."

533.    After these conversations with Teva and Mutual/Sun, Heritage also began exploring a price increase for Nystatin. On August 1, 2013, Malek sent an internal email to N.O., M.E., and A.S. stating: "Team: Pricing dynamics may be changing for us for Nystatin. Please advise when Mutual/URL/ (now Caraco) took their Nystatin price increase and if they kept it." On August 20, 2013, Malek sent an email titled "PRICE INCREASES" to K.F. at Heritage, with a copy to Glazer, stating "KF: We need [to] analyze the following product price increases and understand how much to increase and which customers to extend." Malek provided a list of four drugs, one of which was Nystatin.

534.    Patel went on maternity leave from August 12, 2013 through the end of that year, and the decision to raise Nystatin prices was temporarily put on hold at both Teva and Heritage. But shortly after her return from maternity leave, Patel and Malek began communicating again. Patel called Malek

on February 4, 2014 and left a message. Malek returned her call the next day, and they spoke for more than one hour. This was the first communication between the two since Patel went on maternity leave.

535.    On February 7, 2014, Patel created a spreadsheet titled "PI Candidates." That spreadsheet included Nystatin and Theophylline as candidates for price increases. With regard to Nystatin, the spreadsheet included the comments "Shared with Heritage and Mutual/Caraco" and "WAC increase likely."

536.    Malek and Patel had a series of phone calls in February and March 2014. By April 2014, Teva decided to increase prices for both Nystatin and Theophylline—and Heritage planned to follow those price increases to match Teva.

537.    Teva began implementing the price increases for Nystatin with an effective date of April 4, 2014, doubling the WAC price from $47.06 to $100.30.

538.    By the time that Heritage held its "Price Increase Discussion" on April 22, 2014, it already had its agreement with Teva in place with respect to Nystatin and Theophylline, and Teva had already taken the lead on implementing the price increases.

539.    A.S. was responsible for communicating with Co-conspirator Sun about Nystatin. On April 22, 2014, shortly after the initial Heritage "Price Increase Discussion," A.S. called S.K., her counterpart at Sun, and spoke for more than forty-five (45) minutes.

540.    After his call, A.S. immediately sent an email to Glazer and Malek titled "Conference call follow up." She reported her agreement with S.K. to her supervisors: "Caraco notified and on board." Glazer immediately replied: "No emails please."

541.    On May 9, 2014, Heritage held another call regarding "Price Increases." Nystatin was again on the list of drugs slated for a price increase.

542.    On June 23, 2014, Heritage employees held a "Price Change Call," where they discussed the specific percentage amounts they would seek to increase certain drug prices, as well as

their strategies for doing so. Nystatin was included on the list and was slated for a 95 percent increase. In her notes about the call, K.B., Associate Director, International Sales at Heritage, indicated that Heritage had to increase its WAC pricing for Nystatin, because Teva had "increased WAC already."

543.    On June 25, 2014, Heritage held one last call regarding "Product Price Changes" before those changes were to be implemented. Nystatin was again on the list of drugs slated for a price increase.

544.    While she was still on the Heritage "Product Price Changes" conference call on June 25, 2014, A.S. exchanged text messages with her contact at competitor Sun, S.K., to let her know the details of the anticipated price increase:

> A.S.: "Work news: we are raising price on Nystatin. Just letting you know. :)"
> S.K.: "How much"
> A.S: "Double the price"
> A.S.: "On conf call- will call you back" S.K.: "Yes"

545.    Malek also spoke with Patel the same day for nearly fourteen (14) minutes. During that call, Malek reported that Heritage would be sending out Price Increase Notices the next day for Nystatin and several of the other drugs that Heritage and Teva had agreed to raise prices on.

546.    Heritage began sending out Price Increase Notices to its customers for Nystatin the next day. By July 9, 2014, Heritage had been able to successfully increase prices to at least fourteen different customers nationwide.

547.    In addition to leading the price increases, Teva also refused to bid or challenge the Heritage price increases when requested by Heritage customers. For example, on July 8, 2014, a large retail customer sent an email to a Teva representative requesting a quote for Nystatin given a price increase from its current supplier. The Teva representative forwarded that email to Patel, asking, "Are you aware of the below? Should we engage?" Patel responded that she was aware, and that Heritage

116

would be "following Teva on the Nystatin" and "leading Glyburide." She concluded that "we will not be bidding. Thanks."

548.    By at least August of 2014, Sun also had begun implementing price increases on Nystatin.

549.    This agreement among Heritage, Teva, and Sun was part of an overarching conspiracy of the Defendants and Co-Conspirators named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

8)    Paromomycin

550.    Paromomycin, also known by the brand names Humatin, Catenulin, and others, is a broad-spectrum oral capsule antibiotic used to treat amoeba infection in the intestines and complications of liver disease.

551.    In April 2014, Heritage had approximately 65 percent market share for Paromomycin. Heritage's only competitor at the time was Co-conspirator Sun, through its division Caraco.

552.    A.S. was responsible for communicating with Co-conspirator Sun about Paromomycin. On April 22, 2014, shortly after the initial Heritage "Price Increase Discussion," A.S. called S.K., her counterpart at Sun, and they spoke for more than forty- five (45) minutes.

553.    After this call, A.S. immediately sent an email to Glazer and Malek titled "Conference call follow up." In that email she advised that "Caraco notified and on board." Glazer immediately responded: "No emails please."

554.    On May 8, 2014, Malek emailed the Heritage sales team, asking them to confirm which competitors they had each been able to obtain agreements from in order to move forward with the price increases discussed during the April 22, 2014 conference. A.S. responded: "Jason: I made contact with all my take aways - with positive results. I can resend those notes or talk with you on any details."

117

555.    On May 9, 2014, Heritage held another conference call regarding "Price Increases." Paromomycin was again on the list of drugs targeted for a price increase.

556.    On May 20, 2014, A.S. spoke again to S.K. for more than twelve (12) minutes. During that call, S.K. informed A.S. that Sun would be "temporarily discontinuing" production of Paromomycin due to a need to transfer its manufacturing operations to another facility. A.S. immediately informed Malek of the news, and he responded: "Need price increase to go immediately. Jack it up."

557.    Sun continued to sell Paromomycin inventory through at least January 2015, maintaining a market share of almost 40 percent during that time. Heritage nonetheless felt comfortable raising its prices for Paromomycin, knowing that an agreement was already in place with Sun.

558.    On June 23, 2014, Heritage employees held a "Price Change Call," where they discussed the specific percentage amounts they would seek to increase certain drugs, and the strategies for doing so. Among the changes included on the list was Paromomycin, which at that time was slated for a 100 percent increase.

559.    On June 25, 2014, Heritage held one last call regarding "Product Price Changes" before the price increases were to be implemented. Paromomycin was again on the list of drugs slated for a price increase.

560.    Heritage began sending out Price Increase Notices to its customers for Paromomycin the next day. By July 9, 2014, Heritage had been able to successfully increase prices to at least thirteen (13) different customers nationwide.

561.    This agreement between Heritage and Sun was part of an overarching conspiracy of Defendants and Co-conspirators named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

9)    Theophylline ER

562.    Theophylline ER, also known by the brand name Theodur, is a medication used to treat asthma and airway narrowing associated with long-term asthma or other lung problems, such as chronic bronchitis and emphysema. Theophylline ER is an extended-release medication, which means that it is released into the body throughout the day.

563.    In 2014, Heritage's primary competitor for Theophylline ER was Teva.

564.    Teva began to consider raising the price of Theophylline ER in early 2014. Patel called Malek on February 4, 2014 and left a message. Malek returned her call the next day, and they spoke for more than one hour. This was the first communication between the two since before Patel went on maternity leave in August 2013.

565.    On February 7, 2014, Patel created a spreadsheet titled "PI Candidates". That spreadsheet included Theophylline as a candidate for a price increase.

566.    Malek and Patel had a series of phone calls in February and March 2014. By April 2014, Teva had decided to increase prices for Theophylline, and Heritage had planned to follow the price increases to match Teva.

567.    Teva began implementing the price increases across the board for Theophylline with an effective date of April 4, 2014.

568.    Shortly after implementing the price increases, on April 24, 2014, Teva received the following email from a consumer of Theophylline, with the subject line "PLIVA.com [Info] Price Gouging":

> I have been a consultant to virtually every major pharma company including Teva and Pliva (before it was acquired and located in E. Hanover). Since retiring I have been asked to participate with a US Senate Special Committee on the issue of pharmaceutical price gouging in the U.S.A. Today, I acquired my usual Rx of Theophylline ER from Costco for which I usually pay $19.01 and was charged $53.28 an increase of almost 200%. Costco Pharmacy confirmed that this increase is correct and was instituted sometime earlier this year (2014). Before having this listed in our national report as another example of Pharmaceutical Price Gouging, [w]e respectfully request a confirmation

119

response from you, the manufacturer, relative to the accuracy of our data. Please respond to me at the above email address. If you prefer you can respond to Senator Schumer a New York State representative.

569.     The email was forwarded to a member of the Government Affairs Department at Teva, who asked: "Can I get some details on the specifics of this product and the price increase. I'm hoping someone increased the price and we had to follow it up. Or, API or something I can give the senate." Ultimately, the request was forwarded to Patel – who had directed and agreed to the price increases – with the question: "Please let me know the specifics of the price increase. Anything positive I can say?" Patel responded: "I don't have a great story. I'll take a closer look." The real story was that Teva conspired with Heritage to raise market prices.

570.     By the time that Heritage held its "Price Increase Discussion" on April 22, 2014, it already had its agreement in place with Teva with respect to Theophylline, and Teva had already taken the lead on implementing the price increases. Malek specifically instructed the Heritage sales team during that meeting that Heritage would be following the Teva price increase on Theophylline.

571.     On May 9, 2014, Heritage held another call regarding "Price Increases." Theophylline was again on the list of drugs slated for a price increase.

572.     On June 23, 2014, Heritage employees held a "Price Change Call," where they discussed the specific percentage amounts they would seek to increase certain drugs, and the strategies for doing so. Among those included on the list was Theophylline, which was slated for a 150 percent increase.

573.     On June 25, 2014, Heritage held one last call regarding "Product Price Changes" before the price increases were to be implemented. Theophylline was again on the list of drugs slated for a price increase.

574.    Malek also spoke with Patel the same day for nearly fourteen (14) minutes. During that call, Malek reported that Heritage would be sending out Price Increase Notices shortly for Theophylline and several of the other drugs for which Heritage and Teva had agreed to raise prices.

575.    Heritage began sending out Price Increase Notices to its customers for Theophylline the next day. By July 9, 2014, Heritage had been able to successfully increase prices to at least twenty (20) different customers nationwide, much as Teva had done three months earlier.

576.    On June 30, 2014, Patel sent an email to Teva employees, stating that "[it appears that Heritage took an increase [on Theophylline] to follow Teva. The new pricing looks like it will be effective tomorrow and matches Teva's WACs." Patel noted to her Teva colleagues that this activity "will likely trigger some bid requests/activity," but stated that Teva "should not be considering decreases."

577.    This agreement between Heritage and Teva was part of an overarching conspiracy of the Defendants and Co-conspirators named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

10)    Verapamil

578.    Verapamil, also known by various brand names, is a calcium channel blocker used to treat hypertension, angina, and certain heart rhythm disorders. It works by relaxing the muscles of the heart and blood vessels.

579.    In April 2014, Heritage's competitors for Verapamil were Defendants Mylan and Actavis.

580.    N.O. was primarily responsible for communicating with Mylan about Verapamil and other drugs. N.O. spoke to M.A. of Mylan on April 23, 2014 and reached an agreement to raise prices for Verapamil and two other drugs. Immediately after hanging up the phone with M.A., N.O. sent an email to Malek and A.S. titled "Mylan," stating: "Just let me know a day before we price adjust on

the three Mylan products and they will put the word out to the reps to leave us alone. They are looking at price increases as well on a number of products."

581.    A.S. was responsible for communicating with Defendant Actavis about Verapamil and one other drug. On April 22, 2014, within hours after the initial Heritage "Price Increase Discussion," A.S. called M.D., Director of National Accounts at Actavis, and they spoke for more than nine (9) minutes. Upon information and belief, during that call, A.S. and M.D. reached an agreement to raise the price of Verapamil and another drug, Glyburide-Metformin.

582.    M.D. conveyed the message internally to the sales and pricing team at Actavis that Heritage was looking to take a price increase on Verapamil. Immediately after speaking to A.S., M.D. called two different Senior Pricing Managers at Actavis, J.R. and C.K. The information spread quickly throughout the sales and pricing teams at Actavis. In an internal email dated April 28, 2014 regarding potential price increases for a list of different drugs, an Actavis pricing manager added: "[M.D.] made mention of keeping an eye out for an increase on Glyburide/Met and Verapamil IR."

583.    Just over a week later, on May 6, 2014, Falkin, the Vice President of Marketing, Pricing, and Contracts at Actavis, who had also received the April 28 email discussed above, called Nesta, a Vice President at Mylan, and left a message. Nesta returned the call on May 9, 2014 and the two spoke for just over three (3) minutes. They spoke again on May 19, 2014 for almost seven (7) minutes and continued to communicate frequently over the next several months.

584.    On May 8, 2014, Malek emailed the Heritage sales team asking them to confirm which competitors they had each been able to obtain agreements from in order to move forward with price increases discussed during the April 22, 2014 conference. A.S. responded: "Jason: I made contact with all my take aways − with positive results. I can resend those notes or talk with you on any details."

122

585.    On May 9, 2014, Heritage held another conference call regarding "Price Increases." Verapamil was again on the list of drugs targeted for a price increase.

586.    Although Heritage did not increase prices for Verapamil market wide in July, 2014, like it did for many other drugs, it did raise price on Verapamil to at least one customer as part of its price increase initiative.

587.    On August 20, 2014, A.S. exchanged text messages with S.K. at Sun. During this text message exchange, A.S. described agreements that Heritage had reached with Actavis to increase prices of both Glyburide/Metformin and Verapamil:

> S.K.: "Have you heard anything about an Actavis price increase"
> A.S.: "I heard they were on board with it. What item specifically?"
> S.K.: "I don't know. I am just hearing about an increase but no details. What product have you heard about"
> A.S.: "We were communicating on Glyburide/Metformin and Verapamil"
> A.S.: "We haven't touched verapamil yet"

588.    This agreement between Heritage, Mylan, and Actavis was part of an overarching conspiracy of Defendants and Co-conspirators named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

**D.    The Teva Sub-Conspiracy**

589.    In *Connecticut, et al. v. Teva Pharmaceuticals USA, Inc*., et al., Case No. 19-CV- 710-CMR (E.D. Pa.), the States filed suit against a large panoply of defendants—Teva, Actavis, Amneal, Apotex, Aprahamian, Aurobindo, Berthold, Breckenridge, Brown, Cavanaugh, DiValerio, Dr. Reddy's, Falkin, Glenmark, Grauso, Green, Greenstone, Hatosy, Kellum, Lannett, Lupin, Mylan, Nailor, Nesta, Ostaficiuk, Par, Patel, Pfizer, Rekenthaler, Rogerson, Sandoz, Taro, Upsher-Smith, Wockhardt, and Zydus—for a conspiracy to unreasonably restrain trade, artificially inflate and maintain prices, and reduce competition in the generic pharmaceutical industry throughout the United

States for at least 110 different generic drugs[23] in violation of the Sherman Act, 15 U.S.C. § 1 (Counts 1- 34) and various supplemental state law claims (Count 35).

590.    This complaint went further than the State AGs' prior complaint in its allegations of anticompetitive market allocation, bid rigging, and price fixing, because it had the benefit of further discovery and evidence of just how wide-ranging this behavior was among Defendants, including how they "ranked" each other as competitors to identify generic drugs that were price increase candidates. The second AG complaint also provided significantly more detail about how individual defendants in that case entered into agreements—both through industry-wide opportunities to collude and conspire and through the connections they made at various positions throughout the industry. It was these opportunities that led to Defendants successfully colluding and conspiring to raise generic drug prices to anticompetitive levels.

1.    **Teva's Central Role in the "Fair Share" Conspiracy**

591.    From the period of January 1, 2013 through December 31, 2013, senior sales executives and other individuals responsible for the pricing, marketing, and sales of generic drugs at

---

[23] Adapalene Gel, Amiloride HCL/HCTZ Tablets, Amoxicillin/Clavulanate, Amphetamine/ Dextroamphetamine ER (Mixed Amphetamine Salts), Amphetamine/Dextroamphetamine IR, Azithromycin Oral Suspension, Azithromycin Suspension, Baclofen, Benazepril HCTZ, Bethanechol Chloride, Budesonide DR, Budesonide Inhalation, Bumetanide, Buspirone Hydrocholoride, Cabergoline, Capecitabine, Carbamazepine Chewable Tablets, Carbamazepine Tablets, Cefdinir Capsules, Cefdinir Oral Suspension, Cefprozil, Celecoxib, Cephalexin Suspension, Cimetidine, Ciprofloxacin HCL, Clarithromycin ER, Clemastine Fumarate, Clomipramine HCL, Clonidine TTS Patch, Clotrimazole Topical, Cyproheptadine HCL, Desmopressin Acetate, Desogestrel/Ethinyl Estradiol (Kariva), Dexmethylphenidate HCL ER, Dextroamphetamine Sulfate, Diclofenac Potassium, Dicloxacillin Sodium, Diflunisal, Diltiazem HCL, Disopyramide Phosphate, Doxazosin Mesylate, Drospirenone and ethinyl estradiol (Ocella), Enalapril Maleate, Entecavir, Epitol, Estazolam, Estradiol, Ethinyl Estradiol and Levonorgestrel (Portia and Jolessa), Ethosuximide Capsules, Ethosuximide Oral Solution, Etodolac ER, Etodolac Tablets, Fenofibrate, Fluconazole Tablets, Fluocinonide Cream, Fluocinonide Emollient Cream, Fluocinonide Gel, Fluocinonide Ointment, Fluoxetine HCL, Flurbiprofen, Flutamide, Fluvastatin Sodium, Gabapentin, Glimepiride, Griseofulvin Suspension, Haloperidol, Hydroxyurea, Hydroxyzine Pamoate, Irbesartan, Isoniazid, Ketoconazole Cream, Ketoconazole Tablets, Ketoprofen, Ketorolac Tromethamine, Labetalol HCL, Lamivudine/Zidovudine (generic Combivir), Levothyroxine, Loperamide HCL, Medroxyprogesterone, Methotrexate, Mimvey (Estradiol/Norethindrone Acetate), Moexipril HCL, Moexipril HCL/HCTZ, Nabumetone, Nadolol, Niacin ER, Nitrofurantoin MAC, Norethindrone/Ethinyl Estradiol (Balziva), Norethindrone Acetate, Nortriptyline Hydrochloride, Omega-3-Acid Ethyl Esters, Oxaprozin, Oxybutynin Chloride, Paricalcitol, Penicillin VK, Pentoxifylline, Piroxicam, Pravastatin Sodium, Prazosin HCL, Prochlorperazine, Propranolol HCL, Raloxifene HCL, Ranitidine HCL, Tamoxifen Citrate, Temozolomide, Tizanidine, Tobramycin, Tolmetin Sodium, Tolterodine ER, Tolterodine Tartrate, Topiramate Sprinkle, Trifluoperazine HCL, Valsartan HCTZ, and Warfarin Sodium.

Defendant Teva spoke to representatives of every significant competitor by phone and/or text on multiple occasions. Phone calls and text messages with several of those key competitors during the 2013 calendar year are set forth below in the following table that the State AGs published in their Teva-centric complaint. The table is also conservative because it is based on phone and text message records from only some of the executives and salespeople at issue, and therefore shows only some of the phone calls and text messages between the Defendants during that period. Nevertheless, it sheds some light on the frequency with which Defendants communicated with each other throughout 2013:

|  | Jan-13 | Feb-13 | Mar-13 | Apr-13 | May-13 | Jun-13 | Jul-13 | Aug-13 | Sep-13 | Oct-13 | Nov-13 | Dec-13 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actavis | 2 | 2 | 0 | 7 | 27 | 1 | 17 | 12 | 15 | 40 | 13 | 47 | 183 |
| Glenmark | 0 | 3 | 0 | 0 | 26 | 9 | 6 | 8 | 1 | 12 | 14 | 16 | 95 |
| Greenstone | 2 | 0 | 20 | 1 | 4 | 5 | 6 | 1 | 0 | 2 | 7 | 11 | 59 |
| Lupin | 10 | 5 | 9 | 3 | 33 | 9 | 19 | 9 | 5 | 13 | 6 | 0 | 121 |
| Mylan | 31 | 47 | 32 | 37 | 33 | 26 | 26 | 16 | 1 | 1 | 0 | 11 | 261 |
| Sandoz | 17 | 5 | 4 | 4 | 12 | 16 | 18 | 14 | 3 | 0 | 9 | 2 | 104 |
| Taro | 0 | 0 | 0 | 0 | 2 | 1 | 8 | 11 | 0 | 11 | 1 | 1 | 35 |
| Zydus | 13 | 23 | 42 | 20 | 30 | 40 | 59 | 21 | 34 | 148 | 58 | 43 | 531 |
| Totals | 75 | 85 | 107 | 72 | 167 | 107 | 159 | 92 | 59 | 227 | 108 | 131 | 1389 |

592.    Of the 1,389 calls listed in above, 1,234 of them—or 89 percent—involved Kevin Green, Nisha Patel, and David Rekenthaler of Teva speaking with competitors.  Many, though not all, of those communications involve matters that are addressed throughout this Complaint.

593.    The following table, also from the State AGs' Teva-centric complaint, shows the same information for the period of January 1, 2014, through December 31, 2014:

|  | Jan-14 | Feb-14 | Mar-14 | Apr-14 | May-14 | Jun-14 | Jul-14 | Aug-14 | Sep-14 | Oct-14 | Nov-14 | Dec-14 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actavis | 31 | 17 | 47 | 42 | 76 | 9 | 38 | 24 | 36 | 23 | 8 | 14 | 365 |
| Glenmark | 4 | 11 | 11 | 7 | 7 | 2 | 9 | 6 | 1 | 6 | 3 | 3 | 70 |
| Greenstone | 17 | 3 | 13 | 3 | 1 | 1 | 6 | 1 | 9 | 0 | 0 | 0 | 54 |
| Lupin | 11 | 5 | 13 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 33 |
| Mylan | 6 | 1 | 1 | 1 | 7 | 2 | 0 | 10 | 13 | 5 | 2 | 9 | 57 |
| Sandoz | 5 | 10 | 7 | 10 | 0 | 1 | 28 | 7 | 4 | 1 | 6 | 3 | 82 |
| Taro | 1 | 1 | 7 | 4 | 17 | 16 | 5 | 2 | 1 | 0 | 0 | 1 | 55 |
| Zydus | 18 | 36 | 44 | 24 | 37 | 14 | 19 | 15 | 5 | 5 | 4 | 4 | 225 |
| Totals | 93 | 84 | 143 | 95 | 145 | 45 | 105 | 65 | 69 | 40 | 23 | 34 | 941 |

594.    Of the 941 calls listed above, 778 of them − or 83 percent − involved Patel and Rekenthaler of Teva speaking with competitors (by this time, Green no longer worked at Teva). Many, though not all, of those communications involve matters that are addressed throughout this Complaint.

**2.    The Teva Sub-Conspiracy Illegal Schemes**

595.    As with the Heritage Sub-Conspiracy, the Teva Sub-Conspiracy followed the overarching conspiracy's familiar playbook of combining customer and market allocation agreements with illegal price-fixing agreements in order to restrain trade.

a.    The Overarching Conspiracy in Operation: Customer and Market Allocation Agreements

596.    When entering a generic drug market, Teva and the other Defendants routinely and systematically sought out their competitors in an effort to reach agreement to allocate market share, maintain high prices, and/or avoid competing on price. These agreements had the effect of artificially maintaining high prices for a large number of generic drugs and creating an appearance of competition where in fact little to none existed.

597.    Some illustrative examples of these agreements are set forth below, organized by company relationship and describing specific examples relating to specific drugs over time.

i.    Teva/Mylan

1)    Fenofibrate

598.    Fenofibrate also known by brand names such as Tricor is a medication used to treat cholesterol conditions by lowering "bad" cholesterol and fats (such as LDL and triglycerides) and raising "good" cholesterol (HDL) in the blood.

599.    As of the end of 2012, Teva and Lupin were the only major suppliers of generic Fenofibrate 48mg and 145mg tablets, with Teva having approximately 65 percent market share and Lupin having approximately 35 percent market share.

600.    On February 27, 2013, Green, a senior marketing executive at Teva, emailed multiple Teva colleagues asking them to provide "any noise you may be hearing in the market relative to additional competition on Fenofibrate 48mg and 145mg." Specifically, Green was seeking information on Mylan's potential entry to the market. In order to get this information, Green called Mylan's Vice President of National Accounts, Jim Nesta. Over the course of that day, Green and Nesta spoke at least four (4) different times. That same day, Green reported back to other Teva colleagues what he had learned: Mylan planned to launch Fenofibrate 48mg and 145mg sometime around November 2013.

601.    A few months later, however, Teva learned that Mylan was moving up its launch date for Fenofibrate. In advance of this launch, Teva, Lupin, and Mylan conspired to allocate the market for Fenofibrate. On May 8, 2013, Green emailed his colleagues at Teva that "Mylan is entering [the market for Fenofibrate] very soon." The following day, Green sent an internal email stating that Mylan expected to launch Fenofibrate 48mg and 145mg tablets "on or around May 14" and that he needed Teva's Fenofibrate sales and profitability information "to determine who we want to keep and who we want to concede" to Mylan.

602.    Up to this point, executives for Teva, Mylan, and Lupin had all been in regular contact by phone. Between May 6 through May 9 alone, Teva, Mylan, and Lupin executives participated in at least seventeen calls in which they shared information about Mylan's Fenofibrate launch and the plan to allocate market share to Mylan.

603.    On May 10, 2013, Green received the Teva sales and profitability information he requested. After having the information for barely a half hour, and before there was even a formal price challenge by Mylan at any of Teva's customers, Green concluded that "it is best to concede Econdisc [to Mylan] and try to maintain the balance of our customers." By conceding Econdisc to Mylan, Teva would walk away from its single biggest customer (in terms of gross profit) for the 48mg

tablets and the third largest out of six customers (in terms of gross profit) for the 145mg tablets. Patel, who had been at Teva for only two weeks at that point, said she "want[ed] to understand the logic you [Green] use for determining this." The logic, of course, was to allocate a customer of sufficient size to Mylan so that Mylan would be comfortable with its "fair share" and not need to compete on price to acquire market share.

604.    Teva executives immediately reached out to executives at Mylan and Lupin through a series of phone calls. On May 10 there were at least seven calls where executives of Teva, Mylan, and Lupin confirmed the market allocation scheme.

605.    Teva made good on its agreement to concede Econdisc to Mylan. On May 15, 2013, Econdisc informed Teva that a new market entrant had submitted a competitive offer for Fenofibrate 48mg and 145mg tablets and asked Teva for a counteroffer to retain Econdisc's business. Less than an hour after receiving the notice of the price challenge, Green recommended conceding Econdisc based on "prior conversations." Green later agreed: "this is the customer we should concede on Fenofibrate."

606.    Following Teva's internal confirmation of the market allocation scheme on May 15, over the next two days, there were at least nineteen calls among executives of Teva, Mylan, and Lupin to confirm that Teva was sticking to the market allocation scheme by conceding Econdisc to Mylan.

2)    Clonidine-TTS Patch

607.    Clonidine-TTS Patch, also known by the brand name Catapres-TTS, is a transdermal patch that is used to treat high blood pressure.

608.    As of September 2011, Mylan and Teva were at rough parity in the market for generic Clonidine-TTS, with Mylan having approximately 48.4 percent market share and Teva having approximately 44.4 percent market share. At the end of 2011 and beginning of 2012, however, Teva began to take more than its "fair share."

609.    In November 2011, Teva took over Mylan's business for Clonidine-TTS at Walgreens after Walgreens solicited Teva to provide a bid. Then, in late January 2012, Cardinal Health solicited a bid from Teva for a one-time-buy to cover an alleged short-term "supply disruption" that Mylan was experiencing. A few days after Teva submitted its offer to Cardinal for the one-time-buy, Cardinal asked Teva to become Cardinal's primary supplier for Clonidine-TTS. Believing that Cardinal's request was prompted by Mylan having supply issues, Teva accepted and took over the primary position at Cardinal for Clonidine-TTS.

610.    On February 10, 2012, the move of Cardinal's business to Teva prompted Green of Teva to order his colleagues to get intelligence on the extent of Mylan's alleged supply issues. That same day, Rekenthaler of Teva called B.P., a senior national account executive at Mylan, to obtain the information, and they spoke for six (6) minutes. Later that day, Rekenthaler reported back to his Teva colleagues that, contrary to Teva's assumptions, "Mylan is back in supply" and cautioned that Teva should "tread carefully." Rekenthaler was concerned that Mylan might retaliate against Teva for taking more than its "fair share" without consulting with Mylan. With the awards from Walgreens and Cardinal, Teva was projected to have between 65-70 percent market share for Clonidine-TTS.

611.    To gain back some market share, Mylan challenged Teva's Clonidine-TTS business at McKesson. To de-escalate the situation, Teva "conceded the McKesson business to Mylan." Then, in April 2012, Mylan aggressively challenged Teva's Clonidine- TTS business at CVS to gain back market share and further signal its displeasure with Teva for taking the Cardinal business. Internally, Teva lamented that Mylan was "trashing the price in pretty much a two-player market." Ultimately, Teva "conceded [the CVS business] due to price."

612.    Teva heard Mylan's retaliatory message loud and clear. On May 4, 2012, just a few days after losing the CVS Clonidine-TTS business to Mylan, Teva was approached by Cardinal about a different drug, Doxazosin. At the time, Mylan was the primary supplier for Doxazosin at Cardinal.

129

Cardinal representatives told Teva that Mylan was on backorder for one of the four Doxazosin dosage strengths until the end of June 2012, but Cardinal wanted to move the entire Doxazosin line to Teva. Rather than take this business, Green cautioned his colleagues that Teva "will need to be cautious after what happened with Clonidine. I would rather cover them on a short-term basis where they have an issue and revisit if it becomes a more prolonged and extensive event."

613.    On July 18, 2012, E.G., a senior Teva product manager, circulated an internal email to Teva's national account managers that the "[m]arket rumor is Mylan may be having Clonidine Patch supply issues." Teva learned of this "rumor" directly from Mylan over the course of at least two calls between Green and Nesta on July 17 and the morning of July 18, 2012.

614.    On the morning of September 28, 2012, Nesta and Green spoke by phone at least twice, once for four (4) minutes and once for fourteen (14) minutes. On those calls, Nesta informed Green of Mylan's impending temporary exit from the Clonidine-TTS market. As expected, later in the day on September 28, 2012, Teva began getting solicitations from Mylan customers, such as Walmart and CVS, seeking a bid from Teva for Clonidine-TTS because Mylan had just issued a temporary discontinuation notice.

615.    Mylan's exit from the Clonidine-TTS market presented an opportunity to raise prices and collusively reallocate the market at the inflated prices when Mylan fully reentered the market. For example, in April 2012, before Mylan had challenged Teva's Clonidine-TTS business at CVS, Teva's direct invoice price to CVS for the .1mg, .2mg, and .3mg Clonidine-TTS was $22.13, $37.81, and $54.41, respectively. Mylan's retaliation against Teva drove the prices for CVS down to below $10.49, $18.17, and $26.51 for those dosages, respectively. Because of Mylan's exit from the market, however, when Teva took back the CVS business in October 2012, Teva was able to charge CVS a direct invoice price of $33.28, $56.08, and $80.76, respectively.

616.    Teva and Mylan representatives continued to keep in contact going forward so that if Mylan reentered the Clonidine-TTS market, Mylan could regain market share without eroding price through competitive bidding. For example, on October 10, 2012, Green and Nesta spoke for ten (10) minutes. That same day, E.G. of Teva sent an email to Teva national account managers and other senior representatives reiterating that Teva representatives should "advise of any update to this market intelligence."

617.    In or about February 2013, Mylan relaunched Clonidine-TTS and began seeking market share. In early March 2013 Mylan sought to secure the Clonidine-TTS business at Econdisc. Rather than competitively bid for the business, Teva's internal documents state that they chose to "concede" Econdisc back to Mylan. By April 2013 Teva also "gave up Rite Aid" and "concede[d]" McKesson to Mylan.

618.    In a stark admission of Teva's willingness to help Mylan regain market share without competition, Rekenthaler acknowledged in an internal email dated February 28, 2013 that Teva was "trying to concede the Clonidine business at CVS" to Mylan. Because Teva had been able to increase the price at CVS following Mylan's exit, Mylan gave a bid to CVS that was higher than Mylan's "previous price prior to their supply problems." For its part, Teva was "not going to make any effort in the form of price concessions to retain the CVS business" if CVS brought Mylan's price challenge to Teva's attention. CVS pushed Mylan to lower its bid in light of its prior prices but, confident that its brinkmanship would work because of Teva's cooperation, Mylan would not do so. Ultimately, CVS declined Mylan's bid because of Mylan's refusal to lower its bid in light of its prior pricing. Nonetheless, because Mylan's bid to CVS was not competitive but rather an effort to allocate the market without eroding price Teva was able to maintain artificially higher prices at CVS.

619.    To carry out their scheme to allocate the Clonidine-TTS market without eroding price, representatives of Teva and Mylan remained in regular contact. In February and March 2013 alone,

Teva and Mylan representatives called each other at least 33 different times and spoke for nearly 2 hours and 45 minutes.

620.    By April 2013, Teva had "conceded all customers [it] plan[ned] on conceding." Having successfully allocated the market, however, Mylan and Teva were now conspiring to raise prices on Clonidine-TTS. On April 8, 2013, J.L., a marketing manager at Teva, reported internally to his Teva colleagues, including Rekenthaler, that Mylan had agreed to raise prices:



Green knew that Mylan would follow a price increase on Clonidine-TTS because earlier that day, Green had two phone calls with Nesta (Mylan), with one lasting one (1) minute and the other lasting eight (8) minutes. In a follow up call the following day between Green and Nesta lasting eleven (11) minutes, Mylan and Teva reconfirmed their agreement that Mylan would follow a Teva price increase on Clonidine-TTS.

### 3)    Tolterodine Extended Release

621.    Tolterodine Extended Release ("Tolterodine ER"), also known by the brand name Detrol LA, is a medication used for the treatment of an overactive bladder.

622.    Pfizer is the branded drug manufacturer for Detrol LA. To resolve patent infringement claims against Teva by Pfizer related to Detrol LA, Teva and Pfizer entered into a settlement agreement under which Teva would distribute an authorized generic of Tolterodine ER. To resolve

similar claims, Mylan entered into its own settlement agreement with Pfizer, which allowed Mylan to launch its generic version Tolterodine ER. On October 31, 2013, Mylan's ANDA for Tolterodine ER was approved. Under their respective settlement agreements with Pfizer, this triggering event allowed Teva and Mylan to launch their respective generics on January 2, 2014.

623.    Teva planned to launch on January 2, 2014. During the first half of December 2013, Teva was under the impression based on conversations with potential customers that Mylan was not in a position to launch until 30 to 60 days after Teva launched. Nonetheless, Teva was considering how to allocate the market with Mylan when it did eventually launch. On December 3, 2013, J.K., a marketing executive at Teva, sent an email to Rekenthaler, Green, and several other Teva colleagues stating "we prepared for 50-60 share... I am looking into the numbers as far as what this means." To prepare offers and figure out the allocation of customers that would bring Teva its desired 50-60 percent market share, Teva executives were instructed to gather usage from potential customers.

624.    Through the first half of December 2013, as Teva was soliciting usage amounts from potential customers, customers were asking Teva to send in pricing offers before the launch. Teva resisted sending out those offers and instead did not plan to do so until the January 2, 2014 launch date. Teva's delay in putting together pricing for potential customers was part of a plan to drive up the amount it could charge for Tolterodine ER. Specifically, Teva expected that on January 1, 2014, Pfizer would raise the price of branded Detrol LA. This would allow Teva to peg its price to the now inflated price of the branded drug and thereby command a higher price for Tolterodine ER on the January 2, 2014 generic launch date.

625.    At the end of the day on Friday December 20, 2013, T.C. of Teva learned from D.H. at Cardinal that Mylan intended to launch its Tolterodine ER on January 2, 2014. D.H. further provided T.C. with Mylan's pricing for two dosages, and conveyed that Mylan is "looking for a 40% market share," and that Teva "can figure the rest out."

133

626.    T.C. informed her Teva colleagues of Mylan's plans. Green of Teva then worked over the weekend to turn this information into initial pricing for all of Teva's potential customers and then shared it internally. In a telling admission that Teva had no intention to bid competitively for all accounts, Green noted that the next step was "to pick who should receive" bids. The goal in "pick[ing] who should receive" bids was to ensure that both Mylan and Teva received their previously stated market share goals: Teva wanted "50-60 [%] share" while Mylan was only "looking for a 40% market share."

627.    On Monday, December 23, 2013, Rekenthaler and Nesta had two telephone call totaling over thirteen minutes. During these calls, Rekenthaler and Nesta exchanged the details about their offers to various customers, including the specific contractual language used in their offers.

628.    Following the calls between Nesta and Rekenthaler, Green circulated a revised version of Teva's pricing plan for the Tolterodine ER launch. This new version incorporated Teva and Mylan's plan to allocate the market, including the submission of cover bids and abstention from bidding. Notably, the revised pricing plan included the following chart identifying the major customers (and their associated market share percentage) that Teva would receive to get close to its desired 60 percent market share while Mylan would get its desired 40 percent share:

| CVS | 18 |
|---|---|
| Wal-Mart | 5 |
| Cardinal | 8 |
| Omnicare | 1 |
| Anda | 2 |
| Rite Aid | 4 |
| Econdisc | 15 |
| McKesson | 6 |
| | 59 |

629.    In exchange for Mylan either submitting cover bids or abstaining from bidding on these customers, Teva reciprocated by submitting cover bids and or refusing to submit bids to customers that Mylan targeted. This is demonstrated by the fact that Teva's newly revised pricing plan now included considerably higher direct invoice prices for major customers allocated to Mylan −

namely Walgreens, Cigna, Humana, Optum RX Prime Therapeutics, and Kaiser. The table below includes a comparison of Teva's pricing plan for these Mylan customers before and after Rekenthaler spoke with Nesta on December 23, 2013:

**WALGREEN**

| Product Description | Initial Pricing Plan — Indirect Contract | Direct Invoice | Price after — Indirect Contract | Direct Invoice |
|---|---|---|---|---|
| TOLTERODINE TARTRATE ER CAPSULES 2MG 30 | 114.30 | 83.03 | 114.30 | 107.93 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 90 | 342.90 | 249.08 | 342.90 | 323.80 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 500 | 1,866.90 | 1,383.78 | 1,866.90 | 1,798.91 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 30 | 114.30 | 83.03 | 114.30 | 107.93 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 90 | 342.90 | 249.08 | 342.90 | 323.80 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 500 | 1,866.90 | 1,383.78 | 1,866.90 | 1,798.91 |

**CIGNA**

| Product Description | Indirect Contract | Direct Invoice | Indirect Contract | Direct Invoice |
|---|---|---|---|---|
| TOLTERODINE TARTRATE ER CAPSULES 2MG 30 | 114.30 | 88.05 | 114.30 | 108.00 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 90 | 342.90 | 264.15 | 342.90 | 324.00 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 500 | 1,866.90 | 1,467.50 | 1,866.90 | 1,800.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 30 | 114.30 | 88.05 | 114.30 | 108.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 90 | 342.90 | 264.15 | 342.90 | 324.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 500 | 1,866.90 | 1,467.50 | 1,866.90 | 1,800.00 |

**HUMANA**

| Product Description | Direct Invoice | Direct Invoice |
|---|---|---|
| TOLTERODINE TARTRATE ER CAPSULES 2MG 30 | 88.05 | 108.00 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 90 | 264.15 | 324.00 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 500 | 1,467.50 | 1,800.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 30 | 88.05 | 108.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 90 | 264.15 | 324.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 500 | 1,467.50 | 1,800.00 |

**OPTUM RX**

| Product Description | Indirect Contract | Direct Invoice | Indirect Contract | Direct Invoice |
|---|---|---|---|---|
| TOLTERODINE TARTRATE ER CAPSULES 2MG 30 | 114.30 | 88.05 | 114.30 | 108.00 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 90 | 342.90 | 264.15 | 342.90 | 324.00 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 500 | 1,866.90 | 1,467.50 | 1,866.90 | 1,800.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 30 | 114.30 | 88.05 | 114.30 | 108.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 90 | 342.90 | 264.15 | 342.90 | 324.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 500 | 1,866.90 | 1,467.50 | 1,866.90 | 1,800.00 |

**PRIME THERAPEUTICS**

| Product Description | Indirect Contract | Direct Invoice | Indirect Contract | Direct Invoice |
|---|---|---|---|---|
| TOLTERODINE TARTRATE ER CAPSULES 2MG 30 | 114.30 | 88.05 | 114.30 | 108.00 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 90 | 342.90 | 264.15 | 342.90 | 324.00 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 500 | 1,866.90 | 1,467.50 | 1,866.90 | 1,800.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 30 | 114.30 | 88.05 | 114.30 | 108.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 90 | 342.90 | 264.15 | 342.90 | 324.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 500 | 1,866.90 | 1,467.50 | 1,866.90 | 1,800.00 |

630.    In addition to submitting inflated bids for Walgreens, Cigna, Humana, Optum RX Prime Therapeutics, and Kaiser, Teva agreed to refrain from bidding for certain customers, such as Publix, Ahold, Hannaford, and PVA Health.

631.    The following day, on December 24, 2013, Rekenthaler and Nesta had two more calls to confirm and refine Teva and Mylan's market allocation agreement. Those calls lasted for nine (9) minutes and eight (8) minutes, respectively.

135

4)    Capecitabine

632.    Capecitabine, also known by the brand name Xeloda, is an anti-cancer chemotherapy drug used to treat a variety of cancers, including breast and colon cancer.

633.    To resolve patent litigation, the brand manufacturer, Roche Pharmaceuticals, entered into settlement agreements with various generic manufacturers−including Teva and Mylan−that would allow those generic manufacturers to sell generic Capecitabine after a certain period of time.

634.    As early as January 2014, both Teva and Mylan were making plans for their eventual launch of Capecitabine. Part of this planning included the sharing of information so that they could allocate the market between them.

635.    On February 26, 2014, Nesta of Mylan called Rekenthaler of Teva and the two spoke for sixteen (16) minutes. Nesta informed Rekenthaler that Mylan would not be able to launch on time with Teva. Rekenthaler immediately reported this news internally at Teva. In early March 2014, Teva launched as the exclusive generic Capecitabine manufacturer. Teva remained the exclusive generic Capecitabine manufacturer until Mylan entered in August 2014.

636.    On August 4, 2014, Nesta and Rekenthaler spoke by phone three times. On these calls, Nesta informed Rekenthaler that Mylan would soon enter the Capecitabine market and the pair discussed how to allocate the market.

637.    Later that day, Rekenthaler sent another email, just to Patel, asking her to run a customer report and indicating that Mylan will "be looking at ABC, McKesson, and Econdisc as well as a couple small guys, probably aiming at 35% share." Mylan did seek the business for each of these three companies, and Teva conceded each of them, pursuant to the agreement Rekenthaler had reached with Nesta.

638.    On August 7, 2014, McKesson informed Teva that it received a bid for Capecitabine and gave Teva the opportunity to bid to retain the business. Patel then sent an email to Green,

Rekenthaler, and C.B.2 at Teva to ask if they had "[t]houghts in regards to [loss of exclusivity]." C.B.2, a senior operations executive at Teva, replied that Teva did "have a plan," but C.B. did not want to put the plan in writing. Instead, C.B.2. told Patel she "wi[ll] call" to discuss it. Green, separately, questioned whether the competitive bid was coming from Mylan, and asked Rekenthaler whether he had any additional information. Rekenthaler also did not want to put that "additional information" in writing, so he responded: "I'll catch up with you today."

639.    The "plan" was the market allocation scheme previously agreed to by Nesta and Rekenthaler on behalf of Mylan and Teva. The same day that Mylan put a bid in to McKesson − August 7, 2014 − Nesta and Rekenthaler spoke by phone for nearly thirteen (13) minutes. On that call, Rekenthaler and Nesta discussed Mylan's bid to McKesson and reconfirmed their market allocation scheme.

640.    This market allocation "plan" was highlighted in other emails as well. On August 10, 2014, C.B.2 emailed Rekenthaler, Patel, and Green about the plan. C.B.2 stated that C.B.2's "notes are showing that are (sic) plan is to concede McKesson, Econdisc, Rite-Aid, and Cardinal," but that C.B.2 wanted to confirm. Rekenthaler corrected C.B.2, stating that Mylan is "going after McKesson, ABC (only) and Econdisc," but that Teva "ha[s] not heard from Econdisc yet." Rekenthaler knew Mylan was targeting Econdisc, even though Econdisc had not contacted Teva, because he and Nesta had previously discussed it.

641.    The next morning, at 8:30am on August 11, 2014, Rekenthaler alerted others at Teva that Mylan had received formal approval to market Capecitabine and that he was "[c]hecking on shipping status." Five minutes later, Rekenthaler received a call from Nesta. After exchanging voicemails, the two spoke at 8:52am. The call lasted nearly six (6) minutes. Shortly after hanging up the phone, at approximately 9:02am, Rekenthaler emailed Green, Patel, and others at Teva to confirm

that Mylan's "primary targets are ABC, McKesson and Econdisc." He added that Teva "may hear from some other smaller guys as well" and that he "do[es]n't expect price to be aggressive."

642.    In accordance with their market allocation scheme, Mylan targeted and Teva conceded the Capecitabine business at ABC, Econdisc, and McKesson/Rite-Aid. Teva also conceded some of the "smaller guys" as well, pursuant to the agreement. On August 14, 2014, for example, a smaller customer, Cigna, informed Teva that it received a bid for Capecitabine. On August 18, 2014, Rekenthaler called Nesta to discuss the market allocation scheme and Mylan's bid to Cigna. The pair talked for thirteen (13) minutes. The next day, Green circulated an internal email confirming that Teva "will be conceding this business" at Cigna.

ii.    Teva/Sandoz

1)    Portia and Jolessa

643.    Ethinyl estradiol and levonorgestrel, when used in combination, is an oral contraceptive used to prevent pregnancy. During the relevant time period, both Teva and Sandoz marketed ethinyl estradiol and levonorgestrel under multiple names, including both Portia and Jolessa.

644.    In or around May 2012, Teva had much higher market share than Sandoz for both Portia and Jolessa. Teva's market share for Portia was 37 percent compared to Sandoz's 17 percent, while Teva's market share for Jolessa was 43 percent compared to Sandoz's 11 percent.

645.    On May 11, 2012, Walmart contacted Teva with a right of first refusal and explained that another supplier had made an offer for the sale of four drugs, including Portia and Jolessa. T.C., a senior sales executive at Teva, responded, "We really need to know who is challenging. Sandoz??? Glenmark???" The customer responded that it was Sandoz. T.C. had initially been very reluctant to let Sandoz have the business, candidly remarking to the customer that, "[w]e are not going to let Walmart go to Sandoz [because] we have conceded a number of accounts to Sandoz that were not as strategic to Teva."

646.    After sending out a competitive offer for the sale of three drugs, including Portia and Jolessa, to the customer on May 16, 2012 and an even more competitive offer on May 18, Teva abruptly backtracked on May 23 and removed Portia and Jolessa from the offer. The night before this change in plans, on May 22, Green of Teva spoke on the phone with CW-2, then at Sandoz, for five (5) minutes, and agreed to withdraw the offer for Portia and Jolessa. The decision to concede the Walmart business to Sandoz led to a more equal share split between the companies for both Portia and Jolessa. Teva discussed the decision internally and explained that the reason for the "change in plans" was that Teva was "going to concede this business to Sandoz."

647.    Sandoz continued to coordinate with Teva to achieve its "fair share" of the markets for both Portia and Jolessa. On July 2, 2013, another key customer contacted Teva stating it had received bids on Portia and Jolessa and in order for Teva to retain the business, Teva would need to submit its "best bids." On July 9, 2013, CW-1 of Sandoz called Patel and left a voicemail. Shortly thereafter, they connected for a sixteen (16) minute call. On July 10, Teva learned that the challenger was Sandoz. At 12:16pm, Rekenthaler forwarded an email to Patel and posed the question, "Who's over at Sandoz now?" Patel did not respond by email, but due to the close proximity of their offices, she likely related her conversation with CW-1 directly to Rekenthaler.

648.    Rekenthaler and CW-2 had three phone calls on July 10, totaling eighteen minutes. Later that same evening, Teva submitted a cover bid to the customer for Portia and Jolessa, which the customer described as "not aggressive enough" for their primary supply. Teva submitted an intentionally inflated bid for the two drugs in order to ensure that Sandoz obtained the primary award with the customer.

2)    <u>Temozolomide</u>

649.    Temozolomide, also known by the brand name Temodar, is used to treat glioblastoma multiforme and refractory anaplastic astrocytoma, both cancers of the brain.

650.    The patent on Temodar was set to expire in early 2014, but both Teva and Sandoz had independently obtained the right to launch in August 2013 − six months prior to the patent expiration. Leading up to the launch of the generic, Teva coordinated with Sandoz to divide up the market.

651.    On July 18, 2013, a large retail pharmacy customer ("The Pharmacy") submitted an RFP to Sandoz for Temozolomide. Playing by the rules of the road, Sandoz waited to see what Teva was going to do before submitting its own bid. That same day, CW-1 received a telephone call from Patel. Patel sought information on Sandoz's current customers and discussed options to allocate customers for Temozolomide. Nothing was agreed to on that call.

652.    On July 22, 2013, P.G., a senior Sandoz executive, instructed his team to find out Teva's plans with regard to The Pharmacy: "Please find out if Teva is submitting an offer to them." The next morning, S.G., a National Accounts executive at Sandoz, spoke with The Pharmacy and asked The Pharmacy to find out Teva's plans. S.G. summarized his call with The Pharmacy to his team: "I just spoke to [The Pharmacy] regarding Temozolomide. [The Pharmacy] has not yet received an offer from Teva on the product. At this time, [The Pharmacy] is reaching out to Teva to understand their supply and launch status. [The Pharmacy] will be circling back and I will share the feedback we receive with everyone on this email trail."

653.    At the same time, CW-1 was reaching out to Teva directly to get more information. After exchanging voicemails on July 23, they spoke for over fourteen (14) minutes that same afternoon.

654.    Also, on the afternoon of July 23, The Pharmacy replied to Sandoz and cryptically delivered Teva's message regarding its plans for Temozolomide:

From: ██████████████████████████████
Sent: Tuesday, July 23, 2013 3:26 PM
To: Greenstein, Steven
Subject:

8/11 launch

Looking to play nice in 2 player market

Have supply for that share.

What are your plans?

655.    By using The Pharmacy as its intermediary, Teva was able to communicate to Sandoz (a) when it was prepared to launch Temozolomide, (b) that it was not planning to compete aggressively or pursue more than its fair share, (c) that it had sufficient stock of Temozolomide to sustain around a 50 percent market share, and (d) an inquiry regarding Sandoz's plans for Temozolomide. Sandoz understood the implications of the communication and understood that "Teva is seeking a ~45-50% share." One Sandoz executive responded internally and exclaimed that this was "[g]reat news ...!"

656.    On July 30, 2013, another customer, CVS Caremark, contacted Teva asking for an offer on Temozolomide. T.C., a senior sales executive at Teva, discussed the matter internally and asked her boss, Rekenthaler, "[i]s the strategy to target CVS[?]" Rekenthaler responded by alluding to the deal that had already been struck with Sandoz: "We'll send offers out to everyone. My instincts tell me Sandoz will end up with them as we'll probably be more focused on [The Pharmacy] on this one. Again, we'll send them out an offer same time as everyone else and respond from there." Rekenthaler most likely got his information from Patel. Just one day earlier, on July 29, 2013, Patel had called CW-1 at Sandoz and spoke for nine (9) minutes, where the two discussed how to carve up the market for the drug.

657.    Teva and Sandoz were also coordinating through other channels. After receiving the RFP from The Pharmacy, S.G. of Sandoz coordinated with T.S., a senior account executive at Teva, on a seven (7) minute call on July 29, 2013, followed by an eleven (11) minute call on July 31, 2013. After those calls, S.G. suggested in an internal email on July 31 that Sandoz cede the business and instead submit a cover bid: [The Pharmacy] has received an offer from Teva on Temozolomide. They are asking for an offer from Sandoz. Even if we decide not to take this business, I would recommend that we submit an offer."

658.    Similarly, on July 29, 2013, Green spoke to CW-2 of Sandoz two (2) times. The two spoke again on July 31, 2013 for six (6) minutes. During those calls, Green told CW-2 about Teva's launch plans and that Teva wanted The Pharmacy's business. The next day, August 1, 2013, D.P., another Sandoz executive, emailed Kellum, conveying the message from Green:



659.    Teva and Sandoz communicated their future plans with each other for other accounts in addition to The Pharmacy and CVS. On July 31, 2013, D.P. of Sandoz emailed an update on Temozolomide to his coworker, stating: "Teva has sent offers to ABC and [The Pharmacy] and is planning to send to Econdisc tomorrow[.]"

660.    Going forward, Sandoz and Teva continued to coordinate with respect to Temozolomide. On August 12, 2013, the same day as Teva's launch, CW-2 met in person with

Rekenthaler at the Grand Lux Café in Las Vegas during the NACDS Total Store Expo conference. There, Rekenthaler discussed, among other things, Temozolomide and informed CW-2 that Teva had officially launched and shipped all formulations of the drug.

661.    Although Teva initially obtained the CVS account in August 2013 due to Sandoz's inability to supply the 250mg strength of Temozolomide, the companies had agreed that the account would revert back to Sandoz once Sandoz could supply that dosage strength. In an internal email dated August 16, 2013, a Teva employee confirmed the plan: "This is perfect I spoke to [a CVS representative] and as soon as Sandoz is available to launch the 250mg we kill the contract."

662.    CW-1 spoke to Patel both before and after Sandoz sent out any offers regarding Temozolomide in an effort to develop and ensure the appropriate fair share balance between the two competitors.

### 3)    Tobramycin

663.    Tobramycin, also known by the brand name Tobi, is an eye drop used to treat bacterial infections.

664.    Beginning in October 2013, prior to the first generic launch of Tobramycin (for which Teva would have 180-day generic exclusivity), Sandoz began making plans for its entry after Teva's exclusivity period. These plans included going after Sandor's "fair share," but depended on Teva being "rational." A.S.2, a Sandoz executive responsible for product launches, wrote in an internal email in October 2013: "[w]e will aim to go for our fair share of the market, and exact goals will depend on how Teva goes into the market on day 1, and how rational they behave on day 181."

665.     As expected, Teva was "rational" when it came time to give up share to Sandoz. Nearing Teva's loss of exclusivity and Sandoz's entry, on July 1, 2014, Teva and Sandoz began sharing information and coordinating to divide up the market for Tobramycin. Patel exchanged seven (7) calls with CW-1 on July 1, during which they discussed Sandoz's launch plans and how to divide up the

market for Tobramycin. Patel conveyed some of this information in an internal Teva email the same day, writing, "[A]s a heads up, I heard that Sandoz plans to ship Tobi [Tobramycin] prior to Akorn. Hearing they are ready to ship once they secure business, and we have been challenged." The next day, Teva made the decision to concede two different accounts for Tobramycin to Sandoz.

666. On July 7, 2014, Patel and CW-1 spoke five more times, including one call lasting eleven (11) minutes. On these calls, CW-1 and Patel discussed how to divide up the market for Tobramycin, including specific accounts that each would maintain or concede to the other. Patel then memorialized the agreement in an email two days later. The result: Teva would take Walgreens, McKesson, Econdisc, ABC, and Omnicare; while Sandoz would take CVS, Cigna, Prime Therapeutics, Kinney Drugs, and OptumRx. Teva also planned to concede the Cardinal business to Sandoz.

667. Patel told CW-1 specifically that Teva would not even submit a bid to CVS. This was significant because Tobramycin was a very expensive product, and Sandoz was able to acquire the CVS business by offering only a nominal reduction to the extremely high Teva price.

668. According to plan, Teva conceded the CVS business to Sandoz after CVS contacted Teva and requested that Teva submit a lower price to retain the business. Rekenthaler wrote in an internal email, "I notified CVS that we would be conceding their business. [T.C.], never a pleasant call so I figured I'd simply handle it myself." Teva also went through with its plan to concede Cardinal to Sandoz.

669. CW-1, in turn, told Patel that Sandoz would not pursue business from ABC and Walgreens. CW-1 spoke with Kellum about his conversations with Patel and the agreement to stay away from Walgreens and ABC, and Kellum agreed with the plan. Pursuant to that agreement, Sandoz made no effort to contact those two large customers when it entered the market.

670.    CW-1 and Patel also discussed Sandoz's target market share. CW-1 informed Patel that Sandoz was seeking a 50 percent share, but Patel thought that was "unrealistic due to Akorn's expected entry." After discussing Sandoz's share goal with Rekenthaler, Patel went back to CW-1 and informed him "that a 25% share was reasonable." Sandoz appeared to comply with that, as Patel observed that Sandoz "appear[s] to be taking a responsible approach."

671.    On July 9, 2014, one of the allocated customers, Kinney Drugs, approached Teva asking for a lower price on Tobramycin. A Teva analyst stated in an internal email, "we are strategically going to decline to bid on this request per Nisha." A Teva national accounts director was confused by this decision and responded, "Really? Do you have a little more detail? It is such a small qty." The analyst responded and said, "we were given direction from Nisha not to pursue this opportunity. My understanding of this is there is a new market entrant, (Sandoz) and we are trying to keep our current customers instead of picking up new business." Patel's direction had come after she had called CW-1 at Sandoz twice on July 9, 2014 and left him a voicemail. CW-1 then returned her call the same day and the two spoke for four (4) minutes.

4)    Dexmethylphenidate HCL Extended Release

672.    Dexmethylphenidate HCL Extended Release ("Dexmeth ER") is a generic version of the drug Focalin, and it is used to treat attention deficit hyperactivity disorder (ADHD).

673.    As Sandoz was preparing to enter the market on the 40mg strength of Dexmeth ER in February 2014, Patel of Teva spoke frequently with CW-1 at Sandoz about how to divide the market so that Sandoz could obtain its fair share without significantly eroding the price. On February 10, 2014, for example, CW-1 began internal preparations to pursue the Rite Aid account for Dexmeth ER 40mg. Later that night, CW-1 called Patel and the two spoke for more than thirteen (13) minutes. On February 18, Patel left a voicemail for CW-1. That same day, Teva conceded the Rite Aid account to Sandoz. Patel and CW-1 then spoke again by phone on February 20, 2014.

145

674.    Similarly, on February 12, 2014, Sandoz submitted a bid to ABC for the 40mg strength of Dexmeth ER. After Patel spoke with CW-1 on February 10 and again on February 12, 2014, Teva agreed to let Sandoz have the business. In an email to her team on February 12, Patel summarized the understanding that Teva had reached with Sandoz:



> From:    Nisha Patel02
> Sent:    Wed 2/12/2014 8:34 PM (GMT-05:00)
> To:      ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
> Cc:
> Bcc:
> Subject: Re: ABC Dexmethylphenidate 40mg - Challenge
>
> We have 100% of the market, so will have to give someone up. ABC is the smallest wholesaler, so it makes sense for this class of trade. Sandoz is being responsible with their pricing. We should be responsible with our share. Plus, between the WBAD members, makes more sense to hold onto Walgreens than ABC, if we were going to lose one of them.
>
> Sent from my iPhone

One of the Teva national account managers on the email responded by confirming that the approach "makes total sense."

675.    On February 14, 2014, Teva also refused to lower its price for Dexmeth ER when approached by a GPO customer, Anda, even though Sandoz's price was not significantly lower than Teva's—essentially conceding the business to Sandoz.

676.    Further, on February 20, 2014, another large retail customer approached Teva, indicating that because a new competitor had launched for Dexmeth ER, the customer was entitled to certain price protection terms (i.e., a lower purchase price for the drug). Patel spoke to CW-1 the same day for almost twenty-one (21) minutes. The next day, February 21, Patel responded internally about the customer's request, with additional inside information from Sandoz, stating: "[t]he competitor (Sandoz) has not yet shipped.  The new price will become effective on and the price protection should be calculated on the date that Sandoz ships. The expected date is 2/28/14."

677.    Also on February 21, 2014, Patel sent a calendar invite to Rekenthaler and other team members for a meeting on February 24 where one of the topics to be discussed was "Post Launch

Strategy" for "Dexmethylphenidate 40mg: Sandoz (AG) entering market." Not surprisingly, she called CW-1 a few days later, on February 27, to further coordinate about Dexmeth ER.

678.    Throughout this time period, Sandoz abided by fair share principles and its ongoing understanding with Teva. In February 2014, Sandoz's target market share for varying strengths of Dexmeth ER varied by how many manufacturers were in the market.

679.    Teva and Sandoz were not alone in allocating customers for certain formulations of Dexmeth ER. The agreement was also carried out by other manufacturers allowing Sandoz to take share from them. In February 2014, for example, as Sandoz was seeking share on the 15mg dosage strength of Dexmeth ER, Par "gave up the business to keep the market share even." As Sandoz was entering the market, Rekenthaler of Teva was speaking to M.B., a senior national account executive at Par, right around the same times that Patel had been speaking to CW-1 including two calls on February 10 (18 and 3 minutes), two (2) calls on February 19 (2 and 22 minutes), and calls on February 24 and 25, 2014  in order to effectuate the scheme.

680.    The market allocation scheme between Teva and Sandoz on Dexmeth ER continued through at least mid-2015. On May 6, 2015, for example, Teva declined to submit a bid to Walgreens for Dexmeth ER Sig on the basis that "there is equal share in the market between competitors." Similarly, on June 30, 2015, Sandoz declined to put in a bid to Managed Health Care Associates, a large GPO, on Dexmeth ER 20mg, on the basis that Sandoz already had 57 percent market share − greater than its sole competitor on this dosage strength, Teva. When a Sandoz national account representative communicated this decision to the customer, he lied and explained that the decision not to bid was based on limited supply.

         iii.     Teva/Lupin
             1)     Lamivudine/Zidovudine (generic Combivir)

681.    Lamivudine/Zidovudine, also known by the brand name Combivir, is a combination of medications used in the treatment of human immunodeficiency virus (HIV) infection. This combination of drugs is often prescribed to decrease the chances that an HIV-positive patient will develop acquired immunodeficiency syndrome (AIDS) or other related illnesses.

682.    Teva launched its generic Combivir product in December 2011.

683.    In mid-May 2012, two competitors, Lupin and Aurobindo, received FDA approval for generic Combivir and were preparing to enter the market.

684.    Even before those two companies obtained FDA approval, Teva was communicating with both about how to share the market with the new entrants. Rekenthaler was speaking to R.C, a senior-most executive at Aurobindo, while Green was speaking to Berthold of Lupin and Grauso of Aurobindo.

685.    For example, on April 24, 2012, T.C. of Teva asked her co-workers whether they had heard about any new entrants to the market for generic Combivir. Rekenthaler responded immediately that Aurobindo was entering. When T.C. questioned that information based on her understanding of how quickly the FDA typically approved new product applications, Rekenthaler assured her that the information was coming from a reputable source:



**From:** Dave Rekenthaler
**Sent:** Tuesday, April 24, 2012 11:17 AM
**To:**
**Subject:** RE: what r you guys hearing on generic combivir?

It was brought up to me last week by our good friend so I'm assuming it's accurate.

That "good friend" was Aurobindo's R.C., who had previously worked with both T.C. and Rekenthaler while at Teva. Rekenthaler was reluctant to identify R.C. in writing as it would evidence conspiratorial

communications between the two competitors. To confirm this information, Green also called and spoke to Grauso of Aurobindo that same day for twelve (12) minutes and Berthold of Lupin for four (4) minutes.

686.    After speaking with Berthold, Green responded separately to T.C., providing specific information regarding Lupin's entry plans, including commercially sensitive intelligence about Lupin's anticipated bid at a large wholesaler. Green and Berthold then spoke again the next day, April 25, 2012, for seven (7) minutes.

687.    In early May, with the Lupin and Aurobindo launches just days away, communications among all three competitors accelerated noticeably. Over the four-day period from May 7 to May 10, for example, the three companies spoke at least 32 times.

688.    During this four-day period, the three individuals were negotiating and discussing the specific customers that Teva would concede and retain in order to make Lupin and Aurobindo's entry into the generic Combivir market as seamless as possible.

689.    On May 10, 2012, at the conclusion of this four-day period of intensive communications, Green of Teva informed his colleagues of the results. He confirmed that "Lupin and Aurobindo anticipate approval and launch." Importantly, he went on to list the specific accounts that Teva had negotiated to retain in order to hold on to a 40 percent market share in generic Combivir. Green also identified the specific accounts that Teva would concede to its competitors Aurobindo and Lupin.

690.    Even before the negotiations with Aurobindo and Lupin were finalized, Green made it clear to the sales team that Teva would be cooperating with its competitors to provide them with their fair share of the generic Combivir market. On May 9, 2012, when a major customer was pressing Teva for a bid, Green instructed T.C. that Teva did not plan to keep that customer. When T.C. asked if

she should provide any bid at all, Green directed her to provide a sham bid, saying: "We can send them a proposal that will not work."

691.    Three days later, when preparing the bid for that customer, T.C. pushed back on Green's directive on price, asking: "Can we send something that at least looks like we are trying?" But Green refused, responding that they could not go any lower or else Teva might risk actually winning the business. He concluded: "We really need to concede this business with the accounts we have kept."

692.    In a separate email exchange with T.C. on that same day, May 11, 2012, Green told T.C. that another of her major customers was not on the list for Teva to retain with respect to generic Combivir. He reminded her of the goal of the overarching conspiracy, stating that Teva should concede that customer "in order to preserve market pricing as much as possible." Green pointed out that such a move would give Teva its fair share as the first entrant: "40-45% market share in a three player market." T.C. then informed that customer that Teva would not compete for its business because "we need to concede some share."

693.    Lupin was able to enter the market for generic Combivir and obtain more than a 30 percent market share without significantly eroding the price due to the understanding with Teva and Aurobindo that each was entitled to its fair share of the market.

2)    Irbesartan

694.    Irbesartan is a drug used in the treatment of hypertension. It prevents the narrowing of blood vessels, thus lowering the patient's blood pressure. Irbesartan is also known by the brand name Avapro.

695.    Teva received approval to manufacture generic Irbesartan in March 2012.

696.    On March 6, 2012, Teva's Green polled the Teva sales team seeking information about competitors that were also making offers to supply Irbesartan.

697.    At 11:27am, J.P., an account manager at Teva responded: "Lupin is promising offers today." Less than twenty minutes later, Green placed a call to Berthold at Lupin. They talked for seventeen (17) minutes. Shortly after hanging up the phone, Green emailed his colleagues with the information he obtained:



698.    At 10:54am the next day, Green called Berthold again. They spoke for nearly seven (7) minutes. At 12:20pm, Green of Teva shared with the sales team the competitively sensitive information Green had obtained. Included were the details Berthold had shared with Green about which competitors were launching/not launching the drug, and the identity of the customers that received offers. Green stated that Teva was in a position to take up to a 40 percent market share when it launched Irbesartan on March 30, 2012.

### 3)    Drospirenone and ethinyl estradiol (Yasmin)

699.    Drospirenone and ethinyl estradiol, commonly known by the brand name Yasmin, are a pair of drugs used in combination as an oral contraceptive.

700.    Barr Pharmaceuticals received approval to market generic Yasmin in 2008 under the trade name Ocella, and Teva continued to market the drug after the acquisition of Barr in 2011.

701.    In late 2012, Lupin received approval to market a generic Yasmin product.

702.    By April 2013, Lupin was making plans for a summer 2013 entry into the market and contacted Teva to initiate negotiations on how the competitors would allocate fair share between

themselves. On April 24, 2013, Berthold of Lupin called Green at Teva. The two spoke for over three (3) minutes. Berthold called Green two more times the following day.

703.    The negotiations intensified the following week among Teva, Lupin, and a third competitor − Actavis. In preparation, on April 29, 2013, Green of Teva asked a colleague for current market share figures along with a list of Teva's generic Yasmin customers. The colleague responded with a customer list, estimating Teva's current share of the market at 70-75 percent.

704.    The next day, April 30, A.B., a senior sales and marketing executive at Actavis, and Rekenthaler of Teva spoke twice by phone. That same day, Patel of Teva also called A.B. On May 1, Patel sent A.B. four (4) text messages.

705.    The competitors' communications continued into early May. On May 6, Patel and Berthold spoke twice by phone, the second call lasting twenty-two (22) minutes. Green and Berthold also spoke that same day. On May 7, Patel and Berthold had yet another call, this one lasting over ten (10) minutes. Patel also placed a call to Rogerson at Actavis, which lasted thirty-nine seconds.

706.    Faced with the news it had received from a major customer on May 8 − that Actavis had bid for that customer's business for generic Yasmin−Teva doubled down on its efforts to reach a deal with its competitors that would give each its fair share. Patel called Rogerson on May 8, and they spoke for nineteen (19) minutes. On May 9, Green spoke with Berthold twice, for one (1) and twelve (12) minutes, respectively.

707.    The following day, Teva's L.R. complied with Rekenthaler's request for an analysis of the business Teva would lose by conceding its two major customers for this drug to Actavis and/or Lupin. Armed with that analysis, Patel spoke to Berthold three times that afternoon − with one call lasting over seventeen (17) minutes. Patel also called Rogerson at Actavis and the two spoke for more than five (5) minutes.

708.    On May 14, 2013, Green of Teva recommended to Rekenthaler that Teva concede the business to Actavis. Rekenthaler replied simply: "Agreed."

709.    On July 10, 2013, Green spoke to Berthold twice (for more than eight (8) minutes and more than two (2) minutes). Later that day, Green called and spoke to Patel for more than seven (7) minutes, conveying what he had learned from Berthold. During that call, the two decided that Patel would call Berthold back and confirm the agreement between Teva and Lupin. Patel called Berthold shortly after and the two spoke for more than four (4) minutes. They spoke again first thing the next morning, for nearly one (1) minute. Patel then confirmed to Green that she and her contact at Lupin had agreed on the arrangement about Ocella.

710.    Discussions between Teva and Lupin continued on July 17, 2013 with a call between Green and Berthold that lasted twenty (20) minutes.

711.    On July 29, 2013, Green announced to his colleagues: "Lupin has entered and we need to evaluate."

712.    The lines of communication between competitors Teva and Lupin remained open and active over the next few months as they worked on the details of which company would take which generic Yasmin accounts. On September 5, 2013, for example, Rekenthaler conveyed to a colleague the importance of retaining a particular customer's account, along with his understanding of Green's discussions with Berthold about Lupin's desired market share. Green spoke to Berthold by phone twice the following day to confirm the understanding between the two companies.

713.    On September 9, 2013, Green of Teva sent an internal email to his colleagues conveying his thoughts about Lupin's bid for a portion of another customer's generic Yasmin business. He informed them that because Teva had secured two other significant customers, "we will likely need to give up some of our formulary position to this new market entrant."

714.    In mid-October 2013, as Teva and Lupin finalized the allocation of accounts between them, Green sent a word of caution to a co-worker, reminding her of the parameters of the furtive arrangement. He told her to be careful before conceding large  customers on a "bucket basis" rather than drug-by-drug in order to "make sure we are not giving up volume on products where we do not have our fair share."

4)    Norethindrone/ethinyl estradiol (Balziva)

715.    Norethindrone/ethinyl estradiol, also known by the brand name Ovcon 35, is a combination of medications used as an oral contraceptive. Teva markets its generic version of this combination medication under the name Balziva.

716.    On January 23, 2014, a customer informed Teva that a new market entrant was seeking a share of its business. Teva employees surmised that the entrant was Lupin, as it had recently obtained approval to begin marketing its generic of Ovcon 35.

717.    Teva employees discussed internally how to make room for this new player in the market, with one expressing concern that "[w]e would lose our current market lead if we were to concede this business."

718.    The discussions about how to share the market with the recent entrant were not limited to internal communications, however. On January 24, 2014, Patel spoke to Berthold at Lupin twice by phone.

719.    Five days later, on January 29, Patel informed Rekenthaler of her recommendation based on her communications with Berthold, to take a cooperative stance towards this competitor, saying: "Kevin and I are in agreement that we should concede part of the business to be responsible in the market."

154

720.    On February 4, Patel received the profitability analysis she requested in order to determine how much of the customer's business to hand over to Lupin. That same day, she spoke to Berthold two more times to further coordinate Lupin's seamless entry into the market.

iv.    Teva/Greenstone
1)    Oxaprozin Tablets

721.    Oxaprozin, also known by the brand name Daypro, is a nonsteroidal anti-inflammatory drug (NSAID). It is used to treat rheumatoid arthritis, osteoarthritis, and juvenile rheumatoid arthritis.

722.    Greenstone entered the market for Oxaprozin 600mg Tablets on March 27, 2013. It entered with the exact same WAC pricing as Teva. In the three weeks leading up to Greenstone's entry into the market, Green of Teva and Hatosy, an account executive at Greenstone, were in frequent communication by phone and text. During these communications, Teva agreed to concede specific customers to Greenstone in order to avoid competition and price erosion resulting from Greenstone's entry.

723.    Part of the understanding between the companies was that Teva would concede at least two large customers−CVS and Cardinal−to Greenstone, and that Teva would retain Walmart as a customer. On March 27, 2013, however, Teva learned that Greenstone had either misunderstood the deal or was trying to cheat on the agreement by approaching Walmart.

724.    On March 27, 2013, T.C. of Teva forwarded an email that T.C. had received from Walmart to Green and Rekenthaler. The email from Walmart, sent the same day, requested that Teva provide a more competitive price on Oxaprozin 600m tablets because Walmart had received a new bid from a competitor (Greenstone).

725.    Rekenthaler's immediate reaction to T.C.'s email was "Great. More idiots in the market . . ." In subsequent emails between T.C. and Rekenthaler, T.C. reminded Rekenthaler that, pursuant to

the agreement with Greenstone, "[w]e just conceded at cardinal ...remember[?]" Rekenthaler corrected T.C., stating that Teva had conceded both Cardinal and CVS to Greenstone. Rekenthaler remarked that "[t]hey should not have gone to Walmart. Poor strategy on their part for sure." In her reply, T.C. made it clear that there was an understanding between Teva and Greenstone: "I thought they said they were done after cardainl (sic). I am pissed."

726.    Teva took immediate steps to address the situation. That same day, Green called Hatosy at Greenstone at 5:25pm but she did not answer. The next morning, at 8:06am, T.C. sent an email to Walmart stating: "Addressing this morning..." Less than a half hour later, T.C. sent an email to Green, stating: "CALL ME IN MY OFFICE when you get a chance."

727.    After Green spoke to T.C., he immediately called Hatosy at Greenstone. Hatosy relayed the information from Green to her boss, Nailor, in a series of conversations and text messages over the course of the day. During those conversations, Greenstone agreed to withdraw the offer to Walmart and honor the agreement with Teva.

728.    At 1:22pm that day, after several of the communications identified above, Walmart sent an email to T.C. at Teva confirming that Greenstone had in fact withdrawn its offer: "FYI−I just received word from Greenstone that they have met their market share and the proposal has expired. Please see what you can do with pricing." T.C. forwarded the email to Green, with a one-word response making it clear that Teva would not be reducing its price for Oxaprozin: "FUNNY."

729.    Pursuant to the agreement between Greenstone and Teva, there was very little price erosion as a result of Greenstone's entry. A couple of months later, as Defendant Dr. Reddy's was preparing to enter the market for Oxaprozin (discussed more fully below), a Dr. Reddy's representative commented positively that "[p]ricing [is] still high" on Oxaprozin. That same representative had also talked to wholesaler Cardinal about the drug and conveyed that "Cardinal switched to Greenstone. Teva was 'fine' with it!"

156

2)      <u>Tolterodine Tartrate</u>

730.    Tolterodine Tartrate, also known by the brand name Detrol, is in the antispasmodics class of medications. It is used to treat overactive bladder by improving the ability to control urination.

731.    Greenstone entered the market for Tolterodine Tartrate 1mg and 2mg Tablets ("Tolterodine") on January 23, 2014 with the exact same WAC prices as Teva for all formulations. In the days leading up to Greenstone's entry, Hatosy and Nailor of Greenstone spoke over a half-dozen times to Patel and Rekenthaler of Teva to coordinate Greenstone's entry into the market. During these calls and text messages, Teva and Greenstone agreed that Teva would concede business to Greenstone in order to avoid significant price erosion in the market.

732.    The day after Greenstone's entry–January 24, 2014–in a message to Teva national account managers about how important it was for them to determine and document which competitor was challenging Teva for business in a particular situation because it would help Teva determine whether to concede or not, Patel stated: "As we've heard, Greenstone is entering the market for Tolterodine. I'm sure we will have to concede somewhere."

733.    On January 28, 2014, Teva was informed by CVS that it had received a competitive price challenge on Tolterodine. Green of Teva immediately asked: "do we know who this could be?" Rekenthaler responded that it was Greenstone, but did not want to put the details into writing: "It's Greenstone, new to market. We can discuss." The next day, Patel and Hatosy of Greenstone tried to reach each other several times, and were ultimately able to speak once, for more than two (2) minutes.

734.    On Monday, February 3, 2014, Patel instructed a colleague at Teva to concede the business at CVS by providing a small price reduction that she knew would not be sufficient to retain the business. T.C. of Teva, who had the customer relationship with CVS, challenged the decision to concede the business. Rekenthaler responded–again not wanting to put the details into writing:

On Feb 3, 2014, at 11:29 AM, "Dave Rekenthaler" <Dave.Rekenthaler@tevapharm.com> wrote:

■ I'll discuss the details of this with you later. There was a strategy here and you weren't in the office Thursday or Friday so we proceeded. Again, it will make sense after I discuss with you.

The next day, Patel called Hatosy at Greenstone, and the two spoke for nearly sixteen (16) minutes.

735.    After some internal discussions at Teva regarding the CVS business, Teva confirmed its decision to concede CVS to Greenstone. CVS represented more than 20 percent of Teva's business on Tolterodine.

3)    <u>Piroxicam</u>

736.    Piroxicam, also known by the brand name Feldene, is a nonsteroidal anti-inflammatory drug (NSAID). Piroxicam is used to treat rheumatoid arthritis, osteoarthritis, and juvenile rheumatoid arthritis.

737.    On March 3, 2014, Greenstone received FDA approval to market Piroxicam Capsules. It entered the market with the exact same WAC pricing as Teva for both the 10mg and 20mg capsules.

738.    Greenstone immediately began seeking potential customers. At 10:07am on March 5, 2014, J.L. of Teva sent an email to Patel informing her that Greenstone had just received Piroxicam approval and was challenging Teva on several accounts. J.L. asked Patel: "Do we have any strategy in place for Piroxicam?"

739.    Before responding to that email, Patel sought to negotiate strategy with Greenstone. Patel called Hatosy at Greenstone at 10:55am and they spoke briefly. Shortly after that call, Patel also called Hatosy's boss, Nailor. At 2:14pm that afternoon, Patel and Nailor spoke briefly. Immediately after hanging up with Nailor, Patel responded to J.L.'s email:



740.    Teva immediately began preparing a strategy to deal with Greenstone's entry into the Piroxicam market. On March 6, 2014, Patel requested a customer profitability and share analysis. During these negotiations with competitors regarding market entry, it was typical for Teva employees to request a "customer profitability and share analysis" (as Patel did here) so they could easily determine which customers to concede when talking to competitors about dividing the market.

741.    That same day, Patel had multiple calls with Nailor and Hatosy at Greenstone to discuss their plans for dividing the Piroxicam market.

742.    The next day, Patel sent an email to L.R., a customer marketing manager at Teva, identifying specific customers to concede to Greenstone. Based on her several conversations with Greenstone, and her understanding of the concept of fair share, Patel also noted: "I'm guessing that Greenstone will not stop here since we are the share leader, but for the customers listed below, we should concede. We will review additional challenges as they come, if they come."

743.    Additional challenges did come. On March 12, 2014, Patel learned that Greenstone was challenging Teva at CVS−Teva's largest account for Piroxicam. Teva refused to concede CVS to

Greenstone because CVS represented 26.1 percent of Teva's total market share for that drug. Teva lowered its price by 20 percent, and the next morning CVS notified Teva that it would retain the account. The same day, after hearing that Teva was not going to back down on the CVS challenge, Hatosy of Greenstone called Patel at 1:41pm, and they spoke briefly.

744.    Teva and Greenstone continued to coordinate their allocation over the coming days and weeks. On March 17, 2014, Patel called Hatosy and they spoke briefly. Hatosy called Patel back at 11:35pm that same day and they spoke for fifteen (15) minutes. Immediately after speaking to Patel, Hatosy called Nailor, and they spoke for ten (10) minutes. Teva retained the CVS account but conceded other customers (representing less market share) to Greenstone through March and April.

745.    For example, on March 25, 2014, Teva learned of a challenge from Greenstone at Anda, a wholesaler distributor. Following an analysis of its market share, Teva determined that it still had more than its fair share of the market. Pursuant to the understanding among generic manufacturers alleged above, Teva determined that it would be prudent to concede the Anda business to Greenstone on Piroxicam, in order to alleviate any future challenges from Greenstone. Patel agreed with the decision to concede on April 1, 2014.

### 4)    Cabergoline

746.    Cabergoline, also known by the brand name Dostinex, is used to treat medical problems that occur when too much of the hormone prolactin is produced. It can be used to treat certain menstrual problems, fertility problems in men and women, and tumors of the pituitary gland.

747.    In December 2014, as Greenstone was preparing to enter the market for Cabergoline, F.H., a senior executive responsible for generic products at a large joint venture between a retail pharmacy ("The Pharmacy") and a large wholesaler ("The Wholesaler") to pool the companies' drug purchasing globally, approached T.C. of Teva on Greenstone's behalf. In a December 9, 2014 email, F.H. directly sought to facilitate a customer allocation between Greenstone and Teva: "I need to talk

to you about Cabergoline. Greenstone is now shipping and they are targeting [The Wholesaler] and 2 small grocery chains. [The Wholesaler] owes Greenstone a favor and would be ok if you walked away from their business. Greenstone has promised to play nice in the sandbox. Let me know if you are available to discuss." The Wholesaler represented about 13 percent of Teva's total business for Cabergoline, and about $861,000 in annual net sales.

748.    T.C. of Teva did not respond immediately, asking for a little extra time "to figure something out on our side." F.H. responded: "Of course. I will let Greenstone know not to do anything crazy."

749.    The next day, after some internal conversation at Teva, T.C. agreed to the proposed allocation: "Tell Greenstone we are playing nice in the sandbox and we will let them have [The Wholesaler]."

750.    Pursuant to this agreement, Greenstone was able to acquire The Wholesaler as a customer for Cabergoline without any fear that Teva would compete to retain the business. In exchange, Greenstone agreed to "play nice in the sandbox"-i.e., not compete with Teva for other customers and drive prices down in the market.

                    v.    Teva/Actavis

                    1)    Amphetamine/Dextroamphetamine ER

751.    Amphetamine/Dextroamphetamine Extended Release, also known by the brand name Adderall XR, is a medication used in the treatment of attention deficit hyperactivity disorder (ADHD). The drug is comprised of a combination of dextroamphetamine salts and levoamphetamine salts and is sometimes referred to as "Mixed Amphetamine Salts" or "MAS." Teva began marketing generic Amphetamine/Dextroamphetamine Extended Release ("MAS-XR"), after the expiration of brand manufacturer Shire's patent on Adderall XR.

752.    On April 9, 2012, a large customer contacted Teva to request a price reduction because a new competitor had expressed an interest in "all or some" of its MAS-XR business. A senior Teva sales director, T.C., insisted on knowing the identity of the competitor before deciding what Teva's response would be. The customer responded that the competitor was Actavis, and that Actavis was expecting approval soon to enter the market for that drug. Teva deferred its decision on pricing until Actavis was in a position to ship the product.

753.    Actavis obtained FDA approval to manufacture various formulations of MAS-XR on June 22, 2012. At 9:58pm that same evening, Rekenthaler instructed Teva employees to find out Actavis's plans regarding its newly-approved generic, including shipping details and inventory levels. At 8:32am the next morning, Teva employee T.S. responded that she had spoken to Michael Perfetto, then a senior Actavis sales and marketing executive, and conveyed to Rekenthaler the details of their conversation:



The customer that had sought a price reduction from Teva in April 2012 was not among those named by Actavis as its targets.

754.    Upon learning which customers Actavis wanted, T.C. warned colleagues that this allocation of market share could be tricky. She cautioned that if Teva decided to concede a particular wholesaler to Actavis, it needed to be "mindful" that the wholesaler also did product warehousing for a different customer whose business Actavis was not soliciting.

755.    One year later, Teva's customer renewed its request for a price reduction on MASXR, citing Actavis's desire to gain a share of the customer's business for the drug. On May 7, 2013, T.C.

162

informed the customer that Teva would agree to revise its price in order to retain 100 percent of the customer's business. T.C. made it clear that Teva had already conceded an appropriate amount of business to its competitor. She stated: " . . .we have plenty of supply and want to keep you [sic] full business [sic] we have already let other customers go to activis [sic] go to help the market dynamites [sic]."

2)    <u>Amphetamine/Dextroamphetamine IR</u>

756.    Amphetamine/Dextroamphetamine Immediate Release, also known by the brand name Adderall IR, is a medication used in the treatment of attention deficit hyperactivity disorder (ADHD). The drug is an immediate release formulation comprised of a combination of dextroamphetamine salts and levoamphetamine salts and is sometimes referred to as "Mixed Amphetamine Salts" or "MAS-IR."

757.    In March 2014, Aurobindo was making plans to enter the market with its MAS-IR product. On March 18, 2014, Teva's J.P. shared with her colleagues that Aurobindo's market share target for the impending launch was 10 percent. Teva's senior marketing operations executive, Green, indicated that Teva was aware that both Aurobindo and Actavis were launching.

758.    A flurry of telephone communications between Teva and these two competitors took place on the days surrounding the foregoing email. The day before, on March 17, 2014, Patel had spoken to Actavis's Director of Pricing, Rick Rogerson, three (3) times. Rekenthaler and Falkin of Actavis also spoke once on that day. On March 18, 2014, the day of the email, Rekenthaler and R.C, a senior-most executive at Aurobindo, had a thirty (30) minute telephone conversation. Rekenthaler and Falkin spoke again seven (7) times on March 20, 2014.

759.    On April 16, 2014, Teva received word from a customer that a new competitor in the market had offered a lower price than Teva's current price for MAS-IR. Patel informed Green that the challenge was coming from Actavis and recommended that Teva concede that customer's account. At

163

1:43pm, she communicated to another colleague that the decision had been made to concede. Apparently closing the loop, she called Rogerson at Actavis at 1:55pm. They spoke for just over four (4) minutes.

3)    Dextroamphetamine Sulfate Extended Release

760.    Dextroamphetamine Sulfate Extended Release, also known by the brand name Dexedrine and sometimes referred to as "Dex Sulfate XR," is a medication used to stimulate the central nervous system in the treatment of hyperactivity and impulse control.

761.    On June 19, 2014, as Actavis was entering the market for Dex Sulfate XR, Patel reviewed a profitability analysis for that drug and asked Rekenthaler what share of the market Actavis was targeting. Rekenthaler responded: "20-25%." Rekenthaler knew Actavis's market share goals because he and Falkin of Actavis had spoken twice by phone that morning—once for more than eleven (11) minutes and again for more than nine (9) minutes.

762.    Five days later, on June 24, 2014, Teva employee S.B. confirmed to her colleagues in an email that Actavis had entered the market for Dex Sulfate XR. She remarked that Teva had a 72.2 percent share of this "multi-player market" and thus recommended giving up a large customer to Actavis and reducing Teva's market share to 58.3 percent, in accordance with the industry understanding to allocate the market and Teva's ongoing agreement with Actavis. Later internal emails confirmed Teva's decision to concede that customer to Actavis because "Actavis is entering the market and seeking share."

4)    Clonidine-TTS Patch

763.    Clonidine-TTS Patch, also known by the brand name Catapres-TTS, is a transdermal patch that is used to treat high blood pressure.

764.    Teva began marketing Clonidine-TTS in 2010 after the expiration of brand manufacturer Boehringer Ingelheim's patent on Catapres-TTS.

765.    On May 6, 2014, Actavis was granted approval to market Clonidine-TTS. Teva and Actavis immediately commenced an extensive negotiation over price and market share. Rekenthaler and Falkin spoke by phone three times that day for fifteen (15) minutes, one (1) minute, and three (3) minutes, respectively.

766.    The next day, Rekenthaler announced to his colleagues that Actavis was entering the market. Green of Teva responded by requesting that Patel come up with a recommendation as to which customers Teva should concede to Actavis. At the same time, Teva employees bemoaned Actavis's "ridiculous" low pricing for a new entrant, saying that price "is already eroded here."

767.    On May 8, 2014, Teva personnel accelerated their efforts to convince Actavis to revise its pricing and market share plans for Clonidine-TTS to more acceptable levels with an even more intensive flurry of phone calls. On that day, Rekenthaler spoke to Falkin three more times (5-, 10-, and 8-minute calls). Patel spoke to Rogerson at Actavis four times, the last call coming at 9:54am. At 10:02am, she informed her colleagues of the results of the negotiations, instructing them: "Please concede Ahold and HEB."

768.    The following day, May 9, 2014, Patel learned from yet another customer of a "competitive price challenge" on this drug. Suspecting the source of the challenge was Actavis, Patel called Rogerson three times. Following those conversations, Patel informed her colleagues that Actavis wanted 25 percent of the market. She also stated that Actavis would likely want 10-15 percent of that share from Teva. During those conversations, she also likely conveyed her displeasure to Rogerson about how low Actavis's pricing was, because not long after those phone calls, she conveyed to her supervisor, Green, that "I just found out that Actavis rescinded their offer." Shortly after that, Patel also learned that Actavis had "resent all of their offer letter: at pricing that is higher than our [Teva's] current."

769.    Rekenthaler described to his colleagues the agreement he was willing to strike with Actavis over market share, saying: "I'm okay with adjusting 15% but we're not going to play any games with them. They take the 15% and I don't want to hear about this product again." Teva's senior sales executive, T.C., cautioned him on the importance of maintaining a cooperative stance towards this competitor, saying: "now, now Mr. Rekenthaler play nice in the sand box………..If history repeats itself activist [sic] is going to be responsible in the market…….."

770.    The market share give-and-take between Teva and Actavis continued over the coming weeks, with Teva conceding accounts to the new entrant in order to allow Actavis to achieve its fair share of the market for Clonidine-ITS. On May 14, 2014, for example, Patel told colleagues that Teva must be "responsible" and concede a particular wholesaler's account to Actavis. On May 17, 2014, Teva conceded a large retailer account to Actavis. On May 20, 2014, Patel again declined to bid at another customer due to the new entrant Actavis, stating: "We are trying to be responsible with share and price."

771.    When L.R., Teva's analytics manager, recommended giving up yet another Clonidine-TTS account to Actavis on May 23, 2014, after several conversations between Patel and Rogerson the prior day, Green of Teva reluctantly approved, saying: "[o]kay to concede, but we are getting to the point where we will not be able to concede further."

5)    Budesonide Inhalation

772.    Budesonide Inhalation, also known by the brand name Pulmicort Respules, is an anti-inflammatory steroid, administered through inhalers or similar devices, used to prevent asthma attacks.

773.    Teva obtained approval to market Budesonide Inhalation in November 2008. Prior to February 2015, Teva controlled virtually the entire market for generic Budesonide Inhalation, with other competitors having less than 1 percent market share.

166

774.    On February 13, 2015, Rekenthaler informed other Teva employees of Actavis's plans to enter the market, saying: "[i]t appears that Actavis is intending on shipping" Budesonide Inhalation. Rekenthaler and Falkin of Actavis had spoken by phone three days earlier on February 10, 2015.

775.    On February 16, 2015, Rekenthaler and Falkin had another lengthy telephone conversation lasting twenty-three (23) minutes. The following morning, Teva's T.C. confirmed to her colleagues that Teva had conceded the Budesonide Inhalation accounts of two major customers to Actavis. She explained that Actavis's sense of urgency to obtain the accounts was due to concerns about getting its product into market before it faced legal action from the brand manufacturer. Thus, she explained, she was working with the customers on an "exit strategy" to get Teva's product out of the supply channel, so as to streamline Actavis's entry into the market.

6)    Celecoxib

776.    Celecoxib, also known by the brand name Celebrex®, is a nonsteroidal anti-inflammatory medication used in the treatment of pain and inflammation associated with arthritis, juvenile rheumatoid arthritis, and other disorders.

777.    Teva received approval to market generic Celecoxib in May 2014.

778.    On November 20, 2014, as Teva was preparing to launch its generic Celecoxib capsules, a customer informed Teva that Actavis was vying for some of the customer's Celecoxib business. The customer indicated that Actavis was preparing for a launch of its own and had advocated its position by pointing out that it was just trying to "get their share" in light of the fact that Teva had already secured over 30 percent of the market."

779.    Rekenthaler took a cooperative-rather than competitive-stance upon hearing that news, saying: "That's all pretty accurate and hard to argue with."

780.    By December 1, 2014, however, the issue of where Actavis would obtain its desired market share remained undecided. Another customer, a large retail pharmacy chain ("The

Pharmacy"), became actively involved in trying to broker an agreement between Teva and Actavis on how much share each company would take upon launch. Actavis reportedly sought 25 percent of The Pharmacy's Celecoxib business. A representative of The Pharmacy told Teva's T.C. that "he would not move this unless we are all on the same page" and that he did not have an issue with sending Actavis "a message."

781.    Rekenthaler's response was consistent with the "fair share" understanding, saying "I don't want to give up anything………We're at 32% and I think that's reasonable."

782.    In the days leading up to Teva's December 10, 2014 launch, Teva executives had numerous telephone conversations with their counterparts at Actavis. Rekenthaler had a six (6) minute call with Falkin at Actavis on November 25. The two spoke twice more on December 3, once for two (2) minutes and another time for one (1) minute. Patel spoke to A.B., a senior sales and marketing executive at Actavis, for over eight (8) minutes on December 5, and for over sixteen (16) minutes on December 8.

783.    Rekenthaler and Falkin resumed their communications the day before the Teva launch December 9, with a one (1) minute phone call. On the day of the launch, Rekenthaler and Falkin spoke three times, with calls of one (1) minute, nine (9) minutes, and three (3) minutes in duration.

                vi.    <u>Teva/Par</u>
                       1)    <u>Omega-3-Acid Ethyl Esters</u>

784.    Omega-3-Acid Ethyl Esters, also known by the brand name Lovaza, is a lipid regulating agent used to lower levels of triglycerides.

785.    Teva launched Omega-3-Acid Ethyl Esters on April 8, 2014. During this time period, manufacturers of the drug were all experiencing various supply problems, affecting how much market share each would be able to take on.

168

786.    On the morning of June 26, 2014, Patel emailed C.B.2, a senior operations executive at Teva, to inform C.B.2 that Par had recently received FDA approval for Omega-3-Acid Ethyl Esters. C.B.2 responded by asking if Par had started shipping that product. Patel replied at 10:24am that she had not heard anything yet, but promised to "snoop around."

787.    Patel followed through by reaching out to T.P. of Par, resulting in a flurry of ten (10) text messages between them in the late afternoon and early evening of June 26. That night, Patel followed up with C.B.2, informing her that the only thing Patel knew at that point was that Par was limited on supply, but that she was "working on getting more…………."

788.    The next morning, T.P. called Patel and they spoke for nearly thirty (30) minutes. That was the first and only voice call ever between the two, according to the phone records. That same morning, Patel informed C.B.2 that she now had "some more color" on Par's launch of Omega-3-Acid Ethyl Esters and would "fill you in when we speak." Patel also communicated this information to Rekenthaler. At 11:27am that same morning, Rekenthaler sent an email to T.C., a Teva sales executive, with a veiled but clear understanding about Par's bidding and pricing plans:

> You're aware PAR receive [sic] an approval. I would imagine that CVS is going to receive a one-time buy offer from PAR. I'm also assuming the price would be above ours so there should not be a price request (which we would not review anyway). My point in the email is to ensure that you are aware of all of this. . . .

Par launched Omega 3-Acid Ethyl Esters Capsules the following Monday, June 30, 2014.

789.    After the discussions between Patel and T.P. at Par, Teva proceeded to concede business to Par to ensure Par's smooth entry into the market. As of July 11, 2014, Teva's share of the market for new generic prescriptions had dropped 15.9 points to 84.1 percent, and its share of the total generic market (new prescriptions and refills) had dropped 16.3 points to 83.7 percent.

790.    As new competitors entered the market, Teva coordinated with them to avoid competition and keep prices high. For example, in an internal email on October 2, 2014, Teva's Green

169

stated that "[w]e heard that Apotex may be launching with limited supply and at a high price." Rekenthaler had obtained this information through phone calls with J.H., a senior sales executive at Apotex, on September 25 and 27, 2014, and then conveyed the information internally at Teva.

791.    Because of supply limitations, Par was not able to meaningfully enter the market until late November 2014. On November 10, 2014, Patel and T.P. exchanged five (5) text messages. On December 1, 2014, Teva was notified by a customer that it had received a price challenge on Omega-3-Acid Ethyl Esters. T.C. at Teva speculated that the challenge was from Apotex, but Rekenthaler knew better, stating "I'm confident it's Par." Rekenthaler informed T.C. that Teva would not reduce its price to retain the business − thus conceding the business to Par.

792.    By mid-February 2015, Teva had conceded several large customers to Par to smooth Par's entry into the market and maintain high pricing. During this time, Rekenthaler was speaking frequently with M.B., a senior national account executive at Par, to coordinate.

793.    By April 2015, Apotex had officially entered the market, and consistent with the "fair share" understanding, Teva's market share continued to drop. By April 25, Teva's share of the market for new generic prescriptions for Omega-3-Acid Ethyl Esters had dropped to 68.3 percent and its share of the total generic market (new prescriptions and refills) had dropped to 66.8 percent. Rekenthaler was speaking frequently with J.H. at Apotex to coordinate during the time period of Apotex's entry in the market.

2)    Entecavir

794.    Entecavir, also known by the brand name Baraclude, is a medication used to treat chronic Hepatitis B.

795.    As Teva was preparing to enter the market for Entecavir in August 2014, T.C., a senior sales and business relations executive at Teva, informed an executive at WBAD that Teva was planning on launching Entecavir "shortly" depending on when the FDA approved the drug. T.C.

further noted: "We may or may not be alone on the market at launch. Sandoz has a settlement and we do not know their terms. Apotex has recently filed a PIV [Paragraph IV certification] but we invalidated the patent. We are hearing PAR has the [authorized generic] and is stating they will launch after we launch, but there is still a good chance we may be alone in the market for a short time."

796.    On August 28, 2014, Rekenthaler informed Teva sales employees that Teva had received approval on Entecavir and would circulate offers later that day or the next day. Rekenthaler noted: "[w]e are looking for at least a 60 share. Known competition is Par with an [authorized generic]." Rekenthaler also noted that Teva would be pricing as if it were "exclusive" in the market, and expressed concern that customers might react negatively to the launch of this drug "because of our recent price increase [on other drugs]."

797.    The same day, August 28, 2014, Rekenthaler had three phone calls with M.B., a senior national account executive at Par. The two spoke two (2) more times the next day, August 29, 2014.

798.    On August 29, a Teva sales employee reported that a customer had informed her that Par was launching Entecavir at a lower price point than Teva. The employee inquired whether Teva might consider reducing its price as well. Rekenthaler, after speaking with M.B. at Par several times on August 28 and 29, replied that Teva would remain firm on the price and noted that he was "doubtful PAR will be much lower." Despite Teva's refusal to lower its price, that customer signed an agreement with Teva to purchase Entecavir.

799.    Also on August 29, Rekenthaler emailed T.C., asking if she had received any feedback from CVS on Entecavir. T.C. replied that she had not, and followed up later, saying that ABC had indicated that it would sign Teva's offer letter. Rekenthaler replied: "Great, that helps. We may end up conceding our friends up north [CVS] if they make too much fuss." T.C. dismissed that concern: "I think they will work with us really... We need them they need us so we just have to make it work."

800. Teva and Par both launched their respective Entecavir products on September 4, 2014. Within days of its launch, Teva had captured 80 percent of the market for new generic prescriptions and 90.9 percent of the total generic market (new prescriptions and refills).

801. Within a few weeks, however, Teva's share of the market was much more in line with "fair share" principles−52.6 percent for new generic prescriptions, and 47 percent of the total generic market (new prescriptions and refills).

802. On October 9, 2014, another customer, who had already received a discount on Entecavir, asked for an additional discount to "help close the gap with current market prices." Teva declined to do so, citing that the "pricing is competitive and in line with the market." Rekenthaler had spoken to M.B. at Par twice on October 2, 2014.

803. The two-player market for Entecavir remained stable over time. By January 2, 2015, Teva's share of the market for new generic prescriptions was 52.2 percent, and its share of the total generic market (new prescriptions and refills) was 46.7 percent.

3) <u>Budesonide DR Capsules</u>

804. Budesonide DR Capsules, also known by the brand name Entocort EC, is a steroid used to treat Crohn's disease and ulcerative colitis when taken orally.

805. Teva was preparing to enter the market for Budesonide DR in or about March 2014. At that time, it was a 2-player market: Par had 70 percent market share and Mylan had the remaining 30 percent.

806. Shortly before Teva received approval to market Budesonide DR, Par decided to increase the price of the drug. On April 1, 2014, M.B., a senior national account executive at Par, called Rekenthaler at Teva. The two executives spoke for twenty-six (26) minutes. The next day, April 2, 2014, which happened to be the same day that Teva received FDA approval to market Budesonide DR, Par increased its price for Budesonide DR by over 15 percent.

807.    That same day, Teva sales employees were advised to find out which customers were doing business with Par and which were with Mylan, so that Teva would have a better sense of how to obtain its fair share: "it would be helpful to gather information regarding who is with mylan and who is with par . . . they are the two players in the mkt . . . as well as usage."

808.    Par and Mylan were also communicating at this time. On April 3, 2014−the day after the Par price increase−K. O., a senior account executive at Par, spoke to M.A., a senior account manager at Mylan, for fifteen (15) minutes.

809.    On April 4, 2014, Rekenthaler informed some members of Teva's sales force that, although the company had received approval to market and manufacture Budesonide DR, Teva was not prepared to launch the product, and he did not yet know when it would do so. Nonetheless, Rekenthaler spoke to both Nesta, the Vice President of Sales at Mylan, and M.B., a similarly high-level executive at Par, that same day.

810.    Although Teva did not launch Budesonide DR until approximately June 2016, company executives clearly attempted to coordinate pricing and market share with its competitors in anticipation of its product launch date.

vii.    Teva/Taro

1)    Enalapril Maleate

811.    Enalapril Maleate ("Enalapril"), also known by the brand name Vasotec®, is a drug used in the treatment of high blood pressure and congestive heart failure.

812.    In 2009, Taro discontinued its sales of Enalapril under its own label and effectively exited the market. It continued supplying Enalapril thereafter only to certain government purchasers under the "TPLI" label.

813.    By mid-2013, the Enalapril market was shared by three players: Mylan with 60.3 percent, Wockhardt with 27.5 percent, and Teva with 10.7 percent. As discussed more fully

below, those three companies coordinated a significant anticompetitive price increase for Enalapril in July 2013.

814.   Shortly before the Teva and Wockhardt price increases, on or about July 12, 2013, Aprahamian, the Vice President of Sales and Marketing at Taro, was considering whether to renew or adjust Taro's price on Enalapril for its national contract (for government purchasers), which was slated to expire in September 2013.

815.   In the midst of that coordinated price increase, however, Aprahamian was communicating with both Patel of Teva, as well as M.C., a senior sales and marketing executive at Wockhardt, about Enalapril. As a result of those conversations, Taro's plans changed.

816.   On July 17, 2013, the same day that Teva was taking steps to implement the price increase, Patel called Aprahamian and left a message. He returned the call, and the two spoke for almost fourteen (14) minutes. Then, on July 19, 2013, the day that both Teva and Wockhardt's price increases for Enalapril became effective, Aprahamian called M.C. at Wockhardt on his office phone and left a message. He then immediately called M.C.'s cell phone, which M.C. answered. They spoke for nearly eleven (11) minutes.

817.   On the morning of July 19, Aprahamian sent an internal email to Taro colleagues, saying he would like to get the product back in the market under the Taro label.

818.   Aprahamian followed up with another email shortly after, adding that Taro "[w]ould only look for 10-15% MS [market share] but with recent market changes and units on this product, it would be incremental."

819.   In the coming months, both Teva and Taro engaged in intensive analyses of how the market should look after Taro's re-launch so that each competitor would have its desired, or "fair," share of the market.

820. On July 31, 2013, for example, Patel provided her analysis of the drugs Teva should bid on in response to a request for bids from a major customer, which was largely based on whether Teva had reached its "fair share" targets. Enalapril was one of the drugs where, according to Patel, Teva was "seeking share," so she authorized the submission of a bid. Prior to sending that email, Patel had spoken to Aprahamian on July 30 (11-minute call) and July 31, 2013 (4 minute call). Based on the agreement between the two companies, and in accordance with the industry's "fair share" code of conduct, Taro understood that it would not take significant share from Teva upon its launch because Teva had a relatively low market share compared to others in the market.

821. Meanwhile, as he worked on pricing for Taro's upcoming re-launch, Aprahamian emphasized to his colleagues that Taro's final prices would be set largely based on "continued market intelligence to secure share…….."

822. In early December 2013, Taro was fully ready to re-enter the Enalapril market. On December 3, 2013, Aprahamian consulted twice by phone with Mylan's senior account executive, M.A., during conversations of two (2) and eleven (11) minutes.

823. On December 4, 2013, one customer that had recently switched from Wockhardt to Teva expressed an interest in moving its primary business to Taro for the 2.5mg, 5mg, 10mg, and 20mg strengths. At 4:30pm that afternoon, Aprahamian instructed a colleague to prepare a price proposal for that customer for all four products. Before sending the proposal to the customer, however, Aprahamian sought the input of his competitor, Teva. On December 5, 2013, he and Patel spoke by phone for nearly five (5) minutes.

824. Taro's fact sheet for the Enalapril re-launch generated on the day of Aprahamian's call with Teva showed a "[t]arget market share goal" of 15%, with pricing identical to Teva's and nearly identical to Wockhardt's and Mylan's.

175

825.    Taro began submitting offers on Enalapril the following day, December 6, 2013. But even with the bidding process underway, Aprahamian made certain to communicate with Mylan's M.A. during a brief phone conversation that afternoon. This particular communication was important since Mylan was the market share leader and Taro was targeting more of Mylan's customers than those of other competitors.

826.    Over the next ten days, the discussions between Taro and Mylan continued over how to allocate the Enalapril market. Aprahamian and M.A. talked for ten (10) minutes on December 11, and for seven (7) minutes on December 12.

827.    Thereafter, and with the likely consent of Mylan, Aprahamian reported on an internal Sales and Marketing call on December 16, 2013, that Taro's prior target Enalapril market share goal of 15 percent had been raised to 20 percent.

828.    Taro continued to gain share from both Mylan and Wockhardt, and to coordinate with both. For example, in late December, Taro submitted a competitive offer to Morris & Dickson, a Wockhardt customer. This caused M.C. of Wockhardt to call Aprahamian on December 31, 2013, to discuss the situation. During the call, M.C. agreed that so long as Wockhardt was able to retain McKesson as a customer, it would concede Morris & Dickson to Taro.

829.    By May 2014 the market was stable, and market share for Enalapril was reasonably distributed among the companies. As Teva was considering whether to bid on specific drugs for an RFP sent out by a large wholesaler customer, Patel provided the following caution with regard to Enalapril: "no bid due to potential market/customer disruption, aka strategic reasons." The same day she sent that email, Patel spoke to Aprahamian for more than four (4) minutes and exchanged eight (8) text messages with him.

830.    By June 2014, Taro had obtained 25 percent market share for Enalapril in a 4-player market. Mylan and Teva each had approximately 28 percent market share.

2)    Nortriptyline Hydrochloride

831.    Nortriptyline Hydrochloride ("Nortriptyline"), also known by the brand name Pamelor, is a drug used to treat depression.

832.    While Taro was approved in May 2000 to market generic Nortriptyline, it subsequently withdrew from the market. As of early 2013, the market was shared by only two players: Teva with a 55 percent share, and Actavis with the remaining 45 percent.

833.    By February 2013, Taro personnel had come to believe that they should reclaim a portion of this market, one opining that "Nortriptyline capsules should be seriously considered for re-launch as soon as possible."

834.    In early November, Taro was formulating re-launch plans, including a "Target Market share goal" for Nortriptyline of 25 percent that would leave Teva with 42.45 percent and Actavis with 31.02 percent.

835.    On November 6, 2013, Aprahamian pressed his team to "get some offers on Nortrip[tyline] out." He emphasized the need to find out who currently supplied two particular large customers so that Taro could "determine our course (Cardinal or MCK) ." Two days later, on November 8, Aprahamian received confirmation that McKesson was a Teva customer.

836.    Several days of conversations ensued among the affected competitors in an effort to sort out how Teva and Actavis would make room for Taro in this market. For example, Rekenthaler of Teva and Falkin of Actavis spoke twice by phone on November 10, 2013.

837.    Then, on November 12, 2013, Taro's Aprahamian called Patel at Teva. Their conversation lasted almost eleven (11) minutes. That same day, Aprahamian announced to his colleagues that Taro would not be pursuing Teva's business with McKesson, saying simply: "Will pass on MCK on Nortrip." Accordingly, he instructed a subordinate to put together an offer for Cardinal instead.

177

838.    The discussions about how to accommodate Taro into the Nortriptyline market were far from over, however. Falkin of Actavis and Rekenthaler of Teva spoke on November 14, 15, and 18. Falkin also exchanged two text messages with Maureen Cavanaugh of Teva on November 17, and one on November 18, 2014.

839.    Immediately following this series of discussions, Aprahamian began delivering a new message to his team: Taro had enough offers out on Teva customers-it needed to take the rest of its share from Actavis. On November 19, 2013 when a colleague presented an opportunity to gain business from Teva customer HD Smith, Aprahamian flatly rejected the idea, saying: "Looking for Actavis. We have outstanding Teva offers out ..."

840.    The next day, November 20, 2013, another Taro employee succeeded in finding an Actavis customer that Taro might pursue. Armed with this new information, Aprahamian wasted no time in seeking Actavis's permission, placing a call to M.D., a senior national account executive at Actavis, less than four hours later. They ultimately spoke on November 22, 2013 for more than eleven (11) minutes.

841.    Meanwhile, Teva employees finalized plans to cede Cardinal to Taro as discussed in the negotiations with Actavis and Taro. On November 21, 2013, Teva informed its customer that "[w]e are going to concede the business with Cardinal."

842.    The competitors continued consulting with each other over the coming months on Nortriptyline. On December 6, 2013, for example, Aprahamian called M.D. at Actavis, and the two spoke for over thirteen (13) minutes. On December 10, 2013, a Taro colleague informed Aprahamian that a large customer, HEB, was with Actavis for all but one of the Nortriptyline SKUs, and that HEB was interested in moving the business to Taro.

843.    Having already cleared the move with Actavis during his December 6 call with M.D., Aprahamian put the wheels in motion the next day for Taro to make an offer to HEB.

178

844.   Aprahamian also continued to coordinate with Teva. He called Patel on January 28, 2014, but she did not pick up. The dialogue continued on February 4, 2014, when Patel called Aprahamian back. The two talked for nearly twenty-four (24) minutes.

845.   Two days later, on February 6, a potential customer solicited Taro to bid on its business. When a colleague informed Aprahamian of that fact and asked if he wanted to pursue the opportunity, Aprahamian responded that Teva had already done enough to help Taro with its re-launch, and thus only Actavis accounts should be pursued.

846.   Over the first ten days of March, executives at Teva, Taro, and Actavis called and texted each other at least a dozen times in their continuing efforts to work out the details of Taro's re-entry.

847.   At the end of this flurry of communications, Teva documented its internal game plan for Nortriptyline. Prior to this time, particularly in early 2014, Nortriptyline had been listed by Teva as a potential candidate for a price increase. On March 10, 2014, however, as Patel was revising that list of price increase candidates (and the same day she spoke to Aprahamian for more than five (5) minutes), she removed Nortriptyline from contention in order to accommodate Taro's entry. The spreadsheet that she sent to a colleague on that date expressly considered the negotiations over Taro's entry that had occurred over the past few weeks. With respect to a possible Nortriptyline price increase, it stated: "Delay − Taro (new) seeking share." As discussed more fully below, Teva subsequently raised the price of Nortriptyline on January 28, 2015, in coordination with both Taro and Actavis.

viii.   <u>Teva/Zydus</u>

848.   Green left Teva in November 2013 and moved to Zydus where he took a position as an Associate Vice President of National Accounts. Once at Zydus, Green capitalized on the

relationships he had forged with his former Teva colleagues to collude with Teva (and other competitors) on several Teva/Zydus overlap drugs.

849.    In the spring/early summer of 2014 in particular, Zydus was entering four different product markets that overlapped with Teva. During that time period, Green was in frequent contact with Patel and Rekenthaler, and others, to discuss pricing and the allocation of customers to his new employer, Zydus. Indeed, given the close timing of entry on these four products, Green, Patel, and Rekenthaler were often discussing multiple products at any given time.

1)    Fenofibrate

850.    Fenofibrate, also known by brand names such as Tricor, is a medication used to treat cholesterol conditions by lowering "bad" cholesterol and fats (such as LDL and triglycerides) and raising "good" cholesterol (HDL) in the blood.

851.    As discussed in detail above, Defendant Teva colluded with Mylan and Lupin to allocate the Fenofibrate market upon Mylan's entry in May 2013. To effectuate that agreement, Green was in frequent contact with Nesta of Mylan and Berthold of Lupin.

852.    In February 2014, Zydus was preparing to launch into the Fenofibrate market. Green, now at Zydus, colluded with Patel, Rekenthaler, Nesta, and Berthold to share pricing information and allocate market share to his new employer, Zydus.

853.    On February 21, 2014, Teva's Patel sent a calendar invite to Rekenthaler and to her supervisor, Green, Senior Director, Marketing Operations, for a meeting to discuss "Post Launch Strategy (Multiple Products)" on February 24, 2014. One discussion item was Zydus's anticipated entry into the Fenofibrate market. Notably, Defendant Zydus did not enter the Fenofibrate market until a few weeks later on March 7, 2014.

854.    In the days leading up to the meeting, between February 19 and February 24, Patel and Green spoke by phone at least 17 times, including two calls on February 20 lasting twenty-seven (27)

minutes and nearly nine (9) minutes, respectively; one call on February 21 lasting twenty-five (25) minutes; and a call on February 24 lasting nearly eight (8) minutes.

855.    On or about March 7, 2014, Defendant Zydus entered the Fenofibrate market at WAC pricing that matched Defendants Teva, Mylan, and Lupin. In the days leading up to the launch, employees from all four competitors were in regular contact with each other to discuss pricing and allocating market share to Zydus. Indeed, between March 3 and March 7, these competitors exchanged at least 26 calls with each other.

856.    During the morning of March 17, 2014, Patel and Green had two more phone calls, lasting nearly six (6) minutes and just over five (5) minutes. During those calls, they were discussing how to divvy up the market for several products where Zydus was entering the market. A half an hour after the second call, Patel emailed her supervisor, Green, identifying "LOE Targets to Keep" for several products on which Teva overlapped with Defendant Zydus, including Fenofibrate. With respect to Fenofibrate, Patel recommended "Defend all large customers." Later that same day, Patel called Green again and they spoke for more than eleven (11) minutes.

857.    In the months that followed, Teva "strategically conceded" several customers to Zydus in accordance with the agreement they had reached.

858.    For example, on Friday March 21, 2014, J.P., a Director of National Accounts at Teva, sent an internal email to certain Teva employees, including Patel and Rekenthaler, notifying them that Zydus had submitted an unsolicited bid to a Teva customer, OptiSource. Patel responded that Teva was "Challenged at Humana as well."

859.    That morning, Patel sent a calendar invite to Rekenthaler and to Green scheduling a meeting to discuss "Open Challenges−Retain/Concede Plan." One item on the agenda was "Fenofibrate (Zydus at Opti and Humana−propose to concede)."

860.    The following Monday, Patel sent internal emails directing that Teva "concede" OptiSource and Humana to Zydus. Patel further stated that Teva provided a "courtesy reduction" to a third customer, NC Mutual, but stated that Teva should "concede if additional reduction is requested." That same day, Patel called Green and they spoke for more than fourteen (14) minutes. She also spoke with Berthold of Lupin for nearly twelve (12) minutes.

861.    In the meantime, Zydus bid at another Teva customer, Ahold. On March 25, 2014, Patel emailed Rekenthaler stating, "Need to discuss. NC pending, and new request for Ahold. We may not be aligned." Patel then sent an internal email directing that Teva "concede" the Ahold business. Later that day, Patel called Green. He returned the call, and they spoke for nearly eight (8) minutes. Patel also called Berthold of Lupin, and they spoke for five (5) minutes.

862.    On May 13, 2014, Zydus bid on Fenofibrate at Walgreens, which was also Teva's customer. The next day, on May 14, 2014, Patel forwarded the bid to her supervisor, Green, and explained, "if we concede, we will still be majority share, but only by a few share points. On the other hand, if Zydus is seeking share, they're challenging the right supplier, but the size of the customer is large. What are you[r] thoughts on asking them to divide the volume 25% Zydus and 75% Teva? This way, we've matched, retained majority and will hopefully have satisfied Zydus, and minimize them going elsewhere."

863.    Green agreed with the approach, and on May 15, 2014, Patel sent an internal email directing that Teva reduce its price to Walgreens but explained that "we will retain 75% of the award. The remainder will go to Zydus. Hopefully, this will satisfy their share targets." Patel emphasized that we "need to be responsible so that Zydus doesn't keep challenging Teva in the market." Later that day, Green called Patel and they spoke for twenty (20) minutes.

864.    On June 2, 2014, Green called Patel and they spoke for nearly six (6) minutes. He also called Rekenthaler, and they spoke for two (2) minutes. Two days later, on June 4, 2014, Zydus submitted an unsolicited bid for Fenofibrate at Anda, a Teva customer.

865.    On June 10, 2014, T.S.2, Senior Analyst, Strategic Support at Teva emailed J.P., Director of National Accounts, stating "We are going to concede this business to Zydus per upper management." T.S.2 forwarded the email to Green, copying Patel and Rekenthaler, asking to "revisit the decision to concede ANDA" because "[w]e need to send Zydus a message to cease going after all of our business." Rekenthaler responded, "At Anda I would suggest you try to keep our product on their formulary in a secondary position and we'll continue to get sales…………………..Zydus has little market share on Fenofibrate that I can tell and they'll continue to chip away at us until they get what they are looking for." A few hours later, J.P. responded that Anda would maintain Teva on secondary and award the primary position to Zydus. Anda was fully aware that Teva was conceding Anda's business to Zydus because it was a new entrant.

866.    The next day, on June 11, 2014, Green called Rekenthaler's and they spoke for eight (8) minutes. Later that day, Patel called Green. He returned the call and they spoke for nearly fifteen (15) minutes.

2)    Paricalcitol

867.    Paricalcitol, also known by the brand name Zemplar, is used to treat and prevent high levels of parathyroid hormone in patients with long-term kidney disease.

868.    Defendant Teva entered the market on Paricalcitol on September 30, 2013. As the first generic to enter the market, it was entitled to 180 days of exclusivity.

869.    In March 2014, with the end of the exclusivity period approaching, Teva began planning which customers it would need to concede. Teva had advance knowledge that Defendant Zydus planned to enter the market on day 181, which was March 29, 2014.

870.    In the month leading up to the Zydus launch, Patel and Rekenthaler spoke with Green and discussed, among other things, which Paricalcitol customers Teva would retain and which customers it would allocate to the new market entrant.

871.    On February 28, 2014, T.S., a Director of National Accounts at Teva, sent an internal email to certain Teva employees, including Patel and Rekenthaler, advising that ABC was requesting bids on two Zydus overlap drugs − Paricalcitol and Niacin ER. After receiving that email, Rekenthaler called Green. The call lasted less than one (1) minute (likely a voicemail). The next business day, on March 3, 2014, Rekenthaler called Green again, and they spoke for twenty (20) minutes. Later that afternoon, Patel also called Green. The two exchanged four calls that day, including one that lasted nearly twenty (20) minutes. On March 4, Patel called Green again and left a voicemail.

872.    On March 12, 2014, T.S. emailed Patel and Rekenthaler stating that Zydus had bid on Paricalcitol at ABC. That same day, Patel sent an internal email asking for a loss of exclusivity report for Paricalcitol, listing out Teva's customers and the percentage of Teva's business they represented. This was typically done by Teva employees before calling a competitor to discuss how to divvy up customers in a market.

873.    On March 13, 2014, Patel directed that Teva retain ABC and match the Zydus pricing. The next day, on March 14, 2014, Patel called Green. A few minutes later, Green returned the call and they spoke for nineteen (19) minutes. Rekenthaler then called Patel, and they spoke for eleven (11) minutes.

874.    During the morning of March 17, 2014, Patel and Green had two more phone calls, lasting nearly six (6) minutes and just over five (5) minutes. During those calls, they were discussing how to divvy up the market for several products where Zydus was entering the market. A half an hour after the second call, Patel emailed her supervisor, Green, identifying "LOE Targets to Keep" for several products on which Teva overlapped with Defendant Zydus including Paricalcitol. With respect

to Paricalcitol, Patel recommended that Teva "Keep Walgreens, ABC, One Stop, WalMart, Rite Aid, mnicare." Later that same day, Patel called Green again, and they spoke for more than eleven (11) minutes.

875.     Over the next several weeks, Defendant Teva would "strategically" concede several customers to the new entrant Zydus.

876.     For example, on March 27, 2014, Green called Patel. Patel returned the call, and they spoke for nearly nine (9) minutes. The next day, on March 28, 2014, OptiSource, one of Teva's GPO customers, notified J.P., a Director of National Accounts at Teva, that it had received a competing offer from Zydus for its Paricalcitol business. J.P. forwarded the OptiSource email to Patel. Within minutes, Patel responded "[w]e should concede."

877.     That same day, Defendant Teva was notified by another customer, Publix, that Zydus had submitted a proposal for its Paricalcitol business. On April 1, 2014, Defendant Teva conceded the customer to Zydus and noted in Delphi that the reason for the concession was "Strategic New Market Entrant."

878.     Also on April 1, 2014, Defendant Zydus bid for the Paricalcitol business at NC Mutual, another Teva customer. That same day, Patel called Green and left a 22-second voicemail. The next day, on April 2, 2014, Patel tried Green twice more and they connected on the second call and spoke for nearly ten (10) minutes. Later that evening, L.R., an Associate Manager, Customer Marketing at Teva, sent an internal email to T.S., the Teva Director of National Accounts assigned to NC Mutual, copying Patel, asking: "May we please have an extension for this request until tomorrow?" Patel responded, "I apologize for the delay! We should concede."

879.     On April 15, 2014, Walmart received a competitive bid for its Paricalcitol business and provided Teva with the opportunity to retain. Two days later, on April 17, 2014, Green responded that he thought it might be Zydus. Patel replied, "We have conceded a reasonable amount of business (as

185

planned) to Zydus. I would be surprised if they were going after a customer this big after they've picked up business recently." Later that day, Green called Patel. She returned his call, and they spoke for nearly twelve (12) minutes. Later that day, after her discussion with Green, Patel sent an internal email stating, "After further review, I believe this is [a company not identified as a Defendant in this case]." On April 22, 2014, Patel sent an internal email regarding Walmart directing, "Need to retain. Please send an offer. Thanks."

3)    Niacin ER

880.    Niacin Extended Release ("ER"), also known by the brand name Niaspan Extended Release, is a medication used to treat high cholesterol.

881.    Defendant Teva entered the Niacin ER market on September 20, 2013 as the first-to-file generic manufacturer and was awarded 180 days of exclusivity. Teva's exclusivity was set to expire on March 20, 2014.

882.    Teva had advance knowledge that Defendant Lupin planned to enter on March 20, 2014 and that Lupin would have 100 days or until June 28, 2014 before a third generic manufacturer would be allowed to enter. Teva also knew that Defendant Zydus planned to enter on June 28, 2014.

883.    Armed with that knowledge, Teva increased price on Niacin ER on March 7, 2014 in advance of the competitors' entry. In the days leading up to the price increase, all three competitors exchanged several calls during which they discussed, among other things, the price increase on Niacin ER and the allocation of customers to the new entrants, Zydus and Lupin.

884.    Similarly, in the days leading up to the Lupin launch on March 20, 2014, all three competitors spoke again to discuss their plans for Niacin ER.

885.    In May 2014, Zydus began readying to enter the Niacin ER market. On May 5, 2014, Zydus bid on the Niacin ER business at ABC - a Teva customer. The next day, on May 6, 2014, Green called Rekenthaler and they spoke for three (3) minutes. Less than an hour later, Green called Patel

and they spoke for eight (8) minutes. A few minutes later, Green called Patel again and left a twelve-second voicemail. Later that evening, Patel emailed Green reporting what Teva had learned on those calls:



Green responded that Patel should schedule an internal meeting to discuss their strategy for Niacin ER and include Rekenthaler.

886.    Over the next several days, Patel and Rekenthaler exchanged several calls with Green. Green also exchanged several calls with Berthold of Lupin. Ultimately, the competitors agreed that Teva would retain ABC and concede McKesson, another large wholesaler, to Zydus.

887.    On May 29, 2014, C.D., an Associate Director of National Accounts at Teva, sent an internal email to certain Teva employees, including Patel and Rekenthaler, stating: "A customer is reporting that Zydus is soliciting usage for Niacin with an anticipated launch of June 24." After receiving the email, Rekenthaler called Green. The call lasted two (2) minutes. Green returned the call a few minutes later and they spoke for twenty-eight (28) minutes. Later that day, Patel called Green and they spoke for nearly twenty-one (21) minutes.

888.    On June 2, 2014, J.P., a Director of National Accounts at Teva, sent an internal email stating "I received a ROFR from McKesson due to Zydus entering the market. They apparently did not secure ABC. They are launching 6/28, but are sending offers early due to Sun entering as well."

Patel replied, "Please be sure to consult with [Green] on this one. Thanks." Later that morning, Green called Rekenthaler. The call lasted two (2) minutes. Green then called Patel and they spoke for nearly six (6) minutes.

889.    On June 5, 2014, J.P. sent an internal email regarding "McKesson Niacin," stating "Per Dave [Rekenthaler], Maureen [Cavanaugh] has agreed to concede this item."

890.    J.P. also entered the loss in Teva's internal database - Delphi - and noted that the reason for the concession was "Strategic New Market Entrant."

891.    On June 28, 2014, Zydus formally launched Niacin ER and published WAC pricing that matched the per-unit cost for both Teva and Lupin.

4)    Etodolac ER

892.    Etodolac Extended Release ("Etodolac ER") is a nonsteroidal anti- inflammatory drug that is used to treat symptoms of juvenile arthritis, rheumatoid arthritis, and osteoarthritis.

893.    Prior to Zydus' entry into the Etodolac ER market, Defendant Teva and Co-conspirator Taro were the only generic suppliers of the product. As described in detail below, Defendant Teva and Co-conspirator Taro colluded to significantly raise the price of Etodolac ER in August 2013.

894.    On May 12, 2014, Defendant Zydus entered the Etodolac ER market at WAC pricing that matched Teva and Taro's artificially high pricing. Not surprisingly, in the days leading up to the Zydus launch, Patel was relaying communications back and forth between Green and Aprahamian. During these calls, the competitors discussed, among other things, the allocation of market share to the new entrant, Zydus.

895.    On May 14, 2014, Anda (a wholesaler customer of Teva) notified Teva that Zydus had submitted a bid for its Etodolac ER business. That same day, Patel exchanged eight (8) text messages and had a four (4) minute call with Aprahamian. The next day, on May 15, 2014, Green called Patel, and they spoke for twenty (20) minutes.

896.    On May 20, 2014, Green called Patel, and they spoke for four (4) minutes. That same day, K.R., a senior sales executive at Zydus, also exchanged two (2) text messages and had a 39-second call with Maureen Cavanaugh of Teva. The next day, May 21, 2014 – Green called Patel again and they spoke for twenty-eight (28) minutes. That same day, K.R. of Zydus and Cavanaugh of Teva exchanged four (4) text messages.

897.    The next day, on May 22, 2014, T.S.2, Senior Analyst, Strategic Support at Teva, sent an internal email to certain Teva employees, including Patel, stating: "I have proposed we concede Anda as they are a small percent of market share and we will have to give up some share with a new market entrant. Anda is looking for a response today." Patel responded: "agree with concede."

898.    Similarly, on June 27, 2014, Econdisc, a Teva GPO customer, notified Teva that it had received a competitive offer for its Etodolac ER business. Later that day, Patel spoke with Aprahamian at Taro for fourteen (14) minutes.

899.    On July 2, 2014, Patel called Green and left a four-second voicemail. The next day, on July 3, 2014, Patel sent an internal email advising that "We will concede." Later that day, Teva told Econdisc that it was unable to lower its pricing to retain the business.

900.    When Patel's supervisor, K.G, learned that Teva had lost the Econdisc business, he sent an internal email asking, "Did we choose not to match this?" Patel responded, " Yes. New market entrant - Zydus." Green replied, "Okay good. Thank you."

        ix.   Teva/Glenmark
        1)   Moexipril Hydrochloride

901.    Moexipril Hydrochloride ("Moexipril"), also known by the brand name Univase, is part of a class of drugs called angiotensin-converting enzyme (ACE) inhibitors. It is used to treat high blood pressure by reducing the tightening of blood vessels, allowing blood to flow more readily and

the heart to pump more efficiently. Glenmark entered the market for the 7.5mg and 15mg tablets of Moexipril on December 31, 2010.

902.    As discussed more fully below, Glenmark and Teva coordinated with each other to raise pricing on two different formulations of Moexipril between May and July 2013. When Patel colluded with CW-5, a senior-most executive at Glenmark, to raise prices on Moexipril, one of the fundamental tenets of that agreement was that they would not try to poach each other's customers after the increase and the competitors would each maintain their "fair share."

903.    On August 5, 2013, Teva learned that it had been underbid by Glenmark at one of its largest wholesaler customers, ABC. Upon hearing this news, Rekenthaler, the Vice President of Sales at Teva, forwarded an email discussing the Glenmark challenge to Patel, expressing his confusion over why Glenmark would be challenging Teva's business. Rekenthaler forwarded the email only to Patel because he was aware that she had been the person at Teva who had been colluding with Glenmark.

904.    Five (5) minutes after receiving the email from Rekenthaler, Patel responded: "I know . . . made the call already." The call that Patel had made was to CW-5, a senior executive at Glenmark, to find out why Glenmark sought to underbid Teva at ABC.

905.    Patel spoke to CW-5 three times that day. The following day, Jim Brown, the Vice President of Sales at Glenmark, called Patel at 9:45am but did not reach her. Patel returned Brown's call at 10:08am, and the two spoke for approximately thirteen (13) minutes. Later that day, at 1:11pm, the two spoke again for approximately fifteen (15) minutes. During these calls, Patel reminded Brown and CW-5 of their prior agreement not to poach each other's customers after a price increase.

906.    As a result of these communications, Glenmark decided to withdraw its offer to ABC and honor the agreement it had reached with Teva not to compete on Moexipril. Later that same day

190

− August 6, 2013 − T.S. of Teva informed colleagues that "[t]oday is a new day and today ABC has now informed me that they will NOT be moving the Moexipril business to Glenmark."

2)    Desogestrel/Ethinyl Estradiol (Kariva)

907.    Desogestrel/Ethinyl Estradiol ("Kariva") is a combination pill containing two hormones: progestin and estrogen. This medication is an oral contraceptive. Glenmark markets this drug under the name Viorele, while Defendant Teva markets the drug under the name Kariva. These drugs are also known by the brand name, Mircette. Glenmark entered the market for Kariva 0.15mg/0.02mg tablets on April 4, 2012.

908.    During the morning of May 19, 2014, Patel learned that Glenmark had bid a low price for its own version of Kariva, Viorele, at Publix, a retail pharmacy purchaser. S.B., an analyst at Teva, emailed Patel a list of suggested re-bid prices to send to Publix for various drugs, including Kariva. The chart included a suggested re-bid price for Kariva of $76.14, which was $52.64 higher than the $23.50 price that Glenmark had offered Publix.

909.    This sparked a flurry of communications that same day between Patel and three different Glenmark representatives − Brown and Grauso, and J.C., a sales and marketing executive at Glenmark.

910.    After this flurry of communications between the two competitors, Patel decided that Teva would offer Publix a re-bid price with a nominal 10 percent reduction off the originally proposed re-bid price of $76.14, which virtually guaranteed that the business would be awarded to Glenmark.

3)    Gabapentin

911.    Gabapentin, also known by the brand name Neurontin, is part of a class of drugs called anticonvulsants. The medication is used to treat epilepsy and neuropathic pain. Glenmark entered the market for Gabapentin 800mg and 600mg tablets on April 1, 2006.

912.    On October 13 and 14, 2014, Patel attended the Annual Meeting of the Pharmaceutical Care Management Association ("PCMA") in Rancho Palos Verdes, California, along with a number of Teva's competitors. The PCMA described its Annual Meeting as "the . . . ideal venue for senior executives from PBMs, specialty pharmacy, payer organizations and pharmaceutical manufacturers to network, conduct business and learn about the most current strategic issues impacting the industry."

913.    Shortly after returning from that meeting, during the morning of October 15, 2014, Patel informed colleagues at Teva that Glenmark would be taking a price increase on Gabapentin and suggested that this would be a great opportunity to pick up some market share. The Glenmark increase had not yet been made public and would not be effective until November 13, 2014. Nonetheless, Patel informed her colleagues in an email that same day that there would be a WAC increase by Glenmark effective November 13, and that she had already been able to obtain certain contract price points that Glenmark would be charging to distributors. At around the time she sent the email, Patel exchanged two (2) text messages with Brown of Glenmark.

914.    Having relatively little market share for Gabapentin, Teva discussed whether it should use the Glenmark price increase as an opportunity to pick up some market share. Over the next several weeks, Teva did pick up "a bit of share" to be more in line with fair share principles, but cautioned internally that it did not "want to disrupt Glenmark's business too much."

x.    Teva/Lannett

1)    Baclofen

915.    Baclofen, also known by the brand names Gablofen and Lioresal, is a muscle relaxant used to treat muscle spasms caused by certain conditions such as multiple sclerosis and spinal cord

injury or disease. It is generally regarded as the first choice of physicians for the treatment of muscle spasms in patients with multiple sclerosis.

916.    In June 2014, Defendant Lannett was preparing to re-enter the market for Baclofen but was faced with limited supply. In an internal email sent to his sales staff, K.S.2, a senior sales executive at Lannett, stated: "Baclofen launch in four weeks, need market intelligence. We can only take a 10% market share." At that time, Teva had a large market share in relation to the existing competitors in the market.

917.    Sullivan, a Director of National Accounts at Lannett and a recipient of the email, promptly communicated with Patel (Teva was a competitor for Baclofen) using Facebook Messenger. The message was sent at 11:16am. At 11:30am, Patel called Sullivan, and they spoke for seven (7) minutes. This was the first phone conversation between Sullivan and Patel since Patel had joined Teva in April 2013. During the conversation, Sullivan informed Patel that Lannett would be entering the market for Baclofen shortly. In a follow-up message through Facebook Messenger later that afternoon, Sullivan said that she would be back in touch in a few weeks.

918.    True to her word, Sullivan called Patel on July 1, 2014 and left a voicemail. Patel promptly returned the call, and the two spoke for almost seven (7) minutes.

919.    On July 11, 2014, as Teva was evaluating future forecasting and whether to try and take on additional Baclofen business with a large wholesaler, Patel stated to a Teva colleague: "[not sure if it helps your review, but there is another entrant coming to market (Lannett). I'm not sure about their share targets, but I know it's probably soon." That same day, Patel sent a text message to Sullivan asking "Around?" Sullivan immediately called Patel and left a voicemail. Patel called Sullivan back promptly, and they spoke for more than three (3) minutes. After speaking, Patel sent another text message to Sullivan, stating: "Thank you!!" Sullivan responded: "No prob!"

920.    Shortly thereafter, on July 22, 2014, Teva was approached by a customer stating "[w]e were contacted by another mfg that is going to be launching Baclofen in the coming weeks." The customer asked whether Teva wanted to exercise its right of first refusal (i.e., offer a lower price to maintain the account). Even though the new manufacturer's price was only slightly below Teva's price, Teva declined to bid. Patel specifically agreed with the decision to concede, stating "I believe this is Lannett." Teva's internal tracking database noted that the customer had been conceded to a "Strategic New Market Entrant."

921.    Teva had significantly increased its price for Baclofen in April 2014 (following an Upsher-Smith price increase) and was able to maintain those prices even after Lannett entered the market a few months later. In fact, when Lannett entered the market, it came in at the exact same WAC price as Teva.

xi.    <u>Teva/Amneal</u>

1)    <u>Norethindrone Acetate</u>

922.    Norethindrone Acetate, also known by the brand name Primolut-Nor among others, is a female hormone used to treat endometriosis, uterine bleeding caused by abnormal hormone levels, and secondary amenorrhea.

923.    On September 9, 2014, a customer approached Teva asking if Teva would lower its pricing on certain drugs, including Norethindrone Acetate. One of Teva's competitors for Norethindrone Acetate was Defendant Amneal. The same day, Patel received phone calls from two different Amneal employees-S. R., a senior sales executive (call lasting more than three (3) minutes), and S.R.2, a senior sales and finance executive (almost twenty-five (25) minutes). These were the first calls Patel had with either S.R. or S.R.2 since she joined Teva in April 2013. That same day, S.R. also spoke several times with Jim Brown, Vice President of Sales at Glenmark, the only other competitor in the market for Norethindrone Acetate.

194

924.    After speaking with the two Amneal executives, Teva refused to significantly reduce its price to the customer, instead providing only a nominal reduction so as not to disrupt the market. At that time, market share was almost evenly split between the three competitors.

925.    When discussing it later, Patel acknowledged internally that Teva had "bid high" at the customer based on its understanding "that it would be an increase candidate for Amneal. They increased shortly after." By bidding high and not taking the business from Amneal, in anticipation of a future price increase, Teva reinforced the fair share understanding among the competitors in the market.

### 2)    Bethanechol Chloride

926.    As part of Defendants' overarching conspiracy with respect to the Operative Generic Drugs, they conspired to fix, raise, maintain, or stabilize the prices of Bethanechol Chloride tablets beginning at least as early as October 2014.

927.    Bethanechol Chloride, also known by the brand name Urecholine, is a medication used to treat certain disorders of the urinary tract or bladder.

928.    During the relevant time frame, Defendants Amneal, Teva, Wockhardt, and Rising, and Upsher-Smith were the primary manufacturers of Bethanechol Chloride tablets. According to Teva's price increase spreadsheet, Amneal held 65% of the market. Other manufacturers included Wockhardt, Rising, and Upsher-Smith.

929.    Amneal announced a list (WAC) price increase in November 2014, and Teva followed the list price increase in January 2015.

930.    During this period, Amneal and Teva met at trade conferences like the HDMA 2014 Annual Board and Membership Meeting in Laguna Beach, California from September 27 to October 1, 2014 and the GPhA Fall Technical Conference in Bethesda, Maryland from October 27-29, 2014, and communicated directly in furtherance of their price-fixing agreement on Bethanechol Chloride and the Fair Share agreement.

931.    Teva announced its list (WAC) price increase on Bethanechol Chloride tablets on January 28, 2015. Teva's price increase spreadsheet identified the reason for the increase as "Follow Competitor – Amneal".

| Product Description | Price Increase Strategy | Reason for Increase |
|---|---|---|
| BETHANECHOL CHLORIDE TABLETS | Market Intel | Follow Competitor -Amneal |

932.    On January 6, 2015, between Amneal's November 2014 increase and Teva's January 2015 increase, Nisha Patel of Teva had a fifty-one-minute phone call with S.R., the Senior Direct of Sales and Finance at Amneal.

933.    S.R. and S.R.2 engaged in conspiratorial phone calls, text messages, and other conversations with representatives of Teva, Taro, Mylan, Glenmark, Actavis, and others on Norethindrone Acetate, Bethanechol Chloride, Phenytoin Sodium ER, Hydrocodone Acetaminophen, Naproxen Sodium, and Oxycodone/Acetaminophen.

xii.    Teva/Dr. Reddy's

1)    Oxaprozin

934.    Oxaprozin, also known by the brand name Daypro, is a non-steroidal anti-inflammatory drug (NSAID indicated for the treatment of signs and symptoms of osteoarthritis and rheumatoid arthritis.)

935.    In early 2013, Dr. Reddy's began having internal discussions about re- launching Oxaprozin in June of that year. In March 2013, when Teva was still the sole generic in the market, the plan was to target one large chain and one large wholesaler in order to obtain at least 30 percent market share. Two months later, in May 2013, Dr. Reddy's adjusted its market share expectations down to 20 percent after Greenstone and Sandoz both re-launched Oxaprozin.

936.    On June 13, 2013, members of the Dr. Reddy's sales force met for an "Oxaprozin Launch Targets Discussion" to "discuss launch targets based on the market intelligence gained by the sales team."

937.    Dr. Reddy's re-launched Oxaprozin on June 27, 2013 with the same WAC price as Teva. At the time, Teva had 60 percent market share. Dr. Reddy's almost immediately got the Oxaprozin business at two customers, Keysource and Premier. Dr. Reddy's also challenged for Teva's business at McKesson, but Teva reduced its price to retain that significant customer.

938.    Eager to obtain a large customer, Dr. Reddy's turned its sights to Walgreens. At a July 1, 2013 sales and marketing meeting, there was an internal discussion among Dr. Reddy's employees about "asking to see if Teva would walk away from the business" at Walgreens. Within a week, Dr. Reddy' employees had learned that Teva would defend the Walgreens business and recognized that they would have to "bid aggressively" to obtain that customer.

939.    Dr. Reddy's did bid aggressively at Walgreens. On or around July 14, 2013, Walgreens informed Green, then a National Account Director at Teva, that Dr. Reddy's had made an unsolicited bid for the Oxaprozin business, at a price of roughly half of Teva's current price. Per Green, Walgreens did not "want to move but obviously want[s] the price."

940.    While the Dr. Reddy's offer to Walgreens was still pending, on July 23, 2013 J.A. of Dr. Reddy's called Green. That phone call, the only one ever between the two individuals that is identified in the phone records, lasted for nearly five (5) minutes.

941.    Two days later, Green noted that "[i]f we give D[r. Reddy's] this business, they may be satisfied. I will see if I can find this out." Green also warned, however, that if Teva decided to defend and keep Walgreens' business, Dr. Reddy's will "just go elsewhere" – meaning Dr. Reddy's would continue to offer unsolicited bids to Teva customers and drive prices down.

942.    While deciding whether to match the Dr. Reddy's offer at Walgreens or concede the business to Dr. Reddy's, Teva engaged in internal discussions about strategy. On July 29, 2013, Green at Teva suggested the possibility of keeping the Walgreens business but conceding Teva's next largest customer for Oxaprozin—Econdisc—to Dr. Reddy's. Eager to avoid any further price erosion from the

Dr. Reddy's entry, Rekenthaler immediately asked Patel to "look at our business on Oxaprozin in order to accommodate Dr. Reddy's entry." Rekenthaler's goal was to identify customers other than Walgreens that Teva could concede to Dr. Reddy's in order to satisfy its market share goals.

943.    At 12:33pm that day, Patel asked a colleague to "run the customer volume and profitability analysis for Oxaprozin." At 2:20pm, that colleague provided the information to Patel, copying Rekenthaler and Green. With this information in hand, less than an hour later Rekenthaler placed a call to T.W., a Senior Director of National Accounts at Dr. Reddy's. The call lasted two (2) minutes and was their only telephone conversation in 2013.

944.    After having this conversation with T.W., Teva decided to maintain the Walgreens business, but concede the Econdisc business to Dr. Reddy's. Teva conceded the Econdisc business on August 7, 2013. Green listed "Strategic Market Conditions" in Teva's Delphi database as the reason for conceding the business to Dr. Reddy's.

945.    By September 10, 2013, Dr. Reddy's had achieved its goal of obtaining 20 percent share of the Oxaprozin market. At that time, its customers included Econdisc, Keysource, and Premier.

2)    Paricalcitol

946.    Paricalcitol, also known by the brand name Zemplar, is used to treat and prevent high levels of parathyroid hormone in patients with long-term kidney disease.

947.    Teva entered the market for Paricalcitol on September 30, 2013 as the first- to-file generic and had 180 days of generic exclusivity.

948.    Following its period of exclusivity, Teva's "goal was to concede business on day 181" but "to retain CVS, Walgreens and ABC. All others are not an automatic concede, but we expect to concede." As discussed more fully above, during March and April 2014, Teva coordinated with and conceded several customers to Zydus, as Zydus was entering the market for Paricalcitol. By mid-April 2014, Teva "ha[d] conceded the share [it] planned for" to Zydus.

949.    By May 2014, Dr. Reddy's started preparing to enter the Paricalcitol market.

950.    On May 1, 2014, T.W. of Dr. Reddy's spoke with Rekenthaler of Teva for nearly eleven (11) minutes.

951.    At a May 20 sales and marketing team meeting, the Dr. Reddy's sales force was instructed to find out which customers were currently purchasing Paricalcitol from which manufacturers, and their prices. Dr. Reddy's was targeting a 20 percent market share. At the time, Teva's share was 73 percent.

952.    On June 10, 2014, as Dr. Reddy's was starting to approach certain customers, including a large retail pharmacy customer ("The Pharmacy"), Patel spoke with V.B., the Vice President of Sales for North American Generics at Dr. Reddy's, several times. At 8:50am, Patel called V.B. and left a voicemail. V.B. returned the call at 9:18am, and the two spoke for more than ten (10) minutes. Later that day, at 2:46pm, Dr. Reddy's provided The Pharmacy with a market share report for Paricalcitol, indicating that Teva was the market leader at 60 percent share. A representative of The Pharmacy responded that it "[l]ooks like Teva is the right target." Shortly after this email exchange, at 3:21pm, V.B. called Patel again, and the two spoke for nearly nine (9) minutes.

953.    By June 19, 2014, Dr. Reddy's had made offers to Omnicare, Cardinal, ABC, and The Pharmacy. The internal plan was that if The Pharmacy declined, then Dr. Reddy's would make an offer to CVS. That same day, Teva agreed to concede its Paricalcitol business at Omnicare, dropping its market share by 3 percent.

954.    Teva also strategically conceded what remained of its Cardinal business (it had previously conceded some of that business to Zydus). After receiving Dr. Reddy's bid, Cardinal approached Teva and asked whether Teva would bid to retain the 4 mcg portion of the business. Patel recommended to her boss, Green, that Teva concede the business: "We have ~70 share and it is ideal to concede here because of the incomplete family." Green agreed.

955.    Patel then instructed S.B., a customer analyst at Teva, to concede "due to [T]eva's high share." S.B. subsequently emailed T.C., Teva's Senior Director of Sales & Trade Relations: "Due to the fact that we have high share and already conceded on the other strengths, we are going to concede on this strength as well. T.C. relayed this statement, word-for-word, to Cardinal.

956.    Dr. Reddy's also submitted a bid to ABC, which was one of the customers that Teva had targeted to keep after losing exclusivity. ABC notified Teva of Dr. Reddy's competitive bid for Paricalcitol on June 26, 2014. In internal emails discussing this price challenge, Teva employees noted that Dr. Reddy's was "aggressively seeking market share" and potentially eroding the price of the drug.

957.    Despite the pricing challenge, Teva retained the ABC Paricalcitol business. As ABC explained to Dr. Reddy's, "Teva wanted to keep the business and has given us a competitive price."

958.    Dr. Reddy's formally launched Paricalcitol on June 24, 2014. On or around that date, it sent offers to, inter alia, Winn-Dixie, Giant Eagle, and Schnucks. On June 26, 2014, Teva's Green told Patel that he was "willing to concede 10-15% share total on Paricalcitol" to Dr. Reddy's.

959.    Winn-Dixie informed Teva that it had received a competing offer for Paricalcito, from Dr. Reddy's. Patel recommended that Teva concede the business. Teva did, and Winn-Dixie informed Dr. Reddy's that it had won its Paricalcitol business on July 9, 2014.

960.    Giant Eagle informed Teva that it had received a competing offer on Paricalcitol on July 10, 2014. That same day, V.B. of Dr. Reddy's called Patel, and the two spoke for more than twelve (12) minutes. Shortly after getting off the phone with V.B., Patel responded to a question from a colleague regarding an RFP to another supermarket chain. One of the potential bid items was Paricalcitol. Patel directed her colleague to "bid a little high on Paricalcitol. We should not be aggressive since we are in the process of conceding share due to additional entrants." Her colleague responded: "I will bid higher" on Paricalcitol.

961.    The next day, Teva conceded the Giant Eagle business to Dr. Reddy's. S.B., a Teva Strategic Customer Analyst, wrote in an internal email, "Due to DRL recent launch and pressure to give up share, we are going to concede." Giant Eagle accepted Dr. Reddy's proposal the next day.

962.    After receiving an offer from Dr. Reddy's, Schnucks also asked Teva for reduced pricing in order to retain the business. Teva decided internally to concede Paricalcitol at Schnucks "[d]ue to new entrants and having to give up some share." In order to create the appearance of competition with this customer, Teva engaged in what Patel referred to as "fluff pricing," by which it offered Schnucks an inflated price (cover bid) for Paricalcitol to ensure that Teva did not win the business. Indeed, Schnucks was "so insulted" by Teva's price that it moved to Dr. Reddy's the same day it received Teva's offer, June 30, 2014.

963.    On July 16, 2014, McKesson informed Teva that it had received a competing bid for Paricalcitol, and that Teva would need to submit its best bid in order to retain the business. Teva initially decided to concede the One Stop portion of McKesson's business only, while retaining the Rite Aid portion. Patel wrote internally to her team that "[t]his decision is based on the number of competitors, DRL's potential share target and our current/conceded share. (Dr. Reddy's should be done with challenging our business on this product.)" Patel further added that Teva had been "looking to give up One Stop to be responsible with share" and that "[t]he responsible thing to do is concede some share to DRL but not all."

964.    On July 18, 2014, a Friday, Patel called V.B. at Dr. Reddy's at 4:20pm and left a message. V.B. returned the call on Monday morning, and the two spoke for more than four (4) minutes. They spoke again the next morning, July 22, 2014, for more than six (6) minutes. During these calls, Patel and V.B. agreed that Dr. Reddy's would stop competing for additional market share (and driving price down further) if Teva conceded all of its McKesson business (One Stop and Rite Aid) to Dr. Reddy's. Indeed, Dr. Reddy's confirmed to McKesson (that same day) that it "would be

done after this"—meaning it would not compete for additional business because it had attained its fair share. McKesson passed this information along to Teva on July 22.

965.    The next day, July 23, 2014, Teva decided to concede its entire McKesson business-both Rite Aid and One Stop-to Dr. Reddy's. In making this decision, Patel noted: "NOW, DRL should be done." In its Delphi database, Teva noted that the McKesson Paricalcitol business had been conceded to a "Strategic New Market Entrant." After the fact, former customer McKesson informed Teva that Dr. Reddy's had been "so aggressive because [Teva was] not giving up share."

966.    By early August 2014, Dr. Reddy's had attained 15-16 percent of the total Paricalcitol market, which it decided, pursuant to its understanding with Teva, it would "maintain for now."

b.    Taking the Overarching Conspiracy to a New Level: Price Increases

967.    As evident from the many examples above, by 2012, the overarching "fair share" conspiracy was well established in the industry, including among the Defendants. Generic manufacturers replaced competition with coordination in order to maintain their fair share of a given generic drug market and avoid price erosion. The structure and inner workings of the agreement were well understood and adopted throughout the industry.

968.    Around this time, however, manufacturers began to focus more on price increases than they had in the past. They were no longer satisfied to simply maintain stable prices; rather, there was a concerted effort by many in the industry to significantly raise prices. Manufacturers started communicating with each other about those increases with greater and greater frequency.

969.    A troubling pattern began to emerge. Starting sometime in 2012 or even earlier, and continuing for several years, competitors would systematically communicate with each other as they were identifying opportunities and planning new price increases, and then again shortly before or at the time of each increase. The purpose of these communications was not only to secure an agreement to raise prices, but also to reinforce the essential tenet underlying the fair share agreement-i.e., that

202

they would not punish a competitor for leading a price increase or steal a competitor's market share on an increase. There was an understanding among many of these generic drug manufacturers, including the Defendants, that a competitor's price increase be quickly followed, but even if it could not, the overarching conspiracy dictated that the competitors who had not increased their prices would, at a minimum, not seek to take advantage of a competitor's price increase by increasing their own market share (unless they had less than "fair share").

970.    It is important to note that generic drug manufacturers could not always follow a competitor's price increase quickly. Various business reasons − including supply disruptions or contractual price protection terms with certain customers that would result in the payment of significant penalties − could cause such delays. In those instances when a co-conspirator manufacturer delayed following a price increase, the underlying fair share understanding operated as a safety net to ensure that the competitor not seek to take advantage of a competitor's price increase by stealing market share.

i.    Teva July 31, 2012 Price Increase

971.    Effective July 31, 2012, Teva increased pricing on a number of different drugs. Many were drugs where Teva was exclusive, but several of them were drugs where Teva faced competition, including the following:

| Drug | Competitors |
|---|---|
| Buspirone Hydrochloride Tablets | Mylan (29.5%); Watson (23.5%) |
| Estradiol Tablets | Mylan (26.7%); Watson (16.4%) |
| Labetalol HCL Tablets | Sandoz (61.4%); Watson (10%) |
| Loperamide HCL Capsules | Mylan (67%) |
| Mimvey (Estradiol/Noreth) Tablets | Breckenridge (66.2%) |
| Nadolol Tablets | Mylan (49.8%); Sandoz (10.3%) |
| Nitrofurantoin MAC Capsules | Mylan (45.3%); Alvogen (7.9%) |
| Tamoxifen Citrate Tablets | Mylan (22.2%); Watson (10.3%) |

972. Before raising prices on these drugs, Teva coordinated each of these price increases with its competitors. For every drug on the list above, either Green or Rekenthaler was communicating directly or indirectly with Teva's competitors to coordinate in the days and weeks leading up to the price increase. For example:

- Mylan: Green spoke to Nesta on July 23 (7 minutes), July 24 (2 calls: 4 and 8 minutes); July 25, (4 minutes , July 26 (4 minutes), July 30 (2 calls, including one 8 minutes), and July 31, 2012 (5 calls: 6, 2, 4, 7, and 2 minutes).
- Watson: Rekenthaler spoke to A.S.3, a senior Watson sales executive, on July 11, 2012 (2 calls: 1 and 9 minutes).
- Sandoz: Green spoke to CW-2 at Sandoz on July 29, 2012 (2 calls: 2 and 4 minutes) and July 31, 2012 (6 minutes).
- Breckenridge: Rekenthaler spoke to D.N., a senior sales executive at Breckenridge, on July 17, 2012 (4 minutes).
- Alvogen: Green had several calls with Nesta at Mylan (noted above) on July 31, 2012. After some of those calls between Green and Nesta on July 31, Nesta called B.H.2, a senior sales and marketing executive at Alvogen.

973. Teva continued to coordinate with these competitors on these drugs even after July 31, 2012. Examples of this coordination with respect to specific drugs are discussed in more detail below.

1) Nadolol

974. As early as 2012, Teva was speaking to competitors about the drug Nadolol.

975. Nadolol, also known by the brand name Corgard, is a "beta blocker" which is used to treat high blood pressure, reducing the risk of stroke and heart attack. It can also be used to treat chest pain (angina).

976. In 2012 and 2013, Teva's only competitors for Nadolol were Mylan and Sandoz. All three companies experienced supply problems of some sort during that time period, but they were in continuous communication to coordinate pricing and market allocation in order to maintain market stability. Nadolol was a high-volume drug and one of the most profitable drugs where Teva, Mylan, and Sandoz overlapped, so it was very important that they maintain their coordination.

977.    Teva's relationships with Mylan and Sandoz are discussed more fully below, but by 2012, an anticompetitive understanding among those companies was firmly entrenched.

978.    Teva raised its price on Nadolol on July 31, 2012. In the days leading up to that increase—following a pattern that would become routine and systematic over the following years—Kevin Green, at the time in the sales department at Teva, was in frequent communication with executives at both Sandoz and Mylan. Green spoke to CW-2 from Sandoz twice on July 29, 2012, and again on the day of the price increase, July 31, 2012.

979.    Similarly, Green was communicating with Nesta of Mylan often in the days leading up to the increase, including five (5) calls on the day of the price increase.

980.    Sandoz followed with its own increase on August 27, 2012. The increases were staggering, varying from 736 to 798 percent, depending on the formulation. The day before the Sandoz increase, Armando Kellum, then the Senior Director of Pricing and Contracts at Sandoz, called Green. They had also spoken once earlier in the month, shortly after the Teva increase. CW-2 also called Green twice on August 21, 2012, the same day that Sandoz requested approval from its Pricing Committee to raise the Nadolol price. The day after the Sandoz increase, Green, acting as the conduit of information between Sandoz and Mylan, called Nesta of Mylan twice, with one call lasting fourteen (14) minutes.

981.    Mylan, which returned to the market after a brief supply disruption, followed the Teva and Sandoz increases on January 4, 2013. In what had become a routine component of the scheme, the day before the Mylan increase, Nesta spoke to Green four (4) times. The next day, Green conveyed the information he had learned from Nesta directly to his counterpart at Sandoz. On the day of the Mylan increase, Green called Kellum twice in the morning, including a six (6) minute call at 9:43am. Shortly after hanging up with Green, Kellum reported internally on what he had learned—but

concealed the true source of the information—a convention that was frequently employed by many Sandoz executives to avoid documentation of their covert    communications with competitors:



**From:** Kellum, Armando
**Sent:** Friday, January 04, 2013 11:28 AM
**To:**
**Subject:** Levothryoxine and nadolol

Just heard from a customer that

- Teva and Mylan raised have now raised price on Nadolol to our levels

and

Mylan took a significant price increase on Levothryoxine

Let's please be cautious on both of these products.

Thanks

Being "cautious" on those products meant that Sandoz did not want to steal business away from its competitors by offering a lower price and taking their market share.

982.    Kellum's phone records demonstrate that he did not speak with any customers during the morning of January 4, 2013. At 11:50am the same morning, Green also called CW-2 at Sandoz, and they spoke for fifteen (15) minutes.

983.    Significantly, Green was not speaking with his Sandoz contacts solely about Nadolol, the common drug between Teva and Sandoz, but was also conveying information to Sandoz about a Mylan price increase on another drug that Teva did not even sell: Levothyroxine. Such conversations further demonstrate the broad, longstanding agreement among each of these competitors to share market intelligence in order to facilitate the scheme.

984.    To put the Nadolol price increases into context, the Connecticut Attorney General's Office received a complaint from a Connecticut resident who has been prescribed Nadolol for approximately the last 15 years. In or about 2004, that individual paid between $10 and $20 in out-of-pocket costs for a 90-day supply of Nadolol. Later, that same 90-day supply of Nadolol would cost the complainant more than $500.

985.    As discussed more fully below, Teva continued to conspire with Mylan and Sandoz about Nadolol and many other drugs throughout 2013 and into the future.

2)    Labetalol

986.    Labetalol, also known by brand names such as Normodyne and Trandate, is a medication used to treat high blood pressure. Labetalol, like Nadolol, is in a class of drugs called beta blockers, and it works by relaxing blood vessels and slowing heart rate to improve blood flow and decrease blood pressure.

987.    After Teva increased its pricing on Labetalol on July 31, 2012, it continued to coordinate with its competitors to maintain that supra-competitive pricing for that drug. For example, In October 2012, Teva learned that Sandoz was "no longer having supply issues" but that "Watson is on allocation" (i.e., did not have enough supply to meet all of its demand). In an internal email sent on October 16, 2012, J.L., a senior analyst at Teva, questioned whether Teva should consider lowering "strategic customer pricing" in order to retain its market share.

988.    That same day, Green spoke to CW-2 of Sandoz two (2) times. After those calls with CW-2, Green reported that Sandoz was holding firm to its price increase and that Teva should stay the course and likewise maintain its higher price. T.C. of Teva agreed: "We need to stay the TEVA course."

989.    Rekenthaler was not satisfied, however. In order to confirm that Watson was also still committed to maintain high pricing on Labetalol, Rekenthaler called and spoke to A.S.3, a senior sales executive at Watson, four (4) times on October 18, 2012.

### 3)     Nitrofurantoin MAC Capsules

990.     Nitrofurantoin Macrocrystal ("Nitrofurantoin MAC"), also known by the brand name Macrodantin, is a medication used to treat certain urinary tract infections.

991.     Teva's July 31, 2012 price increase on Nitrofurantoin MAC was between 90-95 percent, depending on the dosage and formulation. After that increase, Teva continued to coordinate with Mylan and Alvogen to maintain those high prices.

992.     For example, on October 10, 2012, a distributor customer approached Teva requesting a lower price for Nitrofurantoin MAC because it was having difficulty competing with the prices being charged by the distributor's competitors (i.e., other distributors). At 9:49am on October 10, 2012, Green of Teva sent an internal email to the Teva sales team, including Green and Rekenthaler, asking them to confirm current market pricing.

993.     Immediately after receiving that email, Green reached out to both Nesta at Mylan and B.H.2, his counterpart at Alvogen. At 10:01am, Green called Nesta, and the two spoke for ten (10) minutes. After hanging up, Green called B.H.2 at Alvogen for the first of three (3) calls that day, including one call lasting fourteen (14) minutes. To close the loop, Nesta also separately spoke to B.H.2 two times that same day, including a call lasting almost ten (10) minutes. Teva did not lower its price.

### ii.     Increasing Prices Before a New Competitor Enters the Market: Budesonide Inhalation Suspension

994.     Budesonide Inhalation Suspension, also known by the brand name Pulmicort Respules, is a medication used to control and prevent symptoms caused by asthma. It belongs to a class of drugs called corticosteroids and works directly in the lungs to make breathing easier by reducing the irritation and swelling of the airways.

995.    As of February 2013, Teva was the only company in the market for generic Budesonide Inhalation Suspension. Teva knew, however, that a potential legal action challenging the validity of the patent on the brand drug could allow additional competition into the generic market shortly. Thus, before any additional competition could enter the market, effective February 8, 2013, Teva raised the WAC price for its Budesonide Inhalation Suspension by 9 percent. Although a very modest increase in percentage terms, the 9 percent price increase added $51 million to Teva's annual revenues.

996.    On April 1, 2013, Actavis won a legal challenge in federal district court against the brand manufacturer declaring the patent for the brand drug, Pulmicort Respules, invalid. Actavis immediately began planning to launch the product "at risk," which is when a generic manufacturer puts the product on the market before all appeals in the patent lawsuit are formally resolved and there is still a risk that the new generic entrant might ultimately be found to violate the patent. That same day, David Rekenthaler of Teva called his counterpart at Actavis, A.B., a senior sales and marketing executive, and they spoke for two (2) minutes. This was the first-ever phone call between them based on the phone records produced.

997.    The next day, April 2, 2013, Rekenthaler spoke to A.B two (2) more times, including one call lasting eight (8) minutes. Actavis then immediately began shipping the product. Instead of competing to obtain market share as a new entrant, however, Actavis entered the market with the exact same WAC price as Teva. Indeed, when Teva inquired of a customer that same day to confirm Actavis's pricing, Teva was informed by the customer that Actavis's pricing was "in line with [Teva's] current wholesale pricing."

998.    At some point thereafter, further legal action from the brand manufacturer prevented Actavis from permanently entering the market, but in the interim Teva was able to continue to charge the agreed-upon prices. In addition, once Actavis entered the market in 2015, Teva immediately

conceded customers to Actavis in accordance with the fair share agreement, after calls between Rekenthaler and Falkin, by then a Vice President at Actavis.

iii.    Early 2013: Teva's Generics Business Struggles

999.    Despite Teva's initial attempts to increase its revenues through price increases in 2012 and early 2013, its generic business was struggling as of early 2013. Throughout the first quarter of 2013, Teva realized it needed to do something drastic to increase profitability. On May 2, 2013, Teva publicly announced disappointing first quarter 2013 results. Among other things: (1) net income was down 26 percent compared to the prior year, (2) total net sales were down 4 percent, and (3) generic sales declined by 7 percent.

1000.    By this time, Teva had already started to consider new options to increase its profitability, including more product price increases. Over the next several years, Teva embarked on an aggressive plan to conspire with its competitors to increase and sustain price on many generic drugs, completely turning around the company's fortunes.

iv.    April 2013: Teva Hires Nisha Patel

1001.    In April 2013, Teva took a major step toward implementing more significant price increases by hiring Nisha Patel as its Director of Strategic Customer Marketing. In that position, her job responsibilities included, among other things: (1) serving as the interface between the marketing (pricing) department and the sales force teams to develop customer programs, (2) establishing pricing strategies for new product launches and in-line product opportunities, and (3) overseeing the customer bid process and product pricing administration at Teva.

1002.    Most importantly, she was responsible for—in her own words—"product selection, price increase implementation, and other price optimization activities for a product portfolio of over 1,000 products." In that role, Patel had 9-10 direct reports in the pricing department at Teva. One of Patel's primary job goals was to effectuate price increases. This was a significant factor in her

210

performance evaluations and bonus calculations and, as discussed more fully below, Patel was rewarded handsomely by Teva for doing it.

1003.   Prior to joining Teva, Patel had worked for eight years at a large drug wholesaler, ABC, working her way up to Director of Global Generic Sourcing. During her time at ABC, Patel had routine interaction with representatives from every major generic drug manufacturer and developed and maintained relationships with many of the most important sales and marketing executives at Teva's competitors.

1004.   Teva hired Patel specifically to identify potential generic drugs for which Teva could raise prices, and then utilize her relationships to effectuate those price increases.

1005.   Even before Patel started at Teva, she was communicating with potential future competitors about the move, and about her new role. For example, on April 2, 2013, nearly three weeks before Patel started at Teva, Ara Aprahamian, the Vice President of Sales and Marketing at Co-conspirator Taro, sent an email to the Chief Operating Officer ("COO") at Taro stating: "Nisha Going To Teva – Hush Hush for now…." The COO responded by saying "[m]aybe the industry will be better for it. Teva can only improve." Teva had, up to that point, acquired a reputation in the industry for being slow to follow price increases, and the Taro COO viewed Patel as someone who would change that mindset at Teva. Patel had also worked with Aprahamian several years earlier at ABC.

1006.   Patel's last day at ABC was April 11, 2013, and she started at Teva on April 22, 2013. Patel began communicating with competitors by phone and text the day after she left ABC and before she even started at Teva, with calls to Sandoz, Glenmark, and Upsher- Smith.

1007.   Once Patel began her employment at Teva, her communications with certain competitors became much more systematic and frequent, and focused on market events such as price increases, market entry, customer challenges, and loss of exclusivity.

211

1008.   When she joined Teva, Patel's highest priority was identifying drugs where Teva could effectively raise price without competition. On May 1, 2013, Patel began creating an initial spreadsheet with a list of "Price Increase Candidates." As part of her process of identifying candidates for price increases, Patel started to look very closely at Teva's relationships with its competitors, and also her own relationships with individuals at those competitors. In a separate tab of the same "Price Increase Candidates" spreadsheet, Patel began ranking Teva's "Quality of Competition" by assigning companies into several categories, including "Strong Leader/Follower," "Lag Follower," "Borderline," and "Stallers."

1009.   Patel understood and stressed internally at Teva that "price increases tend to stick and markets settle quickly when suppliers increase within a short time frame." Thus, it was very important for Patel to identify those competitors who were willing to share information about their price increases in advance, so that Teva would be prepared to follow quickly. Conversely, it was important for Patel to be able to inform Teva's competitors of Teva's price increase plans so those competitors could also follow quickly. Either way, significant coordination would be required for price increases to be successful, and quality competitors were those who were more willing to coordinate.

1010.   As she was creating the list, Patel was talking to competitors to determine their willingness to increase prices and, therefore, where they should be ranked on the scale. For example, in one of her first conversations with CW-1 after Patel joined Teva, Patel told CW-1 that she had been hired by Teva to identify drugs where Teva could increase its prices. She asked CW-1 how Sandoz handled price increases. CW-1 told Patel that Sandoz would follow Teva's price increases and, importantly, would not poach Teva's customers after Teva increased. Not surprisingly, Sandoz was one of Teva's highest "quality" competitors. Patel and Teva based many price increase (and market allocation) decisions on this understanding with Sandoz over the next several years.

1011.  Patel had several different ways of communicating with competitors beyond phone calls and text messages, including but not limited to instant messaging through social media platforms such as LinkedIn and Facebook, encrypted messaging through platforms like WhatsApp, and in-person communications. Many of these communications have been destroyed by Patel.

1012.  Through her communications with her competitors, Patel learned more about their planned price increases and entered into agreements for Teva to follow them. On May 2, 2013, Patel spoke to her contacts at Glenmark, Actavis, and Sandoz several times. After one of her calls with CW-5 of Glenmark, Patel sent an internal email to one of her subordinates, directing him to add six (6) different Glenmark drugs to Teva's "high priority" price increase list: Adapalene Gel, Nabumetone, Pravastatin, Ranitidine, Moexipril, and Moexipril HCTZ. As discussed more fully below, these are all drugs that Glenmark eventually increased prices on two weeks later, on May 16, 2013, and Teva followed with its own price increases shortly thereafter.

> v.   Ranking "Quality of Competition" to Identify Price Increase Candidates

1013.  By May 6, 2013, Patel had completed her initial ranking of fifty-six (56) different manufacturers in the generic drug market by their "quality." Patel defined "quality" by her assessment of the "strength of a competitor as a leader or follower for price increases. Ranking was done numerically, from a +3 ranking for the "highest quality" competitor to a 3 ranking for the "lowest quality" competitor. The top ranked competitors at that time included Mylan, Watson/Actavis, Sandoz/Fougera, Glenmark, and Taro. The lowest ranked competitors were Apotex and Zydus.

1014.  Patel created a formula, which heavily weighted those numerical ratings assigned to each competitor based on their "quality," combined with a numerical score based on the number of competitors in the market and certain other factors including whether Teva would be leading or following the price increase. According to her formula, the best possible candidate for a price increase

(aside from a drug where Teva was exclusive) would be a drug where there was only one other competitor in the market, which would be leading an increase, and where the competitor was the highest "quality." Conversely, a Teva price increase in a drug market with several "low quality" competitors would not be a good candidate due to the potential that low quality competitors might not follow Teva's price increase and instead use the opportunity to steal Teva's market share.

1015.   Notably, the companies with the highest rankings at this time were companies with which Patel and other executives within Teva had significant relationships. Some of the notable relationships are discussed in more detail below.

### 1) The "High Quality" Competitor Relationships

1016.   The highest quality competitors in Patel's rankings were competitors with which Teva had agreements to lead and follow each other's price increases. The agreements and understandings regarding price increases were what made each of those competitors a high quality competitor. As part of their understandings, those competitors also agreed that they would not seek to compete for market share after a Teva price increase.

#### a) Mylan (+3)

1017.   Mylan was Teva's highest-ranked competitor by "quality." The relationship between these two competitors was longstanding and deeply engrained. It survived changes in personnel over time, and it pre-dated Patel's creation of the quality competitor rankings.

1018.   Kevin Green, who was employed by Teva beginning in 2006 through late October 2013, first began communicating with Jim Nesta of Mylan by telephone on February 21, 2012. From that time until the time that Green left Teva, Green and Nesta were in almost constant communication, speaking by phone at least 392 times, and exchanging at least twelve (12) text messages – including at or around every significant price increase taken by either company. This amounts to an average of nearly one call or text message every business day during this period.

214

1019.   Shortly after Patel started her employment at Teva, she called Nesta on May 10, 2013, and the two spoke for over five (5) minutes. Because Green had already established a relationship with Mylan, Patel did not need to speak directly with Nesta very often. Typically, Patel would email Green and ask him to obtain market intelligence about certain Mylan drugs; Green would then speak to Nesta, often about a long list of drugs, and report his findings back to Patel. Several examples of these communications are outlined more fully in various sections below.

1020.   When Green left Teva to join Zydus in late October 2013, the institutional relationship and understanding between Teva and Mylan remained strong. Rekenthaler promptly took over the role of communicating with Nesta. Starting in December 2013, through the time that Rekenthaler left Teva in April 2015, Rekenthaler spoke to Nesta 100 times. Prior to Green leaving Teva in late-October 2013, Rekenthaler and Nesta had only spoken by phone once, more than a year earlier in 2012.

1021.   The relationship between Teva and Mylan even pre-dated the relationship between Green and Nesta. For example, between January 1, 2010 and October 26, 2011, R.C.2, a senior executive at Teva, communicated with R.P., a senior executive counterpart at Mylan, by phone or text at least 135 times. The pace of communications between the two companies slowed dramatically in November 2011 after R.C.2 left Teva and before Green began communicating with Nesta, but continued nevertheless as needed during that time through communications between Rekenthaler and R.P. at Mylan.

b)    Watson/Actavis (+3)

1022.   Actavis was Teva's next highest quality competitor by ranking. Patel had strong relationships with several executives at Actavis, including Rogerson, the Executive Director of Pricing and Business Analytics, and A.B., a senior sales executive at Actavis. Rekenthaler also communicated frequently with A.S.3, a senior sales executive at Watson— a relationship that pre-dated Patel joining Teva.

1023.   Patel contacted A.B. shortly after she started her employment at Teva, as she was creating the quality competitor rankings. She called him on April 30, 2013, and the two exchanged several text messages the next day, May 1, 2013. But as detailed herein, Patel communicated on a more frequent basis with Rogerson, her counterpart in the pricing department at Actavis. From May 2, 2013 through November 9, 2015, Patel spoke and/or texted with Rogerson 157 times, including calls at or around every significant price increase taken by the respective companies.

1024.   In August 2013, Marc Falkin joined Actavis, and the relationship between Teva and Actavis grew stronger through his communications with Rekenthaler. From August 7, 2013 through the date that Rekenthaler left Teva in April 2015, Rekenthaler and Falkin communicated by phone or text at least 433 times.

1025.   Maureen Cavanaugh also had a very strong relationship with Falkin. The two communicated with great frequency. From August 7, 2013 through the end of May 2016, Cavanaugh and Falkin spoke or texted with each other 410 times.

c)    Sandoz (+3)

1026.   Sandoz was also considered a top-quality competitor by Teva. Patel had a very strong relationship with CW-1 at Sandoz.

1027.   Beginning on April 12, 2013—the day after Patel's last day at ABC—until August 2016, Patel and CW-1 spoke 185 times by phone, including at or around every significant price increase taken by either company.

1028.   Green and Rekenthaler of Teva also both had a very strong relationship with CW-2, who at the time was a senior Sandoz executive. These relationships pre-dated Patel joining Teva.

d)    Glenmark (+3)

1029.  Glenmark was one of Teva's highest-ranked competitors primarily because Patel had very significant relationships with several different individuals at Glenmark, including CW-5, Brown, and J.C., a sales and marketing executive.

1030.  As stated above, Patel began communicating with CW-5 even before she began her employment at Teva. Patel was also communicating frequently with both CW-5 and J.C. during the time she created the quality competitor rankings, and agreed to follow several Glenmark price increases, in May 2013.

1031.  Patel and CW-5 communicated by phone with great frequency, including at or around the time of every significant price increase affecting the two companies, until CW-5 left Glenmark in March 2014, at which point their communication ceased for nearly six (6) months. After CW-5 left Glenmark, Patel began communicating with Brown with much greater frequency to obtain competitively sensitive information from Glenmark.

1032.  Patel and Brown had never spoken by phone before Patel started at Teva, according to the phone records produced.

e)    Taro (+3)

1033.  Taro was highly rated because of Patel's longstanding relationship with the Vice President of Sales at Taro, Ara Aprahamian. Patel had known Aprahamian for many years, dating back to when Patel had started her professional career as an intern at ABC.

1034.  Even though she knew Aprahamian well, they rarely ever spoke or texted by phone until Patel started at Teva. From April 22, 2013 through March 2016, however, Patel and Aprahamian spoke or texted at least 100 times, including calls or text messages at or around the time of every significant price increase affecting the companies during those years.

217

f)      Lupin (+2)

1035.   Although initially not the highest ranked competitor, Lupin was assigned a high rating because of Patel's strong relationship with David Berthold, the Vice President of Sales at Lupin. The relationship between Teva and Lupin, however, pre-dated Patel.

1036.   Prior to Patel starting at Teva, Green and others at Teva conspired directly with Berthold. Several of those examples are discussed above. Between January 2012 and October 2013, Berthold and Green, for example, communicated by phone 125 times.

1037.   From May 6, 2013 through April 8, 2014, Patel and Berthold communicated by phone 76 times, including at or around the time of every significant drug price increase where the two companies overlapped.

1038.   Demonstrating the strength of the relationship between the two companies, the price increase coordination continued between Defendants Teva and Lupin even when Green had left Teva and when Patel was out on maternity leave. For example, as discussed more fully below, in October 2013, Lupin was preparing to increase its pricing on the drug Cephalexin Oral Suspension. Without Green or Patel to communicate with, Berthold instead communicated with Rekenthaler and T.S. of Teva in order to coordinate the price increase.

vi.     May 24, 2013: The First List of Price Increase Candidates

1039.   Patel completed and sent her first formal list of recommended price increases to her supervisor, Green, on May 24, 2013. She sent the list via email, with an attached spreadsheet entitled "Immediate PI File." The attached list included twelve (12) different drugs where Patel recommended that Teva follow a "high quality" competitor's price increase as soon as possible. The spreadsheet also revealed competitively sensitive information about future pricing and bidding practices of several of

Teva's high quality competitors – information that Patel could have only learned through her discussions with those competitors. The relevant columns from that spreadsheet are set forth below:

| Product Category | Competitors | Reason for Increase |
|---|---|---|
| NABUMETONE TABLETS Total | Watson 26, Glenmark 25, Sandoz 5 | Follow 10% below Glenmark. Sandoz also bidding high. |
| RANITIDINE HCL TABLETS Total | Glenmark 1, Amneal 35, Wockhardt 10? | Follow Glenmark and Amneal increase. 3% below Glenmark. |
| MOEXIPRIL HCL TABLETS Total | Glenmark 18, Paddock 16 | Follow Glenmark increase. 5% lower |
| MOEXIPRIL HCL/HCTZ TABLETS Total | Glenmark 78, Paddock 2 | Follow Glenmark increase. 5% lower |
| ADAPALENE GEL Total | Glenmark 13, Taro 45 | Follow Glenmark increase. 5% lower. Rumors of Taro increase |
| CEFDINIR ORAL SUSPENSION Total | Lupin 35, Northstar 5, Sandoz 3 | Follow Lupin. 8-10% lower |
| CEFPROZIL TABLETS Total | Lupin 42, Northstar 10, Sandoz 18 | Follow Lupin. 8-10% lower |
| CEFDINIR CAPSULES Total | Lupin 49, Sandoz 16, Northstar 7 | Follow Lupin. 8-10% lower |
| FLUOCINONIDE OINTMENT Total | Taro 44, Sandoz 1 | Raise to follow Taro |
| FLUOCINONIDE CREAM E Total | Taro 62, Sandoz 10 | Raise to follow Taro |
| FLUOCINONIDE GEL Total | Taro 63, Sandoz 9 | Raise to follow Taro |
| FLUOCINONIDE CREAM Total | Taro 68, Sandoz 1 | Raise to follow Taro |
| CEFACLOR ER TABLETS Total | Teva Exclusive | Teva Exclusive |
| CEPHALEXIN TABLETS Total | Teva Exclusive | Teva Exclusive |
| CEFADROXIL TABLETS Total | Westward 41 | EXCLUDE; ERROR IN SOURCE DATA |

1040.    For every one of the relevant drugs on the list, Patel or another executive at Teva spoke frequently with Teva's competitors in the days and weeks leading up to May 24, 2013. During these communications, Teva and its competitors agreed to fix prices and avoid competing with each other in the markets for the identified drugs. For some of these drugs, including the four different formulations of Fluocinonide, Patel knew before she even began her employment at Teva that she would be identifying those drugs as price increase candidates because of communications she had already had with Aprahamian of Taro.

1041.    The "Immediate PI File," including the competitively sensitive information Patel had obtained from competitors, was sent by Patel's supervisor Green to Maureen Cavanaugh, at that time the Senior Vice President of Sales and Marketing at Teva.

1042.    Cavanaugh adopted and approved Patel's price increase recommendations on May 28, 2013. The Teva price increases for the drugs identified in Patel's May 24, 2013 "Immediate PI File" went into effect on July 3, 2013. Patel went to great lengths to coordinate these price increases with competitors prior to sending the list to Green on May 24, 2013. Some illustrative examples of that coordination are set forth below.

1)    <u>Glenmark</u>

1043.    A number of the drugs identified in the "Immediate PI File" were targeted because of a recent Glenmark price increase on May 16, 2013. As soon as Patel started at Teva, she began to identify price increase candidates through her conversations with various sales and marketing executives at Glenmark, including:

- CW-5: 4 calls on 5/2/13 (5:02, 0:06, 7:18 and 11:39), 2 calls on 5/3/13 (1:53 and 0:06) , 1 text message on 5/3/13; and
- J.C.: 3 calls on 5/6/13 (6:45, 20:44, 8:39), 2 calls on 5/7/13 (7:59 and 1:03).

1044.    For example, early in the morning on May 2, 2013, Patel informed a colleague that she expected to have some new drugs to add to the price increase list imminently. Less than fifteen minutes later, Patel received a call from CW-5 of Glenmark and the two spoke for just over five (5) minutes. Shortly after that call, Patel sent a follow-up email where she identified six different "high priority" Glenmark drugs to add to the price increase list, including Adapalene Gel, Nabumetone, Pravastatin, Ranitidine, Moexipril, and Moexipril HCTZ. Glenmark had not yet increased the price on any of those drugs, nor had it sent any notices to customers indicating that it would be doing so (and would not send such notices until May 15, 2013).

1045.    As the Glenmark price increases were approaching, Patel took steps to make sure that Teva did not undermine its competitor's action. During the morning on May 15, 2013, in anticipation of the Glenmark price increases that had not yet been implemented or made public, Patel instructed her Teva colleagues to alert her of any requests by customers for pricing relating to eight different Glenmark drugs. In accordance with the fair share understanding outlined above, Patel wanted to be careful to avoid obtaining any market share from Glenmark after the price increases.

1046.    Following the normal pattern, Patel also spoke to CW-5 of Glenmark for nearly six (6) minutes the next day, May 16, 2013, the day of the Glenmark price increases. Effective that day, Glenmark increased price on the following drugs where there was an overlap with Teva: Adapalene

Gel, Nabumetone, Fluconazole Tablets, Ranitidine, Moexipril, Moexipril HCTZ, Pravastatin, and Ondansetron. Patel also spoke to CW-5 and J.C. at Glenmark multiple times on May 17, 2013.

1047.   After the implementation of the Glenmark price increases on May 16, 2013, and before Teva had the opportunity to follow those increases, Teva was approached by several customers looking for a lower price. Teva refused to bid on most of these solicitations in order to maintain market stability. When it did provide a customer with a bid, Teva intentionally bid high so that it would not win the business. As Patel stated to a Teva colleague when a large wholesaler approached Teva about bidding on several Glenmark increase drugs: "IF we bid, we need to bid high, or we will disturb the market."

1048.   Patel did not immediately include all of the Glenmark price increase drugs on Teva's price increase list, however, because certain drugs involved competitors that were not of the highest "quality." For these drugs, a little more work (and communication) was required before Patel would feel comfortable moving forward with a price increase.

1049.   For example, the market for Fluconazole Tablets included Greenstone as a competitor (albeit with relatively low market share) in addition to Teva and Glenmark. As of Friday May 17, 2013, Patel had not yet decided whether Teva should follow the Glenmark price increase on Fluconazole, fearing that Greenstone might not be a responsible competitor. In an internal email that day, Patel indicated to colleagues  that she was "[g]athering some revised intel" about Fluconazole in order to determine next steps.

1050.   The following Monday, May 20, Patel called Hatosy, a national account manager at Greenstone, but was unable to connect. Patel was ultimately not able to communicate with Hatosy by phone until May 28, 2013, when the two had a twenty-one (21) minute call. The next day, after speaking to Hatosy, Patel promptly added Fluconazole to the Teva price increase list.

1051.   As discussed more fully below, Teva followed the Glenmark price increase for Fluconazole Tablets on July 3, 2013. That same day, Patel spoke to Hatosy for nearly sixteen (16) minutes; she also spoke to CW-5 at Glenmark for almost five (5) minutes. The Teva price increases were a staggering 875–1,570 percent, depending on the dosage strength. Greenstone then followed with an increase of its own on August 16, 2013. Patel coordinated those increases with both Glenmark and Greenstone.

1052.   Another example of a drug that required even more effort and coordination among several competitors before it could be included on the Teva price increase list was Pravastatin, which is discussed more fully below in the Section relating to Teva's August 9, 2013 price increases.

### 2)   Sandoz

1053.   In her May 24 "Immediate PI File," Patel included competitively sensitive information about the drug Nabumetone, indicating that she was confident following Glenmark's increase because Sandoz was "bidding high" on that drug. In other words, Sandoz would provide cover bids that were too high to be successful, so that Sandoz would not take its competitors' market share even if it did not take its own price increase. Patel had spoken to CW-1 for nearly twenty-five (25) minutes on May 15, 2013, and again for more than eighteen (18) minutes on May 20, 2013, during which time she learned this information.

1054.   Patel continued to coordinate with CW-1 and other competitors about increasing prices for drugs on the list even after she sent it to Green on May 24, 2013. For example, on May 30, 2013, Patel spoke to CW-5 at Glenmark for nearly twelve (12) minutes. Immediately after hanging up the phone, Patel called CW-1 at Sandoz to discuss Glenmark's increase on the drug Ranitidine and Teva's plans to follow that increase (Sandoz was also in the market for Ranitidine). She left CW-1 a voicemail, and he called her back promptly. Patel and CW-1 then had several substantive telephone calls over the next half hour.

1055.   After these conversations with Patel, CW-1 sent an email to Kellum indicating that he believed there would be price increases in the pipeline with respect to Ranitidine, and suggesting a potentially substantial increase in Sandoz's price:

From: ▮▮▮▮▮▮
Sent: Thursday, May 30, 2013 10:02 AM
To: Kellum, Armando
Cc: ▮▮▮▮▮
Subject: Ranitidine tabs

I think there might be some price increases in the pipeline.

Per analysource Glenmark just took a WAC increase to $9.53 from $2.70(we are at 4.98) on the 150mg on 5/16. I wonder if Teva and Amneal will follow? They are the two dominant players on this molecule

We just bid and I think we are getting the award at a contract price of $1.77. This contract is negative gross margins but 15% above variable costs. RAD was at $0.95. Looking at the competition of Amneal, Teva and Glenmark I thought that this was the best way to go to get into this product, we are currently sitting with a 1.8% share.

RAD is also buying up a lot of our short dated product.

Wonder if there is any way to work with them to revise the cost at a future date if Teva and Amneal go up as well. I'm thinking we can go from $1.77 to $5 maybe

1056.   The communication between Patel and CW-1 about competitively sensitive information was constant and unrelenting during this period. For example, in June 2013, Teva was "attempting to understand how [its] pricing for Isoniazid compares to the rest of the market." On June 11, 2013, L.R., a Teva marketing representative, asked Patel whether she was "aware of any competitive market intel for this family?" According to the marketing representative, Sandoz was also in the market for Isoniazid and had "drastically increased their pricing" in January 2013. Patel responded: "I will try to get the scoop on Sandoz pricing tomorrow. When do you need this by?"

1057.   The next day, Patel exchanged at least five (5) calls with CW-1 at Sandoz. At 8:27am, after the first two of the phone calls, Patel sent the following email clarifying some of the information that L.R. had provided, reflecting some of the conversations about market share she was having with CW-1:

```
From: Nisha Patel02
Sent: Wednesday, June 12, 2013 8:27 AM
To:
Cc:
Subject: RE: Isoniazid market pricing
```

I hope to get intel later today. In the meantime, I am hearing about IMS info that contradicts what we have. I am being told that as of quarter ending March 2013, Sandoz has 62% share, with Teva having about 36% share. The data also indicates that Westward has less than 1% share, which implies that they are not back. I also heard that Westward makes the product for Versa, so they are out for now as well. You may want to request more current share data from Market Research to verify?

It is my opinion that we could have raised pricing to a higher level, but I also understand that there are several factors to consider in these decisions. Depending on what you plan to include in your response, I would also have supply info handy. I imagine that we could easily have picked up more share at this very low price, but were probably limited by supply...which is why Sandoz is able to maintain business at their high price.

I'll pass on additional info as I receive it. If you have any questions, please feel free to come by to chat.

1058.    Later that day, Patel passed along additional information with specific price points for Sandoz products that she had received from CW-1 at Sandoz.

1059.    As discussed more fully below, Teva ultimately increased price on Isoniazid on January 28, 2015, in coordination with Sandoz. Patel spoke to CW-1 for more than sixteen (16) minutes shortly before the increase, on January 22, 2015.

3)    Taro

1060.    Patel noted in her May 24, 2013 "Immediate PI File" that for the drug Adapalene Gel, she was confident in following the Glenmark price increase because there were also "[r]umors of a Taro increase" on that drug. In addition to Teva and Glenmark, Taro was the only other competitor in the market for Adapalene Gel at that time. Patel had heard the "rumors" about a Taro increase directly from Ara Aprahamian, the Vice President of Sales and Marketing at Taro. During a nearly eleven (11) minute phone conversation between the two on May 22, 2013, the competitors agreed to follow the Glenmark increase. This was the first call between Patel and Aprahamian since Patel joined Teva.

1061.    Shortly after the phone call with Patel, Aprahamian made an internal request for a report with specific information about Adapalene Gel in order to evaluate a potential Taro increase on the drug, including volume and pricing. Aprahamian indicated that the reason for his request was that the "[r]umor mill has some price changes in the market."

1062.   The next day, May 23, 2013, Aprahamian directed a Taro employee to implement a price increase on Adapalene Gel.

1063.   Exactly one week after the call between Patel and Aprahamian, on May 29, 2013, Taro increased its price on Adapalene Gels. As discussed below, Teva followed with its own price increase on July 3, 2013, which was coordinated with both Glenmark and Taro.

vii.   <u>July 3, 2013 Price Increases</u>

1064.   Teva implemented its first formal set of price increases using Patel's high- quality competitor formula on July 3, 2013, relating to twenty-one (21) different generic drugs. Many of the drugs slated for price increases were from the May 24, 2013 "Immediate PI File," but several others had been added in the interim. Patel scheduled a conference call for the day before the price increases to discuss those increases with members of Teva's sales and pricing departments.

1065.   Following the now-established pattern, Patel and/or Green spoke to every important competitor in the days and weeks leading up to the July 3, 2013 Teva price increase to coordinate the increases and reiterate the understanding already in place with those competitors. The only drugs that Patel or Green did not coordinate with Teva's competitors were drugs where Teva was exclusive— i.e., had no competitors.

1066.   Patel and other executives at Teva went to great efforts to coordinate these price increases with competitors prior to July 3, 2013. Some illustrative examples of generic drugs that were added to the list after May 24, 2013 are set forth in more detail below.

1)    Upsher-Smith

1067.    On June 13, 2013, as Patel was in the process of finalizing the Teva price increase list, she learned that Defendant Upsher-Smith had increased its listed WAC prices for the drug Oxybutynin Chloride Tablets.

1068.    Oxybutynin Chloride, also known by the brand name Ditropan XL, is a medication used to treat certain bladder and urinary conditions. Belonging to a class of drugs called antispasmodics, Oxybutynin Chloride relaxes the muscles in the bladder to help decrease problems of urgency and frequent urination.

1069.    On June 13, 2013, Green of Teva sent an email to several Teva employees, including Patel, asking them to "share any competitive intelligence you may have or receive" regarding Oxybutynin Chloride. At that time, Teva had been considering whether to delete the drug from its inventory, due to low supply and profitability. One factor that could potentially change that calculus for Teva was the ability to implement a significant price increase. On June 14, 2013, while considering whether to change Teva's plan to delete the drug, a Teva employee asked Patel whether she could "provide an estimate of the pricing we might secure business at?"

1070.    On June 15, 2013, Patel exchanged six (6) text messages with B.L., a senior national account executive at Upsher-Smith.

1071.    Patel deemed Upsher-Smith a highly-ranked competitor (+2) in large part because of her relationship and understanding with B.L. In the week before she began her employment at Teva (after leaving her previous employment), Patel and B.L. exchanged several text messages. During her first week on the job, as she was beginning to identify price increase candidates and high quality competitors, Patel spoke to B.L. on April 29, 2013 for nearly twenty (20) minutes. During these initial communications, the two competitors reached an understanding that Teva and Upsher-Smith would

follow each other's price increases. This understanding resulted in Upsher-Smith receiving a +2 "quality competitor" ranking from Patel.

1072.  On June 19, 2013, Teva learned that the other competitor in the market for Oxybutynin Chloride, a company not identified as a Defendant in this Complaint, also increased its price for that drug. As a result, a national account executive at Teva sent an email to Patel stating "Did you know about the Oxybutynin? We have small share, but huge increase there!" Patel responded: "Yes, heard late last week. The train is moving so fast, I'm worried we won't get on!" That same day, Patel instructed a colleague to add Oxybutynin Chloride to the Teva price increase list and began taking steps to implement the increase.

1073.  On July 3, 2013, Teva implemented a price increase ranging between 1,100 – 1,500 percent on Oxybutynin Chloride, depending on the dosage strength. Like the other drugs on the list, Teva would not have increased its price without first obtaining agreement from competitors that they would not compete with Teva or steal market share after the increase.

2)    <u>Mylan</u>

1074.  Immediately after she began at Teva, Patel began to investigate Mylan drugs as a potential source for coordinated price increases. For example, on May 6, 2013, as she was creating the list of "Immediate PI" candidates, Patel sent Green an email with an attached spreadsheet titled "Price Increase Candidate Competitive Landscape." Patel asked Green to "gather as much market intelligence as possible" for certain, specific items that she had highlighted in blue, including nine (9) Mylan drugs: Tolmetin Sodium Capsules, Doxazosin Mesylate Tablets, Methotrexate Tablets, Diltiazem HCL Tablets, Flurbiprofen Tablets, Nadolol Tablets, Amiloride HCL/HCTZ Tablets, Cimetidine Tablets, and Estradiol Tablets.

1075.  The next day, Green spoke to Nesta at Mylan three times, including one call lasting more than eleven (11) minutes. Green also called Patel twice that day to report on what he had learned.

Green and Nesta also spoke a number of times over the next several days, including on May 8 (3:46), May 9 (4:05), and May 10, 2013 (0:28, 10:46, and 2:19).

1076.  On May 14, 2013, Patel asked several Teva national account managers, including Green, to obtain "price points" on certain Mylan drugs, including Cimetidine and Nadolol, in preparation for a potential price increase. She indicated internally to another Teva colleague that she was expecting "additional Mylan intel," and that she was expecting Mylan "to take an additional increase" on those items. On May 17, 2013, Green spoke to Nesta six (6) times, including calls lasting 11:50, 2:23, 4:25, and 16:02.

1077.  On May 29, 2013, after a discussion with Cavanaugh, Patel added four Mylan drugs to the Teva price increase list: Nadolol, Cimetidine, Prazosin and Methotrexate.

1078.  Discussions between Green and Nesta about specific drugs continued into June, as Mylan was also preparing for its own major price increase on a number of drugs. From June 24 through June 28, 2013, for example, Green and Nesta had at least ten telephone calls.

1079.  On June 26, 2013, in the midst of this flurry of communications between Teva and Mylan (and the same day that Green and Nesta had a one-hour phone call), one of Patel's colleagues sent her a suggestion with the following list of potential drugs to add to the price increase list:

| Product | Competitors (Mkt Share) |
|---|---|
| Disopyramide Phosphate Capsules | Actavis (61%) |
| Ketorolac Tablets | Mylan (32%) |
| Ketoprofen Capsules | Mylan (63%) |
| Hydorxyzine Pamoate Capsules | Sandoz (39%); Actavis (9%) |
| Nystatin Tablets | Heritage (35%); Mutual (32%) |

1080.  In response, Patel's supervisor, Green of Teva, commented that "Ketoprofen would have a high likelihood of success." Patel also responded favorably with regard to some of the drugs, alluding to the fact that she had inside information about at least Ketoprofen.

228

1081.   Mylan raised its price for both Ketorolac and Ketoprofen (the two Mylan drugs on the list above) six days later, on July 2, 2013. Teva then quickly followed with its own price increase for both drugs (and others) on August 9, 2013. As discussed more fully below, those price increases were closely coordinated and agreed to by Teva and Mylan.

1082.   At the end of the flurry of phone communications between Teva and Mylan described above – on June 28, 2013 – Green and Nesta had a four (4) minute call starting at 10:59am. Within minutes after that call, Patel sent an email internally reporting that Mylan would be announcing a long list of price increases that day.

1083.   Patel obtained this information directly from Green but got one significant point wrong (which confirms that she had advance notice of the Mylan increase). In actuality, Mylan did not announce the price increases until the following Monday, July 1, 2013—with an effective date of July 2, 2013.

1084.   "Rumors" was a term consistently used by Patel in emails to camouflage the fact that she and her co-conspirators within Teva were communicating with competitors about future price increases. She used the term when discussing Taro in the May 24, 2013 "Immediate PI" spreadsheet, after speaking with Aprahamian and before Taro raised it price on Adapalene Gel. She used it again on June 26, 2013, after Green and Nesta spoke several times in advance of Mylan's price increase on Ketoprofen.

1085.   Similarly, on July 2, 2013, the day before Teva's price increases (including for the drug Methotrexate) went into effect, a colleague asked Patel how Teva's competitors' pricing compared with regard to Methotrexate. Patel responded that Mylan's pricing was a little low on that drug, "but we are hearing rumors of them taking another increase," so Teva felt comfortable increasing the price of that drug on July 3, 2013. These "rumors"—which were based on the direct communications

between Green and Nesta noted above—again turned out to be accurate: Mylan increased its price of Methotrexate, pursuant to its agreement with Teva, on November 15, 2013.

3)    <u>Sandoz</u>

1086.   After the large Teva and Mylan price increases on July 2 and 3, 2013, Sandoz sought to obtain a "comprehensive list of items" increased so that it would "not respond to something adversely" by inappropriately competing for market share on any of those drugs. Sandoz executives had previously conveyed to their counterparts at both Mylan and Teva that Sandoz would follow their price increases and not steal their customers after an increase. Obtaining the comprehensive list of price increase drugs was an effort by Sandoz to ensure it was aware of every increase taken by both competitors so it could live up to its end of the bargain.

1087.   On July 9, 2013, CW-1 stated in an internal Sandoz email that he would "call around to the [Sandoz directors of national accounts] to try and gather a comprehensive list of items."

1088.   Pursuant to that direction, on July 15, 2013, CW-2 of Sandoz called Rekenthaler at Teva and left a message. Rekenthaler called CW-2 back immediately and the two had a three (3) minute conversation during which CW-2 asked Rekenthaler to provide him with a full, comprehensive list of all the Teva price increase drugs—not just those drugs where Teva overlapped with Sandoz. Rekenthaler complied. Understanding that it was improper to share competitively sensitive pricing information with a competitor, and in an effort to conceal such conduct, Rekenthaler first sent the Teva price increase list from his Teva work email account to a personal email account, and then forwarded the list from his personal email account to CW-2's personal email account. CW-2 later called CW-1 and conveyed the information orally to CW-1, who transcribed the information into a spreadsheet.

1089.   One of the drugs that both Teva and Mylan increased the price of in early July 2013 was Nadolol. Sandoz was the only other competitor in that market. Shortly after the Teva increase, CW-1 sent Patel a congratulatory message regarding the increase.

viii.   July 19, 2013 Price Increase (Enalapril Maleate)

1090.   Immediately after the July 3, 2013 price increases, Patel began preparing for what she called "Round 2"—another large set of Teva price increases. In the interim, however, Teva was presented with an opportunity to coordinate a price increase with competitors on a single drug, Enalapril Maleate Tablets.

1091.   Enalapril Maleate ("Enalapril"), also known by the brand name Vasotec, is a drug belonging to the class called ACE inhibitors and is used to treat high blood pressure.

1092.   Mylan previously increased its price for Enalapril effective July 2, 2013. At that time, there were only three manufacturers in the market: Mylan, Teva, and Wockhardt. Enalapril was on the list of drugs slated for a price increase that Teva had received from Mylan in June 2013, before those price increases were put into effect (as discussed above).

1093.   Shortly after the Mylan price increase, on July 10, 2013, Teva received a request from a customer for a lower price on Enalapril. Interestingly, the customer indicated that the request was due to Wockhardt having supply problems, not because of the Mylan increase. Green of Teva confirmed that Enalapril "was on the Mylan increase communicated last week. They took a ~75% increase to WAC."

1094.   The comment from the customer sparked some confusion at Teva, which Teva quickly sought to clarify. That same day, Green and Nesta had two phone calls, including one lasting almost sixteen (16) minutes. The next day, July 11, 2013, Green and Nesta spoke two more times. During these conversations, Nesta explained to Green that Wockhardt had agreed to follow the Mylan price increase on Enalapril.

231

1095.   On Friday, July 12, 2013, J.P., a national account executive at Teva, asked Patel whether Teva was "planning on increasing [its price for Enalapril]?" Patel responded: "I hope to increase, but we're gathering all the facts before making a determination." J.P. then inquired whether Teva would make an offer to the customer, and Patel responded: "Not sure yet. Need some time. We're exploring the possibility of an increase just on this item . . . in the near future. Maybe next week."

1096.   That same day, Patel and Green each started "exploring the possibility" and "gathering the facts" by reaching out to Teva's two competitors for Enalapril. Patel called Nesta of Mylan directly, and they spoke three times, including calls lasting six (6) and five (5) minutes. Patel likely called Nesta directly in this instance because Green was attending the PBA Health4 Conference at the Sheraton Overland Park, Overland Park, Kansas, where he was participating in a golf outing. Upon information and belief, K.K. – a senior national account executive at Wockhardt – attended the same conference, and likely spoke directly to Green either at the golf outing during the day or the trade show at night, because at 12:40am that evening (now the morning of July 13, 2013), K.K. created a contact on his cell phone with Green's cell phone number in it.

1097.   On Sunday, July 14, 2013, after Green returned home from the conference, Green and Patel spoke three times, including one call lasting twenty-one (21) minutes.

1098.   During these calls, Green conveyed to Patel what he had learned from K.K.: that Wockhardt planned to follow the Mylan price increase.

1099.   First thing the next morning, on Monday, July 15, 2013, Patel sent an email to a Teva executive stating, "new developments…heard that Wockhardt is taking an increase today or tomorrow." At the same time, Wockhardt began planning to raise the price of Enalapril and sought to confirm specific price points for the increase. Internally, Wockhardt employees understood that K.K. would try to obtain price points from a competitor. That morning, K.K. of Wockhardt called Green

for a one (1) minute call; shortly thereafter, Green returned the call and they spoke for two (2) more minutes. K.K. then reported internally the specific price ranges that he had obtained from Green.

1100.  Armed with this competitively sensitive information, and the understanding that Wockhardt intended to follow the Mylan increase, Teva began to plan its own price increase. On Tuesday, July 16, 2013, Patel sent the following internal email to her supervisor Green, again using the term "rumors" to obfuscate the true source of her information:

From: Nisha Patel02
Sent: Tue 7/16/2013 11:08 AM (GMT-05:00)
To: ▓▓▓▓▓▓▓▓
Cc:
Bcc:
Subject: Enalapril Increase Overview

▓▓▓▓

As you are aware, we are currently preparing the information to hopefully be able to implement a price increase on Enalapril.

This is a 3-player market that we share with Mylan and Wockhardt. Mylan announced a price increase last week. We are hearing rumors that Wockhardt will follow or exceed Mylan sometime this week. It would be ideal if we could follow very soon at a slightly more competitive price, with the intent of picking up some additional share in the market. Current share make up is as follows:

1. Mylan: 44%
2. Wockhardt: 43%
3. Teva: 13%

At this time, we are holding off on responding to a couple of bids in-house since a WAC increase would be required to follow the market. It would be a great opportunity to win this share and hopefully additional business as customers request bids going forward. (I think it would be ideal to capture an additional 10%.)

1101.   Patel's July 16, 2013 email was forwarded to Cavanaugh, who promptly approved the price increase. That same day, Patel then scheduled a "Price Increase Discussion" with members of Teva's sales and pricing teams.

1102.   Teva and Wockhardt simultaneously implemented price increases on July 19, 2013. Although the timing of the price increase was coordinated among the competitors, Patel nevertheless described the simultaneous increase as a coincidence in an internal email that same day.

1103.   Within a few days after the increases, a customer complained to K.K. at Wockhardt, asking: "What is going on in the market that justifies your price increases?" K.K.'s response to the customer was direct: "Mylan took up first we are just following." Similarly, in early August, a different customer asked Wockhardt to reconsider its increase, suggesting that Wockhardt's competitors were offering a lower price point. Knowing this to be untrue, K.K. replied again "we followed Mylan and Teva for the increase."

ix.    <u>August 9, 2013 Price Increases ("Round 2")</u>

1104.   On August 9, 2013, Teva raised prices on twelve (12) different drugs. These increases were again coordinated with a number of Teva's competitors, including Defendants Mylan, Sandoz, Lupin, Glenmark, and Zydus, and Co-conspirators Apotex and Taro.

1105.   Patel began planning for the increase shortly after the July 3 increases were implemented. On July 11, 2013, Patel sent a preliminary draft list of price increase candidates to a colleague for what she referred to as "Round 2." For the drugs on the preliminary list, Patel stated that "this does not guarantee that [they] will end up getting an increase, but at the very least, it will be put through the review process."

1106.   The list included a number of drugs involving the following competitors, primarily: Actavis, Aurobindo, Glenmark, Heritage, Lupin, Mylan, and Sandoz. In the days leading up to July

11, 2013, Patel was communicating directly with executives at nearly all of those competitors, including Glenmark, Lupin, Aurobindo, Actavis, Heritage, and Sandoz.

1107.   Patel was also communicating indirectly with Mylan through Kevin Green.

1108.   For example, on July 10, 2013, the day before Patel sent the preliminary "Round 2" increase list, Green and Nesta spoke twice. Shortly after the second call, Green called Patel, and the two spoke for just over seven (7) minutes. The next day, on July 11, Nesta and Green exchanged several more calls. Patel and other Teva executives continued to coordinate with competitors over the next several weeks, refining the list and preparing for the next large Teva increase.

1109.   By August 7, 2013, Patel had finalized the list. That day, she sent an email to her supervisor, Green, with a "Price Increase Overview" spreadsheet which she had prepared for Maureen Cavanaugh, summarizing the increases. The spreadsheet included competitively sensitive information about certain competitors' plans regarding future price increases that Patel and/or Green could have only learned from directly colluding with those competitors.

1110.   Green immediately recognized that having such explicit evidence of a competitor's price increase plans in writing would be problematic for Teva. In response to the email, Green asked Patel to remove some of the incriminating information. In accordance with the executive's request, Patel deleted the information.

1111.   Following the now common and systematic pattern, Patel and Green coordinated the price increases with every important competitor in the days and weeks leading up to the increase. The only drug on the list that Patel and/or Green were not coordinating with competitors on in advance (Clemastine Fumarate Oral Liquids) was a drug where Teva was exclusive and thus had no competitors.

1112.  The day before the price increase went into effect—August 8, 2013—Patel was particularly busy, spending most of her morning reaching out and communicating with key competitors Lupin, Sandoz, Taro, and Mylan.

1113.  As it turned out, Mylan was also in the process of implementing its own price increases on August 9, 2013 on several drugs (including several sold by Teva), and it is likely that Nesta reached out to Patel to coordinate those increases.

1)    <u>Mylan</u>

1114.  Teva and Mylan were coordinating price increases consistently during this period, including the time leading up to the August 9, 2013 increases. During each step in the process, Teva and Mylan executives kept their co-conspirators apprised of their decisions. The communications were typically initiated by Patel, who asked Green to communicate with Nesta of Mylan and obtain what she referred to as "intel" on many different drugs. But at times, Patel communicated directly with Nesta.

1115.  For example, on July 22, 2013, Patel sent Green an email with an attached spreadsheet of "Round 2" price increase items. She indicated that she was "seeking intel" for a group of drugs in the attached spreadsheet. A large majority were Mylan drugs.

| Product Family | Initial Comments | PM Related | Follow Mylan/Other |
|---|---|---|---|
| Amiloride | Mylan increase; Teva only has HCTZ | | X |
| Diclofenac Tab | Mylan increase; On historical PI list | x | X |
| Doxazosin Mesylate | Mylan increase; On historical PI list | | X |
| Enalapril Tab | Mylan increase; On historical PI list—COMPLETED | | X |
| Ketoprofen | Follow Mylan; Deletion candidate; PM related | x | X |
| Ketorolac | Follow Mylan; Deletion candidate; PM related | x | X |
| Metoprolol | Mylan increase (Teva does not have 25mg but small sku) | | X |
| Nystatin | Heritage involved follow Mutual deletion candidate PM related | x | X |
| Pravastatin | Carried over from round 1 | | X |
| Sotalol | Mylan increase; On historical PI list | | X |
| Tolmetin Tab | Mylan increase; Teva has 94 share; On historical PI list | | X |
| Verapamil (Isoptin SR) | Mylan increase (lost Kroger and OneStop--to who?) | | X |

1116.   The next day, Green and Nesta spoke for more than six (6) minutes. Immediately after hanging up the phone, Green called Patel to convey the intel he had obtained from Mylan.

1117.   On July 29, 2013, Green at Teva was approached by a large retail pharmacy asking for bids on several of the drugs for which Mylan had increased prices in early July.

1118.   Green's first step was to request market share information for those drugs so that Teva could plan on how to respond to the customer's inquiry based on the generally accepted understanding regarding fair share.

1119.   The next day, Patel sent Green the "latest" price increase file as an attachment, saying that she "[f]igured it would help since I've changed a few things on you." Patel asked Green to obtain additional "market intel" for a group of seven Mylan drugs, some of which varied slightly from the prior spreadsheet.

1120.   Following the same consistent pattern, Green and Nesta spoke six (6) times over the next two days. After hanging up from the last call between the two on August 1, 2013, Green called Patel and conveyed the results of his conversations.

1121.   Based on all of these communications between Teva and Mylan (and at times other competitors), Teva was able to successfully increase price on seven different Mylan drugs on August 9, 2013, as set forth above.

2)      Pravastatin (Glenmark/Apotex/Zydus/Lupin)

1122.   Pravastatin, also known by the brand name Pravachol, is a medication belonging to a class of drugs called "statins," and is used to treat high cholesterol and triglyceride levels.

1123.   As early as May 2, 2013, Patel engaged in discussions regarding a price increase for Pravastatin with CW-5, a senior executive at Glenmark. Early in the morning of May 2, as she was in the process of formulating her list of "high quality" competitors and the list of price increase candidates, Patel informed a colleague that she expected to have some "priority items" to add to the

237

price increase list "shortly." Within minutes, she received a call from CW-5 and they discussed price increases for a number of different drugs, including Pravastatin. Shortly after that call, Patel sent an email to her Teva colleague directing him to add Pravastatin, and several other Glenmark drugs, to the price increase list. In all, Patel spoke to CW-5 four (4) times throughout the day of May 2.

1124.  As of May 2013, the market for Pravastatin included five competitors: Glenmark, Teva, Lupin, Zydus, and Apotex. The number of competitors made it more difficult to coordinate a price increase. This difficulty stemmed in part because two of those competitors, Zydus and Apotex, were also the two lowest quality competitors in Patel's quality of competition rankings, and any price increase for that drug would require significant coordination and communication before Teva could feel comfortable raising its own price.

1125.  Teva was able to achieve a sufficient level of comfort and substantially raise prices for Pravastatin by systematically communicating and reaching agreement with each and every competitor on that drug over the next several months.

1126.  On May 3, 2013, Green called M.K., a senior executive at Zydus, twice, with one call lasting four (4) minutes. Over the next several weeks, Green communicated numerous times with both M.K. and K.R., a senior sales executive at Zydus, to coordinate a Zydus price increase on Pravastatin.

1127.  On May 6 and 7, 2013, Patel communicated with her contacts at Lupin (Berthold) and Glenmark (J.C., a national account executive) multiple times.

1128.  During one or more of her calls with J.C. and/or CW-5 of Glenmark in early May 2013, Patel obtained specific price points from Glenmark for its Pravastatin (and other) price increases— well before the Glenmark increases became public—and documented those price points in her price increase spreadsheet.

1129.  By May 8, 2013, Teva executives clearly understood that Glenmark would be leading the Pravastatin price increase and were comfortable enough with the situation that one marketing

238

executive at Teva indicated in an email to Patel that he was hoping to raise price on Pravastatin "if/when Glenmark does."

1130.   As the Glenmark increase for Pravastatin was approaching, Patel began preparing. On May 15, 2013, the day before Glenmark's increase would become effective, a Teva executive sent an email out to the pricing team stating that "Nisha would like to be made aware of any requests (including in-house RFPs) that include" several of the Glenmark product families, including Pravastatin. The Teva executive concluded: "[i]n the event you are reviewing these products for any request, please make her aware and as a group we can discuss where to price based on market intelligence she has collected."

1131.   That same day, Glenmark notified its customers that it would substantially raise the price of Pravastatin, effective May 16, 2013.

1132.   As was now the practice among co-conspirators, the day before and the day of the Glenmark price increase brought a flurry of phone calls among several of the competitors, including Teva executives. Patel and Green spoke to executives from Zydus, Glenmark, and Lupin.

1133.   As of May 16, 2013, Patel was still considering whether Teva should increase its price for Pravastatin, because she was concerned about whether Zydus would act responsibly and follow a price increase. At that time, Patel did not view Zydus as a quality competitor. Patel stated: "I have asked to get Zydus' ability to supply on this. If it's not so great, I would like to add back to the increase list." Patel later indicated that "[t]he only threat was Zydus. Just waiting to hear on their ability to supply."

1134.   Green was responsible for coordinating with Zydus. On May 15, 2013, Green spoke with three Zydus employees, including a call with K.R. of Zydus lasting sixteen (16) minutes. The next day, on May 16, Green spoke with M.K. for 4 minutes. Later that day, K.R. called M.K., and the two Zydus executives spoke for more than seventeen (17) minutes. Green also spoke to Rekenthaler

and Patel the same day, conveying what he had learned from his communications with the Zydus executives.

1135.  Also on May 16, Patel's supervisor, Green, sent an internal email to several colleagues, including Patel and Rekenthaler, stating, "I think we need to understand additional competitor ability to take on additional share and pricing actions. The volume is huge for us. It would be nice to try to increase our price, but we do not really want to lose a lot of share on this product." In response, Rekenthaler indicated that he was now comfortable with the price increase, but he did not want to put his reasoning in writing: "Let's talk about this in person."

1136.  The next day, May 17, 2013, Patel continued to coordinate the price increase with executives at both Glenmark and Lupin. For example, at 12:08pm, Patel called Berthold at Lupin for an eleven (11) minute call. While she was on the phone with Berthold, CW-5 of Glenmark called Patel and left a 23-second voice mail. Immediately after she hung up the phone with Berthold, Patel returned the call to CW-5; they ultimately connected for nearly eight (8) minutes.

1137.  As of this point, Teva executives had spoken to all of their competitors, except Apotex, about Pravastatin. From May 20-24, Patel had at least five phone calls with B.H., a senior sales executive at Apotex, during which Apotex agreed to raise its price for Pravastatin. These were the first documented phone calls between Patel and B.H. since Patel had joined Teva.

1138.  But even with this agreement in hand, Patel was still hesitant to add Pravastatin to the price increase list until Apotex actually increased its price. For example, when she sent the "Immediate PI" spreadsheet to her supervisor Green on May 24, 2013, Pravastatin was still not on the list.

1139.  That would change shortly. On May 28, 2013, Apotex raised its price for Pravastatin. That same day, Green also exchanged six (6) text messages with K.R. at Zydus. The next day, after a conversation with Maureen Cavanaugh, Patel added Pravastatin to the Teva price increase list.

1140.   The day after the Apotex increase, Green spoke to K.R. at Zydus two more times and exchanged four (4) more text messages. He then spoke to K.R. and M.K. at Zydus several times from June 11 to June 13. Zydus then followed with a price increase of its own on June 14, 2013.

1141.   Teva ultimately followed Glenmark, Apotex, and Zydus with a significant (653 percent) price increase of its own on August 9, 2013. As described in more detail above, in the days and weeks leading up to August 9, Patel and Green were communicating with all of Teva's competitors for Pravastatin to coordinate the increase.

1142.   When Patel sent the "Price Increase Overview" to her supervisor, Green, on August 7, 2009, two days in advance of Teva's price increase, she included one piece of very telling information about the agreement she had in place with Berthold and Lupin: specifically, that Lupin was "waiting on Teva" before implementing its own increase. Based on this representation from Lupin, and Lupin's status as a high-quality competitor, Teva executives felt comfortable implementing the significant price increase.

1143.   A couple of days after Teva implemented its increase, a colleague at Teva asked Patel when Zydus and Apotex implemented their price increases. In her response, Patel confirmed that it was Kevin Green ("KGn") who had indeed coordinated the Pravastatin price increase with Zydus:

> Assuming we're talking Prava. Glenmark dud theirs 5/15. Zydus followed right before/after hdma i think. apotex i think was early to mid june? KGn got the Zydus intel...he might know off the top if his head.

1144.   Pursuant to that agreement, shortly after Teva's increase, on August 28, 2013, Lupin raised its price to follow competitors Glenmark, Apotex, Zydus, and Teva.

1145.   The extra work required to implement the Pravastatin price increase was well worth it to Teva. On August 8, 2013, the day before the Teva increase, Patel sent her supervisor Green an estimate of the "net upside" to Teva as a result of certain price increases. She estimated that, for Pravastatin alone, the "net upside after credits" to Teva was $674,670,548 per quarter.

3)    Etodolac and Etodolac ER

1146.    Etodolac, also known by the brand name Lodine, is a medication known as a nonsteroidal anti-inflammatory drug (NSAID). It is used to reduce pain, swelling, and joint stiffness from arthritis. It works by blocking the body's production of certain natural substances that cause inflammation. An extended release version of Etodolac—Etodolac ER—also known by the brand name Lodine XL, is also available.

1147.    As of July 13, 2013, Teva sold both Etodolac and Etodolac ER. Teva's competitors for the standard version of Etodolac were Taro and Sandoz. For Etodolac ER, Teva had only one competitor: Taro.

1148.    When Patel first began planning for "Round 2" of Teva's price increases, Etodolac and Etodolac ER were not slated for increases. For example, when she circulated a long list of potential "Round 2" increases on July 11, 2013 (that would later be cut down substantially), neither of those drugs was on the list.

1149.    Around that time, Sandoz began identifying a list of drugs where it believed it could increase price by the end of July. Etodolac was on the list, primarily because Sandoz would be able to implement a substantial increase without incurring significant price protection penalties from its customers.

1150.    On July 16, 2013, CW-3, then a senior executive at Sandoz, reached out to Aprahamian at Taro, and they spoke for sixteen (16) minutes. Aprahamian called CW-3 back the next day, and the two spoke again for eight (8) minutes. After hanging up the phone with CW-3, Aprahamian immediately called Patel. They exchanged voicemails until they were able to connect later in the day for nearly fourteen (14) minutes. On July 18, 2013, Patel called CW-1 at Sandoz, and the two spoke for more than ten (10) minutes.

242

1151.   During this flurry of phone calls, Defendants Sandoz and Teva and Co-conspirator Taro agreed to raise prices for both Etodolac and Etodolac ER.

1152.   On July 22, 2013, before any price increases took effect or were made public, Patel added both Etodolac and Etodolac ER to her price increase spreadsheet for the first time. Based on her conversations with CW-1 and Aprahamian, Patel understood that Sandoz planned to increase its price on Etodolac, and that Taro would follow suit and raise its price for Etodolac ER. During those conversations, Teva agreed to follow both price increases.

1153.   That same day, Sandoz sent out a calendar notice to certain sales and pricing employees for a conference call scheduled for July 23, 2013 to discuss planned price increases, including for Etodolac. Prior to the conference call on July 23, CW-1 called Patel at Teva. After exchanging voice mails, the two were able to connect for more than fourteen (14) minutes that day. During that call, CW-1 confirmed the details of the Sandoz price increase on Etodolac. Similarly, CW-3 of Sandoz called Aprahamian at Taro that same day, and the two spoke for more than three (3) minutes.

1154.   The Sandoz price increase for Etodolac became effective on July 26, 2013. That same day, Taro received a request from a customer for a one-time buy on Etodolac 400mg Tablets. After learning of the request, Aprahamian responded swiftly internally: "Not so fast. Why the request? Market just changed on this and not apt to undercut." When Taro received another request on July 30 from a large wholesale customer for a bid due to the Sandoz price increase, Aprahamian's internal response was equally short: "recent market changes, not taking on additional share."

1155.   Also on July 26, Patel sent an email to others at Teva informing them of the Sandoz increase on Etodolac IR (immediate release). She instructed them to "[p]lease watch ordering activity for both, IR and ER. The intent is that we will follow in the near future, but a date has not been determined."

1156.   Patel continued to coordinate with both Sandoz and Taro regarding the Etodolac and Etodolac ER price increases (among other things). Between July 29 and August 2, 2013, for example, Patel had more than a dozen calls with CW-1 of Sandoz and Aprahamian at Taro. Aprahamian also spoke to his contact at Sandoz, CW-3, three times those same days.

1157.   On August 1, 2013, shortly after speaking with Patel, Aprahamian instructed a colleague at Taro to begin implementing a price increase on Etodolac and Etodolac ER. Aprahamian stated, "[w]e need to get these out next week." Not wanting to provide the details in writing, Aprahamian concluded: "Will come over and discuss with you."

1158.   By August 5, 2013, it was well known internally at Teva that Taro would soon be raising prices on both Etodolac and Etodolac ER. When Patel sent the "Price Increase Overview" spreadsheet to her supervisor Green on August 7, 2013, summarizing Teva's upcoming August 9 price increases, she again made it clear that Teva was increasing its prices for Etodolac and Etodolac ER because Teva senior executives knew that Taro would be raising its prices on both drugs "this week." Green quickly instructed Patel to delete those entries, but never instructed her to stop communicating with the company's competitors, including Taro.

1159.   Teva and Taro raised prices for Etodolac and Etodolac ER simultaneously, with the price increases effective on August 9, 2013. Both their AWP and their WAC prices were increased to the exact same price points. The increases were substantial. For Etodolac, Teva's average increase was 414 percent; for Etodolac ER, the average increase was 198 percent.

4)    Impact of Price Increases

1160.   As she was preparing to implement Teva's August 9, 2013 price increases, Patel also calculated the quarterly increase in sales revenues resulting from the price increase taken by Teva on July 3, 2013. The analysis also included the financial impact of the recent Pravastatin increase. The results were staggering.

1161.   According to her analysis, the "Total Net Upside after Credits" as a result of the July 3 price increases, plus Pravastatin and one other drug, was a staggering $937,079,079 (nearly $1 billion) per quarter to Teva, as shown below:

| Price Increase Category | Incremental Sales Value (Est ASPs) | Total Credit Estimate | CVS Credit Estimate | Credit Estimate (Less CVS) | Total Net Upside after Credits | Total Net Upside (CVS credits deferred) |
|---|---|---|---|---|---|---|
| Grand Total | $973,184,165 | ($36,105,086) | ($10,188,095) | ($25,916,991) | $937,079,079 | $962,996,070 |
| IHI Total | $850,711,025 | ($31,676,647) | ($7,898,091) | ($23,778,555) | $819,034,379 | $842,812,934 |
| ILI Total | $34,078,176 | ($1,489,058) | ($594,035) | ($895,023) | $32,589,117 | $33,484,141 |
| UR Total | $88,394,964 | ($2,939,381) | ($1,695,968) | ($1,243,413) | $85,455,583 | $86,698,996 |

1162.   Patel was rewarded handsomely by Teva for effectuating these price increases. In March 2014, less than a year after starting at Teva, Patel was rewarded with a $37,734 cash bonus, as well as an allocation of 9,500 Teva stock options.

x.    Price Increase Hiatus

1163.   Shortly after the August 9, 2013 price increase went into effect, Patel left the office for several months while on maternity leave.

1164.   This slowed down Teva's plans for its next round of price increases. During the time period that Patel was out on maternity leave, Teva did not implement or plan any additional price increases, instead waiting for Patel to return and continue her work. Patel began to return to the office on a part-time basis beginning in November 2013.

1165.   During this time period, Kevin Green left Teva to join Defendant Zydus as the Associate Vice President of National Accounts. His last day of employment at Teva was October 23, 2013. This prompted Rekenthaler to assume the role of communicating with specific competitors, including Mylan. Rekenthaler also identified and began communicating on a more frequent basis with co-conspirators at different companies to facilitate the price increase process for Teva.

245

1166.   As discussed more fully below, although Patel's absence slowed Teva in its plans for price increases on additional drugs, it did not stop certain competitors—in particular Lupin and Greenstone—from attempting to coordinate with Teva regarding their own price increases. In Patel's absence, they simply communicated through different channels. These communications were conveyed to Patel upon her return, and she included the information in her efforts to identify new price increase candidates.

1167.   As discussed more fully below, by early 2014, Patel had picked up right where she left off planning for the next round of Teva increases.

xi.    March 7, 2014: Price Increases and Overarching Conspiracy Converge

1168.   Niacin Extended Release (ER), also known by the brand name Niaspan Extended Release, is a medication used to treat high cholesterol.

1169.   On September 20, 2013, Teva entered the market for Niacin ER as the first-to-file generic manufacturer. As the first-to-file, Teva was awarded 180 days of exclusivity to sell the generic drug before other generic manufacturers could enter the market.

1170.   Teva's period of exclusivity for Niacin ER was scheduled to expire on March 20, 2014. As that date approached, Teva began to plan for loss of its exclusivity. By at least as early as February, Teva learned that Defendant Lupin would be the only competitor entering the market on March 20.

1171.   The first thing Teva sought to do—knowing that a high-quality competitor would be the only new entrant—was to raise its price. On February 28, 2014, Maureen Cavanaugh instructed Green and others at Teva that "[w]e need to do the Niacin ER price increase before Lupin comes to market and sends offers out." Green immediately forwarded the email to Patel with the instruction: "Please see comment on Niacin ER. Please make sure you include in your price increase." Later that day, Patel called Berthold at Lupin, and the two spoke for nearly seven (7) minutes.

246

1172.   Within a week, Teva was ready to implement the price increase. On March 5, 2014, Patel sent an email to the Teva pricing group stating, "[p]lease prepare for a price increase on Niacin ER, to be communicated [to customers] this Friday for an effective date of Monday." The next day, March 6, Teva notified its customers that it would be implementing a price increase on Niacin ER effective March 7, 2014. The increase was for 10 percent across the board, on all formulations.

1173.   Once Teva coordinated the price increase, it next began taking the necessary steps to divvy up the Niacin ER market with new entrant Lupin so as to avoid competition that would erode Teva's high pricing. Patel scheduled a meeting with Rekenthaler for March 6, 2014 to discuss an "LOE Plan" for Niacin ER. "LOE Plan," in Teva parlance, is a plan detailing which customers Teva would concede and which customers it would retain upon Teva's "loss of exclusivity" in a particular generic drug market. Teva's LOE plans were often secretly negotiated directly with competitors as they were entering the market, consistent with the industry understanding of fair share discussed above.

1174.   This situation was no different. During the morning of March 6, 2014, Patel called Berthold, and they spoke for more than seven (7) minutes. During this and several subsequent calls, discussed in more detail below, Teva and Lupin agreed on which specific customers Teva would concede to Lupin when it entered the market on March 20, 2014.

1175.   Teva agreed that it would concede 40 percent of the market to Lupin upon entry.

1176.   When Lupin entered the market for Niacin ER on March 20, 2014, it entered at the same WAC per unit cost as Teva, for every formulation. Patel and Berthold spoke on each of the three days leading up to Lupin's entry, and on the entry date itself, and were in frequent communication to coordinate the entry.

1177.   In addition, Lupin entered with customer pricing only 10 percent below Teva's recently increased pricing, so it was expected that pricing would remain at least at Teva's pre-increase

exclusive pricing levels. In other words, there was little or no price erosion as a result of Lupin's anticompetitive entry into the market for Niacin ER.

1178.   Over the next several days, Patel and Berthold continued to coordinate to make sure Lupin obtained the agreed-upon customers. For example, on March 24, 2014, a Teva executive received an email from Cardinal indicating that Cardinal had received "a competitive offer for the Niacin ER family." Cardinal was one of the customers that Teva had already agreed to concede to Lupin. The Teva executive forwarded the email to several people internally at Teva, including Patel, Rekenthaler, and Cavanaugh, seeking confirmation that the plan to concede the customer to Lupin was still in place. Patel spoke to Berthold at Lupin three times that day, and then responded: "Yes. The plan is to concede. This was re-confirmed earlier today, unless something has changed."

1179.   The next day, Green of Teva summarized the status of Teva's LOE Plan and the company's agreement with Lupin on Niacin ER: "With the four concessions (CVS, Cardinal, Optum and Humana), we would be giving up right around 40% share as Dave noted (I calculated 39%)…………………We need to keep everybody else."

xii.   April 4, 2014 Price Increases

1180.   On April 4, 2014, Teva raised prices on twenty-two (22) different generic drugs. Again, nearly all of these increases were coordinated with a number of Teva's high- quality competitors who by now were familiar co-conspirators, including Defendants Sandoz, Actavis, Mylan, Lupin, and Greenstone and Co-conspirator Taro. But for this price increase, Teva also began coordinating with some of what it regarded as "lesser-quality" competitors—such as Breckenridge, Heritage, Versapharm, and Rising—as new sources for anticompetitive agreements. For this price increase, Teva also decided to lead many more price increases, which was riskier for Teva and required even greater coordination with competitors.

1181.   Leading more price increases was part of a strategy that Patel memorialized in writing in January of 2014, documenting in many respects the successful strategy that she had implemented in 2013, focused on leveraging Teva's collusive relationships with high-quality competitors. This strategy was well known, understood, and authorized by individuals at much higher levels at Teva, including Cavanaugh and Rekenthaler, and Patel's direct supervisor Green.

1182.   Patel began planning for the next round of Teva price increases in early January 2014, shortly after returning to full-time status from maternity leave. On January 14, 2014, Patel sent Green a preliminary draft list of price "Increase Potentials Q1 2014." She stated: "Attached is my list of potential items. Note that they still need to go through the review process."

1183.   The initial list contained drugs sold by Actavis, Lupin, and Greenstone, among others. Not surprisingly, Patel was communicating frequently with each of those competitors throughout December 2013 and into early January 2014.

1184.   On February 7, 2014, Patel created a formal list of "PI Candidates" in a spreadsheet. In the days leading up to February 7, Patel was feverishly coordinating by phone with a number of different competitors to identify price increase candidates, including calls to Taro, Glenmark, Greenstone, Lupin, Heritage, Sandoz, and Actavis.

1185.   Those efforts were successful. By February 26, 2014, Patel had a more refined list of "PI Candidates," which she forwarded to another colleague for his review. Patel continued to refine the list over the next several weeks.

1186.   On March 17, 2014, Patel sent a near-final version of the "PI Candidates" spreadsheet to Green with the statement: "Once you verify these are acceptable, we can finalize for the increase." In a practice that had now become routine at Teva, Patel and Rekenthaler both were communicating frequently with competitors—in this case Taro, Lupin, Actavis, Greenstone, Zydus, Heritage, and Rising—to coordinate the price increases in the week before Patel sent the price increase list to Green.

1187.   Rekenthaler had also previously spoken with his contact at Versapharm, J.J.3, a senior national account executive, on January 22, 2014 (a five (5) minute call) and March 7, 2014 (a three (3) minute call) to secure Versapharm's agreement to follow the Teva increase on two drugs. Those were the only two identified telephone calls between Rekenthaler and J.J.3 since 2012. As discussed more fully below, Versapharm followed with its own price increase shortly after the Teva increase.

1188.   In the days leading up to the price increase, Rekenthaler asked Patel for a list of drugs and competitors associated with each of the increase items so that he could confirm that Teva had successfully coordinated increases with everyone. On April 1, 2014, Patel responded by providing a list of only those drugs for which Teva was leading the price increase—i. e., the drugs with the most risk if Teva did not secure an agreement beforehand with a competitor before raising its own price.

1189.   Satisfied that Patel and Rekenthaler had confirmed agreement with all the appropriate competitors, on April 4, 2014 Teva increased pricing on various dosage strengths of the following drugs:

| Product Description | Lead/Follow | Competitors |
|---|---|---|
| AZITHROMYCIN ORAL SUSPENSION | Follow | Greenstone |
| AZITHROMYCIN SUSPENSION | Follow | Greenstone |
| BUMETANIDE TABLETS | Lead | Sandoz |
| CEPHALEXIN SUSPENSION | Follow | Lupin |
| CLARITHROMYCIN ER TABLETS | Follow | Actavis; Zydus |
| CYPROHEPTADINE HCL TABLETS 4MG 100 | Follow | Breckenridge |
| DICLOXACILLIN SODIUM CAPSULES | Lead | Sandoz |
| DIFLUNISAL TABLETS | Lead | Rising |
| ESTAZOLAM TABLETS | Follow | Actavis |
| ETHOSUXIMIDE CAPSULES | Lead | Versapharm |
| ETHOSUXIMIDE ORAL SOLUTION | Lead | Versapharm |
| HYDROXYZINE PAMOATE CAPSULES | Lead | Sandoz; Actavis |
| KETOCONAZOLE CREAM 2% | Lead | Taro; Sandoz |
| KETOCONAZOLE TABLETS | Lead | Taro; Mylan |
| MEDROXYPROGESTERONE TABLETS | Follow | Greenstone |
| MIMVEY (ESTRADIOL/NORETH) TAB | Follow | Breckenridge |
| NYSTATIN ORAL TABLETS | Lead | Heritage; Mutual |
| PENTOXIFYLLINE TABLETS | Lead | Apotex; Mylan |
| TAMOXIFEN CITRATE TABLETS | Follow | Actavis |
| THEOPHYLLINE ER TABLETS 100MG 100 | Lead | Heritage |

1190.   These price increases were all coordinated and agreed to between Teva and its competitors. As was now their standard procedure, Patel and/or Rekenthaler communicated directly with all of their key competitors in the days and weeks leading up to the increase. Patel and others at Teva again went to great efforts to coordinate these price increases with competitors prior to April 4, 2014, including during the time that Patel was out on maternity leave. Some illustrative examples of those efforts are set forth below.

1)      Lupin (Cephalexin Oral Suspension)

1191.   Throughout 2013, David Berthold of Lupin colluded with two different individuals at Teva: Patel and Green. As discussed above, at times, Patel and Green would even coordinate with each other regarding who would communicate with Berthold and take turns doing so. As of late October, 2013, however, neither of those options was available to Berthold. Patel was out of the office on maternity leave, and Green had left Teva to join Zydus as of October 23, 2013.

1192.   This did not deter Berthold; he merely went further down the Teva organizational chart to find a Teva executive to communicate with. The ongoing understanding between Teva and Lupin was institutional, not dependent upon a relationship between specific individuals. Thus, in October 2013, when Lupin decided to raise price on Cephalexin Oral Suspension-a drug where Teva was the only other competitor in the market-Berthold already knew that Teva would follow the increase.

1193.   On October 14, 2013, Berthold called Rekenthaler at Teva. They ultimately spoke for sixteen (16) minutes that day. Communication was rare between those two executives. Prior to October 14, 2013, the last (and only) time they had spoken by phone was November 21, 2011, according to the phone records produced.

1194.   On October 31, 2013, the day before Lupin was scheduled to increase its price on Cephalexin Oral Suspension, Berthold also called T.S., a national account executive at Teva, to notify

251

Teva of the price increase. He called T.S. at 9:18am that morning and left a message. T.S. returned the call at 9:57am, and the two spoke for nearly five (5) minutes.

1195.    Within minutes after hanging up the phone with Berthold, T.S. notified others internally at Teva about the substantial increase Lupin was about to take: "I have heard that Lupin is implementing a price increase today on Cephalexin Oral Suspension (4-6 x's current price."

1196.    The Lupin increase on Cephalexin Oral Suspension actually became effective the next day, November 1, 2013, demonstrating that T.S. had advance knowledge of the increase. Shortly thereafter, T.S. followed up her own email with specific price points that Lupin would be charging for Cephalexin.

1197.    Green of Teva responded later that day, asking: "Did Lupin increase the Caps as well?" Rekenthaler answered immediately, with information he had learned from Berthold in mid-October: "Lupin did not increase the caps, only the susp[ension]."

1198.    On November 22, 2013, a large customer requested a bid from Teva on Cephalexin due to the Lupin price increase. T.S. forwarded the email from the customer to Rekenthaler and others with the suggestion that, because Teva already had the majority share, it should not bid for the business. Green agreed.

1199.    When Patel drafted her initial list of possible price increase candidates and forwarded it to Green in January 2014, Cephalexin Oral Suspension was on the list. Patel coordinated the increase consistently with Berthold throughout the period.

1200.    On April 4, 2014, Teva raised its WAC prices on Cephalexin Oral Suspension to match Lupin's prices exactly. The increases to the WAC price ranged from 90-185 percent, depending on the formulation.

2)    Greenstone (Azithromycin and Medroxyprogesterone)

1201.  In November 2013, Greenstone began planning to increase prices on several drugs, including some that overlapped with Teva: Azithromycin Oral Suspension, Azithromycin Suspension, and Medroxyprogesterone Tablets. Patel and Hatosy, a national account executive at Greenstone, were communicating frequently during that time, including exchanging six (6) text messages on November 16, 2013 and a phone call on November 23, 2013. Because Greenstone was a high-quality competitor, and because the companies had successfully conspired to raise prices previously, it was understood between the two that if Greenstone raised prices Teva would follow and would not seek to poach Greenstone's customers after the increase.

1202.  Defendant Pfizer was directly involved in the approval process for these price increases. On November 18, 2013, only two days after Patel and Hatosy exchanged six (6) text messages, a senior pricing executive at Greenstone sent an email to Greenstone's General Manager seeking approval to implement the price increases. The General Manager approved of the price increases the next day but indicated that he had sent a message to a senior Pfizer executive for sign off and wanted "to socialize this with him" and let him know that the price increases sought by Greenstone were consistent with the other price increases then happening with great frequency in the U.S. generic industry. Part of that socialization process included explaining the strategy behind the price increases. Pfizer approved the price increases on November 22, 2013. The next day, Patel spoke to Hatosy at Greenstone.

1203.  On December 2, 2013, the same day that Greenstone was slated to send out notices of the price increases to its customers, Patel spoke to Hatosy at Greenstone three times within a span of twenty (20) minutes. After the last of those three calls, Patel sent an email to several colleagues at Teva notifying them of an impending Greenstone price increase-one that would not be effective for

253

another month: "FYI. I'm hearing that Greenstone just announced an increase for Azithromycin Oral Suspension, effective January 1st."

1204.  On December 5, 2013, Patel continued to communicate with Hatosy about the Greenstone increases and how Teva would react to unsolicited customer requests for bids, trading two voicemails. The next day, Patel sent another email to Green about Azithromycin Suspension, recommending that Teva decline to bid on any customer requests. She noted that this was a two-player market and Teva already had a 54-percent market share.

1205.  Green agreed with Patel's recommendation. Later that day, J.L. of Teva emailed to several Teva colleagues: "We've been informed that we will not be pursuing any business at this time on the Azithromycin OS." That same day, Teva declined to bid on Azithromycin at multiple customers.

1206.  Over the next several months, during the period of time before Teva followed Greenstone's price increases, Teva continued to refuse to bid (and avoid taking Greenstone's market share) when requested by customers, for both Azithromycin formulations and Medroxyprogesterone Tablets. For example, on January 27, 2014, Teva was approached by a large wholesaler asking for bids on both Azithromycin Suspension and Medroxyprogesterone due to a "Change in Market Dynamics." After speaking with Hatosy of Greenstone for more than five (5) minutes that same day, Patel agreed with the recommendation not to provide a bid to that customer.

1207.  Similarly, on March 17, 2014, which was the same day that Patel sent a nearly final price increase list to Green, Teva was approached by another wholesaler requesting a lower price for Azithromycin Oral Suspension. A national account executive at Teva asked Patel: "Can we provide any better pricing than Greenstone? . . . I know we have picked up our target share." Patel had spoken with Hatosy of Greenstone twice earlier that day, including one call lasting more than fifteen (15) minutes. Patel's response to the national account executive was: "Let's talk tomorrow."

1208.   Consistent with the understanding between the two companies, Teva followed Greenstone's price increases for Azithromycin Oral Suspension, Azithromycin Suspension, and Medroxyprogesterone Tablets on April 4, 2014. Patel spoke twice with Hatosy from Greenstone that same day.

3)      Actavis (Clarithromycin ER Tablets, Tamoxifen Citrate, and Estazolam)

1209.   Teva and Actavis were coordinating about several drugs increased by Teva on April 4, 2014. One of them was Clarithromycin ER Tablets. As of December 2013, Teva, Actavis, and Zydus were the only three generic manufacturers actively selling Clarithromycin ER.

1210.   On December 30, 2013, however, Cardinal approached Teva looking for a bid on Clarithromycin ER because Zydus was exiting the market. Teva informed Cardinal that it would not have adequate supply to be able to take on this additional market share until April 2014, but if Cardinal could wait until then for Teva to supply, Teva would make an offer. Cardinal agreed.

1211.   The Cardinal bid request was forwarded to Patel on the morning of January 2, 2014. At 9:37am that morning, L.R., a customer marketing manager at Teva, suggested providing an offer to Cardinal at "10% under market intel pricing for [the] Watson/Actavis product." L.R. also stated: "[i]f Cardinal is willing to wait until April, I suspect that Actavis isn't interested in picking up a lot of additional share."

1212.   Immediately after receiving that email, at 9:40am, Patel called Rogerson at Actavis, and the two spoke for more than seventeen (17) minutes. Shortly after hanging up the phone with Rogerson, at 10:12am, Patel responded to the email, saying: "I think we have an opportunity to go higher. Let's aim for around $148 net and request feedback."

1213.   On January 9, 2014, Teva learned that Cardinal had accepted Teva's bid at the higher price. At 9:19am that morning, Patel called Rogerson at Actavis, and they spoke for more than six (6)

minutes. Shortly after that call, at 9:45am, Patel sent an email internally at Teva stating: "It looks like Cardinal accepted our bid at the higher price. We may have an opportunity to take some increases."

1214.    When Patel sent her supervisor the initial list of "Increase Potentials Q1 2014" on January 14, 2014, Clarithromycin ER was on the list.

1215.    Similarly, in March, 2014, Actavis implemented its own price increase on several other drugs, including some that overlapped with Teva. Consistent with the ongoing understanding between these high-quality competitors, Actavis understood that Teva would follow the increases or, at a minimum, would not poach Actavis customers after the increase.

1216.    Following a now very familiar pattern, at 9:54am on March 14, 2014 Rogerson called Patel and left a message. Patel called Rogerson back at 10:31am, and the two spoke for more than twelve (12) minutes. Within minutes after hanging up with Rogerson, Patel emailed others at Teva about the Actavis increase. He said "I'm hearing that Actavis announced a bunch of price increases yesterday" and identified the Actavis products that she believed overlapped with Teva products.

1217.    In actuality, these increases would not become effective until April 15, 2014, again demonstrating that Teva knew in advance of its competitors' price increase plans.

1218.    Within half an hour of sending that email, Patel instructed colleagues to add the Actavis drugs to the Teva price increase list. She added: "We intend to follow where we can."

1219.    Less than two hours later, Patel called Rogerson again. They spoke for more than five (5) minutes. Shortly after hanging up the phone, at 12:51pm, Patel wrote another email to certain colleagues at Teva, stating: "Actavis took an increase. We will follow. We need to review price per my alert list. Let's wait to see what intel we can get and discuss Monday."

1220.    First thing the next business day, Patel forwarded the "PI Candidates" list to Green at Teva. The list included both Tamoxifen Citrate and Estazolam. Later that morning, Patel called Rogerson. After quickly exchanging voicemails, they spoke for more than nineteen (19) minutes.

Rekenthaler of Teva and Falkin of Actavis also exchanged four text messages that day and had one call lasting more than six (6) minutes.

1221.   Teva followed the Actavis price increases on Tamoxifen Citrate and Estazolam less than three weeks later, on April 4, 2014. Patel and Rogerson spoke twice by phone that day. Rekenthaler and Falkin also spoke by phone that day. Because Teva was able to follow the price increase so quickly, Teva's increase became effective even before the Actavis price increase for those drugs.

1222.   After the price increases became effective, Teva took consistent steps not to disrupt the market or steal market share from Actavis. For example, on May 14, Patel declined to bid at ABC on both Tamoxifen Citrate and Estazolam, stating: "unable to bid (strategic reasons, for internal purposes)." When Patel and her other conspirators at Teva used the term "strategic" in this context, it was code for the fact that there was an understanding in place with a competitor.

1223.   Similarly, on May 21, 2014, Teva received a request from a large customer for a bid on Tamoxifen Citrate. As of that date, Teva had 58.4 percent of the market, and Actavis had 40.7 percent. A Teva analyst forwarded the request to Patel and others, recommending (pursuant to the fair share understanding in the industry) that Teva not bid "as we are first in a two-player market with good share already." Patel responded: "Agree. We should decline to bid."

4)    Multiple Manufacturers (Ketoconazole Cream and Tablets)

1224.   Patel identified Ketoconazole Cream and Ketoconazole Tablets as price increase candidates sometime in February 2014. They were not listed on her original "Increase Potentials" list that she sent to Green on January 14, 2014, but they were on the list of "PI Candidates" that she sent to a colleague on February 26, 2014.

1225.   Taro was a common competitor on both drugs, but there were different sets of competitors for each formulation. For Ketoconazole Cream, Teva's competitors were Taro and Sandoz. For Ketoconazole Tablets, Teva's competitors were Taro, Mylan, and Apotex.

1226.   Teva led the price increases for both drugs but made sure to coordinate with all of its competitors before (and as it was) doing so. On April 4, 2014, the day of the increases, Patel spoke separately with both Aprahamian of Taro and CW-1 of Sandoz.

1227.   During each call, she let them know that Teva was increasing the price of Ketoconazole. The same day, Rekenthaler spoke to Nesta of Mylan; he had previously communicated with J.H., a senior sales executive at Apotex, on March 20 and 25, 2014.

1228.   For Ketoconazole Cream, co-conspirators at Taro and Sandoz were also communicating directly with each other. On April 4, 2014, for example, Aprahamian spoke to CW-3 at Sandoz for nineteen (19) minutes. They discussed the Teva increase and the fact that Taro would follow. CW-3 then sent an email internally at Sandoz, alerting colleagues of the price increase and conveying information about Taro's price increase plans: "Teva increased contract price and WAC on Keto Cream yesterday (tripled). Taro will more than likely follow them shortly."

1229.   CW-1 at Sandoz immediately told his colleagues not to bid on any new opportunities for the drugs, and instead put the products on "strict allocation" until Sandoz determined how to proceed. That same day, Aprahamian sent a similar email internally to his colleagues at Taro.

1230.   The following Monday, April 7, 2014, Taro received a request from a customer-the Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP"), a group purchasing organization acting on behalf of a number of states-seeking a competitive bid on Ketoconazole Tablets due to the Teva price increase. After reviewing the request, a Taro sales executive sent an internal email stating: "we are not going to bid this product. Taro has 27% share in a 4-player market." In a follow-up email, E.G.2, a Director of Corporate Accounts at Taro, confirmed that Taro would decline

to bid, but indicated that Taro would need to lie about the reason: "Yes, we are declining, but we need to advise its [sic] due to supply."

1231.   Four days after the Teva increase, on April 8, 2014, Aprahamian called Patel, and the two spoke for more than nineteen (19) minutes. Later that same day, he initiated a price increase for all of Taro's customers on both the Ketoconazole Cream and the Tablets. Aprahamian directed that the notice letters be sent to customers on April 16, 2014, with an effective date of April 17, 2014.

1232.   Although Sandoz immediately understood that it would follow these price increases, it was not able to implement them until October. The delay was due to the fact that certain contracts imposed substantial penalties on Sandoz if it increased its prices at that time, and those penalties would have caused Sandoz to miss certain financial targets during the months after April 2014. At Sandoz, senior management held monthly budget meetings where they analyzed whether it made financial sense to implement a particular price increase. In this case, the ramifications of the price protection terms did not make sense for Sandoz to follow until October 2014.

1233.   In the months after the Teva and Taro increases, Teva held up its end of the agreement not to poach its competitors' customers. For example, on May 14, 2014, Teva was approached by Cardinal requesting a bid due to the Taro increase. The email from Cardinal was forwarded to Patel, who responded immediately: "Unable to bid at this time. For internal purposes, it is for strategic reasons."

1234.   Shortly before sending the email, Patel exchanged several text messages with Aprahamian at Taro. She would ultimately exchange eight (8) text messages and had one phone call lasting more than four (4) minutes with Aprahamian on that day.

1235.   Later that same day, Patel also directed that Teva decline to bid for Ketoconazole at ABC, citing the same logic: "unable to bid (strategic reasons, for internal purposes)."

259

1236.    Sandoz ultimately followed the Teva and Taro increases for Ketoconazole Cream on October 10, 2014. That same day, Patel and CW-1 at Sandoz spoke for more than three (3) minutes.

1237.    The Teva increases on Ketoconazole were significant. For the cream, Teva, Taro, and Sandoz all increased the WAC price by approximately 110 percent. For the tablets, Teva's WAC increases were approximately 250 percent, but its customer price increases were substantially larger, averaging 528 percent.

5)    <u>New Relationships Emerge</u>

1238.    By early 2014, the generic drug industry was in the midst of a price increase explosion. In an internal Teva presentation titled "2014 US Pricing Strategy" and given shortly after the April 2014 price increases, Teva reflected on the current state of the industry, noting that the "[c]ompetitive landscape is supportive of price increases." In commenting on the future implications for Teva's pricing strategy, the company stated: "Mature competitors participate in price appreciation; immature competitors are starting to follow."

1239.    Understanding that many more competitors were enthusiastic about conspiring to raise prices, Teva began to develop new and additional relationships with certain competitors when implementing its April 4, 2014 price increases. Some illustrative examples are set forth below.

a)    <u>Breckenridge</u>

1240.    One of those new Co-conspirators was Breckenridge. Patel already had a relationship with S.C., a senior sales executive at Breckenridge, and Rekenthaler had a relationship with D.N., another senior sales executive at Breckenridge, so Breckenridge was a prime candidate to coordinate pricing.

260

1241.  On November 14, 2013, Breckenridge increased its pricing on both Estradiol/Norethindrone Acetate Tablets ("Mimvey") and Cyproheptadine HCL Tablets.[24] For Cyproheptadine, Breckenridge increased its WAC pricing by as high as 150 percent and raised its customer contract pricing even higher: 400 percent. The increases to Mimvey were a more modest 20-27 percent for both the WAC and customer pricing.

1242.  In the weeks leading up to those increases, when Patel was still out on maternity leave, Rekenthaler had several phone calls with D.N. at Breckenridge to coordinate the price increases. The two spoke twice on October 14, 2013 and had a twenty-six (26) minute call on October 24, 2013. After those calls, they did not speak again until mid-January 2014, when Teva began preparing to implement its increase.

1243.  Over the next several months, during the period of time before Teva was able to follow the Breckenridge price increases, Teva followed the "fair share" understanding to the letter.

1244.  With respect to Cyproheptadine HCL, Teva had approximately 54 percent market share in a two-player market. For that drug, Teva consistently refused to bid or take on any additional market share after the Breckenridge increase. For example, on February 7, 2014, a customer gave Teva an opportunity to pick up new business on Cyproheptadine. When she learned the news, Patel called S.C. at Breckenridge. They ended up speaking twice that day - the first and only phone calls ever between them. After speaking to S.C., Patel sent the following email regarding the customer's request: "Let's hold off on providing a bid."

---

[24] Breckenridge had acquired the ANDA for Cyproheptadine HCL Tablets in September 2013 from another manufacturer, and immediately sought to raise the prices previously charged by the prior manufacturer as it began to sell the product under its own label.

1245.  With regard to Mimvey, however, Teva only had 19 percent market share in a two-player market. For that drug, Teva sought to pick a few customers to level the playing field-before raising its own prices to follow Breckenridge.

1246.  On April 4, 2014, Teva followed the Breckenridge price increases with substantial increases of Mimvey (contract increases of as much as 393 percent) and Cyproheptadine HCL Tablets (contract increases of as much as 526 percent). In addition, Teva increased the WAC price on Mimvey (Estradiol/Norethindrone Acetate Tablets) by 26 percent and the WAC price on Cyproheptadine HCL Tablets by as much as 95 percent, to exactly match Breckenridge's WAC price on both products.

b)    <u>Rising</u>

1247.  Rising became a more appealing potential co-conspirator when CW-2, who had formerly been employed at Sandoz, left to join Rising in August 2013. Rekenthaler had known CW-2 for many years, going back to when they both worked together at Teva several years prior.

1248.  Of the drugs on the Teva April 4, 2014 price increase list, Rising was a competitor on Diflunisal. For that drug, Rising had 21 percent market share in a two-player market with Teva as of March 2014.

1249.  Rekenthaler spoke to CW-2 of Rising on December 5, 2013 for fourteen (14) minutes. When Patel sent her initial list of "Increase Potentials" to Green on January 14, 2014, Diflunisal was on the list, with Teva expecting to lead the increase.

1250.  Teva and Rising continued to coordinate the increase over the next several months. On March 17, 2014, Rekenthaler spoke with CW-2 twice. During those calls, CW- 2 informed Rekenthaler that Rising was having supply problems for Diflunisal and might be exiting the market at some point in the future. CW-2 confirmed that it would be a good opportunity for Teva to take a price increase.

1251.   Rekenthaler and CW-2 spoke once again on March 31, 2014, shortly before the Teva price increase for Diflunisal. On April 4, 2014, Teva increased is WAC pricing on Diflunisal by as much as 30 percent, and its contract pricing by as much as 182 percent for certain customers.

1252.   Rising ultimately exited the Diflunisal market for a short period of time starting in mid-July 2014. When Rising decided to exit the market, CW-2 called Rekenthaler to let him know. Four months later, when Rising's supply problems were cured, Rising re- entered the market for Diflunisal. Consistent with the fair share principles and industry code of conduct among generic drug manufacturers discussed more fully above, CW-2 and Rekenthaler spoke by phone on several occasions in advance of Rising's re-entry to identify specific customers that Rising would obtain and, most importantly, to retain the high pricing that Teva had established through its price increase on April 4, 2014. On December 3, 2014, Rising re-entered the market for Diflunisal Tablets. Its new pricing exactly matched Teva's WAC price increase from April 2014.

c)    <u>Versapharm</u>

1253.   On the April 4, 2014 Teva price increase list, Versapharm was a competitor on two different drugs: Ethosuximide Capsules and Ethosuximide Oral Solution.

1254.   When Patel began creating the price increase list, neither of these drugs was considered a candidate for an increase. For example, when Patel sent her initial "Increase Potentials" list to Green in mid-January 2014, neither drug was on the list.

1255.   Versapharm was not considered a high-quality competitor. When Patel created the quality competitor rankings in May 2013, Versapharm was given a -2 score in the rankings. That did not stop Rekenthaler, however, from calling J.J.3, a senior national account executive at Versapharm, and speaking for five (5) minutes on January 22, 2014. When Patel sent the next "PI Candidate" list to a colleague on February 26, 2014 - Ethosuximide Capsules and Oral Solution were both on the list, with the following notation:

| Ethosuxamide Liquid | Shared only with Versa; test quality of competitor |
| Ethosuxamide Caps | Shared only with Versa; test quality of competitor; UNPROFITABLE |

1256.   Rekenthaler called again and spoke with J.J.3 at Versapharm on March 7, 2014. Teva then raised prices on both drugs on April 4, 2014. For Ethosuximide Capsules, Teva raised its WAC price by 87 percent, and its contract prices by up to 322 percent. For Ethosuximide Oral Solution, Teva raised its WAC price by 20 percent and its contract prices by up to 81 percent.

1257.   If Versapharm was being tested by Patel and Teva, it passed with flying colors. On April 9, 2014—only five days after the Teva increase—Versapharm increased its pricing on both Ethosuximide Capsules and Oral Solution to a nearly identical price to Teva.

1258.   Following their agreement on those two drugs, and with no reason to speak further, Rekenthaler and J.J.3 of Versapharm never spoke by phone again.

d)      <u>Impact</u>

1259.   A few weeks after Teva's April 4, 2014 price increases went into effect, Patel calculated the impact to Teva's net sales as a result of the April 4 increase. Based on her analysis, she found that the April 4, 2014 price increases resulted in a net increase in sales to Teva of $214,214,338 per year.

xiii.     <u>April 15, 2014 Price Increase (Baclofen)</u>

1260.   Baclofen, also known by the brand names Gablofen and Lioresal, is a muscle relaxant used to treat muscle spasms caused by certain conditions such as multiple sclerosis and spinal cord injury or disease. It is generally regarded as the first choice by physicians for the treatment of muscle spasms in patients with multiple sclerosis.

1261.   Effective February 21, 2014, Defendant Upsher-Smith took a significant price increase on Baclofen, ranging from 350 to 420 percent of the WAC price, depending on the formulation. Prior to the increase, Baclofen was not a profitable drug for Upsher-Smith, and Upsher-Smith was considering whether to exit the market or significantly raise price. It chose the latter.

1262.  The primary competitors in the market for Baclofen at this time were Teva (62.4 percent), Qualitest (22.5 percent), and Upsher-Smith (6.8 percent).

1263.  Teva initially considered following the Upsher-Smith price increase quickly, as part of its April 4, 2014 price increases, but decided against it. The primary reason was that Qualitest was in the market, and Teva considered Qualitest a "low-quality" competitor. In other words, Qualitest would likely compete for market share if Teva increased its price.

1264.  Starting on April 10, 2014, however, Teva learned that Qualitest was having supply problems and could exit the market for at least 3-4 months, if not permanently.

1265.  Upon learning that the only significant remaining competitor in the market would now be Upsher-Smith, a high-quality competitor, Teva immediately decided to follow the price increase. Patel asked one of her direct reports to start working up price increase scenarios for Baclofen that same day.

1266.  Upsher-Smith was a highly-ranked competitor by Patel (+2) in large part because of Patel's relationship and understanding with B.L., a national account executive at Upsher-Smith. In the week before she started her employment at Teva (after leaving her previous employment), Patel and B.L. exchanged several text messages. During her first week on the job, as she was beginning to identify price increase candidates and high quality competitors, Patel spoke to B.L. on April 29, 2013 for nearly twenty (20) minutes. During these initial communications, Patel and B.L. reached an understanding that Teva and Upsher-Smith would follow each other's price increases, and not compete for each other's customers after a price increase. Their agreement was further cemented in June and July 2013, when the two competitors agreed to substantially raise the price of Oxybutynin Chloride.

1267.  There was no need for the two competitors to communicate directly in this situation because it was already understood between them that Teva would follow an Upsher-Smith price

increase based on Patel's prior conversations with B.L. and based on the history of collusion between the two competitors.

1268.   Effective April 15, 2014, Teva raised its WAC and SWP pricing to match Upsher-Smith's pricing exactly. Teva increased its WAC pricing from 350 to 447 percent, depending on the dosage strength. Teva would not have increased its prices on Baclofen unless it had an understanding in place with Upsher-Smith.

1269.   Pursuant to the agreement between the companies, Teva did not seek to take any customers from Upsher-Smith during the time period after Upsher-Smith's increase and before Teva could follow. Even after Teva's increase, when Qualitest customers approached Teva for a bid due to Qualitest's supply problems, Teva deferred to Upsher-Smith. As Patel told Green in a June 11, 2014 email: "Dynamics have changed, but I think we need to see if Upsher wants to pick up share. We have an unreasonably high share." Green agreed: "I think this is the right thing to do...we should just give them a high bid."

1270.   Upsher-Smith, on the other hand, was able to secure several new customers as a result of the Qualitest exit. In short order, Baclofen became a very profitable product for Upsher-Smith.

1271.   Only two months later, Lannett would enter the market at the same WAC prices as Teva and Upsher-Smith. As discussed more fully above, Teva and Lannett colluded so that Lannett could enter the market seamlessly without significantly eroding the high prices in the market.

xiv.    July 1, 2014 Price Increase (Fluocinonide)

1272.   Fluocinonide, also known by the brand name Lidex, is a topical corticosteroid used for the treatment of a variety of skin conditions, including eczema, dermatitis, psoriasis, and vitiligo. It is one of the most widely prescribed dermatological drugs in the United States.

1273.   There are several different formulations of Fluocinonide including, among others: Fluocinonide 0.05% cream, Fluocinonide 0.05% emollient-based cream, Fluocinonide 0.05% gel and

Fluocinonide 0.05% ointment. As of June 2014, Teva, Taro, and Sandoz were the only three manufacturers actively selling any of the four Fluocinonide formulations mentioned above.

1274.   As discussed above, Teva coordinated with Taro and Sandoz to increase the price of all four of those formations of Fluocinonide in July 2013, based in part on discussions that started between Patel and Aprahamian even before Patel started her employment at Teva. The increases to the WAC prices in 2013 were a modest 10-17 percent, depending on the formulation.

1275.   The second coordinated increase of Fluocinonide was much more significant. Taro raised its prices for all four Fluocinonide formulations effective June 3, 2014. For each, the increases to Taro's WAC prices are set forth below:

| Formulation | Percentage Increase to WAC |
|---|---|
| Fluocinonide 0.05% Cream | 206 – 754% |
| Fluocinonide 0.05% Gel | 155 – 255% |
| Fluocinonide 0.05% Ointment | 206 – 483% |
| Fluocinonide Emollient-Based 0.05% Cream | 160 – 430% |

1276.   Taro notified its customers of the increases on June 2, the day before they became effective. Patel knew of these (and other) Taro increases well in advance and was prepared so that Teva would be able to quickly follow the price increases. Patel was already preparing for the next round of Teva price increases in June 2014; many of which would ultimately be implemented by Teva in August.

1277.   On May 14, 2014, Patel and Aprahamian exchanged eight (8) text messages and had one phone conversation lasting more than four (4) minutes.

1278.   Subsequent to the May 14 communications, Patel directed a colleague to create a list of future price increase candidates, based on a set of instructions and data she had given him. On May 28, 2014, that colleague sent her a list titled "2014 Future Price Increase Candidate Analysis." The list included several drugs sold by Taro, including the four formulations of Fluocinonide (plus Carbamazepine and Clotrimazole), with the notation "Follow/Urgent" listed as the reason for the

increase, even though Taro had not yet increased its price on those drugs or notified its customers that it would be doing so.

1279.   On June 3, 2014, the day the Taro increases on Fluocinonide became effective, CVS reached out to T.C., a senior sales executive at Teva, indicating that it had an "immediate opportunity" on Fluocinonide 0.05% Cream and Fluocinonide 0.05% Emollient Cream, but did not give a reason for providing that opportunity to Teva. The CVS representative offered to move a significant amount of business from Taro to Teva, stating: "Opportunity knocks." The email was forwarded to Patel, who responded: "I suspect a price increase . . . and we would likely follow."

1280.   Of course, Patel already knew the bid request was due to a price increase, because she had spoken to Aprahamian in May and included Fluocinonide on her list of price increases with a notation to "Follow/Urgent." But she still needed to determine the specific price points so that Teva could follow quickly.

1281.   T.C. stated that she had not heard about a price increase from anyone else but indicated that she would "snoop around." Patel stated: "OK. Thanks. I'll do the same."

1282.   Patel immediately began snooping around by exchanging five (5) text messages with Aprahamian at Taro. Later that afternoon, she reported that she "[c]onfirmed that Taro increased," but that she was "still working on intel." Green at Teva suggested that it might be a good opportunity to take some share from Taro—the market share leader on several of the Fluocinonide formulations. He asked Patel to provide "guidance" by the next day. Patel responded at 4:23pm, making it clear that she had been talking to Aprahamian not only about Fluocinonide, but other drugs as well:

> I expect to provide guidance at some point in the morning. I'm also hearing Warfarin, Carbamazepine as well. I'll be looking at shares and intel tomorrow and will provide commentary. (Taro is a high quality competitor. It's just a matter of who the others are.)

1283.   Shortly after sending that email Patel called Aprahamian, and they spoke for nearly seven (7) minutes. As discussed more fully below, Taro had also increased its prices for Warfarin and Carbamazepine on June 3. Teva followed those substantial Taro price increases with equally substantial increases of its own in August.

1284.   First thing the next morning, Patel exchanged two (2) more text messages with Aprahamian, and then the two spoke on the phone for more than twenty-five (25) minutes. Within minutes after hanging up the phone with Aprahamian, Patel sent the following email to Green, making it clear that she had obtained additional "intel" that she did not want to put in writing: "I have additional intel (I can discuss with you) that will be useful." She also advised: "Taro is a high quality competitor—I think we need to be responsible where we have adequate market share."

1285.   That same day, Teva received a bid request from another large customer, Walmart. Shortly after that email was forwarded to her, Patel responded by making it clear that Teva would play nice in the sandbox with Taro:



1286.   After further deliberation, Teva decided not to bid on any of the Walmart business at all.

1287.   On June 23, 2014, as Teva was planning to implement a price increase on Fluocinonide to follow the Taro increase, Patel forwarded a spreadsheet to a subordinate with "intel" she had obtained directly from Aprahamian. That spreadsheet contained specific Taro customer price points for the different formulations of Fluocinonide for each of the various classes of trade (i.e., wholesalers, chain drug stores, mail order, and GPO). Prior to sending that "intel," Patel had spoken to Aprahamian on June 17 for fifteen (15) minutes, and June 19 for nearly fourteen (14) minutes. The contract price points obtained by Patel were not otherwise publicly available.

1288.   Sandoz was also a competitor on Fluocinonide ointment and Fluocinonide gel, but was only actively marketing the gel. Not coincidentally, Aprahamian was having similar communications with his contact at Sandoz, CW-3, during this time period.

1289.   During one of those calls, on June 20, Aprahamian dictated to CW-3 over the telephone specific Taro contract price points for each of the same classes of trade that he had provided to Patel, for Fluocinonide ointment, Fluocinonide gel, and various other drugs that Taro had increased that overlapped with Sandoz. CW-3 took very detailed notes of the pricing information Aprahamian provided, which again were not publicly available.

1290.   Based on a history and pattern of practice between CW-3 and Aprahamian, it was understood that Sandoz would follow the Taro price increase.

1291.   On June 26, 2014, Teva sent out a calendar notice to a number of sales and pricing employees for a 3pm conference call that day. The notice stated: "We will discuss the upcoming price increase for all Fluocinonide products: Fluocinonide Cream, Fluocinonide E-Cream, Fluocinonide Gel, Fluocinonide Ointment. We are targeting an announcement date of Monday, June 30th for an effective date of July 1." The next morning, at 9:57am, Patel and Aprahamian spoke again for nearly thirteen (13) minutes.

1292.   The Teva price increases on Fluocinonide became effective on July 1, 2014.

270

1293.   Teva increased its WAC pricing to match Taro's pricing almost exactly. That same day, Patel spoke CW-1, with her contact at Sandoz, several times. During those calls, Patel informed CW-1 of the Teva price increase and provided specific price points to CW-1 so that Sandoz would be able to follow the price increase.

1294.   Sandoz was in the process of exiting the market for Fluocinonide ointment (it had ceased its sales by September 2014) but followed the increase on the gel three months later, on October 10, 2014. Sandoz increased its WAC pricing on the gel by 491 percent. That same day, Patel spoke to CW-1 at Sandoz by phone for more than three (3) minutes.

1314.   During this time period, Actavis had also started to re-enter the market for Fluocinonide 0.05% cream but had not yet gained any significant market share due to supply problems. Nonetheless, Actavis still followed the Taro and Teva price increases in December 2014 by raising its prices to the exact WAC prices as Teva and Taro. The Actavis price increase on Fluocinonide cream was effective December 19, 2014. Not surprisingly, in the days and weeks leading up to the Actavis price increase, the co- conspirators at Actavis, Taro, and Teva were all communicating frequently. Executives of the three companies spoke with each other on over a dozen phone calls between December 3 and December 18.

> xv.   August 28, 2014 Price Increases

1295.   On August 28, 2014, Teva raised prices on a number of different drugs, including those set forth below:

| Product Description | Competitors | % WAC Increase |
|---|---|---|
| AMILORIDE HCL/HCTZ TABLETS | Mylan (88%) | 50% |
| AMOXICILLIN/CLAV CHEW TABLETS | Sandoz (34%) | 25% |
| CARBAMAZEPINE CHEWABLE TABLETS | Taro (59%); Torrent (24.9%) | 270% |
| CARBAMAZEPINE TABLETS | Taro (52%); Torrent (3.2%); Apotex (3%) | 1538% |
| CIMETIDINE TABLETS | Mylan (58%); Apotex (0.4%) | 25% |
| CLEMASTINE FUMARATE TABLETS | Sandoz (13%) | 45% |
| CLOTRIMAZOLE TOPICAL SOLUTION | Taro (54%) | 208% |
| DESMOPRESSIN ACETATE TABLETS | Actavis (43%) | 75% |
| DICLOFENAC POTASSIUM TABLETS | Mylan (37%); Sandoz (13.5%) | 50% |
| DISOPYRAMIDE PHOSPHATE CAPSULES | Actavis (47%) | 100% |
| ENALAPRIL MALEATE TABLETS | Mylan (30%); Wockhardt (22.5%) | 230% |
| EPITOL TABLETS | Taro (52%); Torrent (3.4%); Apotex (3%) | 1538% |
| FLURBIPROFEN TABLETS | Mylan (41%) | 75% |
| FLUTAMIDE CAPSULES | Par (33%); Actavis (26.8%) | 140% |
| FLUVASTATIN SODIUM CAPSULES | Mylan (82%) | 32% |
| HYDROXYUREA CAPSULES | Par (64%) | 37% |
| LOPERAMIDE HCL CAPSULES | Mylan (56%) | 25% |
| PENICILLIN VK TABLETS | Sandoz (26%); Northstar (5.3%); Dava (4%); Aurobindo (3.6%); Greenstone (2%) | 100% |
| PRAZOSIN HCL CAPSULES | Mylan (71%); Mylan Inst. (0.5%) | 21% |
| PROCHLORPERAZINE TABLETS | Mylan (35%); Cadista (30.3%); Sandoz (11%); Mylan Inst. (0.3%) | 0% |
| TOPIRAMATE SPRINKLE CAPSULES | Zydus (81%); Actavis (3.5%) | 0% |
| WARFARIN SODIUM TABLETS 10MG 100 | Taro (57%); Zydus (16.2%); Upsher-Smith (5%); Amneal (0.4%); | 5% |

1296.   Following the normal pattern, in the days and weeks leading up to the price increase, Patel and Rekenthaler were communicating with every high-quality competitor on those drugs to coordinate the increases in advance. At least some of those communications are set forth in the graphic below:



1297.   The day before the increase became effective—August 27, 2014—Patel spent most of her morning discussing the price increases in over a dozen calls with her contacts at Sandoz, Actavis, Taro, Zydus, and Glenmark.

1298.   In addition to those phone communications noted above, representatives from Teva and every other defendant met in Boston, Massachusetts shortly before the increase, from August 23-26, 2014, for the NACDS annual event, which was the largest pharmaceutical industry meeting of the year. Cavanaugh, Rekenthaler, and Patel, along with many other Teva executives, as well as executives from every other Defendant, attended.

272

1299.   For those few drugs where the phone records do not identify direct communications between Teva executives and their competitors, these executives, at a minimum, communicated through other competitors.

1300.   For example, with regard to Enalapril, Patel was speaking to Aprahamian at Taro as shown above. Aprahamian, in turn, spoke to M.C., the Vice President of Sales and Marketing at Wockhardt, on August 8, 2014 for thirteen (13) minutes, and again twice on August 14, 2014, including one call lasting eight (8) minutes.

1301.   Similarly, with regard to the drug Prochlorperazine, Rekenthaler communicated with Nesta at Mylan on August 7 and August 11, as shown above. Nesta, in turn, communicated with M.D.2, a senior sales executive at Defendant Cadista, on the same days that he had been communicating with Rekenthaler.

1302.   A large number of the drugs on Teva's August 28, 2014 price increase list were selected because Teva was following a "high quality" competitor. The coordination between Teva and certain co-conspirators regarding those drugs is discussed more fully below.

1)      Mylan

1303.   Effective April 17, 2014, Mylan increased its WAC pricing on a number of different drugs, including several that overlapped with Teva. Mylan also increased its contract prices, but at least some of those price increases would not become effective until mid-May 2014.

1304.   Pursuant to the established understanding between the two companies, Teva immediately decided that it would follow the Mylan increases. On April 21, 2014, T.S., a national account executive at Teva, forwarded to Patel two spreadsheets with WAC and AWP pricing information for the price increases taken by Mylan. The spreadsheets were created by Mylan personnel.

1305.   Patel, in turn, forwarded the email to the Teva sales team and stated: "Our intention is to follow Mylan on this increase. Below, you will see the list of increase items where Teva overlaps with Mylan. Please share any pricing intelligence you are able to obtain. Thank you in advance!" The list that Patel referred to included the following products, several of which had been the subject of coordinated price increases in 2013 as well: Amiloride HCL/HCTZ Tablets, Cimetidine Tablets, Enalapril Maleate Tablets, Fluvastatin Sodium Capsules, Loperamide HCL Capsules, Prazosin HCL Capsules, and Sotalol Hydrochloride Tablets.

1306.   Within days, Teva began receiving requests from its customers for bids due to the Mylan price increases. On April 24, 2014, Patel began to formulate a "Mylan Increase Strategy" in order to respond to those requests but noted that Teva was "still awaiting intel" about the Mylan customer contract price points, which were not publicly available. Previously, Patel had relied on Kevin Green to obtain specific Mylan customer price points (referred to as "intel") through his communications with Nesta of Mylan, which she used to follow Mylan's pricing. The next day, in a follow-up email about the Mylan strategy, Patel noted that "we really need some intel" about the Mylan contract price points.

1307.   Patel continued to push for specific contract price points from Mylan. On April 28, 2014, Patel sent an email to the Teva sales team, stating: "To date, we have no intel on Mylan's recent increases. I realize there is a lot of travel going on, but whatever you can gather and share would be greatly appreciated." On May 9, 2014, Patel sent an email to Rekenthaler saying that Teva needed the intel "to become better, quicker followers":



From: Nisha Patel02
Sent: Fri 5/09/2014 9:55 AM (GMT-05:00)
To: ██████████████████
Cc: Dave Rekenthaler; ██████████████
Bcc:
Subject: Mylan Increase Intel

NAMs,

Sorry to be so persistent, but we have not received any Mylan price increase intelligence yet. Whatever you can gather and provide would be greatly appreciated. Our intention is to become better, quicker followers, but without intel, we are unable to do so.

In fact, I cannot see Teva being able to follow in the next round of mass price changes (without any price points) at this point. Of course we can always follow by guessing, but it could cause needless price disruption in the market.

Please send any intel to me and Tom.

1308.    Shortly after receiving that email, Rekenthaler called Nesta at Mylan and left a message. Nesta returned the call minutes later, and the two spoke for nearly eight (8) minutes.

1309.    Separately, and before Rekenthaler was able to convey any information he had obtained, Patel forwarded a customer request from ABC (relating to the Mylan increase items) directly to T.S. at Teva, lamenting the absence of Green to obtain the Mylan intel:

> I am in a really tough spot on these. Please help! There are several requests open for offers, but I have ZERO intel. A little frustrating/discouraging, as we are bound to hear complaints on how long it took to close the Delphi request. Is there anything you are able to get to help when you are back? . . . At some point, I know I'll have to find another source of magic :))

1310.    The next day, T.S. sent Patel an email with an attached spreadsheet listing the Mylan contract price points for all of the recent increases. The email was unclear on where T.S. had obtained this information, but the spreadsheet attached to her email was created by a Mylan employee.

1311.    Rekenthaler and Nesta spoke again on May 20, 2014. Armed with this new source of "intel," Patel was more confident that Teva could follow the Mylan price increases exactly, without disrupting the market. That same day, as Patel began to create a new list of Teva price increase candidates, she instructed a colleague to include the Mylan increase drugs-with specific price points-

275

as its own separate tab in the spreadsheet, called "follow." Her colleague provided the list, as requested, on May 21.

1312.   On May 27, 2014, Rekenthaler and Nesta spoke twice, including one call lasting nearly four (4) minutes. By May 28, Teva had a much more comprehensive list of price increase items. On that list, seven of the Mylan items were prominently listed with a "Follow Urgent" notation listed next to each. Also on the list were three additional Mylan drugs for which Teva would be leading the price increase: Diclofenac Potassium Tablets, Flurbiprofen Tablets, and Prochlorperazine Tablets.

1313.   With the list firmly squared away at the end of May, Rekenthaler and Nesta had no need to speak again until August, when Teva was preparing to implement the price increases. In the weeks leading up to the August 28, 2014 Teva price increases, Rekenthaler and Nesta spoke at least six times to coordinate.

2)    Taro

1314.   As discussed above, Taro implemented a substantial price increase on various formulations of Fluocinonide on June 3, 2014. In addition to Fluocinonide, Taro also significantly raised its prices on the following additional drugs, which overlapped with Teva: Carbamazepine Chewable Tablets, Carbamazepine Tablets, Clotrimazole Topical Solution and Warfarin Sodium Tablets.

1315.   Patel learned of the prices increases for certain of these drugs in advance, based on her conversations with Aprahamian. It was understood that Teva would follow the Taro price increases based on these and prior conversations. In fact, Teva agreed and made plans to follow them before Taro had even put them into effect.

1316.   Specifically, on May 28, 2014, T.S. of Teva sent Patel the then-current version of her "Future Price Increase Candidate" spreadsheet. That list included four Taro drugs which had not yet

been increased by Taro. Patel likely obtained this information from Aprahamian on May 14, 2014, when the two exchanged eight (8) text messages and spoke for more than four (4) minutes by phone.

1317.   On June 3, 2014-the date of the Taro price increases on Fluocinonide, Carbamazepine, Clotrimazole, Warfarin and other drugs-Patel and Aprahamian exchanged five (5) text messages. After exchanging those text messages, Patel confirmed to her supervisor Green and another Teva representative that Taro had in fact raised its pricing on Fluocinonide. Patel then added: "I expect to provide guidance at some point in the morning. I'm also hearing Warfarin, Carbamazepine as well. I'll be looking at shares and intel tomorrow and will provide commentary. (Taro is a high-quality competitor. It's just a matter of who the others are.)" At 5:08pm that evening, Patel called Aprahamian and the two spoke for nearly seven (7) minutes.

1318.   First thing the next morning, Patel and Aprahamian exchanged two (2) text messages. Then the two spoke again for almost twenty-six (26) minutes. Shortly after hanging up the phone with Aprahamian, Patel sent an email to Green making it clear that she had obtained additional "intel" regarding the Taro price increases that she did not want to put into writing, stating: "I have additional intel (I can discuss with you) that will be useful."

1319.   On June 12, 2014, Teva internally discussed future projections regarding Carbamazepine, including the fact that its API supplier might run out of supply sometime in 2015. One of the options discussed was a price increase. Green-aware that Patel had been in discussions with Aprahamian and had "intel" regarding the Taro price increase on Carbamazepine (and other drugs)-stated: "Nisha [Patel] would be able to provide guidance relative to [the Carbamazepine] price increase for the analysis being put together." In fact, Patel had communicated with Aprahamian earlier that same day for more than nine (9) minutes.

1320.   One of the drugs that Taro increased on June 3, 2014 was Warfarin Sodium Tablets ("Warfarin"). Also known by the brand name Coumadin, Warfarin is a blood thinner medication used to treat and prevent blood clots.

1321.   As of June 2014, there were three competitors in the market for Warfarin: Teva, Taro, and Zydus. Ten days after Taro increased its price, Zydus quickly followed with a price increase of its own on June 13, 2014. In the days between the Taro and Zydus price increases for Warfarin, Teva, Taro and Zydus coordinated through various phone communications with each other.

1322.   On June 13, 2014, the date of the Zydus increase on Warfarin, Teva was presented with an offer from a customer for a one-time buy on that drug. Patel responded that "[w]e will review but note that we intend to follow [the] Taro and Zydus increase price." Later that same day, Patel sent an internal email alerting her group, including her supervisor Green, about a list of drugs on which Teva planned to raise prices. A number of them − including Carbamazepine Chewable Tablets, Carbamazepine Tablets, Clotrimazole Topical Solution, Fluocinonide Cream, Emollient Cream, Gel and Ointment, and Warfarin Sodium Tablets − included the notation "Follow/Urgent − Taro" as the reason for the increase. For that list of drugs, Patel directed that "we should not provide any decreases on these products." Patel's directive meant that Teva would not seek to compete for market share against Taro or Zydus when approached by customers due to those competitors' price increases.

1323.   On June 18, 2014, Patel sent that same list to the entire sales team at Teva, informing them of the status of Teva's next price increase. She noted that Teva had already been "receiving multiple requests on several items that are prioritized as increase candidates." Patel continued: "While we do not have an exact date of increase, we are taking our increase plans into consideration and are bidding on new business at the planned increase price where our WAC allows."

1324.   Patel had gathered information about Taro's plans during a fifteen (15) minute phone conversation she had with Aprahamian the previous day, June 17. On June 19, Patel continued to

gather information and made concerted efforts to simultaneously coordinate with both Aprahamian and Green at Zydus, making at least ten calls to them.

1325.  On August 28, 2014, Teva followed the Taro price increases on Carbamazepine Chewable Tablets, Carbamazepine Tablets, Clotrimazole Topical Solution, and Warfarin Sodium Tablets. As discussed more fully above, Teva coordinated those increases with Taro (and Zydus) through direct communications with those competitors in the days leading up to the increase.

### 3)    Zydus

1326.  In addition to their agreement on Warfarin, Teva also agreed with Zydus to raise the price of Topiramate Sprinkle Capsules.

1327.  Topiramate Sprinkle Capsules, also known by the brand name Topamax, is a medication used to treat seizures caused by epilepsy, and also to treat migraine headaches. As of June 2014, Zydus and Teva had a large majority of the market share for Topiramate, while Actavis had just 3 percent of the market.

1328.  In April 2014, Zydus raised its price for Topiramate Sprinkle Capsules Patel was in frequent communication with Green at the time of the Zydus price increase.

1329.  In the days leading up to the June 13 Zydus price increase on Warfarin, which is discussed more fully above, Kevin Green coordinated with both Patel and Rekenthaler at Teva in multiple phone calls.

1330.  Green was likely speaking to Patel and Rekenthaler about both Warfarin and Topiramate Sprinkle Capsules during those calls because on June 13-the same day the Zydus price increase on Warfarin became effective, and after the conversations noted above-Patel added Topiramate Sprinkle Capsules to Teva's price increase list, with a notation: "Follow/Urgent - Zydus." Two days before that, the same day that Green had extensive phone calls with both Rekenthaler and

Patel, Rekenthaler also spoke twice with Falkin of Actavis, the only other competitor in the market for Topiramate Sprinkle Capsules.

1331.   Teva followed the Zydus price increase for Topiramate Sprinkle Capsules on August 28, 2014. As noted above, Teva coordinated that increase with both Zydus and Actavis in the days and weeks before it.

4)      Competitors Follow Teva

1332.   For those drugs where Teva was leading the price increases on August 28, 2014, several of Teva's competitors followed in short order and those price increases were also coordinated.

1333.   For example, on October 10, 2014 Sandoz followed Teva's price increases on three drugs: (1) Amoxicillin/Clavulanate Chewable Tablets; (2) Diclofenac Potassium Tablets; and (3) Penicillin VK Tablets. Following the normal pattern, Patel of Teva spoke to CW-1 of Sandoz on the day of the Sandoz price increases for more than three (3) minutes.

1334.   Then, on December 19, 2014, Actavis followed the Teva price increase on Desmopressin Acetate Tablets. Rekenthaler of Teva and Falkin of Actavis spoke frequently in the days and weeks leading up to the Actavis price increase, including calls on November 18, November 21 and November 25, 2014.

1335.   Indeed, even before Actavis followed the Teva price increase, Teva knew that Actavis planned to increase. For example, on October 15, 2014, approximately six weeks before Actavis raised its price, Teva received a request from a customer asking Teva to reduce its pricing on Desmopressin Acetate because it was no longer offering competitive prices. Patel's initial response to the customer was "[w]e believe the market I still settling on this product. Can you please review in a few days and advise of more current pricing intelligence?" In a subsequent internal discussion, Patel expressed how difficult it was to actually keep track of all of Teva's different collusive agreements, saying: "I can't

quite recall if Actavis followed us or we followed them….but they definitely did not change their WACs recently."

1336.   Similarly, on March 4, 2015, Mylan followed the Teva and Sandoz price increases on Diclofenac Potassium Tablets. Rekenthaler coordinated that price increase with Nesta of Mylan during two phone calls on February 18 and one call on February 19, 2015.

xvi.    <u>January 28, 2015 Price Increases</u>

1337.   Shortly after the August 28, 2014 Teva price increases, Patel accepted a new position at Teva. She left her position in the pricing department to take on the role of Director of National Accounts at Teva. Her new position meant new responsibilities, necessitating more frequent travel to customer conferences and trade shows, giving her a greater opportunity to meet and collude face-to-face with competitors instead of over the telephone.

1338.   When Patel left the pricing department at Teva her position was not refilled. Green, Patel's former supervisor, assumed her role and became the executive responsible for identifying price increase candidates and implementing price increases.

1339.   On January 28, 2015, Teva raised prices on thirteen different drugs. Consistent with their normal pattern, Patel and Rekenthaler communicated with a number of Teva's significant competitors about these drugs in the days and weeks leading up to January 28, 2015. The relevant phone communications between Teva and several of its competitors related to these drugs are set forth below:



1340.  Upon information and belief, Patel also spoke in-person with many of these competitors. For example, in her new role as a Director of National Accounts, Patel personally attended the following trade association events and customer conferences in the fall of 2014 and winter of 2014-15: NACDS, Boston, MA (August 23-26, 2014); Econdisc Bidders Meeting, St. Louis, MO (September 17-19, 2014); PCMA Annual Meeting in Rancho Palos Verdes, CA (October 13-14, 2014); Anda Strategy Meeting, Miami, FL (October 26-29, 2014); and the HDMA Round Table, Washington, DC (January 8, 2015). These industry events were all well-attended by Teva's competitors.

1341.  Some specific examples of Teva's coordination with competitors about its January 28, 2015 price increases are set forth below.

1) Propranolol

1342.  Propranolol HCL Tablets, also known by various brand names including Inderal LA, Inderal XL, Hemangeol and InnoPran XL, is a beta-blocker used to treat high blood pressure, irregular heartbeats, shaking (tremors), and other conditions.

1343.  On January 15, 2015, Actavis sent a notice to its customers informing them of a significant increase to its WAC and Suggested Wholesale Prices (SWP) fo Propranolol. The increases

would not become effective (and thus publicly visible to the rest of the market) until February 17, 2015.

1344.   In the days before Actavis sent this notice to its customers, Falkin of Actavis and Rekenthaler of Teva spoke frequently. Indeed, the day before Actavis sent the price increase notice to its customers, Rekenthaler coordinated the price increase in phone calls with Falkin and Nesta of Mylan, the other quality competitor in the market for Propranolol.[25]

1345.   On January 16, 2015, more than a month before the Actavis price increase for Propranolol was disclosed to the public, Rekenthaler forwarded Teva's price increase list to Patel. Propranolol was on the list, with an explanations that Teva planned to follow Actavis.

1346.   Teva raised its pricing for Propranolol on January 28, 2015, before the Actavis price increase even became effective. As discussed above, Rekenthaler was in constant communication with Falkin of Actavis and Nesta of Mylan in the days leading up to Teva's price increase.

1347.   When the Actavis price increase on Propranolol did become effective, on February 17, 2015, Rekenthaler and Falkin continued to discuss pricing. For example, on February 16, the day before those price increases became visible to the public, Rekenthaler and Falkin spoke two times, including one call lasting nearly twenty-three (23) minutes. Rekenthaler then spoke to Nesta twice on February 18, 2015 and again on February 19, 2015.

1348.   Mylan ultimately followed the Teva and Actavis price increases for Propranolol with a price increase of its own on July 10, 2015.

2)      Ciprofloxacin HCL and Glimepiride

1349.   Ciprofloxacin HCL Tablets, also known by various brand names including Cetraxal, Otiprio, and Ciloxan, is an antibiotic that fights bacteria in the body. It is used to treat different types

---

[25] During this time period, Heritage and Qualitest were both suffering from long-term supply issues on Propranolol and were not viable competitors in the market.

of bacterial infections, including skin infections, bone and joint infections, respiratory or sinus infections, urinary tract infections, and certain types of diarrhea.

1350.  Glimepiride Tablets, also known by the brand name Amaryl, is a medication used to control high blood sugar in people with type 2 diabetes.

1351.  Dr. Reddy's significantly increased its pricing on both Ciprofloxacin HCL and Glimepiride on August 18, 2014. The increases to the Ciprofloxacin HCL WAC were 201 to 533 percent, depending on the dosage strength. The increases to the Glimepiride WAC were approximately 300 percent for all dosage strengths.

1352.  In the time leading up to these price increases, V.B., a senior sales executive at Dr. Reddy's, spoke frequently with Patel about the planned price increases. V.B. continued to communicate with Patel after the Dr. Reddy's price increases became effective, in the hope that Teva would quickly follow with its own price increases. The two exchanged four (4) text messages on August 25, 2014, only three days before Teva announced substantial price increases for certain drugs on August 28, 2014.

1353.  Despite Dr. Reddy's best efforts, Teva was unable to add Ciprofloxacin HCL or Glimepiride to its August 28 price increase. On the same day that Teva sent its price increase notices out to its customers, T.W., a senior account executive at Dr. Reddy's, obtained a complete list of Teva's price increases. Although unclear how T.W. obtained this information, the subject line of the email clearly identified the information as "Confidential Teva increases." In her message to several other Dr. Reddy colleagues about the Teva increases, T.W. noted that Glimepiride was not on the list.

1354.  1374.  J.M.2, a senior marketing executive at Dr. Reddy's, replied: "Thanks for sending. This was shown in the pricing compendium today. I was a little disappointed. However, some of the price increase[s] were led by other companies more than a month ago. So I am still hopeful

they may follow." Dr. Reddy's anticipated that Teva would follow its price increases based on the understanding that had been reached between V.B. and Patel during their various conversations.

1355.   In fact, Teva did follow the Dr. Reddy's price increases on both Ciprofloxacin HCL and Glimepiride during its next round of price increases on January 28, 2015. In the interim, V.B. and Patel continued to communicate, exchanging four (4) text messages on October 10, 2014.

1356.   Actavis, the only other quality competitor in the market for Ciprofloxacin HCL, increased its pricing for that drug on December 19, 2014 to exactly match Dr. Reddy's WAC pricing. In the days leading up to the Actavis price increase, Rekenthaler of Teva spoke to Falkin of Actavis several times to coordinate the increase, including twice on December 17 (including one call lasting nearly nine (9) minutes) and once on December 18, 2014.

1357.   When Teva did follow the Dr. Reddy's (and Actavis's) price increases on Ciprofloxacin HCL and Glimepiride, on January 28, 2015, Teva raised its WAC pricing to match Dr. Reddy's WAC prices exactly. That same day, Dr. Reddy's was (again) able to obtain a full copy of Teva's price increase list.

3)      Griseofulvin

1358.   Griseofulvin Microsize Oral Suspension, also known by the brand name Grifulvin V, is a medication used to treat fungal infections of the skin, hair and nails that do not respond to creams or lotions. The medication works by stopping the growth of fungi.

1359.   On September 9, 2014, Actavis notified its customers of a price increase on Griseofulvin Microsize Oral Suspension, effective October 6. In the week leading up to the announcement, Patel and Rekenthaler of Teva communicated with Falkin and Rogerson of Actavis at least ten times to coordinate the increase.

1360.   Teva promptly added Griseofulvin to its own price increase list, with the notation "Follow Competitor - Actavis" as the reason for the price increase.

1361.   Teva followed the Actavis increase for Griseofulvin during its next price increase event on January 28, 2015. As discussed above, in the days leading up to that price increase Rekenthaler of Teva and Falkin of Actavis coordinated frequently. Teva's price increase for Griseofulvin Microsize Oral Suspension matched Actavis's WAC pricing exactly.

      c.    <u>Competitors Become "High Quality" After Colluding With Teva</u>

          i.    <u>May 2014: Patel Updates the Quality Competitors Rankings</u>

1362.   A little more than a year after she first circulated her Quality of Competitor List, Patel finalized an updated list on May 9, 2014. This updated list reflected changes in Teva's conspiratorial relationships.

1363.   Although certain competitors like Defendants Mylan, Sandoz, and Actavis and Co-conspirator Taro retained a high-quality ranking throughout the entire relevant time period, other competitors saw their ranking increase (sometimes dramatically) after successfully colluding with Patel or others at Teva on one or more drugs during the prior twelve-month period.

1364.   These changes demonstrate that Teva's quality competitor rankings were, in reality, a list of co-conspirators that Teva could trust to adhere to the illegal agreements.

          1)    <u>Apotex</u>

1365.   Apotex, for instance, was one of Teva's two lowest-ranked competitors in May 2013 with a ranking of -3. When Patel updated her Quality Competitor rankings in May 2014, however, Apotex was rated +2.

1366.   Apotex made this jump in Teva's quality competitor rankings in large part due to Patel's relationship with B.H., a sales executive at Apotex, and the successful coordination between Apotex and Teva in 2013 on Pravastatin and Doxazosin Mesylate, discussed above.

1367.    As noted above, Patel revised her May 2013 price increase list on May 29, 2013 to add Pravastatin. The day before, Apotex had increased its price on Pravastatin by over 100 percent. Apotex' new, higher prices for Pravastatin exactly matched Glenmark's May 16, 2013 price increase.

1368.    In the days leading up to Patel's decision to add Pravastatin to her list of price increase candidates-and Apotex actually increasing its prices-Patel communicated frequently with B.H. at Apotex. Between May 20 and May 24, 2013, the two spoke five (5) times.

1369.    Teva ultimately raised its prices on Pravastatin-to follow Glenmark, Apotex and Zydus-on August 9, 2013. In the days leading up to the Teva price increase, Patel spoke to B.H. at Apotex three (3) times to coordinate.

1370.    At the same time that Teva raised its prices on Pravastatin in August 2013, it also increased its pricing on Doxazosin Mesylate. Teva's new, increased price (a 1,053 percent increase) matched Apotex' (and Mylan's) recent price increases. Apotex itself had increased the price of this drug on July 23, 2013. B.H. of Apotex and Patel of Teva had one conversation the week before Apotex took the increase, in addition to coordinating before Teva followed on August 9, 2013.

1371.    Apotex soared dramatically in the quality competitor rankings for one additional reason: in April 2013, Apotex hired J.H. as a senior executive. Rekenthaler of Teva and J.H. began communicating regularly after J.H. was hired by Apotex. There is no record that they had ever communicated by phone before that.

1372.    That relationship continued through 2014. On April 4, 2014, Teva increased the price on Pentoxifylline by as much as 69 percent. Despite the fact that Apotex was the market leader at that time, Teva chose to lead the price increase on Pentoxifylline. In the weeks leading up to Teva's price increase, Rekenthaler of Teva engaged in numerous communications with J.H. at Apotex. The two spoke twice on March 7, 2014, for two (2) and three (3) minutes, respectively. They spoke again on March 20 for four (4) minutes, and again on March 25 for two (2) minutes. A week after Teva

increased its price - on April 11, 2014 - they spoke again for five (5) minutes. During these calls, Rekenthaler gathered Apotex's pricing plans and conveyed them to Patel.

1373.   As a result of Patel and Rekenthaler's successful coordination with Apotex executives, Patel dramatically increased Apotex's quality competitor ranking in May 2014.

2)    <u>Zydus</u>

1374.   Zydus - like Apotex - had been one of Teva's two lowest-ranked competitors in May 2013 with a ranking of -3. But, when Patel updated her quality competitor rankings in May 2014, Zydus was rated +2. While Apotex's increase in the ranking was due to Teva's successful collusion with Apotex on several price increases in 2013 and 2014, Zydus's increase was more personnel oriented: Kevin Green, who had himself conspired with a number of competitors while at Teva (at the direction of and in coordination with Patel and Rekenthaler at Teva, among others) moved from Teva to Zydus in November 2013. With Green firmly installed at Zydus, Patel was emboldened to include Zydus more fully in the conspiracy.

1375.   Patel's confidence was well-founded. In the year after Green joined Zydus, the two companies successfully conspired to divide markets and allocate customers relating to Zydus's entry into the market for multiple drugs, including Fenofibrate (February - March 2014), Paricalcitol (March - April 2014), Niacin (May - June 2014), and Etodolac ER (May - July 2014). These agreements are discussed more fully above.

1376.   Teva and Zydus also agreed to increase prices on Topiramate Sprinkles and Warfarin Sodium tablets. Zydus increased the price for both of those drugs on June 13, 2014. Teva followed with an increase on both drugs on August 28, 2014. With respect to the Topiramate Sprinkles, Teva was explicit in its internal communications that its increase was to "follow competitor," namely Zydus.

1377.  In the days leading up to both companies' price increases, Green and Patel communicated frequently to coordinate the price increases. On June 19, 2014-four days before Zydus increased its prices-Green and Patel spoke four (4) times. And on August 27, 2014-the day before Teva raised its prices-Green and Patel spoke three (3) times.

1378.  Green was also communicating frequently with Rekenthaler of Teva around the time of the price increases on Topiramate Sprinkles and Warfarin Sodium tablets. On June 11, 2014, the two men spoke for eight (8) minutes. On August 20, the two exchanged an additional pair of phone calls.

1379.  Patel and Rekenthaler did not communicate with Green in isolation. The two Teva executives made sure to keep each other apprised of their conversations with competitors, including Green. In early 2014, Patel and Rekenthaler both worked largely out of Teva's home office. After either one of them engaged in a phone call with a competitor, he or she would be sure to provide an in-person debrief of the communication so as to avoid putting such information in writing.

1380.  Even before Green joined Zydus in November 2013, Teva had some success in coordinating price increases with Zydus. As discussed above, Patel decided to add Pravastatin to her price increase list only after determining that Zydus agreed to the increase. In the week leading up to Patel's decision to revise her price increase list to include Pravastatin, Green (still at Teva) spoke to K.R. and M.K., both senior executives at Zydus.

1381.  Just two weeks later, on June 14, 2013, Zydus increased its price on Pravastatin by over 150 percent. Green similarly had at least nine conversations with Zydus executives in the week prior to that company's Pravastatin increase.

1382.  As noted above, Teva ultimately raised its prices on Pravastatin on August 9, 2013. At that time, Patel recommended that Teva follow the competitors that had already raised their prices,

including Zydus. Prior to Teva raising its prices on August 9, 2013, Green spoke to K.R. at Zydus three times, twice on August 4, 2013 and once on August 5.

3)    <u>Heritage</u>

1383.    Heritage, like Apotex and Zydus, was not a highly-ranked competitor when Patel first created the quality of competitor ranking list in May 2013. Initially, Patel gave Heritage a ranking of "0." However, when Patel updated her quality competitor rankings in May 2014, Heritage received the highest possible ranking of +3.

1384.    The reason for Heritage's significant improvement in Patel's quality competitor rankings was the relationship that Patel established with the Vice President of Heritage, Jason Malek. After moving to Teva, Patel began communicating with Malek by phone as early as July 9, 2013. From that date until July 25, 2014, the two spoke by phone at least 37 times.

1385.    Heritage's successful effort to coordinate price increases with Teva on seven drugs-Acetazolamide, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Leflunomide, Nystatin, and Theophylline-is described in detail above.

4)    <u>Lupin</u>

1386.    In Patel's initial May 2013 quality competitor ranking list, Defendant Lupin was given a ranking of +2. When Patel updated her quality competitor rankings a year later, Lupin received the highest possible rating of +3.

1387.    Defendant Lupin was awarded the highest score in the quality competitor ranking in 2014 because Berthold of Lupin earned Patel's trust by consistently agreeing to her price increase plans. From May 2013 through April 2014, for example, Patel and Berthold spoke at least 76 times by phone. Green, while still at Teva, also had a very strong relationship with Berthold.

1388.    As discussed more fully above, after Patel joined Teva in 2013, Teva and Lupin conspired to fix and raise prices on at least the following four drugs: Cefdinir Oral Suspension,

Cefdinir Capsules, Cefprozil Tablets, and Pravastatin. Then in early 2014, executives at the two companies coordinated Lupin's entrance into the market for Balziva.

1389.   The relationship was so strong between Teva and Lupin that even when Green left Teva, and Patel was out of the office on maternity leave, Berthold still found other executives at Teva with whom to communicate with regarding a price increase for the drug Cephalexin Oral Suspension. As discussed above, in October 2013 Berthold called Rekenthaler and T.S., a national account executive at Teva, to coordinate Lupin's November 1, 2013 price increase for Cephalexin Oral Suspension. When Patel returned from maternity leave and began planning the next round of Teva price increases, she continued these communications with Berthold until Teva followed Lupin's price increase on April 4, 2014.

1390.   Patel and Berthold also coordinated a price increase and market allocation scheme with regard to the drug Niacin ER, as Lupin was entering the market in March 2014. Given the successful track record between the two competitor companies, Lupin warranted a +3 in the quality competitor rankings when Patel updated them in May 2014.

5)    Par

1391.   In Patel's initial May 2013 quality competitor ranking list, Co-conspirator Par was given a ranking of +1. When Patel updated her quality competitor rankings a year later, Par improved to a ranking of +2.

1392.   Par rose in the rankings largely because of several strong relationships between executives at the two companies. For example, T.S., a national sales executive at Teva, had a strong relationship with R.K., a senior sales executive at Par. The two began communicating by telephone in September 2013. Between September 2013 and May 2014, the two spoke at least twenty-seven (27) times by phone.

1393.   Similarly, Rekenthaler at Teva had a very strong relationship with another senior executive at Par, M.B. Rekenthaler spoke with M.B. frequently throughout 2013 and 2014. From the beginning of 2013 through May 2014, Rekenthaler spoke to M.B. at Par at least thirty-two (32) times by phone.

1394.   Patel was well aware of these strong relationships and relied on the information that T.S. and Rekenthaler obtained from their communications with senior Par executives in order to make pricing or bidding decisions for Teva's drugs. One such example occurred on Friday, February 7, 2014 when Teva received notice from a customer that it had received a competitive challenge from Par on the drug Labetalol HCL Tablets. Patel forwarded the email to T.S. with three question marks: "???" T.S. responded immediately: "left message." The message that T.S. had left was for R.K. at Par, and the two executives spoke five (5) times that same day. After these calls with R.K., T.S. responded back to Patel saying "[l]et's speak on Monday. Just received call back with more information."

1395.   The following Monday, Patel also forwarded the original email (discussing the competitive challenge from Par on Labetalol) to Rekenthaler, saying "[n]eed to make a decision quickly." One (1) minute after receiving that email, Rekenthaler called M.B. at Par and the two spoke for eighteen (18) minutes. Shortly after hanging up the phone with M.B., Rekenthaler sent another email to Patel, stating: "[h]old off on this until I get back with you." Rekenthaler spoke to M.B. again later that afternoon for three (3) minutes.

1396.   After these discussions between Teva and Par executives, Teva ultimately offered only a nominal price reduction to that customer, knowing that this would likely concede the business to Par.

1397.   As discussed more fully above, Teva continued to conspire with Par on various market allocation and price fixing schemes throughout the remainder of 2014 and into 2015.

6)    Greenstone

1398.  Greenstone was not a highly-ranked competitor when Patel first rated the quality competitor ranking list in May 2013. Patel had, at that time, given Greenstone a ranking of "0." However, when Patel updated her quality competitor rankings in May 2014, Greenstone improved to a +1 ranking.

1399.  One of the reasons for Greenstone's improvement in the rankings was Patel's developing relationship with Robin Hatosy, a national account executive at Greenstone. Patel and Hatosy were former co-workers at ABC and had a longstanding relationship. From the time Patel started her employment at Teva in April 2013, through the time that she updated the quality competitor rankings in May 2014, Patel and Hatosy communicated by phone or text at least 66 times. Patel also spoke to Hatosy's supervisor, Jill Nailor of Greenstone, numerous times in early 2014 to coordinate Greenstone and Teva price increases and customer allocation agreements.

1400.  Patel and Hatosy of Greenstone spoke consistently at or around the time of every price increase effectuated by either company on drugs where they overlapped, including for example: July 3, 2013, the day of Teva's price increase on Fluconazole; December 2, 2013, the day that Greenstone sent notices to customers of its price increases on Azithromycin Suspension, Azithromycin Oral Suspension, and Medroxyprogesterone; and April 4, 2014, the day that Teva followed Greenstone's price increases on Azithromycin Suspension, Azithromycin Oral Suspension and Medroxyprogesterone.

1401.  Given the willingness of Greenstone's executives to coordinate price increases with Teva, Patel increased Greenstone's quality competitor ranking in May 2014.

7)    <u>Amneal</u>

1402.   In Patel's initial May 2013 quality of competitor ranking list, Defendant Amneal was given a ranking of +1. When Patel updated her quality competitor rankings a year later, Amneal improved to a ranking of +2.

1403.   One of the reasons why Defendant Amneal rose in the rankings was because of several strong relationships between executives at the two companies. For example, Rekenthaler of Teva had a strong relationship with S.R., a senior sales executive at Amneal. From May 2013 to May 2014, they spoke eight (8) times by phone, and attended many trade association meetings and customer conferences together as well.

1404.   Rekenthaler and S.R. were regular participants in an annual golf outing hosted by a packaging contractor in Kentucky, where the generic drug manufacturer participants (competitors) played golf by day and gathered socially by night, referring to each other as "friends" and "fraternity brothers." (Green and Ostaficiuk were also participants.)

1405.   Similarly, Patel also developed strong relationships with two Amneal executives: S.R.2, a senior sales and finance executive at Amneal, and S.R. As discussed above, Patel and S.R. coordinated price increases for the drugs Norethindrone Acetate (September 2014) and Bethanechol Chloride (January 2015).

1406.   Patel also spoke to S.R. regarding Norethindrone Acetate in September 2014, and continued to communicate with S.R. into at least 2015, sometimes using alternative forms of communication. In addition to their cell phones, the two executives also used Facebook Messenger to coordinate anticompetitive conduct.

8)    Rising

1407.   In Patel's initial May 2013 quality competitor ranking list, Rising was given a ranking of +1. When Patel updated her quality competitor rankings a year later, Rising improved to a ranking of +2.

1408.   Rising improved in the quality competitor rankings because of the relationship between Rekenthaler and CW-2. In 2013, CW-2 left Sandoz to join Rising. At that time, Rising was already preparing to enter the market for a drug called Hydroxyzine Pamoate. Teva was one of the competitors already in that market. During several calls in early October 2013, CW-2 coordinated with Green and Rekenthaler of Teva to acquire a large customer and facilitate Rising's entry into the Hydroxyzine Pamoate market.

1409.   Later, in March 2014, CW-2 sought to return the favor. At that time, Rising experienced supply problems for the drug Diflunisal Tablets, a two-player market involving only Teva and Rising. In an effort to "play nice in the sandbox," and to further the ongoing understanding between the two competitors, CW-2 contacted Rekenthaler of Teva and informed him of Rising's supply problems and the fact that Rising may have to leave the market at some point in the future. The purpose for the call was to alert Rekenthaler that Teva would have the opportunity to take a price increase, as Rising would not be in a position to take on any additional market share.

1410.   On April 4, 2014, Teva increased the price on Diflunisal Tablets (by as much as 182 percent), as well as Hydroxyzine Pamoate (by as much as 165 percent). In the weeks leading up to those price increases, Rekenthaler communicated several times with CW-2 at Rising to coordinate the increases. The two spoke by phone twice on March 17, 2014 and once on March 31.

1411.   When Rising decided to leave the Diflunisal market in mid-July 2014, CW-2 called Rekenthaler to let him know. Four months later, after Rising remedied its supply problems, Rising re-entered the market for Diflunisal. Consistent with the fair share understanding discussed above, and

the rules of engagement that were generally followed in the industry, CW-2 and Rekenthaler communicated in advance of Rising's re-entry to identify specific customers that Rising would obtain and, most importantly, to ensure the retention of the high prices that Teva had established through its price increase in April 2014. On December 3, 2014, Rising re-entered the market for Diflunisal Tablets. Its new pricing matched Teva's WAC price increase from April 2014.

1412.   Rekenthaler's successful efforts to coordinate price increases and customer allocation agreements with CW-2 of Rising led Patel to increase Rising's quality competitor ranking in May 2014.

9)      <u>Breckenridge</u>

1413.   In Patel's initial May 2013 quality competitor ranking list, she gave Breckenridge a ranking of +1. When Patel updated her quality competitor rankings a year later, Breckenridge improved to a ranking of +2.

1414.   Breckenridge improved in the quality competitor rankings largely because of the strong relationship established between Patel and Rekenthaler and certain executives at Breckenridge, which led to several successful price increases.

1415.   For example, on November 14, 2013, Breckenridge increased the WAC pricing of both Mimvey and Cyproheptadine HCL Tablets. In the weeks leading up to those Breckenridge price increases, Rekenthaler communicated by phone several times with D.N., a sales executive at Breckenridge. The two spoke twice on October 14, 2013 and once on October 24, 2013. The call on October 24 lasted twenty-six (26) minutes.

1416.   On April 4, 2014, Teva followed the Breckenridge price increases on Mimvey Tablets (increasing the WAC pricing by over 100 percent) and Cyproheptadine HCL Tablets (increasing the WAC pricing by over 90 percent), to match Breckenridge's WAC pricing on both products. Teva raised prices even higher on its customer contracts. Teva increased the contract pricing of Mimvey by

296

as much as 393 percent, and the contract pricing of Cyproheptadine HCL Tablets by as much as 526 percent, depending on the dosage strength.

1417.   As Patel planned for Teva's April 4, 2014 price increases, both she and Rekenthaler continued to communicate with their counterparts at Breckenridge.

1418.   Rekenthaler spoke to D.N. at Breckenridge on January 15, 2014-the day after Patel sent her first list of "Increase Potentials Q1 2014" to Green-for nineteen (19) minutes.

1419.   Similarly, Patel spoke with S.C., a sales executive at Breckenridge, two times on February 7, 2014, as she was determining whether Teva should provide a bid to a customer. After her discussions with S.C., Teva declined to bid for the business in order to avoid taking market share away from Breckenridge as a result of the price increases.

1420.    As a result of the successful coordination of these price increases between Teva and Breckenridge, Patel increased Breckenridge's quality competitor ranking in May 2014.

### 10)    Glenmark

1421.   Not every Teva competitor saw its quality competitor ranking increase between 2013 and 2014. Defendant Glenmark, for example, declined slightly in the rankings. In Patel's initial May 2013 quality competitor ranking list, Glenmark was given a ranking of +3. When Patel updated her quality competitor rankings a year later, Glenmark was given a ranking of +2.

1422.   Defendant Glenmark declined in the rankings because Patel lost her most valuable relationship at that company-CW-5. CW-5 left Glenmark in April 2014. In the eleven-month period between Patel joining Teva in late April 2013 and CW-5 leaving Glenmark in April 2014, the two competitors communicated by phone or text message 121 times. They also communicated frequently using an encrypted messaging application, WhatsApp. As discussed more fully above, starting in early May 2013, Teva and Glenmark conspired to fix and raise prices on a number of drugs, including

297

Adapalene, Nabumetone, Fluconazole Tablets, Ranitidine, Moexipril, Moexipril HCTZ, and Pravastatin.

1423.   In addition to CW-5, Patel also had other contacts at Glenmark, which is why Glenmark did not fall dramatically in the quality competitor rankings when CW-5 left the company. For instance, Patel exchanged 44 phone calls or text messages with J.C., a sales and marketing executive at Glenmark, between May 2013 and July 2015. Similarly, Patel exchanged 36 calls with Jim Brown, the Vice President of Sales at Glenmark, between August 2013 and October 2014. As discussed more fully above, Patel continued to coordinate with J.C. and Brown throughout 2014 on several drugs, including Kariva and Gabapentin Tablets - demonstrating that Glenmark remained a quality competitor even after CW-5 left the company.

    d. <u>"Quality Competitors" Collude With Each Other</u>

      i. <u>One Example: The Sandoz/Mylan Relationship</u>

1424.   In addition to conspiring with Teva, the "quality" competitors also colluded with each other on drugs that Teva did not market. Indeed, each of the quality competitors had their own set of relationships with their counterparts at competitor companies that they used to facilitate agreements regarding drugs where they overlapped. The relationship highlighted in this section is the relationship between executives at Sandoz and Mylan.

1425.   However, to the extent that some of the drugs at issue involve additional competitor companies, those relationships are also discussed.

1426.   In September 2012, CW-4 was concerned about her job security at Sandoz and sought to network with executives at competing companies in the hope of obtaining new employment. CW-4 contacted Nesta because she was interested in potentially working at Mylan. CW-4 obtained Nesta's phone number from a mutual contact and called to introduce herself. During that phone call, Nesta

immediately started talking about competitively-sensitive information. Although CW-4 was surprised that Nesta was being so blatant, she did not stop him.

1427.   In the year that followed, between September 2012 and October 2013, CW- 4 and Nesta developed an ongoing understanding that they would not poach each other's customers and would follow each other's price increases. Notably, CW-4 and Nesta were not friends and communicated almost exclusively by phone. Examples of their coordination with respect to specific drugs are discussed in more detail below.

1)    Market Allocation - Valsartan HCTZ

1428.   The first drug that CW-4 and Nesta coordinated about was Valsartan HCTZ. Valsartan HCTZ, also known by the brand name Diovan, is used to treat high blood pressure.

1429.   Diovan was a large volume drug that had sales in the United States of approximately $1.6 billion for the 12 months ending June 30, 2012.

1430.   Mylan was the first company to file an abbreviated new drug application (ANDA) to market the generic version-Valsartan HCTZ-which, if approved, would give Mylan 180 days of generic exclusivity. Sandoz manufactured the authorized generic. This meant that Sandoz and Mylan would be the only two manufacturers of the generic version of the drug for six months.

1431.   Mylan and Sandoz launched Valsartan HCTZ on the same day: September 21, 2012. From September 6 through September 20, CW-4 and Nesta spoke at least twenty-one (21) times by phone, during which they discussed, among other things, allocating market share for this product.

1432.   During these phone calls, Sandoz and Mylan-through CW-4 and Nesta- agreed to divvy up the market so that each competitor obtained roughly a 50 percent market share.

1433.   Throughout this time, CW-4 also kept Kellum (her supervisor) regularly informed of her discussions with Nesta and met with Kellum in person to discuss her customer accounts, including a meeting on September 14, 2012.

1434.   On September 21, 2012, the date of the Valsartan HCTZ launch, R.T., a senior sales and marketing executive at Sandoz, sent an internal email stating "[a]s a cross functional team, we have optimized this launch successfully securing ~52% market share vs. a formidable competitor like Mylan… you should be very proud!"

1435.   That same day, Mylan issued a press release announcing that it had received final FDA approval to market generic Valsartan HCTZ. In an internal series of emails reacting to this news, a Sandoz employee remarked: "Fyi, good news, Mylan has 180 days as expected." H.F., a senior-most executive of Sandoz Germany responded, "sometimes a little help from our competition is welcome as well." D.D., a senior-most executive of Sandoz North America, replied: "I guess this is what they call "co-epitition."

1436.   Kellum forwarded Mylan's press release announcing the Valsartan launch to the Sandoz pricing and sales teams. S.G., a national account executive at Sandoz, replied "Hallelulah!!!!!!!!!!!!!!!"

1437.   On September 25, 2012-only four days after the launch-ABC contacted Sandoz, seeking a price reduction on Valsartan HCTZ. S.G. forwarded the request to CW-1 and Kellum, stating "ABC has provided additional information regarding the market pricing on Valsartan HCTZ (specifically to McK [a Mylan customer]). Please review and advise if Sandoz will continue to let the market settle or move in a different direction." Kellum replied, "[n]o price change."

1438.   On November 16, 2012, Sandoz executives met to discuss increasing sales for Valsartan HCTZ. R.T. sent an internal email in advance of the meeting asking, "Are there opportunities with non-Sandoz customers that we should evaluate?" After a colleague responded with a list of potential Mylan customers, Kellum responded, "I'm concerned we are going to disrupt the market. I understand the need for additional sales but we need to be thoughtful here." R.T. then

informed the Sandoz team, "Do not approach new customers, with[out] me or Armando [Kellum]'s consent."

### 2) Price Increases - Summer 2013

1439.  As detailed above, after Mylan and Teva implemented significant price increases in early July 2013, Sandoz executives sought to obtain a "comprehensive list" of those Teva and Mylan price increases. Sandoz sought this information because it did not want to accidentally compete for market share on any of the Teva or Mylan drugs that overlapped with Sandoz.

1440.  To that end, on July 15, 2013, Sandoz executives held an internal meeting during which CW-1 instructed members of the Sandoz sales team, including CW-2 and CW-4, "to investigate [the] list of Mylan and Teva increase items."

1441.  That same day, as detailed above, CW-2 contacted his counterpart at Teva, Rekenthaler, and obtained the list of drugs that Teva increased on July 3, 2013, along with the percentage increases for each. Similarly, on July 16, 2013, CW-4 called her contact at Mylan, Nesta. The call lasted two-and-a-half (2.5) minutes. A half hour later, Nesta returned the call and they spoke for nearly nineteen (19) minutes.

1442.  During those two calls, CW-4 asked Nesta to identify the drugs Mylan had increased prices on so that Sandoz could follow with its own price increase. Nesta provided CW-4 with a list of drugs, highlighting that the Nadolol price increase would be large. Nesta also emphasized that Mylan did not appreciate having its prices challenged and that prices should be kept high.

1443.  Over the next several months, and consistent with their understanding, Sandoz declined to bid and take business from Mylan customers (except in one instance where Mylan had more than its fair share) and raised prices to match Mylan on a number of products. Some examples of this conduct are detailed below.

301

a)      Haloperidol and Trifluoperazine HCL

1444.   Haloperidol, also known by the brand name Haldol, and Trifluoperazine HCL, also known by the brand name Stelazine, are antipsychotic drugs that are used to treat disorders such as schizophrenia and Tourette syndrome.

1445.   On August 6, 2013, Nesta of Mylan called CW-4 at Sandoz twice. Both calls were less than a minute long. Three days later, on August 9, 2013, Mylan implemented significant price increases on both Haloperidol and Trifluoperazine HCL. For Haloperidol, Mylan increased the WAC price by 250 percent on several formulations. For Trifluoperazine HCL, Mylan increased the WAC price by 80 percent on all formulations.

1446.   On August 19, 2013, S.G., a national account executive at Sandoz, sent an internal email stating that Mylan increased its prices on Haloperidol and Trifluoperazine and that Sandoz needed to "rationalize the market."

1447.   On August 22, 2013, CW-2 emailed Kellum, stating that CVS "wanted to know if we will be raising price on Haloperidol and Trifluoperazine. Mylan took substantial increases." Kellum forwarded the request to CW-1 and F.R., a pricing manager at Sandoz.

1448.   F.R. responded, "I believe the answer is yes?? We bid at current price in RFP and did not go after this business. I would answer yes. Thoughts?" CW-1 replied that he would obtain the pricing data, "but I would imagine we will be fast followers."

1449.   On September 18, 2013, CW-1 emailed Kellum with his price increase analyses for Haloperidol and Trifluoperazine HCL. For Haloperidol, CW-1 indicated that Mylan had 72 percent market share, Sandoz had 15 percent, and Zydus had 10 percent. For Trifluoperazine HCL, CW-1 stated that "Mylan has 73% and we have 24%. This is a no brainer."

1450.   On September 25, 2013, Walgreens, a Mylan customer, emailed Sandoz asking for bids on Haloperidol and Trifluoperazine HCL. CW-1 sent an internal email explaining that "Mylan took a

302

price increase on this product. That's why he is asking. We are currently evaluating tak[ing] one ourselves."

1451.   On October 2, 2013, CW-1 emailed S.G., the Sandoz national account executive assigned to Walgreens, directing S.G. to not only decline to bid at Walgreens, but also lie about the reason for doing so: "We have been running up against Mylan a lot lately (Nadolol, Benaz/Hctz), and fear blowback if we take on any more products at this moment. Trying to be responsible in the sandbox. I recommend you blame supply."

1452.   Over the next several days, CW-4 and Nesta spoke by phone several times.

1453.   Prior to these calls, CW-4 and Nesta had not communicated by phone since August 6, 2013.

1454.   On October 15, CW-1 emailed the Sandoz Pricing Committee, recommending that Sandoz increase pricing on Haloperidol and Trifluoperazine HCL. After reviewing the email, O.K., a senior executive responsible for business planning at Sandoz, recommended approval of the Haloperidol price increase, but advised that Sandoz wait to increase the price of Trifluoperazine HCL until January 2014 because of price protection penalties that would be triggered if Sandoz increased in October 2013. As O.K. explained, "I understand that both price increases have been taken by Mylan in August and we are the followers. We might be sending the wrong signal to Mylan by not following promptly however 1.6m top/bottom-line hit with no upside is too big to swallow."

1455.   Ultimately, Sandoz followed O.K.'s recommendation and increased its WAC pricing on Haloperidol to match Mylan's pricing on October 25, 2013, but waited to follow on Trifluoperazine HCL until January 31, 2014.

b)      <u>Benazepril HCTZ</u>

1456.   Benazepril HCTZ, also known by the brand name Lotensin, is an angiotensin converting enzyme (ACE) inhibitor that is used to treat high blood pressure.

1457. In July 2013, Sandoz finalized its plan to re-launch Benazepril HCTZ. However, because Sandoz executives knew that Mylan planned to increase price on this product, it chose to wait to re-enter the market until after Mylan increased its price so that Sandoz could enter at the higher price.

1458. On July 12, 2013, a marketing executive at Sandoz sent an internal email regarding "Benazepril Orders for Cardinal" stating: "[b]efore any release, we are expecting Mylan to raise their price." Similarly, during a Commercial Operations meeting on July 15, 2013, it was confirmed that Sandoz was just waiting for confirmation of a Mylan price increase before re-entering the market.

1459. The next day, on July 16, 2013, CW-4 spoke with Nesta and sent the July 2013 Email outlining the Mylan price increase drugs that Nesta had provided to her (discussed more fully above). That list did not include Benazepril HCTZ. CW-1 forwarded the July 2013 Email to Kellum stating "See [CW-4's] note below for Mylan increases... I'm I benazepril hctz isn't on the list below for Mylan?" CW-1 then emailed CW-4 asking, "Benazepril hctz? Was hoping to see that one." Over the next few days, CW-4 and Nesta communicated several times, during which they discussed Benazepril HCTZ.

1460. On August 2, 2013, CW-1 sent a spreadsheet to Kellum entitled, "Teva increases July 2013." In the email, CW-1 stated: "Mylan is also in there. Be on the lookout for bumetanide and Benazepril/hctz."

1461. One week later, on August 9, 2013, Mylan increased WAC pricing on Benazepril HCTZ by nearly 334 percent on all dosage strengths.

1462. On August 20, 2013, consistent with their agreement to maintain high prices, Sandoz quickly re-entered the Benazepril HCTZ market and essentially matched Mylan's WAC pricing.

1463. A third competitor, Rising Pharmaceuticals, entered the Benazepril HCTZ market on April 2, 2014. When Rising entered, it essentially matched the WAC pricing of Sandoz and Mylan.

Both before and after entering the market, CW-2, who was then at Rising, communicated with his former colleagues at Sandoz (including CW-1 and CW-3) about obtaining market share on Benazepril HCTZ. Through those communications, Sandoz ultimately agreed to relinquish ABC to Rising so that the new entrant could achieve its fair share of the market.

c)    Levothyroxine

1464.   Levothyroxine is a synthetic form of the thyroid hormone thyroxine used to treat hypothyroidism, goiter, thyroid cancer, and cretinism.

1465.   Levothyroxine was the second most prescribed drug, measured by number of prescriptions, in the United States in the first quarter of 2010. Over 120 million prescriptions are written annually for Levothyroxine in the United States, treating 15% of the population over the age of 55.

1466.   Since approximately December 2010, Defendants Mylan, Sandoz, and Lannett have dominated the generic Levothyroxine market.

1467.   In 2013 and 2014, the three competitors coordinated to significantly raise the price of Levothyroxine. Nesta of Mylan spearheaded the discussions by speaking with K.S.2, a senior sales executive at Lannett, and with CW-4 of Sandoz. In addition to communicating directly with CW-4, Nesta also communicated indirectly with Sandoz through a mutual contact at a competitor company, Green of Teva. Notably, Levothyroxine was not a drug that Teva sold.

1468.   As detailed above, Mylan increased prices on a number of drugs on January 4, 2013, including Levothyroxine. The day before the Mylan increase, on January 3, 2013, Nesta of Mylan and Green of Teva spoke at least four times by phone. The next morning, Green spoke twice with Kellum, including a six (6) minute call at 9:34am.

1469.   Shortly after hanging up the phone with Green, Kellum sent an internal email stating, among other things, that he "[j]ust heard from a customer that . . .Mylan took a significant price

increase on Levothyroxine" and Kellum advised his team to "please be cautious" on this product. As the phone records demonstrate, Kellum's source for the information was not "a customer," but rather Green of Teva.

1470.   That same morning, K.S.2 of Lannett called Nesta of Mylan. The phone call lasted 44 seconds. Then, on January 10, 2013, Nesta called K.S.2 back and they spoke for more than six (6) minutes. That same day, McKesson emailed Sandoz and requested a price reduction on Levothyroxine. Kellum responded internally, "This is a no. We just learned that Mylan look a large price increase."

1471.   The following Monday, Lannett raised its pricing for Levothyroxine to match Mylan. Notably, after these phone calls, Nesta would not speak again with K.S.2 of Lannett until August 6, 2013-three days before Mylan increased its prices for Levothyroxine a second time.

1472.   On July 16, 2013, as detailed above, CW-4 spoke with Nesta and sent the July 2013 email identifying the Mylan price increases. The price list included Levothyroxine and noted that Lannett had followed.

1473.   On August 6, 2013, Nesta called CW-4 two times. Both calls lasted less than a minute. A few minutes after the second call, Nesta called K.S.2 at Lannett. The call lasted 24 seconds (likely a voicemail). Three days later, on August 9, 2013, Mylan increased WAC pricing on Levothyroxine for a second time.

1474.   On August 10, 2013, S.G., a national account executive at Sandoz, sent an internal email that stated: "Mylan took a 300% price increase on Levothyroxine!!! Based on my intelligence (we will need to confirm), please lock down inventory (strict allocation per AK) and no new product offers until we can clarify the situation." CW-4 replied to S.G.'s email stating, "This is correct based on my info as well."

306

1475.  Pursuant to their ongoing understanding, Lannett followed quickly and matched Mylan's WAC pricing on August 14, 2013.

1476.  On August 14, 2013, S.G. sent an email to Kellum, copying CW-1, regarding "Levothyroxine Mylan" and asked "[w]e taking the pricing up?" CW-1 responded: "[w]orking on it." In response, S.G. replied: "Thx. I believe Lannett rationalized the market earlier this week." CW-1 answered, "We just noticed that as well."

1477.  On September 5, 2013, Cigna-a Mylan customer-contacted Lannett and requested a bid on Levothyroxine. J.M.3, a national account manager at Lannett, forwarded the request to K.S.2, stating "due to Mylan's across the board price increases on a number of products, they are looking for new suppliers wherever there is crossover." J.M.3 explained that "[t]he volume isn't gigantic on the 1000s so it wouldn't attract much attention from Mylan if it went to us …." Nonetheless, on September 12, 2013, Lannett declined the opportunity and blamed supply issues, stating "[a]s much as we'd love to take on the business, we are not in a position to do so at this time."

1478.  During a September 10, 2013 earnings call, Lannett's CEO, A.B.2, was asked for his reaction to Mylan's Levothyroxine price increase. A.B.2 responded, "You mean after I sent them a thank you note? I'm just kidding. I'm always grateful to see responsible generic drug companies realize that our cost of doing business is going up as well.  =So whenever people start acting responsibly and raise prices as opposed to the typical spiral down of generic drug prices, I'm grateful."

1479.  On September 13, 2013, Sandoz did indeed act "responsibly" and, consistent with the understanding it had with its competitors, raised WAC pricing to match Mylan and Lannett.

1480.  The three competitors-Defendants Mylan, Lannett, and Sandoz-did not stop there. They coordinated again to raise price on Levothyroxine in April/May 2014.

1481.  Consistent with the 2013 increases, Mylan was the first to raise its WAC pricing on Levothyroxine on April 25, 2014. In the two days leading up to the increase, Nesta and K.S.2 of

Lannett spoke by phone several times. Notably, these calls are the last documented telephone calls between these two executives.

1482.   On April 2, 2014-the day that Mylan increased its pricing for Levothyroxine-P. C., a sourcing manager at Cardinal Health, sent a text message to Sullivan of Lannett stating: "not sure if you knew already…Mylan increasing levos."

1483.   Sullivan responded: "Thanks for the heads up…We heard 55% on contract price, can you confirm?" P.C. replied, "[y]es ~50-55%." Sullivan had "heard" about the Mylan increase from her supervisor, K.S, who had communicated with Nesta only days prior.

1484.   Lannett quickly followed with a price increase of its own, raising its WAC pricing to match Mylan on April 28, 2014. In accordance with their ongoing agreement, and consistent with past practice, Sandoz followed shortly thereafter on May 23, 2014 and matched the WAC pricing of its competitors.

d)   Clomipramine HCL

1485.   Clomipramine HCL, also known by the brand name Anafranil, is used for the treatment of obsessive-compulsive disorder, panic disorder, major depressive disorder, and chronic pain.

1486.   In addition to Defendants Sandoz and Mylan, Co-conspirator Taro also manufactured Clomipramine HCL. Indeed, it was Taro that led a price increase on this product on May 1, 2013. The price increase was striking-more than a 3,440 percent increase to Taro's WAC pricing on certain formulations.

1487.   In the weeks leading up to the Taro price increase on Clomipramine HCL, Aprahamian of Taro spoke several times with both CW-3 at Sandoz and M.A., a national account manager at Mylan. In fact, on several occasions during this time period, Aprahamian hung up the phone with one competitor and immediately called the next. At the same time, CW-4 of Sandoz was also speaking with D.S., a senior sales and national account executive at Taro. During these conversations,

Defendants Sandoz and Mylan and Co-conspirator Taro agreed to raise the price of Clomipramine HCL. Certain of these phone calls are detailed in the table below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 4/2/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:06:00 |
| 4/2/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:06:00 |
| 4/4/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 0:15:00 |
| 4/4/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:02:00 |
| 4/4/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:06:00 |
| 4/9/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:07:00 |
| 4/9/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:00:06 |
| 4/15/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:18:00 |
| 4/15/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:01:00 |
| 4/15/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:09:00 |
| 4/16/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 0:01:00 |
| 4/16/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:11:00 |
| 4/17/2013 | Voice | D.S. (Taro) | Outgoing | CW-4 (Sandoz) | 0:12:00 |
| 4/17/2013 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 0:02:00 |
| 4/17/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:04:00 |
| 4/19/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:13:00 |
| 4/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 4/19/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 0:01:00 |
| 4/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:09:00 |
| 4/22/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | M.A. (Mylan) | 0:04:00 |
| 4/24/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 4/24/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:05:00 |
| 4/25/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 0:01:00 |
| 4/26/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:08:00 |
| 4/30/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:14:00 |
| 4/30/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:02:00 |

1488.  CW-3 of Sandoz also took contemporaneous notes of some of his conversations with competitors. For example, after speaking with Aprahamian of Taro twice on April 30, 2013, CW-3 wrote in his Notebook (i.e., the document CW-1 later termed the "Diary of Collusion") that Clomipramine HCL was one of the products that Taro planned to increase on May 1st.



1489.  Indeed, there are notations in CW-3's Notebook that demonstrate that he began communicating with Aprahamian about Taro's May 1 increase as early as April 2, 2013.

1490.  As part of the agreement to raise prices and not poach each other's customers on Clomipramine HCL, Defendant Sandoz consistently refused to bid for Taro's customers after Taro raised its price. For example, on April 30, 2013, Publix emailed Sandoz stating that it had received a price increase letter from Taro regarding several Sandoz overlap products, including Clomipramine HCL, and asked whether Sandoz wanted to bid for the business. Kellum emailed CW-4 stating "I'm not inclined to do anything here as these may be opportunities for us. We can blame supply if these are in fact opps for us." CW-4 replied, "Agreed! Especially the opportunities for us part!"

1491.  Taro did agree to concede one customer to Sandoz so that the competitor could achieve its fair share of the market. On May 1, 2013, Rite Aid emailed Sandoz asking for a bid on Clomipramine HCL. Kellum responded: "I want to raise price and perhaps pick up share here if possible. [CW-4] try to keep Rite Aid warm and let them know we are evaluating but need to assess supply etc……"

1492.  The next day, on May 2, 2013, Aprahamian of Taro called CW-3 at Sandoz and they spoke for five (5) minutes. CW-3 hung up the phone and then immediately called Kellum. The two spoke for eight (8) minutes. First thing the next morning, CW-3 called Aprahamian back and they spoke for another five (5) minutes. Within a half hour, CW-3 again contacted Kellum and spoke for two (2) minutes. Later that day, CW-4 of Sandoz emailed Kellum regarding an upcoming call with Rite Aid stating: "[w]hen we speak to the clomipramine – let's reiterate we need to keep it on the DL from taro as long as possible.….... like we don't already know the cat's out of the bag."

1493.  Ultimately, Sandoz was awarded the Clomipramine HCL business at Rite Aid. When Rite Aid notified Taro, Aprahamian forwarded the email to Perfetto, Chief Commercial Officer at Taro, stating "[a]s expected Rite Aid moving Clomipramine."

1494.   Mylan was the next to increase price on Clomipramine HCL. On May 16, 2013, Mylan increased to the same WAC per unit cost as Taro. In the days leading up to the Mylan price increase, all three competitors were in contact with each other to coordinate efforts, with at least sixteens calls among themselves.

1495.   On July 3, 2013, HEB Pharmacy informed Taro that Mylan was on back order for Clomipramine HCL and asked Taro to bid for the business. Aprahamian responded that he was "[n]ot inclined to take on new business. Wholesalers have product, let them pull from there temporarily and we can certainly review if shortage persists. Don't want to over react to this product. Not sure how long Mylan is out."

1496.   On July 16, 2013, CW-4 of Sandoz sent the July 2013 Email identifying Clomipramine HCL as a Mylan price increase product. By this time, Sandoz knew that Mylan had increased its price on this product.

1497.   On July 20, 2013, Taro received a "Watch List" notification that Sandoz was increasing price on Clomipramine HCL. Aprahamian forwarded the notice to Perfetto stating: "FYI, Sandoz is in the market (and adjusted price to match ours) now with product as expected. Don't want to alert the reps as they could overreact. They did take Rite Aid as you know. Will see what happens from here."

1498.   Two days later, Sandoz increased its WAC pricing to match the per unit cost of Taro and Mylan.

1499.   On August 5, 2013, Walgreens, a Mylan customer, emailed Sandoz and requested a bid on Clomipramine HCL. S.G., a national account executive at Sandoz, sent an internal email asking "[s]hould we consider a 25% share of their business?" Kellum responded negatively, based on the agreement in place with Mylan, stating: "[t]hat is tempting but I worry very disruptive." On August 6, 2013, Nesta of Mylan called CW-4 at Sandoz twice. Both calls lasted less than a minute (likely

voicemails). The next day, on August 7, 2013, S.G. replied to Kellum's email, stating: "[b]ased upon your concerns, I will kill this unless I hear otherwise from you."

1500.   In October 2013, CW-4 and Nesta spoke by phone several times. After this series of calls, during the morning of October 15, 2013, CW-4 of Sandoz called Kellum.

1501.   The call lasted one minute. Approximately one half hour later, Kellum emailed McKesson and asked if Sandoz could submit a bid for Clomipramine HCL.

1502.   On October 23, 2013, Sandoz submitted a bid to McKesson and the customer responded that a reduction was needed to bring the pricing in line with their current supplier, Taro. CW-1 was surprised and forwarded the request to CW-4, copying Kellum, stating: "I thought we were taking Mckessons Clomipramine from Mylan? Per below it appears that they have Taro on the 90s." CW-4 responded, "Hey, I'm only as good as my intel . . . which should have been good."

1503.   In December 2013, Sandoz received an inquiry from a Bloomberg reporter who questioned the propriety of the large increases that Sandoz had taken in recent months on a whole host of drugs, including Clomipramine HCL and several other drugs at issue in this Complaint. After several conversations with antitrust counsel, Kellum prepared the following response to Bloomberg with regard to Clomipramine HCL:

Here are the details on our price increase for Clomipramine.

1) On July 22, 2013 We raised WAC by the following %'s
   25mg    2,778%
   50m     2,325%
   75mg    1,778%

2)  We were not the first to raise the price but rather followed Mylan and Taro when we learned they had taken a price increase which we first learned from the pricing services we subscribe to "Analysource" (First Databank) and Prospectorrx (Gold Standard).

3)  We had a very small market share  (1%) and have since gained ~15% market share Rite Aid and Mckesson by providing lower prices than their incumbent suppliers (Taro and Mylan/Taro).

1504.  As is clear from the above allegations, Kellum's statement was a lie. In reality, Sandoz had raised its prices after coordinating the increases with Taro and Mylan in advance and stayed true to its commitments to keep those prices high.

e)  <u>Tizanidine</u>

1505.  Tizanidine, also known by the brand name Zanaflex, is used to treat muscle spasticity due to spinal cord injury or multiple sclerosis.

1506.  As of May 2013, Defendants Sandoz, Mylan, and Dr. Reddy's were in the market for Tizanidine. Dr. Reddy's led the price increase on this product on May 13, 2013, increasing its WAC price and raising contract pricing tenfold. At that time, Dr. Reddy's was the market leader with 59 percent market share, while Mylan had 24 percent, and Sandoz had 17 percent.

1507.  Tizanidine was a drug that had been on the market for many years and whose price had eroded as many competitors entered and exited the market depending on the profitability of the drug. As Dr. Reddy's explained in an internal presentation, "Price needs to be adjusted to incentivize current manufacturers to stay in this product" and stated that Dr. Reddy's assumes "Mylan and Sandoz are responsible players, and they may not be able to pick up the large volumes we currently service."

1508.  Sandoz was thrilled when it learned that Dr. Reddy's had increased its price on Tizanidine. For example, on May 10, 2013, S.G., a national account executive at Sandoz, sent an internal email stating that "Giant Eagle just let me know that Dr. Reddy just took a price increase on Tizanidine! Pricing on the 2 & 4mg 150ct went from $4.50 to $45.00. . . . We should secure confirmation but if this is true it would be very positive …." Kellum responded, "Wow! Thank you." Kellum then quickly sent out a directive to the team to "[p]lease put the product on strict allocation to forecast. Pricing Team - no new offers."

313

1509.   On May 13, 2013, Dr. Reddy's published its new WAC pricing for Tizanidine. That same day, Nesta of Mylan called CW-4 at Sandoz, and they spoke for 4 minutes. Two days later, CW-1 of Sandoz sent an internal email to Kellum regarding "Tizanidine," stating "[l]et's discuss."

1510.   On May 24, 2013, Sandoz followed and matched Dr. Reddy's WAC pricing on several formulations, and even exceeded Dr. Reddy's pricing on one formulation.

1511.   Sandoz's WAC increases were significant, ranging from 248 to 344 percent, depending on the formulation. In the days leading up to the Sandoz increase, Nesta of Mylan exchanged phone calls with both CW-4 of Sandoz and J.A., a national account executive at Dr. Reddy's, to coordinate the price increase regarding Tizanidine. Notably, after this, Nesta would not speak with J.A. again until three months later in August 2013.

1512.   On May 29, 2013, customer Omnicare emailed Sandoz and asked whether it wanted to submit a bid for Tizanidine. CW-3 of Sandoz forwarded the request internally to CW1 and Kellum, asking "Are we considering additional Tizanidine market share? I'm assuming are [sic] intent is not to be disruptive at this time." A few minutes later, Nesta called CW-4 at Sandoz, and they spoke for nearly thirteen (13) minutes. Later that day, CW- 1 replied to CW-3's email stating, "We will sit tight for now." CW-3 then responded to Omnicare, stating that "Although we are not in a back order situation we cannot assume additional usage at this time. If this were to change I will let you know."

1513.   On June 14, 2013, Anda, a wholesale customer, emailed J.A. of Dr. Reddy's, asking "Did mylan follow your increase?" J.A. responded, "We've heard they did." J.A. had learned of Mylan's intent to follow the price increase through his prior communications with Nesta. However, Mylan had not actually raised its price on Tizanidine at the time of the inquiry and would not do so until July 2, 2013.

1514.   On June 26, 2013, Meijer, a supermarket chain customer, emailed Dr. Reddy's requesting a bid for Tizanidine. J.A. forwarded the request to N.M., a marketing executive at

Dr. Reddy's, stating: "I'm assuming they got a price increase." N.M. responded: "I think, given the market situation and us leading the price adjustment, I think, we should not go behind additional market share since it will erode the market even further." J.A. replied, "Yeah, I was just sending it as an FYI, no intention to bid." A few weeks later, Meijer forwarded the same request to Sandoz. Sandoz's response was similar: "We cannot supply unfortunately."

e.  "Quality Competitor" Rankings Relate to Price Increases, But Even "Low Quality" Competitors Participate in Overarching Conspiracy

1515.  As a further demonstration that the fair share understanding was universally accepted and understood in the generic pharmaceutical industry, even companies that Patel and Teva referred to as "low quality competitors," because they were not viewed as strong leaders or followers for price increases, consistently complied with the principles of "fair share" and "playing nice in the sandbox."

i.  Example: Camber and Kon Ostaficiuk

1516.  When Patel first created the quality of competitor rankings in early May 2013, she gave Camber Pharmaceuticals a ranking of -2. When Patel revised those rankings one year later in May 2014, Camber's ranking did not change. It remained one of the lowest ranked of all of Teva's competitors.

1517.  Nonetheless, Camber adhered to the fair share understanding, and consistently applied those rules in dealing with its competitors.

1518.  This was evident when, in September 2014, Camber entered the market for two different drugs that overlapped with Teva.

1519.  One of those drugs was Raloxifene Hydrochloride Tablets ("Raloxifene"), also known by the brand name Evista, a drug used in the treatment of osteoporosis in postmenopausal women.

1520.  Teva had begun marketing Raloxifene in March of that year. Actavis had received approval to begin marketing Raloxifene in 2014 as well but had not yet entered by September 2014.

315

1521.   The other drug was a generic form of Lamivudine/Zidovudine, a combination medication also known by the brand name Combivir. Generic Combivir is used in the treatment of human immunodeficiency virus (HIV). Camber had received approval to market a generic form of Combivir in February 2014, but as of September 2014 was still in the process of entering the market. Already in the market were competitors Teva, Aurobindo, and Lupin. As discussed more fully above, Defendants Teva, Lupin, and Aurobindo agreed to divvy up the generic Combivir market in 2012 when Teva was losing exclusivity on that drug.

1522.   As the anticipated product launches for Raloxifene approached, the new entrants discussed an allocation strategy with Teva to ensure they each received their fair share of the market. On September 9, 2014, Rekenthaler had a twenty-six (26) minute phone call with A.B., a senior sales and marketing executive at Actavis. A short time later, a Teva executive told colleagues that she had "just heard Camber and Actavis expect to launch 9/24."

1523.   Teva's discussions with Actavis escalated over the coming week. On September 10, Rekenthaler exchanged two calls with Falkin of Actavis, lasting fifteen (15) minutes and one (1) minute, respectively. On September 11, the men talked for ten (10) more minutes. On September 16, Rekenthaler spoke by phone a total of six (6) times with different Actavis personnel, including one call with A.B. lasting thirty-four (34) minutes.

1524.   The following morning, in response to an inquiry regarding whether Teva intended to retain a major customer's Raloxifene business, Green of Teva replied in the affirmative. Rekenthaler then shared the information he had gathered through his communications with competitors: "I know Actavis will be late. Camber is talking but their [sic] being somewhat unclear as well. I'll know more about them after my trip this week." That same day, on September 17, 2014, Camber sent an offer for Raloxifene to a large Teva customer, Econdisc.

1525.   Rekenthaler and Kon Ostaficiuk, the President of Camber Pharmaceuticals, spent the next three days playing golf during the day and socializing at night at an industry outing in Kentucky sponsored by a packaging vendor.

1526.   On September 21, 2014, Ostaficiuk called Rekenthaler and the two spoke for two (2) minutes. The next day, Rekenthaler initiated a series of four (4) phone calls with Ostaficiuk. The two spoke for a total of thirty (30) minutes that day. Notably, these are the first identified phone calls ever between the two competitors. As a result, Camber sent a revised offer to its potential customer that same afternoon, containing modified prices for Raloxifene.

1527.   1537.   On September 24, Patel discussed a Raloxifene allocation strategy with her Teva colleagues in light of Camber's offer to Teva's customer Econdisc. She emphasized Camber's expressed commitment to the overarching conspiracy among the competitors and conveyed information she obtained from Rekenthaler during his conversations with Ostaficiuk, stating: "Camber indicated that they are targeting Econdisc and a small retailer … and then they would be 'done.'"

1528.   As a part of this discussion, Green considered whether Teva should just concede Econdisc to Camber and seek to recover that market share with another customer. At 9:07am that morning, Patel informed her supervisor Green and others at Teva that Rekenthaler planned to discuss the matter with Camber. Indeed, at 9:28am that morning, Rekenthaler called Ostaficiuk, and the two spoke for two (2) minutes. They spoke two more times that day, including one call that lasted eight (8) minutes.

1529.   Some of these calls also related to Camber's entry into the market for generic Combivir. Teva and Lupin were already in the market for generic Combivir, and Ostaficiuk was engaging in contemporaneous communications with Rekenthaler of Teva and Berthold of Lupin to negotiate Camber's entry into that market.

1530.   On that same day, Berthold also spoke with P.M., a senior operations executive at Aurobindo, for more than eighteen (18) minutes, to close the loop on the generic Combivir communications.

1531.   On September 25, after discussing with his colleagues which customers Teva should concede in order to give Camber its fair share of the Raloxifene market, and armed with the information Rekenthaler had gathered from Camber's President, Green concluded: "Okay, we will concede additional smaller customer challenges (particularly distributors) since they are not going to target One Stop." Rekenthaler and Ostaficiuk spoke again twice that day.

1532.   That evening, a Camber executive instructed a colleague to gather market intelligence on possible additional customers for Camber's new Raloxifene product but stressed that the company would not bid on any additional Teva accounts "until we know how we do with Econ[disc]."

1533.   On Friday, September 26, 2014, Camber publicly announced that it was launching Raloxifene, the generic version of Evista. Rekenthaler called Ostaficiuk that day, for a short one (1) minute call.

1534.   From those telephone calls, Rekenthaler expressed to Ostaficiuk that Teva did not want Camber challenging for any more of its customers, on Raloxifene or generic Combivir. As a result of this communication, on Monday, September 29, 2014, Ostaficiuk emailed his colleagues at Camber, saying "We do not offer anything to any Teva Customers.. . . We do not want to upset them more!"

1535.   A.R., a senior sales executive at Camber, replied: "We have not made any offers to any Teva Raloxifene accounts since we received the Econ award. Both Sales and Contracts are aware, & requesting incumbent detail for all offers, if Teva, no offer." A.R. also added that "We are also not seeking any Lupin business on Lamo/Zidovudine [aka generic Combivir]." Ostaficiuk replied: "Thank you. We don't want to antagonize either of them and start a war."

1536.   About a week later, on October 7, 2014, a large Teva customer informed a Teva sales representative that Camber had made an unsolicited bid for its Raloxifene business. J.P., a Director of National Accounts at Teva, sent an email to certain employees at Teva, including Rekenthaler, notifying them of her conversation with the customer, and expressing surprise given the agreement Teva had previously reached with Camber: "I thought they were done after securing Econdisc?" Based on his prior conversations with Ostaficiuk, Rekenthaler doubted that Camber made an offer to another Teva customer, stating: "You're positive they sent them an offer?"

1537.   J.P. of Teva "relayed 'the message'" to the customer that "the market should be stable at this point" and Teva would be surprised if Camber had intended to make an offer to the customer. After further discussion with the customer, Teva staff learned that it was a misunderstanding. Camber never actually made the offer but had instead complied with its agreement with Teva.

1538.   The fair share agreement continued to govern as usual until mid-December 2014, when Camber learned of supply problems at Teva on Raloxifene. A Camber employee described the prospect of Teva being on backorder for this drug as a "Game changer." Expressing her understanding of the rules of the conspiracy, she pointed out: "Fair share only applies when there is not supply constraints." Ostaficiuk responded optimistically, but cautiously: "Good luck guys but go fishing and gather information before we commit"

f.    Teva Profitability Increases Dramatically as a Result of Price Increases

1539.   As discussed more fully above, from July 3, 2013 through January 28, 2015, Teva conspired with its competitors to raise prices on at least 85 different drugs. The impact of these price increases on Teva's profitability was dramatic.

1540.   After these price increases, on July 30, 2015 Teva reported strong results and raised its guidance for the full year 2015. Among other things: (1) net income was up 15 percent compared to the prior year; (2) operating income was up 16 percent compared to the prior year; and (3) cash flow

from operations was up 41 percent compared to the prior year. Teva reported a gross profit margin of 62.8 percent, which was up from 58.1 percent the prior year. Teva's stock prices also soared. By July 2015, Teva's stock price was trading at an all-time high. These significant results were obtained largely as a result of the anticompetitive conduct detailed herein.

g.    Teva and its Executives Knowingly Violated the Antitrust Laws

1541.   Teva was aware of the antitrust laws and paid them lip service in its Corporate Code of Conduct. But high-level executives at Teva were aware that those laws were being violated systematically and egregiously, and never instructed Teva employees to stop or to rescind the agreements that Teva had reached with its competitors.

1542.   For example, when Patel started at Teva in late-April 2013, she immediately began ranking Teva's competitors by their "quality." "Quality" was nothing more than a euphemism for "good co-conspirator," and it was well known internally at Teva that Patel was identifying price increase candidates based on who Teva's competitors were for those drugs, and whether she or others at Teva had an understanding in place. Indeed, Patel already had a short list of price increase candidates in place on the day she started at Teva, which was based at least in part on conversations she had already been having with Teva's competitors before she started, including Ara Aprahamian at Taro.

1543.   As Patel was starting to create her ranking of quality competitors and identify candidates for price increases, she sent her very first iteration of the quality competitor ranking to her supervisor Green on May 1, 2013. That ranking included, within the category of "Strong Leader/Follower," the following competitors: Mylan, Actavis, Sandoz, Glenmark, Taro, and Lupin. The preliminary list of price increase candidates also included the formula that Patel would use to identify price increase candidates using the quality of competitor scores.

1544.   With Green's approval of her methodology for identifying price increase candidates, Patel continued communicating with competitors and agreeing to price increases. She also routinely provided Green with intelligence that she had received from her communications with competitors. For example, when Patel sent her very first formal "PI Candidates" spreadsheet to Green on May 24, 2013, she identified that the drug Nabumetone was a price increase candidate because, among other things, "Sandoz [was] also bidding high." For the drug Adapalene Gel, Patel noted that there were "[r]umors of a Taro increase" - even though Taro had not yet increased its prices for Adapalene Gel. Patel had obtained this competitively sensitive information directly from her communications with competitors.

1545.   Green immediately forwarded that information to Maureen Cavanaugh, the Senior Vice President of Sales at Teva, who approved of the price increases based on the reasoning that Patel provided for each drug. As discussed more fully above, Teva raised prices on those drugs (and others) on July 3, 2013.

1546.   Cavanaugh was well aware that Patel was communicating with competitors about price increases, and making recommendations based on those communications, because Patel told her so directly. For example, during a 2013 meeting of Teva sales and pricing personnel where Cavanaugh was present, Patel was discussing her communications with certain competitors about price increases when Cavanaugh smiled, put her hands over her ears, and pretended that she could not hear what was being said. Not once, however, did Cavanaugh ever tell Patel or anyone else at Teva to stop conspiring with Teva's competitors or rescind the agreements that had been reached.

1547.   Patel also spoke regularly to both Rekenthaler and Green about each other's communications with competitors. Patel was aware that both Rekenthaler and Green were communicating with competitors, sometimes at her direction. Green and Rekenthaler, in turn, were

also both aware that Patel was communicating with competitors and implementing price increases based on those communications.

1548.   Rekenthaler, the Vice President of Sales at Teva, was aware that communicating with competitors about pricing and market allocation was illegal and took steps to avoid any evidence of his wrongdoing. For example, as discussed more fully above, on July 15, 2013 CW-2 of Sandoz called Rekenthaler at Teva and left a message.

1549.   Rekenthaler called CW-2 back immediately and they had a three (3) minute conversation during which CW-2 asked Rekenthaler to provide him with a full, comprehensive list of all drugs that Teva had recently increased pricing on-not just those drugs where Teva overlapped with Sandoz. Rekenthaler complied. Understanding, however, that it was improper to share competitively sensitive pricing information with a competitor, and in an effort to conceal such conduct, Rekenthaler first sent the Teva price increase list from his work email account to a personal email account, then forwarded the list from his personal email account to CW-2's personal email account.

### E.    The Taro Sub-Conspiracy

1550.   *In Connecticut, et al. v. Sandoz, Inc., et al.*, Vogel No. 20-CV-3539-CMR (E.D. Pa.), the States filed suit against Sandoz, Actavis, Amneal, Aprahamian, Aurobindo, Bausch, Blashinsky, Boothe, Fougera, Glenmark, Grauso, Greenstone, G&W, Kaczmarek, Kellum, Lannett, Lupin, Mallinckrodt, Mylan, Orlofski, Perfetto, Perrigo, Pfizer, Sun, Taro, Teligent, Vogel-Baylor, Wesolowski, and Wockhardt. That suit primarily focused on the effect of the defendants' anticompetitive market allocation, bid rigging, and price fixing in the area of generic topical products, but also utilized the additional discovery and investigation the States had done to identify even more generic drugs that had been the subject of the defendants' illegal agreements. The complaint also added significant detail about how the defendants' profits rose as a result of their anticompetitive behavior and how the behavior slowed dramatically after the government began investigating the

defendants. The complaint added at least 80 additional generic drugs[26] to the overarching conspiracy identified in the prior two Attorney General complaints.

### 1.    The "Fair Share" Conspiracy in Topical Generics

1551.   Nowhere was the "fair share" understanding underlying Defendants' overarching conspiracy more pronounced than with regard to the sale of generic topical products, where the competition is limited and the product overlap extensive. Indeed, companies recognized that reality and celebrated the fact that they operated in this segment of the industry.

1552.   For example, Erika Vogel-Baylor, a senior sales and marketing executive at Defendant G&W, remarked in an internal email from May 2013, "[w]e remain very upbeat to be playing in the topical and suppository market where there continues to be limited to no competition."

1553.   Although manufacturers of generic topical products have been colluding on price increases since at least 2009, the size and frequency of those increases grew exponentially in 2013 and 2014. During that time period, the prices of hundreds of generic drugs—including many at issue in this Complaint—skyrocketed without explanation, sparking outrage from politicians, payers, and

---

[26] Acetazolamide Tablets, Adapalene Cream, Alclometasone Dipropionate Cream, Alclometasone Dipropionate Ointment, Ammonium Lactate Cream, Ammonium Lactate Lotion, Betamethasone Dipropionate Cream, Betamethasone Dipropionate Lotion, Betamethasone Valerate Cream, Betamethasone Valerate Lotion, Betamethasone Valerate Ointment, Bromocriptine Mesylate Tablets, Calcipotriene Betamethasone Dipropionate Ointment, Calcipotriene Solution, Carbamazepine ER Tablets, Cefpodoxime Proxetil Oral Suspension, Cefpodoxime Proxetil Tablets, Ciclopirox Cream, Ciclopirox Shampoo, Ciclopirox Solution, Clindamycin Phosphate Cream, Clindamycin Phosphate Gel, Clindamycin Phosphate Lotion, Clindamycin Phosphate Solution, Clobetasol Propionate Cream, Clobetasol Propionate Emollient Cream, Clobetasol Propionate Gel, Clobetasol Propionate Ointment, Clobetasol Propionate Solution, Clotrimazole Cream, Clotrimazole Betamethasone Dipropionate Cream, Clotrimazole Betamethasone Dipropionate Lotion, Desonide Cream, Desonide Lotion, Desonide Ointment, Desoximetasone Ointment, Econazole Nitrate Cream, Eplerenone Tablets, Erythromycin Base/Ethyl Alcohol Solution, Ethambutol HCL Tablets, Fluocinolone Acetonide Cream, Fluocinolone Acetonide Ointment, Fluocinonide .1% Cream, Fluocinonide Gel, Fluocinonide Ointment, Fluocinonide Solution, Fluticasone Propionate Lotion, Griseofulvin Microsize Tablets, Halobetasol Propionate Cream, Halobetasol Propionate Ointment, Hydrocortisone Acetate Suppositories, Hydrocortisone Valerate Cream, Imiquimod Cream, Ketoconazole Cream, Latanoprost Drops, Lidocaine Ointment, Methazolamide Tablets, Methylphenidate HCL Tablets, Methylphenidate HCL ER Tablets, Metronidazole Cream, Metronidazole .75% Gel, Metronidazole 1% Gel, Metronidazole Lotion, Mometasone Furoate Cream, Mometasone Furoate Ointment, Mometasone Furoate Solution, Nafcillin Sodium Injectable Vials, Nystatin Ointment, Nystatin Triamcinolone Cream, Nystatin Triamcinolone Ointment, Oxacillin Sodium Injectable Vials, Phenytoin Sodium ER Capsules, Pioglitazone HCL Metformin HCL Tablets, Prochlorperazine Maleate Suppositories, Promethazine HCL Suppositories, Tacrolimus Ointment, Terconazole Cream, Triamcinolone Acetonide Cream, Triamcinolone Acetonide Ointment, and Triamcinolone Acetonide Paste

consumers across the country whose costs have doubled, tripled, or even increased by 1,000 percent or more. Generic drug manufacturers argued publicly that the significant price increases were due to a myriad of lawful factors, such as industry consolidation, FDA-mandated plant closures, or elimination of unprofitable generic drug product lines.

1554.   However, these reasons were far from the truth. In reality, there were several structural and personnel changes among generic topical manufacturers in late 2012 and early 2013 that fostered and facilitated collusion in that segment of the industry. These changes increased opportunities for coordination between competitors—and coordinate they did.

1555.   First, in July 2012, Defendant Sandoz finalized its purchase of Fougera, a niche dermatology manufacturer, making Sandoz a much more prominent manufacturer of generic topical products. Sandoz publicly touted that the purchase positioned it "as the new #1 in generic dermatology medicines both globally and in the U.S."

1556.   As a result of the acquisition, all of Fougera's sales executives lost their jobs, except for one executive who is now cooperating with the State Attorneys General (referred to herein as CW-3). Because of Sandoz's size, and the fact that it was an active participant in many different product markets, many competitors reached out to CW-3 when they learned he had transitioned to Sandoz because they viewed it as a strategic opportunity to collude on overlapping products.

1557.   Over the ensuing years, CW-3 leveraged these competitive relationships to allocate markets and increase prices, thereby improving his standing with Sandoz management. His competitor contacts included Blashinsky, Ara Aprahamian, and Walter Kaczmarek, but there were many others. As noted previously, CW-3 took copious, contemporaneous notes of these conversations in a two-volume notebook ("Notebook"), which one of his colleagues, CW-1, later termed the "Diary of Collusion."

1558.  Second, in the months following the Fougera acquisition, three key Actavis executives—Douglas Boothe, Michael Perfetto, and Aprahamian—left Actavis to assume senior-level positions at competitor companies that were also prominent manufacturers of topical products. Boothe became an executive at Defendant Perrigo, and Perfetto and Aprahamian became executives at Co-conspirator Taro. These former colleagues turned competitors would use their longstanding relationships and new high-level positions as an opportunity to collude with their key competitors on overlap products.

### 2.  Taro's Role in the Topical Generic Drug Conspiracy

1559.  Perfetto and Aprahamian, in particular, wasted no time working together to implement changes designed to improve Taro's financial bottom line and firmly position the company as a price increase leader. Although Taro had been successful in implementing price increases in the past, the increases taken by Taro in 2013 and 2014 would be much more significant. These increases caught the attention of other generic drug manufacturers across the industry. Indeed, one sales executive at a generic manufacturer not named in this Complaint remarked in an internal email that "Taro just continues to amaze me. How are we progressing with identifying responsible market areas and options. Is there a next derm?" To that, his colleague responded "[t]his space continues to be appealing as the number of players are limited and the frequent, significant price increases drive the business."

1560.  For example, in June 2014, Taro initiated significant price increases on more than a dozen different drug products. As a result of the June 2014 increases, Credit Suisse analysts increased their price target for Taro and its parent company, Co-conspirator Sun Pharmaceuticals, from $85 to $150 per share. As justification for the increase, Credit Suisse emphasized that even with multiple price increases by Taro, competitors did not attempt to compete on price: "there has been no roll-backs of prices even once so far in the last three years."

1561.   Taro's success in implementing price increases depended, in large part, on the strength of the ongoing collusive relationships that Perfetto and Aprahamian had fostered with their contacts at competitor companies, including manufacturers of topical products and beyond. These included Boothe, Blashinsky, Kurt Orlofski, and Vogel-Baylor, but there were others. Numerous examples of how this collusion unfolded with respect to specific products will be discussed in detail below.

1562.   The price increases taken by generic topical manufacturers during this time period resulted in the accrual of significant profits. Indeed, between 2008 and 2016, Defendant Perrigo and Co-conspirator Taro both saw their profits from the sale of generic topical products increase by over 1300 percent. The other corporate Defendants profited handsomely from this conduct as well.

1563.   The Defendants spoke with each other, when needed, hundreds or even thousands of times to ensure adherence to the overarching conspiracy. Because it would be too voluminous to list the total number of calls among all the Defendants, the following graphic shows, by way of example, the interlocking web of communications and relationships between executives at several of the corporate Defendants and their key competitors. Each line in the graphic demonstrates that at least one phone call or text message was sent between those executives (identified by their initials) while they were competitors. For many of these executives, there were hundreds of calls and texts with competitors, but the volume of those communications is not captured by this graphic.



1564.  As noted throughout this Complaint, the "rules of engagement" for the generic drug industry dictate that when two generic manufacturers enter the market at the same time, they generally expect that each competitor is entitled to approximately 50 percent of the market. When a third competitor enters, each competitor expects to obtain 33 percent share; when a fourth competitor enters, each expects 25 percent; and so on, as additional competitors enter the market.

1565.  Similarly, when a generic drug manufacturer is the first to enter a particular drug market on an exclusive basis it is commonly understood that that manufacturer is entitled to a little more than its proportional share of the market. Conversely, those generic manufacturers that enter later are typically entitled to a little less than their proportional share.

1566.  Defendants followed these "rules of engagement" in the generic topical markets.

1567.  For example, in April 2010, Defendant Perrigo was entering the Imiquimod Cream market where Defendant Fougera had been exclusive. D.K., a senior Fougera executive, sent an internal email stating that "Perrigo is satisfied with 35-40% share" and explained that "[i]f the market shares settle out at the current prices we are in a much better position than a higher share at a lower price." When another senior executive questioned why Perrigo would be satisfied with 35-40 percent

of the market, D.K. responded, "any further attempts to gain share would result in driving prices down (D&A up) and no one wins in that scenario."

1568.   Taro used these principles to guide its behavior when communicating with its competitors regarding specific drugs. One example involved Lidocaine Ointment, a product where Taro was entering the market as a third entrant. In an internal launch summary from April 2013, Taro described the "Current Market" as "Taro third entrant preceded by Sandoz (~55% share) and Hi-Tech (~45% share)" and stated that Taro had targeted 20-25 percent share and had achieved 26.3 percent share. Further, Taro had matched "WAC and AWP on gram to gram basis . . . with competitors," which it stated was "consistent with a traditional 3 player market." As was their typical practice, Taro executives spoke with their competitors—CW-3, a Sandoz senior sales executive, and E.B., a senior sales and marketing executive at Hi-Tech—in advance of Taro's entry to ensure that the company met its target market share through agreements to allocate specific customers.

1569.   This common goal was stated succinctly by Aprahamian, who advised the Taro Pricing Department in training documents from September and November 2013 that "[g]iving up share to new entrant (as warranted) shows responsibility and will save us in the long run" and "[d]on't rock the boat – [g]reedy hogs go to slaughter."

### 3.    Agreements Among All Topical Generic Drug Manufacturers Were Widespread

1570.   Defendant G&W had similar understandings with its key competitors, Taro and Perrigo. For instance, in February 2012, Vogel-Baylor exchanged emails with her supervisor, Orlofski, regarding responding to the annual McKesson One Stop RFP. Vogel-Baylor stated that she was waiting for McKesson "to confirm the incumbents so depending on who they are, we can decide to bid." Once she confirmed the incumbents, she conveyed that information to Orlofski who replied: "Please either don't bid or bid very high the Perrigo and Taro items. OK to bid the Mometasone Ointment aggressively [a Glenmark product]." As discussed in more detail below, shortly thereafter,

Vogel-Baylor would strike up a relationship with CW-5, a senior executive at Glenmark, and begin communicating and colluding with that company in earnest as well.

1571.  Further, in June 2014, Sandoz created a "Dermatology Fair Share Index" that was specifically designed to track Sandoz's market share with respect to dermatology products. As T.O., a Sandoz marketing executive, described in an internal email: "Wherever we have lower than fair share, the products are on the list. In general, we are not targeting Perrigo or Taro." Similarly, in November 2015, Sandoz compiled a spreadsheet containing various product opportunities, which contained comments demonstrating its agreements with certain competitors, such as: "So long as incumbent is not Taro" and "Avoid if Taro," or "Avoid if G&W."

1572.  It was also common for these manufacturers to communicate about, and collude on, multiple products at any given time, regardless of whether the competitors were currently in the market for those products. For example, in April 2013, T.P., a sales executive at Perrigo, and CW-3, a Sandoz senior sales executive, discussed nine (9) different products for which Perrigo had recently increased prices. CW-3 later conveyed that information to Kellum in an email stating: "As mentioned on the CommOps call earlier today, here are the products Perrigo has recently increased." Notably, this list included several products that Sandoz did not sell at that time, including Halobetasol Propionate Cream. As discussed in more detail below, Sandoz would re-enter that market a few months later, in December 2013, and match competitor pricing.

1573.  Similarly, in April 2013, Orlofski of G&W asked his colleague Vogel- Baylor to run a report listing "recent price increases on all Perrigo products." Vogel-Baylor responded: "I'm assuming you only want it for Perrigo products that we have in common? Or their entire product line?" Orlofski answered: "Their entire line actually."

1574.  Indeed, unlike their branded counterparts, generic drugs are commodities and generic manufacturers are constantly making decisions to enter new markets and leave, existing markets.

Often these decisions are made, at least in part, on who the competitors are and how strong the relationship is between the two companies. As one example, in July 2013, Sandoz was looking to implement a "Taro Strategy" that involved temporarily delisting ten (10) products on which it overlapped with Taro. This strategy would allow Taro to raise price on these products while Sandoz was out of the market, and then Sandoz could re-enter later at the higher price. One product included in this strategy was Econazole Nitrate Cream. As discussed more fully below, Sandoz exited the market in July 2013, Taro and Perrigo raised price in November 2014, and Sandoz re-entered in January 2016 at the higher price.

1575.   This interdependence between generic manufacturers is further demonstrated by the countless examples of generic manufacturers sharing sensitive information with competitors as a matter of course. The Plaintiff States have gathered evidence going back more than a decade of generic manufacturers routinely communicating and sharing information with each other about bids and pricing strategy.

1576.   This includes forwarding a bid package received from a customer to a competitor, either on his/her own initiative, at the request of a competitor, or by contacting a competitor to request that the competitor share that information.

1577.   Defendants and other generic drug manufacturers also share information among themselves regarding the terms of their contracts with customers, including pricing terms, price protection, and rebates. Defendants use this information to negotiate prices or terms that are more favorable to them, often to the ultimate detriment of payors and consumers. For example, in August 2010, CW-6, then a senior sales executive at Fougera, sent the following email regarding "WAC Increase Intel" to his supervisor, Kaczmarek:

```
From:                          ▮▮▮▮▮▮▮▮▮▮▮
Sent:                          Wednesday, August 04, 2010 7:05 PM
To:                            Walt Kaczmarek
Subject:                       WAC Increase Intel


Here is what others have agreed to:

Barr (when they existed) – had it for MCK, days unsure.
Breckenridge – CAH - 30 day credit or buy in.  MCK – 60 days credit or buy in.
Caraco –  Yes, 45 days credit.
Corepharma – did not sign agreement, but would have agreed to 30 days max.
G&W – Yes, 90 days credit on multi-source items. 30 days on exclusives.
Glenmark – Yes,  30 day buy-in.
Lupin – No to both CAH and MCK.
Perrigo – did not agree to any protection.
Teva – No.
West Ward – No.  All open PO's cancelled.
Zydus – Net company with CAH/MCK.  WAC increase not relevant.
```

1578.   Before sending this email, CW-6 had spoken that same day with his contacts at several of the competitors listed, including Grauso, then a senior sales executive at Defendant G&W, T.P., a sales executive at Defendant Perrigo, D.C., a sales executive at Defendant Glenmark, M.R., a sales executive at West-Ward Pharmaceuticals, and V.M., a sales executive at Core Pharma LLC.

1579.   Defendants and Co-conspirators understood that what they were doing was illegal and took steps to cover up evidence of the overarching conspiracy. For example, in May 2014, a large customer received a bid on Betamethasone Dipropionate Lotion and gave Taro an opportunity to bid to retain the business. A.L., a pricing executive at Taro, sent an internal email stating: "FS ok, will not protect." E.G., a Taro sales executive, responded, "explain FS [Fair Share]." Aprahamian replied: "No emails please. Phone call.   let's discuss."

1580.   To avoid creating a potentially incriminating paper trail, Kellum of Sandoz routinely admonished colleagues for putting information that was too blatant in emails, understanding that it could lead to significant legal exposure for both the company and the individuals involved. Similarly, handwritten notes from an internal Sandoz business review presentation from May 2017, after the

States' investigation was well underway, read: "Avoid Fair Share terminology on slides – underdeveloped or overdeveloped is better."

1581.   The concept of "fair share" and price increases went hand in hand. For example, and as discussed in more detail below, Defendant Sandoz's ongoing understandings with Defendant Perrigo and Co-conspirator Taro that they would follow each other's price increases was predicated on the agreement that the follower would not poach the leader's customers after the increase. Indeed, Aprahamian of Taro often spoke with CW-3 of Sandoz about coordinating price increases between the two companies. Almost invariably, he would conclude the conversations with phrases like "don't take my fucking customers," "don't take my business," or "don't be stupid."

> **4.** **The Taro Sub-Conspiracy Illegal Schemes**

> > a.     Generic Topical Products—An Overview

1582.   Topical products include any drug that is administered by means of contact, most often with an external body surface. Topical products come in a variety of dosage forms, including creams, gels, lotions, ointments, shampoos, and solutions. Although topical products are mostly dermatology-related, they can also be used to treat other conditions such as pain and allergies.

1583.   Topical products are a niche market segment within the generic pharmaceutical industry. Historically, there have been fewer generic manufacturers that have focused on selling topical products than "conventional" generic drugs such as oral solids (e.g., pills). This is because manufacturers of generic topical products typically face higher barriers to entry, including technical hurdles relating to proving bioequivalence, which must be shown through multiple clinical trials. Further, once a manufacturer obtains FDA approval, topical products often require higher levels of investment in manufacturing to produce the various dosage forms involved.

1584.   Since at least 2007, the top three manufacturers, by sales, of generic topical products have consistently been Defendants Perrigo and Fougera (now Sandoz) and Co-conspirator Taro.

1585.   Indeed, between 2007 and 2014, these three companies controlled approximately two-thirds of the topical market segment. Several other manufacturers make up the remaining third, including Actavis, Mylan, Teva, G&W, Glenmark and others, as discussed throughout this Complaint. The following graphic shows the market share breakdown on generic topical products for June 2007 through June 2012:

| Figure 15: Ranks have changed in the Derma generic market with Taro now at #1 | | | | | | |
|---|---|---|---|---|---|---|
| Value market share | Jun-07 | Jun-08 | Jun-09 | Jun-10 | Jun-11 | Jun-12 |
| Taro | 19% | 18% | 20% | 17% | 17% | 25% |
| Perrigo | 22% | 22% | 21% | 19% | 24% | 21% |
| Fougera | 26% | 24% | 22% | 23% | 23% | 16% |
| Actavis | 3% | 4% | 4% | 4% | 6% | 9% |
| Mylan | 0% | 0% | 0% | 7% | 5% | 4% |
| Teva | 7% | 6% | 6% | 5% | 5% | 3% |
| Novartis | 2% | 2% | 2% | 2% | 2% | 3% |
| Glenmark | 0% | 0% | 0% | 0% | 2% | 2% |
| G & W | 0% | 0% | 0% | 0% | 0% | 2% |
| Prasco | 0% | 0% | 1% | 1% | 2% | 1% |
| Spear Derm | 1% | 1% | 3% | 3% | 2% | 1% |
| Hi-Tech | 1% | 1% | 1% | 1% | 1% | 1% |
| Pfizer | 1% | 1% | 1% | 1% | 1% | 1% |
| Wockhardt | 4% | 3% | 2% | 2% | 1% | 1% |
| Others | 14% | 18% | 17% | 13% | 9% | 8% |
| Derma generic mkt ($mn) | 779 | 837 | 955 | 1,230 | 1,740 | 2,510 |
| Source: IMS Health, Credit Suisse | | | | | | |

1586.   The limited number of manufacturers of generic topical products has created an environment that is ripe for collusion. Many topical products have only two or three competitors, which increases the likelihood that any market allocation or price fixing agreement will succeed. In addition, sales and pricing executives at many of the prominent generic topical manufacturers are very familiar with their counterparts at competitor companies because of the extensive product overlap between them. This personal familiarity among sales executives has led to greater opportunities to collude—which those executives have taken advantage of by consistently communicating and agreeing with each other to limit competition, allocate customers, and significantly raise prices on dozens of generic topical products.

b.     The Early Days—Collusion from 2009 to Early 2012

i.     Key Relationships Among Generic Topical Manufacturers

1587.   The key manufacturers of generic topical products during this early time period—Fougera (and later Sandoz), Perrigo, Taro, and Actavis—had ongoing understandings going back many years not to poach each other's customers and to follow each other's price increases. These competitors met with each other regularly at trade shows and customer conferences, in addition to speaking frequently by phone, and specifically discussed and agreed on allocating customers and coordinating price increases on the products they had in common. The following section focuses on these relationships and provides illustrative examples of how these ongoing understandings manifested themselves with respect to specific products.

1)     Fougera/Perrigo/Taro

1588.   CW-6 was a senior sales executive at Fougera between October 2004 and August 2012 and a central player in the collusion taking place among generic topical manufacturers at that time. Prior to working at Fougera, CW-6 was a lead buyer in the generics group at Cardinal Health where he developed extensive contacts in the industry.

1589.   Upon moving to Fougera, CW-6 was instructed by his supervisor, Walter Kaczmarek, a senior Fougera executive, to reach out to his contacts at competitor companies to discuss market allocation, price increases, and other commercially sensitive topics. If CW-6 did not have a contact at a competitor, Kaczmarek directed him to pass messages to that competitor through his contacts that did. This practice—facilitating anticompetitive conduct through a third competitor—was pervasive throughout the industry.

1590.   During his tenure at Fougera, CW-6 frequently attended trade shows and customer conferences. At these events, he would regularly discuss competitively sensitive topics with his competitors. CW-6 was also a prolific communicator by phone and exchanged thousands of calls and

text messages with his competitors. After speaking with a competitor, CW-6 would often report the competitive intelligence back to his supervisor, Kaczmarek, and Fougera would use that information to make competitive decisions, including which customers to give up to a competitor or what pricing actions to take and when.

1591.    CW-6 had a particularly collusive relationship with T.P., a sales executive at Perrigo, dating back to at least 2010. CW-6 and T.P. were not social friends. If the two were communicating, it was to coordinate behavior on products where Fougera and Perrigo overlapped. CW-6 and T.P. regularly met at trade shows and customer conferences and discussed competitively sensitive topics. The goal of these conversations was always to keep prices as high as possible. CW-6 and T.P. also spoke often by phone. For example, between February 2010 and August 7, 2012, CW-6 and T.P. exchanged at least three hundred and two (302) phone calls.

1592.    CW-6 also had a collusive relationship with H.M., a sales executive at Taro, dating back to at least 2011. CW-6 spoke with H.M. in person at trade shows and customer conferences, as well as by phone. During these conversations, the competitors coordinated customer allocation and price increases on products where Fougera and Taro overlapped. Between January 2011 and August 2012, CW-6 and H.M. exchanged at least eighty-six (86) phone calls.

1593.    There were several products where all three companies—Fougera, Perrigo, and Taro— sold a particular drug. In these instances, CW-6 would facilitate the communications, passing messages from one competitor to the other to ensure the anticompetitive agreement was understood by all three competitors. This was necessary because T.P. and H.M. did not have an independent relationship and depended on CW-6 to serve as a conduit to effectuate their collusion on overlapping products.

1594.    During this early time period, T.P. and H.M. were acting at all times at the direction of, or with approval from, their superiors, including Wesolowski of Perrigo and Blashinsky of Taro.

2)    Actavis and Taro/Perrigo

1595.   Michael Perfetto, then a senior sales and marketing executive at Actavis, had a collusive relationship with Mitchell Blashinsky, then a senior marketing executive at Taro. Between January 2011 and May 2012, when Blashinsky moved to Defendant Glenmark, the competitors exchanged at least one hundred and twenty (120) phone calls.

1596.   Similarly, M.D., a sales executive at Actavis, had a collusive relationship with T.P. of Perrigo going back many years. The two discussed market allocation and coordinated price increases on products where Actavis and Perrigo overlapped. Between August 2011 and December 2013, the two competitors exchanged at least eighty-three (83) phone calls.

1597.   During this early time period, M.D. was acting at all times at the direction of, or with approval from, his superiors at Actavis, including Perfetto.

3)    Sandoz/Taro

1598.   CW-4 worked as a senior sales executive at Sandoz for many years, including during this early time period (between 2009 and early 2012). At Sandoz, CW-4 was evaluated based on her ability to acquire competitive intelligence. Competitive intelligence included information concerning product launches, customer alignment, price increases, and supply disruptions.

1599.   CW-4 obtained competitive intelligence from customers as well as competitors with whom she had relationships. CW-4 viewed providing this information as a way to demonstrate value to the company. CW-4 reported competitive intelligence to superiors, including Kellum and CW-1, both senior pricing executives at Sandoz. When CW-4 felt pressure from superiors to deliver useful information, she tended to engage in more anticompetitive conduct.

1600.   CW-4 had a longstanding relationship with D.S., a sales executive at Taro. CW-4 first met D.S. when he was a buyer at a large grocery chain. The two developed a friendly relationship, in addition to a professional one.

1601.   In 2009, shortly after D.S. joined Taro, he and CW-4 met in person at an industry event and had a high-level discussion about Taro's and Sandoz's philosophies with respect to market share and pricing. The two competitors agreed that both of their employers believed in price increases and maintaining higher pricing. D.S. explained that companies that compete on price to get more market share were bad for the market because they brought prices down. CW-4 agreed and the two discussed the importance of maintaining a fair share balance, not being greedy about market share, and following price increases on overlapping products.

1602.   After this conversation, CW-4 and D.S. were confident that they had a consistent understanding, and that neither Sandoz nor Taro would compete aggressively against the other. This conversation paved the way for them to work cooperatively in orchestrating Sandoz's and Taro's movements on several drugs in the coming years.

1603.   In addition to communicating frequently in-person, CW-4 and D.S. also spoke often by phone. Between January 2011 (which is as far back as the Plaintiff States have phone records) and October 2013 (when D.S. left Taro), the two exchanged at least seventy-three (73) phone calls.

1604.    During this early time period, CW-4 and D.S. were acting at all times at the direction of, or with approval from, their superiors including Kellum of Sandoz and Blashinsky of Taro.

1605.   The following sections will discuss specific examples of how the long- standing competitor relationships detailed above manifested themselves regarding particular products between 2009 and early 2012.

a)    Carbamazepine ER Tablets

1606.   Carbamazepine ER, also known by the brand name Tegretol XR, is a drug prescribed for the prevention and control of seizures, for the relief of nerve pain, and for the treatment of certain mental and mood disorders such as bipolar disorder and schizophrenia.

1607.   Shortly after their high-level conversation in 2009 about Taro's and Sandoz's respective views on competition and market-share, D.S. of Taro and CW-4 had the opportunity to put their understanding into practice as Taro and Sandoz both prepared to enter the market for Carbamazepine ER.

1608.   Taro received FDA approval in late March 2009 to enter the Carbamazepine ER market as the first-to-file generic. A few months later, in June 2009, Sandoz received approval to launch as the authorized generic (the "AG"). As the AG, Sandoz would not be required to wait until the end of Taro's 180-day exclusivity period to enter the market.

1609.   Not only was Carbamazepine ER a high-volume, lucrative branded product for Sandoz's parent company, Novartis, but Novartis had also given Sandoz late notice that it would be entering as the AG. As a result, Sandoz's sales and marketing executives felt a great deal of pressure to secure market share within a short time frame.

1610.   As the Taro launch grew close, R.T., a senior marketing executive at Sandoz, pressured CW-4 to obtain information from Taro about its impending launch. Confident that their recent conversation meant that D.S. would readily provide such information, CW-4 reached out to him.

1611.   During one in a series of phone calls between the two, D.S. informed CW-4 that Taro had sent offers to Walmart, Walgreens, and SUPERVALU. Consistent with "fair share" principles and the fact that Taro would be the first to enter the market, D.S. told CW-4 that Taro's goal was to secure 50–60 percent market share and that it would be pursuing other smaller customers as well. CW-4 understood from that conversation that Sandoz should not compete for the customers that D.S. had identified, and that by identifying those specific customers Sandoz would, in turn, know which customers it should target. As requested, CW-4 reported this information directly to R.T. at Sandoz.

1612.   Based on those conversations, Taro and Sandoz were able to enter the market with little competition, initially leaving generic pricing nearly as high as pricing for the branded drug.

1613.   After the initial launch, CW-4 and D.S. continued to discuss and share competitively sensitive information about Carbamazepine ER. For example, when Taro was delayed in launching the 100mg formulation, Novartis put pressure on R.T. and others at Sandoz to get information about Taro's launch. R.T., in turn, asked CW-4 to obtain the information.

1614.   After exchanging several text messages in January 2010, D.S. informed CW-4 that Taro would not be launching the 100mg formulation because Taro was having trouble filling orders for the other strengths and needed the raw material for those other strengths (which were more profitable for Taro).

1615.   Through 2011, Sandoz refused to challenge for Taro's customers with respect to Carbamazepine ER. For example, on January 5, 2011, CVS provided Sandoz with a list of product opportunities for Sandoz to bid on, including Carbamazepine ER. CW-2, then a senior sales executive at Sandoz, was hesitant, and asked his colleagues if there was any appetite to compete for the business. The purpose for pursuing CVS, he opined, would be "merely to pick off share where we may want some while providing CVS with a lower cost." He added: "Not sure that we want to do that."

1616.   M.M., a Sandoz marketing executive, responded that pursuing CVS was tempting given that Taro's market share was higher than Sandoz's, but supply issues created short-term obstacles. Further, the executive concluded that challenging for the business at CVS would "disrupt" the market and erode pricing. As a result, Sandoz declined to bid on the Carbamazepine XR business at CVS.

b)    Imiquimod Cream

1617.   Imiquimod Cream, also known by the brand names Aldara and Zyclara, is a topical medication used to treat actinic keratosis, or precancerous growths on the skin. Imiquimod Cream was a high-priced, large volume drug that provided a significant source of revenue for its

manufacturers. In 2012, the annual market for Imiquimod Cream in the United States exceeded $200 million.

1618.  On February 25, 2010, Fougera received FDA approval to market Imiquimod Cream. At that time, Fougera was the only generic manufacturer in the market and it used that as an opportunity to set a high price for the product.

1619.  Less than two months later, on April 13, 2010, Perrigo announced that it would be the AG for Imiquimod Cream. That same day, D.K., a senior Fougera executive, sent the following email to Kaczmarek, also a senior Fougera executive:

| From: | ▆▆▆▆▆▆ |
|---|---|
| Sent: | Tuesday, April 13, 2010 12:18 PM |
| To: | Walt Kaczmarek |
| Subject: | Re: New imiquimod pricing model |

I think its clear we need to keep:

1) Walgreens
2) CAH
3) McKesson

Let Perrigo have:

1) CVS
2) ABC
3) W or RA

1620.  Later that same day, Kaczmarek called CW-6, a senior sales executive at Fougera, and they spoke for nearly four (4) minutes. CW-6 hung up and immediately called T.P., a sales executive at Perrigo, and they spoke for nearly nine (9) minutes. When CW-6 hung up with T.P., he promptly called Kaczmarek back.

1621.  It is rare that the entry of a generic competitor would cause prices to actually increase, but it did so in this case. Three days later, on Friday April 16, 2010, in advance of Perrigo's entry into the market, Fougera increased its WAC pricing for Imiquimod Cream. The next business day, Monday April 19, 2010, Perrigo sent an internal email stating that "due to Fougera's price change on Friday, we are changing our AWP & WAC for Imiquimod." As a result of the increase, Perrigo's WAC pricing would end up even slightly higher than Fougera's.

1622.   That same day, John Wesolowski, a senior executive at Perrigo, called T.P. and they spoke for nearly six (6) minutes. This set off another rush of communications between T.P. of Perrigo and CW-6 of Fougera, with each of them concurrently reporting the results of those communications to their superiors, Wesolowski and Kaczmarek.

1623.   The following week, between April 24 and April 27, 2010, the NACDS held its annual meeting in Palm Beach, Florida. Several executives from Fougera and Perrigo were in attendance, including Kaczmarek, D.K., and CW-6 from Fougera and Wesolowski and S.K., senior executives from Perrigo.

1624.   Fougera and Perrigo executives were speaking about Perrigo's launch throughout the conference. On April 26, 2010, T.P. and CW-6 spoke by phone for seven (7) minutes. Immediately after that call, CW-6 hung up and called Kaczmarek, speaking for four (4) minutes.

1625.   Similarly, on April 27, 2010, D.K. emailed Kaczmarek while they were still at the NACDS meeting, stating that he needed "to find [S.K.] from Perrigo. Interested in what he has to say. I looked a[t] the roster and it reads like he is John [Wesolowski's] boss now and not BD."

1626.   On April 28, 2010, Perrigo officially entered the Imiquimod Cream market and published WAC pricing that was slightly higher than Fougera's. That same day, D.K. emailed Fougera executives with an update regarding his conversations at the NACDS meeting. With respect to Imiquimod Cream, D.K. stated, "[c]ertainly the number one topic for us. Importantly Perrigo is in full launch mode." D.K explained that Fougera gave up McKesson and ABC to Perrigo because "[w]e know we have to give up share in order to maintain price integrity." D.K. also noted that he was pleased that Perrigo has "respected our position at Walgreens which is the cornerstone to our strategy." CW-3, a sales executive at Fougera, expressed confusion that Fougera had lost ABC's business. Kaczmarek explained that "it was a market share play." CW-3 replied: "I understand. It's for the greater good."

1627.   On April 30, 2010, a senior Fougera executive, L.B., demanded an urgent explanation from D.K. as to why Fougera was willing to give up both McKesson and ABC. D.K. reminded L.B. that it was inevitable that Perrigo would take some of the market. D.K. also explained: "Had we chosen to fight Perrigo at McKesson to hold onto their business we would have set a new low in the market and Perrigo would then move on to another major account and achieve their share at a NEW lower price." D.K. stated that Perrigo's share would likely settle in the range of 30-40 percent "which is a positive as is the fact that Perrigo respected our position at Walgreens [which is] our number one priority."

1628.   Consistent with fair share principles and the prior discussions between the competitors, by April 30, 2010 Fougera had given up more than ten (10) of its Imiquimod customers to Perrigo.

1629.   On May 16, 2010, Fougera was preparing an internal presentation regarding Imiquimod Cream, which included a statement that "Perrigo is satisfied with 35-40% market share." While reviewing the presentation, L.B. challenged D.K. about the statement, asking "[w]hy should they [be satisfied]? Sorry for being so direct but isn't that a bit of wishful thinking of ours?" D.K. assured L.B. that "[o]ur assumptions on Perrigo share are driven from competitive intelligence at the field level. To answer your question as to why they would stop, any further attempts to gain share would result in driving prices down (D&A up) and no one wins in that scenario."

1630.   The next day, on May 17, 2010, CW-6 and T.P. exchanged at least six calls, including one lasting more than six (6) minutes, likely to confirm (again) the agreement in place between the two competitors.

1631.   Several months later, on September 8, 2010, CW-6 circulated a press release to the Fougera sales team announcing that Perrigo had received its own ANDA approval to market generic Imiquimod Cream. Previously, Perrigo had been selling the AG through a license with a branded

342

manufacturer. That same day, CW-6 called T.P. That call lasted less than a minute. T.P. called CW-6 back almost immediately, and they spoke for more than two (2) minutes.

1632.  On September 27, 2010, CW-6 gave a presentation to Fougera's parent company titled "Business Plan and Status Update" during which he noted that Fougera had given up Imiquimod share to Perrigo and that, with regard to the larger fair share understanding, Fougera is "continuing playing nice in the sand box with Perrigo and Taro." Later that year, in November 2010, CW-6 also noted in his monthly recap that "everyone [was] playing nice" in the Imiquimod market.

1633.  Fougera also continued to monitor the status of other competitors' plans to enter the Imiquimod market. For example, on February 7, 2011, a Glenmark employee called CW-6, and they spoke for four (4) minutes. Later that day, CW-6 sent an email to - mail to Kaczmarek and D.K. reporting that Glenmark was at least 18 months away from entering the Imiquimod market.

1634.  Although Fougera was fortunate that Glenmark had no near-term plans to enter the Imiquimod Cream market, another competitor-Sandoz-did receive FDA approval on February 28, 2011 to launch the product. That same day, CW-6 of Fougera and T.P. of Perrigo exchanged at least five (5) calls, including two calls lasting two (2) minutes each.

1635.  On March 1, 2011, one of Fougera's customers, NC Mutual, also emailed CW-3, a sales executive at Fougera, to tell him that Sandoz was launching Imiquimod. The NC Mutual employee further noted: "Here's to hoping they play smart on pricing ……" CW-3 promptly forwarded the email to Kaczmarek. That same day, CW-6 called T.P. and they spoke for more than three (3) minutes.

1636.  When Sandoz entered the market, it did so seamlessly, initially taking comparable share from the existing competitors Fougera and Perrigo.

1637.   For example, in late February and early March, Sandoz made offers to ABC, a Perrigo customer, and Rite Aid, a Fougera customer. In total, the customers accounted for approximately 13 percent of the Imiquimod Cream market (ABC at 8 percent and Rite Aid at 5 percent).

1638.   On March 3, 2011, Fougera declined to bid to retain the Rite Aid business and gave up its primary position to Sandoz. The next day, on March 4, 2011, Kellum of Sandoz followed up with S.G., a sales executive at Sandoz, stating, "[c]an you try to get an answer from ABC on this? Our remaining strategy for this product is dependent on their decision." Later that day, Perrigo followed suit and declined to bid to retain the ABC business. That same day, CW-6 called T.P. and they spoke for four (4) minutes. A few minutes later, Kaczmarek called CW-6 and they spoke for nearly five (5) minutes.

1639.   Around this same time, Taro was also starting to make plans to enter the market. Between March 6 and March 10, 2011, representatives from Fougera, Perrigo, Sandoz, and Taro were all in attendance together at the ECRM Retail Pharmacy Generic Pharmaceutical Conference in Champions Gate, Florida. These representatives included CW-6 from Fougera, T.P. from Perrigo, CW-4 and Kellum from Sandoz, and H.M. and D.S., sales executives from Taro.

1640.   On March 7, 2011, while at the ECRM conference, CW-4 of Sandoz and D.S. of Taro spoke on the phone for four (4) minutes. Later that day, Kellum-CW-4's boss-sent an internal email from ECRM stating that he had "heard" Taro may be entering the Imiquimod Cream market.

1641.   Also, while at the ECRM conference, CW-6 of Fougera and T.P. of Perrigo spoke once by phone on March 9, 2011. The call lasted one (1) minute.

1642.   By March 9, 2011, Sandoz had acquired approximately 13 percent of the Imiquimod Cream market and Kellum recommended that they "stop after 'da group' unless we are sure it's a small Fougera account." "Da group" referred to a consortium composed of HEB, Ahold, Schnucks, and Giant Eagle. These were all Perrigo customers, and Sandoz intended to obtain their Imiquimod

business "'quietly' as not to cause a panic at Perrigo that we are trying to go after all their business (which obviously is not the case)." Those customers were the only additional customers whose business Sandoz was seeking. To that end, Kellum conveyed to S.G., a sales executive at Sandoz, that "if we are successful, can you ask that [the consortium] let the incumbent know that we have reached our share goal with this and not pursuing more share." Ultimately, on March 17, 2011, Perrigo conceded the consortium business to Sandoz.

1643.  On March 10, 2011, Kellum provided additional color for his recommendation that Sandoz only go after smaller Fougera customers moving forward:

| | |
|---|---|
| **From:** | CN=Armando Kellum/OU=GX/O=Novartis |
| **Sent:** | Thursday, March 10, 2011 7:30 AM |
| **To:** | CN=▮▮▮▮▮OU=GX/O=Novartis@PH |
| **Subject:** | Re: Imiquimod Update - *ABC orders released today* |
| **Attach:** | EmbeddedImage0001.gif; EmbeddedImage0002.gif |

Thanks ▮▮▮ both Perrigo and Fougera have been reasonable (as have we) and that is why the market is still good.  At some point it will be noisy and annoying if we keep picking and picking.

AK

1644.  A month or so later, on April 15, 2011, Taro received FDA approval to market Imiquimod Cream. Taro immediately began coordinating its entry with competitors. On April 17, 2011, D.S. of Taro and CW-4 of Sandoz exchanged two calls, with one call lasting twelve (12) minutes. Within an hour of ending the second call, CW-4 called her supervisor, Kellum, and they spoke for five (5) minutes. The next day, on April 19, 2011, D.S. called CW-4 again.

1645.  On these calls, D.S. conveyed to CW-4 that Taro had gotten FDA approval for Imiquimod Cream but advised that Taro would not formally launch until June. D.S. also told CW-4 that Taro had already received a pre-commitment from Econdisc, a large GPO customer, and now would only go after smaller customers. CW-4 understood that D.S. shared this information with her so that she knew Taro would not attack Sandoz at large customers and, if it did compete for smaller

345

customers, it was only to obtain its fair share of the market. CW-4 also understood that Sandoz should not compete for the Econdisc business. The next day CW-4 shared this competitive intelligence with R.T., a senior sales and marketing executive at Sandoz.

1646.   Perrigo and Fougera were also simultaneously coordinating how they would react to Taro's entry. For example, on April 18, 2011, Kaczmarek informed the Fougera sales executives that Taro had received FDA approval to market Imiquimod Cream and asked, "Hearing anything out there yet?" This set off a flurry of communications that same day between CW-6 of Fougera and T.P. of Perrigo, who were both concurrently reporting to, and taking direction from, their supervisors, Kaczmarek and Wesolowski.

1647.   Three days later, on April 21, 2011, CW-6 decided to reach out to Taro directly and called H.M., a sales executive at Taro. The two men spoke for eight (8) minutes. Upon hanging up, CW-6 called Kaczmarek. The call lasted one (1) minute. First thing the next morning, CW-6 sent a text message to T.P. of Perrigo.

1648.   By early July 2011, Taro was finally starting to enter the Imiquimod Cream market. On July 5, 2011, T.P. of Perrigo reached out to CW-6 of Fougera. That set off another rush of communications among Perrigo, Fougera, and Taro-five calls in approximately fifteen minutes-to make sure they were on the same page regarding Taro's entry.

1649.   At the same time, D.S. of Taro was coordinating with CW-4 of Sandoz. On July 7, 2011, D.S. of Taro called CW-4 of Sandoz. The call lasted two (2) minutes. CW-4 returned the call and they spoke for sixteen (16) minutes. A few hours later, CW-4 called D.S. and they spoke for another four (4) minutes.

1650.   On July 14, 2011, CW-6 of Fougera called H.M. at Taro again and they spoke for nine (9) minutes. As soon as CW-6 hung up, he called his boss, Kaczmarek, and the two spoke for five (5)

minutes. Later that day, Kaczmarek emailed the Fougera sales team stating, "[w]e have market intelligence that suggests Taro has quietly launched imiquimod this week."

1651.   On July 26, 2011, a customer, MedCo, informed Perrigo that it had received a competitive offer for Imiquimod Cream and asked if Perrigo could match the price. MedCo declined to disclose who made the offer. This sparked another flurry of phone communications starting first thing the next morning between Perrigo, Taro and Fougera. The next day, on July 28, 2011, Perrigo declined to bid to retain the MedCo business.

1652.   On August 8, 2011, D.S. of Taro called CW-4 of Sandoz again. They ultimately spoke for seventeen (17) minutes. On that call, D.S. informed CW-4 that Taro had officially been awarded the Econdisc business and the secondary position at Cardinal and that Taro could not support any more customers. CW-4 understood this to mean that the market would remain strong with no price erosion and Sandoz would not have to relinquish any additional customers to Taro. Later that evening, on August 8, 2011, CW-4 passed this competitive intelligence along internally at Sandoz.

1653.   On August 19, 2011, Hannaford, a retail pharmacy customer, advised CW-6 that it had received a competitive offer for Imiquimod Cream, but similarly would not identify which competitor made the offer. Thereafter, CW-6 spoke several times with T.P. of Perrigo and H.M. of Taro, in an effort to discover which competitor made the offer. During those calls, CW-6 was able to confirm that Taro had in fact made the offer.

1654.   Later that day, CW-6 recommended to Kaczmarek that Fougera allow Taro to take the Hannaford business. Kaczmarek ultimately agreed, and Fougera gave up the customer to Taro.

1655.   The goal of these communications between the various competitors on Imiquimod Cream-Fougera, Perrigo, Sandoz, and Taro-was always to avoid competition and minimize the price erosion that would typically come with the entry of new competitors. The results were highly successful.

1656.    The next day, on August 20, 2011, D.K., a senior executive at Fougera, sent an email to other senior Fougera executives regarding Imiquimod Cream stating, "[w]e are VERY pleased with where the price is today      With three additional generic players in addition to us in the market today its amazing the price is holding as high as it is."

1657.    Throughout September 2011, H.M. of Taro, CW-6 of Fougera, and T.P. of Perrigo spoke several times by phone during which they discussed, among other things, Taro's new capacity to take on additional market share for Imiquimod Cream and how that should be accommodated in the market. As always, CW-6 and T.P. kept their supervisors, Kaczmarek and Wesolowski, informed of the content of those conversations.

1658.    After this series of calls, on September 30, 2011, Kaczmarek emailed other Fougera sales executives, including D.K., to advise them that Taro had made an offer for Imiquimod Cream at Walmart, a Fougera customer. Kaczmarek explained that "[i]n the past 2 weeks we have been getting competitive intelligence to suggest that Taro has rectified their manufacturing issues with imiquimod and have been in search of additional market share - they currently have about 5% share so their quest for share is not completely without merit." Kaczmarek reluctantly recommended that Fougera give up Walmart's business and "hope the market settles back down." Kaczmarek noted that, if Fougera defended Walmart's business, Taro would likely just go after other customers at lower and lower prices "until they get their 'fair share.'" On the other hand, if Fougera gave up Walmart, Taro would hopefully "do the right thing and leave our remaining share alone and try to pick up an additional from Perrigo." D.K. agreed with Kaczmarek's recommendation and Fougera ultimately ceded the business to Taro in order to keep the market stable.

c)    Triamcinolone Acetonide

1659.    Triamcinolone Acetonide, also known by the brand names Aristocort, Aristocort HP, Kenalog, and Triderm, is a corticosteroid that is used to treat a variety of skin conditions, including

eczema, dermatitis, allergies, and rashes. Triamcinolone Acetonide is available as both a cream and an ointment.

1660.   As of July 2010, Fougera and Perrigo were the only generic manufacturers in the market for both Triamcinolone Acetonide Cream and Ointment. They took advantage of their already ongoing collusive relationship to raise prices on both products.

1661.   On July 1, 2010 and again on July 20, 2010, Fougera raised WAC prices for various sizes and formulations of both the cream and the ointment. CW-3, a sales executive at Fougera, later described these price increases as a "strategic decision." On July 21 and July 30, 2010, Perrigo increased its own WAC prices on the same products to comparable levels.

1662.   In the days leading up to and surrounding these increases, CW-6 of Fougera and T.P. of Perrigo exchanged at least eight (8) calls.

1663.   After the price increases, both companies adhered to their understanding not to poach the other's customers or improperly take advantage of the price increase by seeking additional market share.

1664.   For example, on July 30, 2010, a Perrigo customer, ABC, provided Fougera an opportunity to bid on its Triamcinolone Acetonide business because of Perrigo's price increase. CW-3 of Fougera emailed Kaczmarek, his supervisor, stating, "[h]ere we go again. Perrigo has taken price increases on the Triams. I will inquire about their new market sell pricing after I confirm with Joyce we can supply. Seems like we go through this exercise with the Triams & NT's quite often."

1665.   That same day, Kaczmarek called CW-6. The call lasted two (2) minutes. CW-6 then called T.P. of Perrigo and they spoke for three (3) minutes. CW-6 hung up with T.P., called Kaczmarek back, and they spoke for five (5) minutes. Immediately upon hanging up, Kaczmarek responded to CW-3's email, with a copy to CW-6. Confident that the agreement with Perrigo was strong, Kaczmarek stated, "[w]e will NOT bid this. Don't even bother asking Joyce."

d)    Adapalene Cream

1666.   Adapalene Cream, also known by the brand name Differin, is a retinoid used to treat severe acne.

1667.   On July 6, 2010, Fougera received FDA approval as the first-to-file generic for Adapalene Cream. Two weeks later, on July 20, 2010, Fougera entered the market and published WAC pricing.

1668.   Fougera quickly realized, however, that it would not be alone in the market for long, and that Perrigo would soon emerge as a competitor. On August 9, 2010, Kaczmarek emailed D.K., a senior executive at Fougera, regarding "Adapalene AG Intel" stating: "Walgreens and Cardinal [are] reporting contact from Perrigo as AG - expected market entrance in approximately 2 weeks." Similarly, a few weeks later, on August 30, 2010, D.K. informed other Fougera executives: "I am at NACDS Summer Mtg in San Diego. I learned today that Perrigo will launch Adapalene Cream within a matter of weeks." Several Perrigo representatives attended NACDS, including T.P., Wesolowski, and S.K., a senior Perrigo executive.

1669.   On September 27, 2010, CW-6 of Fougera called T.P. of Perrigo. The call lasted less than one (1) minute. Minutes later, T.P. called CW-6 back and they spoke for three (3) minutes.

1670.   Two days later, on September 29, 2010, Kaczmarek informed D.K. that Perrigo would be shipping Adapalene Cream in two (2) weeks and sending out offers to customers starting that day. D.K. passed that information along to other senior Fougera executives.

1671.   Between October 5 and October 7, 2010, CW-6 of Fougera and T.P. of Perrigo exchanged several calls. CW-6 of Fougera and T.P. of Perrigo continued to exchange calls in the days leading up to Perrigo's launch of Adapalene Cream. As before, CW-6 and T.P. continued to keep their supervisors, Kaczmarek and Wesolowski, informed of their conversations.

1672.   On October 25, 2010, Perrigo entered the Adapalene Cream market and published WAC pricing that matched Fougera's WAC pricing exactly. That same day, CW- 6 and T.P. spoke again for nearly four (4) minutes.

1673.   From the outset, and consistent with fair share principles, Fougera understood and agreed that it needed to give up 40 percent of its share of the market to Perrigo. CW-6 of Fougera and T.P. of Perrigo also discussed which customers Fougera would give up. For example, the day after Perrigo's entry, on October 26, 2010, CW-6 and T.P. spoke at least four times. Shortly after the last of those calls, CW-6 sent the following email to Kaczmarek regarding "Adapalene cream - ones to dismiss," listing customer he thought Fougera should give up.

1674.   Fougera wasted no time in acting on CW-6's recommendations and ceding significant share to the new entrant, Perrigo. For example, on October 25, 2010, Publix informed Fougera that it had received a competitive offer for Adapalene Cream and offered Fougera the opportunity to retain the business. The next day, on October 26, 2010, S.H., a Fougera sales executive, declined to bid stating, "[w]e have to let this go. We have to give up share, and you were the first offer we had seen."

1675.   Also on October 25, 2010, NC Mutual informed Fougera that it had received a competitive offer for Adapalene Cream. On October 28, 2010, CW-3 forwarded the request to Kaczmarek asking: "Are we definitely letting NC Mutual go?" Kaczmarek responded in the affirmative. Later that day, CW-3 responded to NC Mutual stating: "Unfortunately we have to give up some market share and cannot match the new pricing."

1676.   On October 26, 2010, Rite Aid advised Fougera that it had received a competitive bid for Adapalene Cream. Consistent with the plan, on November 2, 2010, Fougera ceded the account to Perrigo, telling the customer: "We are going to have to let this go" and reasoning that "we have to give up share somewhere."

1677.    On October 29, 2010, Kroger informed CW-3 that it had received a competitive offer from Perrigo for Adapalene Cream. CW-3 forwarded the email to Kaczmarek asking: "We are definitely not matching? Kroger purchased 1,464 units YTD and average usage should be around 450 per month. Publix or Supervalu may be a better option in my opinion." Kaczmarek responded: "It is a better option and we are giving up all of them. We may keep SUPERVALU because they do not like Perrigo. Remember, we have to give up 40%." CW-3 would later acknowledge in his October 2010 monthly recap that the decision not to match Perrigo's offer was a "strategic decision" meant "to relinquish some market share" to the new entrant, Perrigo.

1678.    Further, by the end of October 2010, Fougera had also given up Cardinal's Adapalene Cream business to Perrigo.

1679.    The agreement operated successfully for both Fougera and Perrigo. Fougera was impressed that Perrigo had behaved responsibly by keeping prices high and focusing on the agreed-upon customers as it entered the market for Adapalene Cream. As D.K. noted in an internal email, "[t]o this point, Perrigo is using similar methodology as they did with Imiquimod which should insure that pricing stays at an appropriate level." He stated further, "[c]ongrats to all that we were able to maximize the situation."

e)    Betamethasone Dipropionate Lotion

1680.    Betamethasone Dipropionate Lotion ("Betamethasone Dipropionate" or "Beta Dip"), also known by the brand name Diprolene, is a topical steroid used to treat inflammation caused by allergic reactions, eczema, and psoriasis.

1681.    In 2010, Fougera, Perrigo, and Teva were the only three competitors in the market for Betamethasone Dipropionate.

1682.    On December 16, 2010, CW-6 of Fougera emailed Kaczmarek to inform him that Teva was exiting the market, leaving Fougera and Perrigo as the only competitors. With a strong collusive

understanding firmly in place between Fougera and Perrigo at that point, Kaczmarek was thrilled with the news and immediately suggested that Fougera take advantage of Teva's departure by increasing pricing on the product.

1683.   Also on December 16, 2010, Perrigo held an internal meeting to discuss increasing pricing on Betamethasone Dipropionate. Notes from that meeting stated: "Will Fougera lead the charge and we can follow?" That same day, T.P. of Perrigo and CW-6 of Fougera exchanged several calls. After hanging up with T.P., CW-6 called Kaczmarek to update him on their discussions.

1684.   After this series of phone calls, Perrigo also decided to raise prices-and did so even before Fougera. On January 4, 2011, Perrigo increased its WAC pricing for Betamethasone Dipropionate by 504 percent to $37.50. That same day, T.P. called CW-6, and they spoke for seven (7) minutes. Just minutes after hanging up, CW-6 again called Kaczmarek.

1685.   On January 12, 2011, Fougera followed Perrigo and increased its WAC pricing on Betamethasone Dipropionate to $39.99 - slightly higher than Perrigo's WAC pricing. The next day, on January 13, 2011, CW-6 called T.P. again and they spoke for twelve (12).

f)      Clotrimazole Betamethasone Dipropionate

1686.   Clotrimazole Betamethasone Dipropionate ("CBD"), also known by the brand name Lotrisone, is a combination of clotrimazole (a synthetic antifungal agent) and betamethasone dipropionate (a synthetic corticosteroid). CBD comes in both a cream ("CBD Cream") and a lotion ("CBD Lotion"). These products are used to treat a variety of inflamed fungal skin infections such as ringworm, athlete's foot, and jock itch. In 2013, annual sales of CBD Cream and Lotion in the United States exceeded $150 million.

1687.   In early 2011, the competitors in the generic market for CBD Cream were Fougera, Taro, and Actavis and the competitors in the generic market for CBD Lotion were Fougera and Taro.

353

1688.  On March 9, 2011, J.R., a senior Actavis pricing executive, circulated internally a proposed price increase plan for four products, including CBD Cream, to take effect on March 28, 2011. Actavis planned to raise WAC prices for CBD Cream by 227 percent and to increase contract prices to customers by as much as 1100 percent. Notably, Actavis had not yet conveyed the proposed to its customers. In fact, in that March 9, 2011 email, J.R. specifically told his colleagues "no letters should go out prior to the 25th."

1689.  Even though Actavis had not yet told its customers of these substantial price increases, its competitors, Fougera and Taro, were already aware. For example, on March 9, 2011-the same day that J.R. circulated the price increase proposal internally at Actavis-D.H.2, a Fougera sales executive, sent a National Accounts Monthly Recap report for February 2011 to Kaczmarek. In that recap, D.H.2 reported that for CBD "Actavis is supposed to raise prices." Further, D.H.2 reported: "Taro [is] raising prices on all Beta products." The reference to "all Beta products" is a reference to all of Taro's betamethasone products, including CBD Cream and CBD Lotion. Importantly, Taro had not yet raised its prices on those products.

1690.  Fougera was already aware of its competitors' price increases for CBD products because, in the preceding month, representatives of Actavis, Fougera, and Taro were in contact with one another to ensure that each competitor would follow the other's price increases.

1691.  For example, from February 1, 2011 to March 9, 2011, Perfetto, then a senior Actavis sales and marketing executive, spoke with Blashinsky, then a senior Taro marketing executive, eight (8) times for a total of approximately fifty-two (52) minutes. During that same time, H.M., a Taro sales executive, spoke with CW-6 of Fougera three (3) times for a total of approximately fifteen (15) minutes.

1692.  On March 25, 2011, Actavis informed its customers of the price increases for CBD Cream. By happenstance, just days before the announcement, Actavis learned that its API costs for

CBD Cream would increase. Actavis immediately recognized that it could use this news to mislead its customers and provide cover for its illegal price-fixing conspiracy.

1693.   Before the announcements went out, Perfetto emailed the Actavis sales executives, telling them to "[b]e strong" and to stick to the story that the price increase is "due to significant price increase[s] in API cost and overall cost." One sales executive even went so far as to tell Econdisc that the increase was necessary because Actavis's "API costs were skyrocketing." In reality, Actavis knew the API "increases on a per tube basis amount[ed] to only pennies, literally" and were "not a real issue" for the pricing of prescription medications such as CBD Cream.

1694.   In furtherance of their conspiracy to raise prices, Actavis, Taro, and Fougera remained in contact during the days leading up to Actavis's formal price increase announcement on March 25, 2011, including calls between the following individuals:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/17/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 12:03:40 | 0:01:44 |
| 3/21/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 10:50:22 | 0:00:00 |
| 3/21/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 10:51:24 | 0:00:34 |
| 3/21/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 12:27:28 | 0:02:38 |
| 3/22/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 15:26:45 | 0:02:00 |
| 3/23/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 12:31:15 | 0:00:24 |
| 3/23/2011 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 12:44:00 | 0:09:00 |
| 3/23/2011 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 13:07:00 | 0:15:00 |
| 3/24/2011 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 6:49:00 | 0:15:00 |

1695.   On March 30, 2011, just three business days after Actavis sent out its price increase notices for CBD Cream, Fougera sent out notices to its customers stating that it was raising prices for CBD Cream. Those increases, which took effect April 1, 2011, increased Fougera's WAC prices for CBD Cream by 54 percent and increased contract prices across the board, in some cases by over 1200 percent. The day after Fougera announced those price increases, CW-6 of Fougera and H.M. of Taro spoke three separate times for a total of eighteen (18) minutes.

1696.   Within days, on April 4, 2011, Taro implemented its own substantial price increases across the board for both CBD Cream and CBD Lotion. For some customers, Taro raised prices for

355

CBD Cream by approximately 1350 percent and raised prices for CBD Lotion by approximately 960 percent. The next day, H.M. called CW-6 and they spoke for eighteen (18) minutes.

1697.   On April 14, 2011, Fougera followed Taro with a price increase on CBD Lotion-raising its WAC by 71 percent and increasing its contract prices across the board, in some cases by over 900 percent. At the time, Fougera's gross profit margin on CBD Lotion was already 67 percent, yet, with this price increase, their gross profit percentage would soar to 96 percent. Fougera estimated that these increases accounted for an extra $1.8 million in profit for the rest of 2011 alone.

1698.   In furtherance of the conspiracy, Fougera refrained multiple times from taking customers that approached it for bids. For example, after Taro's increase, Walmart, a Taro customer for CBD Cream and Lotion, asked Fougera to bid for that business. Kaczmarek cautioned "we definitely do not want to upset this apple cart." In an effort to conceal the reason for not bidding, Kaczmarek instructed his colleagues that the "[m]essage back to Walmart is we can't supply - I think they will believe that one!" Likewise, when Rite-Aid approached Fougera, Fougera did not even consider making a competitive offer. Instead, a Fougera employee asked internally: Kaczmarek determined that Fougera should opt for the latter.

1699.   Shortly after pulling off this massive, coordinated price increase, Taro wasted no time planning the next. By March 5, 2012, Taro reignited its desire to raise prices on CBD Cream. Over the next several weeks, representatives of Taro spoke several times with their contacts at Actavis and Fougera. During these calls, Taro conveyed to its competitors its intentions to increase prices and secured their commitments not to poach Taro's customers.

1700.   On March 30, 2012, Taro increased its WAC prices for CBD Cream by approximately 7 percent and its contract prices by 15 percent for most of its existing customers.

1701.  In May 2012, McKesson twice asked Taro to reduce its price based on comparable sales by competitors. Both times Taro declined, comfortable that its competitors would not poach its business. Taro's confidence was well placed.

1702.  On May 23, 2012, McKesson contacted L.P., an Actavis sales executive, asking if Actavis's recent RFP bid still stood because "something has occurred as it relates to a product [Actavis] bid on the RFP." At 5:02 p.m., L.P. forwarded McKesson's request to Perfetto and Aprahamian, then a senior pricing executive at Actavis. Perfetto said he was "sure it's reflective of the Taro price increase" and that Actavis "need[s] to be prudent." Aprahamian replied, "[l]ove being prudent . . . Yes, we will be wise." The following day, Perfetto exchanged three calls with Blashinsky of Taro, including one call lasting fourteen (14) minutes. Following his calls with Blashinsky, Perfetto instructed Aprahamian to call him. Aprahamian called Perfetto the next morning on May 25, 2012. After that call, an Actavis employee suggested that Actavis should stick by their RFP price and take the business because it was "in line with or rather on the high end of our market prices." Aprahamian, however, responded simply and directly: "[n]o bid."

1703.  In the fall of 2012, a fourth competitor (Prasco) was entering the CBD Cream market. However, Taro and Sandoz (which acquired Fougera in July 2012) were still the only competitors in the CBD Lotion market. Facing new competition on CBD Cream, Sandoz and Taro sought to maximize profits by raising the price of CBD Lotion.

1704.  Starting in late August 2012, Sandoz began planning a 100 percent price increase on CBD Lotion to take place in October, which - assuming "continued rational behavior by Taro" - would bring in an estimated additional $3.9 million to Sandoz annually. In the weeks leading up to its planned increase, Sandoz made repeated overtures to Taro to secure that "rational" behavior.

1705.  On October 18, 2012, Sandoz increased prices for CBD Lotion, doubling its WAC price (from $61.90 to $123.80) as well as its contract prices. As expected, Taro did not attempt to

poach Sandoz's customers. For example, when MMCAP emailed Taro on October 26, 2012 to request a bid from Taro for a dual award in light of Sandoz's increase, Taro did not even respond to the customer's request.

1706.   Taro also made plans to follow the Sandoz price increase. On January 4, 2013, J.J., a senior Taro sales executive, instructed Taro sales executives, including H.M. and D.S., to gather competitive intelligence on CBD Lotion in anticipation of Taro's planned price increase. That same day, H.M. spoke with CW-3 of Sandoz for five (5) minutes. The pair spoke again on January 7, 2013 for thirteen (13) more minutes. Three days later, on January 10, 2013, D.S. spoke with CW-4 of Sandoz for twenty-three (23) minutes.

1707.   On February 12, 2013, Taro instituted its price increase on CBD Lotion, raising WAC by approximately 80 percent and contract prices by approximately 60 percent.

1708.   After Taro's increase was issued, news of it spread throughout Sandoz. One Sandoz employee remarked "[f]antastic news!! Big hugs to Taro." Just as Taro did not poach Sandoz's customers when Sandoz raised CBD Lotion prices, Sandoz was careful not to poach Taro's customers. In fact, CW-1, a Sandoz senior pricing executive, specifically instructed Sandoz employees to "[b]e on the lookout for requests" for CBD Lotion bids, because "we do not want to send offers."

g)    Fluocinonide Solution

1709.   Fluocinonide Solution, also known by the brand name Lidex, is a corticosteroid used to treat a variety of skin conditions, such as eczema, dermatitis, allergies, and rash. Fluocinonide Solution comes in 20ml and 60ml bottles.

1710.   In early 2011, the competitors in the Fluocinonide Solution market were Teva, Taro, and Fougera. All three competitors produced Fluocinonide Solution in 60ml bottles, while only Taro produced them in 20ml bottles.

1711.   In the beginning of April 2011, Fougera's Fluocinonide Solution products had been on long-term backorder due to quality control issues with the tips of the bottles leaking. As a result, the market was split between Teva (76 percent market share) and Taro (19 percent market share) until Fougera returned to production. Fougera was working to re-launch its Fluocinonide Solution products by mid-May 2011.

1712.   On April 21, 2011, Kaczmarek learned by email that Teva was "obsoleting" Fluocinonide Solution; that is, Teva was stopping production and leaving the market. This meant the only competitors in the market would now be Fougera and Taro.

1713.   Even though it was still on backorder due to supply problems, Fougera viewed Teva's exit as an opportunity to increase prices. In internal calculations of the expected benefit from the pricing action, Fougera assumed that "Taro follows [Fougera's] lead on pricing actions" and that they would split the market 50/50. Fougera estimated that this would provide it with a yearly gain of $4.6 million.

1714.   On May 10, 2011, Fougera raised its WAC pricing for Fluocinonide Solution by 100 percent, from $12.50 to $25.00 - with the change effective the following day. That evening, Fougera also sent out contract price-change notifications to customers with which it had existing contracts for Fluocinonide Solution. With those increases, the average net sales price jumped 800 percent, from $2.50 to $20.

1715.   On May 13, 2011 - three days after Fougera sent out its price changes - CW-6 and H.M. of Taro exchanged two calls, with one call lasting five (5) minutes.

1716.   One week later, on May 20, 2011, Taro followed Fougera's lead by substantially increasing its pricing for Fluocinonide Solution. Taro increased the WAC price for the 20ml and 60ml formulations by 200 percent and 400 percent, respectively. Taro also increased average net sales prices by 260 percent and by over 500 percent for the 20ml and 60ml formulations, respectively.

1717.   Following their respective price increases, the market share between Taro and Fougera stabilized to rough parity. By September 2011, Fougera had approximately 50 percent market share and Taro had approximately 48 percent market share.

1718.   On January 26, 2012, Kaczmarek sent an email to his Fougera colleagues stating, "[w]e have an opportunity to adjust market pricing on fluocinonide solution. Tomorrow we need to discuss preparing the sensitivity analysis and prework for review by the Pricing Committee." The proposed price increase involved nearly tripling Fougera's WAC price and increasing associated contract prices in a little over two weeks' time.

1719.   This price increase opportunity was viewed as so pressing by Kaczmarek that he asked A.R.2, a Fougera business analyst, to put together a pricing analysis that evening while flying on a plane because she had a scheduled day off the next day.

1720.   First thing the next morning, on January 27, 2012, Kaczmarek called CW-6, and they spoke for twenty-two (22) minutes. CW-6 hung up and immediately called H.M. of Taro. The call lasted one (1) minute. A few minutes later, CW-6 called H.M. again, and they spoke for twenty-one (21) minutes. Later that day, CW-6 called Kaczmarek twice. The calls lasted four (4) minutes and three (3) minutes, respectively.

1721.   Later that evening, on January 27, 2012, Kaczmarek submitted the proposed price increase to the Fougera Pricing Committee. Now, the price increase had grown even larger. The plan was to raise Fougera's WAC price from $25 to $80.99 and increase its average net sales price from $18.08 to $58.57. This increase was estimated to bring in an additional $10.1 million in gross profit for the rest of 2012. Members of the Fougera Pricing Committee enthusiastically embraced the massive price hike, with one member responding: "Let's go!!"

1722.   On February 13, 2012, CW-6 called H.M., and they spoke for five (5) minutes. The next day, on February 14, 2012, Fougera formally raised its WAC and contract prices for Fluocinonide Solution as planned.

1723.   The increases more than tripled Fougera's WAC price, as well as direct and indirect contract prices for its customers. The increase was so dramatic that third-party data vendor Medi-Span, which tracks WAC prices, reached out to Fougera to confirm that the new WAC amount was not an error.

1724.   On February 15, 2012, the day after the increases, CW-6 called H.M. again, and they spoke for six (6) minutes. Later that day, Blashinsky, a senior Taro marketing executive, circulated an email informing others within Taro that prices in the Fluocinonide Solution "market have gone up dramatically and we will follow shortly."

1725.   In furtherance of their price increase conspiracy, and consistent with the overarching conspiracy, Taro was careful not to use Fougera's price increase to poach customers and upset market share. Indeed, Taro refused to poach even very small customers. For example, Meijer requested that Taro submit a bid for Fluocinonide Solution. Internally, Taro noted "we could assume this without upsetting the balance" of market share. Nonetheless, Taro declined to provide Meijer with a bid and instead falsely claimed that Taro did not have inventory to supply them.

1726.   Similarly, HD Smith asked Taro to bid for its Fluocinonide Solution business after Fougera increased prices. The representative at HD Smith even stated that she "would take her chances 'IF' [Taro] decided to have a price increase." S.B.2, a Taro sales executive, relayed this news to J.J., a senior Taro sales executive, who then chastised him for even considering the offer.

1727.   When Taro planned and implemented corresponding price increases in the following weeks, representatives of Taro and Fougera remained in contact. Taro ultimately implemented its price

increase on March 9, 2012, which essentially doubled its WAC and contract prices for both the 60ml and 20ml formulations of Fluocinonide Solution.

h)    <u>Erythromycin Base/Ethyl Alcohol</u>

1728.   Erythromycin Base/Ethyl Alcohol Solution ("Erythromycin Solution") is a topical medication used to treat acne.

1729.   In the summer of 2011, Defendants Fougera and Wockhardt were the only two competitors in the market for Erythromycin Solution. However, both manufacturers would experience intermittent supply issues that would require their exit from the market for periods of time. Because of these supply problems, extensive coordination was necessary between competitors in order to maintain a stable market.

1730.   Between May 17 and May 19, 2011, Defendant Perrigo discussed internally whether to re-enter the Erythromycin Solution market. The next day, May 20, 2011, T.P. of Perrigo called CW-6 of Fougera and they spoke for seven (7) minutes. Immediately after that call, T.P. called his supervisor, Wesolowski, and they spoke for three (3) minutes. The following Monday, on May 23, 2011, Wesolowski gave the green light to move forward with Perrigo's plans to re-launch the product within six months.

1731.   On August 5, 2011, CW-3 of Fougera emailed his supervisor, Kaczmarek, stating, "[a]s an FYI, I heard from a customer that Wockhardt . . . will be out of Erythromycin Solution sometime at the end of August for a very very lengthy period (well into 2012)."

1732.   Thereafter, on August 9, 2011, CW-6 of Fougera called M.C., a Wockhardt sales executive, three times, including one call lasting ten (10) minutes. Notably, these were the first phone calls ever between the two competitors according to available phone records. Indeed, CW-6 and M.C. were not friends and did not socialize together. If they did speak, it was to coordinate anticompetitive conduct relating to products on which Fougera and Wockhardt overlapped.

362

1733.   Over the next week, CW-6 exchanged several calls with M.C. of Wockhardt and T.P. of Perrigo, the prospective new entrant. Because T.P. and M.C. did not have an independent relationship, CW-6 acted as the go-between - relaying information between the two. After speaking with his competitors, CW-6 called his supervisor, Kaczmarek, to report back what he had learned.

1734.   On August 19, 2011, Fougera held an internal meeting to discuss Erythromycin Solution and the intelligence that CW-6 had gained from phone calls with competitors.

1735.   On November 15, 2011, Wesolowski of Perrigo sent an internal email to the Perrigo sales team, including to T.P., stating that Perrigo planned to launch Erythromycin Solution the following month in December 2011. Wesolowski stated, "[w]e need pricing, but don't share too much information with your customers." Beginning that day, and over the next few days, T.P. exchanged several calls with CW-6 of Fougera. At the same time, CW-6 was speaking with M.C. of Wockhardt.

1736.   The next day, on November 18, 2011, K.K., another Wockhardt sales executive, called CW-3 of Fougera. The call lasted two (2) minutes. Later, CW-3 sent the following email to his supervisor, Kaczmarek, saying that he had heard "from a customer" that Perrigo would be entering the market in the next few weeks. It was CW-3's customary practice to state that he learned information from a customer when he actually learned it from a competitor because he wanted to keep that information out of writing. In response to CW-3's email, Kaczmarek stated simply: "Heard that as well."

1737.   A few weeks later, on December 19, 2011, Perrigo entered the Erythromycin Solution market and set WAC pricing that was significantly higher-indeed, approximately 200 percent higher-than the market WAC pricing at that time.

1738.   CW-6 of Fougera exchanged several calls with T.P. of Perrigo in the weeks leading up to, and surrounding, Perrigo's launch, including on the date of the launch itself. On these calls, the competitors discussed pricing and the allocation of market share to the new entrant, Perrigo.

1739.   Several months later, between April 24 and April 27, 2012, the NACDS held its annual meeting in Palm Beach, Florida. Representatives from Fougera, Perrigo, and Wockhardt attended, including CW-6 and CW-3 of Fougera, Wesolowski of Perrigo, and M.C. of Wockhardt.

1740.   At that time, Fougera was readying to re-enter the Erythromycin Solution market. Fougera's three competitors learned of the planned launch, and there was a flurry of communications between them on May 1 and May 2, 2013. The next day, on May 3, Fougera re-entered the market and matched Perrigo's increased WAC pricing.

1741.   That same day, CW-3 of Sandoz spoke with K.K. of Wockhardt for five (5) minutes and called A.F., a sales executive at Perrigo. Further, CW-6 called his contact at Perrigo, T.P., and the two competitors spoke for fifteen (15) minutes. Immediately after hanging up with T.P., CW-6 again called his supervisor, Kaczmarek, and they spoke for five (5) minutes.

1742.   The following Monday, on May 7, 2012, Wesolowski of Perrigo sent an email regarding Erythromycin Solution to other Perrigo executives, saying that "[w]e will need to give up some market (25-35%)" in light of Fougera's return to the market.

1743.   Less than two months later, on June 7, 2012, Fougera recalled Erythromycin Solution and again placed the product on back order. By that time, Fougera had approached and secured approximately 12 percent market share on the product, including several customers on its target list such as Rite Aid, Cardinal, Optisource, and SUPERVALU.

1744.   By August 2012, Fougera had resolved those supply issues. Around this same time, Defendant Sandoz had completed its acquisition of Fougera. As Fougera (now Sandoz) prepared to re-enter the Erythromycin Solution market, the company set an internal market share goal of 20 percent on the product.

1745.   After the Fougera acquisition was completed, CW-6 left the company for another position. At some point before he left Fougera, CW-6 introduced CW-3, who would be remaining at

Sandoz after the acquisition, to T.P. at Perrigo. This was the beginning of a collusive relationship that would last several years and will be discussed in detail in subsequent sections of this Complaint.

1746.   The first ever phone calls between CW-3 and T.P., according to the available phone records, were on August 8, 2012. They spoke two times that day. The competitors spoke again on August 21, 2012, as Sandoz was preparing to re-enter the market for Erythromycin Solution.

1747.   On September 5, 2012, S.G., a Sandoz sales executive, emailed CW-3 and Kellum to advise them that Sandoz had an opportunity to bid on Erythromycin Solution at Walgreens. Kellum responded, "[l]et's leave this alone for now." On September 6, 2012, CW-3 called T.P. of Perrigo and they spoke for eleven (11) minutes.

1748.   On September 17, 2012, CW-1 instructed CW-3 to put together offers for Cardinal and Walmart and advised that they would be the only customers Sandoz would be bidding on at this time. That same day, K.K. of Wockhardt called CW-3 and they spoke for four (4) minutes.

1749.   Between September 20 and September 21, 2012, CW-3 and T.P. of Perrigo exchanged six (6) calls, including two calls lasting eight (8) minutes and seven (7) minutes, respectively. By October 2012, Perrigo had conceded the Erythromycin Solution business at Cardinal and Walmart to Sandoz.

i)    <u>Nystatin Ointment</u>

1750.   Nystatin Ointment, also known by the brand name Mycostatin, is a topical antifungal medication used to treat fungal skin infections.

1751.   In early 2011, Fougera and Perrigo were the only players in the market for generic Nystatin Ointment.

1752.   On February 7, 2011, J.E., a Fougera sales executive, circulated internally a list of products and their potential for price increases. While Nystatin Ointment was one of the products

deemed worthy of consideration, the initial conclusion was that its "WAC is too low to raise CP [contract price]."

1753.  Undaunted, key Fougera employees turned to rival Perrigo for a creative solution to the problem of low prices and low profits on Nystatin Ointment. Between February 7 and February 28, 2011, CW-6 of Fougera and T.P. of Perrigo were in frequent communication with each other, exchanging twenty-seven (27) calls and three (3) text messages, with eleven (11) of the calls taking place on February 28, 2011. During these calls, the competitors hatched a plan for Fougera to leave the market temporarily, allowing Perrigo to significantly raise prices, at which point Fougera would return to the market at that new, higher pricing.

1754.  By March 1, 2011, word of the plan formulated during those phone calls had begun to spread into the market, reaching J.E. at Fougera by way of a customer.

1755.  Perplexed, J.E. emailed Kaczmarek, asking: "Are we doing something market-wide with the Nystatins? [CW-6] sent several emails to customers telling them we are removing the products from contract at end of March or April (in most cases)."

1756.  Kaczmarek responded in the affirmative: "The current thought is that due to manufacturing issues with nt's and nystatins, low market share and low to negative GP's, we discontinue with the possibility of re-launching at later date." In fact, other Fougera personnel were already preparing a draft letter announcing the discontinuation of the product.

1757.  Fougera subsequently discontinued Nystatin Ointment effective March 15, 2011.

1758.  By late March 2011, numerous large customers including Meijer, Morris & Dickson, Rite Aid, Giant Eagle, and NC Mutual, had switched their Nystatin Ointment business to the only remaining alternative in the market-Perrigo.

1759.  With essentially the entire market transferred to Perrigo, and customers left with no alternative suppliers, the stage was set for the next phase of the plan. On June 1, 2011, Perrigo

366

instituted a large WAC price increase on Nystatin Ointment. Indeed, the price of a 15gm tube increased by 493 percent, and the price of a 30gm tube increased by 269 percent.

1760.   That same day, CW-6 of Fougera called T.P. of Perrigo. The two competitors spoke for six (6) minutes. Nine days later, on June 10, 2011, CW-6 and T.P.'s discussions intensified with the two competitors exchanging seven calls that day.

1761.   As those phone calls were taking place, and less than three months after it had discontinued the product, Fougera was taking the first steps towards re-launch by starting to market the remaining inventory of Nystatin Ointment that it had on hand when it discontinued the product.

1762.   On June 12, 2011, senior Fougera executive D.K. requested an update on discontinued items that the company might want to bring permanently back into its product line. J.S., a Fougera marketing executive, sent back a list the next morning, calling special attention to Nystatin Ointment: "The Nystatin was just a regular disco until we saw the increases that the competitors took." Recognizing the lucrative opportunity presented by following Perrigo's price hike, D.K. replied, "we should then sit down and lay out a time line to bring them back with new forecasts at new price points."

1763.   But Fougera was not the only company that was motivated by the size of the price increase that Perrigo had managed to implement. Late in the evening on June 14, 2011, Perfetto, then a senior sales and marketing executive at Actavis, sent an email to Aprahamian and other Actavis colleagues with the subject line: "Perrigo - Nystatin: increases prices on ointment as other suppliers leave market." The text that followed was simple and clear: "Let's rock on this."

1764.   The next day, Actavis marketing executive J.M.4 responded with some projections on the financial implications of Actavis entering the Nystatin market. The recent sharp WAC increase by Perrigo made the prospect of entry surprisingly irresistible. J.M.4 wrote: "This is a very rough projection - just want to know what kind of $ we are talking about - WOW!!! Stay put, I almost fell

off my chair!" J.M.4 estimated that if Actavis secured a 30 percent share of the current two-player market, the company would realize more than $3.8 million in sales. Aprahamian agreed that the time was right to capitalize on the Perrigo price hike, saying: "This is a great opportunity for us to get in while there are issues, carve out our share, and lock up long term profitable business.... Timing is key here."

1765.    Meanwhile, Fougera continued selling off its previously stockpiled inventory of Nystatin Ointment and made plans to fully re-enter the market at the new higher WAC prices. On June 27, 2011, D.K. of Fougera emailed Kaczmarek asking: "Can you do a pre and post using the new pricing and current volumes to spitball what Nystatin cream and ointment would mean if we came back and got a 30 share at new prices?"

1766.    Actavis made its move in early November 2011. On November 4, 2011, just days before the launch, Actavis executive D.M. opined in an email to Aprahamian, Perfetto and other colleagues that conditions were favorable for a very successful launch, including the 187 percent increase in the price of Nystatin Ointment over the past year, and the fact that Fougera had not reentered the market as yet. Aprahamian inquired how much share Actavis could handle. In response, D.M., mindful of the fair share rules of the game, replied: "We have budgeted 20% share on the Cream and 30% on the Ointment. In reality, we can handle more than that (especially on the ointment); provided, of course, it doesn't upset the market. (But I'm sure I don't need to tell YOU that!)."

1767.    On November 7, 2011, Actavis re-entered the market with WAC prices that exactly matched Perrigo's.

1768.    On the day of the Actavis launch, the phone lines among the three competitors were alive with activity. In the morning, T.P. at Perrigo placed two calls to CW-6 at Fougera to discuss the Actavis development. After the second call, T.P. called M.D., an Actavis sales executive, setting off a chain of three more calls back and forth between them totaling more than twenty-three (23) minutes

collectively. During these calls, the competitors discussed which customers Actavis should target to obtain its market share goals without eroding the high prices currently in the market.

1769.   In the coming weeks, having coordinated its entry with market leader Perrigo, Actavis began collecting its share of accounts, winning business at Omnicare, Publix, and Rite Aid, among others.

1770.   Meanwhile, unable to gear up its production for an immediate re- launch, Fougera set its sights on a June 2012 re-launch date for Nystatin Ointment.

1771.   On June 15, 2012, a Fougera marketing executive provided Kaczmarek with WAC pricing data for Perrigo and Actavis and asked what Fougera's re-launch WAC prices would be. The competitors' prices were identical to the penny with each charging $14.00 for a 15gm tube, and $21.00 for a 30gm tube. Later that day, Kaczmarek announced to his colleagues that Fougera would also fall in line, saying: "Let's match the competitive market: 15gm $14.00, 30gm $21.00."

1772.   On June 21, 2012, Kaczmarek instructed CW-6 to gather intelligence on price points and "who has who" for Nystatin Ointment. CW-6 initially emailed Cardinal asking for contract pricing, emphasizing that Fougera did not "want to screw the market." Knowing that he most accurate source of competitor intelligence was the competitors themselves, however, CW-6 reached out directly to T.P. at Perrigo, initiating a call that lasted two (2) minutes that morning.

1773.   The competitors moved forward to claim the market shares to which they had agreed each was entitled, all the while taking great care not to erode the lucrative market pricing. On June 22, 2012, for example, Aprahamian at Actavis rejected a colleague's suggestion to offer a competitive price on Nystatin Ointment to one customer by saying, "don't want to reduce the Nystatin and disrupt the market." On the same day, CW-6 sent the following message to another customer: "We are going to be re-launching nystatin ointment at the end of the month. Who are you with? Can you tell me roughly where you are currently on price and your usage so we enter responsibly?"

1774.   On June 25, 2012, CW-6 asked Kaczmarek for Fougera's market share goal for Nystatin Ointment. Kaczmarek's reply acknowledged the importance of playing by the rules of the competitors' agreement: "Don't want to be a pig - 20-25%."

1775.   That same day, CW-6 called T.P. at Perrigo, and they spoke for ten (10) minutes. Immediately after hanging up with T.P., CW-6 called Kaczmarek, and they spoke for three (3) minutes.

1776.   With all decisions made and cleared with its competitors, Fougera re- entered the Nystatin Ointment market on June 29, 2012 at WAC prices identical to its competitors. Consistent with the fair share understanding in place between the three competitors, Fougera proceeded to claim its share of accounts over the coming weeks, including business at HEB, Giant Eagle, and Cardinal Health.

### 4)   G&W and Its Relationships

1777.   Although G&W is not a large company and does not manufacture as many topical products as some of the larger generic manufacturers discussed above, G&W has actively conspired with its competitors in the topical space for many years. During this early time period, G&W had anticompetitive relationships with Fougera and Glenmark and used those relationships to allocate markets and fix prices on a number of products on which those companies overlapped. These relationships, as well as some illustrative examples of how these relationships manifested themselves regarding specific products, are discussed in detail below.

#### a)   G&W/Fougera - Metronidazole Cream & Lotion

1778.   Jim Grauso, then a senior sales and marketing executive at G&W, had a relationship with CW-6 of Fougera. Although Grauso and CW-6 were social friends, they also had an ongoing understanding, on behalf of the companies they represented, not to poach each other's customers and to follow each other's price increases. The two competitors conspired with regard to several products on which G&W and Fougera overlapped, some examples of which are discussed below.

1779.   Metronidazole 0.75% is a topical antibiotic commonly used to treat the skin lesions that result from rosacea. Among other formulations, it is manufactured as a cream ("Metro Cream," also known by the brand name "Metrocream") and as a lotion ("Metro Lotion," also known by the brand name "MetroLotion"). In 2013, the combined annual market for Metro Cream and Lotion in the United States exceeded $70 million.

1780.   In 2011, Actavis, Fougera, G&W, and Harris Pharmaceutical ("Harris") each marketed a generic version of Metro Cream, and Actavis and Fougera shared the market for generic Metro Lotion.

1781.   In early July 2011, Actavis initiated its plan to raise the prices of both products by reaching out to its rival G&W. On July 6, 2011, Mike Perfetto, then a senior sales and marketing executive at Actavis, called Grauso at G&W twice. The calls lasted four (4) minutes and twenty-one (21) minutes. The next day, on July 7, 2011, the conversation continued, with Perfetto initiating a six (6) minute call to Grauso.

1782.   Confident that at least G&W was on board with the planned increase, Actavis raised the price of Metro Cream and Lotion effective July 22, 2011. The new WAC price for Metro Cream was $153.33 for a 45gm tube, an increase of 278 percent. The WAC price for Metro Lotion increased by 189 percent to $208.03 for a 59ml bottle.

1783.   That same day, M.A.2, a Fougera marketing executive, emailed several colleagues, including Kaczmarek, with the precise details of the Actavis increase. Kaczmarek began at once assessing how Fougera would follow, mindful of the fair share rules and the agreement among the competitors. He inquired of M.A.2 about G&W's current share of the market, saying: "I show G&W Labs with 40% MS on the cream?"

1784.   The next morning, on Saturday July 23, 2011, Fougera utilized one of its most reliable sources of information-the relationship between Fougera's CW-6 and Grauso at G&W. CW-6 called

Grauso and the two competitors spoke for four (4) minutes. A few minutes later, CW-6 called Grauso again and they spoke for fourteen (14) minutes.

1785.   Just after 9:00 a.m. on Monday, July 25, 2011, Kaczmarek cautioned his team at Fougera to consult with management before quoting a price to any customer on Metro Cream or Metro Lotion, saying: "Please put metro cream and lotion on mandatory review prior to releasing an order. Market just moved and we will as well."

1786.   By 10:31 a.m. that morning, Kaczmarek had already decided on the exact amount by which Fougera should increase its price on these products to stay in lockstep with Actavis. He told his colleagues: "We have another market opportunity to raise pricing on the below metro sku's due to [sic]. This will again require swift action. Below are suggested price points based on 99% of Actavis new WAC points." By early afternoon, a price increase announcement letter had already been drafted and circulated for comment, incorporating Kaczmarek's "99% of Actavis" formula.

1787.   Meanwhile, CW-6 and Grauso continued their discussions that same morning. CW-6 initiated calls to Grauso at 9:55 a.m. and 12:21 p.m. Less than twenty (20) minutes after the second call with Grauso ended, CW-6 called his boss, Kaczmarek, to report the information he had obtained. A total of eight calls were exchanged between CW-6 and Kaczmarek on the afternoon and early evening of July 25, 2011.

1788.    During those calls-only 3 days after the Actavis increase and before G&W had even been able to follow-Kaczmarek informed the Fougera team that "…we should pull trigger on metro WAC increase for tomorrow."

1789.   In the early afternoon of Monday, July 25, 2011, a large customer reached out to CW-6 at Fougera seeking a new source of supply for Metro Lotion and another product. CW-6 asked whether the request was the result of supply issues or "market wide price increases." The buyer,

tongue-in-cheek, asked which answer would yield the better price. CW-6, following Kaczmarek's earlier instructions replied: "Unfortunately, neither - we cannot take on the volume."

1790.   That same day, Fougera informed its customers that it was increasing its pricing for both Metro Cream and Metro Lotion effective July 26, 2011, closely tracking Actavis's new prices. The new WAC price for Metro Cream was $151.80 for a 45gm tube. The new WAC price for Metro Lotion was $205.95 for a 59ml bottle.

1791.   Customers quickly began to complain to Fougera about the sharp price increase, prompting one Fougera customer service representative to ask Kaczmarek for help in framing a response to a disgruntled customer that emailed protesting that the roughly 150% price hike was "very high."

1792.   Undaunted by the obvious dissatisfaction of its customers, Fougera's singular focus was on ensuring that the competitors all followed the price increases. In response to yet another customer inquiry about the price spike, Kaczmarek virtually disregarded the news of the customer's displeasure, saying instead: "Hope to hell G&W does the cream with us."

1793.   Kaczmarek did not have to worry for long, however, as G&W's plans to follow the Actavis and Fougera price increases on Metro Cream were already in full swing. On July 26, 2011, the day of the Fougera increase, Grauso of G&W called CW-6 of Fougera. The call lasted one (1) minute. CW-6 hung up and immediately called Kaczmarek.

1794.   Meanwhile, less than ten minutes after ending his call with CW-6, Grauso brought Actavis into the conversation, initiating a two (2)-minute call to Perfetto. Orlofski of G&W similarly followed up with a text message to Perfetto at Actavis roughly a half hour after that. Grauso called CW-6 at Fougera again a few hours later, and the resulting call lasted seven (7) minutes. Within five minutes of the end of that call, Grauso had placed yet another call to Perfetto at Actavis, this one lasting five (5) minutes. By that evening, Grauso had spoken to Perfetto by phone for thirty-five (35)

more minutes, and had sent him a text message, while CW-6 of Fougera had conferred twice more with his boss, Kaczmarek.

1795.    Over the next two days, July 27 and July 28, 2011, Grauso spoke to Perfetto at Actavis four more times and to CW-6 at Fougera six (6) more times.

1796.    With its competitors fully apprised, G&W raised the price of Metro Cream on July 28, 2011, following close on the heels of the Actavis and Fougera increases.

1797.    As the news of yet another Metro Cream price increase hit the market, customers again scrambled to find more reasonably priced sources of supply. One large customer reached out to Fougera and Actavis on the same day as the G&W increase seeking quotes. Fougera sales executive K.K.2 contacted Kaczmarek about the request, surmising both that the customer was currently supplied by G&W and that G&W must be implementing a price increase.

1798.    Despite over a week of receiving nearly constant updates from G&W through CW- 6, Kaczmarek remained coy about his knowledge of G&W's increase, saying: "Yes I believe they are." Then, to ensure that K.K.2 did not try to compete for the business, he added: "Don't bid this. We have majority share."

1799.    Finally, just four days later on August 1, 2011, the remaining competitor, Harris, fell in line with an increase of its own on Metro Cream. The new Harris WAC price was $135.00, an increase of 437 percent.

1800.    On August 2, 2011, a customer informed G&W that its increase would bump G&W from its primary position on Metro Cream, but only by a small margin considering the market-wide increases. Vogel-Baylor promised the customer a slight price adjustment in order to maintain the primary position but asked who the other competitor was. The customer responded that it was Harris.

1801.    The following day, the customer followed up with Vogel-Baylor to let her know that Harris would not be fighting G&W for the primary position. The customer added that the Harris

representative was upset about the outcome, not because it failed to win the primary position but rather "[s]he seemed more upset with the lack of communication with G&W."

b)    G&W/Fougera - Calcipotriene

1802.   Calcipotriene Solution ("Calcipotriene"), also known by the brand name Dovonex Scalp, is a form of vitamin D that impacts the growth of skin cells. This topical medication is prescribed for the treatment of chronic plaque psoriasis of the scalp.

1803.   In early 2010, the market for generic Calcipotriene was shared by Defendants Fougera and Impax and Co-conspirator Hi-Tech. Even with three competitors in the market, pricing remained high and the product was "hugely profitable" for the sellers.

1804.   On July 23, 2010, however, Hi-Tech received a warning letter from the FDA detailing numerous violations found during a recent manufacturing facility inspection. Even though G&W was not in the Calcipotriene market at the time, Grauso knew his contact at Fougera would be interested in the information. On July 28, 2010, he forwarded a copy of the FDA letter to CW-6 at Fougera. Pleased with the news, CW-6 replied: "Christmas in July."

1805.   By the end of July 2010, Hi-Tech had discontinued the product, leaving its approximate 35 percent market share open for competitors to claim.

1806.   One year later, on June 6 and 7, 2011, CW-6 and Grauso exchanged several phone calls, with one call lasting eight (8) minutes. During those calls, Grauso informed CW-6 that G&W would soon be launching its own generic Calcipotriene. Shortly after speaking with Grauso, CW-6 emailed Kaczmarek and other colleagues at Fougera sharing the news that he had just learned from his competitor-G&W was launching that week.

1807.   G&W did, indeed, launch Calcipotriene that week, on June 10, 2011. As G&W was entering the market, CW-6 and Grauso continued to speak, including exchanging two calls on June 23, 2011 and one call on June 24, 2011 lasting sixteen (16) minutes.

1808.   A few months later, between November 10 and November 17, 2011, CW-6 and Grauso exchanged at least seven separate phone calls. The topic of conversation during these calls was a G&W price increase that was about to become effective for Calcipotriene.

1809.   At the end of this series of phone communications between Grauso and CW-6, G&W instituted a 54 percent price increase on Calcipotriene, effective November 18, 2011. Grauso sent an internal email advising the team to "[p]lease follow-up with your accounts on Monday to let them know there was a change in the market on this item. Currently, it is only us & [Fougera]."

1810.   Shortly after the G&W price increase became effective, on November 21, 2011, CW-6 of Fougera called his supervisor, Kaczmarek. Immediately upon hanging up, CW-6 called Grauso, and they spoke for five (5) minutes. Within minutes after that call ended, CW-6 called Kaczmarek again to report the results of his call with the competitor. Almost simultaneously, Grauso was also reporting the substance of his conversation with CW-6 to his G&W colleagues, by placing calls to Orlofski and Vogel-Baylor.

1811.   Fougera acted quickly. Just two days later, it followed G&W's price increase. Fougera's new WAC price on Calcipotriene went into effect on November 23, 2011.

c)   G&W/Fougera - Fluocinolone Acetonide

1812.   Fluocinolone Acetonide ("Fluocinolone") is a steroid that reduces inflammation. In its topical formulations (cream - 0.025%, 0.01% and ointment - 0.025%), it is prescribed for the treatment of skin conditions such as eczema and psoriasis.

1813.   In early 2011, Fougera had 100 percent share of the market for these products and was making plans to implement a price increase.

1814.   At an October 3, 2011 meeting of the Fougera Pricing Committee, members discussed their confidence that they were nearly ready to execute the planned increase. Moreover, they discussed the possibility that Fougera could use the impending entry of a competitor into the Fluocinolone

market to ensure the success of the price hike, saying: "There is a competitor coming out next year and we would like to reset the market and maximize opportunity."

1815. The market intelligence that the Fougera Pricing Committee had when it convened was the result of at least a week's worth of preparatory conversations that CW-6 had in late September 2011 with the entering competitor-G&W. Between September 20, 2011 and September 27, 2011, CW-6 and Grauso at G&W exchanged five phone calls, speaking for a total of forty-six (46) minutes.

1816. The conversations between CW-6 and Grauso continued at a vigorous pace over the coming weeks as Fougera moved towards its price increase, and G&W planned for its launch. The two exchanged sixteen calls during October and November 2011.

1817. On the morning of December 14, 2011, Fougera learned that G&W had launched Fluocinolone the preceding day and, importantly, that it had done so at nearly the same pricing as Fougera's current (pre-increase) price.

1818. D.K., a senior executive at Fougera, was quite displeased with the development considering Fougera's impending price increase, saying: "This is VERY bad news." J.B., also a senior executive at Fougera, concurred: "Ouch…. let's discuss prior to the review this pm."

1819. Less than a half hour later, Kaczmarek called CW-6. The call lasted two (2) minutes. Immediately after hanging up, CW-6 placed a call to Grauso. They spoke for six (6) minutes. Later that day, the competitors exchanged two more calls lasting nine (9) minutes and eighteen (18) minutes, respectively.

1820. Having received some peace of mind from the conversations between CW- 6 and Grauso, D.K. of Fougera sent an internal email recommending that Fougera move forward with the planned price increase on Fluocinolone, adding "hope G&W follows."

1821. To solidify the plan, CW-6 and Grauso placed three more calls to each other that afternoon. Less than an hour after his final call with CW-6, Grauso initiated the first of three calls to

his superior, Orlofski, to update him on the Fluocinolone discussions with Fougera. CW-6 also called to update his supervisor, Kaczmarek. Six more calls followed between CW-6 and Grauso in the days that followed between December 15, 2011 and December 21, 2011. At the conclusion of that series of calls, on December 22, 2011, Fougera increased WAC pricing on Fluocinolone Cream and Ointment by 200 percent.

1822.    Fougera knew from its discussions with G&W that G&W would follow the price increase. On the morning of December 28, 2011, D.K. of Fougera instructed a co- worker to find out whether G&W had followed Fougera's price increase yet. The co- worker reported that the competitor had not.

1823.    Shortly before noon that day, CW-6 and Grauso had a twenty (20) minute phone conversation. Immediately after that call ended, Grauso called his colleague at G&W, Vogel-Baylor.

1824.    Less than a week later, on January 3, 2012, G&W followed through with its assurances to Fougera, increasing WAC prices on Fluocinolone Cream and Ointment to within pennies of Fougera's prices. D.K. was delighted by the news and agreed with a colleague's suggestion that Fougera would "have to give [G&W] some accounts when they actually get out there to do so."

1825.    Fougera was satisfied with G&W's compliance and promptly gave up its Walmart business to G&W, quoting intentionally high prices on this drug to allow the rival to "gain some share." Specifically, Kaczmarek recommended giving G&W 30-35 percent share of the market, adding "hopefully G&W is being smart about targeted market share."

1826.    In early February 2012, the two companies continued to collaborate on allocating the market between themselves to give the new entrant its fair share. CW-6 called Orlofski on the morning of February 1, 2012, because his regular contact at G&W, Grauso, had left the company for employment at Aurobindo a few weeks earlier. Less than one hour later, Orlofski called CW-6 back. On February 8, 2012, Orlofski called Kaczmarek. Kaczmarek called Orlofski back on February 9,

378

2012, and the competitors exchanged two more calls the following day, including one call lasting over twenty-five (25) minutes.

1827.  At the conclusion of these communications, on February 14, 2012, Fougera ceded another large customer to G&W, telling Cardinal that it would "give up the primary source position to G&W."

d)    G&W/Fougera - Betamethasone Valerate

1828.  Betamethasone Valerate ("Beta Val"), also known by brand names such as Betamethacot, Beta-Val, and Betacort Scalp Lotion, among others, is a medium-strength topical corticosteroid prescribed for the treatment of skin conditions such as eczema and dermatitis, as well as allergies and rashes. It is manufactured in various formulations, including cream, lotion, and ointment.

1829.  In mid-2011, two companies shared the market for Beta Val Lotion - Fougera with 79 percent of the market, and Teva with 21 percent market share.

1830.  In early November 2011, however, Grauso at G&W contacted CW-6 with some important news about G&W's plans to enter the Beta Val Lotion market. Grauso called CW-6 late in the afternoon of November 9, 2011. They also spoke three times the next morning. Later that day, CW-6 informed his Fougera colleagues that G&W would be launching "in the next month" and that he believed Teva had discontinued the product. He opined that, under those circumstances, Beta Val Lotion "[m]ay be ripe for a 100% PI." Kaczmarek responded: "Thanks - will look into [it]."

1831.  Fougera promptly began preparing for an even larger price increase than CW-6 had recommended. On December 13, 2011, CW-3, a Fougera sales executive, created a spreadsheet detailing Fougera's upcoming price increases, including a 200 percent increase in WAC pricing for Beta Val Lotion from $20.00 to $60.00 per 60ml bottle. The average net sales price for the product would go from $10.11 to $30.33.

1832.   With the Fougera price increase details now firm, CW-6 began coordinating the price increase directly with G&W, initiating what became a series of twelve phone calls with Grauso at G&W from December 14 through December 21, 2011, in the days leading up to Fougera's price increase for Beta Val Lotion.

1833.   Fougera's new $60.00 WAC price went into effect on December 22, 2011. 1840. CW-6 and Grauso remained in close contact in the days that followed the Fougera price increase, as G&W also finalized plans for its Beta Val Lotion launch, including a twenty (20) minute call on December 28, 2011, Grauso's last day as a G&W employee. During these calls, the competitors discussed G&W's market share goals and identified customers for G&W to target as it launched.

1834.   On January 9, 2012, Vogel-Baylor of G&W (who had just taken over for Grauso) distributed to her colleagues a "[t]arget 1 list" for the G&W launch of Beta Val Lotion, saying "[o]ur market share goal is 44%." That same day, she sent an email to Walmart announcing the G&W launch. On January 11, 2012, she followed up with a quote, offering to supply the product for $10.40, far below Fougera's newly increased average net sales price.

1835.   Vogel-Baylor directed her colleagues at G&W to generate a nearly identical offer letter for another customer, Rite Aid, on January 10, 2012, offering a price of $10.20.

1836.   Something had clearly been lost in translation after Grauso's departure, and CW-6 of Fougera set out to figure out what had happened. Late in the afternoon on January 11, 2012, CW-6 placed an urgent call to Grauso, who had recently started at Defendant Aurobindo. Grauso called him back quickly, and the two spoke for five (5) minutes. Immediately upon ending that call, Grauso called his former colleague at G&W, Vogel-Baylor, to convey Fougera's concerns about G&W's drastically underpriced offers. As soon as that call ended, Grauso called CW-6 of Fougera to confirm that he had addressed the problem.

1837.   At 7:55 a.m. the following morning, Vogel-Baylor asked that the G&W team resubmit the Rite Aid proposal with a new price of $20.00, bringing it more in line with Fougera's new price. That same day, G&W also issued a revised price proposal to Walmart, quoting the new price of $20.00.

1838.   Vogel-Baylor explained the sudden about-face to a colleague by saying that she had revised the G&W launch pricing for this product "based on the recent increase." The modified schedule included $30.00 for large chains, $32-$75 for small chains, and $38.53 for wholesalers, closely paralleling the new Fougera prices.

1839.   One week later, on January 19, 2012, Vogel-Baylor announced to Orlofski that G&W had already reached its target market share for Beta Val Lotion: "Target 1 is now complete and we have 45% market share." By following Fougera's price increase, that 45 percent share equated to $1.6 million in total annual gross sales for G&W.

1840.   In a February 17, 2012 email exchange with a distributor, Orlofski explained G&W's rationale for not seeking additional market share on this product: "We have achieved approx. 45 percent market share on Beta Val lotion through the awarding of the business at CVS, Walmart, Rite Aid and Cardinal Source. We do not plan any additional activity at this time as it would lead to further price decline vis. Fougera."

e)    G&W/Fougera - Metronidazole .75% Gel

1841.   Metronidazole Topical .75% Gel ("Metro Gel .75%," also known by the brand name Metrogel) is a topical antibiotic prescribed for the treatment of skin lesions in patients suffering from rosacea.

1842.   As of June 2011, there were three competitors in the market for Metro Gel.75% - Fougera, Sandoz, and Taro.

1843.   In the summer of 2011, Sandoz was seeking opportunities to increase prices on its products. In pursuit of that goal, on July 6, 2011, J.P.2, a product manager at Sandoz, sent an internal

email asking for information on any recent price increases instituted by rivals Taro and Fougera on a list of products on which the companies overlapped. The list included Metro Gel .75%. J.P.2 urged that obtaining such information would "help with our efforts to drive additional profits with in-lines and potential AGx opportunities."

1844.  That same day, July 6, 2011, CW-4, a senior sales executive at Sandoz, exchanged three calls with D.S. at Taro, including one call lasting sixteen (16) minutes. During these calls, D.S. informed CW-4, among other things, that Taro would be raising prices on Metro Gel .75%. Based on their prior conversations and understanding, CW-4 knew that Sandoz was expected to follow the price increase.

1845.  Later that day, CW-4 responded to J.P.2's email stating "[t]hese are comments around Taro products." She then listed out the competitive intelligence she had just gathered from D.S. Regarding Metro Gel .75%, she included the notation "increase expected."

1846.  Over the coming months, Sandoz kept watch on the market, waiting to follow Taro's expected price increase on Metro Gel .75%.

1847.  In the interim, on July 20, 2011, a fourth competitor, G&W, entered the Metro Gel .75% market. Despite only recently entering the market, G&W quickly got to work coordinating a price increase on Metro Gel .75%. For the increase to succeed, G&W would need to ensure that the other competitors in the market would follow-and follow they did.

1848.  From January 29 to February 1, 2012, the ECRM held its Retail Pharmacy Generic Pharmaceuticals Conference in Atlanta, Georgia. Representatives from all four (4) competitors in the Metro Gel .75% market-Fougera, Sandoz, Taro, and G&W-were in attendance. These representatives included CW-6 and Kaczmarek of Fougera, CW-4 of Sandoz, D.S. of Taro, and Vogel-Baylor and Orlofski of G&W. Grauso, then at Aurobindo, was also in attendance.

1849. On February 2, 2012, the day after the conference concluded, G&W generated a price increase analysis for Metro Gel .75%, which included a 245 percent increase to the WAC price from $39.99 to $137.99. That same day, Vogel-Baylor used her former colleague Grauso (then at Aurobindo) to convey information to CW-6 at Fougera regarding the Metro Gel .75% price increase.

1850. For example, on February 2, 2012, Vogel-Baylor called Grauso and they spoke for eight (8) minutes. Grauso hung up and immediately called CW-6 of Fougera. The two men spoke for four (4) minutes. Immediately upon hanging up, Grauso called Vogel- Baylor back and they spoke for eleven (11) minutes. Grauso then called CW-6 again and spoke to him for five (5) minutes. Grauso hung up, received a call from Orlofski at G&W, and the two men spoke for thirteen (13) minutes.

1851. Later that evening, CW-6 emailed his boss at Fougera, Kaczmarek, asking him to give him a call. CW-6 and Kaczmarek spoke by phone three times the following day.

1852. On February 7, 2012, Vogel-Baylor emailed Orlofski her latest price increase analysis for Metro Gel .75%. The next day, on February 8, 2012, Orlofski called Kaczmarek at Fougera. The two competitors exchanged two more calls over the next few days and finally connected on February 10, 2012 for a twenty-five (25) minute call.

1853. The communications intensified on February 14, 2012 as G&W made final preparations for its price increase announcement. As they had done previously, Vogel- Baylor and CW-6 used Grauso as the conduit to coordinate their plans on Metro Gel .75%. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 8:42:00 | 0:25:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | CW-6 (Fougera) | 11:34:00 | 0:02:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | CW-6 (Fougera) | 11:56:00 | 0:13:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Orlofski, Kurt (G&W) | 12:09:00 | 0:01:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 12:10:00 | 0:01:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 12:19:00 | 0:04:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | CW-6 (Fougera) | 12:22:00 | 0:04:00 |
| 2/14/2012 | Text | Vogel-Baylor, Erika (G&W) | Incoming | Grauso, Jim (Aurobindo) | 12:26:30 | 0:00:00 |
| 2/14/2012 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | Grauso, Jim (Aurobindo) | 13:25:08 | 0:00:00 |
| 2/14/2012 | Text | Vogel-Baylor, Erika (G&W) | Incoming | Grauso, Jim (Aurobindo) | 13:25:59 | 0:00:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:40:00 | 0:05:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | CW-6 (Fougera) | 13:44:00 | 0:06:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:49:00 | 0:04:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | CW-6 (Fougera) | 13:55:00 | 0:01:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 14:39:00 | 0:08:00 |

1854.  Similarly, the next day, Vogel-Baylor called Grauso and they spoke for eleven (11) minutes. Less than ten minutes later, Grauso called Vogel-Baylor back and they spoke for forty-one (41) minutes. Grauso hung up the phone and immediately called CW-6 at Fougera. That call lasted one (1) minute. The next day, Vogel-Baylor instructed her team to generate price increase letters for Metro Gel .75%, and to issue them by 1:00 p.m. on February 17, 2012.

1855.  Even before G&W notified its customers of the increase, other competitors in the market knew that G&W would be increasing price and planned to do the same. For example, on February 15, 2012, two days before G&W sent its notice letters to its customers, Blashinsky, then a senior marketing executive at Taro, informed his colleagues that prices had "gone up dramatically" for Metro Gel .75% and one other product. "[W]e will follow shortly," he added. B.S., a senior executive at Taro, responded: "If you think it makes sense to be a fast follower we can raise metronidazole and fluo solution now."

1856.  On February 17, 2012, Orlofski emailed Blashinsky of Taro asking if he was going to the annual GPhA industry conference the following week. Orlofski stated, "[i]f so, perhaps we can catch up. Let me know!" Blashinsky responded, "[u]nfortunately, I won't be here but [B.S.] will." The next day, Orlofski emailed B.S., a senior Taro executive, asking "[a]re you planning on attending

GPhA? If so, would you have a few minutes to meet perhaps on Wednesday?" B.S. replied, "I will be attending, and we can certainly make some time."

1857.   On February 17, 2012, G&W sent out letters notifying its customers of the Metro Gel .75% price increase. That same day, Grauso called Vogel-Baylor, and they spoke for sixteen (16) minutes. Following the now normal pattern, Grauso hung up and called CW-6 at Fougera. The two men spoke for five (5) minutes. Immediately upon hanging up, Grauso called Vogel-Baylor again. That call lasted two (2) minutes.

1858.   On February 18, 2012, a GPO customer emailed Vogel-Baylor after receiving the Metro Gel .75% notice asking, "Sandoz or Fougera have not adjusted their WACs on this item . . . did they? Perhaps we should have a 60 day notice to see what really happens on the Gel." Vogel-Baylor responded, "[t]hey have not increased yet . . . we just initiated the price increase yesterday. We can do 15 days. I think we will know by then." Of course, Vogel-Baylor already knew that her competitors would follow G&W's price increase, but she could not tell the customer that. Ultimately, the customer negotiated a 45- day notice period and noted, "okay but will be watching the market closely!"

1859.   On February 20, 2012, Blashinsky reiterated to his colleagues that "[m]ajor changes" were taking place in the Metro Gel .75% market, and that Taro "will be following quickly."

1860.   From February 22 to February 24, 2012, the GPhA held its annual meeting in Orlando, Florida. Senior executives from all four competitors in the Metro Gel .75% market-Fougera, Sandoz, Taro, and G&W-were in attendance. These representatives included Kaczmarek and D.K., a senior executive at Fougera, R.T. of Sandoz, B.S. of Taro, and Orlofski of G&W. During the conference, the competitors were actively discussing and agreeing on the details of the Metro Gel .75% price increase.

1861.   On February 22, 2012, the first day of the GPhA meeting, Orlofski emailed B.S. again, stating "I hope you still have some time to meet at GPhA. I am available Wed afternoon evening and most of Thursday." B.S. replied, "[j]ust landed how about 4pm."

1862.   Immediately after meeting with Orlofski on February 22, B.S. emailed Blashinsky regarding Metro Gel .75% stating: "G&W Fougera and Sandoz all raised. Please check it." Blashinsky responded, "[s]o did we." B.S. replied, "[i]s it done or is it on the list?" to which Blashinsky answered, "[l]etters are going this week." B.S. further inquired, "Did you already chg WAC and AWP?" and Blashinsky replied, "[n]ope. That's the beauty of waiting." Of course, Fougera and Sandoz had not increased their Metro Gel .75% pricing yet - but B.S. of Taro understood that they would based on his conversation with Orlofski.

1863.   Similarly, that same evening, on February 22, 2012, Kaczmarek of Fougera (who was also at the GPhA conference) sent an email to the Fougera Pricing Committee stating: "G&W took a WAC price increase on metronidazole gel .75% yesterday to $137.99. I suggest that we move our WAC to $136.68 as soon as possible to prevent spec buying. Current status: 4 player market - Taro 43% share; Fougera 32% (we are coming back from supply issues mid 2011); Sandoz 14%; and G&W 9 %. Expect other competitors to follow suit on WAC."

1864.   On March 5, 2012, CW-3, then a sales executive at Fougera, emailed Kaczmarek predicting that "the new pricing will go over like an atomic bomb" with one customer that had already received a pre-increase price quote from Fougera. Kaczmarek was unsympathetic, responding that he was willing to lose the customer in the interest of maintaining the agreed-upon higher prices. He added that with respect to Fougera's price at another Metro Gel .75% customer, "we need to move that with market as well."

1865.   On March 9, 2012, Rite Aid emailed Sandoz asking for a bid on Metro Gel .75%. CW-4 of Sandoz forwarded the invitation to Kellum with the simple comment "HMMMMMM." Kellum wasted no time in telling his colleagues that Sandoz should stay clear of the Rite Aid bid, as Sandoz intended to follow the price increase that he believed spawned the opportunity, saying: "Bingo - no new bids for now please."

386

1866.   One week later, when Rite Aid pressed again for a Sandoz bid, CW-4 contacted Kellum to verify that the decision was to decline. Kellum not only confirmed that fact, but also suggested a pretext: "Correct - let's blame supply." Consistent with this instruction, CW-4 responded to Rite Aid: "Finally heard … we are unable to supply. Sorry for the delay but Demand Planning was trying to make it work."

1867.   Within the next several weeks, all three competitors followed G&W's increase on Metro Gel .75% as agreed and essentially matched G&W's WAC pricing. Fougera increased on March 16, 2012, Taro increased on March 23, 2012, and Sandoz increased on April 6, 2012.

1868.   On March 22, 2012, the day before Taro increased its price, Orlofski at G&W received two phone calls from a Taro employee[27] lasting twelve (12) minutes and two (2) minutes, respectively.

1869.   Customers began to react immediately to the dramatic price hikes by seeking price quotes from the competitors. The competitors, however, refused to break ranks. On April 3, 2012, for example, Fougera received a request from a Taro customer to bid on Metro Gel .75% in light of the Taro increase. CW-6 relayed the information to Kaczmarek, saying: "I suggest we pass." Kaczmarek responded simply: "Agree, pass."

1870.   The following day, on April 4, 2012, CW-6 sent Kaczmarek an updated market share breakdown for the Metro Gel .75% market. CW-6 expressed satisfaction that the market had arrived at an appropriate equilibrium in accordance with fair share principles, saying: "Sandoz finally moved their marketshare[sic] up. Meijer and Cardinal have asked me for a bid. I have declined."

f)    G&W/Glenmark - Ciclopirox Cream

1871.   In addition to colluding with CW-6 at Fougera, Vogel-Baylor at G&W also had a collusive relationship with CW-5, a senior executive at Defendant Glenmark. Although G&W and

---

[27] Taro employees do not have their own individual extensions and calls from their office lines appear in the phone records as coming from the Taro main company number.

Glenmark did not overlap on a large number of products, Vogel-Baylor and CW-5 capitalized on their relationship to collude and enter into anticompetitive agreements on those products that they did have in common.

1872.  Vogel-Baylor and CW-5 first met at a Rite Aid event in Las Vegas, Nevada in March 2012. In the months that followed, the two stayed in constant communication through emails, text messages, and phone calls, while also meeting in person at various trade shows and customer conferences. For example, Vogel-Baylor and CW-5 exchanged hundreds of text messages and phone calls in April 2012 alone. Indeed, between April 2012 and the end of that year, Vogel-Baylor and CW-5 exchanged at least 2,037 phone calls and text messages.

1873.  Ciclopirox Olamine Cream, also known by the brand name Loprox, is an antifungal medicine that prevents fungus from growing on your skin. Ciclopirox Cream is used to treat skin infections such as athlete's foot and ringworm.

1874.  In the summer of 2011, the market for Ciclopirox Cream was evenly split among four competitors - Perrigo with 26 percent; Paddock Laboratories, LLC ("Paddock")[28] with 30 percent; Fougera with 21 percent; and Glenmark with 21 percent. Defendant G&W was not in the market at this time.

1875.  On September 21, 2011, however, Vogel-Baylor learned from a customer that Fougera had temporarily discontinued Ciclopirox Cream. Vogel-Baylor forwarded that information to her supervisor, Grauso, who then called CW-6 at Fougera twice to confirm the information. The two competitors also spoke again the next morning.

1876.  G&W saw Fougera's exit as an opportunity to enter the market for Ciclopirox Cream. After confirming Fougera's plans to exit, G&W began making plans to enter the market.

---

[28] Perrigo acquired Paddock in July 2011.

1877.   On October 28, 2011, Vogel-Baylor emailed Grauso regarding a meeting she had with Rite Aid concerning G&W's upcoming launches. Regarding Ciclopirox Cream, Vogel-Baylor noted that Rite Aid's current incumbent was Glenmark and stated that "[p]ricing has been stagnant since November 2010."

1878.   Throughout January 2012, G&W began formalizing its strategy for the Ciclopirox Cream launch and reached out to various customers to obtain incumbent information, usage, and pricing intelligence.

1879.   On February 3, 2012, Vogel-Baylor emailed Orlofski, a senior G&W executive, notifying him that Ciclopirox Cream was now available in small quantities and that several additional batches would be ready for shipment in the next few weeks. She further stated that she needed to sit down with him to discuss which customers G&W wanted to approach.

1880.   On February 20, 2012, Orlofski emailed Vogel-Baylor with a list of the tasks that she was accountable for. One of those responsibilities was to secure approximately 20 percent market share of Ciclopirox Cream per the company's launch plan.

1881.   The next day, on February 21, 2012, Orlofski exchanged eight (8) text messages with S.K., a high-level executive at Perrigo. Two days later, on February 23, 2012, the two competitors exchanged an additional ten (10) text messages.

1882.   As of March 2012, Glenmark had 60 percent share of the Ciclopirox Cream market, Perrigo had 25 percent, and Fougera had the remaining share even as it was phasing out of the market.

1883.   By March 19, 2012, G&W had secured the Ciclopirox Cream business at Walgreens. Walgreens was a Glenmark customer that accounted for slightly less than G&W's goal of 20 percent of the market for Ciclopirox Cream.

1884.   On March 23, 2012, Vogel-Baylor asked C.M., a sales executive at G&W, to reach out to Publix to see if the customer would be interested in a bid for Ciclopirox Cream. C.M. responded:

"If they have Glenmark, it will be a little difficult as I know [the customer] has a good relationship with J.J.2 [a sales executive at Glenmark]." Vogel-Baylor responded: "He does have Glenmark. We are only offering this to Walgreens and Publix. That is it." C.M. replied: "Ok. That helps! He will leak that to Glenmark if we need him to." Vogel-Baylor answered immediately stating: "NO!!! Let's hold off on this for now. Glenmark cannot know that we went after Walgreens. They have not been told yet!!"

1885.   On March 27, 2012, C.M. advised Vogel-Baylor that G&W should put together a proposal for Publix and that the customer planned to award G&W the business before the upcoming RFP. That same day, while they were both at a Rite Aid event in Las Vegas, Nevada, Vogel-Baylor met CW-5, a senior executive at Glenmark, for the first time.

1886.   Two days later, on March 29, 2012, Vogel-Baylor emailed CW-5 stating, "[i]t was really nice to finally meet you at the Rite Aid event on Tuesday night" and asked the Glenmark executive to send his full contact information. The next day, CW-5 responded to Vogel-Baylor's email, providing his contact information and adding, "see you in Florida at NACDS next month." After exchanging a few more emails, the two then also exchanged several text messages.

1887.   On April 2, 2012, CW-5 emailed Vogel-Baylor stating that he had forgotten his cell phone at home and was "working on a few things today, lets touch base tomorrow with a plan to get together."

1888.   Throughout the month of April 2012, Vogel-Baylor and CW-5 exchanged hundreds of text messages and phone calls. During these communications, and others over the next several months, G&W and Glenmark colluded to significantly raise, almost simultaneously, their contract pricing on Ciclopirox Cream.

1889.   For example, on April 11 and April 12, 2012, Vogel-Baylor and CW-5 exchanged more than fifty (50) text messages and phone calls. In the early morning of April 12, 2012, Vogel-Baylor

emailed her supervisor, Orlofski, recommending that G&W increase contract pricing for Walgreens and Publix. She suggested a direct price increase for Publix between 57 percent and 82 percent and between 233 percent and 408 percent for Walgreens, depending on the dosage size.

1890.   On April 18, 2012, Vogel-Baylor emailed C.M. at G&W with specific pricing to submit for the upcoming Publix RFP. Regarding Ciclopirox Cream, Vogel- Baylor advised that because G&W was doing a price increase on the product, she was including increased pricing on the bid. Vogel-Baylor further stated that C.M. should discuss this with her before submitting the bid. That same day, Vogel-Baylor exchanged at least twenty (20) text messages and phone calls with CW-5 of Glenmark.

1891.   That same day, Glenmark also began sending out notices to its customers that it would be increasing its prices for Ciclopirox Cream.

1892.   From April 24 to April 27, 2012, the NACDS held its annual meeting in Palm Beach, Florida. Representatives from Glenmark, G&W, and Perrigo all attended, including S.K. of Perrigo, Orlofski and Vogel-Baylor of G&W, and CW-5 of Glenmark.

1893.   S.K. of Perrigo and Orlofski of G&W communicated several times by phone in advance of the conference, as well as on the day the conference began. Between April 19 and 24, 2012, Orlofski and S.K. exchanged at least fifteen (15) text messages. Orlofski also called S.K. once on April 24, 2012. Vogel-Baylor and CW-5 of Glenmark continued to communicate constantly throughout this time period. On April 24, 2012 alone, Vogel-Baylor exchanged eighty-eight (88) text messages with CW-5.

1894.   That same day, April 24, 2012, Cardinal emailed G&W requesting a bid on Ciclopirox Cream. C.M., a sales executive at G&W, forwarded the request to Vogel-Baylor stating: "Clearly, the reason Cardinal wants us to bid on Ciclopirox is due to the price increases." G&W declined to bid on the opportunity.

1895.   The next day, on April 25, 2012, Vogel-Baylor emailed C.M. asking him to "[p]lease tell [Publix] that we have been notified by our customers that there has been a price increase in the market on Ciclopirox Cream. Please tell him that we will be increasing his pricing slightly on the bid, however, it is not as high as we have heard the market has gone."

1896.   Two days later, on April 27, 2012, Vogel-Baylor requested that G&W prepare a price increase letter for Walgreens, raising the prices for Ciclopirox Cream between 233 percent and 408 percent depending on the formulation.

1897.   On May 21, 2012, Kroger, a Glenmark customer, emailed Vogel-Baylor asking if G&W would like to bid on Ciclopirox Cream. Vogel-Baylor declined to bid on the opportunity, claiming that G&W could not handle the volume.

1898.   On May 24, 2012, Vogel-Baylor emailed C.M., asking if he had heard whether Publix would accept the price increase on Ciclopirox Cream. C.M. responded that Perrigo had submitted low pricing on the RFP.

1899.   By this time, Vogel-Baylor had been introduced to CW-6 at Fougera and was communicating with him directly (instead of through Grauso, as she had done previously). Vogel-Baylor knew that CW-6 had a relationship with T.P. at Perrigo, so she reached out to him that same day to have CW-6 act as a conduit between her and T.P. at Perrigo. Immediately upon hanging up with Vogel-Baylor, CW-6 called T.P. of Perrigo. After speaking with T.P., CW-6 hung up and immediately called Vogel-Baylor back.

1900.   Later that day, Vogel-Baylor replied to her colleague C.M. stating, "[w]e will not be matching those prices so [Publix] will have to move to Perrigo." Vogel-Baylor forwarded Perrigo's pricing to her supervisor, Orlofski.

1901.   On June 4, 2012, G&W sent its price increase notice to Walgreens.

1902.  On June 11, 2012, C.M. of G&W emailed Vogel-Baylor, stating that he had spoken with Walgreens, and the customer had told him "we missed our mark with pricing and went too high based on where he knows the market to be on this item." C.M. stated, "[h]e did not say it and I did not ask if we did not go back to these prices would they move it." Vogel-Baylor responded: "Thanks for letting me know. I will talk to Kurt [Orlofski] about this." That same day, Vogel-Baylor and CW-5 of Glenmark exchanged more than eighty (80) text messages.

1903.  Vogel-Baylor forwarded her exchange with C.M. to Orlofski. The next day, on June 13, 2012, Vogel-Baylor exchanged eighteen (18) text messages with CW-5 of Glenmark. Also on June 13, 2012, Orlofski sent a text message to a Walgreens employee. G&W ultimately retained the Walgreens business.

1904.  Between June 15, 2012 and June 26, 2012, Vogel-Baylor and CW-5 continued to exchange multiple text messages each day. During that time period, the two competitors exchanged five-hundred forty-five (545) text messages.

1905.  On June 29, 2012, C.M. emailed Vogel-Baylor to advise her that MMCAP was requesting a bid on Ciclopirox Cream. Vogel-Baylor asked: "Who is the incumbent?"

1906.  C.M. replied: "Glenmark. They took a price increase without informing MMCAP. MMCAP has tried contacting Glenmark without any response." Vogel Baylor responded: "We will skip. Thanks." Vogel-Baylor later changed her mind and recommended to C.M. that he bid on the MMCAP business. As she explained: "It's high pricing so I don't think we will get it but I thought it was better for you to submit something than not make an effort."

5)    Additional Collusive Relationships

1907.  The key relationships discussed above are examples and are not meant to be an exhaustive list of all the collusive relationships that the Defendants had with each other during this

393

time period. Indeed, even if a company was not a prominent manufacturer of topical products, if there were product overlaps and a relationship, there was an opportunity to collude.

1908.  The relationship between CW-6 of Fougera and E.B., a senior sales executive at Hi-Tech, is a good example. During his tenure at Fougera, CW-6 had only eight (8) calls with E.B., according to available phone records. However, Fougera overlapped with Hi-Tech on the product Lidocaine Ointment and CW-6 used his connection with E.B. to significantly raise price on that product prior to Hi-Tech's entry in early 2012. This collusion is detailed in the following section.

a)      Lidocaine Ointment

1909.  Lidocaine Ointment ("Lidocaine" or "Lido"), also known by brand names such as Xylocaine Topical Solution, among others, is an anesthetic used to temporarily numb and relieve pain from minor burns, skin abrasions, insect bites, and other painful conditions affecting mucous membranes.

1910.  In late 2011, Hi-Tech began making plans to launch Lidocaine Ointment. At that time, Fougera was the sole generic manufacturer in the market.

1911.  On November 21, 2011, A.R.2, a Fougera sales executive, forwarded an invitation to CW-6, among others, for a conference call on November 28, 2011 to discuss "Lido & Lone Pricing Strategy." "Lone" referred to Fluocinolone Acetonide – a product on which Fougera and G&W overlapped and where CW-6 was colluding with Grauso of G&W at the same time. That anticompetitive conduct is discussed above in an earlier section of this Complaint.

1912.  The next day, on November 22, 2011, E.B. of Hi-Tech called CW-6, and they spoke for seven (7) minutes. Immediately after hanging up, CW-6 called his supervisor, Kaczmarek, and they spoke for four (4) minutes. The November 2011 call between CW-6 and E.B. was the first time that the two competitors had ever spoken by phone, according to the available phone records. During

these calls, the two competitors discussed Hi-Tech's entry into the market and Fougera's plan to raise its prices before Hi-Tech entered.

1913.   Fougera held its internal strategy meeting on November 28, 2011. A few days later, on December 2, and then again on December 5, 2011, CW-6 called E.B.

1914.   Later that month, on December 22, 2011, and consistent with the competitors' discussions, Fougera increased WAC pricing for Lidocaine Ointment by 200 percent.

1915.   Starting in February 2012, as Hi-Tech began preparing in earnest to enter the market, E.B. and CW-6 began speaking more frequently. On February 23, 2012, E.B. of Hi-Tech called CW-6 and they spoke for seven (7) minutes. Immediately upon hanging up, CW-6 called his supervisor, Kaczmarek, to report the conversation. An hour later, Kaczmarek called CW-6 back and they spoke for six (6) minutes. Further, on March 7, 2013, E.B. called CW-6, and they spoke for five (5) minutes. CW-6 called E.B. back a few minutes later. During these calls, the competitors discussed which customers Hi-Tech should target as it entered the Lidocaine market, as well as pricing.

1916.   One week later, on March 13, 2012, Hi-Tech entered the Lidocaine Ointment market and matched Fougera's increased WAC pricing.

1917.   After Hi-Tech entered, and consistent with fair share principles, Fougera gave up several of its Lidocaine Ointment customers to the new entrant. For example, on March 22, 2012, ABC emailed Fougera to advise that it had received an offer for Lidocaine Ointment and asked whether Fougera wanted to bid to retain the business. CW-3, then a sales executive at Fougera, asked Kaczmarek how to respond and he directed that CW-3 "give it up" to the new player.

1918.   Similarly, on March 27, 2012, CW-6 advised Kaczmarek that Hi-Tech had made an offer to another customer, Ahold, for Lidocaine Ointment. CW-6 suggested that Fougera "let it go as we have to give up some market share," to which Kaczmarek replied: "Let it go."

1919.   On May 17, 2012, Walmart emailed K.K.2, another Fougera sales executive, to advise that Fougera was not the lowest bidder on its RFP for Lidocaine Ointment and asked whether Fougera wanted to bid to retain the business. K.K.2 forwarded Walmart's request to Kaczmarek, asking how he should respond.

1920.   First thing the next morning, Kaczmarek called CW-6, and they spoke for ten (10) minutes. A few hours later, Kaczmarek called CW-6 again, and they spoke for three (3) minutes. Immediately upon hanging up, CW-6 called E.B. of Hi-Tech. A half hour later, CW-6 called E.B. again. That same morning, Kaczmarek responded to K.K.2's email stating, "[w]e have given up accounts. . . . one thing we know, they have CVS."

1921.   Later that day, Kaczmarek emailed the sales team regarding Lidocaine Ointment and stated that Fougera had already given up CVS, ABC, and Rite Aid, which accounted for 34 percent market share, and advised that Fougera was "[n]ot giving up too much more" S.H., a Fougera sales executive, then reminded Kaczmarek that Fougera had also given up HD Smith and Anda to Hi-Tech. Therefore, Kaczmarek recommended that Fougera "[d]efend Walmart. That's enough share to give up." The next day, on May 19, 2012, CW-6 called E.B., speaking for four (4) minutes—likely letting him know that Fougera was now done conceding customers to the new entrant.

        c.     <u>Focus on Price Increases Intensifies—Collusion from Late 2012-2016</u>

            i.     <u>Shifts in the Market Foster Collusion</u>

1922.   In late 2012 and early 2013, there were several changes among various manufacturers of topical products at both the corporate and personnel levels that facilitated and fostered a heightened focus on collusion among many of these competitors.

1923.   For example, in July 2012 Sandoz finalized its purchase of Fougera, a specialty dermatology company, making Sandoz a much more prominent manufacturer of topical products.

Indeed, Sandoz publicly touted that the purchase positioned it "as the new #1 in generic dermatology medicines both globally and in the U.S."

1924.   As a result of the acquisition, most Fougera executives, including Kaczmarek and CW-6, eventually lost their jobs. Indeed, out of the five Fougera sales executives in place prior to the acquisition, CW-3 was the only one to retain a long-term position with Sandoz.

1925.   Because of Sandoz's size and the fact that it manufactured and sold a large number of generic drugs, many competitors reached out to CW-3 when they learned he had transitioned to Sandoz because they viewed this as a strategic opportunity to collude on more overlapping products. In turn, and as discussed in further detail below, CW-3 would use these contacts to his own advantage by engaging in anticompetitive conduct in order to prove his worth to Sandoz management.

1926.   Further, in the months following the Fougera acquisition, three key Actavis executives—Boothe, Perfetto, and Aprahamian—left Actavis to assume senior-level positions with competitors. In December 2012, Boothe became the Executive Vice President and General Manager of Perrigo. One month later, in January 2013, Perfetto became the Chief Commercial Officer of Taro. And, in March 2013, Aprahamian followed his colleague Perfetto to Taro and assumed the role of Vice President of Sales and Marketing.

1927.   As discussed below, these former colleagues, now competitors, would use their longstanding relationships and new high-level corporate positions to collude with their key competitors on many overlapping products.

1)   <u>Post-Fougera Acquisition, Sandoz Sales Executives Feel<br>Pressure to Demonstrate Their Value</u>

1928.   As a result of the Fougera acquisition, Sandoz had more dermatology products than anyone else. Although Teva and Mylan were comparable in size to Sandoz, they had fewer topical products. The other key players in the topical space, Perrigo and Taro, were smaller companies.

1929.   Sandoz moved at a much faster pace than Fougera and sold many more products. At the time, the company was also launching several high-value products and bringing even more new products to market. CW-3 was thrown into the position and spent a lot of time learning about new (to him) oral solid products. The mindset at Sandoz was not to celebrate work accomplishments, but to move quickly from one launch to the next. As a result, CW-3 experienced a significant amount of culture shock and felt stressed and overwhelmed with his new circumstances.

1930.   In addition to his regular job duties and responsibilities, CW-3 was also required to participate in an informal working group created by Sandoz management to evaluate the profitability of the Fougera product line. Shortly after the acquisition, it quickly became apparent that Fougera sales were lagging below Sandoz's initial financial projections. As the lone holdover from Fougera, CW-3 felt a great deal of pressure from Sandoz management to come up with a plan to make the Fougera product line more profitable. CW-3 was responsible for identifying areas to help Sandoz meet its numbers, including recommending where to increase prices or where to increase market share.

1931.   Other Sandoz sales executives were also feeling anxieties resulting from the Fougera acquisition. For example, CW-4, a longtime Sandoz senior sales executive, was required to re-interview for her position and felt an immense amount of pressure to perform. Although she ultimately retained her job, CW-4 continued to feel nervous about having to learn a whole new line of topical products and to prove her value to Sandoz management.

2)    <u>Key Relationships Emerge and Existing Relationships Strengthen</u>

1263.   The pressures that the Sandoz sales executives were experiencing translated into the emergence of new collusive relationships and the strengthening of existing relationships among many of the competitors for topical products. For example, just as his predecessor CW-6 had done, CW-3 would forge ongoing understandings over the next several years with his key competitors Taro and Perrigo with regard to overlapping products. Similarly, Perfetto would capitalize on his relationship

398

with his former colleague Boothe to collude with respect to products on which Taro and Perrigo overlapped. Lastly, CW-4 would find solace in her existing relationship with D.S. of Taro who provided confirmation that the companies' understanding would continue unchanged despite the Fougera acquisition. Each of these relationships is explored in greater detail below.

a)    Sandoz/Taro

1932.    Around the time of the Fougera acquisition, CW-3 was approached by Aprahamian, then a senior pricing executive at Actavis. CW-3 and Aprahamian had known each other since 2006 when CW-3 worked at Cardinal and Aprahamian worked at ABC. The two men had lost touch over the years as they changed jobs, but they still saw each other throughout the years at trade shows and customer conferences.

1933.    Once CW-3 became a Sandoz employee, he and Aprahamian started communicating regularly again. For example, although they had exchanged only two (2) calls in 2011 according to available phone records, CW-3 and Aprahamian exchanged at least two hundred thirty-five (235) phone calls between April 2012 and August 2016 (when CW-3 left Sandoz to take a sales position with a competitor). CW-3 and Aprahamian almost always communicated by phone and rarely met in person.

1934.    CW-3 and Aprahamian engaged in anticompetitive conduct with regard to several products that Sandoz and Actavis overlapped on while Aprahamian was still at Actavis. Three examples—Desonide Lotion, Ciclopirox Shampoo, and Betamethasone Valerate Ointment—are discussed in detail below. However, once Aprahamian moved to Taro in March 2013, the extent of the product overlap between the two competitors increased significantly, and so did their collusion.

1935.    Aprahamian's move to Taro was a promotion. As Vice President of Sales and Marketing, Aprahamian had the power to set prices. Similarly, when Aprahamian told CW-3 that Taro

would give up a customer, CW-3 was confident, given Aprahamian's senior role, that he could rely on that representation.

1936.   Over the years, Sandoz and Taro, primarily through CW-3 and Aprahamian, developed an ongoing understanding not to poach each other's customers and to follow each other's price increases. Indeed, every time that Taro increased prices on a product for which Sandoz was a competitor, Aprahamian informed CW-3 about the increases in advance and provided him with specific price points. CW-3 would write this information down and then pass the information along to his superiors, CW-1 and Kellum. The expectation was always that Sandoz would follow the increases, and Sandoz did.

1937.   When there were other competitors in the market beyond Taro and Sandoz, CW-3 understood that Aprahamian was also coordinating with those competitors as he was coordinating with him. Many examples of this are discussed below in subsequent sections of this Complaint.

1938.   Although Sandoz consistently followed Taro's price increases, the company could not always do so right away. This did not mean that there was not an agreement to follow. Because price increases could trigger price protection penalties from customers, Sandoz would sometimes push the increases to the next quarter to ensure it hit its financial targets. In the meantime, Kellum would order that Sandoz place the product on strict allocation—meaning that Sandoz would allocate product to a customer based on regular usage—so that there was not a run on Sandoz's inventory resulting from a competitor's increase.

1939.   Further, when Taro increased prices, Aprahamian typically warned CW-3 not to take Taro's customers. Aprahamian was very animated and would say things like: "Don't take my f***ing customers," "Don't take my business," or "Don't be stupid." CW- 3 understood these warnings to mean that if a Taro customer asked for an offer in response to a Taro price increase, Sandoz should not compete for the business.

1940.   Aprahamian and CW-3 also coordinated on product launches. For a Taro launch into a Sandoz market, Aprahamian would share with CW-3 the customers Taro was targeting. CW-3 would then pass that information along to CW-1 and Kellum, and then subsequently report their responses back to Aprahamian.

1941.   For a Sandoz launch into a Taro market, which was more common because Taro was a smaller company and did not launch as many new products, Aprahamian would give CW-3 specific contract price points for customers that Taro agreed to relinquish. Aprahamian provided these price points so that Sandoz did not launch at too low a price. Typically, when Aprahamian told CW-3 that Taro would give up a customer, it did.

1942.   CW-3 also colluded with H.M. of Taro. Shortly after the Fougera acquisition, CW-6, who would not be staying at Sandoz, provided CW-3 with H.M.'s contact information. Although CW-3 and H.M. had met each other at a supplier meeting several years earlier, they did not actively start conspiring with one another until after CW-3 moved to Sandoz. According to available phone records, the two men spoke for the first time by phone in September 2012 and then exchanged at least fifty-one (51) phone calls and text messages through March 2014, when H.M. left Taro. Notably, CW-3 and H.M. were not social friends. If they were communicating by phone, it was to coordinate anticompetitive conduct with regard to products on which Sandoz and Taro overlapped.

1943.   While at Taro, H.M. shared price points with CW-3 and Sandoz used that information to inform Sandoz's product launches and to obtain market share without significantly eroding prices. CW-3 considered H.M.'s information to be reliable. However, once Aprahamian moved to Taro, he told CW-3 not to bother calling H.M anymore and to simply call him directly because he was responsible for pricing.

1944.   During this time period, CW-3 and H.M. were acting at all times at the direction of, or with approval from, their superiors, including CW-1 and Kellum of Sandoz and Aprahamian and

Perfetto of Taro. In turn, Aprahamian was acting at the direction of, or with approval from, his superior, Perfetto.

1945.   As detailed above, CW-4 of Sandoz and D.S. of Taro had an ongoing understanding going back to at least 2009 that Taro and Sandoz would behave responsibly in the market and not compete on overlapping products. However, CW-4 was unsure what impact the Fougera acquisition might have on that understanding and felt uneasy about having to learn a whole new product line.

1946.   CW-4 reached out to D.S. to calm her nerves and the two competitors had several conversations both in person and over the phone during which they discussed which manufacturers of topical products were responsible and which were not. D.S. reiterated what he had conveyed to CW-4 previously—that "Taro believes in making money." CW-4 understood this to mean that Taro wanted to maintain a fair market-share balance and keep prices high. Both CW-4 and D.S. concurred (again) that this was the smart way of doing business.

1947.   After these conversations, CW-4 felt more secure and less anxious about her new circumstances. CW-4 understood that she and D.S. would continue to be resources for each other and collude on overlapping products as they had in the past.

1948.   During this time period, CW-4 and D.S. were acting at all times at the direction of, or with approval from, their superiors, including Kellum of Sandoz and Perfetto and Aprahamian of Taro.

1949.   Soon after the Fougera acquisition, CW-4 learned from Sandoz management that the company was looking to increase market share and take price increases on certain drugs in the Fougera product line to improve the profitability of the Fougera portfolio. At this time, there were several products where Fougera had less than its fair share.

1950.   Shortly thereafter, CW-4 conveyed this information to D.S. at Taro. CW-4 wanted to make sure that if Sandoz tried to take a Taro customer, D.S. would not get alarmed and would

402

understand that it was only because Sandoz was looking for its "fair share" on that product. Similarly, CW-4 wanted to signal to D.S. and Taro that if Sandoz took a price increase, Taro should follow, or vice versa. D.S. listened to what CW-4 said and did not disagree.

              b)        <u>CW-3's Relationship with T.P. of Perrigo</u>

1951.  Just as CW-6 had provided H.M.'s contact information to CW-3 shortly after the Fougera acquisition, he also introduced CW-3 to T.P. of Perrigo. The two competitors spoke for the first time by phone in August 2012 and then exchanged at least eighty-one (81) phone calls through the end of 2014.

1952.  CW-3 and T.P. were not social friends. If they were communicating, it was to coordinate anticompetitive conduct with regard to products on which Sandoz and Perrigo overlapped. CW-3 and T.P. generally spoke only by phone. They did not exchange emails or text messages because T.P. did not want to create a written record of their communications. T.P. also did not like receiving voicemails. On one occasion, CW-3 left a voicemail for T.P. on his office phone. T.P. thereafter called CW-3 to admonish him, demanding that CW-3 not call his office phone but instead only call him on his personal cell phone.

1953.  CW-3 continued the ongoing understanding that his predecessor, CW-6, had in place with T.P.: that the competitors would not poach each other's customers and would follow each other's price increases.

1954.  Conversations between CW-3 of Sandoz and T.P. of Perrigo about price increases were intended to encourage the other side to follow. Sandoz was typically a price-increase follower. Neither company wanted to disrupt the market or do anything to lower prices. CW-3 and T.P. provided each other with information about price increases with the understanding that the other company would not use the price increase as an opportunity to compete for market share and take the other's customers.

1955.   Similarly, when Sandoz was launching into a Perrigo market, T.P. would provide CW-3 with a list of customers to target. T.P. also had access to Perrigo's pricing file. The file was searchable by customer and included non-public information such as contract pricing, dead nets, and cost of goods sold. T.P. provided pricing information to CW-3 when he requested it. However, on occasion, T.P. had to first check with his boss, Wesolowski, before he did so.

1956.   When T.P. provided CW-3 with information, he typically cautioned that CW-3 should be "smart" with the information; meaning that Sandoz should not use the information against Perrigo. CW-3 could generally rely on the pricing and customer alignment information that T.P. provided to him.

1957.   During this time period, T.P. was acting at all times at the direction of, or with approval from, his superiors, including Boothe and Wesolowski.

c)    Perfetto's Relationship with Boothe of Perrigo

1958.   Prior to Sandoz's acquisition of Fougera, H.M. of Taro and T.P. of Perrigo used CW-6 as a conduit to collude on overlapping products because the two competitors did not have an independent relationship. That changed when former Actavis executives, Perfetto and Boothe, moved to Taro and Perrigo, respectively. As a result of these moves, the two competitors could now communicate directly to coordinate their anticompetitive conduct with regard to products on which Taro and Perrigo overlapped.

1959.   Indeed, between January 2013 and January 2016 (when Boothe left Perrigo), the competitors exchanged at least one-hundred nineteen (119) phone calls. During this time period, the two former colleagues colluded on numerous overlapping products. Some examples of these products are discussed in detail below.

3)    <u>Sandoz Management Knew of, and Encouraged, the Collusion With Competitors</u>

1960.  Early on after the Fougera acquisition, CW-3 had a conversation with Kellum informing him that he could provide competitive intelligence on the Fougera product line. Shortly thereafter, CW-3 began providing Kellum and CW-1 with competitive intelligence he obtained from competitors regarding price increases, product launches, and customer allocation. Kellum and CW-1, Sandoz senior pricing executives, both knew that CW-3 obtained this information directly from competitors because he told them he did.

1961.  CW-3 conveyed competitive intelligence to Kellum and CW-1 through emails and phone calls. When communicating by email, CW-3 would disguise the true source of his information by stating that he had received it from a customer. When CW-3 had truly learned the information from a customer, it was always from a customer that he worked with, and he referred to that customer by name in his email. CW-1 and Kellum understood that when CW-3 referred to hearing from a "customer" without identifying that customer, or if CW-3 provided information relating to customers that he did not have responsibility for, it meant that CW-3 had gotten that information from a competitor.

1962.  As detailed above, CW-3's strongest relationships were with Aprahamian of Taro and T.P. of Perrigo, although he engaged in anticompetitive conduct with many others. These other relationships are explored in greater detail in subsequent sections of this Complaint. Wherever possible, CW-3 leveraged his relationships with competitors to demonstrate his value to Sandoz management.

1963.  For example, due to the strength of CW-3's relationship with Aprahamian, Sandoz management created what it referred to as a "Taro Strategy" in July 2013 to collude on products where Taro was a competitor. The "Taro Strategy" had a two-pronged approach: (1) implement concerted price increases on products where Sandoz and Taro were the only competitors in the market; and (2)

exit the market for certain other products to allow Taro to raise prices and then Sandoz could re-enter the market later at the higher price.

1964.   Although Kellum and CW-1 knew what they were doing was illegal, they continued to encourage and approve of the collusion with competitors. They did, however, seek to avoid documenting their illegal behavior. Indeed, Kellum routinely admonished Sandoz employees for putting information that was too blatant into emails. At one point, Kellum told CW-1 "we need to keep a lid on this, if this gets out, we could get into real trouble." Similarly, as time went on, CW-3 became increasingly anxious about his behavior and said to CW-1 "we could go to jail for what we are doing." CW-1 agreed with him.

> ii.   Taro Emerges as a Leader Among General Topical Manufacturers
>> 1)   Increased Focus on Fair Share and Price Increases

1965.   As detailed above, in early 2013 Perfetto and Aprahamian left their positions at Actavis to take executive-level positions at Taro. The two men wasted no time working together to implement changes at Taro designed to improve the company's bottom line.

1966.   First, Perfetto and Aprahamian focused their efforts on ensuring that Taro had its fair share of the market on the products it manufactured. To that end, the executives took steps to formalize internal processes for seeking and tracking competitive intelligence obtained by sales executives at the field level. This included compiling intelligence from not only customers, but from competitors as well.

1967.   For example, in January 2013, at Perfetto's request, J.J., a senior Taro sales executive, emailed the sales team asking them to obtain competitive intelligence relating to a list of priority products where "fair market share is being analyzed." Taro then used that information to inform which products to bid on, at which customers, and at what price points to meet its fair share targets without eroding the market price.

1968.  Second, Perfetto and Aprahamian positioned Taro as a price-increase leader and implemented significant price increases on a substantial portion of Taro's product portfolio in 2013 and 2014. Although Taro had had success implementing price increases in the past, the increases in these years would be much larger than they had been in past years.

1969.  For example, in February 2013, Taro took increases on several products, including Nystatin Triamcinolone, its highest grossing product. When an executive at Defendant Dr. Reddy's learned of the news, he sent an email stating: "Taro just continues to amaze me. How are we progressing with identifying the responsible market areas and options. Is there a next derm?" To that, a senior sales and marketing executive at Dr. Reddy's responded, "[t]his space continues to be appealing as the number of players are limited and the frequent, significant price increases drive the business."

1302.  Similarly, in June 2014, Taro took simultaneous, significant price increases on more than a dozen different products. The chart below, which was included in a Credit Suisse investor report, details some of the products for which Taro increased prices in the summer of 2014, the percentage of Taro's sales implicated, and the size of the increases.

| Figure 1: Products where Taro has taken price increases recently | | | |
|---|---|---|---|
| Product | % of Taro sales | Recent Price increase vs. old price | Date of price increase |
| Clobetasol Propionate - Ointment | 1.4% | 21.6x | Jun-14 |
| Clobetasol Propionate - Cream | 1.8% | 17.8x | Jun-14 |
| Warfarin | 4.0% | 3.1x | Jun-14 |
| Fluocinonide | 3.7% | 3.1x | Jun-14 |
| Phenytoin Sodium ER | 1.2% | 3.1x | Jun-14 |
| Hydrocortisone Val  - Cream | 2.6% | 1.4x | Jun-14 |
| Ketoconazole | 1.0% | 2.1x | Apr-14 |
| Carbamazepine - ER | 4.9% | 1.1x | Jun-14 |
| Ovide (g. Malathion) | 1.5% | 1.5x | May-14 |
| Hydrocortisone Val  - Ointment | 3.9% | 1.1x | Jun-14 |
| Hydrocortisone Butyrate | 0.4% | 1.6x | Jun-14 |
| Source: Price Rx, Credit Suisse research | | | |

1303.  These price increases, and others taken by Taro in 2013 and 2014, resulted in the accrual of significant profits to Taro. Indeed, between 2008 and 2016, Taro's profits increased by an astounding 1300 percent. As the graph below demonstrates, Taro's financial growth experienced a

sharp uptick in 2013, when Perfetto and Aprahamian began at Taro and positioned the company as a price-increase leader.



1970.   Taro's success in implementing these increases - and in obtaining its fair share on the products it manufactured - depended, in large part, on the strength of the ongoing collusive relationships that Perfetto and Aprahamian had with their contacts at competitor companies. Some of these relationships have been detailed above, but there were many more.

1971.   For example, between March 2013 and October 2018, Aprahamian exchanged at least six hundred eighteen (618) phone calls and text messages with his contacts at Sandoz, Glenmark, Actavis, Mylan, G&W, Wockhardt, Lannett, Amneal, Hi-Tech, and Perrigo.

1972.    Similarly, between January 2013 and February 2018, Perfetto exchanged at least six hundred ninety (690) phone calls and text messages with his contacts at G&W, Perrigo, Actavis, Glenmark, Aurobindo, Wockhardt, Greenstone, Amneal, and Lannett.

1973.    Aprahamian and Perfetto capitalized on the foregoing relationships to set Taro apart as a leader in the topical space. Some examples of how these relationships manifested themselves regarding specific products are described in detail below.

a)    <u>Aprahamian and CW-3 Collude</u>

1974.    The collusive relationship between Aprahamian and CW-3 dated back to Aprahamian's days at Actavis. Indeed, two of the first examples of collusion between the two competitors involved market allocation agreements on Ciclopirox Shampoo and Betamethasone Valerate Ointment-both products where Sandoz was entering the market and Actavis, acting through Aprahamian, agreed to cede share to the new entrant. A third product, Desonide Lotion, involved Sandoz increasing price while Actavis was out of the market and Actavis re-entering later at the higher price, in coordination with Sandoz. These agreements set the stage for how collusion would work between the two competitors when Aprahamian moved to Taro. These products are discussed in greater detail below.

i)    Desonide Lotion

1975.    Desonide Lotion, also known by various brand names such as DesOwen and LoKara, is a topical steroid that treats a variety of skin conditions, including eczema, dermatitis, allergies, and rash.

1976.    Between 2009 and 2011, Defendants Actavis and Fougera were the only two generic manufacturers of Desonide Lotion. In those years, the competitors instituted WAC price increases that were in lock step with one another. For example, on June 1, 2009, Fougera increased WAC pricing by roughly 90 percent and Actavis followed and matched on September 1, 2009. Similarly, on July 22,

2011, Actavis increased WAC pricing by nearly 200 percent, and Fougera followed three (3) days later, on July 25, 2011.

1977.   Following the increases, and consistent with fair share principles, the competitors declined opportunities to bid on each other's business so as not to take advantage of the price increases.

1978.   As of August 2012, the market for Desonide Lotion was evenly split between the two competitors, with Sandoz at 56 percent market share and Actavis at 44 percent.

1979.   On August 23, 2012, Kellum circulated a list of Fougera products for which he recommended increasing the price, including Desonide Lotion.

1980.   Between August 25 and August 28, 2012, the NACDS held its Pharmacy and Technology Conference in Denver, Colorado. Representatives from for which Actavis and Sandoz attended the conference, including CW-3 and Kellum of Sandoz and Aprahamian, then a senior pricing executive at Actavis.

1981.   At the conference, Aprahamian approached CW-3 and told him that Actavis was having supply issues on Desonide Lotion and would be exiting the market for a period of time. CW-3 then passed this information along to Kellum because he knew Kellum was interested in raising the price on Desonide Lotion and would view Actavis's temporary exit from the market as a positive development.

1982.   J.P.2, a product manager at Sandoz, was tasked with putting together information for the potential price increases, including on Desonide Lotion. On September 12, 2012, J.P.2 emailed CW-1, a senior pricing executive at Sandoz, and Kellum asking for input on the rationale for the price increases. Regarding Desonide Lotion, Kellum responded: "We believe they will follow based on past experience."

1983.   One month later, in October 2012, Kellum asked CW-3 to reach out to Aprahamian to get more specific information regarding Actavis's supply issues on Desonide Lotion. On October 17 and 18, 2012, CW-3 exchanged several calls with Aprahamian.

1984.   Later that evening, on October 18, 2012, CW-3 sent the following email to Kellum and other Sandoz colleagues, reporting what he had learned from Aprahamian:

From: ██████████
Sent: Thursday, October 18, 2012 05:31 PM
To: ████████████  Kellum, Armando; ████████████████████
Subject: Desonide Lotion

All-

After positive initial lab results Desonide Lotion is expected to release in mid-December.  We should be able to retain current market share as Actavis is experiencing an issue due to changing their API supplier.  The customer I spoke with did not have a potential release date at this time.

Thanks, ██████

1985.   As would become his customary practice, CW-3 referred to his source vaguely as a "customer" because he wanted to avoid putting anything incriminating in writing. Further, CW-3 knew that Kellum understood that his true source for the information was not a customer, but rather his contact at Actavis, Aprahamian.

1986.   After confirming its own ability to supply, Sandoz decided to move forward with a price increase on Desonide Lotion. In November 2012, Sandoz generated a price increase analysis for the product. In that analysis, Sandoz assumed "no unit volume decline and continued rational behavior by Actavis."

1987.   On December 5, 2012, Sandoz raised its WAC prices for Desonide Lotion by 75 percent. On the day before and the day of the price increase, CW-3 called Aprahamian twice, letting him know the details of the increase. The calls lasted seven (7) minutes and two (2) minutes, respectively. Several months later, on May 10, 2013, Sandoz again increased WAC pricing for Desonide Lotion – this time by 11 percent.

411

1988.  On August 22, 2013, Actavis finally re-entered the Desonide Lotion market and matched Sandoz's increased pricing.

1989.  On August 26, 2013, CW-3 notified the rest of the Fougera sales team that Actavis had re-entered the market. In response, CW-1 sarcastically recommended reducing all Desonide prices by 75 percent.

1990.  Instead of cutting prices, Kellum recommended that Sandoz "relinquish some share so as to preserve the new higher prices." Kellum noted that "Actavis is generally rationale [sic] so hopefully they act respectfully."

1991.  Sandoz proceeded to concede several of its Desonide Lotion customers to Actavis in order to allow Actavis to regain its market share without eroding the high market pricing. For example, in a December 2013 Business Review, Sandoz noted that it had "[r]elinquished McKesson, Econdisc, and Walmart w/out lowering mkt pricing." Several months later, in a Fougera Business Review, Sandoz further stated that the Desonide Lotion "[m]arket appears stable," and that Sandoz planned to "[d]efend current awards with goal to retain 60% + market at highest possible price."

ii)    Ciclopirox Shampoo

1992.  Ciclopirox Shampoo, also known by the brand name Loprox, is used to treat seborrheic dermatitis, an inflammatory skin condition of the scalp. As of the summer of 2012, the three competitors in the market were Perrigo, Actavis, and Taro.

1993.  After the Sandoz acquisition of Fougera was finalized in July 2012, Sandoz engaged in a review of the Fougera product line to determine whether there were any Fougera products for which Sandoz should considering re-entering the market. One such product was Ciclopirox Shampoo.

1994.  To that end, on September 4, 2012, J.P.2, a product manager at Sandoz, emailed the sales team, including CW-3, asking for market pricing on Ciclopirox Shampoo, among other products.

The next day, on September 5, 2012, S.G. a Sandoz sales executive, also followed up with CW-3 and asked him to provide J.P.2 with the requested information.

1995.   The following morning, on September 6, 2012, CW-3 reached out to his contacts at both Taro and Perrigo to discuss Ciclopirox Shampoo. He then reported the results of those conversations to both J.P.2 and S.G. at Sandoz, either that same day or the next day.

1996.   On November 26, 2012, J.R.2, a marketing executive at Sandoz, emailed CW-3 and others at Sandoz regarding the Ciclopirox Shampoo re-launch. J.R.2 stated that Sandoz planned to re-launch the (former Fougera) product on December 3, 2012 and planned to target 12 percent market share due to limited supply. J.R.2 asked CW-3 about current pricing and told him that they should discuss which customers to target to achieve Sandoz's market share goal.

1997.   The next day, on November 27, 2012, J.R.2 sent another email about the relaunch reiterating that Sandoz was targeting 12 percent share and stating that "since Perrigo and Watson [Actavis] have a majority of the market, we plan on targeting their accounts. [CW-3] and I are in the process of determining which accounts to target and we'll ask for usage if one of your accounts will be targeted. [CW-1, a Sandoz senior pricing executive] will be sending out offers for both products by Thursday."

1998.   Thereafter, CW-3 set out to coordinate Sandoz's entry with Aprahamian of Actavis. The next day, November 28, 2012, CW-3 called Aprahamian and they spoke for nine (9) minutes. First thing the following morning, on November 29, 2012, CW-3 called Aprahamian again and they spoke for ten (10) minutes. A few hours later, Aprahamian called CW-3 back and they spoke for three (3) minutes.

1999.   That same day, J.R.2 emailed CW-3, copying CW-1, asking for pricing information on Ciclopirox Shampoo. Not wanting to put anything in writing, CW-3 responded: "Call me . . . maybe?" First thing the next morning, CW-3 exchanged two calls with CW-1, with one lasting five (5) minutes

413

and the other lasting twelve (12) minutes, during which CW-3 conveyed the requested pricing information he had received from competitors.

2000.   Later that evening, R.T., a senior sales and marketing executive at Sandoz, sent an internal email asking if Sandoz had sent out offers for Ciclopirox Shampoo. The next day, on November 30, 2012, J.R.2 responded that offers had been sent to Walmart and HD Smith—both Actavis customers—and that Sandoz was considering approaching McKesson—a Perrigo customer.

2001.   That same morning, CW-3 called T.P. of Perrigo twice, to alert him to the fact that Sandoz would be approaching McKesson. The calls lasted two (2) minutes and one (1) minute, respectively. Later that day, CW-1 confirmed that Sandoz had sent an offer to McKesson for Ciclopirox Shampoo.

2002.   On December 3, 2012, Sandoz officially re-launched Ciclopirox Shampoo. 2011. On December 4 and December 5, 2012, CW-3 called Aprahamian twice.

2003.   The calls lasted seven (7) minutes and two (2) minutes, respectively. Also, to close the loop, on December 5, 2012, M.D., an Actavis sales executive, called T.P. of Perrigo and the two competitors spoke for seventeen (17) minutes.

2004.   Within three days of its entry, by December 6, 2012, Sandoz had already secured the Ciclopirox Shampoo business at HD Smith (from Actavis) and McKesson (from Perrigo).

iii)    Betamethasone Valerate

2005.   Betamethasone Valerate Ointment ("Betamethasone Valerate") is a corticosteroid used to treat a variety of skin conditions, including eczema, dermatitis, allergies, and rash.

2006.   In early January 2013, Sandoz began making plans to re-enter the market for Betamethasone Valerate and targeted February 15, 2013 as its re-launch date. At that time, Actavis was the only other generic competitor in the market.

414

2007.   On January 21, 2013, Sandoz held a Commercial Operations call during which the Betamethasone Valerate re-launch was discussed. During that call, CW-3 noted that Sandoz was seeking 40 percent of the market—which was typical (and consistent with fair share principles) for a second entrant in a two-player market—and was looking for price points and customer information.

2008.   On February 4, 2013, CW-3 called Aprahamian, who at that time was still at Actavis. The next day, February 5, 2013, CW-3 spoke with Aprahamian two more times – with one call lasting twenty-three (23) minutes. Immediately after each call with Aprahamian, CW-3 called Kellum or CW-1 to report back what he had learned.

2009.   During these calls, Aprahamian provided CW-3 with Actavis's non-public pricing for Betamethasone Valerate at its largest customers, as well as the percentage of the market that each customer represented. CW-3 documented this information in his Notebook, placing check marks next to the pricing and share information for Rite Aid and Walgreens, two of the customers that he and Aprahamian agreed that Sandoz would target:



2010.   This specific information was provided so that Sandoz would be able to price as high as possible while still obtaining business from specific, agreed-upon customers that represented an agreed-upon market share.

2011.   Later in the evening on February 5, 2013, J.R.2, a senior Sandoz marketing executive, sent an internal email, including to CW-3, stating: "Team - let's first focus on WAGS, RA, Cardinal and McK. Please obtain usage, interest level and we'll then compare to our 40% goal before approaching others."

2012.   Two days later, on February 7, 2013, C.P., a pricing analyst at Sandoz, sent an internal email, including to CW-3, stating that Sandoz planned to send an offer to Walgreens shortly and would send offers to additional targets once they received feedback from Walgreens.

2013.   On February 13, 2013, CW-3 called Aprahamian and they spoke for nearly sixteen (16) minutes. That same day, on February 13, 2013, Rick Rogerson, a senior pricing executive at Actavis,

416

discussed ceding the Walgreens account to Sandoz, stating in an internal email: "If Sandoz is looking for share (We have 100% as of IMS Q#-12 data) I would let this go." In response, Aprahamian confirmed that Actavis would be ceding the Walgreens business, stating "[w]e need to be responsible and give them ownership in this product."

2014. Two days later, on February 15, 2013, Sandoz re-entered the market and published WAC pricing that matched Actavis's WAC pricing. That same day, on February 15, 2013, Sandoz was awarded the Betamethasone Valerate business at Walgreens.

2015. On February 19, 2013, Sandoz bid on the Betamethasone Valerate business at Rite Aid. That same day, CW-3 called Aprahamian to let him know. On February 28, 2013, Rite Aid awarded the business to Sandoz.

2016. On March 15, 2013, Sandoz bid on the Betamethasone Valerate business at Cardinal. A few weeks later, on March 27, 2013, Cardinal awarded the business to Sandoz. These three accounts-Walgreens, Rite Aid, and Cardinal-accounted for approximately 32 percent of the Betamethasone Valerate market.

2017. On April 1, 2013, Sandoz held a Commercial Operations call during which they discussed, among other items, the status of the Betamethasone Valerate re-launch. CW-3's notes from that call reflect that Sandoz had been able to secure three customers, but was "shooting for" one additional customer, OptiSource, to reach its original 40 percent market-share goal. The next day, April 2, 2013, CW-3 called and spoke with Aprahamian twice, with one call lasting six (6) minutes.

2018. On April 4, 2013, Sandoz submitted an offer to Optisource for its Betamethasone Valerate business. Four days later, on April 8, 2013, Optisource awarded Sandoz the business.

        b)    <u>Aprahamian Moves to Taro and Begins Colluding with CW-3</u>

2019. In March 2013, Aprahamian followed his former colleague, Perfetto, to Taro and assumed a senior sales and marketing position. The product overlap between Sandoz and Taro was

417

much greater than it was between Sandoz and Actavis, thereby allowing the collusion between CW-3 and Aprahamian to become systematic and routine.

2020.   Indeed, immediately upon moving to Taro, and even before, Aprahamian and CW-3 began colluding on several products on which Sandoz and Taro overlapped: Nystatin Triamcinolone Cream and Ointment, Fluocinonide Ointment, and Lidocaine Ointment. The collusion on these products is discussed in detail below.

i)      Nystatin Triamcinolone

2021.   Nystatin Triamcinolone ("NT") Cream and Ointment is used for the treatment of cutaneous candidiasis, such as yeast infections and thrush.

2022.   By early 2011, Sandoz had discontinued NT Cream and Ointment leaving Taro as the exclusive generic manufacturer of the products.

2023.    Capitalizing on this exclusivity, Taro took several significant price increases on NT Cream and Ointment in 2011 and 2012, which resulted in a total WAC increase of more than 700 percent on certain formulations. During this time period, NT Cream and Ointment, were Taro's highest grossing products and represented approximately 14.1 percent of the company's consolidated net sales for the year ending March 31, 2013.

2024.   Enticed by the high pricing, Sandoz began making plans to re-enter the NT Cream and Ointment markets in late 2012 and began coordinating regularly with Taro. On November 12, 2012, before Aprahamian had joined Taro, CW-3 of Sandoz called H.M., a Taro sales executive, three times to alert him to the fact that Sandoz might be entering the market.

2025.   Two days later, on November 14, 2012, B.S., a senior Taro executive, sent an internal email to other senior executives at Taro and Sun recommending price increases on several products where Taro was exclusive, including NT Cream and Ointment. B.S. explained that "[a]s you have been made aware, we anticipate an N/T ointment competitive launch from Sandoz/Fougera in mid to

late December. If you approve an increase in prices of N/T cream and ointment it's important for us to move quickly ahead of the anticipated Sandoz launch."

2026.   Sandoz's launch dates for NT Cream and Ointment would get pushed back, but CW-3 continued to keep H.M informed. On January 4 and 7, 2013, CW-3 called H.M. of Taro. The calls lasted five (5) minutes and thirteen (13) minutes, respectively. One week later, on January 14, 2013, Taro held a Sales and Marketing conference call. During that call, Perfetto, then a Taro senior executive, informed the team that it was a "Priority to send out Price Increases," that Taro was "Anticipating April/May Competition" on NT Cream, and that the company should "Set Plan of Action to Solidify 50% MarketShare."

2027.   Two days later, on January 16, 2013, Perfetto emailed J.J., a senior Taro sales executive, advising that it was "time to lock up . . . at least 40 to 50 % of our key accounts prior to Sandoz talking about the item," and asked J.J. to put together a list of Taro's top 10 customers. J.J. then forwarded the request along internally stating, "[w]e'll have to consider a wholesaler and chain to give up share on (CVS would be nice)."

2028.   On February 12, 2013, Taro increased WAC pricing on NT Cream by 25 percent.

2029.   On February 28, 2013, CW-3 emailed M.A.2 of Sandoz, asking for an updated target launch date for NT Ointment. M.A.2 responded: "Oct 2013." That same day, CW-3 called H.M. of Taro to keep him updated on Sandoz's plans, and they spoke for eleven (11) minutes. Two days later, on March 2, 2013, the two competitors exchanged three (3) text messages.

2030.   The following Monday, March 4, 2013, Taro held a Sales and Marketing conference call. During that call, Perfetto informed the team that Sandoz was "launching NT cream in May and oint in Oct."

2031.   On March 13, 2013, D.P., a senior sales executive at Sandoz, sent an internal email to the sales team, including to CW-3, requesting "Competitive Intel" regarding pricing for certain products that Sandoz was planning to re-launch, including NT Cream and Ointment.

2032.   One week later, on March 18, 2013, Aprahamian started at Taro. Over the next several days, Aprahamian and CW-3 exchanged several calls.

2033.   On March 19, 2013, D.P. sent CW-3 a "Gentle Reminder" stating "Please remember to seek Taro pricing on NT cream." CW-3 understood from this email that D.P. was asking him to call his contact at Taro to obtain pricing. CW-3 responded: "Not a problem. Had a conversation today regarding all the products and Fluocinonide OT as well. Hope to have market intel tomorrow."

2034.   True to his word, on March 22, 2013, after the series of phone calls referenced above, CW-3 stated: "Please see the attached file containing market intelligence provided by customers." Although CW-3 said his information came from "customers," the true source was Aprahamian at Taro. CW-3 also shared the file with Kellum and CW-1, a

2035.    Sandoz senior pricing executive. Kellum and CW-1 understood at the time that CW-3 obtained this information directly from Taro.

2036.   The file attached to CW-3's email, which is pictured below, contained Taro's non-public contract pricing to several customers for several products, including specific price points for NT Cream and Ointment at Cardinal and Rite Aid. Notably, CW-3 did not have responsibility for either of those customers-which was a clear signal to his superiors that CW-3 had received the information from a competitor rather than a customer.

2037.   The pricing information had been provided directly by Aprahamian for the express purpose of allowing Sandoz to price as high as possible when entering the market.

| Product | Size | NDC | Comments | CAH | Rite Aid | Walgreens | Winn Dixie | Comments |
|---|---|---|---|---|---|---|---|---|
| Betamethasone Dipropionate Ointment(Augmented) 0.05% | 15 gram tube | 00168-0268-15 | Prasco entered 8/6/2012 | | | | $ 30.00 | Actavis pricing |
| Betamethasone Dipropionate Ointment(Augmented) 0.05% | 50 gram tube | 00168-0268-50 | Prasco entered 8/6/2012 | | | | $ 45.00 | Actavis pricing |
| Desoximetasone Cream 0.25% | 15 gram tube | 00168-0180-15 | Taro Price Increase 2-12-13 | $ 17.00 | | $ 6.00 | | Taro pricing |
| Desoximetasone Cream 0.25% | 60 gram tube | 00168-0180-60 | Taro Price Increase 2-12-13 | $ 36.00 | | $ 24.00 | | Taro pricing |
| Desoximetasone Cream 0.25% | 100 gram tube | 00168-0180-99 | Taro Price Increase 2-12-13 | $ 96.50 | | $ 43.00 | | Taro pricing |
| Nystatin Cream 100,000 U/g | 15 gram | 00168-0054-15 | | $ 8.00 | $ 5.25 | | | Taro pricing |
| Nystatin Cream 100,000 U/g | 30 gram | 00168-0054-30 | | $ 12.00 | $ 7.75 | | | Taro pricing |
| Nystatin-Triamcinolone Cream | 15 gram | 00168-0081-15 | Taro Price Increase 2-12-13 | $ 55.00 | $ 50.00 | | | Taro pricing |
| Nystatin-Triamcinolone Cream | 30 gram | 00168-0081-30 | Taro Price Increase 2-12-13 | $ 79.00 | $ 71.00 | | | Taro pricing |
| Nystatin-Triamcinolone Cream | 60 gram | 00168-0081-60 | Taro Price Increase 2-12-13 | $113.00 | $101.00 | | | Taro pricing |
| Nystatin-Triamcinolone Ointment | 15 gram | 00168-0089-15 | Taro Price Increase 2-12-13 | $ 55.00 | $ 50.00 | | | Taro pricing |
| Nystatin-Triamcinolone Ointment | 30 gram | 00168-0089-30 | Taro Price Increase 2-12-13 | $ 79.00 | $ 71.00 | | | Taro pricing |
| Nystatin-Triamcinolone Ointment | 60 gram | 00168-0089-60 | Taro Price Increase 2-12-13 | $113.00 | $101.00 | | | Taro pricing |

2038.   On the morning of April 15, 2013, Aprahamian called CW-3, and they spoke for eighteen (18) minutes. A few minutes after hanging up, CW-3 called Aprahamian back. During these calls, CW-3 told Aprahamian that Sandoz soon would be entering the market for NT Cream. Later that day, Taro held a Sales and Marketing conference call. The minutes from the conference call stated: "Sandoz entering N/T cream market, NO ACTION TO BE TAKEN by Taro."

2039.   On that same day, April 15, 2013, Sandoz held its own Commercial Operations call during which NT Cream was discussed. During that call, Sandoz identified ABC, Walgreens, Rite Aid, Walmart, and Omnicare as potential targets for the re-launch.

2040.   Later that same day, on April 15, 2013, CW-3 called Aprahamian to further discuss the NT Cream launch. The two competitors spoke for nine (9) minutes. On the call, Aprahamian provided CW-3 with Taro's non-public pricing at ABC, Walgreens, Rite Aid, and Omnicare. Aprahamian also told CW-3 that Taro would not defend these customers, a fact CW-3 contemporaneously documented in his Notebook by drawing arrows pointing at those customers' names:



2041.   After hanging up with Aprahamian, CW-3 immediately called Kellum to report his conversation with the competitor. First thing the next morning, on April 16, 2013, CW-3 called Kellum again and they spoke for five (5) minutes.

2042.   From April 20 to April 23, 2013, NACDS held its annual meeting in Palm Beach, Florida. Representatives from Taro, including Aprahamian and Perfetto, and Sandoz, including D.P. and R.T., a senior sales and marketing executive, attended.

2043.   The following day, on April 24, 2013, Aprahamian called CW-3 twice. On April 25, 2013, CW-3 called Aprahamian. That same day, Sandoz re-entered the NT Cream market and matched Taro's increased WAC pricing.

2044.   On the day of Sandoz's re-entry, Rite Aid emailed Taro, stating that it had received a competitive bid on NT Cream and asked whether Taro planned to bid to retain the business. H.M. of Taro forwarded the request to his colleagues J.J., Perfetto, and Aprahamian, stating: "I know the drill, just let me officially know that we are walking, thank you." Aprahamian responded: "We will evaluate and get back to you."

2045.   The next day, on April 26, 2013, Aprahamian called CW-3 and they spoke for eight (8) minutes. Consistent with Taro's agreement to cede that customer to Sandoz, Aprahamian emailed H.M. on April 27, 2013 asking him to call him Monday morning and stating, "[w]e will not be re-bidding and want to make sure we are aligned."

2046.   Also on April 26, 2013, Omnicare emailed Taro, indicating that it had received an offer for NT Cream and giving Taro the opportunity to match the pricing. D.S. forwarded the request to Aprahamian who responded, "[w]e will not be able to match as they have noted. Call me to discuss how you want this communicated."

2047.   That same day, Perfetto sent an internal email to J.K. and M.K., two senior Taro executives, and others including Aprahamian, reporting that over the last two days, Sandoz had approached several of Taro's customers, including ABC, Rite Aid, and Omnicare. Perfetto concluded: "Ara will track share we have given up."

2048.   On May 8, 2013, Perfetto sent an internal email to Taro executives advising that Walgreens was moving its NT Cream business to Sandoz and stating that "[w]e are done giving share to Sandoz on NT." That same day, Aprahamian called CW-3, and they spoke for eight (8) minutes. CW-3 called Aprahamian back later that day, and they spoke for another nine (9) minutes.

2049.   On May 28, 2013, NC Mutual emailed Taro, stating that it had received an offer from Sandoz and asked whether Taro planned to lower its price to retain the business. E.G.2, a Taro sales executive, suggested that Taro defend the account, but Aprahamian disagreed, stating: "Unfortunately we can't touch this. Need to keep balance and can't have this tip the cart, just too much exposure."

2050.   On June 4, 2013, Taro circulated an internal spreadsheet tracking its customer gains and losses in May 2013 for various products. With respect to Nystatin Triamcinolone Cream, Taro noted that it lost the business at Omnicare because it was "giving up share per Ara," and the Walgreens business was "moved for strategic reasons."

2051.    Despite Sandoz's entry, prices for NT Cream remained extremely high. Around this same time, K.S.3, a policy executive at Taro, actually sent an internal email to J.J., Perfetto, and Aprahamian asking whether there had "been any appreciable increase in demand in single ingredient nystatin and triamcinolone" because "we have all heard stories of patients combining the two products on their own to save money." J.J. replied that Kaiser had begun "dispensing a tube of each with instructions to mix" in order to provide some financial relief to its patients.

2052.    Following Sandoz's re-launch into the NT Cream market, Sandoz executives began discussing a larger "Taro Strategy" which involved "price delisting of 10 Taro products for which Sandoz has 0% MS [market share]." The rationale was simple - allow Taro to grow these markets by increasing prices and then Sandoz could re-enter later at the higher prices, in coordination with Taro. Sandoz referred to NT Cream as "precedence" for the success of this suggested approach and further noted that it would "help Taro to offset losses of NT Cream" -meaning that it would help Taro increase its profitability on other products in repayment for Taro's willingness to give up its market share to Sandoz on its most lucrative product.

2053.    In November 2013, Sandoz began readying to re-enter the NT Ointment market. Sandoz executives, including Kellum, wanted to mirror the NT Ointment launch after the NT Cream launch by targeting the same customers as it had for NT Cream. Kellum specifically discussed this approach with CW-1.

2054.    On November 13 and 15, 2013, Aprahamian and CW-3 exchanged several calls during which they discussed NT Ointment. CW-3 then reported what he discussed on those calls to CW-1.

2055.    On these calls, CW-3 and Aprahamian discussed Sandoz's plan to target the same customers that it had targeted on NT Cream: ABC, Walgreens, Rite Aid, and Omnicare. As he had done before, Aprahamian agreed that Taro would not defend those customers and provided CW-3 with Taro's pricing at those accounts.

2056.  On November 22, 2013, Aprahamian called CW-3, and they spoke for seven (7) minutes. That same day, Sandoz re-entered the NT Ointment market and matched Taro's increased WAC pricing. Per the competitors' agreement, Sandoz submitted offers to "the same customers we have contracted with for the NT Cream."

2057.  The next day, on November 23, 2013, P.G., a senior Sandoz executive, emailed Kellum and D.P. regarding the NT Ointment re-launch. P.G. asked who the other competitors were in the market and how much share Sandoz planned to target. D.P. responded: "Two-player market; Taro was alone in the market prior to Sandoz re-launch. 40% share is reasonable to start. We'll eventually seek >50%. Can discuss better off-line."

2058.  By December 2013, Sandoz had-as agreed-targeted and secured the NT Ointment business at ABC, Walgreens, Rite Aid, and Omnicare.

ii)      Fluocinonide Ointment

2059.  Fluocinonide Ointment, also known by the brand name Lidex, is a topical corticosteroid used for the treatment of a variety of skin conditions, including eczema, dermatitis, psoriasis, and vitiligo. It is one of the most widely prescribed dermatological drugs in the United States.

2060.  In early 2013, the Fluocinonide Ointment market was evenly split between Teva with 50 percent share and Taro with 42 percent share.

2061.  On February 12, 2013, Taro increased pricing on several products, including Fluocinonide Ointment. The increase included a 15 percent increase to WAC.

2062.  On February 21, 2013, M.A.2, a Sandoz marketing executive, emailed Kellum and other Sandoz executives to advise that Taro had increased pricing on several products for which Sandoz was re-entering the market, including Fluocinonide Ointment. That same morning, CW-3 of

Sandoz called H.M. of Taro and they spoke for (9) minutes. Immediately after hanging up with H.M., CW-3 called his supervisor, Kellum, and they spoke for four (4) minutes.

2063.   One week later, on February 28, 2013, McKesson emailed Taro stating that it had received an unsolicited bid on Fluocinonide Ointment and asked whether Taro wanted to bid to retain the business. Later that day, CW-3 called H.M. again and the two competitors spoke for eleven (11) minutes. First thing the next morning, on March 1, 2013, CW-3 called his boss Kellum, and they spoke for five (5) minutes.

2064.   On March 2, 2013, CW-3 and H.M. exchanged three (3) text messages. That same day, E.G.2, a Taro sales executive, forwarded the customer request along internally and attached a spreadsheet indicating that McKesson was Taro's largest customer and including the notation: "Sandoz has approval and is looking for share."

2065.   Two days later, on March 4, 2013, M.L., a Taro pricing executive, forwarded the McKesson request to Perfetto and other Taro executives suggesting that Taro reduce its pricing by 20 percent and retract the price increase to retain the business. Perfetto responded that he was okay with this approach but posed a question: "do we [have] all three wholesalers . . . or just mckesson . . . or do we have two of the three . . . that may play into [S]andoz approach."

2066.   On March 5, 2013, M.L. confirmed that Taro supplied all three wholesalers and Perfetto responded by asking J.J., a senior Taro sales executive, "are we primary at ABC and/or Cardinal . . . if so we will need to give one up . . . to Sandoz . . . Otherwise this product could go down rapidly." After confirming that Taro was primary on all three, J.J. replied, "I would agree with Mike P[erfetto] that if Fougera is in / back we may have to give up a wholesaler. But McKesson wouldn't be my first choice."

2067.   Looking for a creative way to communicate to Sandoz that Taro would prefer Sandoz to approach ABC or Cardinal instead of McKesson, Perfetto reached out to his former colleague at

Actavis, Aprahamian, who he knew had a relationship with CW-3 at Sandoz. Perfetto asked Aprahamian to speak with CW-3 about Fluocinonide Ointment. The two exchanged calls, and Aprahamian reported back to Perfetto what they discussed.

2068.  At the same time, CW-3 was reporting back to CW-1, a Sandoz senior pricing executive, what he had discussed with Aprahamian. Shortly after that discussion, CW-1 emailed Kellum and F.R., a Sandoz pricing executive, regarding Fluocinonide Ointment stating that he had "[j]ust received intel telling me that Taro will defend Mckesson. Also told that we should have no resistance going to either ABC or Cardinal." Kellum responded, "Let's do ABC and see where that lands us." Less than an hour later, Kellum called CW-3 and they spoke for twenty-three (23) minutes.

2069.  Having identified ABC as its target, CW-1 then asked CW-3 to contact Taro and obtain price points for the customer. Following this directive, CW-3 exchanged several calls with Aprahamian who, in turn, spoke with Perfetto and then relayed the information back to CW-3.

2070.  After speaking with Aprahamian for the last time on March 11, 2013, CW-3 called CW-1 and left him the following voicemail: Mike, it's Chris. Hey - I'm going to leave you this message on Fluocinonide - I think it's the Ointment. Old pricing for Taro at ABC. These are net prices - old and new nets. 15gm-$9.50, new price $12; 30 gm - old price 13.25, new price 16.75; 60gm $20, new price $25. Alright? Thanks, bye.

2071.  In accordance with the agreement between the two competitors, Sandoz bid on Fluocinonide Ointment at ABC and Taro promptly conceded the business.

iii)    Lidocaine Ointment

2072.  Lidocaine Ointment ("Lidocaine" or "Lido"), also known by brand names such as Xylocaine Topical Solution, among others, is an anesthetic used to temporarily numb and relieve pain from minor burns, skin abrasions, insect bites, and other painful conditions affecting mucous membranes.

427

2073.  As detailed above in an earlier section, in late 2011 Fougera raised its price on Lidocaine Ointment in advance of Hi-Tech's entry into the market in March 2012, and the two companies conspired to allocate customers to Hi-Tech in the months that followed.

2074.  One year later, in March 2013, Taro began preparing to re-launch into the Lidocaine Ointment market. At that time, Sandoz (which by that point had acquired Fougera) had approximately 56 percent market share and Hi-Tech had 42 percent.

2075.  On March 18, 2013, the same day that Aprahamian started at Taro, Perfetto sent an internal email, welcoming Aprahamian to the team and listing potential topics for a Monday call. One of those topics was "Lidocaine . . . get who has Sandoz."

2076.  Over the next several days, Aprahamian and CW-3 of Sandoz exchanged several calls, including a call on March 19, 2013 lasting sixteen (16) minutes and a call on March 21, 2013 lasting twelve (12) minutes.

2077.  Later in the day on March 21, 2013, after Aprahamian's conversations with CW-3, J.J., a senior Taro sales executive, sent an internal email listing Lidocaine Ointment usage numbers by competitor at various customers and stating: "Below is the intel I have so far . . .Originally we were going to target only Sandoz because the market share information indicated a 72% / 28% split. According to Ara [Aprahamian] that may have shifted. Please continue to gather usage and pricing information where you can and send to Kate, Ara, and me. We are looking for some mid-size Hi Tech targets also." The next day, on March 22, 2013, Aprahamian called CW-3 again. CW-3 returned the call and the two competitors spoke for seventeen (17) minutes.

2078.  During these calls in March 2013, Aprahamian informed CW-3 that Taro would be re-entering the Lidocaine Ointment market. CW-3, in turn, provided Aprahamian with non-public price points that Sandoz was charging to its customers for the product.

2079.   Armed with this competitively sensitive information, on or about March 23, 2013, Taro re-launched Lidocaine Ointment and matched Sandoz and Hi-Tech WAC pricing. Over the next two weeks, Aprahamian and CW-3 exchanged at least nine phone calls during which they discussed, among other things, the allocation of customers to the new entrant, Taro.

2080.   Although Aprahamian wanted CW-3 to tell him which customers to target, CW-3 had a difficult time obtaining that guidance from Kellum. Aprahamian told CW-3 that Taro would be taking two customers from Sandoz; CW-3 understood that to mean that Taro planned to take one wholesaler and one retailer.

2081.   On April 5, 2013, J.R.2, a senior Sandoz marketing executive, sent an internal email asking, "[a]ny idea what share and price we think Taro will go for Lidocaine ointment?" CW-3 responded: "More than likely 25 - 30. I believe we relinquished Cardinal to them so they will probably want one more from us." J.R.2 replied by asking Kellum, "any idea on pricing?" Kellum answered by providing his understanding of the conversations between CW-3 and Taro: "My expectation would be that we would relinquish ~2 customers and hopefully pricing would not be too affected." Later that day,J.R.2 sent another email to others at Sandoz stating: "We gave up Cardinal and plan on losing Walmart."

2082.   On April 8, 2013, Taro held a Sales and Marketing conference call. According to the meeting minutes, Perfetto reported the following: "Perfect execution of Lidocaine (Picked up Cardinal and Walmart) - FSS- Golden State- Publix, CVS" and "Sandoz-Giving us share." The next day, on April 9, 2013, CW-3 called Aprahamian, and they spoke for seven (7) minutes.

2083.   On April 15, 2013, Aprahamian and CW-3 exchanged three calls, including one lasting eighteen (18) minutes and another lasting nine (9) minutes. Later that day, Aprahamian sent an internal email attaching a "Lidocaine 30gm Launch Summary." The Summary detailed that, consistent with fair share principles, Taro's "Target Share" was "20%-25%" and they had achieved "26.3%" share.

For pricing, Taro matched "WAC & AWP on gram to gram basis . . . with competitors. Pricing negotiated consistent with traditional 3 player market."

2084.   The next day, on April 16, 2013, CW-3 called Aprahamian. Aprahamian returned the call and the two competitors spoke for eleven (11) minutes. At the same time, J.J. of Taro called E.B., a senior Hi-Tech sales and marketing executive, and they spoke for eight (8) minutes. Throughout the rest of April, CW-3 and Aprahamian would exchange at least ten more phone calls.

2085.   In June 2013, Taro circulated a spreadsheet detailing its gains and losses for May 2013 for various products. With respect to Lidocaine Ointment, Taro noted that it did not bid at Omnicare because "we have our share."

2086.   By January 2014, Sandoz held a "U.S. Strategy Workshop" which included a presentation on "[s]trategies to strengthen business: Fougera Gx." The presentation contained a slide titled, "[o]verview of key competitors," which included Taro, and identified the Lidocaine Ointment launch as a key launch for Taro. Sandoz described Taro's "[m]arket approach and strategy" as a "[v]ery responsible price competitor."

2087.   Throughout 2014, Sandoz was careful not to disrupt the market balance it had achieved with Taro and Hi-Tech with regard to Lidocaine Ointment. For example, in March 2014 Sandoz created a list of products to target at Walmart in 2014. With regard to Lidocaine Ointment, CW-3 responded that Sandoz had "[r]elinquished [Walmart] to Taro when they launched last June; careful with this product with all customers; priced high in the market and all players have been VERY rational."

          c)      <u>Aprahamian and Perfetto Orchestrate and Lead Price Increases in May 2013</u>

2088.   In addition to coordinating with Sandoz to allocate the market on several products on which the two competitors overlapped as detailed above, Aprahamian and Perfetto also began planning significant price increases on a number of products starting in early 2013.

2089.   Aprahamian and Perfetto focused their efforts on increasing prices on those products where they had strong relationships and ongoing understandings with individuals at the competitor companies. The two men capitalized on these relationships to coordinate price increases and avoid competing with each other in the markets for those overlap drugs.

2090.   One early example occurred in May 2013, when Taro increased its pricing on twelve (12) different products (the "May 2013 Increases"). As result of these price increases, Taro anticipated approximately $110 million in additional revenue. These products, their corresponding WAC increases, and Taro's competitors for each product are detailed in the chart below:

| PRODUCT DESCRIPTION | LARGEST % WAC INCREASE | COMPETITORS |
|---|---|---|
| Alclometasone Dipropionate 0.05% Topical Cream | 223% | Sandoz, Glenmark |
| Ammonium Lactate 12% Topical Cream | 97% | Perrigo, Actavis |
| Ammonium Lactate 12% Topical Lotion | 88% | Perrigo, Actavis |
| Betamethasone Dipropionate (Augmented) 0.05% Topical Lotion | 29% | Sandoz |
| Betamethasone Dipropionate 0.05% Topical Cream | 10% | Sandoz, Actavis |
| Betamethasone Valerate 0.1% Topical Cream | 44% | Sandoz, Actavis |
| Carbamazepine 400mg Extended-Release Tablet | 43% | Sandoz |
| Carbamazepine 100mg/5ml Suspension | 18% | Wockhardt |
| Clomipramine Hydrochloride 75mg Capsule | 3441% | Sandoz, Mylan |
| Desonide 0.05% Topical Cream | 703% | Perrigo, Actavis (entered in Aug. 2013) |
| Desonide 0.05% Topical Ointment | 501% | Perrigo, Sandoz (entered in Jan. 2014) |
| Terconazole 3 Day 0.8% Vaginal Cream | 55% | Sandoz, Actavis |

2091.   In advance of the May 2013 Increases, Aprahamian and Perfetto spoke with their competitors on those products – Sandoz, Perrigo, Actavis, Mylan, and Glenmark—to discuss the increases and limit competition between them. Indeed, Taro began communicating with competitors, and formulating its list of products for the increases, as early as April 2, 2013.

2092.   For example, on April 2, 2013, Aprahamian spoke with CW-3 of Sandoz for six (6) minutes. During that call, the two competitors discussed the price increases that Taro was planning for May 2013, a fact evidenced by contemporaneous notes CW-3 made in his Notebook:

Taro - 5/1 Increases          4/2/13
① Carbamezapim
② Desonid OT
③ Flouracil
④ Metro Gel

2093.   Immediately upon hanging up with Aprahamian, CW-3 called another competitor, T.P. of Perrigo, and they spoke for five (5) minutes. During that call, CW-3 discussed the May 2013 Increases with T.P. and T.P. told CW-3 that he already knew about them. When CW-3 hung up with T.P., he immediately called Aprahamian back. A few minutes after hanging up with Aprahamian, CW-3 called his superior Kellum. Later that morning, Aprahamian called CW-3 and they spoke for another six (6) minutes.

2094.   Two days later, on April 4, 2013, Aprahamian called M.A. of Mylan and the two competitors spoke for fifteen (15) minutes. Immediately upon hanging up, Aprahamian called CW-3 of Sandoz and they spoke for six (6) minutes. Mylan and Sandoz were competitors with Taro on the product Clomipramine HCL Capsules ("Clomipramine"), one of the May 2013 Increase products.

2095.   At the same time, Taro was communicating with Blashinsky of Glenmark. On both April 2, 2013 and April 9, 2013, a Taro employee—likely Perfetto—called Blashinsky from his office phone. The calls lasted twenty-eight (28) minutes and twenty- three (23) minutes, respectively. Also on April 9, 2013, Aprahamian exchanged two calls with CW-3 of Sandoz, including one call lasting seven (7) minutes. Sandoz and Glenmark were competitors with Taro for Alclometasone Dipropionate Cream ("Alclometasone Cream"), one of Taro's May 2013 Increase products.

2096.   Further, on April 15, 2013 and April 16, 2013, CW-3 exchanged several calls with Aprahamian and Blashinsky. During these calls, the three competitors discussed, among other things, Taro's planned price increase on Alclometasone Cream.

432

2097.   At the same time, Perfetto and Aprahamian were communicating frequently with their contacts at Perrigo and Actavis. Further, Perrigo and Actavis were also speaking directly with each other during this time period. Perrigo and Actavis had at least two May 2013 Increase products in common that overlapped with Taro, Ammonium Lactate Cream and Lotion.

2098.   While the competitors were communicating with each other, they kept their colleagues apprised of their communications with competitors. For example, after several of CW-3's calls with competitors, he immediately called Kellum or CW-1 to inform them of what he had learned. A few of these examples are detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/9/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 5:50:00 | 0:01:00 |
| 4/9/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 5:51:00 | 0:07:00 |
| 4/9/2013 | Voice | CW-3 (Sandoz) | Outgoing | CW-1 (Sandoz) | 5:58:00 | 0:02:00 |

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/15/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 11:58:00 | 0:09:00 |
| 4/15/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 12:07:00 | 0:01:00 |

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/16/2013 | Voice | CW-3 (Sandoz) | Outgoing | Blashinsky, Mitchell (Glenmark) | 6:32:00 | 0:12:00 |
| 4/16/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 6:46:00 | 0:05:00 |

2099.   By April 17, 2013, Aprahamian and Perfetto had finalized their list of products for the May 2013 Increases. That same day, S.G., a sales executive at Sandoz, sent an internal email, including to CW-3 and CW-4, regarding potential supply issues for Carbamazepine ER Tablets, a drug on Taro's list. S.G. stated, "[c]an you please find out if Taro is experiencing any supply challenges? We are not aware but a customer mentioned this. We want to flesh it out."

2100.   After receiving the email, CW-4 and D.S. of Taro spoke twice, with the calls lasting twelve (12) minutes and two (2) minutes, respectively. On those calls, D.S. explained that Taro did not have any long-term supply issues. After hanging up with D.S. for the second time, CW-4 responded to S.G.'s email stating: "Nothing significant. They will be on BO for a few days."

2101.   At the same time, CW-3 forwarded S.G.'s request regarding Carbamazepine ER directly to Kellum in a separate email stating, "I believe we talked about this one a couple of weeks ago"—likely referring to the impending Taro price increase. To that, Kellum responded simply, "yes."

2102.   In the days leading up to the May 2013 Increases, the competitors continued to communicate with each other in order to coordinate the price increases.

2103.   Also, between April 20 and April 23, 2013, the NACDS held its annual meeting at the Sands Convention Center in Palm Beach, Florida. Representatives from Taro, Sandoz, Perrigo, Actavis, Mylan, and Glenmark were all in attendance. The attendees included Aprahamian and Perfetto of Taro, A.B., a senior-most executive at Actavis, and Blashinsky of Glenmark.

2104.   One week later, on April 29 and April 30, 2013, Taro sent notices to its customers informing them of the May 2013 Increases. The next day, on May 1, 2013, Taro published increased WAC pricing for the affected products.

2105.   During this time, Aprahamian and Perfetto continued to communicate with their competitors. For example, on April 30, 2013, Aprahamian and CW-3 exchanged two calls lasting fourteen (14) minutes and two (2) minutes, respectively. During those calls, Aprahamian and CW-3 discussed the May 2013 Increases and the seven Sandoz products that Taro had increased prices on. After each call with Aprahamian, CW-3 hung up and immediately called Kellum to inform him of what he had learned from Aprahamian.

2106.   At the same time, Aprahamian and Perfetto were also communicating with other competitors about the May 2013 Increases.

2107.   Consistent with their ongoing understandings, Taro's competitors uniformly declined opportunities to bid on Taro's customers after the May 2013 Increases. Taro's competitors understood that to do so would violate the "rules of the road" and would disrupt the market-share balance that

they had worked so hard to achieve. Indeed, rather than compete, these competitors began working on implementing price increases of their own.

2108.   For example, on April 30, 2013, Publix emailed Sandoz, stating that Taro had increased pricing on a number of Sandoz overlap products and asked whether Sandoz wanted to bid on them. The products included Betamethasone Dipropionate Lotion, Clomipramine, and Carbamazepine ER. Kellum emailed CW-4 stating, "I'm not inclined to do anything here as these may be opportunities for us. We can blame supply if these are in fact opps for us." CW-4 replied: "Agreed! Especially the opportunities for us part!" By "opportunities," Kellum and CW-4 both meant that this was a chance for Sandoz to raise its prices on these products as well.

2109.   That same day, April 30, 2013, Publix emailed Actavis to notify it that Taro had raised pricing on Terconazole Cream and asked whether Actavis wanted to bid for the business. Two days later, and after several calls between Aprahamian and Perfetto and their former Actavis colleagues, M.B.2, a sales executive at Actavis, also refused to bid, stating: "Thank you for thinking of us on Terconazole. I'd love to add it to contract but we're not able to take on your business right now."

2110.   Similarly, on May 7, 2013, CVS asked Sandoz if they would be interested in bidding on several of the May 2013 Increase products. C.P., a pricing analyst at Sandoz, responded internally stating, "[w]e can supply the Beta Dip Cream, Beta Val Cream, Terconazole V Cream immediately and the Carbamazepine XR will require a 4 month lead time." To that, Kellum responded: "Guys – we do not want to pursue these products with CVS right now. We'll need to figure out good explanation etc."

2111.   At the same time, Taro was confident based on its conversations with competitors that its increases would stick. For example, when Kaiser gave Taro push back on the May 2013 Increases, including asking for "justification for the price adjustment on Clomipramine and Desonide," Aprahamian saw no need for explanation and in an internal email responded simply, "[t]hey can

435

accept the increase or move the product." Ultimately, Aprahamian's approach yielded results and Taro retained the business at the higher pricing.

2112.  Similarly, on May 8, 2013, Cardinal emailed D.S. of Taro stating that regarding Desonide, "[t]here is a player that is not following you—you can see that you are losing sales. Do you want to re-evaluate?" D.S. forwarded the email internally and Aprahamian responded, "its been exactly one week since the adjustments, can't image 'lost sales' are visible in such a short time. We need to stay the course." Perfetto added, "Ditto."

2113.  Further, by the time the May 2013 Increases were publicly announced, Taro's competitors were already well on their way to implementing comparable price increases of their own. For example, by May 1, 2013, the day that Taro published its increased WAC pricing, Actavis had already conducted its own price increase analysis for Terconazole Cream and had revised its contract pricing to follow the Taro increase.

2114.  Similarly, one day later on May 2, 2013, Kellum emailed the Sandoz Pricing Committee recommending that Sandoz increase prices on six of the seven Sandoz products on Taro's May 2013 Increase list. The powerpoint presentation that Kellum submitted to the Committee contained no detailed price increase analysis and noted simply that Sandoz should increase because Taro had raised prices on those products.

2115.  Over the next several months, and consistent with their ongoing understandings, Taro's competitors—Sandoz, Perrigo, Actavis, Mylan, and Glenmark— followed Taro's May 2013 Increases with increases of their own. Several of these competitor price increases, and their corresponding dates, are detailed in the chart below

| Drug | Competitors | Lead/Followed | Date |
|---|---|---|---|
| Alclometasone Diproproprionate Cream | Sandoz | Followed | 5/10/13 |
| | Glenmark | Followed | 5/16/13 |
| Ammonium Lactate Cream | Actavis | Followed | 6/25/13 |
| | Perrigo | Followed | 7/30/13 |
| Ammonium Lactate Lotion | Actavis | Followed | 6/25/13 |
| | Perrigo | Followed | 7/30/13 |
| Betamethasone Diproprionate Lotion | Sandoz | Followed | 7/26/13 |
| Betamethasone Diprionate Cream | Sandoz | Followed | 7/26/13 |
| Betamethasone Valerate Cream | Sandoz | Followed | 7/26/13 |
| Carbamazepine Extended Release Tablets | Sandoz | Followed | 5/10/13 |
| Clomipramine Hydrochloride Capsules | Mylan | Followed | 5/16/13 |
| | Sandoz | Followed | 7/22/13 |
| Desonide Cream | Perrigo | Followed | 5/21/13 |
| | Actavis | Re-entered and Matched | 8/15/13 |
| Desonide Ointment | Perrigo | Followed | 5/21/13 |
| | Sandoz | Re-entered and Matched | 1/17/14 |
| Terconazole Cream | Actavis | Followed | 6/5/2013 |

2116.   Consistent with past practice, the competitors also often spoke before they followed with a price increase. By way of example, and as detailed in the chart above, Sandoz followed Taro's price increases on Alclometasone Cream and Carbamazepine ER with its own price increases on May 10, 2013, and Glenmark followed Taro's and Sandoz's price increases on Alclometasone Cream shortly thereafter, on May 16, 2013. CW-3 of Sandoz, Blashinsky of Glenmark, and Aprahamian and Perfetto of Taro spoke numerous times in the days leading up to those increases.

2117.   Similarly, Sandoz followed the Taro price increases on Betamethasone Dipropionate Cream and Lotion and Betamethasone Valerate Cream on July 28, 2013. In the days leading up to the Sandoz price increase, Aprahamian exchanged several calls with CW-3, including a call on July 23, 2013 that lasted three (3) minutes. During that call, CW-3 conveyed to Aprahamian that Sandoz would be increasing prices on several Taro products, including the Betamethasone products.

2118.   Lastly, Perrigo followed the Taro price increases on Desonide Cream and Ointment on May 21, 2013, and Actavis re-entered the Desonide Cream market and matched the competitors' pricing on August 15, 2013. Again, there were numerous calls among the competitors in the days leading up to those increases.

437

2119.   Consistent with their ongoing understandings, Taro exercised restraint, just as its competitors had done, and did not poach customers from its competitors after they followed with price increases of their own. For example, on May 23, 2013, Econdisc reached out to Taro asking for a bid on Alclometasone Cream. Aprahamian asked D.S., a Taro sales executive, why Econdisc was looking for a bid and D.S. replied: "Glenmark recently adjusted prices at Econdisc. So Econdisc is seeing if we want to pick up some market share. We can supply . . . However, I did tell [Econdisc] our supply is tight. So if we do not bid, I have an out." Aprahamian responded: "No, we can not take on." Consistent with Aprahamian's directive, Taro subsequently declined to bid on the business.

2120.   The competitors continued to communicate about the May 2013 Increase products even after the competitors had followed the increases. These open lines of communication were important to ensure that the competitors did not run afoul of the delicate market share balance they had achieved with each other.

2121.   For example, in September 2013, D.S. of Taro called CW-4 of Sandoz to tell her that Taro's Carbamazepine ER product was being held up at the border. As a result, Sandoz would likely be receiving requests from Taro customers for the product. By conveying this to CW-4, D.S. was sending the message that Taro would lose customers if Sandoz sold too much and Taro would have no choice but to compete to get its market share back. This would disrupt the market and cause prices to deteriorate across the board.

2122.   After speaking with D.S., CW-4 sent an internal email, including to Kellum, stating: "We need to keep a tight reign on our Carbamazepine ER as it seems Taro's production is held up at the border waiting for FDA to approve. Wholesalers are out of their product by next week so we will start seeing activity within 5 days or so." Kellum responded in agreement: "Let's put on strict allocation – please. I'd like to review options for our inventory."

d)    Taro's Continued Collusion Over the Ensuring Years

2123.   Over the next several years—indeed into at least early January 2016— Aprahamian and Perfetto continued to use their contacts at competitor companies to collude on overlapping products and improve Taro's bottom line. During these years, Aprahamian and Perfetto expanded their efforts to allocate markets and fix prices on additional product, including several non-topical product, and to collude with additional competitors. Although the Taro executives continued to collude with their key competitors Sandoz, Perrigo, Actavis, Mylan, and Glenmark, they also coordinated with their contacts at other companies including Rising, Lannett, Wockhardt, Amneal, and G&W. By 2016, a large majority of the company's business was implicated by the executives' anticompetitive conduct.

2124.   The following section discusses this collusion in further detail as it relates to specific products.

i)    Alclometasone Dipropionate

2125.   Alclometasone Dipropionate Ointment ("Alclometasone Ointment"), also known by the brand name Aclovate, is a topical steroid used to treat inflammation and itching caused by skin conditions such as allergic reactions, eczema, and psoriasis.

2126.   As discussed above in an earlier section, Taro, Sandoz, and Glenmark colluded to significantly raise the price of Alclometasone Cream in May 2013. Simultaneously, those same three competitors were also coordinating on Alclometasone Ointment.

2127.   May 2013, Sandoz was the exclusive generic manufacturer of Alclometasone Ointment. The other competitors, Taro and Glenmark, had exited the market due to supply issues. However, around this time, Sandoz began experiencing supply issues of its own for Alclometasone Ointment. As a result, Taro and Glenmark, in consultation with Sandoz, used this as an opportunity to raise the price of the product and re-enter at that higher price.

2128.   As detailed above, the competitors were discussing their plans for Alclometasone Cream and Ointment as early as April 2013. For example, on April 15 and April 16, 2013, CW-3 of Sandoz exchanged several calls with Aprahamian of Taro and Blashinsky of Glenmark. On these calls, Blashinsky relayed that Glenmark expected to re- enter the Alclometasone Ointment market in the "next couple days" and was seeking "25- 30" percent share.

2129.   Three days later, on April 19, 2013, CW-3 of Sandoz emailed M.A.2, a Sandoz marketing executive, stating "[a] customer informed me that Glenmark will be launching Alclo OT soon. Can you send a quick report with the last 12mos of sales by cust. Reviewing how much share each customer represents to us." However, the true source of CW-3's information was Glenmark, not a customer. CW-3 wanted a breakdown of sales by customer so that he could understand how best to divide up customers as Glenmark entered the market.

2130.   On May 23, 2013, Sandoz sent an internal email advising that it could no longer supply the 45gm formulation of Alclometasone Ointment. At that time, both the 15gm and 60gm formulations were also on temporary back order. That same day, on May 23, 2013, CW-3 called Blashinsky and they spoke for four (4) minutes.

2131.   On May 29, 2013, D.S., a Taro sales executive, forwarded Aprahamian an email he received from Cardinal regarding Sandoz's supply issues on Alclometasone Ointment. The next day, Aprahamian responded, "fire it up and get back in (alclometasone ointment… [I] do think there is an opportunity to adjust pricing on our way in. Also, [w]e want to enter the market with wholesalers only and have accounts pull through them (controlled distribution)… We can discuss. Let me know what you need from me to expedite."

2132.   Over the next several days, Taro had several calls with Glenmark during which the two competitors coordinated their plans to increase pricing in advance of their re-entry into the Alclometasone Ointment market.

2133.  On June 6, 2013, after exchanging emails with Taro's supply chain regarding Alclometasone Ointment, Aprahamian sent an internal email stating, "I'll coordinate market adjustment on the ointment and get pricing to wholesalers." The next day, on June 7, 2013, Aprahamian called CW-3 of Sandoz and they spoke for eleven (11) minutes.

2134.  On June 10, 2013, Glenmark re-entered the Alclometasone Ointment market with WAC pricing that was significantly higher than Sandoz's WAC pricing. The next day, on June 11, 2013, Taro issued notices to the three big wholesalers—ABC, Cardinal, and McKesson—announcing it was re-entering the Alclometasone Ointment market at new WAC pricing that matched Glenmark. Taro increased its WAC pricing between 201 percent and 239 percent, depending on the formulation.

2135.  That same day, on June 11, 2013, M.A.2 of Sandoz sent an internal email indicating that Taro had increased pricing on Alclometasone Ointment. J.R.2, a senior Sandoz marketing executive, responded approvingly: "Thanks, [M.A.2]. Taro has been nice and aggressive."

2136.  The next day, on June 12, 2013, Aprahamian emailed Perfetto and a Taro executive, regarding Alclometasone Ointment stating that Taro had launched the product and "[w]e did adjust the pricing to reflect current market conditions. We have received interest from the wholesalers and do anticipate filling a void in the market. This will be a controlled distribution into the wholesale channel initially to maximize the asset."

2137.  That same day, S.B.2, a Taro sales executive, emailed Aprahamian stating, "[w]e had discussed possibly HD Smith, are we going to wait on the response from the big 3? or move forward?" Aprahamian responded: "I'm fine IF they have a need." S.B.2 replied: "I'll get the usage, wanted to get the OK before I brought up the product." Aprahamian – not wanting to take more share than Taro was entitled to – responded, "make sure they have supply issues."

              ii)       Fluocinonide Solution

2138.   Fluocinonide Solution, also known by the brand name Lidex, is a corticosteroid used to treat a variety of skin conditions, such as eczema, dermatitis, allergies, and rash. Fluocinonide Solution comes in 20ml and 60ml bottles.

2139.   As detailed above in an earlier section, Fougera (later Sandoz) and Taro colluded to increase prices on Fluocinonide Solution twice, once in May 2011 and again in February and March 2012.

2140.   On June 17, 2013, Actavis filed a "CBE 30" application with the FDA, which would allow it to use an old ANDA to sell Fluocinonide Solution after having been out of the market for many years. Actavis targeted the third week of July 2013 for its official launch date and identified a market share goal of 20 percent to 25 percent.

2141.   Beginning on June 17, 2013, and over the next several days, several Actavis employees exchanged calls with Aprahamian and Perfetto of Taro. At the same time, Aprahamian was communicating with his contact at Sandoz, CW-3. Aprahamian was acting as a conduit, conveying information between Actavis and Sandoz, because the two competitors did not have an independent relationship. For example, as detailed above, in between his communications with Actavis on June 19, 2013, Aprahamian spoke with CW-3 of Sandoz for fifteen (15) minutes.

2142.   On July 5, 2013, Actavis submitted a challenge for Taro's Fluocinonide Solution business at ABC. On July 9, 2013, ABC alerted Taro of the offer and extended Taro a right of first refusal. Even though ABC did not disclose the challenger, Taro already knew it was Actavis.

2143.   After receiving the price challenge, H.M., a Taro sales executive, acknowledged that "we will need to give up some market share" and asked Aprahamian if ABC was a customer that they wanted to give up. The following day on July 10, 2013, Aprahamian called three different Actavis sales executives, M.B.2, T.D. , and S.C.

2144.   The next day, on July 11, 2013, Aprahamian informed his colleague at Taro, H.M., that "we will not be retaining this business." The following day, Aprahamian alerted ABC that Taro would not lower its price and, thereafter, ABC awarded the Fluocinonide Solution business to Actavis.

2145.   Having secured ABC from Taro, Actavis then focused on securing a larger customer from Sandoz so that Actavis could meet its target share. In early July, Actavis solicited Walgreens, a large Sandoz customer.

2146.   When Actavis formally launched on July 22, 2013, it still had not received a decision back from Walgreens. The formal launch announcement prompted several companies, including CVS, McKesson, Morris & Dickson, Cigna, and Hannaford, to seek bids from Actavis. Actavis, however, did not provide bids to any of these larger purchasers. The few bids that Actavis sent out in response to solicitations were to smaller potential customers that it determined "wouldn't upset the apple cart" in terms of market share.

2147.   Ultimately, Sandoz refused to bid to retain the Walgreens business, and conceded the customer to Actavis. With this account, Actavis had met its share target and had secured 24 percent of the Fluocinonide Solution market.

2148.   During this time period, Taro and Sandoz were also careful not to poach each other's customers. In early July 2013, Taro was backordered for Fluocinonide Solution. On July 15, 2013, MMCAP, a Taro customer, reached out to CW-3 asking Sandoz to bid on Fluocinonide Solution. Only three day later, CW-3 responded to MMCAP and declined to bid claiming supply constraints. Sandoz's excuse for not bidding was a pretext. In the intervening time, CW-3 exchanged three (3) text messages with H.M. of Taro and spoke with Aprahamian twice, with one call lasting sixteen (16) minutes and the second lasting eight (8) minutes.

2149.   Following shortly on the heels of the May 2013 Increases, Taro colluded with its competitors Teva, Sandoz, and Perrigo to significantly raise prices on three products—Etodolac

Tablets, Etodolac ER Tablets (collectively, "Etodolac"), and Hydrocortisone Valerate Cream—in August 2013 (the "August 2013 Increases"). These drugs and their competitors, as well as the dates and sizes of the increases, are detailed in the chart below:

| Drug | Competitors | Lead/Followed | Date | Largest % Increase |
|---|---|---|---|---|
| | Sandoz | Lead | 7/26/13 | |
| | Teva | Followed | 8/9/13 | |
| Etodolac Tablet | Taro | Followed | 8/9/13 | 433% |
| | Teva | Lead/Followed | 8/9/13 | |
| Etodolac Extended Release Tablet | Taro | Lead/Followed | 8/9/13 | 183% |
| | Perrigo | Lead | 8/1/13 | |
| Hydrocortisone Valerate Cream | Taro | Followed | 8/9/13 | 351% |

2150.  In the weeks leading up to the price increases on Etodolac, Aprahamian was in frequent communication with his contacts at Teva (Nisha Patel) and Sandoz (CW-3) to coordinate. Similarly, and at the same time, Perfetto was colluding with his contact at Perrigo, Boothe, regarding Hydrocortisone Valerate Cream.

2151.  For example, on July 30, 2013, Perrigo notified its customers that it was increasing prices on a number of different products, including Hydrocortisone Valerate Cream. Notably, at the same time that Perrigo was colluding with Taro on Hydrocortisone Valerate, it was also colluding with other competitors regarding different products on its price increase list, including Promethazine HCL Suppositories (Actavis and G&W) and Ciclopirox Solution (G&W and Sandoz). These products are discussed in detail in later sections of this Complaint.

2152.  Two days later, on August 1, 2013, Aprahamian instructed a colleague at Taro to begin implementing price increases on Hydrocortisone Valerate and Etodolac. Aprahamian stated, "[w]e need to get these out next week." Not wanting to provide the details in writing, Aprahamian concluded: "Will come over and discuss with you."

2153.  In the days leading up to the Taro increases, Aprahamian exchanged several calls with Nisha Patel and CW-3 regarding Etodolac, while Perfetto was coordinating with Boothe about Hydrocortisone Valerate.

2154.   After this series of communications, on August 9, 2013, Taro followed the increases on Hydrocortisone Valerate and Etodolac and published WAC pricing that matched its competitors.

2155.   After the August 2013 Increases, several customers voiced concerns over the size of the increases on Hydrocortisone Valerate Cream. For example, after receiving Perrigo's notification on July 30, 2013, one customer emailed P.H., a sales executive at Perrigo, asking, "[w]hy the huge WAC price increase on Hydrocortisone Val? Is it the Hydro raw material?" Knowing that there was no real justification for the increase, P.H. responded simply, "I don't have an answer at this point."

2156.   Similarly, on July 31, 2013, T.P., a sales executive at Perrigo, received some pushback from Walgreens about the Hydrocortisone Valerate price increases. T.P. passed that information along to his supervisor, Wesolowski, a senior Perrigo executive, stating: "I got yelled at pretty good by WAG yesterday, it is one thing to see it on paper (when we discussed the new prices over the phone), then when they put the price in the system and see what the damage is, that hit home hard at WAG yesterday and I got a call from Chris. .. . seriously, I estimate that I have raised prices to the tune of 75M at WAG in the last 4 months, we are at a point where it is getting tougher and tougher . . . WAG is 125M, that is more than ½ the current DN sales! That is truly incredible."

iii)    Triamcinolone Acetonide Paste

2157.   Triamcinolone Acetonide Paste ("Triam Paste"), also known by the brand name Oralone, provides temporary relief from pain symptoms caused by mouth lesions. In 2013, the annual market size for this drug was approximately $14 million.

2158.   As of October 2013, Rising and Taro were the two competitors in the market for Triam Paste and each maintained approximately 50 percent market share.

2159.   In October 2013, Rising was considering implementing a price increase on Triam Paste. Prior to increasing the price, CW-2, then a senior sales and marketing executive at Rising, reached out to D.S., a Taro sales executive, to discuss the increase. CW-2 felt internal pressure to

make money on the product and wanted assurance from D.S. that Taro would follow before Rising raised prices.

2160.   On October 16, 2013, Rising increased its WAC pricing for Triam Paste by 25 percent. Two weeks later, on November 1, 2013, Taro published increased WAC pricing that matched Rising's pricing exactly.

2161.   Prior to implementing the increase, Aprahamian of Taro described in an internal email that Taro was "adjusting" its prices "based upon current market conditions" and noted that the risk of losing business was "low." Indeed, the risk was "low" because CW-2 and D.S. had discussed the increase in advance and Taro had confidence that Rising would respect its market position and not poach its customers.

iv)    Acetazolamide Tablets

2162.   Acetazolamide Tablets ("Acetazolamide"), also known by the brand name Diamox, is an oral solid medication used to treat glaucoma, epilepsy, altitude sickness, periodic paralysis, and heart failure. Acetazolamide Tablets are available in 250mg and 125mg dosages. The 250mg dosage is the predominant form.

2163.   Starting in 2010, Taro and Lannett were the only major suppliers of Acetazolamide Tablets. Taro and Lannett both supply the 250mg dosage and Taro is the only major supplier of the 125mg dosage.

2164.   Beginning in 2010, Taro and Lannett coordinated three lockstep price increases on Acetazolamide: December 2010, April 2012, and late fall 2013. Each time Taro increased the WAC price of its 250mg dosage of Acetazolamide, it also increased the WAC of its 125mg dosage.

2165.   At the start of 2010, Taro and Lannett's WAC prices for the 250mg dosage of Acetazolamide were $34.21 and $32.70, respectively. These prices remained unchanged until December 2010 when Taro and Lannett raised their prices to almost identical levels within two days

446

of each other. On December 6, 2010, Taro increased its WAC price for the 250mg dosage by 15 percent to $40.48. Two days later, on December 8, 2010, Lannett increased its WAC by 24.26 percent to $40.75.

2166.   The day that Taro increased its prices, December 6, 2010, J.F., a member of Lannett's Board of Directors and an executive at a generics wholesaler, emailed K.S.2, a senior sales and marketing executive at Lannett, about the "good news" that "[T]aro just raised Diamox [Acetazolamide]". K.S.2 responded early the next morning stating, "[w]e [Lannett] will raise our prices this week."

2167.   By April 2012, Taro and Lannett were ready to impose a larger price increase. On April 3, 2012, Blashinsky, then a senior Taro marketing executive, called K.S.2 at Lannett. That same day, Taro increased its WAC price for the 250mg dosage by 44.5 percent to $61.43. Lannett followed and matched Taro's increase two (2) days later on April 5, 2012.

2168.   The day of the Taro increase, a Cardinal representative called D.S., a sales executive at Taro, and told him that the customer would be putting Acetazolamide Tablets, as well as other Taro products, out to bid unless the company agreed not to increase prices on those products. D.S. summarized the call in an email to Blashinsky and asked him how to respond. Blashinsky replied that Acetazolamide was one of several "safe products" and that the pricing on the product should "remain as is." What Blashinsky meant was that Taro had an understanding with Lannett that Lannett would follow Taro's price increase and it would not poach any of Taro's customers. On April 10, 2012, Taro submitted reduced pricing to Cardinal for several of the products, but the price of Acetazolamide remained unchanged.

2169.   Also on April 3, 2012, Tracy Sullivan DiValerio, a Lannett sales executive, emailed her supervisor, K.S.2, about bidding on a Target RFP and listed several products including Acetazolamide for which Taro was the current supplier. Consistent with the ongoing agreement with

Taro, K.S.2 directed Sullivan not to bid on the Acetazolamide business. The next day, April 4, 2013, Lannett submitted a response to the Target RFP that did not include Acetazolamide.

2170.   In March 2013, Taro hired Aprahamian as a senior sales and marketing executive. Aprahamian and A.B.2, a senior-most executive officer at Lannett, had a social relationship that preceded Aprahamian's tenure at Taro. The two men met up for meals, contemplated joining a horse racing investment group, and did other favors for each other.

2171.   Shortly after Aprahamian began working at Taro, in the late fall of 2013, that relationship became collusive and Taro and Lannett coordinated to again raise the price of Acetazolamide, this time by raising it more than 220 percent.

2172.   In the months leading up to the increases, representatives of Taro and Lannett had the opportunity to discuss and coordinate the late fall 2013 price increases in person at trade association meetings and other social occasions.

2173.   For example, from August 10 to August 13, 2013, the NACDS held its Total Store Expo in Las Vegas, Nevada. Representatives from Taro, including Aprahamian and D.S., and representatives from Lannett, including Sullivan, K.S.2, A.B.2, and M.B.3, a Lannett business and development manager, attended the conference. Further, representatives from Sun Pharmaceuticals, Taro's parent company, also attended, including G.S., a senior executive, and S.K., a sales executive.

2174.   After the conference, on August 16, 2013, M.B.3 of Lannett and J.F., a Lannett Board member, had dinner with G.S. and S.K. of Sun. M.B.3 of Lannett followed up by email a few days later thanking G.S. for dinner and also "learning from you and [S.K.] about your thoughts on the industry." M.B.3 further noted that "[o]nce you settle in I would like to talk to you about some of the opportunities we discussed at dinner with the Acetazolamide."

2175.   Representatives from Taro and Lannett also attended the GPhA Fall Technical Conference in Bethesda, Maryland from October 28 through October 30, 2013.

2176.   Approximately two weeks later, on November 15, 2013, A.B.2 of Lannett called Aprahamian twice. A.B.2 called Aprahamian again the next day, on November 16, 2013. According to available phone records, the calls on November 15, 2013 were the first calls between the two competitors since August 22, 2012, as well as the first time that they had spoken by phone since Aprahamian joined Taro.

2177.   Shortly after these calls, on November 26, 2013, Lannett raised its WAC price on Acetazolamide by 275.5 percent to $230.65.

2178.   Following the increase, Lannett customers reached out to Taro asking the competitor to bid on Acetazolamide. Consistent with its ongoing understanding with Lannett, Taro turned the business away.

2179.   For example, Walmart, a Lannett customer, emailed D.S. of Taro on November 26, 2013, asking if Taro was interested in bidding on its Acetazolamide business. In response, Aprahamian sent an internal email to D.S., and others at Taro, instructing them that  "[w]e will not be taking on this or any new [Acetazolamide] business." Aprahamian further advised that they should "lock down [Acetazolamide] inventory as discussed this morning."

2180.   Later that same day, another Lannett customer, Meijer, reached out to S.B.2, a Taro sales executive, asking for a bid on Acetazolamide. S.B.2 responded, "[w]e will not be able to supply at this time, receiving multiple requests for this product today. If the inventory situation changes, I will let you know." But that explanation was a lie; Taro was not having supply issues at that time.

2181.   Following Lannett's increase, Taro's customers, including Cardinal, McKesson, and Morris & Dickson, tried to increase their Acetazolamide orders with Taro, at the lower pricing, anticipating that Taro might try to raise its prices as well. Aprahamian told Taro's supply chain personnel to monitor these increased orders and cut them to historical levels. He explained that "we

will be putting out an adjustment price next week and [I]'m sure some [customers] are already on to us."

2182.   On December 4, 2013, Econdisc, a GPO customer, asked Sullivan of Lannett why the company had increased its pricing on Acetazolamide, noting "it is getting really tough around here on increases." Later that day, Sullivan replied to Econdisc stating that Lannett raised the price on Acetazolamide because "testing requirements to bring Acetazolamide to the market have increased, which has impacted our cost and capacity to manufacture it."

2183.   At the same time customers were reacting to Lannett's increase, Taro was in the midst of implementing its own price increase. On December 1, 2013, Aprahamian emailed pricing information for the Acetazolamide increase to the Taro sales team and asked them to coordinate getting Taro's price increase letters out. Taro sent the letters to its customers on December 11 and December 12, 2013.

2184.   On December 13, 2013, Taro raised its WAC price on the Acetazolamide 250mg dosage by 226.5 percent to match Lannett's pricing at $230.65.

2185.   The next day, on December 14, 2013, Aprahamian called A.B.2 of Lannett. The call lasted two (2) minutes. Aprahamian and A.B.2 would not speak again until April 8, 2014, according to available phone records.

2186.   Taro held firm to its increase even when a large distributor, McKesson, asked for a price reduction. In support of a price reduction, McKesson noted that one of Taro's competitors could sell Acetazolamide for 18.42 percent below McKesson's current contract price. Aprahamian responded that "Taro will not be adjusting its price and does feel that our prices are market competitive and will allow McKesson to effectively compete" and suggested that the McKesson representative "revisit current market dynamics." McKesson subsequently closed the issue.

2187.   Similarly, on December 16, 2013, Taro's customer MMCAP emailed asking why Taro had increased pricing on Acetazolamide. L.R., a business analyst at Taro, forwarded the request to M.L., a Taro pricing executive, asking for advice on how to respond. M.L. instructed L.R. to tell MMCAP the increase was "[d]ue to market conditions."

2188.   Taro's and Lannett's revenue from Acetazolamide grew substantially with the coordinated price increases. In 2012, total sales for Acetazolamide were $16,480,000. Revenue from sales in 2013 rose to $21,270,000 and, in 2014, after the late fall 2013 price increases, total sales of Acetazolamide reached $60,680,000.

2189.   Throughout the period of the price increases referenced above, Lannett and Taro maintained a virtually even split of the 250mg market, with each having around 50 percent of the market. Overall, combining the markets for the 125mg dosage and 250mg dosage, Taro had approximately 56 percent of the total market and Lannett had 43 percent.

v)    Desonide Ointment

2190.   Desonide Ointment is a topical steroid that treats a variety of skin conditions, including eczema, dermatitis, allergies, and rash.

2191.   As discussed in detail above in an earlier section, Taro and Perrigo coordinated to significantly raise prices on Desonide Ointment in May 2013. At the same time, Taro and Perrigo were also speaking with Sandoz about Desonide Ointment, knowing that Sandoz had plans to reenter the market.

2192.   Indeed, as early as March 2013, Sandoz began discussing its potential re- entry into the market for Desonide Ointment both internally and with its competitors.

2193.   For example, on March 28, 2013, M.A.2, a Sandoz marketing executive, sent an internal email, including to CW-3, stating "[w]e are trying to evaluate Desonide Ointment, currently

a TU [temporarily unavailable] item. The market is split between Taro and Perrigo. Could you please provide current contract pricing?" CW-3 immediately forwarded the email to Kellum.

2194.   The next morning, on March 29, 2013, CW-3 called Kellum, and they spoke for seven (7) minutes. CW-3 then spent the next twenty-five minutes communicating alternately with Aprahamian and with his superiors at Sandoz. After each call with Aprahamian, CW-3 would immediately hang up and call either Kellum or CW-1.]

2195.   The next business day, on April 1, 2013, CW-3 called T.P. of Perrigo—the other competitor for Desonide Ointment—and they spoke for seventeen (17) minutes. During that call, T.P. provided CW-3 with a list of products, including Desonide Ointment, for which Perrigo had recently increased prices. Notably, however, Perrigo had not yet increased pricing on several of those products, including Desonide Ointment.

2196.   The next day, April 2, 2013, CW-3 called Aprahamian and they spoke for six (6) minutes. CW-3 hung up and immediately called T.P. of Perrigo. The call lasted five (5) minutes. On these calls, and as discussed in detail in an earlier section, the competitors spoke about the products that Taro planned to increase prices on in May 2013, including Desonide Ointment.

2197.   Several months later, after both Taro and Perrigo had implemented their price increases on Desonide Ointment, Sandoz was readying to re-enter the market. On December 18, 2013, CW-3 of Sandoz called T.P. of Perrigo and they spoke for five (5) minutes. CW-3 hung up and called CW-1 twice. First thing the next morning, on December 19, 2013, CW-3 called T.P. again. CW-3 hung up and immediately called CW-1 and they spoke for four (4) minutes. Later that day, CW-3 spoke with Aprahamian at Taro. The call lasted fifteen (15) minutes.

2198.   On January 6, 2014, Sandoz held a Commercial Operations call during which they discussed, among other things, the Desonide Ointment re-launch. In particular, they discussed the

market share breakdown between Taro and Perrigo, Sandoz's target market share, and the anticipated re-launch date of January 17, 2014.

2199.   Two days later, on January 8, 2014, CW-3 called T.P. of Perrigo. The next day, on January 9, 2014, CW-3 called T.P. again and they spoke for nearly sixteen (16) minutes. During that call, T.P. provided CW-3 with Perrigo's non-public pricing for Desonide Ointment at various customers. T.P. also warned CW-3 not to go after Walgreens.

2200.   Immediately upon hanging up with T.P., CW-3 called Aprahamian, and they spoke for nine (9) minutes. That same day, Perfetto of Taro and Boothe of Perrigo also exchanged two calls lasting six (6) minutes and twenty-nine (29) minutes, respectively.

2201.   On January 16, 2014, the day before Sandoz's anticipated re-launch, CW-3 called T.P. of Perrigo, and they spoke for ten (10) minutes. CW-3 hung up and immediately called CW-1. The call lasted eight (8) minutes. A few days later, on January 22, 2014, Aprahamian called CW-3. On January 24, 2014, CW-3 called Aprahamian back, and they spoke for twenty-two (22) minutes.

2202.   On these calls, T.P. of Perrigo and Aprahamian of Taro provided CW-3 with nonpublic pricing for Desonide Ointment at various customers. The competitors also discussed which customers they would agree to cede to Sandoz. CW-3 contemporaneously listed this information in his Notebook and placed check marks next to the customers that Perrigo and Taro agreed to give up to Sandoz:

2203.   In accordance with their agreement, on January 28 and January 29, 2014, Sandoz submitted bids for Desonide Ointment to Taro's customers Econdisc, McKesson, and Omnicare, and to Perrigo's customer, Rite Aid. In each instance, the competitors declined to reduce their pricing to retain the business. As a result, the customers awarded their Desonide Ointment business to the new entrant, Sandoz.

2204.   On February 13, 2014, Sandoz was presented with the opportunity to supply Cardinal with Desonide Ointment. Not wanting to disturb the delicate market balance it had negotiated with its competitors, CW-1 responded, "Cardinal is currently with Taro, and we recently signed Omnicare, econdisc and Mckesson (verbal at this point). I do not want to go after more Taro accounts at this time. I would blame supply."

e)    Taro's June 2014 Price Increases

2205.   Building on its successes in 2013, Taro set its sights even higher in 2014, implementing a number of significant price increases, including several of the largest WAC increases across the industry that year. As they had done in the past, Aprahamian and Perfetto focused their efforts on increasing prices on those products where they had strong relationships and ongoing understandings with individuals at competitor companies.

2206.   For example, in April 2014 Taro capitalized on its relationships with Teva and Sandoz to significantly raise prices on Ketoconazole Cream and Tablets. Aprahamian coordinated with Nisha Patel of Teva and CW-3 of Sandoz, while CW-1 of Sandoz also communicated directly with Patel. The collusion on Ketoconazole is discussed in detail in the AGs' Teva Complaint.

2207.   Shortly thereafter, in June 2014, Taro increased pricing on several different products (the "June 2014 Increases"). Some of these products had also been the subject of coordinated increases in 2013, including Carbamazepine ER Tablets (with Sandoz) and Hydrocortisone Valerate Cream (with Perrigo). As a result of these increases, Taro expected approximately $289 million in additional revenues, more than 2 ½ times what

2208.   Taro had expected from the May 2013 Increases. Several of these products, their corresponding WAC increases, and Taro's competitors are detailed in the chart below:

| PRODUCT DESCRIPTION | LARGEST % WAC INCREASE | COMPETITORS |
|---|---|---|
| Carbamazepine Tablet | 2337% | Teva, Torrent, Apotex |
| Carbamazepine Chewable Tablet | 392% | Teva, Torrent |
| Carbamazepine Extended Release Tablet | 23% | Sandoz |
| Clobetasol Proprionate Cream | 2138% | Sandoz, Hi-Tech, Actavis (entered in Mar 2015) |
| Clobetasol Proprionate Emollient Cream | 1011% | Sandoz, Hi-Tech |
| Clobetasol Proprionate Gel | 2008% | Sandoz, Hi-Tech, Perrigo |
| Clobetasol Proprionate Ointment | 2316% | Sandoz, Hi-Tech |
| Clobetasol Proprionate Solution | 953% | Sandoz, Hi-Tech, Wockhardt |
| Clobetasol Proprionate Lotion | 65% | Actavis, Perrigo |
| Clotrimazole Topical Solution | 208% | Teva |
| Fluocinonide Cream .05% | 754% | Teva |
| Fluocinonide Emollient Cream | 430% | Teva |
| Fluocinonide Gel | 491% | Teva, Sandoz |
| Fluocinonide Ointment | 483% | Teva |
| Hydrocortisone Valerate Cream | 44% | Perrigo |
| Phenytoin Sodium Extended Release Capsule | 210% | Amneal, Mylan, Sun |
| Warfarin Sodium Tablet | 220% | Teva, Zydus, Upsher-Smith |

2209.   As it had done in the past, Taro communicated with several of its competitors in advance of the June 2014 Increases and, consistent with their ongoing understandings, the competitors agreed to follow with comparable price increases of their own.

2210.   For example, on May 14, 2014, Taro had finalized its list of products to include in the June 2014 Increases and Aprahamian forwarded the list to K.S.3, a senior executive at Taro, for his review and approval. That same day, Aprahamian exchanged eight (8) text messages and one five (5) minute phone call with Patel of Teva. Taro overlapped with Teva on seven (7) of the June 2014 Increase products, including Fluocinonide, Carbamazepine, Clotrimazole, and Warfarin.

2211.   After speaking with Aprahamian, Patel directed a colleague to create a list of future Teva price increase candidates, based on a set of instructions and data she had given to her Teva colleague. On May 28, 2014, that colleague sent her a list titled "2014 Future Price Increase Candidate Analysis." The list included several drugs from Taro's June 2014 Price Increase list, with the notation "Follow/Urgent" listed as the reason for the increase. Notably, however, Taro had not yet increased prices on those drugs or notified its customers that it would be doing so.

2212.   Similarly, on Friday May 15, 2014, the day after Taro finalized its June 2014 Increase list, Aprahamian called CW-3 of Sandoz, and the two competitors spoke for fifteen (15) minutes. Taro overlapped with Sandoz on seven of the June 2014 Increase products, including Carbamazepine ER Tablets and various formulations of Clobetasol Propionate. The following Monday, on May 19, 2014, CW-3 sent an internal email, including to Kellum and CW-1, advising them of the Taro increases and attributing the information to "a customer." Notably, the source of the information was not a customer, but his competitor, Aprahamian. Further, Taro had not yet increased pricing on these products and would not do so for another several weeks..

2213.   Further, on May 27, 2014, Aprahamian exchanged three calls with M.C., a sales executive at Wockhardt, including one call lasting nine (9) minutes. Taro overlapped with Wockhardt on one June 2014 Increase product, Clobetasol Solution. That same day, ABC reached out to C.U., a sales executive at Taro, asking for a bid on Clobetasol Solution because Wockhardt was having issues with the FDA. Having spoken with M.C. earlier in the day and knowing that the competitors had discussed coordinating a price increase on the product, Aprahamian responded, "nothing is confirmed yet. Don't want to send any communication out just yet. We will certainly keep our eyes on it."

2214.   On June 2, 2014, Taro sent letters to its customers notifying them of the June 2014 Increases. The next day, on June 3, 2014, Taro published new WAC pricing for the affected products. In the days leading up to these actions by Taro, and in the days that followed, Aprahamian and Perfetto

reached out to their competitors—Sandoz, Perrigo, Actavis, Teva, Hi-Tech, Wockhardt, Mylan, and Amneal—to discuss the increases and limit competition between them.

2215.   After receiving notification of the increases, several customers complained to Taro about the size of the increases. However, confident in their strategy—and the strength of the ongoing understandings they had with their competitors—Aprahamian advised his colleagues that Taro should stay the course and stick with the plan.

2216.   For example, on June 24, 2014, McKesson emailed Taro stating, "[i]f you take the price increase, we will need to re-evaluate your awards as there are lower priced alternatives. You stand to lose your awards on all the price increase products. Please confirm that you are moving forward with the price increase." E.G.2, a Taro sales executive, forwarded McKesson's email to Aprahamian who responded, "[w]e are fine, we have done this before. We always have risk. Will call Jason." E.G.2 replied, "[w]hat do you want me to do?" and Aprahamian stated, "[c]all her and explain national increase. Our PI stands."

2217.   Similarly, on June 27, 2014, ABC sent out a request for bids on multiple products, including several that Taro had increased prices on, and cited the reason as "Change In Market Dynamics." C.U., a sales executive at Taro, forwarded the ABC request along internally, stating that he had left a message with the ABC representative to discuss the request. A.L., a Taro pricing executive, responded: "No no, don't need to call yet, these are our products. They are looking to see if they can get better pricing as a result of recent adjustment. Talk to Ara first, this might be where we just stay put and wait." To that, Aprahamian replied: "Correct . . . these are our products…They have our price, just a matter if anyone else will take our business."

2218.   Sandoz also received the ABC request on June 27, 2014. Kellum forwarded it along internally, including to CW-1, stating simply: "Price in teases." Although CW-1 already knew that Taro had increased prices, he responded to Kellum's email asking, "[w]ho increase[d] [C]lobetasol?"

457

Kellum replied, "Taro" and CW-1 quickly answered, "I was kidding. I say we go after CVS." Kellum responded sarcastically: "LOL Great thinking!" Of course, and consistent with past practice and the ongoing understanding between the two competitors, Kellum and CW-1 did not want bid at CVS. Further, on July 1, 2014, Kellum emailed the larger Sandoz team about the ABC request stating, "[i]t seems obvious these are price increase related. I do not want to bud[sic] under these circumstances. We need to understand the situation and see if we can maximize the opportunity rather than punishing the incumbent."

2219.  Not surprisingly given Taro's understandings with its competitors, on July 11, 2014, ABC emailed C.U. to advise him that Taro had retained all of its business at ABC because "[n]o one bid on your products." C.U. forwarded the email along to Aprahamian, stating excitedly, "FYI!" Aprahamian then forwarded the email to Perfetto stating: "Read trail below."

2220.  Consistent with past practice, and their ongoing understandings, the competitors uniformly followed the July 2014 Increases and matched Taro's increased WAC pricing.

2221.  The following sections explore in further detail the non-Teva overlap products that are the subject of this Complaint – Carbamazepine ER Tablets, Clobetasol Propionate, Hydrocortisone Valerate Cream, and Phenytoin Sodium ER Tablets.

                i)       Carbamazepine ER Tablets and Clobetasol Propionate

2222.  Carbamazepine ER, also known by the brand name Tegretol XR, is a drug prescribed for the prevention and control of seizures, for the relief of nerve pain, and for the treatment of certain mental and mood disorders such as bipolar disorder and schizophrenia. In 2012, the annual market for Carbamazepine ER Tablets in the United States exceeded $100 million.

2223.  At all relevant times, Taro and Sandoz have been the only competitors in the market for Carbamazepine ER.

2224.   As detailed above in earlier sections, Taro and Sandoz have a long history of collusion on Carbamazepine ER, dating back to 2009 when Taro entered the market as the first-to-file generic and Sandoz entered as the AG. At that time, CW-4 of Sandoz coordinated with D.S. of Taro to allocate the market as both companies entered the market. Similarly, in May 2013, CW-3 of Sandoz colluded with Aprahamian of Taro to increase prices on Carbamazepine ER, along with a list of other products that Taro and Sandoz overlapped on.

2225.   Given that history, not surprisingly, when Taro added Carbamazepine ER to its June 2014 Price Increase list, it described the increase as "Low" risk.

2226.   Clobetasol Propionate ("Clobetasol"), also known by the brand name Temovate, is a corticosteroid that comes in various formulations and is used to treat skin conditions such as eczema, contact dermatitis, seborrheic dermatitis, and psoriasis.

2227.   As of June 2014, Sandoz and Hi-Tech were Taro's primary competitors on the various formulations of Clobetasol, including the Cream, Emollient Cream, Gel, Ointment, and Solution. In addition, Wockhardt marketed the Solution.

2228.   As detailed above, Taro spoke with each of these competitors in the days leading up to the increases on Carbamazepine ER and Clobetasol. The sequence and timing of these calls is listed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 5/15/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:42:00 | 0:15:00 |
| 5/19/2014 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 5:23:00 | 0:01:00 |
| 5/27/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.C. (Wockhardt) | 9:35:00 | 0:01:00 |
| 5/27/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.C. (Wockhardt) | 9:36:00 | 0:01:00 |
| 5/27/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | M.C. (Wockhardt) | 9:39:00 | 0:09:00 |
| 5/27/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:17:00 | 0:01:00 |
| 5/28/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 8:37:00 | 0:10:00 |
| 6/3/2014 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 9:16:00 | 0:01:00 |
| 6/3/2014 | Voice | Perfetto, Mike (Taro) | Incoming | Boothe, Douglas (Perrigo) | 14:03:00 | 0:01:00 |
| 6/3/2014 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 14:04:00 | 0:05:00 |
| 6/3/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 14:06:00 | 0:01:00 |
| 6/3/2014 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 15:23:00 | 0:01:00 |
| 6/4/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:04:00 | 0:01:00 |
| 6/6/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 6:54:00 | 0:01:00 |
| 6/6/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | E.B. (Hi-Tech) | 12:34:00 | 0:01:00 |
| 6/6/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | E.B. (Hi-Tech) | 12:52:00 | 0:01:00 |
| 6/6/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 13:14:00 | 0:08:00 |
| 6/9/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | E.B. (Hi-Tech) | 6:26:00 | 0:10:00 |
| 6/9/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | E.B. (Hi-Tech) | 6:35:00 | 0:01:00 |

2229.   After Taro's price increases for Carbamazepine ER and Clobetasol were announced, and consistent with their ongoing understandings, Taro's competitors declined opportunities to bid on customers so as not to take advantage of Taro's price increases, except in those circumstances where they sought additional market share to meet their fair share targets.

2230.   For example, on June 4, 2014, Walmart emailed Sandoz asking whether it would like to submit a bid for Carbamazepine ER because Walmart had received a price increase from Taro. Walmart followed up on the request again on June 10, 2014. L.B., a sales executive at Sandoz, emailed the request to Kellum asking, "Armando . . . any update here? [Walmart] is asking…I understand our situation in that we want to max on share and price, but we hardly get these opportunities at Walmart." Not wanting to bid, and instead planning to take a price increase as well, Kellum suggested a pretext: "Let's say we are currently not in a position to supply."

2231.   Also on June 4, 2014, Cardinal emailed Sandoz asking it to bid on its Clobetasol business as a result of the Taro price increase. Kellum responded similarly: "we DO NOT want to pursue this. We have a very large opportunity of our own as a result of this price increase which we hope to implement next month. I suggest we reference supply constraint and pass."

2232.   Further, on June 23, 2014, McKesson presented Sandoz with an opportunity to take on additional business for several products, including both Clobetasol and Carbamazepine ER. K.K.3, a senior sales executive at Sandoz, responded to the customer: "Any opportunity to increase business is always welcome! I do know that there are some constraints on some of these products. We need to run the requests through supply chain to see if we can squeeze additional volume." Less than five minutes later, Kellum responded to K.K.3 (without copying the customer) stating: "I do not want to pursue these. Let's run thru the process but these are the products that Taro took very large price increases on and we have [an] opportunity ourselves." K.K.3 replied: "Understood Armando: This is why I brought up the 'supply constraint' theme to have our out option." The next day, K.K.3 responded to McKesson, raising the familiar refrain: "The team reviewed this opportunity. Unfortunately, as feared, we are still supply constrained at this time and cannot supply the incremental volumes requested."

2233.   Throughout June 2014, Aprahamian exchanged several calls with his contacts at Taro's principal competitors on Carbamazepine ER and Clobetasol, Sandoz and Hi-Tech, to discuss the increases and coordinate their actions.

2234.   For example, on June 6, 2014, Aprahamian twice called E.B., a senior sales and marketing executive at Hi-Tech. These were the first calls ever between the two competitors, according to the available phone records. Then, on June 9, 2014, Aprahamian and E.B. exchanged two more calls, including one call lasting ten (10) minutes. The next day, on June 10, 2014, E.B. met in-person with B.K., a senior executive at Akorn, and S.G., a sales executive, "to discuss our options" regarding Clobetasol.

2235.   On June 20, 2014, Aprahamian engaged in a series of communications with both CW-3 of Sandoz and E.B. of Hi-Tech. Each time that CW-3 hung up with Aprahamian, he immediately called his supervisor, Kellum, to report the conversations.

2236.    During these calls, Aprahamian provided CW-3 with Taro's new non-public prices, by class of trade, for Carbamazepine ER, the various formulations of Clobetasol, and Fluocinonide. In all, Aprahamian identified more than seventy (70) different price points for these products, and CW-3 documented this pricing information carefully in his Notebook, as shown in this excerpt related to Fluocinonide:



2237.    When CW-3 conveyed the price points to Kellum and CW-1, Kellum was shocked by the size of the increases and asked CW-3 to go back and confirm with Aprahamian that the information was correct. Indeed, Taro had increased WAC pricing on certain formulations of Clobetasol by more than 1000 percent. Armed with this information, Kellum then directed CW-3 to tell Aprahamian that Sandoz would follow and remarked: "We are swinging for the fences on clobetasol."

2238.    Similarly, after E.B.'s conversations with Aprahamian, on June 24, 2014, Hi-Tech held an internal "Clobetasol Price Increase Discussion," which E.B. attended. The agenda for the call was "to discuss the logistics of increasing the WAC on Clobetasol and the contractual implications of the price increase. The goal is to increase the price while incurring minimal penalties from our wholesaler agreements."

2239.    Over the next several days, Hi-Tech held several internal meetings during which they discussed the Clobetasol price increase, including on July 1, July 2, and July 8. B. attended all three meetings. On July 8, the day of the third meeting, E.B. called Aprahamian. Less than a half hour later, Aprahamian called CW-3 of Sandoz.

2240.   Three days later, on July 11, 2014, Hi-Tech sent letters to its customers notifying them that it was increasing WAC pricing on the various formulations of Clobetasol effective August 9, 2014. The new pricing matched Taro's pricing exactly. That same day, Aprahamian exchanged two calls with CW-3 and two calls with E.B. Notably, these were the last calls that Aprahamian and E.B. exchanged, according to the available phone records.

2241.   Shortly after Hi-Tech increased its price on Clobetasol, the other competitors followed suit. On July 18, 2014, Sandoz increased its WAC pricing on Clobetasol to match both Taro and Hi-Tech. On August 26, 2014, it raised its WAC pricing on Carbamazepine ER to match Taro. Further, on September 2, 2014, Wockhardt increased its WAC pricing on Clobetasol Solution to match Taro, Hi-Tech, and Sandoz. As had been the pattern, Aprahamian spoke with both CW-3 of Sandoz and M.C. of Wockhardt in advance of these price increases. After these calls, Aprahamian and M.C. of Wockhardt would not speak again by phone until June 9, 2015, according to the available phone records.

ii)   Hydrocortisone Valerate Cream

2242.   Hydrocortisone Valerate Cream is a topical corticosteroid used to treat a variety of skin conditions including eczema, dermatitis, allergies, and rash.

2243.   The two competitors on Hydrocortisone Valerate Cream were Taro and Perrigo. As detailed above in an earlier section, Boothe of Perrigo colluded with Perfetto of Taro to raise the price of Hydrocortisone Valerate Cream in August 2013, including raising WAC pricing by 351 percent on certain formulations. Building on this success, the competitors colluded to raise the price again in June 2014.

2244.   As detailed above, on June 3, 2014, Taro published increased WAC pricing for the June 2014 Increase products, including Hydrocortisone Valerate. That same day, M.C., a sales executive at Perrigo, sent an internal email advising of the Taro price increases. Wesolowski, a senior executive at

Perrigo, responded stating: "Keep on the look out. Listen mode only." That same day, Boothe and Perfetto exchanged four phone calls. Two days later, on June 5, 2014, Boothe followed up with Perfetto again.

2245.   On July 14, 2014, A.F., a sales executive at Perrigo, sent an internal email asking for a list of products that were due for a price increase. The next day, on July 15, 2014, D.B., a Perrigo pricing executive responded "I am just doing analysis right now. They have not been approved. Here are the products we are reviewing." Hydrocortisone Valerate was on the list.

2246.   Over the next several days, Boothe and Perfetto exchanged several calls during which they discussed the price increase on Hydrocortisone Valerate, as well as other products.

2247.   After a lengthy twenty-six (26) minute call between Boothe and Perfetto on July 21, 2014, Perrigo notified its customers on July 22, 2014 that it would be increasing its WAC pricing on a list of products, including Hydrocortisone Valerate, effective July 24, 2014. Notably, Perrigo was also colluding with competitors regarding other products on its list, Econazole Nitrate Cream (Taro and Teligent) and Hydrocortisone Acetate Suppositories (G&W). These products are discussed in detail below in subsequent sections.

iii)    Phenytoin Sodium ER Capsules

2248.   Phenytoin Sodium Extended Release Capsules ("Phenytoin Sodium"), also known by the brand name Dilantin, is an antiepileptic drug that is used to prevent and treat seizures.

2249.   Throughout the spring and summer of 2014, there were four competitors in the Phenytoin Sodium market: Taro, Mylan, Amneal, and Taro's parent company, Sun.

2250.   In early April 2014, Taro began formulating its list of products for the June 2014 Increases. On April 3, 2014, Aprahamian exchanged an email with a pricing executive at Taro, concerning Phenytoin Sodium pricing and, by April 7, 2014, Taro had added the product to its price increase list.

2251.  Three days later, on April 10, 2014, Aprahamian and M.A., a Mylan sales executive, exchanged two calls lasting two (2) minutes and ten (10) minutes, respectively. Notably, the competitors would not speak again by phone until June 4, 014, one day after Taro increased its pricing on Phenytoin Sodium.

2252.  On April 16, 2014, Walgreens, an Amneal customer, emailed Taro asking for a bid on Phenytoin Sodium. After an internal discussion regarding market shares, Aprahamian responded on April 20, 2014 stating: "I'll advise. Do nothing until I decide what we are doing here." Similarly, on April 24, 2014, Walgreens also emailed Mylan, another competitor in the market, asking for a bid on the product.

2253.  Between April 26 and 29, 2014, NACDS held its annual meeting in Scottsdale, Arizona. Key representatives from Taro, Mylan, Amneal, and Sun all attended the conference. The attendees included Aprahamian and Perfetto of Taro, Jim Nesta, a senior pricing and sales executive at Mylan, S.R., a pricing executive at Amneal, and G.S., a senior executive at Sun.

2254.  While attending the NACDS annual meeting, the competitors had numerous opportunities at various programming and social events to discuss Phenytoin Sodium, along with other products on which they competed. Indeed, between April 27 and April 29, Nesta of Mylan and S.R. of Amneal exchanged at least twenty-two (22) phone calls and text messages. Further, on April 29, 2014, while still at the NACDS meeting, Aprahamian sent an email to an administrative clerk at Taro, asking, "can you send me current pricing that is loaded for all on [Phenytoin Sodium]."

2255.  One month later, on May 29, 2014, the Pricing and Contracts ("P&C") team at Mylan generated a Daily Report listing the Mylan opportunity at Walgreens on Phenytoin Sodium. In the report, Mylan noted that it could supply in July 2014 and identified the product as "Potential Amneal price increase." Notably, no generic manufacturer of Phenytoin Sodium had increased pricing yet, including Amneal.

2256.   In the days leading up to the generation of the P&C Report, Nesta and M.A., a sales executive at Mylan, both communicated multiple times with S.R. of Amneal. Ultimately, Mylan declined to bid on the Walgreens business, refusing to take the business away from its competitor, Amneal.

2257.   As detailed above, on June 2, 2014 Taro notified its customers that it would be increasing its prices on the June 2014 Increase products, including Phenytoin Sodium. That same day, S.R. of Amneal called both M.A. and Nesta several times. Over the next several days, all three competitors would exchange a number of calls.

2258.   On July 2, 2014, S.K., a sales executive at Sun, sent an internal email advising G.S., a senior executive at Sun, and others that Amneal had raised pricing on Phenytoin Sodium. However, Amneal would not publish its increased WAC pricing until several months later, on September 1, 2014.

2259.   In the days leading up to July 2, Taro, Mylan, and Amneal continued to communicate.

2260.   On July 10, 2014, Walmart emailed Mylan requesting a bid on Phenytoin Sodium because its incumbent supplier had increased its pricing. That same day, M.A. of Mylan called Aprahamian. The call lasted seven (7) minutes. First thing the next morning, on July 11, 2014, Aprahamian called S.R. of Amneal. S.R. returned the call a few minutes later and they spoke for three (3) minutes. Later that day, C.W., a pricing executive at Mylan, sent an internal email regarding the Walmart opportunity stating: "This is a future price increase item. Taro increased in June, Amneal increase is rumored but not confirmed. . . . Walgreens and CVS approached us for a bid last month and we did not pursue. . . . P&C is suggested NOT to give Walmart an offer but need management's weigh in."

2261.  On July 14, 2014, Sun followed its competitors and increased pricing on Phenytoin Sodium. Similarly, Mylan followed suit on July 16, 2014, increasing its WAC pricing by 210 percent to match market pricing.

2262.  On July 31, 2014, Walmart was still looking for a supplier for Phenytoin Sodium and reached out to Taro asking for a bid. E.G.2, a Taro sales executive, forwarded the request along internally, asking "[c]an we supply?" Although it was confirmed that Taro could, in fact, supply the customer, A.L., a Taro pricing executive, advised that E.G.2 respond to the Walmart request as follows: "While we would be happy to give them a one time buy to get them to full stock level we are not currently in position to pick up additional share." To that, Aprahamian replied to A.L. separately stating "good, don't get baited."

2263.  One month later, on September 1, 2014, Amneal followed and matched its competitors' WAC pricing.

iv)    Econazole Nitrate Cream

2264.  Econazole Nitrate Cream ("Econazole"), also known by the brand name Spectazole, is a topical antifungal cream prescribed for the treatment of infections of the skin caused by fungus, such as athlete's foot and ringworm.

2265.  In the summer of 2014, there were three competitors in the market for Econazole: Perrigo, Taro, and Teligent.

2266.  In June 2014, Perrigo began planning a price increase. On June 17, 2014, Boothe of Perrigo called a Taro employee - likely Perfetto - and they spoke for forty-five (45) minutes.

2267.  One week later, on June 25, 2014, S.B.2, a sales executive at Taro, sent an internal email stating that "[w]e discussed possibly taking on one smaller customer for Econazole Cream," and suggested bidding at Associated Pharmacies. On July 8, 2014, Taro put together an offer for that customer. With regard to Taro's pricing for the bid, Aprahamian stated: "Go higher . . . Hearing net

price in market has gone up . . . Glad to handle if you are tied up." Notably, the price of Econazole had not yet gone up - and would not do so for another several weeks.

2268.   On July 18 and July 19, 2014, Boothe of Perrigo and Perfetto of Taro exchanged three short calls. The next business day, on July 21, 2014, the two competitors spoke for twenty-six (26) minutes. On July 22, 2014, T.P. of Perrigo spoke with S.M., a sales executive at Teligent, for more than five (5) minutes. Three days later, on July 24, 2014, Boothe called Perfetto again. The call lasted two (2) minutes. Perfetto returned the call and the two competitors spoke for seven (7) minutes.

2269.   That same day, on July 24, 2014, Perrigo instituted a dramatic price increase for Econazole. Customers saw increases ranging from 637 percent to 735 percent.

2270.   That morning, Aprahamian notified his colleagues at Taro of the development. He instructed them not to capitalize on any opportunities that might come Taro's way as a result of Perrigo's price increase, saying: "We will not take on additional share… Supply chain, sorry, but we need to lock down and closely monitor." Aprahamian further instructed his team to increase Taro's Econazole price to GPOs to $0.02 under its WAC price with just five (5) days' notice for all such customers. "(I don't care what contract says)," he added, "If they push back, we can terminate product… Not negotiable."

2271.   The next day, on July 25, 2014, E.G.2, a Taro sales executive, placed two calls to S.M. at Teligent. E.G.2 called S.M. again on August 12, 2014 and they spoke for nearly five (5) minutes. The next day, on August 13, 2014, Perfetto spoke with Boothe for eleven (11) minutes.

2272.   The coordination among the competitors bore fruit quickly. Just two weeks later, on September 1, 2014, Teligent increased its WAC prices for Econazole to match Perrigo. Taro's price increases followed two months later, on November 18, 2014. After the Taro increase, a customer forwarded the Taro notification to K.M., a sales executive at Perrigo, stating "[i]t should make you all feel good that you now are the leaders and the others are the followers."

468

2273.   By May 2015, Sandoz was making plans to re-enter the Econazole market, attracted by the fact that the other players had instituted price increases. CW-3 advocated a relaunch strategy that considered fair share principles as well as Sandoz's ongoing understanding with Perrigo. He advised his colleagues: "[Teligent] will more than likely protect their market share so the logical target would be Perrigo at 57% market share."

2274.   On October 1, 2015, W.W., a Sandoz launch executive, emailed CW-3 seeking intel on current prices for various customer accounts in anticipation of the upcoming Econazole re-launch. Less than an hour later, CW-3 called T.P. at Perrigo and they spoke for twenty-seven (27) minutes.

2275.   Later that day, CW-3 responded to his colleague's email with details of Perrigo's pricing at Morris & Dickson. Not wanting to put additional details about his conversation with T.P. in writing, CW-3 copied CW-1, a senior pricing executive at Sandoz, stating "please call me to discuss additional specific market dynamics surrounding this molecule."

2276.   On November 30, 2015, Sandoz bid on the Econazole business at Morris & Dickson. Perrigo, however, refused to cede the business to Sandoz because it had already given up one customer to the new entrant and was not inclined to hand over another.

2277.   Intent on working out a deal with the market share leader, CW-3 and T.P. of Perrigo exchanged four calls on December 16, 2015. The next day, on December 17, 2015, Sandoz contacted Morris & Dickson and convinced the customer to consider a revised offer from Sandoz. This time, Perrigo ceded the customer to Sandoz.

2278.   When Sandoz's re-launch of Econazole finally came to fruition in late 2015, it matched its competitors' increased WAC prices.

v)      Fluocinonide .1% Cream

2279.  Fluocinonide .1% Cream, also known by the brand name Vanos, is a strong corticosteroid used to treat a variety of skin conditions, including allergic reactions, psoriasis, eczema, and dermatitis.

2280.  2551. On January 14, 2014, Perrigo launched Fluocinonide .1% as the first- to-file generic, giving it 180 days of exclusivity against all other generic competitors, except for the authorized generic (the "AG"). Two weeks later, on January 31, 2014, Oceanside Pharmaceuticals (a subsidiary of Valeant Pharmaceuticals, the brand manufacturer) launched the AG of Fluocinonide .1% and published WAC pricing that matched Perrigo.

2281.  When Bausch entered the market, the company submitted a bid to Publix for Fluocinonide .1%. After consultation with T.P., a sales executive at Perrigo, and Wesolowski, a senior Perrigo executive, the company decided to "play fair" and gave up the business to Bausch.

2282.  As the end of Perrigo's exclusivity approached, Taro and Glenmark both began making plans to enter the Fluocinonide .1% market. Although Sandoz also had plans to enter, manufacturing issues would delay its launch until later in 2015.

2283.  On June 3, 2014, Perfetto of Taro exchanged four (4) calls with Boothe of Perrigo, including one call lasting five (5) minutes.

2284.  On June 9, 2014, A.L., a Taro pricing executive, sent an internal email stating that Taro was nearing the Fluocinonide .1% launch and "we need to start gathering information." A.L. further stated that "given the number of preexisting competitors, we will need precise targeting and execution to make sure we can hit the budgeted goals." A.L. also explained, "it is nearly as pivotal for us to understand who is the incumbent as what is the price range." Attached to the email was a fact sheet about the launch that identified Taro's target market share goal as 15 percent. Thereafter, Aprahamian

responded to A.L. directly to express his approval of the direction the pricing executive had given to the sales team, stating simply: "Solid."

2285.   At the same time, Glenmark was planning its launch and targeting approximately 25 percent share of the Fluocinonide .1% market.

2286.   Over the next several days, Perfetto of Taro exchanged several calls with Boothe of Perrigo and Grauso, a senior executive at Glenmark.

2287.   On June 25, 2014, Taro submitted an offer to Publix, a Bausch customer, for Fluocinonide .1%. On June 30, 2014, Publix emailed Bausch asking whether the company wanted to bid to retain the business. S.S., a sales executive at Bausch, forwarded the request along internally stating that he had spoken with his contact at Publix who told him that Taro "floated some offers out to a handful of customers (some of our customers and Perrigo's), to secure some early share. [Publix] stated they [Taro] want to get their fair share but not be 'pigs' about it     I recommend we walk away." After discussing the issue internally, M.S., a marketing executive at Bausch, responded with his agreement to act in accordance with the larger fair share understanding among the Defendants: "Yes, we are all in agreement. We'll give up Publix to Taro." Thereafter, on July 7, 2014, Publix awarded the business to Taro.

2288.   In the days leading up to Taro's and Glenmark's Fluocinonide .1% launch, Aprahamian of Taro and Grauso of Glenmark exchanged several calls, including two calls on July 14, 2014—the day that both competitors launched the product.

2289.   On July 14, 2014, Taro and Glenmark published WAC pricing that essentially matched each other. Prior to their entry, the generic market was evenly split between Perrigo (with 56 percent) and Bausch (with 44 percent).

2290.   Through the end of July 2014, the competitors continued to talk with each other. Aprahamian and Perfetto of Taro exchanged several calls with Grauso of Glenmark and Perfetto exchanged several calls with Boothe of Perrigo.

2291.   During this time, and in accordance with fair share principles, Perrigo and Bausch both ceded several accounts to the new entrants, Taro and Glenmark.

2292.   For example, on July 14, 2014, Meijer, a Perrigo customer, emailed Glenmark to advise that it was interested in receiving an offer for Fluocinonide .1%. J.J.2, a sales executive at Glenmark, forwarded the email to his colleague Jim Brown, a senior sales executive at Glenmark, who responded: "Let's wrap up a big guy first. I don't want to give Perrigo any reason to not walk away from someone."

2293.   Over the next several days, Glenmark secured awards for Fluocinonide .1% at Econdisc, a Bausch customer, and Rite Aid and ABC, both Perrigo customers. With respect to ABC, when J.C., a Glenmark sales executive, received the customer's acceptance she forwarded it along internally, stating, "[a]warded to Glenmark! Signed offer to follow later this morning. Perrigo walked."

2294.   Notably, after Glenmark bid on Fluocinonide .1% at Econdisc, but before it was awarded the business, the customer emailed S.B.2, a Taro sales executive, asking "[i]s Taro going to send an offer? We are reviewing another so did not want to exclude you." After forwarding the request along internally, S.B.2 replied to the customer on July 18, 2014 stating that Taro would not bid for the business. That same day, Aprahamian of Taro spoke with Grauso of Glenmark for three (3) minutes and Perfetto of Taro exchanged a one (1) minute call with Boothe of Perrigo.

2295.   In addition to securing Publix from Bausch in July, Taro also secured business at Walgreens, Optisource, and McKesson from Perrigo that same month. When Optisource awarded Taro the business, the customer noted "[l]ooks like Perrigo is playing nice after all and is going to

472

give us up to you. Attached is your acceptance." Further, in October and November 2014, Perrigo also gave up its business at Meijer and Omnicare to its competitors.

2296.    Approximately one year later, in September 2015, Sandoz had resolved its manufacturing issues and was readying to enter the Fluocinonide .1% market. At that time, Bausch was the market share leader with 43.93 percent followed by Glenmark 23.79 percent), Perrigo (18.33 percent), and Taro (13.94 percent).

2297.    On September 18, 2015, W.W., a launch executive at Sandoz, emailed Sandoz sales executives, including CW-3, requesting pricing, usage, and incumbent information for Fluocinonide .1% at three customers that Sandoz was considering targeting: H.D. Smith, Morris & Dickson, and Premier. W.W. stated that "[s]ince this is a very crowded market Price CI [competitive intelligence] will be very helpful! We will extend offers after."

2298.    On September 24, 2015, CW-1, a Sandoz senior pricing executive, followed up regarding W.W.'s request, asking "[a]ny info on price points?" CW-3 responded to CW- 1 only stating, "[w]orking on it." That same day, CW-3 called Aprahamian. An hour and half later, CW-3 called T.P. of Perrigo and they spoke for twenty-three (23) minutes. On this call, T.P. provided CW-3 with contract pricing for Fluocinonide .1% for various customers, including Walgreens, HEB, Target, McKesson, and Econdisc. None of these customers were CW-3's customers. Later that day, CW-3 emailed the information he had obtained from his competitor to CW-1, W.W., and others at Sandoz.

2299.    A few days later, on September 28, 2015, Sandoz provided CW-3 with an offer for Fluocinonide .1% to submit to his customer, Morris & Dickson. CW-3 responded stating "[t]hese price points look high based on the CI provided last week," and then re- forwarded his email from September 24, 2015. Thereafter, Sandoz revised its offer to Morris & Dickson and the customer awarded Sandoz the business. On October 12, 2015, Sandoz also secured the Fluocinonide 1% business at Walmart, a Taro customer.

vi)    Metronidazole 1% Gel

2300.   Metronidazole 1% Gel ("Metro Gel 1%"), also known by the brand name Metrogel 1%, is a topical treatment for inflammatory rosacea lesions. Metro Gel 1% is used by patients diagnosed with rosacea, a condition affecting 16 million Americans. In 2013, the annual market for Metro Gel 1% in the United States exceeded $120 million.

2301.   Prior to the summer of 2014, Sandoz was the exclusive generic manufacturer of Metro Gel 1%. In June 2014, Taro began making plans to enter the market and, on July 1, 2014, Taro launched the product and matched Sandoz's WAC pricing.

2302.   In the days leading up to the launch, CW-3 of Sandoz and Aprahamian of Taro exchanged several calls during which they discussed the launch and Sandoz's allocation of customers to the new entrant, Taro. Further, during these calls, Aprahamian told CW-3 that Taro was targeting 35 percent market share and identified the customers that it planned to target. Immediately upon hanging up with Aprahamian, CW-3 reported this information back to his superiors, CW-1 and Kellum.

2303.   On June 18, 2014, Aprahamian sent an internal email to A.L., a pricing executive at Taro, stating "you know the strategy——~35 ish on Metro . . . Need offer by Wednesday at the latest to WBAD." WBAD is a GPO that purchases generic drugs on behalf of its members, ABC and Walgreens. On June 25, 2014, Taro submitted an offer to Walgreens. A few days later, on June 30, 2014, Taro submitted a separate offer to ABC.

2304.   On the same day that ABC received the offer from Taro, the customer notified Sandoz that it had received a competitive bid from Taro and asked whether Sandoz would lower its price to retain the business. S.G., a sales executive at Sandoz, forwarded the request along internally, including to CW-1 and Kellum. CW-1 responded to S.G. stating: "It's my recommendation that we relinquish the ABC share…I'm sure we will see other challenges and will have to monitor closely. The sooner

we give up share the sooner the market will settle. Based on my experience of Taro entering markets that we are already in, I guestimate that they are probably looking for 30%." Kellum agreed: "I think we let ABC go."

2305.   The next day, July 1, 2014, A.H., a sales executive at Sandoz, sent an internal email stating that he had spoken with WBAD and learned that Taro was "looking for 30% share: ABC + WAG + some smaller." Kellum responded, "[t]o maximize product it probably makes sense to relinquish these 2 and hold on to all other large accounts. We should be able to mNage[sic] with minimal erosion. Taro traditionally is rationale[sic] player." CW-1 replied: "OK, We will relinquish Metro 1% at ABC and continue to monitor the market closely."

2306.   Walgreens accepted Taro's bid on July 2, 2014 and ABC accepted Taro's bid on July 7, 2014. WBAD (including ABC and Walgreens) represented approximately 20 percent of Sandoz's volume and sales for Metro Gel 1%.

2307.   On July 8, 2014, Taro also submitted a bid to Walmart for Metro Gel 1%. That same day, Aprahamian called CW-3 of Sandoz twice. Two days later, on July 10, 2014, Aprahamian emailed E.G.2, a Taro sales executive, asking her to follow up with Walmart regarding the offer. The next day, on July 11, 2014, CW-3 and Aprahamian exchanged four (4) calls. After the last call, CW-3 hung up and immediately called Kellum.

2308.   The following Monday, on July 14, 2014, Walmart notified Sandoz that it had received a competitive bid on Metro Gel 1% that was 10 percent lower than Sandoz's pricing and asked whether it would bid to retain the business.

2309.   On July 18, 2014, W.G., a pricing executive at Sandoz, forwarded the request internally, including to CW-1 and Kellum, stating "[t]hey plan to capture ~35% share I recommend that we relinquish this share to Taro. If we retain, the challenges will come elsewhere potentially with more aggressive pricing." CW-1 responded by recommending that Sandoz relinquish Walmart and

stating, "I think we need to relinquish and relinquish soon to calm the market. The WMT reduction needed was only 10%, so I believe Taro is trying to be responsible with their pricing. Just wanted a last check with you before I walk." Kellum then replied, "I agree."

2310.   Notably, after sending this email, someone at Sandoz changed the language in the earlier email string from "they plan to capture ~35% share" to "we assume they will be targeting ~30% share." Sandoz made this change to avoid documenting the fact that the competitively sensitive information came directly from its competitor, Taro.

2311.   Although Sandoz gave up the business, Walmart was unexpectedly reluctant to stop ordering Metro Gel 1% from Sandoz. On August 7, 2014, L.B., a sales executive at Sandoz, sent an internal email advising that Walmart was still ordering and stating, "[a] lot of times, the buyers do not want to change, and, for only a 10% reduction in price, it is not worth changing. I will monitor, and let everyone know if we officially lose it." Another Sandoz employee replied, "I would not push to keep the Walmart business. Hopefully Walmart communicated to Taro that we relinquished. As expected, Taro is targeting other customers and will continue to do so until they pick up fair share."

2312.   On August 4, 2014, McKesson also notified Sandoz that it had received an unsolicited bid for the Rite Aid portion of its Metro Gel 1% business and gave Sandoz the opportunity to bid to retain the business. Kellum responded that "[w]e need to review and respond. The big question here is do we relinquish given that Taro is seeking share." After some internal discussion, Sandoz decided to cede the Rite Aid portion of the business to Taro. As a pricing executive at Sandoz, explained in an internal email on August 8, 2014: "We are going to relinquish this award. This is the last one that we will relinquish for this product."

2313.   On August 11, 2014, McKesson awarded the Rite Aid portion of its Metro Gel 1% business to Taro. Two days later, on August 13, 2014, Aprahamian called CW-3 and they spoke again for seven (7) minutes.

476

vii)    Clotrimazole 1% Cream

2314.    Clotrimazole Cream, also known by the brand name Lotrimin AF Cream, is an antifungal medication used to treat vaginal yeast infections, oral thrush, diaper rash, pityriasis versicolor, and various types of ringworm including athlete's foot and jock itch.

2315.    In early January 2015, Sandoz was readying to re-launch into the Clotrimazole Cream market. At that time, there were three (3) other competitors in the market—Taro , Glenmark, and Major Pharmaceuticals. Sandoz had some supply constraints and was only targeting between 15 percent and 20 percent market share as the fourth entrant.

2316.    On the evening of January 7, 2015, a senior Sandoz launch executive sent an internal email to the Sandoz launch team, stating that the Pricing Department was preparing prelaunch offers for Clotrimazole Cream to be sent the following week.

2317.    First thing the next morning, on January 8, 2015, CW-3 of Sandoz called Aprahamian of Taro. Aprahamian called him back shortly thereafter. That same day, E.D., a Sandoz launch executive, told his colleague CW1, a Sandoz senior pricing executive, that CW-3 was getting an additional price point for the Clotrimazole Cream launch. The next day, on January 9, 2015, Aprahamian called CW-3. CW3 called him back and they spoke for four (4) minutes.

2318.    First thing the next business day, Monday January 12, 2015, E.D. followed up with an email to CW-3 stating, "lust wanted to follow-up on our conversation from last week re: Clotrimazole. Were you able to get a price point?" CW-3 responded: "Will have the price points for you today."

2319.    That same day, CW-3 called Aprahamian. Aprahamian returned the call and they spoke for seven (7) minutes. On that call, Aprahamian provided CW-3 with Taro's non-public pricing for two different categories of customer—wholesalers and retailers. CW-3 told Aprahamian that Sandoz had limited supply of Clotrimazole Cream and that it planned to target Walmart and Walgreens only. Immediately after his call with Aprahamian, CW-3 called CW-1. Also, later that day CW-3 sent an

email to E.D. at Sandoz, with a copy to CW-1, conveying the competitively sensitive information he had learned from Aprahamian.

2320.   The next day, on January 13, 2015, CW-3 spoke with CW-1 for sixteen (16) minutes. Later that afternoon, Aprahamian called CW-3. CW-3 returned the call and they spoke for eight (8) minutes.

2321.   On January 29, 2015, Sandoz bid on Clotrimazole Cream at Walmart, a Taro customer. Walmart emailed Aprahamian to inform him of the bid and asked if Taro wanted to bid to retain the business. Aprahamian responded, "[w]e will review and let you know by Monday if that is OK." That same day, Aprahamian called CW-3 and they spoke for nine (9) minutes.

2322.   The following Monday, February 2, 2015, Aprahamian emailed Walmart and declined the opportunity explaining that "[w]e have reviewed your price on the Clotrimazole and unfortunately we are unable to adjust at this time. Certainly appreciate you giving us a crack at this. Please let us know what you decide so we can plan accordingly." Aprahamian then forwarded his response along internally stating: "Heads up, we will be losing this at Walmart due to new entrant."

2323.   On February 9, 2015, Walmart emailed Sandoz to notify the company that it had won the Clotrimazole Cream business.

2324.   In March 2015, and consistent with its plans, Sandoz also bid on Clotrimazole Cream at Walgreens, a Glenmark customer. On March 27, 2015, Walgreens awarded the business to Sandoz.

                            viii)    Ketoconazole Cream and Fluocinonide Gel

2325.   In March 2015, G&W entered into an agreement with Teva to purchase its manufacturing facility in Sellersville, Pennsylvania. As a part of that transaction, G&W acquired the rights to manufacture over twenty-five (25) of Teva's products, including Ketoconazole Cream and Fluocinonide Gel.

2326.   Taro had a history of colluding with Teva and Sandoz on both Ketoconazole Cream and Fluocinonide Gel. In 2014, Aprahamian of Taro coordinated with Nisha Patel, a Teva pricing and sales executive, and CW-3 of Sandoz, to significantly raise prices on both products. This collusion is discussed in detail in the AG Teva Complaint.

2327.   After G&W acquired these products from Teva, Taro immediately began communicating and colluding with G&W. The following sections will discuss this collusion on Ketoconazole Cream and Fluocinonide Gel in further detail.

2328.   Ketoconazole Cream, also known by the brand name Nizoral, is an antifungal medication used to treat infections such as seborrhea, athlete's foot, and ringworm.

2329.   At the beginning of 2015, there were three competitors in the market for Ketoconazole Cream: Taro, Teva, and Sandoz. As detailed above, in March 2015, G&W purchased the rights to manufacture Ketoconazole Cream from Teva.

2330.   With G&W poised to enter the market, Orlofski of G&W placed a call to Aprahamian at Taro on June 10, 2015 to discuss the details. They spoke for nine (9) minutes. The following Monday, on June 15, 2015, G&W entered the market for Ketoconazole Cream.

2331.   G&W's target market share for the launch was forty percent (40%), a share to which it felt entitled in light of its predecessor Teva's roughly 60 percent share in the months leading up to the sale of the Sellersville facility. G&W took great care to aim for that target with precision, in compliance with its agreement with the other players in the market. Late in the day on June 15, 2015— the day of G&W's launch—Vogel-Baylor of G&W emailed a colleague to ask how close to the target forty percent (40%) G&W would be if it won both Walgreens and CVS. Vogel-Baylor added: "I need to obtain 40% MS for this launch. I need to get the full WAG business, however, I am okay with taking a piece of the CVS business. If the below exceeds 40% by 5% or greater, can you please give me the annual volume that I should target CVS at so that I hit my 40%? Thank you!!!!" The response

was good news: "Good morning!!! Well, believe it or not, total CVS + WAG business is 40% mkt share exactly."

2332.  Even though Teva, Taro, and Sandoz had conspired to significantly raise prices on Ketoconazole Cream only about a year earlier, G&W entered the market with a dramatic price increase, roughly four times that of the competitors already in the market. Its WAC for the 15gm tube was $105.06, while market WAC was $24.72. Its WAC for the 30gm tube was $166.76; market WAC was $41.69. Its WAC for the 60gm tube was $221.55; market WAC was $63.30.

2333.  Anxious to confirm that his competitors would act accordingly, Orlofski placed another call to Aprahamian of Taro on June 17, 2015. This time the call lasted twenty (20) minutes.

2334.  Two days later, on June 19, 2015, Aprahamian called CW-3 at Sandoz and they spoke for seventeen (17) minutes. During that call, the two competitors discussed the details of G&W's entry and Taro's plans to follow the sharp price increase. Following his call with Aprahamian on June 19, 2015, CW-3 texted his superior, Kellum, to set up a time to talk to him about his discussion with Aprahamian.

2335.  G&W's bold price move upon entering the market was not well-received by customers. On June 18, 2015, Red Oak reached out to Taro for a price proposal, saying "Teva is getting out of this product and another supplier is launching it. I think we could keep this all with you if you were interested." Taro, however, held staunchly to its deal with its competitors. C.U., a Taro sales executive, forwarded Red Oak's message to Aprahamian with the comment: "For your enjoyment!!! . . . I will write back and let him know that we cannot take on any additional units."

2336.  The next day, on June 19, 2015, Red Oak also tried to interest Sandoz in its business, saying: "Teva is getting out of this product and another supplier is launching it."

2337.  Sandoz was careful to confer with the competition before responding. On June 22, 2015, CW-3 of Sandoz placed two calls to Aprahamian at Taro, lasting seven (7) minutes and nine (9)

minutes, respectively. On June 26, 2015, CW-3 initiated another call to Aprahamian, and the two spoke for three (3) more minutes.

2338.   Four business days later, on July 1, 2015, CW-1, a Sandoz senior pricing executive, gave approval to submit a bid to Red Oak for one of two drugs under consideration. With respect to the second drug – Ketoconazole Cream – however, the answer was different. CW-1 instructed: "the Keto cream we are currently reviewing the market. No offers."

2339.   Two weeks after the G&W launch, Walgreens was pressing G&W for some relief from its steep price increase. On July 1, 2015, Vogel-Baylor updated Orlofski on the situation. She reported that her Walgreens contact "said that she didn't bid the product out to any other manufacturer yet, however, if she did and she was able to get her current price or lower that she would automatically have that price locked in for 6 months before any price increase." Vogel-Baylor played hardball with Walgreens, however, knowing that the competitors would dutifully follow G&W's price move. She told Orlofski: "I told Courtney that our new WAC/AWP is publicly posted so if a manufacturer is going to follow the price increase then they most likely will bid the increased price when they bid on her business so they wouldn't necessarily have the price locked in for 6 months."

2340.   Orlofski emailed Vogel-Baylor the following day, July 2, 2015, emphasizing that securing the Walgreens business was "Priority 1," adding: "Please keep watching the price databases to see when/if Taro and Sandoz raise the WAC price."

2341.   On July 6, 2015, Vogel-Baylor notified Orlofski and A.G., a senior G&W executive, that she had "checked MediSpan to see if there have been any changes in Sandoz's and Taro's WACs. Both are still the same as they were prior to our launch. They were last updated in April 2014. I will continue to monitor and keep you posted."

2342.   Orlofski acted quickly, calling Aprahamian the next day, plus four more times over the next three weeks.

2343.    On July 31, 2015, the day after the final call in the series of calls between Aprahamian and Orlofski , Taro followed G&W's price increase on the 15gm and 30gm tubes of Ketoconazole Cream, instituting 325 percent and 300 percent WAC increases respectively.

2344.    On August 3, 2015, Orlofski initiated an eight (8) minute call to Aprahamian. Taro raised WAC on the 60gm tube by 250 percent that same day.

2345.    Orlofski was delighted when he heard that Taro had followed G&W's lead, calling it "good news indeed." He instructed Vogel-Baylor: "Please also keep checking the price database to see if Sandoz raises the price."

2346.    Sandoz did not delay in making its own plans to follow its competitors' price increases. On August 17, 2015, the agenda of a Sandoz internal strategy meeting included the item: "Ketoconazole (prune, take price increase)." Before it could follow the price increases, however, it made sure not to poach any of its competitors' customers or take steps that would disrupt the market.

2347.    For example, on September 10, 2015, T.O., a Sandoz marketing executive, instructed a colleague that Sandoz should not submit a bid on Ketoconazole Cream in response to ABC's invitation to do so, revealing that the company's price increase was imminent. T.O. stated: "[I] prefer not to go for ketoconazole … they are bidding it because of the price rise in the market that we are about to take… I feel like we will be asking for a fight with the incumbent. Thx."

2348.    In January 2016, a Sandoz internal report listed drugs they planned to increase prices on, with Ketoconazole Cream described as "the main one."

2349.    In March 2016, Sandoz finally followed the competitors' moves, increasing its price for Ketoconazole Cream by 300 percent. CW-3 of Sandoz and Aprahamian of Taro continued to coordinate even then, with a twenty-three (23) minute call on March 7, 2016, followed by a ten (10) minute call the next day, March 8, 2016.

2350.   Fluocinonide Gel is a topical medication prescribed for the treatment of atopic dermatitis, psoriasis, and other inflammatory skin conditions.

2351.   For most of 2015, Taro was the only player in the market, with Teva and Sandoz having discontinued Fluocinonide Gel from their product lines in late 2014.

2352.   In the fall of 2015, however, G&W was making plans to join Taro in the market by launching the product that November, after purchasing the product from Teva. G&W built into its plans an assumption that Taro would cede approximately twenty-five (25%) percent market share to G&W upon its launch.

2353.   By mid-November, G&W had bumped its product launch date back to December because of a product testing problem at an outside lab. No longer content with assuming that Taro would give it a quarter of the market when the launch came to fruition, G&W executives reached out to the competitor to confirm. On November 17, 2015, Orlofski of G&W called Aprahamian at Taro, and the two competitors spoke for seventeen (17) minutes. Later that same day, Perfetto of Taro placed a brief call to Orlofski. M.P., a G&W business development executive, also continued the dialogue with a call to Perfetto on November 18, 2015.

2354.   On November 20, 2015, Vogel-Baylor of G&W worked on confirming that Taro was, indeed, the only competitor with whom G&W had to confer, asking a colleague to pull information for Fluocinonide Gel: "I need to see who the players are and how much share each player currently has." Orlofski placed another quick call to Perfetto on November 21, 2015.

2355.   Two days later, on November 23, 2015 at 11:25 a.m., Orlofski called Perfetto yet again. They spoke for seven (7) minutes. Less than two hours later, Vogel- Baylor sent Kroger an email with news of the G&W launch of Fluocinonide Gel and a request for information about the purchaser's usage numbers for the product. On November 24, 2015, Kroger responded that G&W would need to

offer all three sizes of the product—15, 30gm, and 60gm—before it would consider moving the business. G&W, however, would not be prepared to launch the two smaller sizes until May 2016.

2356.   Kroger's response sent the competitors back to square one in figuring out how to allocate the Fluocinonide Gel market between them. G&W set to work quickly exploring other options. On November 25, 2015, Orlofski called Perfetto and the two competitors spoke for seven (7) minutes.

2357.   On December 3, 2015, Vogel-Baylor reached out to Walgreens asking whether the customer would entertain a bid for Fluocinonide Gel. Vogel-Baylor explained to Walgreens that it was "most likely [her] only target to start."

2358.   A few days later on December 8, 2015, Aprahamian and Orlofski had a twenty three (23) minute phone conversation. Later that day, Vogel-Baylor moved forward, emailing her Walgreens contact to ask where G&W should send its Fluocinonide Gel proposal soliciting Walgreens' business.

2359.   While Vogel-Baylor awaited Walgreens' response, other G&W executives continued their conversations with their counterparts at Taro. On December 13, 2015, Perfetto called M.P. of G&W and they spoke for twenty-nine (29) minutes. The following day, December 14, 2015, Aprahamian called Orlofski and they spoke for nine (9) minutes.

2360.   Having gotten the requested information from Walgreens late in the evening on December 14, 2015, and having vetted the plan with its competitor, G&W sent its pricing proposal on Fluocinonide Gel to Walgreens the following day.

2361.   Walgreens contacted Taro two days later, on December 17, 2015, to inform the incumbent of G&W's proposal and to find out whether Taro intended to defend. Taro sales executive C.U. asked Aprahamian: "Thoughts on our POA?" Aprahamian responded simply "we will be market responsible." C.U. wrote back, emphasizing that he was well aware of Taro's cooperative arrangement with its competitors, saying: "Thought so, just wasn't sure if we would be responsible elsewhere?"

2362.   To keep the lines of communication open, Orlofski called Perfetto first thing the following morning.

2363.   C.U. refrained from responding to Walgreens' question about Taro's intentions in writing, instead cautiously emailing his Walgreens contact on December 21, 2015: "Can you call my office when you get a chance."

2364.   Having somehow overlooked C.U.'s request for a phone call, on January 4, 2016 the Walgreens representative again pressed for an answer on what Taro's approach would be on Fluocinonide Gel, asking: "Has anything been sent over on this request?" C.U. responded: "I sent you this email and left you a few vmails to discuss this. At this time Taro will not be submitting a competitive offer."

2365.   The following day, January 5, 2016, a Taro pricing executive, M.L., confirmed that Taro had voluntarily ceded its Walgreens business to the competitor, telling his colleague: "We gave up the Fluo Gel at WAG's. Seems that G&W bought Teva plant and we had to give up share."

2366.   That same day, a Taro pricing executive, A.L., advised C.U. that he should have someone on the pricing team send emails to customers when Taro declines to bid, like the one he sent to Walgreens for Fluocinonide Gel. As A.L. explained, "we should send it so you don't look like the bad guy, you can always be the one, 'I tried all I can but they are asswhole[sic] in house they don't understand the business.'"

2367.   On January 6, 2016, the day after Taro declined to bid at Walgreens, Vogel- Baylor called C.U. at Taro and they spoke for twenty-five (25) minutes. Notably, this was the only phone call ever between these two competitors according to the available phone records.

2368.   Several months later, on April 26, 2016, C.U. forwarded along internally a monthly tracking spreadsheet entitled: "CU 2016 Gains and Losses March." In the spreadsheet, C.U. noted

with respect to Fluocinonide Gel at Walgreens: "Taro was market responsible and G&W came into market. Taro walked away from ROFR in January. Removal date is 3-31-16."

iii.    <u>Sandoz and Its Other Relationships</u>

2369.   As discussed in detail above, CW-3 colluded extensively with Aprahamian and H.M. of Taro on products that Sandoz and Taro overlapped on and had an ongoing understanding going back many years not to poach each other's customers and to follow each other's price increases. However, CW-3 was a prolific communicator who regularly colluded with many other competitors.

2370.   For example, between June 2011 and August 2016, when he left Sandoz, CW-3 exchanged at least 1,100 phone calls and text messages with his contacts at Mallinckrodt, Perrigo, Aurobindo, Actavis, Glenmark, G&W, Wockhardt, Mylan, Lannett, Lupin, Rising, Greenstone, and Taro. These communications are detailed in the chart below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Aprahamian, Ara (Taro) | 187 | 3/15/2013 | 8/18/2016 |
| Kaczmarek, Walt (Mallinckrodt) | 146 | 11/14/2012 | 7/13/2016 |
| K.K. (Mallinckrodt) | 158 | 12/3/2012 | 6/20/2016 |
| T.P. (Perrigo) | 95 | 8/8/2012 | 2/4/2016 |
| CW-6 (Aurobindo) | 90 | 8/16/2012 | 5/10/2013 |
| CW-2 (Rising) | 80 | 8/2/2013 | 5/11/2016 |
| H.M. (Taro) | 53 | 9/6/2012 | 3/11/2014 |
| Aprahamian, Ara (Actavis) | 52 | 8/17/2011 | 3/11/2013 |
| Blashinsky, Mitchell (Glenmark) | 49 | 8/28/2012 | 10/9/2013 |
| S.G. (Rising) | 37 | 6/4/2015 | 6/15/2016 |
| K.K. (G&W) | 30 | 2/6/2014 | 3/30/2015 |
| A.F. (Perrigo) | 27 | 6/30/2011 | 7/19/2013 |
| K.K. (Wockhardt) | 25 | 7/29/2011 | 5/23/2013 |
| B.G. (Lannett) | 22 | 3/18/2016 | 8/19/2016 |
| T.G. (Aurobindo) | 20 | 3/11/2014 | 10/19/2015 |
| L.W. (Mylan) | 14 | 9/21/2012 | 7/23/2013 |
| Berthold, David (Lupin) | 3 | 2/7/2012 | 10/18/2012 |
| Grauso, Jim (Aurobindo) | 3 | 6/28/2012 | 7/16/2012 |
| Perfetto, Mike (Taro) | 2 | 8/11/2016 | 8/11/2016 |
| K.S. (Lannett) | 2 | 5/10/2012 | 5/15/2012 |
| D.C. (Glenmark) | 1 | 8/22/2013 | 8/22/2013 |
| A.G. (Actavis) | 1 | 8/22/2013 | 8/22/2013 |
| Nailor, Jill (Greenstone) | 1 | 5/29/2013 | 5/29/2013 |
| Taro Pharmaceuticals | 1 | 8/11/2016 | 8/11/2016 |
| Sullivan, Tracy (Lannett) | 1 | 5/8/2012 | 5/8/2012 |

2371.  As detailed above, when CW-3 was coordinating with competitors, he was acting at all times at the direction of, or with approval from, his superiors, including CW-1 and Kellum.

2372.  Several of CW-3's relationships—including with Perrigo, Glenmark, Aurobindo, Rising, and Mallinckrodt—as well as other relationships between various Sandoz executives and certain competitors, are explored in greater detail in the following sections.

1)    Collusion Between Sandoz and Perrigo

2373.  As detailed above, Sandoz and Perrigo had an ongoing understanding over many years not to poach each other's customers and to follow each other's price increases. This understanding was implemented primarily through communications between CW-3 of Sandoz and T.P. of Perrigo. CW-3 continued the relationship with T.P. after his predecessor, CW-6, left Fougera in August 2012.

CW-3 and T.P. of Perrigo were not social friends. If they were communicating with each other, it was to coordinate anticompetitive conduct with regard to drugs on which Sandoz and Perrigo overlapped.

2374.   During this time period, T.P. was acting at all times at the direction of, or with approval from, his superiors, including Boothe and Wesolowski.

2375.   Several examples of CW-3's coordination with T.P. on specific products are discussed in detail in the following sections.

a)      Bromocriptine Mesylate Tablets

2376.   Bromocriptine Mesylate Tablets ("Bromocriptine"), also known by the brand name Parlodel, is used in the treatment of Parkinson's disease, hyperprolactinemia (abnormally high levels of prolactin in the blood), and acromegaly (a syndrome where the pituitary gland produces excess growth hormones).

2377.   As of December 2012, the three competitors in the market for Bromocriptine were Sandoz (with 65 percent share), Perrigo (with 30 percent), and Mylan (with 5 percent).

2378.   On March 1, 2013, Walgreens reached out to Sandoz asking for a one-time buy for Bromocriptine because Mylan was having supply issues and would be out of the market for two months. On March 4, 2013, S.G. responded to Walgreens stating that Sandoz could not fill the customer's request.

2379.   Viewing Mylan's supply issues as an opportunity, S.G. forwarded his exchange with Walgreens to Kellum asking, "[c]an we take a price increase?" Kellum responded within the hour stating, "Yes." That same day, March 4, 2013, CW-4, a Sandoz senior sales executive, spoke with Jim Nesta, a senior sales executive at Mylan, for nearly four (4) minutes. The two competitors spoke again on March 11, 2013 for nearly ten (10) minutes.

2380.   On March 22, 2013, Kellum emailed the Pricing Committee recommending that Sandoz increase prices on Bromocriptine, among other products. In particular, Kellum sought a 206

percent increase to Sandoz's WAC pricing for Bromocriptine and noted the reason for the increase was due to "Mylan exiting [the] market."

2381.   By March 31, 2013, all members of the Sandoz Pricing Committee (which included Kellum and CW-1, among others) had approved the increase. The very next day, on April 1, 2013, CW-3, a Sandoz senior sales executive, called T.P. of Perrigo – the other competitor on Bromocriptine – and they spoke for seventeen (17) minutes. The next morning, on April 2, 2013, CW-3 called T.P. again and they spoke for five (5) minutes. On this call, CW-3 conveyed to his competitor a list of products that Sandoz planned to increase pricing on in April 2013, including Bromocriptine, as well as the amount of those increases.

2382.   After hanging up with T.P., CW-3 called Kellum. A few hours later, CW-3 called CW-1, a senior pricing executive at Sandoz, and they spoke for eleven (11) minutes.

2383.   The next day, on April 3, 2013, Sandoz held an internal meeting attended by sales and pricing personnel, including CW-3, CW-4, CW-1, and Kellum, to discuss the upcoming Sandoz price increases, including Bromocriptine.

2384.   Two days later, on April 5, 2013, Sandoz implemented the Bromocriptine increase and raised WAC pricing on the product by 205 percent.

2385.   By late May 2013, Mylan had resolved its supply issues on Bromocriptine and was readying to increase its own price. To that end, on May 22, 2013, Mylan held an internal meeting to discuss Bromocriptine.

2386.   That same day, on May 22, 2013, ABC emailed Sandoz to request a bid on Bromocriptine, citing supply issues with its incumbent manufacturer. S.G., a Sandoz sales executive, who had a better idea of Mylan's plans, forwarded the request to Kellum stating "I believe this is Mylan price increase."

2387.   Sandoz quickly set out to confirm the reason for ABC's request. First thing the next morning, on May 23, 2013, Kellum called L.W., a sales executive at Mylan. The call lasted two (2) minutes. Notably, this was the only call ever between the two competitors according to the available phone records. That same morning, CW-3 spoke twice with T.P. of Perrigo and CW-4 exchanged two calls with Nesta of Mylan. After speaking with their competitors, CW-3 and T.P. reported back to their superiors, CW-1 and Kellum of Sandoz and Wesolowski of Perrigo. During these calls, Sandoz learned that ABC was in fact Perrigo's customer, and that Perrigo might be leaving the market for Bromocriptine due to supply problems.

2388.   After this series of calls, Kellum called S.G. of Sandoz and they spoke for twenty-one (21) minutes. Not wanting to upset the market balance between the competitors, Sandoz ultimately decided to submit an offer to ABC for a one-time buy. However, the customer declined the offer because Sandoz's pricing was too high.

2389.   Just one week later, on May 31, 2013, Mylan re-entered the market and published WAC pricing for Bromocriptine that matched Sandoz's increased pricing. In the days leading up to, and on the day of, Mylan's price increase, the competitors again exchanged several calls.

2390.   As of June 2013, Sandoz decided not to pursue additional market share on Bromocriptine because it had reached its "fair share" and achieved a "good price."

2391.   Perrigo did not quickly follow the price increases taken by Sandoz and Mylan, in part due to their intermittent supply issues. As a result, Sandoz received several complaints from its customers that Perrigo was selling the product at a cheaper price.

2392.   For example, on July 22, 2013, McKesson emailed Sandoz requesting a price reduction for Bromocriptine because a competitor was selling the product at "77.77% below [McKesson's] current contract price." The next day, on July 23, 2013, CW-3 called L.W. of Mylan and they spoke for eight (8) minutes. Within minutes of hanging up, CW-3 called CW-1. The call lasted two (2)

minutes. Two days later, Sandoz responded to McKesson and declined to lower its pricing stating, "[w]e feel your current price is competitive relative to the market."

2393.  On July 29, 2013, McKesson asked that Sandoz reconsider its decision because otherwise it would need to request a bid from Perrigo. That same day, T.P. of Perrigo called CW-3 twice. The next morning, CW-3 called T.P. and they spoke for thirteen (13) minutes. During these calls, the competitors discussed the fact that Perrigo had not followed the Sandoz and Mylan price increases on Bromocriptine. However, T.P. assured CW-3 that Perrigo would not take Sandoz's business at McKesson.

2394.  After hanging up with T.P., CW-3 called CW-1 and they spoke for four (4) minutes. On this call, CW-3 conveyed to CW-1 what T.P. had told him about Bromocriptine. According to CW-3, it was not a question of whether Perrigo would follow, but when they would follow. Armed with this assurance from Perrigo, Sandoz responded to McKesson's request by declining to lower its pricing and reiterating "we feel your price is competitive relative to the market."

2395.  Similarly, on August 23, 2013, Omnicare, a Sandoz customer, emailed Perrigo stating that they noticed Perrigo's price for Bromocriptine was significantly lower than the other competitors and asked "[a]re you anticipating a price increase on this soon or having supply issues?" P.H., a sales executive at Perrigo, forwarded the email to T.P. asking, "[d]o you know if we may [be] increasing the price? Our supply looks good." To that, T.P. responded, "yes I recommended we do, I think [John Wesolowski] is going to." Although Perrigo considered bidding on the business, it ultimately declined the opportunity. On September 5, 2013, P.H. emailed Omnicare stating, "I will touch base with you in Oct as we are having a price adj on the item that is TBD."

2396.  Sandoz and Mylan generated a substantial amount of money from Bromocriptine sales in 2013. For example, on February 4, 2014, Sandoz released a business review report that detailed how the 2013 price increases for certain drugs delivered upwards of $197 million of revenue for

Sandoz after price protection. Among the drugs mentioned, Bromocriptine realized incremental net sales of $3.2 million after price protection.

2397.  Perrigo ultimately followed its competitors and implemented a price increase on Bromocriptine in October 2014.

2398.  On October 2, 2014, T.P. of Perrigo called CW-3 and they spoke for seven (7) minutes. Immediately upon hanging up with CW-3, T.P. called his supervisor, Wesolowski. Less than one (1) week later, on October 7, 2014, Perrigo sent letters to its customers notifying them of the Bromocriptine increase. The next day, on October 8, 2014, CW-3 sent an internal email to Kellum and CW-1, among others, noting that Perrigo "has finally followed [Sandoz's] Bromocriptine Price increase from April '13." That same day, CW-3 called T.P. and they spoke for four (4) minutes.

b)      <u>Adapalene Cream</u>

2399.  Adapalene Cream, also known by the brand name Differin, is a retinoid used to treat severe acne.

2400.  As detailed above in an earlier section, Fougera and Perrigo colluded to allocate market share to Perrigo upon its entry into the Adapalene Cream market as the authorized generic in October 2010.

2401.  Two years later, in November 2012, Sandoz (which had acquired Fougera) left the Adapalene Cream market temporarily due to supply issues. This left Perrigo as the sole manufacturer of the product.

2402.  By early January 2013, Sandoz was making plans for its re-entry into the market. On January 14, 2013, CW-3 provided M.A.2, a Sandoz marketing executive, a list of potential targets for Adapalene Cream stating that "the highlighted accounts are just an estimate as we need to target a reasonable amount of market share." CW-3 further explained that "[i]n order to recover these accounts we would have to reduce the pricing however the price points are dependent on where Perrigo is

currently priced." The list of potential targets was organized by historical volume of units purchased and Walgreens was the first name on that list. Walmart was not listed as a target.

2403.    On June 24, 2013, approximately one month before Sandoz's re-launch, CW-3 and T.P. of Perrigo had a ten (10) minute phone call during which T.P. shared Perrigo's non-public dead net pricing for Adapalene Cream for two customers—Walgreens and Optisource.

2404.    On July 15, 2013, Sandoz held a Commercial Operations call during which they discussed, among other things, the Adapalene Cream re-launch scheduled for July 26, 2013. That same day, T.P. and CW-3 exchanged two more calls. After exchanging a third call that lasted one (1) minute on July 16, 2013, the two competitors connected on July 17, 2013 and spoke for nineteen (19) minutes. During this call, T.P. provided CW-3 with Perrigo's non-public pricing for Adapalene Cream for a list of customers. T.P. also told CW-3 that Perrigo was not willing to give up Walgreens to Sandoz. The purpose of conveying this information was so that Sandoz, when it re-entered the market, could target and obtain specific agreed-upon customers with the highest prices possible, to minimize price erosion.

2405.    Also, between July 16, 2013 and July 18, 2013, CW-3 and A.F., a sales executive at Perrigo, exchanged at least nineteen (19) text messages.

2406.    On July 26, 2013, the day of Sandoz's re-launch of Adapalene Cream, CW- 3 called CW-1 and they spoke for eight (8) minutes. On this call, CW-3 provided CW-1 with the customer pricing for Adapalene Cream that T.P. had provided to him. Within minutes of hanging up with CW-3, CW-1 sent an internal email, including to Kellum, regarding Adapalene Cream. In that email, CW-1 recommended that Sandoz approach "ABC, Walmart, and Mckesson for starters. Intel tells me that they want to retain WGS [Walgreens]." CW-1 also provided the current pricing for those three customers.

493

2407. Notably, the price points matched exactly with the price points T.P. had provided to CW-3. In his email, CW-1 also stated that Sandoz would need to bid 30 percent lower than ABC's current price in order to win the business upon re-launch.

2408. That same day, on July 26, 2013, Sandoz prepared and sent offers for Adapalene Cream to the three customers CW-1 identified—ABC, McKesson, and Walmart—as well as Rite Aid and Morris & Dickson. Consistent with the prior conversations between CW-3 and T.P. of Perrigo, Sandoz did not submit a bid to Walgreens.

2409. Later that day, on July 26, 2013, Morris & Dickson accepted Sandoz's bid for Adapalene Cream.

2410. Also, that same day, Walmart declined the opportunity, but for reasons other than price, stating: "This product was not awarded to the current supplier until December of last year. I am not able to move it."

2411. The following Monday (the next business day), on July 29, 2013, T.P. of Perrigo called CW-3 twice. Both calls lasted one (1) minute. The next day, on July 30, 2013, CW-3 called T.P. back and they spoke for thirteen (13) minutes. CW-3 hung up and immediately called CW-1 to report about his conversation with the competitor. The call lasted four (4) minutes. That same day, Rite Aid accepted Sandoz's bid for Adapalene Cream.

2412. The next day, on July 31, 2013, Sandoz sent an offer for Adapalene Cream to Econdisc. The next morning, on August 1, 2013, Econdisc notified Perrigo of the offer and gave the incumbent an opportunity to bid to retain the business. Within the hour, T.P. called CW-3. The call lasted one (1) minute. Ten minutes later, T.P. called CW-3 again and they spoke for five (5) minutes. Later that day, in an effort to avoid putting evidence of his collusive conversations in writing, CW-3 emailed CW-1, saying "Call me about Adapalene." That same day, CW-3 and CW-1 spoke for five (5) minutes.

2413. On August 2, 2013, ABC accepted Sandoz's bid for Adapalene Cream.

2414.   On August 6, 2013, T.P. and CW-3 exchanged two calls lasting four (4) minutes and twelve (12) minutes, respectively. Later that day, T.P. and his colleagues at Perrigo, including his supervisor, Wesolowski, had a conference call to discuss Adapalene Cream. That same afternoon, Perrigo notified Econdisc that it was declining to bid to retain the customer's business. Later that day, Econdisc accepted Sandoz's bid for Adapalene Cream.

2415.   The next day, on August 7, 2013, McKesson accepted Sandoz's offer for Adapalene Cream.

2416.   T.P. of Perrigo and CW-3 continued to talk throughout August 2013 to coordinate Sandoz's smooth entry into the market. For example, between August 12 and August 15, 2013, the two competitors exchanged at least eight calls, including two calls on August 15, 2013 lasting eight (8) minutes and fourteen (14) minutes, respectively. Later that day, M.A.2, a Sandoz marketing executive, emailed CW-1 regarding Adapalene Cream stating that Sandoz's market share was now 25.5 percent and asking whether Walgreens could be "revisited." As detailed above, Sandoz had stayed away from Walgreens because Perrigo said they would not give up the business.

2417.   Respecting the agreement that the two competitors had arranged, Sandoz stayed away from Walgreens and instead submitted another offer to Walmart on August 27, 2013. Walmart, again, summarily refused the offer stating that it "can't entertain the bid at this time," because Perrigo had been its supplier for less than one year. The next day, on August 28, 2013, CW-3 called T.P. and they spoke for fourteen (14) minutes. T.P. hung up and spoke with his supervisor, Wesolowski, for seven (7) minutes.

2418.   As of December 2013, and without the Walmart business, Sandoz had only obtained approximately 30 percent share of the Adapalene Cream market. This was well below its expected share in a two-player market and less than the 47 percent market share that Sandoz had maintained prior to leaving the market in November 2012 due to supply issues.

2419.    This underperformance caught the attention of high-level executives at Sandoz. On January 8, 2014, R.A., a Sandoz finance executive, convened a meeting to discuss the Adapalene Cream re-launch and the issue of securing more market share on the product. By that time, it had been decided internally by the sales team that Sandoz would pursue Walgreens, representing approximately 19 percent share, to meet its fair share targets on Adapalene Cream.

2420.    That same day, on January 8, 2014, CW-3 called T.P. of Perrigo. First thing the next morning, CW-3 called T.P. again and they spoke for sixteen (16) minutes. T.P. and CW-3 would exchange two more calls the following week, on January 13 and January 16, 2013, lasting one (1) minute and ten (10) minutes, respectively. Immediately upon hanging up from the ten (10) minute call, CW-3 called CW-1 and they spoke for eight (8) minutes.

2421.    On January 28, 2014, Sandoz held a follow-up meeting to discuss the Adapalene Cream re-launch and Walgreens as Sandoz's next target. Two days later, on January 30, 2014, Sandoz met with Walgreens to discuss new product opportunities, including Adapalene Cream. The next day, on January 31, 2014, CW-3 called T.P. and they spoke for eight (8) minutes. Upon hanging up with T.P., CW-3 called CW-1.

2422.    After this series of communications between CW-3 of Sandoz and T.P. of Perrigo, Sandoz submitted a bid to Walgreens for Adapalene on February 14, 2014. Perrigo promptly conceded the customer and Walgreens awarded the business to Sandoz on March 5, 2014. This award brought Sandoz's share back to 47 percent—the same percentage it had before exiting the market in 2010.

c)    Calcipotriene Betamethasone Dipropionate

2423.    Calcipotriene Betamethasone Dipropionate Ointment ("CBD Ointment" or "Cal Beta"), also known by the brand name Taclonex Ointment, is a vitamin D analogue and corticosteroid combination product indicated for the topical treatment of psoriasis vulgaris in adults 18 years of age and older. CBD Ointment is available in 60gm and 100gm dosages.

496

2424.  In early 2014, both Sandoz and Perrigo were preparing to launch CBD Ointment. Sandoz was preparing to launch as the first-to-file generic and Perrigo was preparing to launch as the authorized generic. Under the agreement that Perrigo had reached with the brand manufacturer, Perrigo could not launch until Sandoz, the first filer, entered the market. Typically, a first filer interested in gaining a competitive advantage would want to keep its launch date a secret from the company launching the AG so that the first filer could catch the AG by surprise and maintain market exclusivity for a longer period of time. But that was not the case with regard to CBD Ointment.

2425.  T.P., a sales executive at Perrigo, and CW-3, a senior sales executive at Sandoz, exchanged two calls in late February 2014. On those calls, T.P. told CW-3 that Perrigo would be launching the AG of CBD Ointment and asked CW-3 when Sandoz planned to launch its generic version.

2426.  When first approached by T.P. about CBD Ointment, CW-3 was not aware that Sandoz was planning to launch it. After being approached by T.P., CW-3 reached out to others at Sandoz to find out what Sandoz's plans were. On March 4, 2014, A.S.2, a senior Sandoz launch executive, confirmed to CW-3 that Sandoz would be launching CBD Ointment. Within minutes of receiving A.S.2's confirmation the night of March 4, 2014, CW-3 emailed Kellum, stating: "Please call me when you have a moment."

2427.  The next day, on March 5, 2014, Sandoz held an internal "Cal-Beta Launch Meeting" teleconference to discuss its plans. Kellum, A.S.2, CW-1, a Sandoz senior pricing executive, and other members of the sales and launch teams attended the all. Additional meetings were held on March 10 and March 13, 2014 to coordinate the CBD Ointment launch.

2428.  Also on March 13, 2014, CW-3 called T.P. two (2) times, with one of the calls lasting twelve (12) minutes. That same day, Perrigo scheduled its own teleconference for the following day to discuss its CBD Ointment launch. T.P., his supervisor Wesolowski, a senior executive at Perrigo,

and over twenty (20) other Perrigo sales and launch team members attended the call. On the call, the Perrigo sales executives were directed to go after only six (6) select customer accounts, and no others. These accounts were referred to as "wave 1 customers to receive an offer."

2429.  Promptly following the call, J.B.2, a Perrigo marketing executive, circulated a document that was discussed on the call. The document was internally prepared at Perrigo and indicated that Sandoz may launch on March 31, 2014 and that Perrigo's "target share" was 50 percent of the market. Perrigo's information was accurate. Sandoz ultimately launched the 100gm size on March 31, 2014 and the 60gm size on April 1, 2014. In harmony with Perrigo's target share goal of 50 percent, internal Sandoz email correspondence circulated prior to launch stated that Sandoz also had a target market share of 50 percent for CBD Ointment.

2430.  While Perrigo planned to approach a small, select group of potential customers, Sandoz was deciding which large customers to go after. Sandoz initially planned to target Walgreens and ABC for CBD Ointment. However, Sandoz remained involved in ongoing business disputes with Walgreens and ABC in the middle of March 2014. Sandoz was concerned that Walgreens and ABC would not award Sandoz their CBD Ointment business if the disputes were not resolved prior to launch.

2431.  On the night of Friday, March 14, 2014, A.S.2 emailed the President of Sandoz US, stating that resolving the ABC and Walgreens disputes would be a "pivotal success factor" for the CBD Ointment launch. The President of Sun responded by directing A.S.2 to look for CBD Ointment business "somewhere else" and to "stay close and drive orders home asap, no excuses."

2432.  A.S.2 forwarded his email correspondence with the President of Sun. to Kellum and others at Sandoz on the afternoon of March 16, 2014. Consistent with the President of Sun's direction, A.S.2, Kellum, CW-3 and CW-1 immediately began to strategize how Sandoz could reach its market share target of 50 percent without Walgreens and ABC. A.S.2 determined that in order to reach that

goal, Sandoz would need to have CVS as a customer. At an in-person meeting in Sandoz's Princeton offices, Kellum told CW-3 and CW-1 that he also wanted McKesson and Rite Aid as customers.

2433.  On the next day, March 17, 2014, CW-3 called T.P. at Perrigo to resume their discussions about customer allocation and to exchange pricing information. Between March 17 and March 20, 2014, CW-3 and T.P. exchanged more than ten phone calls, with one call lasting eleven (11) minutes and another call lasting seventeen (17) minutes. Further, T.P. reported the substance of these calls to his supervisor, Wesolowski, seeking direction from him on how to respond to CW-3. T.P. often spoke with Wesolowski between calls with CW-3, sometimes calling him immediately after hanging up with CW-3.

2434.  Although most of T.P. and CW-3's calls were just between the two of them, occasionally other colleagues would join them. For example, CW-3 made a call early in the week of March 17, 2014 to T.P. from A.S.2's office in Princeton, and Kellum and CW-1 also joined the call.

2435.  As noted above, over the course of these calls, T.P. and CW-3 discussed market pricing and customer allocation. In a call early in the week of March 17, 2014, T.P. shared Perrigo's proposed WAC pricing and AWP pricing for different types of customers, which CW-3 recorded contemporaneously in his Notebook:



2436.  When Perrigo launched CBD Ointment about two weeks later, its WAC and AWP matched those price points. Sandoz's WAC prices at launch were close but slightly higher than Perrigo's, at $657.45 for the 60gm size and $968.40 for the 100gm size.

2437.   T.P. also shared with CW-3 what Perrigo's non-public, "dead net" pricing would be for its customers. Perrigo ranked its customers into five "tiers." Customers in the same tier were typically sold a drug at the same "dead net" price. T.P. communicated the CBD Ointment pricing tiers to CW-3 by giving examples of the types of customers in a tier, such as large wholesalers like ABC and Cardinal or regional wholesalers like HD Smith or Optisource, and what the corresponding "dead net" pricing would be for that type of customer.

2438.   Perrigo's offers to customers were in step with the "dead net" pricing that T.P. communicated to CW-3. For example, Perrigo made offers to Walmart and Meijer, both so-called "tier 2" customers, that resulted in Walmart and Meijer having "dead net" pricing of $426.31 and $627.94 for the 60g and 100g sizes respectively and offers to Optisource and Morris Dickson, both so-called "tier 3" customers, that resulted in Morris Dickson and Optisource having "dead net" pricing of $448.75 and 660.99 for the 60g and 100g sizes respectively.

2439.   As noted earlier, T.P. and CW-3 did not just use these calls to share pricing information in anticipation of their launches. They also used them to allocate the customers that would be in the market. When CW-3 and T.P. spoke on calls early in the week of March 17, 2014, each shared his respective company's position on how customers should be divided between them to achieve "fair share." CW-3 told T.P. that Sandoz wanted McKesson, Rite Aid, Econdisc, CVS, Cardinal, Omnicare and Kaiser. T.P. responded that Perrigo wanted Anda, Walgreens, ABC, Walmart, Rite Aid and McKesson.

2440.   The purpose of reaching agreement on the list of customers was to avoid competing with one another as both companies entered the market simultaneously.

2441.   As the lists above show, with the exception of Rite Aid and McKesson, Sandoz and Perrigo were aligned on how significant customers should be allocated. In March 2014, Rite Aid was purchasing generic drugs through McKesson's "OneStop Generics" program, so Perrigo and Sandoz

viewed these customers as a package or, put another way, whoever got McKesson also got Rite Aid as a customer. Both of the competitors wanted that business.

2442.   As the negotiations continued, Sandoz recognized that the list of customers it wanted for CBD Ointment was more than its fair share of the market. However, in keeping with its general strategic preference for selling to a smaller number of large customers, Sandoz did not want to give up McKesson, Rite Aid, CVS, or Cardinal. To resolve the issue, Kellum, CW-3 and CW-1 brainstormed a list of other customers that, when combined, would have about the same market share as Rite Aid and McKesson and that Sandoz was willing to give up to Perrigo. Ultimately, the list of customers that Sandoz created included Optisource, Publix, Morris & Dickson (MD), PBA Health (PBA), Meijer, and Kaiser.

2443.   Thereafter, CW-3 called T.P. and proposed that Sandoz give up these customers to Perrigo in exchange for McKesson and Rite Aid. Perrigo agreed.

2444.   Following the plan, Perrigo submitted offers to the customers listed above and was awarded the business at Optisource, Publix, Morris & Dickson, Meijer, and Kaiser. In addition, and as planned, Perrigo bid on and won Anda, Walgreens, ABC and Walmart, while Sandoz bid on and won McKesson, Rite Aid, CVS, Cardinal, and Omnicare.

2445.   While Wesolowski encouraged the Perrigo sales team to go after their assigned customers, he was also careful to make sure they adhered to the agreement reached with Sandoz. For example, on March 21, 2014, Omnicare reached out to Perrigo asking for a bid on CBD Ointment. Omnicare was a customer allocated to Sandoz. P.H., a Perrigo sales executive, forwarded the request to Wesolowski who responded, "[t]his customer will not be approached." Consistent with Wesolowski's direction, P.H. told Omnicare that Perrigo was "holding off on offers for now," even though Perrigo was actively sending offers to other potential customers at that time.

2446.   On March 31, 2014, CW-3 called T.P. That same day, Sandoz officially launched the 100gm package size of CBD Ointment and Perrigo launched both the 100gm and 60gm package sizes. The next day, on April 1, 2014, Sandoz launched the 60gm size. Early in the morning of April 1, 2014, M.A.2, a Sandoz marketing executive, emailed Kellum and A.S.2 to advise that she received an alert that Perrigo had increased prices on CBD Ointment. She noted that she was "sure you are already aware of Perrigo's pricing."

2447.   On April 7, 2014, D.A., a Sandoz launch executive, noted in an internal email that Sandoz "hit its target share goal on Cal/Beta." At the end of April 2014, Sandoz and Perrigo had a virtually even split of the market for that product.

d)     Tacrolimus Ointment

2448.   Tacrolimus Ointment ("Tacrolimus"), also known by the brand name Protopic, is a secondary treatment option for moderate to severe eczema. Tacrolimus is available in 30gm, 60gm and 100gm dosages. Recent annual sales of Tacrolimus Ointment in the United States exceeded $100 million.

2449.   In August 2014, Sandoz and Perrigo were both preparing to launch Tacrolimus. Sandoz was the first-to-file generic and Perrigo was the authorized generic (the "AG").

2450.   On August 13, 2014 at 3:57 p.m., E.D., a Sandoz launch executive, sent an internal email asking if anyone knew whether there would be an AG for Tacrolimus or if any other competitors planned to enter the market. At 5:11 p.m. that same day, CW-3, a Sandoz senior sales executive, called T.P., a Perrigo sales executive, and they spoke for fifteen (15) minutes. Notably, prior to this call, CW-3 and T.P. had not spoken since June 18, 2014. Within a half hour of hanging up with T.P., CW-3 responded to E.D.'s question with an email reporting that Perrigo would be entering with an AG.

2451.   On September 8, 2014, Sandoz held a Commercial Operations meeting during which they discussed the Tacrolimus launch. That same day, CW-3 called T.P. four times, with one call

502

lasting eleven (11) minutes and another six (6) minutes. On those calls, CW-3 and T.P. discussed the Tacrolimus launch and decided to model it after the CBD Ointment launch. As discussed above in the previous section, in the spring of 2014 CW-3 and T.P. had colluded on CBD Ointment when Sandoz was entering as the first-to-file generic and Perrigo as the AG. By using CBD Ointment as a model, the competitors would not have to spend significant time negotiating the allocation of customers for Tacrolimus.

2452.  Two days later, on September 10, 2014, CW-3 called T.P. and they spoke for fifteen (15) minutes. During that call, the competitors again talked about the Tacrolimus launch. Specifically, they discussed the allocation of certain customers to Sandoz and Perrigo so that each competitor could reach 50 percent market share. Further, T.P. provided CW-3 with Perrigo's WAC and AWP pricing for the three dosage sizes, and the dead net pricing that Perrigo was contemplating for various classes of customers. In his notes of the call, CW-3 recorded that the competitors would "Model after Cal Beta" and listed the customers that they agreed to allocate to each other.

2453.  On November 10, 2014, A.F., a Perrigo sales executive, emailed Wesolowski, a senior Perrigo executive, to advise that a customer told her Sandoz was launching Tacrolimus that day. In turn, Wesolowski emailed T.P. and others at Perrigo asking them if the launch could be confirmed. That same day, T.P. and CW-3 spoke two times, with one call lasting two (2) minutes and the second lasting three (3) minutes.

2454.  During those calls, CW-3 told T.P. that Sandoz had not yet formally launched the product or started shipping to customers. Later that afternoon, T.P. reported back to Wesolowski: "My customer says they are not shipping." In order to avoid any written evidence of his illegal activity, T.P. referred to his source as a "customer" even though it was actually his competitor, CW-3.

2455.  On November 19, 2014, Sandoz launched Tacrolimus and Perrigo launched on the following day, November 20, 2014. Consistent with the competitors' plans, Sandoz was awarded

CVS, Cardinal, Omnicare, and Econdisc, among other customers. As planned, Perrigo won Walgreens, Walmart, ABC (secondary), Anda, Optisource, and Publix.

2456.  On November 20, 2014, Boothe, a senior Perrigo executive, sent around a congratulatory email to the Perrigo team that worked on the Tacrolimus launch. He specifically congratulated C.V., a Perrigo business development executive, and Wesolowski for "reeling in this product!" A few days later, in response to a request from the Tacrolimus brand manufacturer on how sales were going, C.V. replied, "[v]ery good so far. We appear to have right around 50% of the market."

e)    Methazolamide Tablets

2457.  Methazolamide, also known by the brand name Neptazane, is used to treat ocular conditions where lowering intraocular pressure would be beneficial, including several types of glaucoma. Methazolamide Tablets are available in 25mg and 50mg dosages.

2458.  By the fall of 2013, there were two manufacturers marketing Methazolamide, Defendant Sandoz and Fera Pharmaceuticals, Inc. ("Fera"). Both competitors had posted nearly identical WAC pricing for the 25mg and 50mg dosage sizes, respectively.

2459.  In early 2014, Sandoz began experiencing issues with its API supplier and was forced to temporarily withdraw from the market. At that time, Sandoz expected that its supply problems would be resolved in June 2014 and it would re-enter then.

2460.  At the same time that Sandoz was experiencing supply problems, Perrigo acquired Fera's right to distribute Methazolamide. As a result of Perrigo's acquisition, Fera left the Methazolamide market.

2461.  On March 6, 2014, Perrigo formally launched Methazolamide. Perrigo knew prior to its launch that Sandoz, its only competitor, was out of the market and was not expected to reenter until the summer of 2014. Perrigo leveraged its temporary position as the only manufacturer with the ability

to supply by implementing a large price increase. Perrigo's WAC pricing when it entered was 136 percent higher than Sandoz's. An internal Perrigo document circulated approximately one month prior to the launch indicated that Perrigo's target share for Methazolamide was "50% of [the] generic market [for Methazolamide] with short-term upside."

2462.   On June 17, 2014, Perrigo learned from a customer that Sandoz was back in the Methazolamide market. That same day, T.P. of Perrigo called CW-3, a Sandoz senior sales executive. After that call, T.P. called his supervisor, Wesolowski, and they spoke for three (3) minutes. The next day, on June 18, 2014, T.P. and CW- 3 exchanged two more calls, with one call lasting three (3) minutes. On Monday, June 23, 2014, T.P. emailed Wesolowski and reported that he believed Sandoz was coming back with just the 25mg version, not the 50mg version.

2463.   Indeed, Sandoz had re-entered the market for the 25mg with a WAC price of $129.84 – which was significantly lower than Perrigo's WAC price of $306.47. Wesolowski was upset that Sandoz did not reach out to Perrigo before re-entering the market. Had it done so, Sandoz would have known to raise its price, and to what level. Wesolowski forwarded T.P.'s email above to Boothe, a senior Perrigo executive, and others at Perrigo with the following cover note:

> Confirmed at three accounts that Sandoz is back at the old price on the 25mg. No timetable set on the 50mg yet but "soon". Bummer that they didn't do their homework.

2464.   In the meantime, Perrigo would make sure that Sandoz did its "homework" before re-entering on the 50mg, and that it would correct its prior mistake on the 25mg.

2465.   On October 21, 2014, CW-3 and T.P. spoke for fifteen (15) minutes.

2466.   During that call, T.P. provided CW-3 with Perrigo's increased WAC pricing for the 25mg and 50mg package sizes of Methazolamide to ensure that Sandoz would match those prices when it re-entered the market.

2467.   Shortly after the call, in early November 2014, Sandoz began ramping up for its re-entry into the Methazolamide market. On November 3, 2014, Sandoz held a Commercial Operations

meeting during which Sandoz discussed its plans for the Methazolamide re-launch, including implementing significant price increases to align with Perrigo's pricing.

2468.    The next day, on November 4, 2014, CW-1, a senior Sandoz pricing executive, sent an internal email asking his colleague to evaluate the "WAC price increase impact" if Sandoz raised its WAC pricing to match Perrigo. The next day, CW-3 called T.P at Perrigo and the two competitors spoke for twelve (12) minutes. Also on that day, CW-1 directed the Sandoz pricing team to remove Methazolamide from any existing contracts. CW-1 explained that "[w]e will be reintroducing [Methazolamide] at a revised price therefore we need to remove the current contract pricing."

2469.    The two competitors continued to coordinate over the next several weeks as Sandoz made final preparations to re-enter the market and raise prices. On November 10, 2014, CW-3 called T.P. twice with one call lasting two (2) minutes and the other call lasting three (3) minutes.

2470.    On December 4, 2014, CW-3 emailed Kellum, CW-1, and others at Sandoz regarding Methazolamide, providing them with specific, non-public pricing information he had learned from his competitor: "GPO `price points in the market are as follows (dead nets) - $250 and $500.

2471.    Internal Perrigo documents confirm that its so-called "dead net" pricing for group purchasing organizations (GPOs) at that time was approximately $250 for the 25mg and $500 for the 50mg. This pricing information was not publicly available.

2472.    On December 5, 2014, Sandoz re-launched its 50mg dosage with a WAC price of $612.97, which matched Perrigo's WAC price. At the same time, Sandoz increased the WAC price on its 25mg dosage by 136 percent to match Perrigo's pricing.

2)    Collusion Between Sandoz and Glenmark

2473.    In August 2012, not long after Sandoz acquired Fougera, Mitchell Blashinsky, who had just recently joined Defendant Glenmark as its Vice President of Sales and Marketing, approached CW-3 of Sandoz at the NACDS conference in Denver, Colorado. During their conversation over

breakfast at the Marriot Hotel, Blashinsky told CW-3, among other things, "we can make a lot of money" and "we can work together on pricing."

2474.   Over the next two years, the two competitors did "work together" on both market allocation and pricing, speaking at least fifty (50) times. Their communications were all collusive in nature. The two competitors were not friends and had no other reason to speak except to coordinate anticompetitive conduct. During that time period, Sandoz and Glenmark conspired to fix prices and allocate markets on at least two products: (1) Fluticasone Propionate Lotion (60ml) and (2) Desoximetasone Ointment.

a)      <u>Fluticasone Propionate</u>

2475.   Fluticasone Propionate Lotion ("Fluticasone"), also known by the brand name "Cutivate," is a topical corticosteroid used to treat swelling and itching that result from various chronic skin disorders, including atopic dermatitis.

2476.   Glenmark was the first generic manufacturer to enter the market for Fluticasone on March 26, 2012. As the first generic manufacturer to file an approved ANDA, Glenmark enjoyed a 180-day period of exclusivity during which time no other competitors could sell the product. Even before Glenmark launched, Sandoz (then Fougera) was planning to enter the market for Fluticasone after Glenmark's exclusivity period ended in September 2012 and understood that Perrigo was also planning to enter at the same time. Over the course of several months, Fougera, in particular CW-6 at the direction of Kaczmarek, coordinated with Glenmark frequently about Fluticasone, including market share targets and pricing, to prepare for its eventual Fluticasone launch.

2477.   After the Sandoz acquisition of Fougera in July 2012, as the end of Glenmark's 180-day exclusivity period approached, Sandoz continued to stay in communication with Glenmark and Perrigo about Fluticasone. As part of its launch strategy, Sandoz planned to obtain 33 percent of the market. Perrigo, however, only anticipated taking about one-quarter of the market.

507

2478.  By mid-August 2012, Sandoz learned that its launch of Fluticasone would be delayed until the end of November 2012 because of certain production problems. As a result of this delay, Kellum was concerned that Perrigo would be able to launch earlier than Sandoz and wanted to learn more about Perrigo's launch strategy. On August 21, 2012, Kellum sent an email to his sales team asking about "Perrigo's intentions." Within minutes of receiving the email, CW-3 reached out to T.P., his contact at Perrigo, by phone.

2479.  CW-3 also sent a message to Perrigo through a customer. That same day, the customer sent an email to a Perrigo sales executive, stating: "Rumor has it… you guys are launching [Fluticasone Lotion.] You guys want to play?" The Perrigo sales executive informed the customer that Perrigo's Fluticasone launch had now been "moved out" to the first quarter of 2013. The customer then forwarded that email directly to CW-3 at Sandoz, who reported the information directly to Kellum and others at Sandoz the next day.

2480.  Around this same time, Sandoz also began preparing to have conversations with "customers" about its Fluticasone launch while at the NACDS Conference in Denver in late August 2012. It was at that same conference where CW-3 first spoke to Blashinsky at Glenmark about working "together" and making "a lot of money." In an internal email to the Sandoz sales team on August 25, 2012, in advance of the NACDS Conference, R.T., a senior Sandoz sales and marketing executive, instructed his team on the current strategy which aligned with the larger "fair share" understanding: "If [the] market is just Glenmark and Sandoz we would like to get at least 40% market share. If Perrigo also enters, we would like to get at least 30% market share."

2481.  As its launch date for Fluticasone approached, Sandoz began to think more critically about which customers to target and began to communicate directly with Glenmark on the subject. On November 26, 2012, Sandoz scheduled an internal meeting to discuss which customers it should approach as part of its Fluticasone launch. That same day, CW-3 of Sandoz spoke to Blashinsky of

Glenmark twice, with one call lasting five (5) minutes. After the second call with Blashinsky, CW-3 emailed his Sandoz colleagues a list of six (6) customers he thought Sandoz should target. That list would later grow to eight (8) customers. CW-3 also made it known to his Sandoz colleagues that Glenmark was planning a potential price increase on Fluticasone at some point in the future.

2482.  The next day, November 27, 2012, a senior Sandoz marketing executive asked CW-3 to get Fluticasone "price points" for the customers Sandoz had agreed to target. CW-3 responded that he was "working on gathering this information." As promised, the next morning (November 28) CW-3 called Blashinsky of Glenmark. The two spoke four (4) times that day, including one call lasting eight (8) minutes. Later that same day, CW-3 was again asked if he had been able to "gather any intel in preparation for sending out offers [on Fluticasone.]" CW-3 responded: "I believe I have all the fluticasone information and will provide it soon."

2483.  The next morning, CW-3 sent an updated list of nine (9) customers that Sandoz should target for Fluticasone, based on his conversations with Blashinsky, but he did not include the pricing information that had been requested. The senior Sandoz marketing executive responded immediately: "Pricing?" CW-3 countered by referring to one of the biggest pop songs of 2012, suggesting that his boss should call him instead of asking for the information in writing: "Call me . . . maybe."

2484.  As Sandoz continued to prepare for its imminent launch, it also began to evaluate the usage expected from the nine customers that it had agreed with Glenmark to target. Sandoz found that those nine customers would not allow the company to reach its desired market share goals. As a result, on November 30, 2012 a senior Sandoz marketing executive suggested that Sandoz approach two large wholesaler customers, instead of one as originally agreed. CW-3 responded immediately, saying "I'm still gathering intel on Fluticasone." CW-3 then stated that "[t]wo retail[ers] and two wholesale[rs] on Fluticasone would be too much. Glenmark will more than likely retain one of the two wholesalers approached." A few hours later, CW-3 called Blashinsky and left a message.

Blashinsky promptly returned the call and the competitors spoke for three (3) minutes. Later that day, CW-3 also called and spoke to his contact at Perrigo, T.P., twice.

2485. Sandoz officially entered the market for Fluticasone on December 3, 2012, matching Glenmark's WAC pricing exactly. That same day, CW-3 of Sandoz called Blashinsky of Glenmark and they had a two (2) minute call. Also that day, Blashinsky directed the sales team to relinquish the Publix and Optisource accounts to Sandoz, two of the nine customers that Glenmark had agreed to give up to the new entrant.

2486. Sandoz continued to coordinate with Glenmark to make sure that it was targeting the appropriate customers and minimizing price erosion as it entered the Fluticasone market. For example, on December 13, 2012, a large wholesaler that Sandoz had agreed not to target approached Sandoz looking for an offer. That same day, CW-3 spoke to Blashinsky twice. When Sandoz refused to respond to the customer, the customer followed up again on December 21, 2012. Again, following the same pattern, CW-3 spoke to Blashinsky twice that day, including one call lasting four (4) minutes.

2487. Although Sandoz made sure to coordinate extensively with Glenmark, it had initial difficulty meeting its market share goal, in part because some of the customers already had a significant amount of inventory on hand. On January 9, 2013, CW-3 had a conversation with Blashinsky where the two competitors walked through a list of customers, identifying those that Sandoz should target and those which it should not. CW-3 took detailed contemporaneous notes of the conversation. Later in the day, after reviewing the list, CW-3 of Sandoz began to suspect that Glenmark may have oversold to certain customers in advance of Sandoz's entry, stating in an email that he had "a feeling Glenmark is playing games with us."

2488. By January 11, 2013, CW-1 of Sandoz sent around a summary of "where we are with Fluticasone," stating that "our market share is now 21.8%, and we have been able to keep the price up which has allowed us to exceed our 2013 [target]. If this were a product with traditional customer

share distribution I would estimate we would probably be a little over 30% share. Currently the brand continues to have 43% of the market." In response, R.T. of Sandoz indicated that he was "ok with our progress so far," but that 21.8 percent market share was "not optimal" and that Sandoz should continue to press for its original market share goal.

2489.   During an internal Commercial Operations meeting on January 21, 2013, Sandoz decided to approach another customer, CVS, in order to obtain additional market share. But before doing so Sandoz wanted to confirm that it was acceptable with Glenmark. In his Notebook, CW-3 recorded contemporaneously that he was supposed to "call MB [Mitchell Blashinsky of Glenmark]" and let him know that Sandoz was "going to CVS":



2490.   Sandoz subsequently learned why Glenmark was reluctant to give up more market share to Sandoz. There was a discrepancy between the two competitors about how much market share Sandoz had already obtained. On January 29, 2013, a senior Sandoz marketing executive reported that "Glenmark believes our share is greater than what we've received in terms of customer utilization and as a result, they continue to defend their business." Two days later, on January 31, 2013, CW-3 and Blashinsky spoke two more times, for five (5) minutes each.

2491.   Over the next several months Sandoz and Glenmark continued to coordinate about Fluticasone, including about a Glenmark price increase on that drug. For example, on April 16, 2013, as Glenmark was preparing for a large-scale price increase on several different drugs (in coordination with several different competitors), CW-3 of Sandoz had two separate calls with Blashinsky of Glenmark, including one call lasting thirteen (13) minutes. They talked about several things, including

Glenmark's potential entry and market share targets on a different drug, Alclometasone, as well as a price increase on Fluticasone.

2492.    Blashinsky called CW-3 again on May 6, 2013, in advance of the Glenmark price increase. He also called CW-3 on May 17, 2013—the day after the Glenmark price increase on Fluticasone became effective. In all, the two competitors spoke three times on May 17, 2013, including two separate five (5) minute calls.

2493.    Throughout this time period, Sandoz also kept in close communication with Perrigo about the details of Perrigo's anticipated entry into the Fluticasone market. For example, in early April 2013 CW-3 of Sandoz spoke to T.P. of Perrigo multiple times, including calls lasting seventeen (17) and five (5) minutes, respectively. CW-3 subsequently reported to his colleagues at Sandoz that Perrigo would be delayed in entering the Fluticasone market "until July at the earliest and fall at the latest." On April 9, 2013, a colleague at Sandoz followed up asking CW-3 for additional information about whether Perrigo planned to enter "with both the 60 and 120 ml bottles?" The next day, CW-3 communicated directly with Perrigo to obtain the answer, calling and speaking with T.P. two (2) times.

2494.    On May 21, 2013, as Perrigo was beginning to plan its entry into the market, a Perrigo executive asked T.P. to obtain "market pricing" for Fluticasone Lotion. Two days later, on May 23, 2013, T.P. called CW-3 at Sandoz. They ended up speaking twice that day, for five (5) and three (3) minutes, respectively. Immediately after their second call, CW-3 called Blashinsky at Glenmark, the other competitor on Fluticasone, and the two spoke for four (4) minutes.

2495.    Similarly, on May 28, 2013 a senior Sandoz executive requested additional "market intelligence" about Perrigo's entry timing on Fluticasone. That same day, CW-3 called T.P. at Perrigo and they spoke for four (4) minutes. The next day, T.P. called CW-3 back and they spoke again for two (2) minutes.

2496. By July 2013, Perrigo finally began preparing in earnest to enter the Fluticasone market. As of that time Sandoz had been able to obtain 30 percent market share, reaching its initial target goal for a 3-player market with Glenmark and Perrigo. Sandoz understood that, because Glenmark still had a significant majority of the market share, Perrigo would target Glenmark customers as it entered.

2497. In the days and weeks leading up to Perrigo's launch, Perrigo was in frequent communication with Sandoz, with at least ten phone calls between July 2 and August 1.

2498. Perrigo held an internal meeting to discuss its Fluticasone launch on July 16, 2013. On the day of the meeting, T.P. of Perrigo called CW-3 at Sandoz and left a message. He called CW-3 again the next day, and they were able to speak for nineteen (19) minutes. During these conversations, T.P. informed CW-3 that, consistent with the "fair share" understanding, Perrigo was targeting specific Glenmark customers and looking for approximately 25 percent market share.

2499. On July 30, 2013, Perrigo received FDA approval to begin selling Fluticasone. That same day, T.P. of Perrigo spoke to CW-3 of Sandoz for thirteen (13) minutes. Perrigo then formally launched the product on August 1, 2013, with the same exact WAC pricing as Glenmark and Sandoz. T.P. and CW-3 also spoke twice that day.

2500. As Perrigo entered the market it planned only a "limited launch," targeting only $1 million per year in sales. In accordance with the fair share understanding and the previous communications between the competitors, Perrigo targeted – and Glenmark conceded – multiple customers immediately.

b)    Desoximetasone Ointment

2501. Desoximetasone Ointment ("Desoximetasone"), also known by the brand name "Topicort," is a corticosteroid used to treat a variety of skin conditions, including eczema and

dermatitis. Desoximetasone reduces the swelling, redness and itching associated with those conditions.

2502.   As of the summer of 2012, Co-conspirator Taro was the only manufacturer of Desoximetasone Ointment.

i)    Sandoz Entry (September 2012)

2503.   Starting in August 2012, Sandoz began making plans to enter the Desoximetasone market. Because it would be a 2-player market upon Sandoz's entry, and because Sandoz was the second manufacturer to enter the market, Sandoz initially decided, consistent with the "fair share" understanding, to target 40 percent market share

2504.   On the evening of August 21, 2012, Sandoz held an internal meeting to discuss its "share goal" and "customer strategy" regarding Desoximetasone. Shortly after the meeting, a Sandoz executive sent an initial list of eight (8) customers that Sandoz should consider approaching. The executive indicated that Sandoz's success would depend "on how Taro reacts to our entry" and that more research was necessary regarding one of the larger customers, because approaching such a "big" customer could cause "disruption."

2505.   First thing the next morning, Sandoz began to coordinate with Taro. K.K.3, a national account executive at Sandoz, called D.S., a senior sales executive at Taro, and the two spoke for nine (9) minutes.

2506.   On August 30, 2012, Sandoz held another internal meeting to discuss its Desoximetasone launch. That same day, K.K.3 of Sandoz spoke again to D.S. of Taro, this time for two (2) minutes. The day after this internal Sandoz meeting and the phone conversation with Taro, on August 31, 2012, CW-1 of Sandoz sent Kellum a "pricing grid" for Desoximetasone, which included

specific pricing "intel" and a more refined list of customers that would provide Sandoz with its target market share.

2507.   As the Sandoz launch date approached, CW-3 of Sandoz also began speaking to H.M., an account executive at Taro, to coordinate Sandoz's entry into the market. The two competitors were not friends, and nearly all their conversations were collusive in nature. According to phone records, the first ever call between the two competitors was on September 6, 2012. They spoke again on September 21, 2012, as Sandoz was finalizing its launch plan. During these calls, H.M. provided CW-3 with Taro price points for various customers so that Sandoz could bid as high as possible and avoid price erosion, while still obtaining new customers as it entered the market. CW-3 passed that pricing information and list of customer targets on to CW-1 and Kellum at Sandoz. That same day, H.M. also sent an email to a sales executive at Taro, relaying a "rumor" that Sandoz would be entering the Desoximetasone market "looking for a 40% share," and suggesting six accounts as possible targets.

2508.   Sandoz received FDA approval and formally launched Desoximetasone on September 28, 2012, matching Taro's WAC pricing exactly. That same day, CW-3 of Sandoz also called H.M. at Taro and left a message; H.M. returned the call almost immediately, leaving CW-3 a voicemail.

2509.   Based on the conversations with Taro, Sandoz decided to take a "staggered approach" in targeting customers, so as "not to cause too much panic" with its competitor. In an internal Sandoz email on October 1, CW-1 indicated that Sandoz's initial "target market share" for this product had now been adjusted slightly lower based on "some additional intelligence."

2510. 2513.   Shortly after receiving approval, on October 1, 2012, Sandoz began approaching a limited set of customers, per its agreement with Taro. That same day, CW-4 of Sandoz reached out to D.S. at Taro, someone CW-4 had colluded with in the past, and spoke two times, including one call lasting twenty-one (21) minutes.

2511.  Consistent with the understanding in place between the two competitors, Taro immediately started conceding customers to Sandoz. For example, on October 11, 2012, a high-ranking Taro executive sent an internal email discussing Sandoz's launch of Desoximetasone.

2512.  In the email, the executive indicated that Taro had been aware of Sandoz's launch "for some time" and that Taro had just conceded two large customers to Sandoz, with the expectation of relinquishing "about 1/3 of our total share" going forward. That same day, H.M. of Taro called CW-3 of Sandoz, likely to let him know that the customers had been conceded and confirm the plan moving forward. They spoke twice that day, including one call lasting more than six (6) minutes.

2513.  Sandoz was able to obtain most of its targeted market share quickly, without any market disruption. By October 12, 2012, for example, R.T., a senior sales and marketing executive at Sandoz, provided a summary of the Desoximetasone launch, stating: "Knock on wood, things are going well on this so far with pricing being very good .. . and have picked up about 20% market share so far with Walmart, Rite Aid, and finalizing McKesson."

2514.  At that point, Sandoz decided it needed to obtain at least one more customer to meet its fair share goals. Internally, Sandoz discussed sending a message to Taro that "this is our last big customer if we get it." On October 23, 2012, CW-1, CW-3 and Kellum scheduled a conference call to discuss which customers to approach to "fill the additional share we need." That same day, CW-3 called H.M. at Taro and the two competitors spoke several times, including two separate fifteen (15) minute calls.

2515.  As a result of these conversations, Taro agreed to relinquish additional customers to Sandoz. By February 2013, Sandoz had captured its original goal of 40 percent of the Desoximetasone market, without any significant disruption.

ii)       Glenmark Entry (September 2013)

2516.   Glenmark received FDA approval to sell Desoximetasone on September 20, 2013. In the days and weeks leading up to the Glenmark launch, Glenmark, Taro and Sandoz were speaking frequently to coordinate Glenmark's entry, with at least eighteen calls and text messages between mid-August and mid-September. At the same time, Perfetto of Taro was also communicating with T.C.2, a senior-most executive at Glenmark, through email.

2517.   Glenmark's approval came on Friday, September 20, 2013. The following week there were additional communications between the three competitors to coordinate Glenmark's entry, including six phone calls on Monday September 23 and five more on Thursday September 26.

2518.   During these calls, the competitors reached an understanding about which customers Glenmark would target and what prices it would offer in order to avoid price erosion. That same day, September 26, 2013, CW-5, a senior-most executive at Glenmark, described Glenmark's launch strategy as a "[t]argeted launch so as not to disrupt the market."

2519.   Because Taro still had a majority of the market share, it understood pursuant to the "fair share" understanding that it would be the primary target of Glenmark and would have to relinquish market share to Glenmark as it entered. Internally, Taro executives commented that it "wouldn't make sense to lower pricing even with a 3rd competitor coming into the market."

2520.   Taro began to concede customers to Glenmark immediately. By October 17, 2013, CW-5 reported internally that Glenmark had already been able to obtain 30 percent market share for Desoximetasone.

2521.   Because of the discussions between the competitors in advance, and because prices remained high, Taro was not upset about conceding this business to

2522.   Glenmark. Taro executives continued to stress that "lowering the price at this point could erode the market" and "we can afford to give up a small percent and leave the price as is."

2523.  In early November 2013, Taro was approached by a customer to bid on Desoximetasone as part of an RFP. In deciding whether to provide a bid, Taro executives noted that the company had already "walked from some customers" so that Glenmark could obtain market share. Nonetheless, Taro still decided not to bid, stating "we are not looking to be awarded this product to increase market share. We already have a nice big slice."

### 3)    Collusion Between Sandoz and Aurobindo

2524.  As a result of Sandoz's acquisition of Fougera, CW-6 left his job at Fougera in August 2012 and took a position as a sales executive at Aurobindo. CW-6 followed his former friend and colleague, Grauso, who moved to Aurobindo in December 2011 to assume a senior executive role.

2525.  As detailed above, CW-6 had a long-standing, collusive relationship with Grauso dating back to when he worked at Fougera and Grauso worked at G&W. Further, the two also continued that relationship even after Grauso left G&W, with Grauso serving as a conduit to communicate messages between his former G&W colleagues, Orlofski and Vogel-Baylor, and CW-6 at Fougera.

2526.  Because many of CW-6's key contacts worked at generic competitors that focused primarily on topical products, his move to Aurobindo, a company focused on oral solids, was a difficult transition. Without many of those prior relationships to rely on, CW- 6 was concerned that he might not be able to prove his value at Aurobindo. Indeed, CW-3 at Sandoz was one of the few people that CW-6 knew who worked for a company that also manufactured a significant number of oral solids.

2527.  For that reason, when Aurobindo sold a product that overlapped with Sandoz, CW-6 used his relationship with CW-3 to collude on that product. Importantly, although CW-6 and CW-3 were former colleagues, they were not social friends. When CW- 6 called CW-3 during this time period, they were engaging in anticompetitive conduct. Between August 2012, when CW-6 began at

Aurobindo, and May 2013, when CW-6 left the industry, he exchanged at least one hundred and nine (109) phone calls with CW-3.

2528.   During this time period, CW-6 was acting at all times at the direction of, or with approval from, his superiors, including Grauso.

2529.   The following section will focus on the anticompetitive conduct engaged in by CW-3 and CW-6 with regard to several products on which Sandoz and Aurobindo overlapped during this time period.

a)    <u>Oxacillin Sodium and Nafcillin Sodium</u>

2530.   Oxacillin Sodium ("Oxacillin") and Nafcillin Sodium ("Nafcillin") are separately marketed antibiotics used to treat infections caused by penicillin-resistant staphylococci, among other bacteria.

2531.   In 2012, Sagent Pharmaceuticals and Sandoz were the primary generic suppliers of Oxacillin and Nafcillin. However, in December 2012, Aurobindo began making plans to enter the Nafcillin and Oxacillin markets as a third entrant.

2532.   In advance of Aurobindo's entry into those markets, on December 26, 2012 for Nafcillin and January 22, 2013 for Oxacillin, CW-6 and CW-3 spoke several times to discuss pricing and the allocation of market share to the new entrant, Aurobindo. All the while, CW-6 kept his supervisor, Grauso, informed of his conversations with CW-3.

2533.   For example, on December 12, 2012, CW-6 called Grauso and they spoke for five (5) minutes. CW-6 and CW-3 spoke multiple times that day, with nearly constant reporting back by CW-6 to his supervisor, Grauso, as the two competitors orchestrated how to avoid competition upon Aurobindo's entry.

2534.   Two weeks later, on December 26, 2012, Aurobindo received FDA approval to market Nafcillin and published WAC pricing that essentially matched Sandoz's WAC pricing. On the date

that Aurobindo received approval, and in the days surrounding the launch, CW-6 spoke several more times with CW-3 during which they discussed the launch. As he had done before, CW-6 reported back to Grauso what they had discussed.

2535.   The calls between the competitors continued into January 2013. On January 3, 2013, CW-6 spoke with Grauso three times for a total of twenty-five (25) minutes. Twenty minutes later, CW-3 called CW-6. The call lasted two (2) minutes. The next morning, CW-6 spoke with Grauso for four (4) minutes. That same morning, CW-6 called CW-3 of Sandoz twice, with one call lasting three (3) minutes.

2536.   Two days later, on January 6, 2013, Sandoz put together a Monthly Business review regarding its key products, including Nafcillin and Oxacillin. Regarding Oxacillin, Sandoz noted that Aurobindo was "rumored" to be entering the market. Sandoz stated that its "recommended next steps in the market" were to "[s]hed customers to [Aurobindo] and or Sagent that consistently request lower pricing," and "[e]mploy similar defense strategy as Nafcillin: relinquish 25-30% share and maintain current price for as long as possible."

2537.   Over the next several days, between January 7, 2013 and January 11, 2013, CW-6 and CW-3 spoke several more times by phone. After those calls, CW-6 promptly called Grauso to keep him apprised of his discussions.

2538.   Two weeks later, on January 22, 2013, Aurobindo entered the Oxacillin market and again published WAC pricing that essentially matched Sandoz's WAC pricing. That same day, CW-6 spoke with Grauso for ten (10) minutes. Ten minutes after hanging up, CW-6 called CW-3 of Sandoz. Over the next two days, CW-6 and CW-3 shared five (5) more phone calls.

2539.   In an email dated January 30, 2013, Sandoz noted that it had "[r]elinquished" its Oxacillin contract at Walgreens to the new entrant, Aurobindo. That same day, CW-3 and CW-6 spoke by phone for four (4) minutes.

b)      Cefpodoxime Proxetil

2540.   Cefpodoxime Proxetil ("Cefpodoxime"), also known by the brand name Vantin, is an antibiotic used to treat a wide variety of bacterial infections. It is sold in both oral suspension and tablet form.

2541.   On January 3, 2013, CW-3 of Sandoz called CW-6 of Aurobindo. The call lasted two (2) minutes. The next day, on January 4, 2013, CW-6 called CW-3 twice, with one call lasting three (3) minutes. A few minutes after hanging up, CW-3 called Kellum and they spoke for nine (9) minutes.

2542.   After that call, Kellum sent an email to R.T., a senior sales and marketing executive at Sandoz, reporting that Aurobindo was likely to launch in the near future. Kellum also reported that he was planning a price increase in January. R.T. responded, "[p]ls take the increase" to which Kellum replied, "[w]ill do."

2543.   The following business day, on January 7, 2013, CW-6 of Aurobindo and CW-3 of Sandoz exchanged three calls, including one lasting six (6) minutes. During these calls, CW-6 confirmed that Aurobindo planned to launch both formulations of Cefpodoxime that week. CW-3 told CW-6 that Sandoz planned to increase pricing on both formulations by 20 percent. CW-6 advised that Aurobindo was looking for 40 percent share and would start by targeting Cardinal and CVS. In turn, CW-3 gave his competitor specific non-public contract price points that Sandoz was charging to those customers. CW-6 then stated: "Follow the plan and we'll be reasonable."

2544.   Shortly after speaking with each other, CW-6 called Grauso and CW-3 called Kellum to report back what they had discussed.

2545.   On January 9, 2013 and January 11, 2013, the day that Sandoz increased WAC pricing on Cefpodoxime, CW-3 and CW-6 exchanged three more calls. Again, after speaking with each other, CW-3 called Kellum and CW-6 called Grauso to report back what they had discussed.

2546.    Due to an issue at its manufacturing facility, Aurobindo's launch of Cefpodoxime was delayed and the company was unable to launch in January 2013 as planned.

2547.    Between February 24 and February 27, 2013, ECRM held its annual Retail Pharmacy Generic Pharmaceuticals Conference in Dallas, Texas. Representatives from Aurobindo and Sandoz were in attendance, including CW-6 and Grauso of Aurobindo and Kellum, CW-3, and CW-2 of Sandoz.

2548.    On February 26, 2013, CW-2, a Sandoz senior sales executive, while still at the ECRM conference, emailed his Sandoz colleagues that he heard at ECRN that Aurobindo would be coming back with Cefpodoxime in about a month.

2549.    On April 17, 2013, CW-6 of Aurobindo called CW-3 of Sandoz. The call lasted two (2) minutes. Less than an hour later, CW-3 called CW-6 back and they spoke for six (6) minutes. The next day, on April 18, 2013, CW-6 called CW-3 and they spoke for ten (10) minutes. That same day, Aurobindo launched both formulations of Cefpodoxime and matched Sandoz's increased WAC pricing.

2550.    On April 30, 2013, CW-3 and CW-6 exchanged three phone calls. On these calls, the competitors again discussed Aurobindo's launch of Cefpodoxime Tablets, including that Aurobindo was looking for 40-50 percent market share. The competitors also discussed specific customers that Aurobindo was targeting.

2551.    In accordance with the plan, on May 22, 2013, Aurobindo made an offer to CVS for Cefpodoxime Tablets and the customer accepted that offer the very next day on May 23, 2013.

2552.    Similarly, on August 29, 2013, Aurobindo made an offer to ABC for Cefpodoxime Tablets. The next day, on August 30, 2013, ABC emailed Sandoz to advise that it had received a competitive offer and asked whether Sandoz wanted to bid to retain the business. On September 4, 2013, S.G., a Sandoz sales executive, responded to ABC and declined the opportunity stating, "we

will be relinquishing Cefpodoxime/Proxet Tabs." Later that same day, ABC awarded the business to Aurobindo.

2553.   Aurobindo would also win awards for Cefpodoxime Tablets at McKesson and several other smaller customers, without substantially eroding the high pricing in the market.

2554.   On September 9, 2013, P.S., an Aurobindo sales and marketing executive, pushed Grauso to submit a bid for Walmart's Cefpodoxime business. Grauso balked at the request stating, "I thought we had our share on Cefpodoxime." P.S. responded, "I thought you wanted to get additional share considering the only other market player is Sandoz. We currently hold only 22% share." Given the market share breakdown, Grauso gave his approval to submit a bid to Walmart. Thereafter, on September 30, 2013, the customer accepted the bid and awarded Aurobindo its indirect business.

2555.   Later, in December 2013, when Sandoz was looking to identify additional products to supply to Walmart, Kellum noted with respect to Cefpodoxime: "If we did/do not have this business, I do not recommend challenging Aurobindo as we have dominant share and high price."

c)    Pioglitazone HCL Metformin HCL

2556.   Pioglitazone HCL Metformin HCL ("Pioglitazone Metformin"), also known by the brand name Actoplus Met, is used to control high blood sugar in patients with type 2 diabetes mellitus.

2557.   Prior to February 2013, Mylan and Teva were the only competitors in the market for Pioglitazone Metformin. As a result of settling patent litigation with the brand manufacturer, Mylan was entitled to 180 days exclusivity as the first-to-file generic and Teva earned the right to market the authorized generic. During that period, Mylan and Teva split the market equally with Teva controlling 48 percent share and Mylan controlling 52 percent.

2558.   Mylan and Teva's 180-day exclusivity period expired on February 13, 2013 and Aurobindo and Torrent Pharmaceuticals entered the market on that date. Although Sandoz also

planned to enter at that time, the company ran into regulatory obstacles that delayed its launch until April 16, 2013.

2559.   In advance of Aurobindo's entry, CW-6 and Grauso were in frequent communication with their contacts at Mylan and Teva to discuss, among other things, Aurobindo's entry into the Pioglitazone Metformin market. On these calls, the competitors spoke about pricing and the allocation of market share to the new entrant.

2560.   For example, in the week leading up to Aurobindo's entry on February 13, 2013, CW-6 exchanged at least nine calls with Jim Nesta, a senior sales executive at Mylan. At the same time, Grauso was communicating with his contacts at Teva, exchanging at least twenty-one calls with sales executives Kevin Green and T.S. Illustrating the substance of these calls, on February 12, 2013, T.S., a Teva sales executive, spoke to Grauso at Aurobindo for forty-five (45) minutes. Shortly after that call, T.S. sent an internal email stating, "I heard that Aurobindo picked up Cardinal on the Pio/Met." Cardinal was a Mylan customer.

2561.   At the same time, Mylan and Teva were communicating with each other. In the week leading up to Aurobindo's entry on February 13, 2013, Green of Teva exchanged at least seventeen (17) calls with Nesta of Mylan. Similarly, Green of Teva exchanged several calls with his contacts at Sandoz, Kellum and CW-2. On February 7, 2013, a day when Green talked to both Kellum and CW-2, both of those Sandoz employees participated in a conference call in which they discussed "status and next steps" on Pioglitazone Metformin.

2562.   Finally, the new entrants, Sandoz and Aurobindo, were also communicating directly with each other regarding Pioglitazone Metformin. For example, CW-3 of Sandoz and CW-6 of Aurobindo exchanged at least six calls between February 13 and February 19, 2013.

2563.    On February 19, 2013, CW-6 and CW-3 discussed specific customers and price points for Pioglitazone Metformin, and the fact that Aurobindo had already picked up Cardinal as a customer.

2564.   By mid-April, Aurobindo had secured approximately 20 percent of the Pioglitazone Metformin market, including Cardinal, a portion of the CVS business, Costco, and several other smaller customers.

2565.   On April 16, 2013, Sandoz finally received FDA approval to market Pioglitazone Metformin. The next day, CW-1, a Sandoz senior pricing executive, emailed the sales team stating: "Per the conversations I had with each of you concerning this launch please send along customer alignment and pricing info. We are looking to send out offers as soon as possible." Six minutes later, CW-1 emailed CW-3 individually, asking him to "find ou[t] who Walmart is with."

2566.   That same day, CW-3 exchanged two calls with CW-6 of Aurobindo lasting two (2) minutes and six (6) minutes. The next day, on April 18, 2013, the two competitors spoke again for ten (10) minutes. During that call, CW-6 provided CW-3 with Aurobindo's dead net prices at several customers, including Cardinal and CVS.

2567.   At the same time, Sandoz was speaking with Teva. On April 18 and April 19, 2013, CW-2, a Sandoz senior sales executive, spoke three times with Green of Teva, including two calls lasting four (4) minutes and one call lasting eight (8) minutes.

2568.   Later in the evening on April 19, 2013, CW-1 emailed Kellum and others at Sandoz regarding Pioglitazone Metformin stating, "I'm thinking ABC is our best first shot at this point. Teva currently has ABC, RAD, WMT, and Mck, so they can do without one of those." Others at Sandoz agreed, and Sandoz submitted an offer to ABC on April 22, 2013.

2569.   The next day, on April 23, 2013, ABC emailed Teva to inform it that Sandoz had made an offer for Pioglitazone Metformin and asked whether Teva intended to bid to retain the business. ABC further stated that "[a]s an FYI, Sandoz is only looking for 10% share and will be done if they get ABC's business." Green, the Teva sales executive who had spoken to CW-2 the day before, forwarded ABC's email to several other Teva executives, writing: "What do you guys think? I have

525

not sent pricing yet, but I did confirm they [Sandoz] are only looking for 10%." Green, a senior Teva marketing executive, responded, "I think we should concede."

2570.  Three days later, on April 26, 2013, Teva declined to bid to retain the business and noted in Delphi, it's internal tracking database, that "Teva conceded business to Sandoz who has entered the market looking for 10% share" and stated the reason for the concession was "Strategic New Market Entrant." That same day, ABC awarded the business to Sandoz.

2571.  2573.  Also, that same day, on April 26, 2013, Sandoz officially entered the market and published WAC pricing that matched its competitors.

4)      Collusion Between Sandoz and Rising

2572.  CW-3 and CW-2 worked together as senior sales executives at Sandoz until August 2013 when CW-2 left Sandoz to become a senior sales and marketing executive at Rising. While at Sandoz, the two were close friends. CW-2 was responsible for Walmart and helped transition the account to CW-3 when he moved to Rising.

2573.  Beginning in 2013, and beyond, these former colleagues turned competitors used their relationship to collude with regard to products on which Rising and Sandoz overlapped. One such example, Griseofulvin Microsize Tablets, is discussed in detail below.

a)      Griseofulvin Microsize Tablets

2574.  Griseofulvin Microsize Tablets ("Griseofulvin"), also known by the brand name Grifulvin V, is a medication used to treat fungal infections of the skin, hair, or nails that do not respond to creams or lotions. The market size for this drug ranged between $13 million and $16 million dollars annually.

2575.  Throughout 2013, Rising had a virtual monopoly on the Griseofulvin market, with Valeant Pharmaceuticals maintaining only a small percentage of the share.

526

2576.   On August 7, 2013, Sandoz received FDA approval to market Griseofulvin. Sandoz planned to talk to customers at the NACDS Annual Total Store Expo that weekend and then launch the following week.

2577.   However, on August 14, 2013, Sandoz learned that the Griseofulvin launch would be delayed due to production problems. Despite the delay, Sandoz estimated that it could still realize $2.5 million in sales in 2013 "if existing competitor [i.e. Rising] behaves rationally."

2578.   On September 19, 2013, CW-2, then a senior sales and marketing executive at Rising, called CW-3 of Sandoz twice. CW-3 returned the calls later that day and they spoke for twenty-one (21) minutes. During these calls, CW-2 and CW-3 discussed Sandoz's manufacturing issues on Griseofulvin and its continued delay in launching the product.

2579.   However, just one week later, on September 25, 2013, Sandoz learned that its production problems had been resolved. The following Monday, on September 30, 2013, CW-3 informed CW-2 of this unexpected news in the following text message exchange:

| Start Time: Time | From | Body |
|---|---|---|
| 9/30/2013 14:17(UTC+0) | CW-3 | Hi ████ Is ████. Looks like Griseo may be this week. |
| 9/30/2013 14:17(UTC+0) | CW-3 | Can't talk right now...I'll call you later. |
| 9/30/2013 14:17(UTC+0) | CW-2 | Ok. Call as soon as possible. |
| 9/30/2013 14:17(UTC+0) | CW-2 | What happened to 'no anytime soon' :-( |
| 9/30/2013 14:17(UTC+0) | CW-3 | On a call |
| 9/30/2013 14:17(UTC+0) | CW-3 | Was on QA hold and is going to release sooner than expected. Sorry |

2580.   That same day, CW-2 called CW-3 twice. The calls lasted one (1) minute and eight (8) minutes. That evening, Sandoz held an internal meeting to discuss launch strategy for Griseofulvin, including which customers to approach in order to achieve Sandoz's market share goal.

2581.   Over the next several days, CW-2 of Rising exchanged several calls with CW-3 and L.J., a Sandoz sales executive, during which they discussed pricing for Griseofulvin and the allocation of market share to the new entrant, Sandoz.

2582.    After this series of communications between the two competitors, on October 2, 2013, Kellum sent an internal email identifying four (4) customers that Sandoz planned to target to obtain approximately 40 percent share of the Griseofulvin market: CVS (20 percent), McKesson (8 percent), Rite Aid (6 percent), and ABC (8 percent). That evening, Sandoz prepared and sent its initial round of offers to CVS and McKesson.

2583.    The next day, on October 3, 2013, CW-2 of Rising exchanged three calls with L.J., the Sandoz sales executive responsible for the McKesson account, and one (1) call with CW-3 that lasted twenty-one (21) minutes.

2584.    On October 4, 2013, McKesson emailed CW-2 asking if Rising wanted to submit a bid for Griseofulvin. Rising responded to the request by submitting a high bid so that Sandoz would win the business. On October 7, 2013, McKesson advised Rising that its bid was not competitive and awarded the business to Sandoz.

2585.    On October 8, 2013, CVS emailed Sandoz and declined its Griseofulvin offer, stating: "This is a 2 player product; we need a better proposal on this one if you are interested in earning our business now." Later that evening, CVS emailed CW-2 asking whether Rising planned to bid on the business.

2586.    First thing the next morning, on October 9, 2013, CW-2 of Rising and CW- 3 of Sandoz exchanged three calls, including one call lasting nine (9) minutes. After these calls, Sandoz reduced its pricing and sent a revised offer to CVS. At the same time, Rising prepared and submitted a high bid to CVS with the intention that Sandoz would win the business.

2587.    However, CVS threw a wrench in the competitors' plans when it refused to accept Rising's high bid that same day stating: "No good. This is a 2 player product. Please Call me." Knowing he had agreed to give up the customer to Sandoz, CW-2 asked his colleague to reduce the

CVS offer only slightly – by $10 – and "advise it is best and final." Thereafter, on October 10, 2013, CVS declined the Rising bid and awarded the business to Sandoz.

2588.   On October 15, 2013, Sandoz submitted an offer to Rite Aid for its Griseofulvin business.

2589.   Between October 16 and October 21, 2013, CW-2 of Rising and CW-3 of Sandoz spoke several additional times to coordinate Sandoz's entry. On these calls, the two competitors discussed Griseofulvin and the accounts that Sandoz had targeted or planned to target. CW-2 also advised CW-3 that Rising would not give up Rite Aid to Sandoz.

2590.   First thing the next morning, on October 22, 2013, CW-2 of Rising called CW-3 of Sandoz twice. CW-3 returned the call later that morning and they spoke for eight (8) minutes.

2591.   The next day, on October 23, 2013, Rite Aid advised Sandoz that it declined to accept Sandoz's offer for Griseofulvin—as expected, Rising had lowered its pricing to retain the customer. That same day, Sandoz began making plans to approach Walmart and Cardinal as their next targets.

2592.   On October 28, 2013, CW-3 emailed Walmart to see if the customer was interested in an indirect bid for Griseofulvin. Walmart replied that it was. The next morning, on October 29, 2013, CW-3 of Sandoz called CW-2 of Rising and they spoke for twenty-two (22) minutes. During that call, CW-3 informed CW-2 that Sandoz would approach Walmart, and CW-2 agreed that Rising would relinquish that customer. Later that day, Sandoz prepared an offer and sent it to Walmart.

2593.   On November 4, 2013, CW-3 of Sandoz called CW-2 of Rising and they spoke for twenty-eight (28) minutes. The next day, on November 5, 2013, Walmart accepted Sandoz's offer for Griseofulvin and awarded it the business.

2594.   On November 20, 2013, CW-2 of Rising and L.J. of Sandoz spoke for three (3) minutes. Later that day, Sandoz submitted an offer to Cardinal for its Griseofulvin business.

2595.   On November 22, 2013, CW-3 of Sandoz called CW-2 of Rising and they spoke for seventeen (17) minutes. Later that day, Rising executives held a Commercial Operations meeting at which CW-2 conveyed that Sandoz needed Rising to relinquish one more account, Cardinal, so that it could meet its share goal. CW-2 advised that Sandoz would be done after Cardinal and would not seek any additional share.

2596.   Thereafter, Rising conceded Cardinal, and Cardinal awarded its Griseofulvin business to Sandoz.

2597.   The following Monday, on November 25, 2013, Rising held a sales and marketing meeting during which they discussed Griseofulvin, among other products. CW-2 forwarded the minutes from that meeting to several Rising executives and S.S., a senior Rising executive responded, "Looks like relinquishing Griseo 500 at Cardinal is a new development. . . . What's the impact? CW-2 responded with the following e-mail to S.S.:

**From:** ▉▉▉▉▉▉
**Sent:** Monday, November 25, 2013 1:21 PM
**To:** ▉▉▉▉▉▉
**Subject:** RE: S&M Meeting Minutes 11/25/13

▉▉▉,

- The Griseo 500mg at Cardinal is what we discussed in the Comm Ops mtg on Friday (Sandoz going here and then being done w/ accounts. Their customer base is now: McKesson, CVS, Walmart, Cardinal . The market share will be ~60:40 Rising/Sandoz once the dust settles.  The impact of relinquishing Cardinal is:

| Griseofulvin 500mg-Cardinal | | |
|---|---|---|
| Annual Units | Net Price | COGs |
| 3,000 | $       354.38 | $   46.60 |
| | | |
| Net Sales: | $ 1,063,140.00 | |
| Ext COGs: | $  (139,800.00) | |
| Gross Profit | $     923,340.00 | |
| Gross Profit %: | 86.9% | |

To that, S.S. replied, apologizing that he had not put two-and-two together, and stated "My bad," followed by a smiley-face emoji.

2598.   One year later, on October 15, 2014, Rising increased WAC pricing on Griseofulvin. In advance of the increase, CW-2 of Rising exchanged several calls with L.J. of Sandoz, during which they discussed the price increase. Further, CW-2 also met in- person with L.J. and the two men discussed the increase over drinks.

2599.   Even after the Rising price increase, CW-2 of Rising continued to communicate with his former Sandoz colleagues about the increase. For example, on November 13, 2014, CW-2 participated in several lengthy calls with CW-3 and L.J. of Sandoz.

2600.   After speaking with CW-2 of Rising, CW-3 sent an email to CW-1, a Sandoz senior pricing executive, reporting that Rising took an increase on Griseofulvin in October. As was his customary practice, CW-3 stated that he had learned the information from a "customer," when he had actually obtained the information directly from his competitor, CW-2.

2601.   Sandoz did not follow the Rising price increase immediately because, after conducting several analyses, it determined that the price protection penalties it would have incurred were too high to justify the increase.

2602.   However, by July 2015 those concerns were alleviated. On July 27, 2015, P.C.2, a Sandoz pricing executive, sent an internal email detailing that Sandoz planned to increase prices the following week on a list of products, including Griseofulvin. P.C.2 noted that for Griseofulvin, Sandoz was assuming "0% volume loss." In other words, Sandoz knew that Rising would not seek to take any of its customers after the price increase.

2603.   Two days later, on July 29, 2015, CW-3 of Sandoz called S.G., then a senior sales executive at Rising, and the two competitors spoke for nine (9) minutes. One week later, on August 7, 2015, Sandoz followed Rising's price increase and published WAC pricing that matched its competitor.

5)    Collusion Between Sandoz and Mallinckrodt

531

2604.   During his time at Fougera, CW-3 worked for Kaczmarek and with K.K.2, another Fougera sales executive. Not long after the Sandoz acquisition of Fougera in July 2012, Kaczmarek and K.K.2 moved to Defendant Mallinckrodt. Kaczmarek became a senior executive and K.K.2 took a senior sales executive position.

2605.   Beginning in late 2012, these former colleagues turned competitors would use their long-standing relationships to collude with regard to products on which Sandoz and Mallinckrodt overlapped. Two such examples, Methylphenidate HCL Tablets and Methylphenidate HCL ER Tablets, are discussed in detail below.

a)      Methylphenidate HCL

2606.   Methylphenidate HCL, also known by the brand name Ritalin, is used to treat attention deficit disorder and attention deficit hyperactivity disorder, as well as some sleep disorders. There are two formulations of Methylphenidate HCL: Immediate Release ("Methylphenidate IR") and Extended Release ("Methylphenidate ER").

2607.   As of November 2012, there were three competitors in the Methylphenidate IR market – Mallinckrodt with 43 percent share, Watson (Actavis) with 37 percent, and Sandoz with 16 percent. For Methylphenidate ER, there were only two competitors – Mallinckrodt with 54 percent share and Sandoz with 16 percent.

2608.   On February 13, 2013, L.J., a Sandoz sales executive, sent an internal email stating that he had heard that Mallinckrodt was experiencing supply issues on Methylphenidate. A few minutes later, D.P., a senior Sandoz sales executive, forwarded L.J.'s email to his sales team, including to CW-3, asking "please query your contacts / customers for Intel on Mal[l]inckrodt and Watson."

2609.   That same day, on February 13, 2013, CW-3 called K.K.2, a senior Mallinckrodt sales executive, and they spoke for sixteen (16) minutes. Immediately upon hanging up, CW-3 called

Aprahamian, then a sales executive at Actavis, and they spoke for sixteen (16) minutes. A few hours later, CW-3 called D.P. of Sandoz to report back what he had learned. That call lasted ten (10) minutes.

2610.   Later that day, CW-3 also sent the following email conveying the information he had obtained from his competitors:



| From: | |
| Sent: | Wednesday, February 13, 2013 6:41 PM |
| To: | |
| Cc: | Kellum, Armando |
| Subject: | RE: Methylphenidate SR and IR Update |

According to my customers, Mallinckrodt has temporarily discontinued 5 out of the 6 six sku's of the IR; the 5mg 100 is available however product is being allocated. They are targeting an availability date of late June or early July. On the SR they are still shipping the 10mg however the 20mg may have periodic supply disruptions. Mallinckrodt has discontinued these products due to API quota limitations imposed by the FDA / DEA; they are petitioning the DEA for an increased quota. Also, it appears as though they are using their current API for other products (i.e. recently launched Concerta). Lastly, Watson does not have any supply issues on the IR and could increase market share.

Hope this helps.

Thanks,

2611.   As was his customary practice, CW-3 stated that the sources of his information were his "customers," to keep out of writing the fact that he obtained the information directly from his competitors, Mallinckrodt and Actavis (Watson). But CW-3's superiors were aware that the information was coming directly from Mallinckrodt and Actavis, not a customer.

2612.   Having confirmed Mallinckrodt's supply issues, and the fact that the market share leader would be out of the market for a period of time, Sandoz immediately set to work on implementing a price increase on Methylphenidate.

2613.   Indeed, less than one week later, on February 19, 2013, Sandoz prepared a price increase analysis for Methylphenidate to send to the Pricing Committee for approval. In the analysis, Sandoz noted that Mallinckrodt had a "significant supply issue" and recommended increasing price by 340 percent on Methylphenidate IR and 125 percent on Methylphenidate ER. Sandoz estimated that these increases would result in the accrual of an additional $12.9 to $36.0 million in profits.

2614.   On March 1, 2013, CW-3 of Sandoz exchanged at least nine (9) text messages with Kaczmarek, then a senior executive at Mallinckrodt. Through those text messages, the competitors discussed Sandoz's price increase on Methylphenidate and specific customer accounts.

2615.   Further, in the days leading up to the Sandoz price increase on Methylphenidate, CW-3 exchanged at least twenty-three (23) calls and text messages with Kaczmarek and K.K.2 During this same time period, CW-3 was also in frequent contact with Aprahamian at Actavis.

2616.   After this series of communications with both Mallinckrodt and Actavis, on March 8, 2013, Sandoz followed through with its plans and increased WAC pricing on Methylphenidate IR between 293 percent and 449 percent, depending on the formulation, and on Methylphenidate ER by 125 percent.

2617.   Three days later, on March 11, 2013, Aprahamian of Actavis called Perfetto, at that point a senior executive at Taro, and they spoke for fifty-four (54) minutes. The two would exchange two more calls that day lasting one (1) minute and three (3) minutes. Immediately competitors upon hanging up with Perfetto, Aprahamian called CW- 3 of Sandoz. A few minutes later, Aprahamian called CW-3 again and they spoke for five (5) minutes.

2618.   Between March 13 and April 2, 2013, CW-3 of Sandoz and Kaczmarek exchanged at least twenty-nine (29) text messages. During that same time period, CW-3 was also communicating frequently with his contact at Actavis, Aprahamian, who was also in the process of transitioning to a position at Taro (his first day at Taro was March 18, 2013, but he continued to speak frequently with Actavis colleagues after his departure).

2619.   Between April 20 and April 23, 2013, the NACDS held its annual meeting in Palm Beach, Florida. Representatives from Sandoz, Mallinckrodt, Actavis, Sun, and Taro were all in attendance. These included senior executives: D.P. of Sandoz, Kaczmarek of Mallinckrodt, G.S. of Sun, and Perfetto and J.K. of Taro.

2620.   The day after the NACDS annual meeting had concluded, on April 24, 2013, Actavis published increased WAC pricing for Methylphenidate IR that matched Sandoz's WAC pricing. Two days later, on April 26, 2013, Sun entered the Methylphenidate IR market and matched its competitors' WAC pricing. And, one week later, on May 1, 2013, Mallinckrodt reentered the market and matched competitor WAC pricing on both formulations.

### 6)     Collusion Between Sandoz and Greenstone

2621.   Defendants Sandoz (including its predecessor, Fougera) and Greenstone coordinated market activity on several overlapping drugs starting at least as early as 2010. Kellum of Sandoz, for example, had collusive relationships with at least two different executives at Greenstone: Jill Nailor, a senior sales executive, and Robin Hatosy, a sales executive. Similarly, CW-1 of Sandoz colluded with Hatosy of Greenstone, and CW-6 of Fougera colluded with Nailor of Greenstone, when necessary, to implement the illegal agreements.

2622.   In order to coordinate their market activity and maintain their anticompetitive agreements, executives at Sandoz/Fougera and Greenstone exchanged over three hundred and sixty (360) phone calls and text messages between January 2011 and October 2014. Many of those calls and text messages can be tied directly to anticompetitive conduct and are discussed below.

2623.    During that same time period, Sandoz/Fougera and Greenstone conspired to fix prices and allocate markets on at least the following products: (1) Clindamycin Phosphate Gel; (2) Clindamycin Phosphate Lotion; (3) Clindamycin Phosphate Solution; (4) Clindamycin Phosphate Cream; (5) Latanoprost Drops; and (6) Eplerenone Tablets.

### a)     Greenstone Equals Pfizer

2624.   In the sections below, and throughout this Complaint, all references to Defendant Greenstone apply equally to Defendant Pfizer. Indeed, during the relevant time period, the two companies operated in many important respects as a single functioning entity, without regard to

corporate formalities. Pfizer was the sole owner and shareholder of Greenstone but treated Greenstone as its generics division or an internal business unit rather than as a separate and independent entity, controlling and directing Greenstone's business activities including Greenstone's marketing and sale of generic drugs. Both companies shared the same office space at Pfizer's Peapack, New Jersey campus. They also shared common officers, managerial and supervisory personnel, and other employees.

2625. Pfizer performed many of the important business functions of Greenstone that an independent corporate entity would typically perform on its own, including but not limited to: (1) financial and sales analysis, (2) business technology, (3) customer service, (4) legal, (5) intellectual property, (6) supply chain, (7) human resources and (8) employee benefits. Importantly, Greenstone, which as of 2017 was the 15th largest generic manufacturer in the country with annual gross sales of over one billion dollars, did not have its own Finance Department, Accounting Department, Legal Department, Customer Services Department, Human Resources Department, Operations Department or Information Technology Department—all critical functions for a legitimate business operation. All of those functions were performed by Pfizer.

2626. Most if not all of Greenstone's "employees" were actually employed by Pfizer. The two primary individuals identified throughout this Complaint as having conspired with competitors on behalf of Greenstone, Jill Nailor and Robin Hatosy, were Pfizer employees. They were paid directly by Pfizer, and Pfizer was listed as their employer in W-2 Wage and Tax Statements submitted to the United States government. In their communications internally and with customers and competitors, both Nailor and Hatosy regularly used email addresses that ended with Pfizer's email domain: "@pfizer.com." This is the case for most if not all of Greenstone's "employees." Nailor and Hatosy also both received shares of Pfizer stock as compensation for their work, in addition to their Pfizer-paid salaries. They were reimbursed and/or compensated by Pfizer through its accounts payable

system for membership in industry trade associations; they used Pfizer cell phones and/or iPads; and they used Pfizer teleconference and Webex services to conduct their work.

2627. Jill Nailor received regular performance evaluations directly from Pfizer, called "Pfizer Senior Leader Excellence Profile[s]," and participated in a program called "Pfizer Cornerstones of Management."

2628. During all times relevant to this Complaint, Greenstone did not have its own President, Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, Chief Commercial Officer, or any Vice Presidents. The highest-ranking position at Greenstone was the General Manager, a position held by a Pfizer employee who reported directly to higher-level executives at Pfizer.

2629. During all times relevant to this Complaint, Pfizer has operated with multiple business units, one of which was always responsible for overseeing the marketing and sale of "established" products, including the generic drugs sold by Greenstone. The name of this business unit has changed over time. As of 2014, it was called the Global Established Pharmaceuticals Division ("GEP"). Later, it was referred to as "Pfizer Essential Health" ("PEH"). Within Pfizer, Greenstone operated as part of GEP and/or PEH, and Greenstone "employees" (often referred to as the "Greenstone team") were all included in Pfizer's organizational charts, demonstrating that Greenstone was acting as an internal division within Pfizer rather than as a separate company. For example, as of 2017, Jill Nailor and other Greenstone executives were prominently identified as PEH employees in certain Pfizer organizational charts.

2630. Similarly, as of 2014 these same individuals were considered part of GEP. In an April 2014 presentation to Greenstone customers at the NACDS Annual Conference in Scottsdale, Arizona, Jill Nailor gave what she referred to as a "Greenstone/Pfizer overview" where she discussed the new streamlined organization of Pfizer and Greenstone. Specifically, Nailor told customers that the General Manager of Greenstone, Jim Cannon, was now only three levels away from the CEO of Pfizer

within the overall Pfizer corporate structure. She showed customers the organizational structure of Pfizer, which included both Cannon and herself as reports within the Pfizer corporate hierarchy.



2631.  Even Greenstone's own separate organizational charts, to the extent they existed, included all Pfizer employees, the Pfizer trademarked logo and brand name, and referred to the "Extended Pfizer Team" of individuals who performed many important business functions for the company.

2632.  Greenstone also promoted itself publicly as a marketing or distribution wing of Pfizer, specifically adopting the Pfizer logo in its marketing materials. For example, on the top of the front page of its own website, Greenstone touted that the authorized generic drugs it sells "are manufactured to the same standards and at the same facilities as Pfizer brand-name drugs" and that they "carry the legacy of the brand-name products' years of clinical research, data and patient and physician experience." Greenstone consistently advertised its connection with Pfizer in order to strategically capitalize on Pfizer's brand recognition and respect, for purposes of increasing its own sales.

2633.   In carrying out its business, Greenstone's internal training and marketing documents regularly carried Pfizer's trademarked logo and brand name. This includes internal "Greenstone" presentations relating solely to generic drugs and issues specific to the generic pharmaceutical industry.

2634.   Because Greenstone operated as part of Pfizer, Pfizer was directly involved in the generics business and extensively evaluated generic competitors, price erosion in the generic industry, and other strategic issues on behalf of Greenstone. Greenstone and Pfizer management regularly coordinated on strategy, and communicated about concepts such as "fair share," "responsible pricing" and following other competitors' price increases in particular generic drug markets. For example, in a PEH presentation in January 2017 relating to Greenstone, a dual Pfizer/Greenstone employee explained the strategy behind the "fair share" concept and indicated that Greenstone should "PUSH" those drugs where Greenstone had less than fair share, and simply maintain market share in those markets that were "STABLE."

2635.   Pfizer employees also worked directly with the FDA on Greenstone's behalf to obtain approval for the drugs that Greenstone sells.

2636.   Greenstone also relied on Pfizer for cost and pricing strategy. For new products in particular, Pfizer's Global Supply unit ("PGS") made the budget, defined the costs of goods sold, and then conveyed that information to Greenstone without significant feedback. PGS was also heavily involved in deciding which new molecules will be produced and/or sold by Greenstone.

2637.   Pfizer performed all financial analyses, sales reports, revenue projections, and other finance functions for Greenstone. Since at least January 2013, these tasks were performed by Pfizer's Director of Business Finance, G.C. In his LinkedIn profile, G.C. listed his employer as Pfizer, and included within his responsibilities that he is the "Finance Lead" for Greenstone—a "business unit" of Pfizer that sells generic pharmaceuticals in the U.S. and Puerto Rico.

2638.   Greenstone did not have its own separate IT infrastructure, and Pfizer provided access to its bid-tracking software and other business tools so that Greenstone could keep track of its operations, including but not limited to budget, supply, pricing, molecules sold, competition, market share, and financial performance generally.

2639.   In every important respect, including financially, Pfizer directly controlled the decision-making of Greenstone. Greenstone did not even have the authority to implement its own price increases without first obtaining the approval of Pfizer. This includes the price increases discussed below. Not only did Pfizer have to approve Greenstone's price increases, but it also directed Greenstone's strategy regarding the increases, and Greenstone always acted at the direction of Pfizer. For example, in a "Business Review" presentation to the President of PEH in May 2017, Greenstone indicated that, for price increases specifically, it must "[f]ollow Pfizer guidelines."

For these reasons, although technically Greenstone was a separately incorporated entity, it was separate in name only. Any actions attributed to Defendant Greenstone throughout this Complaint, including specifically those of Jill Nailor or Robin Hatosy, are actions taken, directed and/or controlled by Defendant Pfizer.

b)    Clindamycin Phosphate

2640.   Clindamycin Phosphate ("Clindamycin"), also known by the brand names Cleocin T, Clinda Max, and Clinda-Derm, among others, is a topical antibiotic used on the skin to stop the growth of certain bacteria that cause acne. Clindamycin comes in several different formulations, including a cream, gel, lotion, and solution.

2709.   At all times relevant to the Complaint, Fougera (and later Sandoz, after its acquisition of Fougera) and Greenstone were the primary players in the markets for the four different formulations of Clindamycin Phosphate. In each of those markets, the two competitors adhered to the "fair share" understanding across all four product markets and coordinated several

significant price increases. In only one of those markets, Clindamycin Solution, did any significant competition ever enter the market. As discussed more fully below, Taro and Perrigo entered the market for Clindamycin Solution in late 2013, coordinating to avoid competition and minimize price erosion consistent with the "fair share" understanding.

i)    The First Coordinated Price Increase (Fougera and Greenstone)

2641.   In 2010, Defendants Fougera and Greenstone were the only suppliers in the market for Clindamycin 60ml solution. Fougera, a separate entity that was subsequently acquired by Sandoz in 2012, temporarily discontinued the product in September 2010 due to production problems, leaving Greenstone as the sole supplier in the market.

2642.   By late 2010, however, Greenstone also began to experience production problems, although it did continue to supply certain select customers. Fougera immediately started preparing to re-enter the market and significantly raise price, in direct coordination with Greenstone.

2643.   On November 1, 2010, Fougera learned that it had Clindamycin 60ml solution in stock and that the product was available for shipping. That day, Kaczmarek stated internally that "[w]e need to effect a WAC price increase and 're-introduce' this into the market. Stand by for details." In response, a Fougera sales executive indicated that Greenstone "is out there, but with a limited customer base. We just need to get that price point figured out." That same executive initially suggested that Fougera double its WAC price, from $7.50 to $15.

2644.   Fougera did get the price point "figured out," with the help of Greenstone. The next day, November 2, 2010, Fougera scheduled an internal "Clinda[mycin] Solution Strategy Conference Call." "Required attendees" for the call included Kaczmarek, CW-3 and CW-6, among others. Before that conference call, CW-6 of Fougera called Jill Nailor of Greenstone, someone he generally did not speak with on the phone for social reasons, and the two spoke for nearly six (6) minutes.

2645.   At some point that day, Fougera changed plans and decided to re-enter the market with a much more dramatic WAC price increase than originally suggested the day before, going from $7.50 to $31.50—a 320 percent increase. Customer contract prices increased even higher. Within two days after the price increase, for example, during a conversation with a Fougera national account representative, a customer complained that it had only just recently taken Clindamycin off contract with Fougera but "[n]ow you want to add it back at a 700% increase?????" That same day, November 4, 2010, CW-6 and Nailor of Greenstone exchanged twenty-one (21) text messages.

2646.   Based on their communications, Fougera knew that Greenstone would follow its price increase, but it could not tell its customers that. For example, in January 2011, a large wholesaler customer, ABC, approached Fougera asking if it knew whether Greenstone would be following Fougera's price increase on Clindamycin Solution. In an internal Fougera email exchange, CW-3 asked CW-6 (who, as stated above, had spoken with Nailor at Greenstone on the day of the Fougera price increase) if there was "[a]ny new news about Greenstone raising prices? ABC is still inquiring. Not sure what to tell them." CW-6 responded that he did not have any new information, other than that a Greenstone price increase "is coming." When CW-3 pressed for more detail about how quickly it would be coming, CW-6 responded: "Don't know. I have left a message." Indeed, CW-6 had called Nailor at Greenstone and left a 43-second voicemail immediately before sending that email to CW-3.

2647.   Over the ensuing months, Fougera was contacted by several customers requesting price reductions due to the fact that Greenstone had not yet followed. Fougera continued to coordinate regularly with Greenstone and did not reduce its price but grew frustrated when its competitor did not promptly follow as expected—internally stating that Greenstone was "so dumb regarding their pricing," and that they "just don't get it," and that they were "[m]orons."

2648.   Greenstone did ultimately follow Fougera's price increase with an increase of its own on Clindamycin Solution in July 2011, but it did not fully match Fougera's public WAC pricing.

Nonetheless, Fougera refused to bid on any of Greenstone's accounts as it did not want to punish Greenstone for actually raising its prices.

2649.   During this time period, the anticompetitive understanding and coordination between Fougera and Greenstone applied to the other formulations of Clindamycin as well. For example, in May 2012 Greenstone notified customers that it would be raising the price of Clindamycin Gel. Shortly after that, Fougera was approached by a customer asking for a bid on Clindamycin Gel. In conveying the request to Kaczmarek, a Fougera senior executive explained that "[m]arket shares [for Clindamycin Gel] are fairly evenly split and have been fairly steady, so I would think we want to stay away." Kaczmarek agreed. The next day, CW-6 exchanged five (5) text messages with Nailor of Greenstone, likely to convey Fougera's decision not to challenge Greenstone's market share at that customer.

2650.   Similarly, on June 27, 2012, CW-3 at Fougera learned that ABC had put Clindamycin Gel, Lotion and Cream out to bid "due to Greenstone's price increase." According to CW-3, "Greenstone's price is [now] close to ours." That same day, CW-6 of Fougera placed a call to Nailor at Greenstone and left a 31-second voicemail.

ii)    The Second Coordinated Price Increase
(Sandoz and Greenstone)

2651.   In late July 2012, Defendant Sandoz formally acquired Fougera. As discussed more fully below, even before the acquisition Sandoz had been conspiring separately with Greenstone to fix prices on Latanoprost Drops, and thus had its own separate relationships with Greenstone.

2652.   After the merger, Sandoz began to scrutinize the Fougera business line and search for ways to maximize revenue for Fougera products in order to meet its pre-merger expectations. Starting in or about August 2012, Kellum (of Sandoz) and Kaczmarek (of Fougera, still with the company

during the transition), now co-workers, were tasked with discussing and identifying a list of price increase candidates from the Fougera drug portfolio.

2653.  By August 1, 2012, Greenstone had identified Clindamycin Solution as a "Price Increase Candidate." On August 7, 2012, Kellum called Hatosy and the competitors exchanged six (6) text messages. The next day, August 8, 2012, Kellum and Hatosy spoke for ten (10) minutes.

2654.  Later that month, on August 22, 2012, Kellum identified Clindamycin, in all of its various formulations, as a price increase candidate. In describing his reasoning, Kellum indicated that the only competitor for all four formulations was Greenstone, "who's shown some signs of intelligence on the tab / ophthalmic [sic.] side." Kellum was referring to his recent successful collusion with Greenstone on Latanoprost drops (discussed below) which had resulted in a significant price increase. In response, Kaczmarek recalled his own experience of Greenstone's failure to follow Fougera's Clindamycin Solution price increase as quickly as he wanted, stating "as FYI Greenstone has been complete and utter idiots in our space."

2655.  Kellum's confidence in Greenstone was based on his own relationship with Hatosy of Greenstone, and his prior conversations with her. Kellum pushed forward with the planed price increases for Clindamycin, noting in a late-August 2012 presentation that "Greenstone [was] traditionally not [a] rational competitor but did follow [Sandoz's] increase on Latan[o]prost Opthalmic Drops recently."

2656.  As Sandoz was planning for the Clindamycin price increase in August 2012, Kellum was coordinating with Hatosy. For example, on August 29, 2012, a colleague at Sandoz sent Kellum a draft "Fougera Price Increases presentation", which included detailed information about the proposed Clindamycin price increase. After speaking with Hatosy of Greenstone that same day for more than three (3) minutes, Kellum responded to his colleague saying, "I'm in favor of recommending [a] price increase on all Clindamycin NDCs (not just V-cream)."

2657.   Similarly, in September 2012 when Kellum was asked for his "rationale" for the price increases on Clindamycin, he told colleagues that he expected Greenstone would "act rationally as they did recently with Latanoprost" and follow the Sandoz price increase. Although others at Sandoz expressed some concern that Greenstone might not follow, Kellum remained confident in his agreement with Hatosy and Greenstone.

2658.   On October 19, 2012, Defendant Sandoz implemented price increases on all four formulations of Clindamycin in the amounts set forth below:

| Formulation | Old WAC | New WAC | Percentage Increase |
|---|---|---|---|
| CLINDAMYCIN PHOSPHATE 1% SOLUTION (60 ML) | $31.50 | $65.29 | 107% |
| CLINDAMYCIN PHOSPHATE 1% GEL (30 GRAM) | $20.00 | $57.49 | 187.00% |
| CLINDAMYCIN PHOSPHATE 1% GEL (60 GRAM) | $36.00 | $103.54 | 188% |
| CLINDAMYCIN PHOSPHATE 1% LOTION (60 ML) | $31.95 | $79.98 | 150% |
| CLINDAMYCIN PHOSPHATE 2% VAG CREAM (40 GRAM) | $42.34 | $75.04 | 77% |

2659.   In the days leading up to the price increases, Kellum continued his coordination, by phone and text message, with Hatosy of Greenstone. Kellum reached out repeatedly by phone and text message to Hatosy at Greenstone in the days leading up to Sandoz's announcement of the price increases. This culminated in a nearly four (4) minute call between the two competitors on October 19, 2012, the day the Sandoz price increases became effective.

2660.   During these communications, the competitors confirmed their understanding that Greenstone would follow the Sandoz price increases. With the agreement in hand and understood between the two competitors, Kellum and Hatosy would not need to speak again by phone or text message for nearly a year-and-a-half, until March 18, 2014, as Sandoz was preparing for another large increase on Clindamycin (discussed below).

2661.   Greenstone followed the price increases quickly this time, notifying its customers of a price increase on all of Clindamycin formulations on November 27, 2012, although the WAC price increases did not become effective and publicly visible until December 27, 2012. In the interim period

before Greenstone publicly followed the Sandoz price increases, Sandoz made sure to not disrupt the market.

2662.    When Greenstone's customers approached Sandoz looking for a lower price, Sandoz refused to bid. Kellum, in particular, "highly recommend[ed]" that Sandoz avoid bidding as a result of the Greenstone price increases.

2663.    During that same time period, Sandoz's own customers also approached the company, seeing lower public prices from Greenstone and requesting that Sandoz reduce its pricing because they were not yet aware that Greenstone had followed. Knowing that Greenstone would follow, however, Sandoz refused. For example, in early December 2012 Sandoz was approached by its customer McKesson asking Sandoz to reduce its pricing for Clindamycin because Greenstone was offering significantly lower pricing in the market. A Sandoz pricing employee initially responded to the customer by refusing to lower the price, saying "[w]e feel McKesson's price is competitive relative to the market" and "[o]ur intelligence indicates that pricing is higher in the market than what is referenced in" your email. When the customer challenged those responses and asked for additional details about what intelligence Sandoz was referring to, the pricing employee forwarded the email string to Kellum and CW-1, asking for advice on how to avoid referring to the illegal understanding between the two companies.

2664.    Kellum responded by instructing the employee to call McKesson and "explain what we believe to be the case." Knowing that a Greenstone increase would be coming, Kellum concluded: "Remind me to check Analysource to see if Greenstone raised WAC [yet]."

2665.    The Greenstone Clindamycin WAC price increases became effective and publicly visible on December 27, 2012. Greenstone followed Sandoz's WAC price increases to the penny on every formulation, with Greenstone's prices on Clindamycin Solution increasing by 416 percent.

2666.  The coordinated price increases were a success. In a May 2013 Sandoz Planning Meeting, Sandoz noted with respect to Clindamycin: "Q4 price increase held, Greenstone By May 2014, those price increases had resulted in an additional $61,000,000 in net sales to Sandoz.

iii)    New Entrants on Clindamycin Solution Do Not Erode Pricing

2667.  The late-2012 Sandoz and Greenstone price increases got the attention of two competitors, Taro and Perrigo, that had previously obtained approval to market Clindamycin Solution but had not recently been active in the market.

2668.  For example, in a January 2013 internal email Perrigo employees noted that they had "seen some big WAC/AWP price increases" on Clindamycin Solution. They noted that Perrigo already possessed approved ANDAs for the product that were "not being commercialized," and "were wondering if the market prices have increased enough to allow us to come back to this market." Perrigo did indeed begin making plans to return to the market; and was in frequent communication with its competitors at every important step throughout the process.

2669.  Taro similarly had approval to sell Clindamycin Solution; but had not been marketing the product. As early as April 2013, however, Taro began taking steps to bring the product back to market, which included reaching out to competitors. For example, on April 17, 2013, Taro circulated an internal email about a "Product Launch" for Clindamycin Solution, requesting specific information about material availability in order to estimate an available launch date. That same day, Aprahamian called his contact at Sandoz, CW-3, and the two spoke for four (4) minutes.

2670.  Similarly, Aprahamian scheduled a meeting with colleagues at Taro on June 6, 2013 to discuss Taro's entry into the market for Clindamycin Solution. They day before that meeting, he sent an email internally saying, "we are hoping to get into the market relatively soon and need to understand current MS [market share] dynamics to roll out our strategy     Looks like only [Sandoz]

and Greenstone [are in the market] with some nice pricing actions in late last year…" The day after his internal meeting, June 7, 2013, Aprahamian called CW-3 at Sandoz and the two competitors spoke for nearly eleven (11) minutes.

2671.  Starting in July 2013, Sandoz started having temporary supply problems for Clindamycin Solution, due to a change in the adhesive label which required additional testing. The disruption was temporary, and Sandoz expected to be back in the market by the end of the year. However, this left Greenstone as the only viable competitor while Taro and Perrigo were planning to enter the market.

2672.  Because it well understood under "fair share" principles that Greenstone would have to concede market share and "play nice in the sandbox" as these new competitors entered the market (and as Sandoz subsequently re-entered the market), it was important for Taro, Perrigo, and Sandoz to coordinate with each other in order to avoid competition and minimize price erosion as they re-entered the market.

2673.  Perrigo started preparing in earnest to enter the market for Clindamycin Solution in August 2013. Throughout August, executives at Perrigo, Taro, and Sandoz were in almost constant communication, with over two dozen phone calls between executives of the three companies. as set forth below:

2674.  On August 28, 2013, at 1:30 p.m. ET, the Perrigo sales team held an internal launch meeting regarding Clindamycin Solution. In advance of that meeting, a Perrigo executive circulated pricing and market share information to the team, including a pricing grid with proposed Perrigo pricing for different "tiers" of customers. One of the attached documents listed Perrigo's "Target Share" at "15-20%." This led to several more phone calls between Perrigo, Taro and Sandoz that same day.

2675.   Aprahamian of Taro and T.P. of Perrigo both spoke to CW-3 of Sandoz in the morning before the 1:30 p.m. ET Perrigo launch meeting. Shortly after the meeting, at 2:36 p.m., Boothe of Perrigo called the Taro main line and spoke to someone at Taro, likely Perfetto, for approximately thirteen (13) minutes.

2676.   Perrigo formally launched and entered the market for Clindamycin Solution on Monday, September 9, 2013, a week earlier than expected. The week before the launch, as Perrigo was deciding which customers to approach, executives at the company were again in frequent contact with competitors Taro and Sandoz. On Wednesday, September 4, 2013, a Perrigo executive sent an email to the Perrigo sales team about Clindamycin Solution, stating: "12 days 'til launch! Do we have any customers yet?" The next day, T.P. of Perrigo called his contact at Sandoz, CW-3, and the two spoke for approximately ten (10) minutes. The day after that, Friday September 6, 2013, Boothe of Perrigo spoke to Perfetto of Taro for nearly two (2) minutes.

2677.   Perrigo was quickly able to obtain ABC and Walmart as customers, allowing the company to even exceed its initial market share targets.

2678.   Shortly after Perrigo entered the market, on September 12, 2013, Aprahamian of Taro sent an internal email announcing that "Perrigo just entered the market making this a 3-player market: Greenstone, Sandoz, and now Perrigo. We are hoping to have product towards end of next month. Will keep you posted with updates."

2679.   Over the next several weeks, executives at Taro communicated frequently with their counterparts at Perrigo and Sandoz to determine which customers to target, and how to avoid competing with each other.

2680.   For example, Aprahamian called CW-3 at Sandoz on October 1, 2013, most likely leaving a voicemail. CW-3 called Aprahamian back the next day, and the two spoke for ten (10) minutes. During that call, Aprahamian and CW-3 talked about specific pricing in the market and

which customers Taro should approach as it entered the market. That same day, Aprahamian created a spreadsheet titled "ClindamycinSolution_Pricing_10.2.13.xlsx," which documented some of the information he had received during that call. In that document Aprahamian created an initial pricing model for Taro's upcoming launch of Clindamycin Solution, based on his conversations with CW-3. The spreadsheet included not only public WAC pricing for Sandoz, Greenstone and Perrigo, but also, in a separate tab of the spreadsheet titled "Com Pricing," non-public price points for three potential customers: Rite Aid, Publix, and ABC.

2681.   On October 8, 2013, Taro was busy preparing for the launch. Aprahamian sent an email to the Taro sales team indicating that Taro was planning to launch Clindamycin Solution "in the next week" and asking those sales executives to reach out to customers and "get a sense of the market." Aprahamian said he was "[s]pecifically looking for price points, usage, who they are with, and their willingness to entertain an offer." Consistent with the "fair share" understanding, Aprahamian indicated that "Greenstone is our sole target with an 89% share"; meaning that Taro would only target Greenstone customers, not Perrigo, due to Greenstone's very high market share. Another Taro employee was concurrently creating a "Clindamycin 1% Solution Fact Sheet" with information about the product, recent price trends in the market, competitors, and Taro's "Target Market share goal" of 20 percent. That same day, Aprahamian called CW-3 at Sandoz and left a message. CW-3 returned the call immediately and the two spoke for approximately three (3) minutes.

2682.   Taro also scheduled an internal meeting regarding the Clindamycin launch for October 11, 2013. The day before and the day of that meeting, Aprahamian was again busy communicating with CW-3 of Sandoz. On October 10, 2013, Aprahamian called CW- 3 twice, first on CW-3's office line, leaving a message, and then immediately after on his cell phone, leaving another message. The next day, the day of the Taro internal launch meeting, the two competitors spoke three times, with calls lasting three (3), one (1), and five (5) minutes, respectively.

2683.   As Aprahamian kept speaking to CW-3 at Sandoz, who was in turn speaking with T.P. at Perrigo, he continued compiling competitively sensitive, non-public price points for various customers. By October 25, 2013, the "Com Pricing" tab of Aprahamian's Clindamycin Solution pricing spreadsheet had grown to include pricing information on more customers and sizes.

2684.   Having this competitively sensitive, non-public information allowed Taro to price as high as possible while still obtaining new business, accomplishing one of the fundamental goals of the "fair share" understanding by minimizing price erosion as it entered the market.

2685.   Taro entered the market for Clindamycin Solution on October 28, 2013, matching Sandoz, Greenstone, and Perrigo's WAC pricing exactly. When launching, Taro quickly targeted and obtained Rite Aid, not ABC or Walmart, to avoid competing with Perrigo for market share. This gave Taro approximately 13 percent market share immediately, almost reaching its target goal with just one customer.

2686.   When Sandoz subsequently re-entered the market for Clindamycin Solution in early 2014, it also did so in coordination with its competitors. For example, on Monday, February 10, 2014, members of the Sandoz sales team had a conversation about the company's upcoming re-launch of Clindamycin Solution. As a result of that discussion, it was decided that "the team was going to call around to get alignment before sending out offers."

2687.   That same day, Kellum sent an internal email to the Sandoz sales team reminding them of the important understanding already in place with Greenstone across all of the Clindamycin formulations, not just the Solution:

| From: | Kellum, Armando |
| --- | --- |
| Sent: | Monday, February 10, 2014 6:35 PM |
| To: | ███████████████████████ |
| Subject: | RE: ABC Clindamycin Solution - Monthly Usage/Alignment? |

Team,

Because of the other Clinda's I think we should avoid Greenstone as much as possible despite their large share.

We enjoy a very good and stable situation on the other Clinda products.

Thanks!

Armando Kellum
Vice President, Contracting and Business Analytics.
Sandoz Inc.

2688.   Two days later, on February 12, 2014, CW-3 of Sandoz called Aprahamian of Taro and the two spoke for seventeen (17) minutes. They spoke again on February 13 for one (1) minute. That same day, CW-1 of Sandoz sent an internal email again stressing the broader relationship with Greenstone and the desire not to disrupt that relationship: "This re-launch is slightly complicated because we share a lot of cross over with GS [Greenstone] on other Clinda sku's, so need to be careful."

2689.   Over the next several weeks until Sandoz re-launched, the four competitors for Clindamycin Solution—Sandoz, Taro, Perrigo and Greenstone—coordinated through numerous phone calls, in order to minimize any disruption that might be caused by Sandoz's re-entry.

2690.   Sandoz set its target market share at 25 percent, choosing to target 20 percent from Greenstone and 5 percent from Perrigo. In a May 2014 internal Sandoz presentation, Sandoz laid out its plan for reentry, specifically referring to one of its competitors as "Pfizer" rather than "Greenstone".

2691.   Ultimately, these coordinated efforts to minimize price erosion were very successful. Even after both Taro and Perrigo's entry, and Sandoz's re-entry, prices for Clindamycin Solution remained significantly higher than they had been prior to the first coordinated price increase. In a "Business Review" presentation to Pfizer in 2017, Greenstone summarized the lock-step price

increases in the market for Clindamycin Solution, while also showing relatively minimal price erosion even after two additional competitors had entered the market:



    iv)    The Third Coordinated Price Increase (Sandoz and Greenstone)

2692.   Starting in April 2014, Sandoz decided to raise prices on the three formulations of Clindamycin where Greenstone was still its only competitor. This led to a quick flurry of phone calls between Greenstone and Sandoz in early April 2014 to confirm the understanding.

2693.   A phone call between Nailor and Kellum during this time was the first phone call ever between the two, according to phone records. As a result of these calls, Sandoz understood that Greenstone would follow its price increases. During these calls, the competitors also discussed a separate price increase on Eplerenone Tablets, discussed more fully below.

2694.   Sandoz moved quickly, raising its WAC prices on Clindamycin Gel, Clindamycin Lotion, and Clindamycin Cream by approximately 20 percent, effective April 18, 2014. Shortly after

the Sandoz increase, on April 23, 2014, Nailor of Greenstone and Kellum spoke again for nearly fifteen (15) minutes.

2695.  By now, Greenstone understood the need to follow the Sandoz price increases quickly—and did so. It followed the Sandoz WAC increases to the penny less than a month-and-a-half later, with an effective date of June 2, 2014. Shortly before Greenstone followed the Sandoz Clindamycin increases, on May 22, 2014, Hatosy of Greenstone called Kellum of Sandoz twice, leaving him a forty-seven (47) second voicemail. They did not speak again for nearly three (3) months. Similarly, three days before the increases became effective, on May 29, 2014, Nailor of Greenstone called Kellum of Sandoz, leaving him a twenty-six (26) second voicemail. As part of that same price increase, Greenstone also raised its pricing on Eplerenone Tablets.

2696.  Sandoz honored the "fair share" understanding with Greenstone and the agreement to raise prices on Clindamycin. For example, when approached by a customer, Omnicare, on May 28, 2014 to provide a bid for Clindamycin Gel, the first reaction from a Sandoz marketing manager was that Kellum "may not want to pursue to avoid price disruption." Omnicare approached Sandoz again in August, asking if Sandoz had enough supply to meet the customer's needs. The email from Omnicare followed a flurry of phone calls between Kellum and Hatosy of Greenstone only a few days prior, on August 14, 2014 (their first calls since May 2014). After receiving the email from Omnicare, CW-3 of Sandoz informed the customer that Sandoz would not do anything that would disrupt the market.

c)    Latanoprost Drops

2697.  Latanoprost, also known by the brand name Xalatan (manufactured by Defendant Pfizer), is an ophthalmic solution, in the form of eye drops, used to treat high blood pressure inside the eye due to glaucoma (open angle type) or other eye diseases including but not limited to ocular

hypertension. In 2013, the annual market for Latanoprost Drops in the United States exceeded $100 million.

2698.   As of March 2012, there were three generic manufacturers in the market for Latanoprost Drops: Sandoz, Greenstone, and Bausch (sometimes referred to as Bausch & Lomb ("B&L")). Greenstone had the largest market share with 42 percent, followed by Bausch with 30 percent and Sandoz with 19 percent. In April 2012, all three manufacturers raised their prices in direct coordination with one another.

2699.   In early April 2012, Greenstone informed its customers that it would be taking a price increase on Latanoprost Drops. In the days and weeks leading up to the Greenstone price increase notice, Robin Hatosy of Greenstone was coordinating with both Kellum of Sandoz and B.P.2, a sales executive at Bausch, by phone and text message.

2700.   Hatosy consistently acted as the conduit, sharing information between Sandoz and Bausch in order to secure an agreement from both to raise prices.

2701.   On the day that Greenstone sent out the price increase notices, April 3, 2012, both CVS and Walgreens approached Sandoz looking for a lower price on Latanoprost Drops. That same day, Hatosy and Kellum exchanged five (5) text messages while Kellum replied internally to his colleagues at Sandoz, stating: "I strongly suspect this [approach from customers] is price increase related. We will evaluate quickly and make [a] recommendation." Later that evening, Kellum instructed his sales team not to make any "new offers" for Latanoprost and to put the product on "strict allocation." Kellum also instructed S.G., one of his sales executives, to lie to Walgreens about why Sandoz was unable to bid, instructing S.G. to "blame supply" even though Sandoz had plenty of supply.

2702.   Sandoz immediately began preparing an increase of its own. On April 4, 2012, Kellum called Hatosy but was unable to connect. He called her again on April 5, 2012, and the two competitors spoke for nearly two (2) minutes.

2703.   On April 6, 2012, Kellum requested a customer list from a colleague so that he could begin calculating the financial impact of a Sandoz price increase. He also added the item "Latanaprost[sic] (price increase)" to the agenda for that day's "Pricing and Product Management Meeting." After some quick calculations, Kellum determined that a Sandoz increase on Latanoprost Drops could increase the company's revenues by up to $14,900,000 per year.

2704.   In a presentation he created that same day to support the Latanoprost price increase, Kellum was intentionally opaque about why Sandoz should take the increase, stating that "Sandoz learned from several customers that both Greenstone (Pfizer gx division) and B&L [Bausch] have taken significant price increase[s]." But that was a lie. Kellum had first learned of the Greenstone price increase directly from Hatosy, not a customer. In addition, the Bausch price increase had not even happened yet. In fact, it would not be effective until April 24, 2012, three weeks in the future; Kellum's inside information instead came directly from his prior conversations with his competitor, Greenstone.

2705.   While he was in the midst of planning the Sandoz price increase on April 6, 2012, Kellum also exchanged two (2) more text messages and had a nearly seven (7) minute call with Hatosy of Greenstone. Hatosy, in turn, then called B.P.2 at Bausch and the two spoke for nearly five (5) minutes. Later that evening, Kellum told colleagues: "I have a very good understanding of the market price points ~ $7 net per dropper."

2706.   Things moved quickly from there. On April 9, 2012, Kellum sent around an agenda for the Pricing Committee meeting the next day. The agenda included "Latanoprost[sic] Opthalmic Price increase approval." He also called Hatosy of Greenstone but was unable to reach her. Kellum quickly obtained approval for the Latanoprost price increase; customers were notified of the increase on April 11, 2012, and it became effective on April 13, 2012. As a result of this quick action, Sandoz's price increase became effective even before Greenstone's.

2707.   On April 12, 2012, a large retail pharmacy customer, Rite-Aid, sent Greenstone a request for a bid on Latanoprost. Knowing that this was likely an indication that Sandoz had followed Greenstone's price increase, Hatosy (then using a different surname) forwarded the email directly to Kellum with an approving message.

2708.   That same day, a different customer, Optisource, approached Sandoz, angry that it was not notified in advance of Sandoz's Latanoprost price increase. A Sandoz sales executive told the customer that Sandoz was simply "following our competitions increase," but Optisource challenged that idea, saying that Bausch, which was also on a secondary contract with that customer, had not raised its price. Questioning Kellum's intel about the price increases, a senior sales and pricing executive at Sandoz forwarded the email string directly to Kellum on Friday, April 13, 2012, asking: "B&L [Bausch] did not raise?" Kellum immediately responded: "Not my understanding." Kellum's understanding, of course, based on his conversations with Hatosy, was that Bausch would be raising, or already had raised, its price.

2709.   The following Monday, April 16, 2012, Kellum called Hatosy. She called him back the next day, but they were unable to connect. On April 18 and 19, 2012, Hatosy and B.P.2 of Bausch then communicated several times by phone and text message, including one call lasting nearly fourteen (14) minutes.

2710.   On April 24, 2012, Bausch raised its WAC pricing on Latanoprost to a point even higher than Sandoz's. That same day, B.P.2 of Bausch called Hatosy of Greenstone, likely to report the news.

2711.   Three price increases in the span of roughly three weeks caused a lot of customer activity and confusion, which in turn required additional coordination among the three manufacturers to make sure prices stayed high and the market remained stable. For the most part, Sandoz tried to

avoid taking any of its competitors' customers after the price increases, but it did want to pick up one customer to get closer to its "fair share" of the market.

2712.   For example, on Friday May 4, 2012, shortly after the Greenstone and Bausch price increases became effective, Cardinal approached Sandoz with an opportunity to bid and take the business with a lower price. Kellum called Hatosy that day, but they were unable to connect. He called her again on Monday, and they spoke for more than six (6) minutes. They spoke about Sandoz's desire to obtain another customer, and which customer it should target. Monday morning, before speaking to Hatosy, Kellum responded to the internal Sandoz email saying, "[m]y preference is really to take the ABC business [instead of Cardinal]. We had that business before and I think we are sending a very poor market signal by taking the Greenstone business immediately after an increase." The next day, after speaking to Hatosy, Kellum followed up the email, confirming that Sandoz should pass on Cardinal, stating "I really think we'll be able to get ABC" and "I'm worried the message this will send." Consistent with the agreement reached with Greenstone, Sandoz retained its secondary position with Cardinal, instead of bidding for the primary position, and decided to wait until ABC put its Latanoprost business out to bid and let Greenstone concede that customer instead.

2713.   Around this same time, CW-1 started at Sandoz. He had previously worked with Hatosy at a prior employer and thus had a pre-existing relationship with the Greenstone sales executive. When some confusion arose later in May 2012 around the Cardinal business, Hatosy communicated with both CW-1 and Kellum from Sandoz, as well as B.P.2 of Bausch, in order to enforce the agreement already in place among the three manufacturers.

2714.   For example, on the morning of May 31, 2012, B.P.2 of Bausch and Hatosy of Greenstone exchanged one text message and had several phone calls of varying lengths. In the midst of those communications with B.P.2, Hatosy was simultaneously communicating with CW-1 of Sandoz using iPhone chat.

2715. As Hatosy explained to CW-1, Bausch (B&L) had the Cardinal business, not Greenstone, but Cardinal was telling Bausch that Sandoz had a lower price in the market. Hatosy expressed the need to call "Armando" [Kellum] because CW-1 had only recently started at Sandoz and thus did not completely understand the scope of the prior collusive communications between Hatosy and Kellum about the Latanoprost price increases.

2716. Immediately following this exchange, Hatosy did call Kellum, setting off a string of nine calls between the three competitors that day.

2717. Over the next several weeks, Hatosy went to great lengths to make sure Sandoz and Bausch lived up to their agreement to keep prices high across the board for Latanoprost. For example, between June 26 and 28, 2012, Hatosy and B.P.2 of Bausch exchanged twelve (12) text messages.

2718. After that series of communications, on June 29, 2012, Hatosy reached out again to CW-1 via iPhone chat. At the exact same time that Hatosy was exchanging these iPhone chat messages with CW-1 at Sandoz, she was also exchanging separate text messages with B.P.2 of Bausch.

2719. Those efforts were successful. On July 3, 2012, CW-1 followed up with Hatosy via iPhone chat message confirming that Sandoz's pricing for Latanoprost was not low at Cardinal—or any other customer for that matter.

2720. Again, shortly after receiving this information from CW-1 about Sandoz's pricing, Hatosy sent a text message to B.P.2 at Bausch. They exchanged several other text messages that same day.

2721. Greenstone similarly lived up to its agreement to concede the ABC business to Sandoz, allowing Sandoz to get closer to its "fair share" of the Latanoprost market. On June 22, 2012, ABC requested a bid from Sandoz on Latanoprost, as expected, due to the Greenstone price increase. Consistent with the agreement, Greenstone quickly conceded the customer to Sandoz, allowing Sandoz to obtain the business "without compromising pricing in [the] market."

2722.  As discussed above, this successful effort at price fixing convinced Kellum to recommend further efforts at price fixing with Greenstone on various formulations of Clindamycin beginning in August 2012, continuing through 2014. That history also paved the way for yet another successful price fixing agreement between Sandoz and Greenstone on Eplerenone Tablets, discussed below.

d)    <u>Eplerenone Tablets</u>

2723.  Eplerenone, also known by the brand name Inspra, is an oral medication used alone or in combination with other medicines to treat high blood pressure by blocking a chemical (aldosterone) in your body which in turn lowers the amount of sodium and water the body retains.

2724.  As of spring 2014, Sandoz and Greenstone were the only generic manufacturers of Eplerenone Tablets.

2725.  While Greenstone was coordinating with Sandoz in April 2014 to follow Sandoz's price increases on various formulations of Clindamycin, it was also coordinating to lead a price increase on Eplerenone Tablets.

2726.  Originally, Greenstone planned its Eplerenone price increase to become effective on May 1, 2014, but sometime in mid-April that increase was delayed. Shortly after the decision was made to delay the Eplerenone price increase, on April 22, 2014, Nailor of Greenstone called Kellum and left a message. They traded voicemails until they were able to speak the next day for nearly fifteen (15) minutes.

2727.  Greenstone planned its increases of Clindamycin and Eplerenone together, as it was coordinating with Sandoz, and both increases ultimately became effective on June 2, 2014. Shortly before the increases became effective, on May 29, 2014, Nailor of Greenstone called Kellum of Sandoz, leaving him a twenty-six (26) second voicemail.

2728.  Sandoz's intent was always to follow Greenstone's Eplerenone price increase, rather than compete for market share. Sandoz began preparing to follow Greenstone's Eplerenone price increase in early July 2014. However, because of price protection terms with several of Sandoz's customers, the company decided to delay the roll-out of its Eplerenone price increase (and several others) until it made more financial sense and Sandoz would be able to limit any contractual penalties that would arise as a result of the increase.

2729.  Ultimately, Sandoz followed Greenstone's price increase on Eplerenone on October 10, 2014. Sandoz increased its pricing by as much as 270 percent to certain customers. During the time period after Greenstone's price increase and before Sandoz could follow, the two competitors continued to coordinate by phone, including a number of calls between Kellum and Hatosy of Greenstone in August 2014. Shortly after the Sandoz price increase became effective, on October 15, 2014, Kellum and Naylor of Greenstone also communicated briefly.

iv.     G&W and Its Other Relationship

2730.  Earlier sections of this Complaint discuss in detail G&W's collusion with several competitors between 2010 and July 2012, when Sandoz acquired Fougera— including collusion with Fougera, Perrigo, and Glenmark. Another section focuses on collusion between Taro and G&W in late 2015 and early 2016 on several products that G&W purchased from Teva.

2731.  However, G&W's illegal behavior goes well-beyond those examples. Indeed, during the Relevant Time Period, the vast majority of G&W's business was implicated by its anticompetitive conduct. Much of this collusion was spearheaded by Orlofski and Vogel-Baylor. Both were prolific communicators that used their many relationships with competitors to collude on overlap products.

2732.  For example, between January 2011 and December 2016, when he left G&W, Orlofski exchanged at least one thousand eight hundred and sixty-three (1,863) phone calls and text messages

561

with his contacts at Defendants Lupin, Aurobindo, Amneal, Wockhardt, Glenmark, Perrigo, Fougera, Actavis, and Sandoz and Co-conspirator Taro.

2733.   Similarly, between July 2011 and February 2017, Vogel-Baylor exchanged at least nine thousand two hundred and seventy-four (9,274) phone calls and text messages with her contacts at Defendants Aurobindo, Glenmark, Greenstone, Wockhardt, Actavis, Lupin, Amneal, Perrigo, Fougera, Bausch, and Mylan and Co-conspirator Taro.

2734.   At all relevant times herein, Vogel-Baylor was acting at the direction of her supervisor, Orlofski. Orlofski was very much aware of her collusion with competitors and encouraged her to do it. The complaint is replete with examples of Vogel-Baylor communicating with a competitor and then immediately calling Orlofski to report back what she had learned. Indeed, Vogel-Baylor was evaluated, at least in part, based on the strength of her competitive relationships.

2735.   Vogel-Baylor also directed her subordinates to collude with competitors. For example, in February 2014, G&W hired K.K., previously a sales executive at Defendant Wockhardt. Immediately upon his arrival, K.K. began colluding in earnest with his contact at Sandoz, CW-3. Up to that point, no G&W employee had a relationship with anyone at Sandoz. Although there had been a relationship with CW-6 of Fougera prior to the Sandoz acquisition, his departure from the company left a gap. K.K.'s relationship with CW-3 filled this void.

2736.   Although it was a smaller company, G&W celebrated the fact that it was selling topical products, where it was able to form anticompetitive agreements with most of its primary competitors. For example, in May 2013, Vogel-Baylor was asked to put together a report for management regarding G&W's sales goals for the coming year. After listing out a number of G&W's price increases from 2012 – all of which were the subject of collusion and are discussed at various points throughout this Complaint – Vogel-Baylor concluded: "We remain very upbeat to be playing in the topical and suppository market where there continues to be limited to no competition."

2737.  The following sections focus on G&W's relationships with Defendants Perrigo, Actavis, Glenmark, and Lupin, and discuss specific examples of how those anticompetitive relationships manifested themselves with respect to particular products.

1)    <u>Collusion Between G&W and Perrigo</u>

2738.  As detailed above, after Sandoz's acquisition of Fougera in July 2012, CW-6 left Fougera and took a sales position at Defendant Aurobindo. Although Vogel-Baylor could no longer use CW-6 to collude with regard to products on which G&W and Fougera overlapped, she knew that CW-6 had a contact at another one of G&W's key competitors, T.P. at Defendant Perrigo. Over the next year, Vogel-Baylor and T.P. would use CW-6 as a conduit to pass information between them and reach anticompetitive agreements with regard to a number of products on which G&W and Perrigo overlapped.

2739.  This collusive relationship was critical because G&W overlapped with Perrigo on more products than any other competitor during this time period.

2740.  In May 2013, CW-6 suffered an illness and left the industry. With CW-6 no longer available to serve as middleman, Vogel-Baylor had no choice but to collude directly with T.P. of Perrigo. In July 2013, she placed her first calls ever to T.P. according to the available phone records. Over the ensuing years, Vogel-Baylor and T.P. colluded on several products that are discussed in detail below.

a)    <u>Halobetasol Propionate</u>

2741.  Halobetasol Propionate, also known by the brand name Ultravate, is a strong corticosteroid used to treat a variety of skin conditions, including eczema, dermatitis, psoriasis, and rash. Halobetasol comes in both cream and ointment form.

2742.  As of June 2012, the market was split between Perrigo with 60 percent share and G&W with 40 percent.

563

i)    The First Coordinated Price Increase—
September 2012

2743.   On September 25, 2012, both G&W and Perrigo announced price increases for Halobetasol Cream and Ointment. G&W's price increases took effect on September 28, 2012 and Perrigo's price increases took effect one month later on October 28, 2012.

2744.   In the days leading up to the price increases, both Vogel-Baylor of G&W and T.P. of Perrigo had numerous discussions with CW-6 of Aurobindo concerning Halobetasol. Although Aurobindo did not manufacture either form of Halobetasol, Vogel- Baylor and T.P. used CW-6 as a conduit to convey information between them about the price increases. As discussed in detail above, CW-6 had formerly worked at Fougera and had developed relationships with Vogel-Baylor and T.P. of Perrigo during his tenure there.

2745.   For instance, on September 19, 2012, less than one week before the price increases, Vogel-Baylor exchanged three (3) text messages with CW-6. Then, CW-6 called Vogel-Baylor, hung up, and immediately called T.P. After speaking with T.P., CW-6 hung up and immediately called Vogel-Baylor back, relaying the information he had learned from T.P. Indeed, within a twenty-minute period, CW-6 had exchanged at least eight calls with Vogel-Baylor and T.P.

2746.   After speaking with CW-6 for the final time on September 19, 2012, Vogel- Baylor immediately called her boss, Orlofski and spoke to him for thirteen (13) minutes. Similarly, T.P. also reported back to his boss, Wesolowski, a senior executive at Perrigo, exchanging two calls with him totaling roughly six (6) minutes.

2747.   Further, two days later, on September 21, 2012, and then again on September 27, 2012, the day before the G&W price increase went into effect, the same call pattern occurred.

2748.   In early November 2012, a customer reached out to G&W asking it to submit a bid for Halobetasol Cream and Ointment because the customer believed its prices were inconsistent with the

market. After receiving the request, Vogel-Baylor had several calls with CW-6 who, again, served as a conduit between Vogel-Baylor and T.P. to discuss Halobetasol.

2749.  After this call exchange, Vogel-Baylor emailed C.M., a sales executive at G&W, instructing him to submit a cover bid to the customer in order to create a false appearance of competition between G&W and Perrigo: "We cannot take this from Perrigo so I will give you pricing so that it looks like you are making an attempt to bid."

ii)    The Second Coordinated Price Increase—
March/April 2013

2750.  The competitors colluded to raise the price of Halobetasol again in 2013. This time, there were multiple channels of communication between the competitors. For example, on March 26, 2013, Boothe of Perrigo called Orlofski of G&W directly and they spoke for seven (7) minutes. That same day, T.P. of Perrigo once again called CW-6. The call lasted two (2) minutes. Right after that call, CW-6 called Vogel-Baylor.

2751.  The next day, on March 27, 2013, Perrigo increased its WAC pricing for both the Halobetasol Cream and Ointment by over 250 percent.

2752.  Roughly two (2) weeks later, on April 11, 2013, G&W also increased its contract and WAC pricing for the two formulations. G&W's contract price was now double what it had been just the year before.

2753.  G&W told one of its customers, Morris & Dickson, that G&W increased prices in "response to a competitor recently raising their price." Indeed, in the days leading up to the G&W price increase, Vogel-Baylor and T.P. had again engaged in a game of telephone with CW-6 to coordinate their pricing actions. After speaking with T.P. for four (4) minutes on April 8, 2013, CW-6 immediately called Vogel-Baylor. CW-6 then called Vogel-Baylor a short while later and they spoke for four (4) minutes. Immediately after that call, Vogel-Baylor called her boss, Orlofski.

565

iii)    Sandoz Launches Halobetasol Cream

2754.   In December 2013, Sandoz began preparing to re-launch Halobetasol Cream. At that time, G&W had 63 percent of the market and Perrigo had 36 percent. Sandoz was targeting 20 percent market share. Because G&W was the market share leader, Sandoz wanted to "[t]ake most of the share from G+W and one smaller account from Perrigo."

2755.   On December 11, 2013, A.S.2, a senior Sandoz launch executive, instructed Sandoz employees to reach out to Rite-Aid and Walgreens to learn who their suppliers were for Halobetasol Cream and what their pricing was. Upon learning that both customers were with G&W, the market share leader, Sandoz decided to target those customers.

2756.   On December 12, 2013, Walgreens reached out to G&W to advise that Sandoz had expressed interest in its Halobetasol Cream business. When Vogel-Baylor shared this information with Orlofski, he remarked that G&W "should give up something to them given our market share." Although Sandoz submitted a bid for Halobetasol on December 16, 2013, Walgreens declined to move the business because the price was slightly higher than G&W's price.

2757.   On December 17, 2013, another one of G&W's customers, Ahold, informed G&W that it had received a bid from Sandoz and was now seeking a lower price from G&W. Vogel-Baylor emailed Orlofski stating, "[w]hile I am thinking about giving it up because it was a new award anyway, this won't be enough for them to stop. Thoughts?" Orlofski responded by asking Vogel-Baylor to call him, noting "[i]t would be good to catch up on a few things." Later that day, Rite Aid also emailed Vogel-Baylor stating that Sandoz had submitted a bid for Halobetasol Cream and requested that G&W lower its price to retain the business.

2758.    Vogel-Baylor tried calling Orlofski three times on December 17, 2013. After the third call, Vogel-Baylor called T.P. of Perrigo and they spoke for more than seven (7) minutes.[29] Vogel-Baylor hung up with T.P. and called Orlofski again. Orlofski returned her call later that day and they spoke for five (5) minutes.

2759.    After speaking with Orlofski, Vogel-Baylor emailed Rite-Aid stating, "we are going to let this go to Sandoz since we only have the 50gm with you. We would like them to stop going after our customers so hopefully it will stop here." Rite-Aid accepted Sandoz's offer the next day.

2760.    At the same time that Sandoz was going after G&W's Halobetasol customers, it was also approaching some Perrigo customers as well, albeit in coordination with Perrigo. On December 17, 2013, CW-1, a senior Sandoz pricing executive, emailed CW-3, a senior Sandoz sales executive, asking him to inquire whether Walmart, a Perrigo customer, was interested in receiving a bid from Sandoz for Halobetasol Cream. CW-3 happened to be meeting with Walmart at that time at its offices in Bentonville, Arkansas. Walmart told CW-3 that it was interested in receiving an offer. Thereafter, CW-3 called T.P. of Perrigo. During that call, T.P. provided CW-3 with Perrigo's price points for Halobetasol Cream at Walmart and Omnicare and agreed to give up Walmart to Sandoz.]

2761.    Also on December 17, 2013, CW-3 responded to an email exchange with CW-1 and Kellum regarding Halobetasol Cream, stating: "We shoul[d] also target GW as Perrigo will not relinquish significant share. [CW-1] . . . will call you later. On a flight now."

2762.    Two days later, on December 19, 2013, CW-3 called T.P. again. The call lasted one (1) minute. After hanging up, CW-3 called CW-1, and they spoke for four (4) minutes. That same day, Sandoz sent offers to Walmart and Omnicare. The next day, on December 20, 2014, K.K.3, a senior Sandoz launch executive, followed up with CW-3 regarding the Walmart offer. CW-3 responded,

---

[29] As detailed above, by this time, CW-6 had left the industry and Vogel-Baylor had begun colluding with T.P. of Perrigo directly with regard to products on which G&W and Perrigo overlapped.

"[n]o response from WMT. Offer sent yesterday. We discussed this one off line and looks like a viable opportunity pending response from Perrigo."

2763.   That same day, Boothe of Perrigo called Orlofski of G&W. The call lasted two (2) minutes. Orlofski returned the call a half hour later and they spoke for eleven (11) minutes. Later that day, Orlofski called Vogel-Baylor and they spoke for more than seventeen (17) minutes.

2764.   On January 8, 2014, CW-3 called T.P. of Perrigo. Later that day, Walmart accepted Sandoz's bid for Halobetasol Cream. CW-3 forwarded the acceptance to his supervisor, CW-1, who asked, "[w]ho was [W]almart with?" CW-3 replied in two separate emails sent simultaneously: "Perrigo" and "Call me. Important."

2765.   The next day, on January 9, 2014, CW-1 and CW-3 agreed that "G&W should be our target next." That same day, CW-3 called T.P. and they spoke for more than fifteen (15) minutes.

2766.   In early February 2014, K.K. joined G&W as a Director of Sales & Marketing.[30] Once at G&W, K.K. wasted no time using his competitor contacts at Sandoz – CW-3 and CW-4 – to coordinate regarding Halobetasol.

2767.   On February 18, 2014, K.K. of G&W emailed Vogel-Baylor stating that Sandoz had bid on Halobetasol at Walgreens again and the customer was providing G&W with an opportunity to bid to retain the business. Less, than an hour later, Vogel-Baylor called T.P. at Perrigo and K.K. called CW-3 at Sandoz to coordinate a response. The calls lasted one (1) minute and two (2) minutes, respectively. Immediately after hanging up, K.K. emailed Vogel-Baylor to ask if she knew whether Sandoz was launching.

2768.   After receiving the email, Vogel-Baylor called K.K. He returned the call and they spoke for sixteen (16) minutes. Immediately after hanging up with K.K., Vogel-Baylor sent a text

---

[30] The K.K. referenced in this Complaint that joined G&W in February 2014 is a different individual than the K.K. of Sandoz identified previously in this section.

message to T.P. of Perrigo. Later that day, K.K. again emailed Vogel-Baylor to say that he still didn't know if Sandoz was launching.

2769.   Two days later, on February 20, 2014, K.K. had still not heard back from CW-3 and so he reached out to his other contact at Sandoz, CW-4, and the competitors spoke for four (4) minutes. Immediately after hanging up, K.K. called Vogel-Baylor and they spoke for our (4) minutes. Later that morning, Vogel-Baylor and K.K. exchanged two (2) more calls lasting thirteen (13) minutes and three (3) minutes, respectively. Upon hanging up with Vogel-Baylor, K.K. sent an internal email, including to Vogel-Baylor, stating that Sandoz was looking to gain a 30 percent market share. Vogel-Baylor later responded: "FYI – we gave them rite aid in December."

2770.   A few minutes after receiving K.K.'s email, Vogel-Baylor sent a text message to T.P. of Perrigo. A half hour later, she called T.P. and they spoke for more than seven (7) minutes. At around the same time, CW-3 of Sandoz called K.K. and they spoke for (8) minutes. Immediately after hanging up with CW-3, K.K. called Vogel-Baylor to report back what he had learned. That call lasted nineteen (19) minutes.

2771.   Later that afternoon, Vogel-Baylor called her supervisor, Orlofski, to apprise him of the situation and they spoke for twenty-one (21) minutes. Upon hanging up, Vogel-Baylor called K.K. and they spoke for nearly twelve (12) minutes. Immediately after talking to K.K., Vogel-Baylor called T.P. of Perrigo one more time that day. That evening, after his conversation with G&W, CW-3 and CW-1 spoke for twenty (20) minutes.

2772.   The next morning, on February 21, 2014, CW-3 and CW-1 spoke again for fourteen (14) minutes. CW-3 hung up and immediately called K.K. of G&W. Immediately after that call, K.K. called Vogel-Baylor. That same day, K.K. sent an email to Walgreens stating that G&W was ceding the business to Sandoz. Walgreens had accounted for over one third of G&W's total market share for Halobetasol Cream.

iv)    Taro Launches Halobetasol Cream and
Ointment

2773.   In mid-March 2014, Taro was making plans to re-launch Halobetasol Cream and Ointment. Although its launch was ultimately delayed until May 2014 due to issues relating to the FDA, Aprahamian called Vogel-Baylor on March 27, 2014 and they spoke for fourteen (14) minutes. Notably, this was the first phone call ever between these two competitors, according to the available phone records. Four days later, on March 31, 2014, Vogel-Baylor called Aprahamian and they spoke for over five (5) minutes.

2774.   On May 13, 2014, Taro re-entered the Halobetasol Cream and Ointment markets and published WAC pricing that matched its competitors. In the days leading up to the re-launch, all four competitors were speaking frequently by phone.

2775.   After the phone calls detailed above, Aprahamian would not speak to Vogel-Baylor again until September 2015. Similarly, the two calls between Aprahamian and Wesolowski of Perrigo are the only calls ever exchanged between the two competitors, according to the available phone records.

2776.   On May 11, 2014, Aprahamian circulated a Fact Sheet including details regarding the Halobetasol re-launch. Taro stated that "[u]nits have been decreasing slightly over the past three years while sales are up over 300% due to price adjustments. Sandoz recently came into the cream market only." The Fact Sheet detailed the following market share breakdown and set Taro's target market shall goal at 15 percent:

| Generic / Brand competition by units: (Q1 2014) | | | |
|---|---|---|---|
| **Cream** | | **Ointment** | |
| G&W | 38.49% | G&W | 47.53% |
| Perrigo | 56.54% | Perrigo | 51.93% |
| Sandoz | 4.95% | Ranbaxy(Brand) | .53% |

Target Market share goal: ~15%

2777.  On June 10, 2014, Aprahamian instructed a colleague to put together offers for Halobetasol at Publix (a G&W and Perrigo customer) and HD Smith (a Perrigo customer). Aprahamian cautioned "do NOT bid the 50gm cream at HD that is with Sandoz." That same day, Perfetto of Taro exchanged three (3) text messages with Orlofski of G&W.

2778.  On June 11, 2014, Vogel-Baylor called T.P. of Perrigo. The call lasted one (1) minute. The next day, on June 12, 2014, HD Smith informed Taro that Perrigo had proactively revised its pricing shortly after Taro submitted the bid and asked Taro to lower its bid to win the business.

2779.  On June 17, 2014, Boothe of Perrigo called a Taro employee on his office line. The call lasted forty-five (45) minutes. Later that day, A.L., a Taro pricing executive, sent an internal email stating, "[i]f Perrigo is looking to keep HD that badly we should move on to another customer." The next day, June 18, 2014, Perfetto called Boothe.

2780.  Around that same time, G&W employees were having a similar exchange over email. On June 17, 2014, K.K. sent an internal email to Orlofski stating: "Taro is launching Halobetasol Cream and Ointment. So far we have been challenged at Publix and Morris Dickson.    I believe we should yield to Taro on this. We are researching to see how much market share they want and I will update once I have intel. Let me know what you want to do. We need to get back to them by Thursday [June 19, 2014]."

2781.  On June 18, 2014, Orlofski sent a text message to Perfetto and also called him. The call lasted two (2) minutes. The next morning, on June 19, 2014, Orlofski replied to K.K.'s email

stating: "I agree with you on this. Let's let these accounts move to Taro. Hopefully they will not go after any other accounts from G&W. Please let me know if you hear of any other competitive offers from Taro to our customers." K.K. then sent an internal email directing that G&W should cede the Publix and Morris & Dickson accounts to Taro. As K.K. explained to his colleagues, it was "purely a business decision that at the end of the day is better for all of us."

2782.   On June 20, 2014, Orlofski exchanged two text messages and two calls with Perfetto, including one call lasting nearly thirty-eight (38) minutes.

2783.   At the same time, G&W was also careful not to take any steps that would throw off its market share balance with Perrigo. For example, on June 18, 2014, HEB, a Perrigo customer, asked G&W to bid on their Halobetasol business. K.K. responded, "[w]e are going to have to hold off on [that] right now. Don't want to upset market. Tell him we are just at capacity with this product right now."

b)    Prochlorperazine Maleate

2784.   Rochlorperazine Maleate Suppositories ("Prochlorperazine"), also known by the brand names Compro and Compazine, are used to treat nausea and vomiting.

2785.   Since at least 2011, G&W and Perrigo have been the only generic suppliers of Prochlorperazine. Throughout 2011 and 2012, G&W and Perrigo priced Prochlorperazine similarly and maintained a virtually even split of the market.

2786.    In mid-January 2013, Perrigo hired Boothe as an executive. On January 25, 2013, Orlofski called Boothe for the first time ever, according to the available phone records.

2787.   A little over one month later, on Friday, March 1, 2013, Boothe and Orlofski met for lunch at an Italian restaurant, Al Dente Ristorante, in Piscataway, New Jersey.

2788.   The next business day, on Monday, March 4, 2013, Orlofski met with Vogel-Baylor in his office at 1:00 p.m. Later that same day, Vogel-Baylor sent an internal email to M.S.2, a sales

analyst at G&W, asking her to run sales reports on Prochlorperazine in anticipation of a price increase. M.S.2 provided the requested information to Vogel- Baylor on March 5, 2013.

2789.   On March 7, 2013, Vogel-Baylor emailed Orlofski a price increase analysis for Prochlorperazine. Vogel-Baylor recommended increasing WAC pricing by 200 percent from $35.66 to $106.98.

2790.   On March 19, 2013, G&W implemented the 200 percent increase. That same day, Orlofski called Boothe. The two competitors would exchange two more phone calls later that day, including one call lasting six (6) minutes. These were the first calls exchanged between Orlofski and Boothe since their lunch on March 1, 2013, according to the available phone records. Orlofski and Boothe would exchange one text message and one more phone call in March 2013 and would not communicate by phone again until August 30, 2013, according to the available phone records.

2791.   On April 11, 2013, Perrigo announced it would also be increasing its WAC price for Prochlorperazine by 200 percent from $34.85 to $104.55. However, Perrigo waited to notify its customers of the specific changes to its contract pricing until after attending the NACDS 2013 annual meeting.

2792.   The NACDS 2013 annual meeting was held at the Sands Expo Convention Center in Palm Beach, Florida between April 20 and April 23, 2013. Boothe, Orlofski, and Vogel-Baylor attended the conference and had many opportunities to meet in person to discuss the Prochlorperazine increases at various programming and social events.

2793.   For example, on Sunday, April 21, 2013, Boothe and Orlofski had dinner together with W.S., a representative of Defendant Pfizer. That same evening, Boothe and Orlofski also attended a wine tasting hosted by Upsher-Smith. Also on Sunday, Vogel- Baylor told a potential GPO customer that G&W would need to understand who its incumbent supplier was for Prochlorperazine, among other drugs, before participating in a bid for new business.

2794.   Over the next several days, Perrigo sent out price increase notices to its customers for Prochlorperazine specifying its new contract pricing.

2795.   On May 7, 2013, Associated Pharmacies, a Perrigo customer, emailed C.M., a sales executive at G&W, asking for a bid on Prochlorperazine. C.M. declined to bid on the new business.

2796.   Although G&W turned away this business, a few months later it would take the customer back in retaliation against Perrigo for taking its Target business through McKesson's One Stop program. After trading these accounts, the competitors fell back in line with the agreement. By the fall of 2013, the Prochlorperazine Suppositories market was again virtually evenly split between Perrigo and G&W.

c)      Ciclopirox Solution

2797.   Ciclopirox Solution, also known by the brand names Penlac and Ciclodan, is an antifungal medication used to treat fungal infections of the fingernails and toenails.

2798.   As of January 2013, Perrigo and G&W were the two dominant suppliers of Ciclopirox Solution, with 46 percent and 41 percent share of the market, respectively. Sandoz had 7 percent share and the remaining 5 percent of the market was split among Hi-Tech, Harris Pharmaceutical, and Versapharm.

2799.   Between April 20 and April 23, 2013, representatives from Perrigo, G&W, and Sandoz attended the NACDS 2013 Annual Meeting in Palm Beach, Florida ("NACDS 2013"). During the conference, the attendees had many opportunities to interact with each other at various programming and social events.

2800.   Vogel-Baylor was among the attendees at NACDS 2013. Immediately upon returning from the conference, on April 24, 2013, Vogel-Baylor prepared a price increase analysis for Ciclopirox Solution and emailed it to Orlofski and R.G., a senior G&W executive. Vogel-Baylor proposed increasing WAC pricing by 132 percent, from $16.00 to $37.15. According to the analysis, the

increase would result in over $7.6 million in additional sales revenue to G&W annually. R.G. was excited at the prospect of this large price increase, replying to the email: "If this works, we'll be transforming a dog into a star."

2801.   The following Monday, April 29, 2013, Vogel-Baylor coordinated on the price increase with competitors Perrigo and Sandoz. Vogel-Baylor used CW-6 (then at Aurobindo) as a messenger to communicate with both T.P. of Perrigo and CW-3 of Sandoz. As discussed above, Vogel-Baylor often used CW-6 as a conduit to convey competitively sensitive information to competitors, even on products that Aurobindo did not sell.

2802.   As detailed further in the chart below, Vogel-Baylor had an early morning phone call with CW-6 on April 29, 2013 that lasted four (4) minutes. After that call ended, CW-6 immediately called T.P. and then CW-3. CW-6 and Vogel-Baylor, T.P., and CW-3 spoke at least nine times that day.

2803.   After the flurry of calls on April 29, 2013, Vogel-Baylor emailed J.G., an operations manager at G&W, advising him that she would know the next day whether G&W was going to be able to increase price on Ciclopirox Solution.

2804.   The phone calls between the competitors continued throughout the next day and on May 1, 2013, with at least six more calls. Also on April 30, CW-3 called his superior at Sandoz, Kellum, five times.

2805.   After her calls with CW-6 on May 1, 2013, Vogel-Baylor confirmed to J.G. that G&W would increase the price of Ciclopirox Solution and directed her sales team to start drafting price increase letters to customers.

2806.   On Tuesday, May 7, 2013, Vogel-Baylor and G&W sales representatives began informing customers about the price increases. Several customers noted that although the product was available from other manufacturers for a lower price, the customer would wait to see what the market did before making G&W a secondary supplier. One customer remarked that product pricing had gotten

575

too low and hoped that more manufacturers would increase pricing. Another customer thanked C.M., a G&W sales executive, for calling him about the price increase before sending the letter and C.M. responded: "I have gotten to be damn good at increasing prices. Practice makes perfect. LOL"

2807.   On May 8, 2013, Vogel-Baylor emailed her "BFF" L.S., an account manager at the customer Ahold, to tell her that G&W was implementing a price increase on Ciclopirox Solution. Ahold was not G&W's customer for the product. Vogel-Baylor wrote that L.S. should "keep [her] eyes out" as a price increase on this product from Ahold's supplier "may be coming."

2808.   By the end of the day on May 9, 2013, G&W's customer Rite Aid had sought a bid from Sandoz for Ciclopirox Solution as a result of the G&W price increase.

2809.   CW-4, a Sandoz senior sales executive, received Rite Aid's bid request and forwarded it to Kellum with the message "?". Kellum responded that the bid request was due to a price increase. C.P., a pricing analyst at Sandoz, asked whether Sandoz should bid for the business or "just leave it alone." Kellum replied, "[l]eave alone." Accordingly, Sandoz did not submit a bid for this business.

2810.   While G&W was in the midst of its price increase on Ciclopirox Solution, CW-6 left the industry and was no longer available to serve as a conduit between the competitors. Going forward, Vogel-Baylor would need to collude with T.P. directly and use him as a conduit to collude with CW-3 of Sandoz. On July 30, 2013, T.P. had a thirteen (13) minute call with CW-3 of Sandoz and exchanged five (5) phone calls with Vogel- Baylor.

2811.   That same day, Perrigo prepared price increase letters for Ciclopirox Solution. Two days later, on August 1, 2013, Perrigo raised its WAC pricing by 60 percent, from $15.00 to $24.00.

2812.   On August 5, 2013, Perrigo's customer Kroger reached out to Vogel-Baylor and asked if G&W would like to bid on Ciclopirox Solution. Vogel-Baylor declined the opportunity, explaining to the customer that it is currently a "4 player market" and G&W "has 45%."

2813.   Later in August, Versapharm, a small player with under 1 percent of the Ciclopirox Solution market, submitted a bid to Cardinal, a G&W customer. Cardinal reached out to Vogel-Baylor to ask G&W to lower its price. Vogel-Baylor wanted to keep the business but also thought, consistent with fair share principles, that she may need to give it up to Versapharm because of its low share. Vogel-Baylor asked Orlofski, her supervisor, for his direction on this. Orlofski decided G&W should retain the business, but should use the customer to convey a message to its competitor Versapharm explaining the fair share understanding and the rules of engagement between generic manufacturers:

> Erika,
>
> I really think we should hold the business. Perhaps Cardinal can pass along that Perrigo is the market share leader and Versapharm should go after one of their accounts. We will not let anything go.
>
> Kurt

2814.   Consistent with Orlofski's recommendation, Vogel-Baylor lowered Cardinal's price on Ciclopirox Solution to keep the customer and told Cardinal: "Perrigo is the market leader here so the bidder can get share from them!"

### d)      Hydrocortisone Acetate

2815.   Hydrocortisone Acetate Suppositories ("Hydrocortisone Acetate"), also known by the G&W brand name Anucort-HC, are used to treat itching or swelling caused by hemorrhoids as well as ulcerative colitis, proctitis, and other inflammatory conditions of the intestines, rectum, or anus. Hydrocortisone Acetate is a corticosteroid.

2816.   During the Relevant Time Period, Hydrocortisone Acetate was G&W's top-selling product. As of January 2016, the 25mg formulation of Hydrocortisone Acetate accounted for nearly half of all of G&W's moving annual sales, totaling more than $119.7 million. Similarly, Hydrocortisone Acetate was Perrigo's second-best selling product. During that same time period, Perrigo's moving annual sales for the 25mg and 30mg formulations accounted for approximately $78.3 million of Perrigo's total sales.

2817.  In 2013, the Hydrocortisone Acetate market was split between G&W with 41 percent market share, Perrigo with 32 percent, and County Line Pharmaceuticals ("County Line") with 25 percent. However, by late June 2013, County Line made the decision to exit the market for Hydrocortisone Acetate.

2818.  County Line's exit created an opportunity for Perrigo and G&W to collude to significantly raise the price of Hydrocortisone Acetate in July 2013, and then again one year later in July 2014.

2819.  On June 25, 2013, Vogel-Baylor of G&W emailed Walmart, a County Line customer, stating that she had heard that County Line was discontinuing Hydrocortisone Acetate and asked whether Walmart was interested in a new supplier.

2820.  Similarly, on June 26, 2013, ABC, also a County Line customer, emailed G&W requesting a bid on Hydrocortisone Acetate due to a "Supplier Discontinuation." Vogel-Baylor forwarded the request to her supervisor, Orlofski, explaining: "Anucort is listed on the ABC bid for the County Line discontinuation. I still haven't heard back from Walmart yet but this bid is due back this Friday. I am leaving for Vegas in the morning for the McKesson Trade Show through Saturday. I could always ask for an extension on this until next week if we think we need more time to see what is going on with the rest of the market. What are your thoughts?"

2821.  Between June 27 and June 30, 2013, representatives from Perrigo and G&W, including Vogel-Baylor, attended the annual trade show, McKesson ideaShare, at the Venetian hotel in Las Vegas, Nevada.

2822.  While at the trade show, on June 27, 2013, Vogel-Baylor received a call from S.S.3, a former sales executive at Perrigo. A few hours later, Vogel-Baylor called Orlofski and they spoke for nearly fifteen (15) minutes. Shortly thereafter, Vogel-Baylor sent an internal email to her team notifying them that G&W would be implementing a price increase for Hydrocortisone Acetate and

requesting that they draft customer notifications to that effect. The price increase included a 200 percent increase to WAC and would result in an estimated $27.9 million in increased sales for G&W.

2823.   J.G., an operations manager at G&W, responded to Vogel-Baylor's email stating, "I hear the Donald Trump theme song… Money, Money, Money…." to which Vogel-Baylor responded: "MONEY!!!!"

2824.   The next day, on June 28, 2013, Vogel-Baylor contacted Orlofski three more times from the trade show, including exchanging two (2) text messages and one call lasting more than nineteen (19) minutes.

2825.   On July 8, 2013, T.P. of Perrigo and Vogel-Baylor exchanged two (2) calls and then connected for a call lasting more than seven (7) minutes, during which they coordinated their price increases on Hydrocortisone Acetate. After that call, both T.P. of Perrigo and Vogel-Baylor reported the substance of their conversations back to their supervisors. Immediately upon hanging up with T.P., Vogel-Baylor called Orlofski and they spoke for more than six (6) minutes. Similarly, T.P. called Wesolowski three (3) times after speaking with Vogel- Baylor, including two calls lasting one (1) minute and a third lasting six (6) minutes.

2826.   The G&W price increases on Hydrocortisone Acetate went into effect on July 9, 2013. That same day, Perrigo issued a product announcement notifying its customers that it was also increasing its pricing on Hydrocortisone Acetate effective July 11, 2013. Perrigo increased its WAC by 473 percent on the 25mg formulation to essentially match G&W's WAC. That same day, July 11, 2013, T.P. of Perrigo called Vogel-Baylor.

2827.   Also on July 11, 2013, ABC emailed Vogel-Baylor asking G&W to lower its dead net pricing for Hydrocortisone Acetate to match Perrigo's slightly lower dead net pricing. Vogel-Baylor forwarded the request to Orlofski who responded: "Just say no!!!" Vogel-Baylor replied, "I will but it's painful!" Later that day, Vogel-Baylor responded to ABC and declined to lower its pricing.

2828.   On July 19, 2013, Harvard Drug Group emailed Vogel-Baylor asking why G&W was increasing its price on Hydrocortisone Acetate. Vogel-Baylor replied: "The only two players that are left are us and Perrigo. Perrigo only carries the 12 count, while we have the 12's, 24's, and 100 counts on this item. We initiated the price increase two weeks ago and we received word from our customers that Perrigo has followed."

2829.   Several months later, on April 9, 2014, K.K., a G&W sales executive, emailed Vogel-Baylor regarding bidding on several products at Kaiser, including Hydrocortisone Acetate. Vogel-Baylor responded that G&W could not disrupt the market and pursue the customer, reasoning that Kaiser "moved Anucort to Perrigo last summer. . .. We can do a onetime buy but we can't take the business back."

2830.   On June 11, 2014, Vogel-Baylor emailed Orlofski recommending that G&W increase McKesson's contract pricing for Hydrocortisone Acetate. That same day, Vogel-Baylor called T.P. of Perrigo. The call lasted less than one (1) minute. Two days later, on June 13, 2014, Vogel-Baylor tried to reach T.P. again by phone. The call lasted less than one (1) minute.

2831.   Less than a week later, on June 26, 2014, Perrigo generated its own internal price increase analysis for Hydrocortisone Acetate. The analysis assumed zero percent unit loss as a result of the planned increase—an assumption no one would make in a competitive market.

2832.   On July 22, 2014, Perrigo notified its customers that it was increasing pricing on a list of products, including Hydrocortisone Acetate. This included a 235 percent increase to WAC for its 25mg formulation, effective on July 24, 2014.

2833.   At the time the increase was announced, representatives from Perrigo and G&W, including Vogel-Baylor, attended the annual trade show, McKesson ideaShare, at the Gaylord Palms Hotel in Orlando, FL.

580

2834.   Over the next several days, G&W heard from multiple customers that Perrigo had increased pricing on Hydrocortisone Acetate.

2835.   In accordance with their ongoing understanding to follow each other's price increases, and consistent with past practice on this product and others, G&W went to work implementing a comparable price increase of its own.

2836.   On July 29 and July 30, 2014, Vogel-Baylor and Orlofski exchanged emails finalizing the details of the price increase for Hydrocortisone Acetate. The increase included an increase to WAC for the 25mg, 12 count bottle that essentially matched Perrigo pricing.

2837.   Also on July 30, 2014, Vogel-Baylor learned of pricing that Perrigo had offered to Schnucks and sent a text message to her superiors: "Perrigo gave Schnucks $101.91. Seems high for a small chain price. Not sure if they priced him high because he is our account."

2838.   The next day, on July 31, 2014, A.G., a senior G&W executive, emailed Vogel-Baylor stating: "Everyday of this increase is worth $200k to the company. I'm OK with the letters going out on Tuesday, but let's get the [price increase] letters out to our top 5 major customers tomorrow." Vogel-Baylor responded, "I can do that. The call to our customers is going to have to come from me since this is a big one. I will confirm with you tomorrow once this has been completed."

2839.   The next day, on August 1, 2014, G&W began notifying its customers of the price increase on Hydrocortisone Acetate. Vogel-Baylor sent an internal email advising the team that, "[a]s always . . . call the customer first, tell them that Perrigo did a price increase last week and we are following it. You can then send them the letter.      Has to go out TODAY!" G&W sent out a second wave of letters to additional customers on August 5, 2014.

2840.   The increase included a 200 percent increase to WAC for all three package sizes. According to an internal analysis, G&W projected an increase in Hydrocortisone Acetate sales from $41.3 million to $111.3 million as a result of the increase, or a total of $70 million in sales.

2841.  The two competitors continued to coordinate after the price increases. On August 11, 2014, T.P. of Perrigo called Vogel-Baylor and they spoke for more than sixteen (16) minutes. One week later, on August 18, 2014, Vogel-Baylor called T.P. and they spoke for more than ten (10) minutes.

2842.  Several customers did not react kindly to the increase. For example, when Vogel-Baylor emailed Econdisc to notify the customer of the price increase, Econdisc responded by stating that G&W's conduct was "[d]ownright getting criminal!!" Similarly, after learning of the increase, Schnucks sent the following email to Vogel-Baylor:



2)    Collusion Between G&W and Actavis

2843.  Vogel-Baylor met Rick Rogerson, a senior pricing executive at Defendant Actavis, while attending the NACDS Pharmacy and Technology Conference in Denver, Colorado, from August 25 to August 28, 2012.

2844.  After returning from the NACDS conference, Rogerson sent Vogel-Baylor an email on August 30, 2012, stating: "It was great to actually sit down and talk to you, we've said 'hi' at meetings for a couple years now! I was completely impressed by you and as I said before I am definitely part

of you[r] fan club now! If there is anything I can ever do to help you out please do not hesitate to call me. When you have time give me a call today to catch up on our conversation."

2845.   Later that same day, on August 30, 2012, Vogel-Baylor called Rogerson and they spoke for seventeen (17) minutes. Over the ensuing months, the two competitors stayed in regular contact and colluded to raise prices on Promethazine HCL Suppositories twice – once in late 2012 and again in 2013. The collusion on this product is discussed in detail below.

a)    <u>Promethazine HCL</u>

2846.   Promethazine HCL, also known by the brand name Promethegan, is an antihistamine that is used to treat some allergies, nausea, and vomiting. In late 2012 and early 2013, the competitors in the market for Promethazine HCL were Actavis, Perrigo, and G&W.

2847.   Starting in late August 2012, around the same time that Vogel-Baylor first met Rogerson at Actavis, G&W began planning a price increase for Promethazine HCL. Prior to implementing that increase, and as it had done on other products, G&W reached out to its competitors to coordinate plans.

2848.   On September 18, 2012, Vogel-Baylor sent an internal email to M.S.2, a sales analyst at G&W, asking her to prepare a spreadsheet containing Promethazine sales data for the price increase. That same day, Vogel-Baylor also responded to a request from her boss, Orlofski, asking who the incumbent manufacturers were for the major wholesalers. Vogel-Baylor stated that G&W was the incumbent at ABC and Cardinal and Actavis supplied McKesson. The next day, on September 19, 2012, Orlofski replied: "OK. That's right. Let's get ready then to go on Prometh 12.5 and 25."

2849.   Meanwhile, Vogel-Baylor was actively communicating with Rogerson of Actavis regarding the increases. Indeed, on September 18, 2012 alone, Vogel-Baylor exchanged thirty-four (34) text messages with Rogerson.

583

2850.   Similarly, on September 19, 2012, Vogel-Baylor used her contact at Aurobindo, CW-6, as a conduit to communicate with T.P. of Perrigo, the other competitor on Promethazine HCL. The two texted or called each other eight times that day. After speaking with CW-6 for the final time on September 19, 2012, Vogel-Baylor immediately called her boss, Orlofski, and spoke to him for thirteen (13) minutes.

2851.   While Vogel-Baylor was communicating with T.P. of Perrigo through her contact CW-6, T.P. was also communicating directly with M.D., a sales executive at Actavis, and reporting that information back to his superior, Wesolowski.

2852.   Over the next week, G&W worked to finalize its price increase for Promethazine HCL. On September 21, 2012, Vogel-Baylor forwarded her initial price increase analysis to Orlofski and scheduled a one-on-one meeting to discuss it on September 24, 2012. Two days later, on September 26, 2012, Vogel-Baylor emailed a revised price increase analysis to Orlofski and, after obtaining his approval, emailed that analysis to the team on September 28, 2012. In her email, Vogel-Baylor informed the team that they were to send out their price increase notices to customers on October 5, 2012.

2853.   Throughout this time period, Vogel-Baylor stayed in constant communication with Rogerson at Actavis. For example, between September 25, 2012 and October 5, 2012, the day the price increase notices were sent, Vogel-Baylor exchanged thirty-eight (38) text messages with Rogerson. Similarly, Vogel-Baylor continued to keep T.P. of Perrigo informed of G&W's plans through her conduit CW-6.

2854.   On October 8, 2012, G&W published increased WAC pricing for Promethazine HCL, which included an 18 percent increase on the 25mg dosage and a 35 percent increase on the 12.5mg dosage.

2855.   Perrigo followed suit on December 4, 2012, when it notified customers that it would be increasing contract pricing on Promethazine HCL effective January 5, 2013. Similarly, on February 12, 2013 and April 3, 2013, Actavis also followed and increased its WAC pricing to match G&W on the 12.5mg and 25mg dosages, respectively. On February 12, 2013, Rogerson called Vogel-Baylor and they spoke for nearly twenty-two (22) minutes.

2856.   The competitors were not satisfied to stop there, however. Knowing now that all three competitors were on board to increase prices, they began contemplating a second increase on Promethazine HCL – and this time, it would be much larger.

2857.   On March 25, 2013, M.S.2, a sales analyst at G&W, forwarded Vogel- Baylor updated sales data for Promethazine HCL. That same day, Orlofski of G&W sent a text message to Boothe, an executive at Perrigo. The next day, on March 26, 2013, Boothe called Orlofski back and they spoke for six (6) minutes. Similarly, Vogel-Baylor continued to communicate with T.P. of Perrigo through her conduit, CW-6, about Promethazine HCL.

2858.   On March 28, 2013, Vogel-Baylor finalized a price increase analysis for Promethazine HCL and, on April 1, 2013, she forwarded that information to Orlofski. Vogel-Baylor and Orlofski discussed some revisions to the analysis and, on April 10, 2013, Vogel-Baylor sent the revised analysis to Orlofski. G&W planned to implement the price increase on April 15, 2013, but ultimately sent the notices on April 16, 2013.

2859.   Meanwhile, all three competitors continued to coordinate their plans on Promethazine HCL. Vogel-Baylor of G&W was speaking with Rogerson at Actavis, while T.P. at Perrigo was speaking to M.D. at Actavis. At the same time, Vogel-Baylor continued to use CW-6 as a conduit to communicate with T.P. of Perrigo regarding Promethazine HCL.

2860.   According to the plan, on April 17, 2013 G&W published new WAC pricing for Promethazine HCL, increasing WAC from $38.99 to $116.97, an approximately 200 percent increase.

2861.  Around the time of the increase, G&W received an email from a potential new customer seeking pricing on a list of products, including Promethazine HCL. M.S.2 forwarded the request to Vogel-Baylor who responded, "tell him that we are not able to bid on these items at this time, and that they are strategic products for us so we would need to know who he is currently buying from before we would bid."

2862.  A few weeks later, Actavis followed G&W's price increase on Promethazine HCL and, on June 5, 2013, published WAC pricing that matched G&W. Prior to increasing its price, and as it had now done several times before, Actavis spoke with both G&W and Perrigo.

2863.  On June 26, 2013, Vogel-Baylor emailed Orlofski to advise him that G&W had received Cardinal's 2013 RFP. Vogel-Baylor explained, "[w]e are primary on Promethazine. If Perrigo does not follow the increase soon, we might have an issue. We are only going to bid the items we are Primary on. Our goal is to maintain what we have. We will not bid on items that we are not the current incumbent on." The next day, Vogel- Baylor received a short phone call from S.S.3, a former sales executive at Perrigo. Several hours later, Vogel-Baylor placed a phone call to Orlofski.

2864.  G&W had no reason to fear because a few weeks later, on July 30, 2013, Perrigo notified its customers that it was increasing price on a list of products, including Promethazine HCL, with an effective date of August 1, 2013. This included an increase to its WAC pricing that matched G&W and Actavis. In the days leading up to Perrigo's price increase, the three competitors again spoke at least nine times by phone.

2865.  Several months later, the collusion continued on Promethazine HCL. On March 5, 2014, K.K., a G&W sales executive, informed Vogel-Baylor that Walgreens had received an offer from Actavis for a one time buy on the 25mg dosage at a significantly discounted price of $42.08. G&W would later learn that Actavis had made the offer because it had an excess of short-dated

inventory on the 25mg dosage. This information stunned Vogel-Baylor, who asked "Jesus…. Did he tell you what qty?"

2866.  Despite her initial surprise, Vogel-Baylor confidently reported to Orlofski: "I will tell you more about this when we speak next, however, I will make sure that this deal does not happen." To make good on her promise, Vogel-Baylor placed a call to Rogerson fifteen (15) minutes later. The two competitors continued to trade phone calls over the next several days, including a call on March 6, 2014 that lasted eleven (11) minutes.

2867.  Apparently, Vogel-Baylor's communications with Rogerson did yield a solution to her problem. On March 18, 2014, she emailed Walgreens to advise the customer that G&W lowered its price on Promethazine HCL. Aware that the details of her interactions with Rogerson would be incriminating if reduced to writing, Vogel-Baylor offered only a vague statement to the customer: "Will tell you why and story next time we speak."

2868.  Over the next several months, G&W would continue to decline to bid on new opportunities for Promethazine HCL so as not to upset the market share balance it had achieved with its competitors.

2869.  For example, on May 5, 2014, L.C.2, a sales executive at G&W, summed up G&W's commitment to playing nice in the sandbox when she told a customer, PBA Health, that she wanted to identify opportunities for Promethazine HCL (and other drugs) only if she could do so "without creating too much of a stir." Similarly, on May 30, 2014, Vogel-Baylor instructed M.S.2 not to bid on the Promethazine HCL business at another customer, IPC, because "we hold the majority of the share in the market and we do not want to upset things." Further, on August 8, 2014, Vogel-Baylor told K.K. that prior to bidding on Promethazine HCL at Humana, G&W would need to know who the incumbent was and whether there was a right of first refusal reasoning it was "not worth pissing someone off for that volume."

587

2870.  Lastly, on August 25, 2014, McKesson, an Actavis customer, emailed K.K. asking if G&W would like to bid on Promethazine HCL. K.K. knew that G&W would not bid, but in an effort to get the story straight, asked Vogel-Baylor if he should provide the pre-textual justification that G&W was at capacity. Vogel-Baylor approved that messaging in a response on August 28, 2014 stating: "Yes, I would say we have the bulk of the market share and can't take on anymore from a capacity standpoint."

### 3)    Collusion Between G&W and Glenmark

2871.  As detailed above in an earlier section, Vogel-Baylor of G&W had a long- standing relationship with CW-5, a senior executive at Defendant Glenmark, and the competitors used that relationship to fix prices on Ciclopirox Cream in April 2012.

2872.  One year later, on May 16, 2013, Glenmark increased pricing on at least eighteen (18) different products, including Ciclopirox Cream and various formulations of Mometasone Furoate that were also manufactured by G&W. The anticompetitive conduct relating to those products is discussed in further detail below.

### a)    Ciclopirox Cream and Mometasone Furoate

2873.  Ciclopirox Olamine Cream, also known by the brand name Loprox, is an antifungal medicine that prevents fungus from growing on your skin. Ciclopirox Cream is used to treat skin infections such as athlete's foot and ringworm.

2874.  As of May 2013, the primary competitors for Ciclopirox Cream were Glenmark with 44 percent market share, Perrigo with 38 percent, and G&W with 16 percent.

2875.  Mometasone Furoate ("Mometasone"), also known by the brand name Elocon, is a medium-strength corticosteroid used to treat skin conditions such as eczema, psoriasis, allergies, and rashes. Mometasone is available in several forms, including cream, ointment, and solution.

2876.  As of May 2013, the same three competitors—Glenmark, Perrigo, and G&W—controlled a majority of the market share on the various formulations of Mometasone.

2877.  Beginning as early as May 2, 2013, Glenmark began communicating with its competitors, including G&W, to coordinate its May 2013 price increases. Over the next two weeks, Vogel-Balor of G&W called or texted CW-5 and Jim Brown, a senior sales executive at Glenmark, at least fifteen times, during which they discussed and agreed to increase prices on Ciclopirox Cream and the various formulations of Mometasone. Notably, prior to these calls, Vogel-Baylor had never spoken to Brown before, according to the available phone records.

2878.  Similarly, Vogel-Baylor, as she had done in the past, used her contact, CW-6, then at Aurobindo, to communicate with T.P. of Perrigo regarding the increases. Vogel- Baylor and CW-6 texted or called at least seventeen times on one day—May 3—alone. CW-6, in turn, communicated with T.P. at Perrigo several times that same day. As discussed above, CW-6 had formerly worked at Fougera and developed relationships with Vogel-Baylor and T.P. of Perrigo during his tenure there. At this time, G&W and Aurobindo had no products that overlapped and CW-6 and Vogel-Baylor were not social friends.

2879.  As a result of these conversations, Glenmark increased prices on Ciclopirox Cream and Mometasone Cream, Ointment, and Solution on May 16, 2013. Soon thereafter, G&W would follow with comparable increases of its own on Ciclopirox Cream and the various formulations of Mometasone and Perrigo would follow with an increase on Ciclopirox Cream.

2880.  Over the next several weeks, G&W consistently declined opportunities to reduce pricing on the various formulations of Mometasone so as not to take advantage of the Glenmark price increases.

2881.  For example, on May 15, 2013—the day before the Glenmark price increases would become effective and publicly visible—C.M., a G&W sales executive, emailed Vogel- Baylor to

inform her that ANDA was requesting decreased pricing on several products because the prices were higher than their competitors. The list included Mometasone Solution and listed Glenmark's pre-increase pricing for Cardinal as the comparison price point. Knowing that Glenmark was increasing pricing on this product, Vogel-Baylor advised C.M. that G&W would not lower its pricing.

2882.   Similarly, on May 17, 2013, the day after the Glenmark increases became effective, McKesson sent G&W a request for a bid on Mometasone Ointment because it "recently received a price increase from our incumbent." Vogel-Baylor asked the customer who its incumbent was, and McKesson responded that it was Glenmark. Immediately upon receiving this response, Vogel-Baylor called CW-5 of Glenmark. The call lasted less than one (1) minute. She then hung up and called Brown of Glenmark. That call lasted less than one (1) minute. Fifteen minutes later, Brown called Vogel-Baylor back and they spoke for twelve (12) minutes. Later that day, Vogel-Baylor responded to McKesson and declined the opportunity, stating "[w]e do not have the capacity to add your volume in our plant. I really wish we could handle it."

2883.   The next business day, on May 20, 2013, C.M. emailed Vogel-Baylor asking, "[w]hat's going on with the Mometasone Ointment? I have not heard but Walgreens just contacted me looking for pricing and I saw Kurt's message." Vogel-Baylor responded by sending the following email to C.M. and others on the sales team, saying that she planned to follow Glenmark's' recent price increase in the next week or two.

2884.   Later that day, ANDA emailed C.M. asking if G&W was interested in bidding on Ciclopirox Cream. Because G&W had slightly less than its fair share of the Ciclopirox Cream market, C.M. responded: "Perhaps. Glenmark is raising prices. What's the usage?" ANDA provided the usage information and, the next day, on May 22, 2013, C.M. forwarded the request to Vogel-Baylor, along with some additional bid requests it had received from other customers on other products. With regard to Ciclopirox Cream, C.M. stated: "In all the pricing scenarios that are going on, we have the

following opportunities that I wanted to run by you for comments: ANDA- No ROFR on this – Ciclopirox Cream – Incumbent Glenmark." Vogel-Baylor responded: "Great! We are definitely going to bid Ciclo Cream at Anda. I am working on our price increase on my flight home this afternoon so I will have pricing to present to them by tomorrow."

2885.   On May 23, 2013, Vogel-Baylor emailed price increase analyses for Ciclopirox Cream and the Mometasone line to her supervisor, Orlofski. The next day, May 24, 2013, Vogel-Baylor called CW-5 at Glenmark twice. The calls lasted less than one (1) minute each.

2886.   On May 29, 2013, Vogel-Baylor exchanged five (5) calls with CW-5 and Brown of Glenmark. That same day, G&W finalized its price increase notifications for Ciclopirox Cream to send to its customers, including Publix and Walmart. Vogel-Baylor sent an internal email to the team stating: "By now you should have your Ciclopirox price increase letters for your customers. Please call your customers right away and tell them that Glenmark initiated this increase, and Perrigo has since followed. We are now going to follow the increase as well. Please make sure all of your calls and letters are sent today. Please confirm back to me once you have completed this."

2887.   Also on May 29, 2013, Target emailed C.M. of G&W stating that the customer had received a 250 percent price increase on another drug, Halobetasol, and asking whether C.M. could provide any insight into why. C.M. responded, "This is simply a case where one manufacturer raised their price and other suppliers followed. A lot of creams and ointments are going up. Look for Ciclopirox Cream and Mometasone to go up in the coming days."

2888.   On May 30 and May 31, 2013, Brown called Vogel-Baylor twice. The calls lasted four (4) minutes and less than one (1) minute, respectively.

2889.   On June 4, 2013, G&W sent price increase notifications to its customers regarding the various Mometasone formulations. That same day, Vogel-Baylor called Brown. The call lasted less than one (1) minute.

2890.  On June 5, 2013, Pharmacy Select emailed C.M. regarding the notification and asked him to provide new WAC pricing for the Mometasone line of products. C.M. forwarded the request to Vogel-Baylor asking, "[a]re there new WAC's on these?" Vogel- Baylor responded, "No only on the solution. Glenmark did not raise WACs so we can't."

2891.  G&W and Glenmark continued to coordinate even after their price increases. For example, on June 5, 2013, Rite Aid, a G&W customer for Mometasone, asked Glenmark whether it wanted to bid for the business because G&W had increased price. The next day, on June 6, 2013, Brown of Glenmark called Vogel-Baylor and they spoke for six (6) minutes. On June 7, 2013, Vogel-Baylor called Brown back. The call lasted less than one (1) minute. That same day, CW-5 emailed his colleagues Brown and Blashinsky regarding the Rite Aid opportunity stating "[w]e don't want this. Bid high." Brown responded: "I was aware this was coming. I'm on it."

2892.  After preparing the bid for Rite Aid, Brown emailed CW-5 and Blashinsky on Saturday, June 8, 2013 stating: "I will confirm that it is high enough, but I am sure it is." The following Monday, on June 10, 2013, Brown called Vogel-Baylor. Vogel-Baylor returned the call and they spoke for more than six (6) minutes. Within ten (10) minutes of hanging up, and having confirmed the pricing with his competitor, Brown emailed his colleagues with specific price points that Glenmark should use to bid high and not take the Rite Aid business from G&W.

4)      Collusion Between G&W and Lupin

2893.  Orlofski of G&W had a long-standing relationship with David Berthold, a senior sales executive at Defendant Lupin. Indeed, as detailed above, it was Berthold who introduced Orlofski and Vogel-Baylor to CW-6 of Fougera. This connection allowed G&W and Fougera to continue their collusive relationship even after CW-6's contact, Grauso, had left G&W to take a senior position at Aurobindo.

2894.   Notably, G&W and Lupin only overlapped on one product – Ethambutol HCL Tablets – during the Relevant Time Period. However, that did not stop the competitors from using their relationship to collude on that product. This collusion is discussed in further detail below.

a)    <u>Ethambutol HCL Tablets</u>

2895.   Ethambutol HCL Tablets ("Ethambutol"), also known by the brand name Myambutol, is a drug used to treat tuberculosis. In 2012, G&W marketed the authorized generic of Ethambutol for the manufacturer, STI Pharma ("STI"), and Lupin, Versapharm, and Teva sold the generic version.

2896.   By late 2012 and early 2013, however, both Versapharm and Teva were experiencing supply issues on Ethambutol. Viewing this as an opportunity, Lupin and G&W colluded to significantly raise price on the product while their competitors were out of the market.

2897.   In November and December 2012, Orlofski and Vogel-Baylor of G&W exchanged several calls with David Berthold of Lupin to discuss Ethambutol. At the same time, Berthold was keeping Kevin Green, a sales executive at Teva, apprised of his discussions with G&W.

2898.   For example, on November 15, 2012, Orlofski exchanged at least eight (8) text messages with Berthold. The next day, on November 16, 2012, Orlofski and Berthold spoke for nearly twelve (12) minutes. Shortly thereafter, Berthold spoke three separate times with Green, with the calls lasting five (5) minutes, ten (10) minutes, and five (5) minutes, respectively.

2899.   That same day, G&W reached out to several Versapharm customers, including Econdisc, HealthTrust, and FW Kerr, to inquire whether they were interested in a new supplier for Ethambutol due to Versapharm's supply issues.

2900.   From November 18 through December 9, Berthold sent over twenty calls and text messages to Vogel-Baylor and Orlofski during which they discussed a coordinated price increase on Ethambutol.

2901.  On December 9, 2012, J.G.2, a finance executive at Lupin, emailed Berthold at 3:41 p.m. stating: "Here are the most recent documents for the price increase on Ethambutol that we would like to communicate by this Friday or next Monday." Three minutes later, at 3:44 p.m., Berthold called Orlofski. The call lasted less than one (1) minute. The next day, on December 11, 2012, Berthold called Vogel-Baylor and they spoke for nearly six (6) minutes. A short time later, Orlofski sent a text message to Berthold and the two competitors exchanged two (2) more calls that day, including one lasting nearly six (6) minutes.

2902.  On December 17, 2012, K.W., a Lupin sales executive, sent an internal email including to Berthold, attaching the price increase letters for Ethambutol that Lupin planned to send on December 18, 2012. Between December 17, 2012 and December 19, 2012, Berthold again exchanged at last fifteen calls and text messages with Orlofski and Vogel-Baylor.

2903.  On January 2, 2013, Orlofski emailed Vogel-Baylor suggesting that they discuss the Ethambutol price increase during their meeting scheduled for the next day. That same day, Vogel-Baylor called Berthold and they spoke for eleven (11) minutes. Later that evening, Vogel- Baylor emailed Orlofski a price increase analysis for Ethambutol.

2904.  The next day, January 3, 2013, a customer, HEB, emailed C.M., a sales executive at G&W, to advise him that Versapharm was out of the market. C.M. responded that he was aware and stated: "Between us . . . we are going to do a price increase on it." That same day, Vogel-Baylor exchanged at least four (4) calls with Berthold, including one lasting more than four (4) minutes.

2905.  On January 14, 2013, another customer, Morris & Dickson, emailed Lupin asking for a bid on Ethambutol. The customer explained that both Versapharm and Teva were having supply issues. That same day, Orlofski sent a text message to Berthold. Berthold also called Green of Teva and they spoke for nine (9) minutes.

2906.  On January 28, 2013, the manufacturer of G&W's authorized generic, STI, emailed Vogel-Baylor to inform her that it would be shipping Ethambutol to G&W the following day stating: "ETA would be Wednesday – but under quarantine." Vogel-Baylor then forwarded the email to Orlofski as an "FYI only." Later that day, Vogel-Baylor sent her Ethambutol price increase analysis to the sales team and asked them to draft letters to their customers advising them of the increases. The next day, on January 29, 2014, Orlofski sent a text message to Berthold and Berthold spoke two times with Green of Teva by phone, with calls lasting three (3) minutes and more than five (5) minutes, respectively.

2907.  On January 31, 2013, Vogel-Baylor called Berthold and they spoke for three (3) minutes. The next day, on February 1, 2013, Vogel-Baylor called Berthold again. Berthold returned the call and they spoke for five (5) minutes. The following Monday, on February 4, 2013, Vogel-Baylor emailed Orlofski to inform him that G&W planned to send the Ethambutol price increase letters on February 7, 2013 and would call customers in advance to advise that they would be coming.

2908.  Consistent with the plan, on February 6, 2013, G&W reached out to its customers to advise them of the Ethambutol increases. As Vogel-Baylor explained in her email to Walmart: "There are only 2 players currently in the market – Lupin and us. Lupin did a price increase in the beginning of January 2013. We are increasing our price so that it is market competitive."

2909.  Berthold continued to communicate with Orlofski and Vogel-Baylor over the next several weeks. For example, on February 19, 2013, Vogel-Baylor and Berthold had a joint dinner with representatives from two customers, ABC and Kroger.

2910.  On April 1, 2013, STI began notifying customers that it was terminating its relationship with G&W regarding Ethambutol. STI advised that it would be taking over the marketing and distribution of the product effective April 15, 2013. Between April 2, 2013 and April 15, 2013, Berthold exchanged at last nineteen text messages and phone calls with Orlofski and Vogel-Baylor.

2911.  Notably, after April 15, 2013, Berthold and Vogel-Baylor would never communicate by phone again, according to the phone records acquired by the State AGs.

        d.    The Defendants' Profitability Increases Dramatically as a Result of the Collusive Conduct

2912.  As discussed more fully above, between 2009 and early 2016, the Defendants colluded to allocate markets and raise prices on at least 80 different generic drugs. The impact of this anticompetitive conduct on the Defendants' profitability was dramatic.

        i.    Co-Conspirator Taro and Defendant Perrigo's Profits Increase Over 1300 percent

2913.  Both Taro and Perrigo's Prescription (Rx) Pharmaceuticals segment saw profits increase over 1300 percent between 2008 and early 2016. Taro often led price increases and Perrigo's Prescription (Rx) Pharmaceuticals segment reported revenues and profits for generic dermatology drugs disaggregated from other operations. Accordingly, the profits of these two companies are instructive in showing the dramatic profits the Defendants made from their collusive conduct.

        1)    Co-conspirator Taro

2914.  By early 2016, Taro's operating income was 1303 percent, or more than thirteen (13) times, higher than it was in 2008. Similarly, in 2016, Taro's net income was 1673 percent, or more than sixteen (16) times higher than it was in 2008. Indeed, in 2016, Taro's net sales revenue reached nearly $1 billion, which was $600 million more than it made in 2008.

2915.  The graph below shows Taro's consistent financial growth from 2008 through early 2016 and highlights how the timing dovetails with Taro's price increases on products at issue in this Complaint.[31]

---

[31] With respect to the two footnotes in the below graphic, as discussed in earlier sections of this Complaint, in May 2013 Taro raised its prices on 12 products, and in June 2014 Taro raised its prices on 17 products.



2916.  As depicted above, as Taro increased prices, its profits increased. Indeed, consistent with the allegations in the Complaint, Taro's profits grew steadily from 2010 through 2011, during the early days of collusion, and then increased exponentially from late 2012 through 2015 when price increases intensified across the industry.

### 2)    Defendant Perrigo

2917.  Perrigo's profits also grew significantly as a result of its collusive conduct.

2918.  As noted above, this analysis focuses on the profits of Perrigo's Prescription (Rx) Pharmaceuticals segment, which covers its U.S. generic drug sales, with a strong focus on extended topicals.

2919.  In its fiscal year 2015, Perrigo's Prescription (Rx) Pharmaceuticals segment's operating income was 1648 percent, or over sixteen (16) times, higher than it was in 2008. The

597

segment's net sales revenue was just over $1 billion in 2015, which was over $800 million more than it made in 2008.

2920.   Perrigo's Prescription (Rx) Pharmaceuticals segment was the growth driver for Perrigo during this time period. Perrigo's other operations grew much slower by comparison. While the segment's operating income grew 1648 percent, Perrigo's operating income for all its operations when combined grew only 278 percent. Similarly, while the segment's net sales revenue grew 521 percent, Perrigo's net sales revenue for all its operations when combined was only 153 percent.

2921.   The graph below shows Perrigo's consistent financial growth from 2008 through 2015 and highlights how the timing dovetails with Perrigo's price increases on products at issue in this Complaint.[32]



---

[32] With respect to the two footnotes in the graphic below, as discussed in earlier sections of this complaint, on July 24, 2014, Perrigo increased its prices on Econazole Nitrate Cream, Hydrocortisone Acetate Suppositories, and Hydrocortisone Valerate Cream. On August 1, 2013, Perrigo increased it prices on Ciclopirox Solution, Hydrocortisone Valerate Cream, and Promethazine HCL Tablets.

2922.  As depicted above, as Perrigo increased prices, the company profited handsomely. Further, and consistent with Taro's financial picture, Perrigo's profits from generic drug sales grew steadily during the early days of collusion, between 2010 and 2011, and then accelerated around 2012 when the industry began to focus more intensely on price increases.

**5.    Other Defendants' Revenues and Profits Also Multiply**

2923.  The other Defendants also profited from their collusive conduct. For example, G&W and Actavis's revenues multiplied as their focus on price increases intensified. G&W's sales tripled from 2011 to 2014, increasing by over 30 percent each year during that period. In 2014, G&W's revenue from sales, at over $290 million, broke $200 million for the first time ever.

2924.  Similarly, Actavis's global generics business saw its revenues grow between 2008 and 2013 from just over $1.4 billion to approximately $6.35 billion. Over that same time period, the company's profits from its generics business also grew from $416 million in 2008 to nearly $2 billion in 2013.

2925.  Defendants Fougera and Sandoz also profited from their collusive conduct. In 2010 and 2011, during the early days of collusion, and prior to its acquisition by Sandoz, Fougera had gross profits of approximately $217 million and $304 million, respectively. Similarly, in 2010, Sandoz had over $1 billion of operating income and, in 2011, the company reported the highest operating income in its history at that time, just over $1.4 billion.

2926.  After acquiring Fougera, Sandoz's sales in the United States rose steadily each year from 2012, which had sales of over $2.7 billion, through 2016, when sales reached $3.7 billion. Sandoz's operating income continued to exceed $1 billion each year during this period and, following years of collusive activity, in 2016 Sandoz's operating income exceeded the 2011 record and reached approximately $1.45 billion, the highest in Sandoz's history to date.

2927.  Sandoz executives wrote about the significant positive impact that the Fougera business had on Sandoz's profits. For example, Sandoz noted in internal documents that "a strong contribution from Fougera" was a driver of US sales growth in 2013, in October 2014 the Fougera team "delivered a record month for 2014 so far", and in 2015 "[o]ur growth was mainly driven by Fougera, Biopharm and Oncology."

**F.    Additional Anticompetitive Behavior Captured by the Private Complaints**

2928.  In addition to the voluminous allegations of unlawful conduct in the three State AG Complaints, various private parties have sought recovery from Defendants based on the same "fair share" conspiracy for anticompetitive price fixing, bid rigging, and/or market allocation for generic drugs not covered by the States' Actions.

2929.  As with the generic drugs specifically identified in the State AG Complaints, Defendants utilized the overarching "fair share" conspiracy to illegally allocate the markets and increase prices for the additional generic drugs identified below, all of which caused Walmart to pay supra-competitive prices.

2930.  For example, Lannett's net sales increased from approximately $274 million in 2014 to approximately $407 million in 2015, an increase of 49 percent. Product price increases contributed $157.3 million to the overall increase in net sales, partially offset by decreased volumes of $24.2 million.

2931.  Similarly, Taro's profits increased dramatically as a result of its price increases, especially on Clobetasol Propionate Lotion. Indeed, in a September 2016 report, Harith Ahamed and Krishna Kiran Konduri of Spark Capital Advisors noted that "[p]rice increases across [Taro's] derma portfolio has been a key driver for Taro's strong performance in recent years" with Clobetasol Propionate (in all of its forms) accounting for approximately "11% of sales in FY2016" after having "witnessed price increases of >12x between 2013 and 2015."

1.    **Albuterol**

2932.   Albuterol, which is also known by the brand names Accuneb, Proair, Proventil, Ventolin, and Vospire, is an inhalant that is used to prevent wheezing, coughing, and breathing difficult caused by asthma and chronic obstructive pulmonary disease ("COPD"). Albuterol has been available in the United States for over 25 years and is considered by the World Health Organization ("WHO") to be an essential medicine.

2933.   During the Relevant Time Period, both Mylan and Sun manufactured and sold Albuterol. Sun had its ANDA for albuterol approved by the FDA on or about December 1989 and Mylan followed with its ANDA being approved on or about January 1991. Mylan and Sun dominate the generic market for Albuterol.

2934.   For years, the Defendants' average price in the United States for Albuterol was stable, but it began rising abruptly—and in concert with one another—beginning in March 2013. On March 6, 2013, Mylan increased its WAC pricing for 100mg Albuterol 4317 percent and its pricing for 500mg Albuterol 4549 percent. Approximately a month later, on April 15, 2013, Sun increased its WAC pricing for 100mg Albuterol 3485 percent and its pricing for 500mg Albuterol 3674 percent:

| Product 2 mg | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100 ct | Mylan | 00378025501 | $0.13 | $5.88 | 6-Mar-13 | 4,317% |
| 500 ct | Mylan | 00378025505 | $0.13 | $5.88 | 6-Mar-13 | 4,549% |
| 100 ct | Sun | 53489017601 | $0.13 | $4.70 | 15-Apr-13 | 3,485% |
| 500 ct | Sun | 53489017605 | $0.12 | $4.70 | 15-Apr-13 | 3,674% |

2935.   There were no legitimate market reasons for these unprecedented and dramatic price increases. Demand for Albuterol has not materially changed between 2010 and the present, nor does any change in input costs explain these price increases. There were no known raw material shortages that would have constrained Defendants' ability to supply the market, either.

601

2936.   What there was, however, in advance of the supra-competitive price increases, was a series of communications between representatives for Mylan and Sun, including an in-person meeting at the 2012 GPhA Technical Conference in Bethesda, Maryland from October 1-3, 2012. On information and belief, it was during this series of communications that Mylan and Sun agreed to increase pricing and restrain competition for the sale of Albuterol in the United States.

2937.   After Albuterol's price was increased by both Sun and Mylan by over 30x and 40x the original WAC pricing, Mylan and Sun continued to meet and coordinate the supra-competitive pricing of Albuterol at a variety of industry meetings and events, including, but not limited to the following:

- April 20-23, 2013: NACDS Annual Meeting in Palm Beach, FL;
- June 2-5, 2013: HDMA Business and Leadership Conference in Orlando, FL;
- August 10-13, 2013: NACDS Total Store Expo in Las Vegas, NV;
- February 19-21, 2014: GPhA Annual Meeting in Orlando, FL;
- April 26-29, 2014: NACDS Annual Meeting in Scottsdale, AZ;
- June 1-4, 2014: HDMA Business and Leadership Conference in Phoenix, AZ;
- June 3-4, 2014: GPhA CMC Workshop in Bethesda, MD;
- August 23-26, 2014: NACDS Total Store Expo in Boston, MA:;
- October 27-29, 2014: GPhA Fall Technical Conference in Bethesda, MD;
- February 9-11, 2015: GPhA Annual Meeting in Miami, FL;
- April 14, 2015: HDMA 7th Annual CEO Roundtable Fundraiser in New York, NY;
- April 25-28, 2015: NACDS Annual Meeting in Palm Beach, FL;
- June 7-10, 2015: HDMA Business and Leadership Conference in San Antonio, TX;
- June 9-10, 2015: GPhA CMC Workout in Bethesda, MD;
- August 22-25, 2015: NACDS Total Store Expo in Denver, CO;
- April 12, 2016: HDMA 8th Annual CEO Roundtable Fundraiser in New York, NY;
- April 16-19, 2016: NACDS Annual Meeting in Palm Beach, FL;
- June 12-16, 2016: HDMA Business and Leadership Conference in Colorado Springs, CO; and
- August 6-9, 2016: NACDS Total Store Expo in Boston, MA.

2938.   Mylan and Sun representatives continued to attend trade association meetings and events, and to otherwise meet and coordinate regarding the pricing of Albuterol after 2016.

2939.   As a result of Defendants' and Co-conspirators' coordination and conspiracy, Defendants were able to charge Walmart supra-competitive prices for Albuterol in the United States.

2.    **Allopurinol**

2940.    Allopurinol, also known by the brand name Zyloprim, is a xanthine oxidase inhibitor used to treat gout and kidney stones. During the Relevant Time Period, Actavis, Dr. Reddy's, Mylan, and Par were the primary generic manufacturers of Allopurinol.

2941.    Prior to 2014, Par, Actavis, Dr. Reddy's and Mylan all offered prices for Allopurinol for pennies per pill—indeed, even when Dr. Reddy's exited the market in 2012, prices from the other manufacturers remained low and stable.

2942.    In the spring of 2014, Par and Actavis used brief supply disruptions for Allopurinol as a pretext for enormous price increases. Actavis announced a WAC price increase of approximately 400 percent (or 4x), and Qualitest followed with a price increase slightly higher than that of Actavis; their contract prices for Allopurinol also increased. Approximately six months after Actavis and Qualitest announced their price increases, Mylan joined them by announcing raising prices to the same level as Actavis.

2943.    In August 2014, as Dr. Reddy's evaluated a possible re-entry into the Allopurinol market, frequent and significant communication between senior sales executives from each of the Defendants occurred. Mark Falkin of Actavis spoke with Nesta of Mylan twice on September 23, 2014, four days after Actavis announced its WAC price increases on Allopurinol. Falkin also communicated with a Senior Director of National Accounts at Dr. Reddy's on September 4, 12, 15, 22, and 23, 2014.

2944.    On September 26, 2014, a week after Actavis's price increase, Actavis's Vice President of Sales spoke to Qualitest's Vice President of National Accounts for fourteen minutes and thirty-five seconds. Several days later, Par announced WAC prices for Allopurinol that were even higher than those of Actavis.

2945.  Ultimately, Dr. Reddy's re-entered the Allopurinol market in January 2015 and announced WAC prices identical to Actavis. Even as Dr. Reddy's sought to add Allopurinol market share, it did not lower its pricing. It also did not target its competitors' customers. Although initially considering bidding to supply Allopurinol to a large customer, Dr. Reddy's did not want to disrupt the "fair share" agreement by taking Mylan's customer with Dr. Reddy's Director of National Accounts telling the Director of Prescription Marketing in a voicemail that it was a bad idea to upset the relationship with Mylan. Dr.

2946.  Reddy's Director of Prescription Marketing thereafter instructed his team not to pursue Mylan's customers.

2947.  Defendants continued to coordinate pricing and market allocation of the Allopurinol market throughout 2015, as Falkin of Actavis spoke to relevant individuals at Dr. Reddy's on January 5, 8, 15, and 21, as well as February 9 and 12, 2015, and to Nesta of Mylan on March 9 and 10, 2015. Dr. Reddy's announced a WAC price increase on Allopurinol on January 26, 2015, and Mylan increased its WAC prices on Allopurinol on March 4, 2015.

2948.  As a result of Defendants' coordination and conspiracy, Defendants were able to charge Walmart supra-competitive prices for Allopurinol in the United States.

### 3.    **Amantadine HCL**

2949.  Amantadine HCL, also known by the brand name Symmetrel, is a medication used to treat flu, Parkinson's disease, and movement disorders caused by some drugs (extrapyramidal reactions).

2950.  During the Relevant Time Period, Defendants Sandoz, Upsher-Smith, Lannett, and Co-conspirator Banner Pharmacaps, Inc.[33] were the primary manufacturers of Amantadine HCL.

---

[33] Banner Pharmacaps, Inc. was acquired by Patheon Inc., a contract drug manufacturer, on or about December 2012. Patheon Inc. was later acquired by ThermoFisher Scientific, Inc.

Although Defendant Mylan held an ANDA for Amantadine HCL, it only ever amassed a market share of approximately one to two percent despite having capacity to produce and sell a substantially larger quantity.

2951.   Prior to 2012, Amantadine HCL capsules cost pennies per dose. However, beginning in late 2011, Sandoz and Upsher-Smith began conspiring to drive up the price of Amantadine HCL by approximately 500 percent (or 5x). Sandoz and Upsher-Smith simultaneously increased their WAC prices for Amantadine HCL in late 2011. Lannett, despite having the lowest market share and the most to gain from price competition, also announced an identical WAC price to Sandoz and Upsher-Smith in December 2012.

2952.   This coordination was made possible by Lannett, Sandoz, and Upsher- Smith executives and sales personnel meeting in person at trade association events and exchanging numerous communications via telephone calls, text messages, and emails. For example, a Senior National Account Executive Sandoz, K.K.3, and a Senior National Account Manager at Upsher-Smith, D.Z., exchanged numerous telephone calls throughout March, April, July, September, November, and December 2011, just before both Sandoz and Upsher-Smith raised their Amantadine HCL pricing.

2953.   In the summer of 2013, co-conspirator Banner Pharmacaps entered the market for Amantadine HCL. Although the market price was significantly more profitable at this time than it had been two years prior, Mylan, Sandoz, Upsher-Smith, and Lannett arranged for Lannett to exit the market and forfeit its market share to Banner.

2954.   Although Lannett lost its "fair share" of the Amantadine HCL market, Lannett gained market share of Levothyroxine (one of the highest volume generic drugs in the country) at supra-competitive prices due to coordination by Lannett, Mylan, and Sandoz. Essentially, Lannett agreed to

forfeit its share to Banner (for the benefit of Upsher-Smith and Sandoz), and in return, Sandoz agreed to cede market share in the Levothyroxine market (for the benefit of Mylan and Lannett).

2955.  After Defendants became aware of the criminal and civil investigations into generic drug pricing, Defendant Upsher lowered its WAC price to only 2x the original Amantadine HCL prices (80 cents per capsule), but Defendants Sandoz and Lannett maintained the price of Amantadine HCL at 4x ($1.60 per capsule) through at least mid- 2019.

2956.  As a result of Defendants' coordination and conspiracy, Defendants were able to charge Walmart supra-competitive prices for Amantadine HCL in the United States.

**4.    Amitriptyline**

2957.  Amitriptyline, also known by the brand name Elavil, is an antidepressant. Amitriptyline has been available in the United States for over 60 years and is considered by the World Health Organization ("WHO") to be an essential medicine. During the Relevant Time Period, Defendants Mylan, Par, and Sandoz manufactured and sold Amitriptyline.

2958.  For years, the Defendants' average price in the United States for Amitriptyline was stable, but Defendants began increasing the price in concert with one another on or about May 2014, when average prices for Amitriptyline increased 300 percent (3x) to nearly 2,000 percent (20x) across various dosage strengths. Indeed, the Financial Times reported on May 12, 2015 that the $1.07 price for a 100 mg pill of Amitriptyline "jumped by 2,487 per cent in under two years" noting that "in July 2013, the same pill cost just 4 cents."[34] The Boston Globe similarly reported: "The cost of the antidepressant drug Amitriptyline jumped 2,475 percent, from 4 cents for a 10- milligram pill in 2014 to $1.03 in 2015."[35]

---

[34] D. Crow, *Teva bids for Mylan amid pressure on copycat drugmakers*, Financial Times, May 12, 2015

[35] P. McCluskey, *As competition wanes, prices for generics skyrocket*, The Boston Globe, Nov. 6, 2015.

2959.   On May 23, 2014, Sandoz increased its WAC pricing for 50mg of Amitriptyline from .05 cents to between .48 cents (for 1000 count) and .57 cents (for 100 count), an increase of roughly 10x. On July 16, 2014, Mylan matched or exceeded this pricing by raising its only WAC prices from .05 cents to .57 cents across the board for Amitriptyline (resulting in a 10x to 11x increase). When Par entered the market on September 26, 2014, it set its pricing exactly the same as Sandoz: .48 cents (for 1000 count) and .57 cents (for 100 count):

| Product 50 mg | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100 ct | Sandoz | 00781148801 | $0.05 | $0.57 | 23-May-14 | 1,032% |
| 1000 ct | Sandoz | 00781148810 | $0.05 | $0.48 | 23-May-14 | 945% |
| 100 ct | Mylan | 00378265001 | $0.05 | $0.57 | 16-Jul-14 | 1,032% |
| 1000 ct | Mylan | 00378265010 | $0.05 | $0.57 | 16-Jul-14 | 1,157% |
| 100 ct | Par | 00603221421 | * | $0.57 | 26-Sep-14 | * |
| 1000 ct | Par | 00603221432 | * | $0.48 | 26-Sep-14 | * |

2960.   There were no legitimate market reasons for these unprecedented and dramatic price increases. If anything, the price of Amitriptyline should have gone down over the Relevant Time Period as Amitriptyline was added to the American Geriatrics Society's list of drugs that pose a high risk of adverse effects in seniors. When drugs are classified as high risk, doctors tend to prescribe them to seniors less often, causing total demand to decline. In a market free from collusion, lower total demand generally causes prices to drop, not to increase ten- or elevenfold. This marked increase can be seen in the graphs below, which track the National Average Drug Acquisition Cost ("NADAC") cost over time:





2961.  There were no known raw material shortages that would have constrained Defendants' ability to supply the market with Amitriptyline.

608

2962.   What there was, however, in advance of the supra-competitive price increases, was a series of communications between representatives for Mylan, Par, and Sandoz, including at the following industry meetings and events:

- February 20-22, 2013: GPhA Annual Meeting in Orlando, FL;
- June 2-5, 2013: HDMA Business and Leadership Conference in Orlando, FL;
- June 4-5, 2013: GphA CMC Workshop in Bethesda, MD;
- August 10-13, 2013: NACDS Total Store Expo in Las Vegas, NV;
- October 28-30, 2013: GphA Fall Technical Conference in Bethesda, MD;
- February 19-21, 2014: GphA Annual Meeting in Orlando, FL;
- April 1, 2014: HDMA 6th Annual CEO Roundtable Fundraiser in New York, NY;
- April 26-29, 2014: NACDS Annual Meeting in Scottsdale, AZ;
- June 1-4, 2014: HDMA Business and Leadership Conference in Phoenix, AZ;
- June 3-4, 2014: GphA CMC Workshop in Bethesda, MD; and
- August 23-26, 2014: NACDS Total Store Expo in Boston, MA.

It was during this series of communications that Mylan, Par, and Sandoz agreed to increase pricing and restrain competition for the sale of Amitriptyline in the United States.

2963.   After Amitriptyline's price was increased by Mylan, Par, and Sandoz to over 10x the original WAC pricing, Mylan, Par, and Sandoz continued to meet and coordinate the supra-competitive pricing of Amitriptyline at various trade association meetings and events, and to otherwise meet and coordinate regarding the pricing of Amitriptyline after 2014.

2964.   As a result of Defendants' coordination and conspiracy, Defendants were able to charge Walmart supra-competitive prices for Amitriptyline in the United States.

### 5.      Atenolol Chlorthalidone

2965.   Atenolol Chlorthalidone, also known by the brand name Tenoretic, is a medication used to treat hypertension (high blood pressure). During the Relevant Time Period, Actavis and Mylan were the primary manufacturers of Atenolol Chlorthalidone.

2966.   During the Relevant Time Period, Mylan and Actavis sought to allocate the market for Atenolol Chlorthalidone pursuant to the rules of the "fair share" conspiracy, with each company entitled to 50 percent market share. Although monthly fluctuations in customer orders occasionally

resulted in small fluctuations in total market share, the two companies communicated with each other frequently to ensure that they were following the conspiracy's rules.

2967.   Defendants Mylan and Actavis also utilized their market dominance and collusion to double the prices for Atenolol Chlorthalidone in the Spring of 2014.

2968.   During this same time period, Nesta of Mylan and Falkin of Actavis spoke frequently, including nine times in March 2014, four times in May 2014, 20 times in June 2014, nine times in July 2014, and twice in September 2014.

2969.   Actavis and Mylan then doubled the prices for Atenolol Chlorthalidone again between 2015 and 2017. These supra-competitive prices have continued ever since.

2970.   As a result of Defendants' coordination and conspiracy, Defendants were able to charge Walmart supra-competitive prices for Atenolol Chlorthalidone in the United States.

### 6.    **Atropine Sulfate**

2971.   Atropine Sulfate is an eye drop medication used to dilate the pupil before eye exams and treat various eye conditions. Atropine Sulfate has been available in the United States as a generic drug for over a decade. During the Relevant Time Period, Defendants Fougera/Sandoz and Bausch manufactured and sold Atropine Sulfate as a 1% ophthalmic solution.

2972.   For several years, the price for Atropine Sulfate 1% ophthalmic solution was relatively stable. However, in January 2010, Sandoz and Bausch utilized their dominance in the Atropine Sulfate market to coordinate and conspire to raise the price of Atropine Sulfate to supra-competitive levels. In late 2014, both Defendants raised their prices again in lockstep.

2973.   There were no legitimate market reasons for these unprecedented and dramatic price increases. There were no known supply shortages, demand spikes, or other competitive market conditions. There were also no relevant labelling changes or reported drug shortages to explain the coordinated price increases.

2974.  Executives from Sandoz and Bausch communicated regularly during the time period that each was raising the price of Atropine Sulfate to supra-competitive levels, including at regularly scheduled trade association events and meetings. For example, representatives from both Sandoz and Bausch attended the ECRM Retail Pharmacy Generic Pharmaceutical Conference from February 15-18, 2010, and the NACDS 2010 Annual Meeting on April 24, 2010.

2975.  As a result of Defendants' coordination and conspiracy, Defendants were able to charge Walmart supra-competitive prices for Atropine Sulfate in the United States.

### 7.    Balsalazide Disodium, Butorphanol Tartrate, and Captopril

2976.  Balsalazide Disodium, also known by the brand name Giazo, is an anti- inflammatory drug used in the treatment of ulcerative colitis. Butorphanol Tartrate, also known by the brand name Stadol NS, is an opioid analgesic used for pain relief. Captopril, also known by the brand name Capoten, is an angiotensin-converting enzyme (ACE) inhibitor used for the treatment of hypertension and heart failure.

2977.  During the Relevant Time Period, Defendants Mylan and West-Ward, and Co-conspirator Apotex were the primary manufacturers of Balsalazide Disodium and Butorphanol Tartrate, while Defendants Mylan, West-Ward, and Wockhardt were the primary manufacturers of Captopril.

2978.  During the Relevant Time Period, Defendants Mylan, West-Ward, and Wockhardt and Co-conspirator Apotex sought to allocate the markets for Balsalazide Disodium, Butorphanol Tartrate, and Captopril Carisoprodol pursuant to the rules of the "fair share" conspiracy as follows: Mylan agreed to exit the Balsalazide Disodium market; Apotex agreed to temporarily exit the Butorphanol Tartrate market, and West-Ward agreed to exit the Captopril Carisoprodol market.

2979.  On or about June 2013, in furtherance of the "fair share" conspiracy, Defendant Mylan exited the Balsalazide Disodium market. On or about January 2014, Apotex briefly exited the market

for Balsalazide Disodium based on a claimed supply issue. West-Ward used Mylan's exit and Apotex' alleged supply issue to increase its price for Balsalazide Disodium by approximately 400 percent (4x). Apotex then almost immediately reentered the Balsalazide Disodium market on or about February 2014 and matched West-Ward's 4x price increase. In exchange, upon its reentry into the Balsalazide Disodium market, Apotex arranged with West-Ward to concede to West-Ward several large customers such that each received their "fair share" of the market at the new, supra- competitive price

2980.   On or about December 2013, in furtherance of the "fair share" conspiracy, Apotex exited the Butorphanol Tartrate market. Rather than compete on price to win Apotex' customers, West-Ward and Mylan increased prices by more than 200 percent (2x), and divided Apotex's customers between themselves evenly.

2981.   When Apotex decided to reenter the Butorphanol Tartrate market in January 2015, it did so pursuant to the "fair share" conspiracy. Apotex did not attempt to compete on pricing to regain market share; rather, it matched West-Ward's and Mylan's existing prices and, in exchange, West-Ward and Mylan conceded market share to Apotex.

2982.   On or about April 2013, in furtherance of the "fair share" conspiracy, West-Ward exited the Captopril market. Prior to West-Ward's exit, Captopril was priced competitively and cost roughly one cent per dose; after West-Ward exited, however, Mylan and Wockhardt agreed to divide the Captopril market evenly between themselves and raise prices. Mylan and Wockhardt both increased the price of Captopril by approximately 2000 percent (20x) by the end of 2013. West-Ward eventually re-entered the Captopril market on or about March 2014 but did so pursuant to the "fair share" conspiracy.

2983.   Although prices should have dropped with a new market entrant, Mylan, West-Ward, and Wockhardt agreed to increase the cost of Captopril even further—100x what it cost before April 2013. Further, Mylan and Wockhardt agreed to concede market share to West-Ward upon its reentry.

612

2984.  To effectuate the "fair share" conspiracy for Balsalazide Disodium, Butorphanol Tartrate, and Captopril, senior sales executives and others from Mylan, Apotex, West-Ward, and Wockhardt communicated directly with each other to coordinate market allocation, market entries and exits, and price increases. For example, K.B.2 of West-Ward was in frequent contact with Mylan's Director of National Accounts (M.W.) between March and July 2013—there were 20 calls between the two. Six of these calls occurred in June 2013 just before Mylan exited the Balsalazide Disodium market and one of these calls, which lasted for twelve minutes, occurred on July 1, 2013, the day before Mylan increased its price on Captopril.

2985.  Executives and senior sales executives from Mylan, Apotex, West-Ward, and Wockhardt also met in person at regularly scheduled trade association events and meetings throughout the Relevant Time Period. For example, West-Ward and Wockhardt both sent representatives to the February 2014 ECRM Retail Pharmacy Efficient Program Planning Session in Amelia Island, Florida; both companies announced large WAC price increases on Captopril shortly thereafter.

2986.  In mid-2015, Wockhardt completely exited the Captopril market, even though pricing (and thus profits) had skyrocketed. This decision to exit the market was based on discussions with Mylan, who agreed to concede market share to Wockhardt on Enalapril in exchange for greater market share of Captopril.

2987.  As a result of Defendants' coordination and conspiracy, Defendants were able to charge to charge Walmart supra-competitive prices for Balsalazide Disodium, Butorphanol Tartrate, and Captopril in the United States.

### 8.  Cefuroxime Axetil

2988.  Cefuroxime Axetil, also known by the brand name Ceftin, is an antibiotic used to treat a variety of bacterial infections. During the Relevant Time Period, Aurobindo, Citron, and Lupin were the primary manufacturers of Cefuroxime Axetil.

2989.  In or about February 2014, Aurobindo and Lupin were the primary manufacturers of Cefuroxime Axetil and they began to coordinate a 500 percent (5x) price increase. Defendant Citron entered the Cefuroxime Axetil market on or about April 2014, but instead of competing on price, Citron matched the price increases made by Aurobindo and Lupin. In exchange for agreeing not to erode the price of Cefuroxime Axetil with its entry, Aurobindo and Lupin gave Citron its "fair share" of the market by conceding several customers.

2990.  For example, when a customer came to Aurobindo in 2014 asking them to reduce prices, their Director of National Accounts refused in order to abide by the "fair share" conspiracy.

2991.  Aurobindo, Lupin, and Citron also communicated directly with each other in furtherance of the conspiracy. For example, David Berthold, the Vice President of Sales at Defendant Lupin, spoke with the Executive Vice President of Sales at Citron (K.S.) for nearly ten minutes on January 10, 2014, just before the initial 5x price increase on Cefuroxime Axetil by Aurobindo and Lupin. The two spoke for over 30 minutes on April  10, 2014, about the time that Citron entered the Cefuroxime Axetil market. The two then spoke repeatedly throughout June and July 2014 as Aurobindo, Lupin, and Citron were coordinating each company's "fair share" of the Cefuroxime Axetil market.

2992.  Berthold of Lupin also spoke on the phone with the Senior Director of Commercial Operations at Aurobindo (P.M.) multiple times in January and February 2014, just before their coordinated 5x price increase on Cefuroxime Axetil, including on January 23, February 4, 5, 14, 15, 18, 20, and 25, 2014.

2993.  As a result of Defendants' coordination and conspiracy, Defendants were able to charge Walmart supra-competitive prices for Cefuroxime Axetil in the United States.

9. **Chlorpromazine HCL**

2994. Chlorpromazine HCL is prescribed to treat psychotic disorders such as schizophrenia, manic depression, and bipolar disorder. It is also used to treat nausea, vomiting, anxiety, and other symptoms.

2995. During the Relevant Time Period, Sandoz, Mylan, and Upsher-Smith dominated the market for Chlorpromazine.

2996. Beginning in approximately August of 2011, Sandoz, Mylan, and Upsher- Smith colluded to implement a series of abrupt and substantial price increases.

2997. For example, on July 1, 2013, a representative of Upsher-Smith emailed Armando Kellum and others at Sandoz to discuss an increase in the cost of the active pharmaceutical ingredients ("APIs") for Chlorpromazine and other drugs. Although the price increase on the API for Chlorpromazine represented a cost increase to the manufacturers of a fraction of a cent per tablet, Sandoz's procurement director discussed the matter internally on July 16, 2013 and Sandoz decided to significantly increase the price of Chlorpromazine. Afterwards, Kellum circulated a list of drugs for which Sandoz would increase prices that included Chlorpromazine along with other drugs such as Betamethasone, Cholestyramine, Clomipramine, Etodolac, and Methazolamide for which Kellum and others at Sandoz also communicated with competitors to implement price increases.

2998. Kellum was able to add Chlorpromazine to the list of pending price increase because senior executives from Mylan, Sandoz, and Upsher-Smith had been in frequent contact by phone during the two months prior to his email. For example, a representative of Upsher-Smith spoke with a Mylan representative of and CW-3 of Sandoz a number of times between May and August 2013. During this same period, James Nesta of Mylan had dozens of calls with CW-4 of Sandoz.

2999. The companies continued to coordinate additional price increases on Chlorpromazine throughout 2014 and 2015. Although Upsher-Smith led another price increase in August 2014, Sandoz

and Mylan did not follow it until early in 2015. However, upon information and belief, the Upsher-Smith representative confirmed with CW-3 and that the companies would comply with the conspiracy's rules, and refrain from taking Upsher-Smith's customers.

3000.   As a result of these communications, Sandoz, Mylan, and Upsher-Smith were able to increase prices on Chlorpromazine by approximately 1000 percent between August 2011 and May 2015, with additional price increases thereafter, and charge Walmart supra-competitive prices for Chlorpromazine in the United States.

**10.    Cholestyramine**

3001.   Cholestyramine is used to lower high cholesterol levels and to alleviate itching associated with liver disease.

3002.   During the Relevant Time Period, Defendants Sandoz, Upsher-Smith, and Par dominated the market for Cholestyramine Powder.

3003.   As noted above, CW-3 of Sandoz and a representative from Upsher-Smith were in frequent communication in May and August 2013, discussing Chlorpromazine.

3004.   Upon information and belief, these discussions also included collusion on Cholestyramine, which the Defendants increased prices on at the same time as Chlorpromazine. Indeed, Cholestyramine was included by Kellum on his list of drugs slated for increases in late July 2013.

3005.   In addition to the calls between and CW-3 and the Upsher-Smith representative, another Upsher-Smith representative spoke with CW-3 on July 16 (the same day that Kellum created his list of price increase targets that included Cholestyramine), and again on July 26. Three days later, an Upsher-Smith representative spoke with a Par representative; they spoke again on September 5, 2013.

3006.  Upon information and belief, through these calls, Par, Upsher-Smith, and Sandoz agreed to implement a price increase that Upsher-Smith led in June 2013. Sandoz followed this increase in July 2013, and Par followed the increase in August 2013.

3007.  Additionally, the competitors agreed to comply with the market allocation rules in order to effectuate the price increase.

3008.  As a result, Defendants were able to increase prices by between 100-200 percent, depending on the method of packaging. For example, between August and September 2013, Par increased its prices of Cholestyramine cans from $22 to more than $63, and on Cholestyramine packets from $43 to more than $107.

3009.  As a result of Defendants' coordination and conspiracy, Defendants were able to charge Walmart supra-competitive prices for Cholestyramine in the United States.

**11.    Digoxin**

3010.   Digoxin, also known by the brand name Lanoxin, is a medication used to manage and treat heart failure and certain arrhythmias. Generic Digoxin has been available in the United States for more than 20 years, though variants of the drug have been in existence since the 18th century (from the Digitalis lanata plant).

3011.   In 1997, GlaxoSmithKline obtained an NDA to market Lanoxin, a branded version of Digoxin. Because Digoxin was not a new chemical compound, its NDA only allowed for a three-year exclusivity period, and by 2003 there were at least eight manufacturers of Digoxin in the United States, including Defendants Impax, Lannett, Mylan, Par, Sun, and West-Ward.

3012.  During the Relevant Time Period, Defendants Impax, Lannett, Mylan, Par, Sun, and West-Ward manufactured and sold Digoxin.

3013.  Due to industry consolidation and manufacturing difficulties experienced by Mylan, Par, and West-Ward, by the end of 2012, just Lannett and Impax remained active in the market for

generic Digoxin. Despite the loss of manufacturers, the price of Digoxin remained stable until October 2013 when Impax and Lannett abruptly—and substantially—raised their prices.

3014.  On October 16, 2013, Lannett increased the WAC price of Digoxin over 700 percent (7x); Impax exactly mirrored Lannett's WAC prices (and price increase) on October 22, 2013. There were no legitimate justifications for this abrupt uptick in price. There were no drug shortages or supply disruptions at the time.

3015.  Indeed, Par re-entered the Digoxin market in January 2014, which should have lowered prices, but Par matched the increased WAC price established by Lannett and Impax. West-Ward did the same when it reentered the market in April 2014 and so did Mylan when it reentered the market in November 2014:

| Product 0.125 mg | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100 ct | Lannett | 00527132401 | $0.14 | $1.19 | 16-Oct-13 | 734% |
| 1000 ct | Lannett | 00527132410 | $0.12 | $0.99 | 16-Oct-13 | 738% |
| 100 ct | Impax | 00115981101 | $0.14 | $1.19 | 22-Oct-13 | 734% |
| 1000 ct | Impax | 00115981103 | $0.12 | $0.99 | 22-Oct-13 | 738% |
| 100 ct | Par | 49884051401 | * | $1.19 | 17-Jan-14 | * |
| 1000 ct | Par | 49884051410 | * | $0.99 | 17-Jan-14 | * |
| 100 ct | West-Ward | 00143124001 | $0.16 | $1.19 | 14-Apr-14 | 638% |
| 1000 ct | West-Ward | 00143124010 | $0.13 | $0.99 | 14-Apr-14 | 687% |
| 100 ct | Mylan | 00378615501 | * | $1.19 | 17-Nov-14 | * |
| 1000 ct | Mylan | 00378615510 | * | $0.99 | 17-Nov-14 | * |

Although WAC data was not available for Co-conspirator Sun, on information and belief, Sun implemented simultaneous and identical price increases for its generic Digoxin drugs as well.

3016.  Defendants' pricing of Digoxin is the exact opposite of what one would expect to see in a competitive market, where the entry of new manufacturers brings the price down. Instead, because of their collusion, Defendants' pricing for Digoxin in the United States increased as the number of "competitors" in the market grew.

3017.  NADAC data confirms that market prices for Digoxin rose dramatically (and inexplicably) and remained artificially high well after November 2013:



3018.  Lannett, Impax, Par, Sun, West-Ward, and Mylan each communicated with each other regarding the re-entry of Par, West-Ward, and Mylan into the generic Digoxin market well in advance of the date of re-entry so that they could reach "fair share" agreements in order to keep the price of Digoxin supra-competitive.


3019.  These collusive agreements were furthered by communications between representatives for Lannett, Impax, Mylan, Par, Sun, and West-Ward, including at the following industry meetings and events:

• April 20-23, 2013: NACDS Annual Meeting in Palm Beach, FL;
• June 2-5, 2013: HDMA Business and Leadership Conference in Orlando, FL;
• August 10-13, 2013: NACDS Total Store Expo in Las Vegas, NV;
• April 26-29, 2014: NACDS Annual Meeting in Scottsdale, AZ;
• June 1-4, 2014: HDMA Business and Leadership Conference in Phoenix, AZ;
• August 23-26, 2014: NACDS Total Store Expo in Boston, MA;
• February 16-18, 2015: National Pharmacy Forum ("NPF") in Tampa, FL;

3020.   After Digoxin's price was increased, Defendants continued to meet and coordinate the supra-competitive pricing of Digoxin at various trade association meetings and events, and to otherwise meet and coordinate regarding the pricing of Digoxin after 2015.

3021.   Impax's President of Global Pharmaceuticals Division, Carole Ben- Maimon, crowed about the Digoxin price increases on a February 20, 2014 earnings call, stating that the "[Digoxin] market has been pretty stable" and that what Impax "ha[s] done is rational and will result in ongoing profitability for that product." Ben-Maimon further stated on the earnings call that "as you've seen across the industry, pricing has improved and the ability to take some price increases has clearly been available."

3022.   As a result of Defendants' coordination and conspiracy, Defendants were able to charge Walmart supra-competitive prices for Digoxin in the United States.

### 12.   **Diphenoxylate Atropine**

3023.   Diphenoxylate Atropine, also known by the brand name Lomotil, is a medication used to treat diarrhea. During the Relevant Time Period, Defendants Mylan and Greenstone manufactured and sold Diphenoxylate Atropine.

3024.   On or about April 2014, Mylan and Greenstone coordinated and conspired to double the price for Diphenoxylate Atropine. This coordination and conspiracy was effectuated by a series of phone calls, among other communications, between senior sales executives from Mylan and Greenstone. For example, the National Account Director of Mylan (M.A.) spoke by telephone with the Director of National Accounts at Greenstone, Hatosy, on both April 3 and 4, 2014, just before Mylan increased its WAC pricing on Diphenoxylate Atropine. M.A. of Mylan and Hatosy of Greenstone spoke again by phone on April 22, 28, and 29, 2014, just after Mylan's WAC price increases.

3025.   M.A. of Mylan and Hatosy of Greenstone spoke again by telephone in June 2014; Greenstone matched Mylan's price increase on Diphenoxylate Atropine on June 2, 2014.

3026.   As a result of Defendants' coordination and conspiracy, Defendants were able to charge Walmart supra-competitive prices for Diphenoxylate Atropine in the United States.

**13.    Divalproex ER**

3027.   Divalproex ER, also known by the brand name Depakote ER, is a medication used to treat seizure disorders and certain psychiatric conditions, as well as to prevent migraine headaches. In 1999, Abbot Laboratories received FDA approval to market Depakote ER, which achieved nearly $1 billion in sales for Abbott. Between January and May of 2009, Mylan, Zydus, and Par (through Anchen Pharmaceuticals, its predecessor-in-interest) all received ANDAs from the FDA authorizing them to market Divalproex ER. Dr. Reddy's received an ANDA to market Divalproex ER in March 2012

3028.   During the Relevant Time Period, Defendants Mylan, Dr. Reddy's, and Zydus, and Co-conspirator Par, manufactured and sold Divalproex ER.

3029.   Between 2009 and June 2013, the Defendants' average price in the United States for Divalproex ER was stable, but Defendants began increasing the price in concert with one another on or about June 2013. For example, Defendants increased the price for a bottle of 500 pills at 250 mg strength from approximately $30 to more than $200 per bottle. Bottles of 500 mg strength pills increased at even greater rates, increasing from approximately $130 per bottle to more than $1600 per bottle, an increase of more than 1100% (11x).

3030.   In terms of WAC pricing, Mylan and Par set identical WAC prices within twelve days of each other in June 2013—Mylan increased the WAC pricing for Divalproex ER from a little over 70 cents to $3.26, a more than 3x increase, on June 14, 2013 and Par matched that price increase on

June 26, 2013. Dr. Reddy's and Zydus matched that WAC pricing on August 14 and August 19, 2013, respectively:

| Product 500 mg ER | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100 ct | Mylan | 00378047301 | $0.74 | $3.26 | 14-Jun-13 | 338% |
| 500 ct | Mylan | 00378047305 | $0.71 | $3.26 | 14-Jun-13 | 361% |
| 100 ct | Par | 10370051110 | $0.74 | $3.26 | 26-Jun-13 | 338% |
| 500 ct | Par | 10370051150 | $0.71 | $3.26 | 26-Jun-13 | 361% |
| 100 ct | Zydus | 68382031501 | * | $3.26 | 14-Aug-13 | * |
| 500 ct | Zydus | 68382031505 | * | $3.26 | 14-Aug-13 | * |
| 100 ct | Dr. Reddy's | 55111053401 | * | $3.26 | 19-Aug-13 | * |
| 500 ct | Dr. Reddy's | 55111053405 | * | $3.26 | 19-Aug-13 | * |

3031.   There were no legitimate market reasons for these unprecedented and dramatic price increases. There were no known raw material shortages at the time and demand for Divalproex ER was decreasing at the time prices were increasing.

3032.   There were, however, a series of collusive communications between representatives for Mylan, Par, Dr. Reddy's, and Zydus, in advance of the supra-competitive price increases for Divalproex ER, including at the following industry meetings and events:

• October 1-3, 2012: GphA Technical Conference in Bethesda, MD;
• February 20-22, 2013: GphA Annual Meeting in Orlando, FL;
• April 20-23, 2013: NACDS Annual Meeting in Palm Beach, FL;
• June 2-5, 2013: HDMA Business and Leadership Conference in Orlando, FL;
• June 4-5, 2013: GphA CMC Workshop in Bethesda, MD;
• August 10-13, 2013: NACDS Total Store Expo in Las Vegas, NV;

3033.   It was during this series of communications that Mylan, Par, Dr. Reddy's, and Zydus agreed to increase pricing and restrain competition for the sale of Divalproex ER in the United States.

3034.   News reports and testimonials from physicians and pharmacists corroborate these dramatic, immediate, market-wide price increases. According to Spalitto's Pharmacy in Missouri, 500

622

pills of Divalproex ER cost $122.99 in May of 2013. By August 2013, they skyrocketed to $1,629.95, an increase of 1,225 percent. "We've been doing this for 30 years. We've never seen anything like this," said the third-generation pharmacy owner.[36] Further, in January 2014, a Morgan Stanley analyst report found that Defendants "have been raising prices on divalproex . . . aggressively."[37]

3035.   After Defendants increased Divalproex ER's price in June and August 2013, Mylan, Par, Dr. Reddy's, and Zydus continued to meet and coordinate the supra- competitive pricing of Divalproex ER at various trade association meetings and events, and to otherwise meet and coordinate regarding the pricing of Digoxin after 2015.

3036.   As a result of Defendants' coordination and conspiracy, Defendants were able to charge Walmart supra-competitive prices for Divalproex ER in the United States.

**14.    <u>Doxy IR</u>**

3037.   Doxycycline Hyclate Regular Release ("Doxy IR") is a tetracycline-class antibiotic that is used to treat a wide variety of bacterial infections, including those that cause acne. Doxy IR is the same as Doxy ER except that the medication is designed to be released immediately as opposed to on a delayed basis.

3038.   At one point, there were approximately 20 different manufacturers of Doxycycline (in all formulations). By early 2012, however, the primary manufacturers were Actavis, Par, Sun, Teva, and West-Ward.

3039.   Although prices of Doxycycline had remained stable for several years, beginning in approximately November 2012, Defendants implemented an abrupt and substantial price increase across all doses of Doxy IR. By May 2013, Defendants' prices for Doxy IR increased on certain

---

[36]   Rob Low, *Rising cost some of generic drugs set to shock consumers*, FOX4 (Aug. 14, 2013), https://fox4kc.com/news/rising-cost-some-of-generic-drugs-set-to-shock- consumers/.

[37] Morgan Stanley, *Specialty Pharmaceuticals Rx Trends in Pictures* (Jan. 27, 2014).

strengths by as much as 8,000 percent. For example, in mid- January 2013, West-Ward and Sun raised prices for a bottle of 500 tablets of 100 mg strength Doxy IR pills from an average of less than $25 per bottle to approximately $2,000 per bottle.

3040.  Upon information and belief, the agreement to increase prices on Doxy IR was discussed at the GphA meetings in October 2012 in Bethesda, Maryland and February 2013 in Orlando, Florida. The October 2012 meeting was attended by Actavis, Teva, Sun, and Mylan, in addition to the other conspiring Defendants. The February 2013 meeting was attended by Actavis, Mylan, and Teva, in addition to the other conspiring Defendants.

3041.  By way of example, Defendants and Co-conspirators raised Doxycycline WACs on the 100 mg capsules to identical benchmark prices over a two-week period reflecting increases of more than 2,500 percent:

| Product 100 mg cap | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 50 ct | West-Ward | 00143314250 | $0.10 | $4.43 | 21-Jan-13 | 4,326% |
| 500 ct | West-Ward | 00143314205 | $0.10 | $4.43 | 21-Jan-13 | 4,370% |
| 50 ct | Actavis | 00591544050 | $0.10 | $2.74 | 1-Feb-13 | 2,515% |
| 500 ct | Actavis | 00591544005 | $0.10 | $2.74 | 1-Feb-13 | 2,663% |
| 50 ct | Sun | 53489011902 | $0.10 | $4.92 | 5-Feb-13 | 4,847% |
| 500 ct | Sun | 53489011905 | $0.06 | $4.92 | 5-Feb-13 | 7,844% |

3042.  In addition, Defendants increased WACs on the 100 mg tablets within a few days of each other, reflecting increases of more than 2,500 percent:

| Product 100 mg tab | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 50 ct | Actavis | 00591555350 | $0.10 | $2.74 | 1-Feb-13 | 2,515% |
| 500 ct | Actavis | 00591555305 | $0.10 | $2.74 | 1-Feb-13 | 2,663% |
| 50 ct | Sun | 53489012002 | $0.09 | $4.92 | 5-Feb-13 | 5,631% |
| 500 ct | Sun | 53489012005 | $0.09 | $4.92 | 5-Feb-13 | 6,268% |

3043.  Although WAC data is not available for Par, on information and belief, Par implemented simultaneous and identical price increases on Doxy IR.

3044.  These substantial, and inexplicable, price increases were also documented by Dr. Stephen Schondelmeyer as part of his testimony at the Senate Hearing on generic drug price inflation in November 2014:



3045.  Despite these large increases in price, in May 2013, Teva discontinued production of Doxy IR – a product that it had manufactured for three decades. This act was against Teva's individual self-interest (given that pricing for Doxy IR had been raised by orders of magnitude above Defendants' marginal costs) and in furtherance of Defendants' conspiracy.

3046.  By April 2014, DAVA launched Doxy IR pursuant to an exclusive supply and distribution agreement with Chartwell Therapeutics Licensing, LLC and Chartwell Pharmaceuticals, LLC ("Chartwell"). Around this time, Endo was in discussions with DAVA to acquire it, which it did in August 2014.

3047.  Following DAVA's acquisition by Endo, Chartwell and Endo sued each other in New York state court for alleged failures to comply with the terms of the supply and distribution agreement

for Doxycycline.[38][42] Chartwell alleged that DAVA, DAVA's former President Aram Moezinia, and Endo (through its generics subsidiaries) were refusing to take delivery of Doxy IR shipments from Chartwell despite the fact that there was demand for Doxy IR in the market. Because Endo (through its generics subsidiaries including DAVA) refused to accept the available Doxycycline supply, Chartwell attempted to rescind its agreement with DAVA in order to find other generic drug marketers, which Chartwell claims it was able to accomplish.

3048.    Chartwell recognized that its supply of Doxycycline provided an opportunity to "reduc[e] prices for consumers, all while earning significant profits." But Endo (and, subsequently, Par) withheld Doxycycline supply from the U.S. market and priced its Doxycycline at the supra-competitive price of its co-conspirators. Chartwell suggested a reason for Endo's economically irrational decision to withhold additional Doxycycline supply when there was ample demand in the market. It accused Endo and its generic subsidiaries of engaging in an illegal price-fixing and market allocation scheme:

"Having bought DAVA, Endo implemented its withhold and-price-gouge scheme, did virtually nothing to sell the Chartwell Entities' Doxycycline, and, in collusion with its alleged 'competitors,' set Doxycycline's price at the exact same level its competitors were charging for the drug." Chartwell further alleged that DAVA and Moezinia withheld Doxy IR from the market to keep the price of Doxy IR high. For example, Chartwell cites to an e-mail dated on or about July 11, 2014, where Moezinia emailed Chartwell and stated that DAVA's plan was to sell Doxycycline "slowly not to disturb pricing." Upon information and belief, all actions taken by DAVA as described in Chartwell's complaint were done at the direction of Endo and targeted at the U.S. market.

---

[38] *See DAVA Pharm., LLC v. Chartwell Therapeutics Licensing, LLC*, Index No. 502775/15 (N.Y. Supreme Court, County of Kings).

3049.  Chartwell sought discovery of the materials that Par and Endo have produced to the DOJ and the State AGs. Notably, the regulators' inquiries to Endo have focused on at least three drugs that Endo acquired rights to via DAVA: Doxy IR, doxazosin mesylate, and methotrexate sodium. Chartwell and Endo settled their claims in November 2016.

3050.  As a result of Defendants' coordination and conspiracy, Defendants were able to charge Walmart supra-competitive prices for Doxy IR in the United States.

**15.    Exemestane**

3051.  Exemestane, also known by the brand name Aromasin, is an estrogen modulator medication used to treat certain types of breast cancer in post-menopausal women. During the Relevant Time Period, Defendants Alvogen, Greenstone, and West-Ward manufactured and sold Exemestane.

3052.  For several years, the price for Exemestane was relatively stable. However, in late 2013, Greenstone and West-Ward utilized their dominance in the Exemestane market to coordinate and conspire to raise the price of Exemestane to supra-competitive levels nearly simultaneously. There were no legitimate market reasons for these unprecedented and dramatic price increases. There were no known supply shortages demand spikes, or other competitive market conditions. There were also no relevant labelling changes or reported drug shortages to explain the coordinated price increases.

3053.  When Alvogen joined the market in the summer of 2014, rather than offer lower prices than Greenstone or West-Ward, if offered the same or even higher prices. Nonetheless, as contemplated by the "fair share" conspiracy, Alvogen was able to win market share.

3054.  Executives from Alvogen, Greenstone, and West-Ward communicated regularly during the time period that each was raising the price of Exemestane to supra- competitive levels, including at regularly scheduled trade association events and meetings. For example, representatives from Alvogen, Greenstone, and West-Ward attempted the HDMA Business Leadership Conference in

June 2013 and the NACDS 2013 Total Store Expo in August 2013, which were just before Greenstone and West-Ward enacted their steep price increases for Exemestane. Likewise, in the summer of 2014, as Alvogen was entering the market, representatives from all three Defendants met at the NACDS Total Store Expo in August 2014.

3055.   As a result of Defendants' coordination and conspiracy, Defendants were able to charge Walmart supra-competitive prices for Exemestane in the United States.

**16.   <u>Hydralazine</u>**

3056.   Hydralazine HCL is a drug used to treat high blood pressure. It is also known by the brand names Apresoline and Dralzine.

3057.   During the relevant time period, Teva, Par, Heritage, Strides, Camber, and Glenmark dominated the market for Hydralazine tablets.

3058.   In approximately August 2014, Defendants colluded in the market for Hydralazine in order to prevent any price erosion for the drug.

3059.   As of August 2014, Co-conspirator Strides was in the process of ramping back up its domestic operations, following its 2013 sale of its specialty injectable business to Defendant Mylan. As a result of this ramp up, Strides sought to obtain customers for Hydralazine, consistent with the principles of the overarching conspiracy. As a company with more share for Hydralazine than the market allocation scheme allowed, it was up to Heritage to concede business to Strides.

3060.   Heritage employed a new Vice President of Marketing, L.S., on or about August 1, 2014. One of his first acts of business for Heritage was to facilitate an agreement to allow Co-conspirator Strides to obtain market share for Hydralazine.

3061.   In early August 2014, L.S. spoke to S.R.3, an executive working with co- conspirator TruPharma, a pharmaceutical manufacturer, who relayed the message that Strides would submit an unsolicited bid to Morris & Dickson, a wholesaler, for its Hydralazine business. Through TruPharma,

Strides requested that Heritage concede the business pursuant to the overarching "fair share" conspiracy.

3062.   On August 20, 2014, L.S. informed Malek that Strides wanted Morris & Dickson's Hydralazine business and advised that Heritage should concede the business to Strides. Malek agreed and looped in A.S., who was responsible for Heritage's Morris & Dickson account.

3063.   On September 5, 2014, Morris & Dickson informed Heritage that it had received a competing bid for its Hydralazine business and asked for Heritage to provide a better price. Consistent with the "fair share" conspiracy, Heritage declined to match Strides' price, effectively conceding the account.

3064.   Upon information and belief, Heritage's decision to concede this business to Strides was communicated to Teva, Par, Camber, and Glenmark, so that each of these Defendants would know that Heritage was complying with the overarching agreement for the benefit of each Defendant.

3065.   As a result of Defendants' and Co-conspirators' coordination and conspiracy, Defendants were able to charge Walmart supra-competitive prices for Hydralazine in the United States.

### 17.    Hydrocodone Acetaminophen

3066.   Hydrocodone Acetaminophen is a narcotic medication used to treat moderate to severe pain and is available in tablet form in multiple strengths, including 5- 325 mg and 10-325 mg Tablets. It has been available in the United States for over a decade in a generic form. During the Relevant Time Period, Amneal, Mallinckrodt, Par, and Teva manufactured and sold Hydrocodone Acetaminophen.

3067.   For several years, the price for Hydrocodone Acetaminophen was relatively stable. However, in mid-2014, Amneal, Mallinckrodt, Par, and Teva began to coordinate and conspire to raise the price of Hydrocodone Acetaminophen to supra-competitive levels. There were no legitimate

market reasons for these unprecedented and dramatic price increases. There were no known supply shortages, demand spikes, or other competitive market conditions. There were also no relevant labelling changes or reported drug shortages to explain the coordinated price increases.

3068.    Executives from Amneal, Mallinckrodt, Par, and Teva communicated regularly during the time period that each was raising the price of Exemestane to supra- competitive levels, including at regularly scheduled trade association events and meetings.

3069.    As a result of Defendants' coordination and conspiracy, Defendants were able to charge Walmart supra-competitive prices for Hydrocodone Acetaminophen in the United States.

**18.    Isosorbide Dinitrate**

3070.    Isosorbide Dinitrate, also known by the brand name Sorbitrate, is a medication used to prevent angina (chest pain). During the Relevant Time Period, Sandoz, Par, and West-Ward manufactured and sold Isosorbide Dinitrate.

3071.    In July 2012, due to claimed supply disruptions, both Sandoz and West- Ward increased their prices on Isosorbide Dinitrate by approximately 1000 percent (10x) due to alleged supply disruption. However, internal Sandoz documents kept by Armando Kellum and others made clear that this price increase was due to collusive activity as Sandoz concluded that it had attained its "fair share" of the Isosorbide Dinitrate market and did not seek to compete for more share.

3072.    Indeed, Sandoz and West-Ward also engaged in a series of collusive conversations around the dates on which each raised the price of Isosorbide Dinitrate to supra-competitive levels. For example, on June 6, 2012, West-Ward's Director of National Accounts (M.R.) spoke to a Sandoz representative for approximately 25 minutes. Sandoz increased its pricing on Isosorbide Dinitrate the next week on June 15, 2012. The same two executives spoke on October 11, 2012 for approximately 21 minutes; West-Ward announced its price increases for Isosorbide Dinitrate the next day.

3073.   Following the price increase by Sandoz and West-Ward, co-conspiratorPar did not price Isosorbide Dinitrate competitively, but instead matched the 10x price increase of both Sandoz and West-Ward and then senior sales executives at Par coordinated and conspired with their counterparts at Sandoz and West-Ward to ensure that Par also obtained its "fair share" of the Isosorbide Dinitrate market.

3074.   Indeed, Par announced its pricing for Isosorbide Dinitrate on March 11, 2013; a couple of weeks later, Par's Vice President of National Accounts spoke to a Sandoz representative for approximately 25 minutes.

3075.   As a result of Defendants' coordination and conspiracy, Defendants were able to charge Walmart supra-competitive prices for Isosorbide Dinitrate in the United States.

**19.    Lidocaine HCL**

3076.   Lidocaine HCL is used as an anesthetic lubricant for intubation and for the temporary relief of pain associated with minor burns. During the Relevant Time Period, Defendants West-Ward and Lannett, and co-Conspirator Teligent manufactured and sold Lidocaine HCL.

3077.   The market for Lidocaine HCL was relatively stable prior to 2015, when Defendants began increasing the price in concert with one another. Specifically, Teligent led a 700 percent increase in price for Lidocaine HCL in 2015 (from less than .20 cents per unit to over $1.00 per unit).

3078.   West-Ward soon thereafter raised its pricing on Lidocaine HCL as well, from less than .20 cents per unit to .80 cents per dose. When Lannett entered the Lidocaine HCL market on or about 2019, it matched West-Ward's pricing.

3079.   There were no legitimate market reasons for these unprecedented and dramatic price increases. There were no known supply shortages, demand spikes, or other competitive market conditions. There were also no relevant labelling changes or reported drug shortages to explain the lock-step price increases.

3080.   There were, however, a series of collusive communications between representatives for Lannett, Teligent, and West-Ward in advance of the supra- competitive price increases for Lidocaine HCL, including at the following industry meetings and events:

- June 3-4, 2014: GphA CMC Workshop in Bethesda, MD;
- October 27-29, 2014: GphA Fall Technical Conference in Bethesda, MD;
- February 9-11, 2015 GPhA Annual Meeting in Miami Beach, FL; and
- June 7-10, 2015: HDMA Business and Leadership Conference in San Antonio, TX

3081.   It was during this series of communications that Lannett, Teligent, and West-Ward agreed to increase pricing and restrain competition for the sale of Lidocaine HCL in the United States.

3082.   After Defendants increased Lidocaine HCL's price in 2015, Lannett, Teligent, and West-Ward continued to meet and coordinate the supra-competitive pricing of Lidocaine HCL at various trade association meetings and events, and to otherwise meet and coordinate regarding the pricing of Lidocaine-Prilocaine after 2015.

3083.   As a result of Defendants' and Co-conspirator's coordination and conspiracy, Defendants were able to charge Walmart supra-competitive prices for Lidocaine HCL in the United States.

**20.    Lidocaine-Prilocaine**

3084.   Lidocaine-Prilocaine is a topical anesthetic cream that has been available in the United States for decades. During the Relevant Time Period, Defendants Impax, Sandoz, and Fougera and Co-conspirators Akorn and Hi-Tech manufactured and sold Lidocaine-Prilocaine.

3085.   The market for Lidocaine-Prilocaine was relatively stable for more than two years prior to April 2014, when Defendants and Co-conspirators began increasing the price in concert with one another. Specifically, Akorn, Hi-Tech, Impax, Sandoz, and Fougera reached an agreement to more than double the prices for Lidocaine-Prilocaine in the United States from an average of 47 cents per dose in April 2014 to an average price of $1.20 by January 2015.

3086.   NADAC data shows that the average market prices for Lidocaine- Prilocaine increased by almost 300 percent beginning on or about April 2014 and remained supra-competitive thereafter:



3087.   There were no legitimate market reasons for these unprecedented and dramatic price increases. There were no known supply shortages, demand spikes, or other competitive market conditions. There were also no relevant labelling changes or reported drug shortages to explain the lock-step price increases.

3088.   There were, however, a series of collusive communications between representatives for Akorn, Hi-Tech, Impax, Sandoz, and Fougera, in advance of the supra- competitive price increases for Lidocaine-Prilocaine, including at the following industry meetings and events:

• February 19-21, 2014: GPhA Annual Meeting in Orlando, FL;
• June 1-4, 2014: HDMA Business and Leadership Conference in Phoenix, AZ;
• June 3-4, 2014: GPhA CMC Workshop in Bethesda, MD;
• August 23-26, 2014: NACDS Total Store Expo in Boston, MA; and
• October 27-29, 2014: GPhA Fall Technical Conference in Bethesda, MD.

3089.  It was during this series of communications that Akorn, Hi-Tech, Impax, Sandoz, and Fougera agreed to increase pricing and restrain competition for the sale of Lidocaine-Prilocaine in the United States.

3090.  After Defendants and Co-conspirators increased Lidocaine-Prilocaine's price in January 2015, Akorn, Hi-Tech, Impax, Sandoz, and Fougera continued to meet and coordinate the supra- competitive pricing of Lidocaine-Prilocaine at various trade association meetings and events, and to otherwise meet and coordinate regarding the pricing of Lidocaine-Prilocaine after 2014.

3091.  As a result of Defendants' coordination and conspiracy, Defendants were able to charge Walmart supra-competitive prices for Lidocaine-Prilocaine in the United States.

**21.  Metformin ER**

3092.  Metformin ER, also known by the brand name Fortamet, is a medication used to control high blood sugar in individuals with Type 2 Diabetes. During the Relevant Time Period, Defendants Actavis, Amneal, Lupin, and Teva and Co-conspirator Sun manufactured and sold Metformin ER.

3093.  Prior to the summer of 2015, pricing for Metformin ER was relatively low and actually decreasing. However, in August 2015, Lupin raised the price on Metformin ER by approximately 200 percent (2x). Between August 2015 and January 2016, based on collusion and conspiracy, Actavis, Amneal, Sun, and Teva all followed Lupin's price increase to ensure that "fair share" was achieved.

3094.  Defendants engaged in a series of collusive conversations around the dates on which each raised the price of Metformin ER to supra-competitive levels. For example, between July 2015 and February 2016—the time period when Defendants were increasing their pricing on Metformin ER—David Berthold of Lupin was in frequent contact with his cohorts at Amneal and Actavis, including Mark Falkin. Similarly, during the same time period Ara Aprahamian was in frequent contact with Rick Rogerson, Mark Falkin, and others at Actavis, and Nisha Patel at Teva.

634

3095.   As a result of Defendants' coordination and conspiracy, Defendants were able to charge Walmart supra-competitive prices for Metformin ER in the United States.

**22.    Methadone HCL**

3096.   Methadone HCL is an opioid medication used to treat addiction to opioids and for pain management. During the Relevant Time Period, Defendants West-Ward and Mallinckrodt manufactured and sold Methadone HCL.

3097.   Prior to 2014, both West-Ward and Mallinckrodt sold Methadone HCL tablets for pennies per pill, but in June 2014, both manufacturers in collusion with each other increased their WAC prices for Methadone HCL by approximately double.

3098.   Defendants West-Ward and Mallinckrodt engaged in a series of collusive conversations with each other before raising the prices on Methadone HCL. For example, West-Ward's Senior Director and Head of Sales and Mallinckrodt's National Accounts Director both attended a February 2014 ECRM event at the Omni Amelia Island Plantation Resort in Amelia Island, Florida. They then spoke via telephone on May 15, 2014. On August 2014, they met again at the NACDS Total Store Expo in Boston, Massachusetts, which was only one month prior to West-Ward announcing its WAC price increase for Methadone HCL in September 2014. Mallinckrodt followed with a price increase in October 2014.

3099.   As a result of Defendants' coordination and conspiracy, Defendants were able to charge Walmart supra-competitive prices for Methadone HCL in the United States.

**23.    Methylprednisolone**

3100.   Methylprednisolone, also known by the brand name Medrol (manufactured by Defendant Pfizer), is a corticosteroid that treats inflammation and severe allergies. Methylprednisolone is most typically sold in 4 mg tablets, but is also occasionally sold in higher-dose tablets ranging from 8 mg to 32 mg.

3101.   During the Relevant Time Period, Defendants Greenstone, Par, Sandoz, and Cadista and Co-conspirator Breckenridge manufactured and sold Methylprednisolone.

3102.   Prior to March 2011, Methylprednisolone cost a few cents per tablet, but both Cadista and Sandoz colluded and conspired with each other to artificially inflate that price by more than 2000 percent (20x) between March and June 2011. Prior to March 2011, Defendant Cadista sold 21 count packages of 4 mg tablets for a mere 85 cents each, but by June 2011, both Cadista and Sandoz sold that same 21 count package of 4 mg tablets for $19.00.

3103.   There were no legitimate market reasons for these unprecedented and dramatic price increases. There were no known supply shortages, demand spikes, or other competitive market conditions. There were also no relevant labelling changes or reported drug shortages to explain the lock-step price increases.

3104.   Par did not use these price hikes by Cadista and Sandoz to increase its own market share, but instead colluded, conspired, and agreed with Cadista and Sandoz to not poach customers. While Par was contractually bound to some of its large customers to keep the price of Methylprednisolone at pre-March 2011 levels, as those contracts expired, Par also raised its Methylprednisolone prices to the supra-competitive level of both Cadista and Sandoz.

3105.   Between October 2011 and October 2012, Greenstone and Breckenridge entered the Methylprednisolone market. Consistent with the overarching "fair share" conspiracy, Greenstone and Breckenridge communicated with the other Defendants and confirmed their intentions to enter the market at the now-elevated price. In return, and Cadista, Qualitest, and Sandoz conceded market share to the new entrants.

3106.   In response to this price increase, some generic drug customers pushed back and attempted to gain more competitive pricing. For example, Walgreens—who was supplied by Cadista—repeatedly tried to get Sandoz to submit an updated bid for the supply of

Methylprednisolone, including in December 2012 and September 2013. Executives at Sandoz, including Kellum and Richard Tremonte, the Vice President of Sales & Marketing, repeatedly quashed Sandoz from sending Walgreens a competitive price for Methylprednisolone to ensure that Sandoz kept up its collusion in the "fair share" conspiracy.

3107.   As a result of Defendants' coordination and conspiracy, Defendants were able to make the uptick in price for Methylprednisolone stick and they continued to charge Walmart supra-competitive prices for Methylprednisolone, in the United States.

### 24.    Naproxen Sodium

3108.   Naproxen Sodium, also known by the brand names Aleve and Midol, is a nonsteroidal anti-inflammatory drug used to reduce fever and relieve mild pain. During the Relevant Time Period, Defendants Amneal and Glenmark manufactured and sold Naproxen Sodium.

3109.   Prior to March 2015, Amneal and Glenmark both sold Naproxen Sodium for pennies per tablet, but in March 2015, both Defendants imposed an abrupt and substantial price increase of more than 1000 percent (10x) for Naproxen Sodium. There were no known supply shortages, demand spikes, or other competitive market conditions to explain this increase.

3110.   To effectuate and coordinate this abrupt price increase, Amneal and Glenmark communicated directly with each other on multiple occasions in furtherance of the conspiracy. For example, Jim Brown—Glenmark's Vice President of Sales—and Stephen Rutledge—Amneal's Senior Director of Sales—communicated via telephone multiple times per month in 2015, including just before and just after Amneal and Glenmark both raised their pricing on Naproxen Sodium.

3111.   As a result of Defendants' coordination and conspiracy, Defendants were able to charge Walmart supra-competitive prices for Naproxen Sodium in the United States.

### 25.    Neomycin Polymyxin Hydrocortisone

3112.   Neomycin Polymyxin Hydrocortisone, also known by the brand name Otosporin and Pediotic (among others), is a topical medication used to treat outer ear infections. It has been available as a generic in the United States for over a decade. During the Relevant Time Period, Defendants Bausch and Sandoz manufactured and sold Neomycin Polymyxin Hydrocortisone.

3113.   For several years, the price for Neomycin Polymyxin Hydrocortisone was relatively stable. However, on or about March 2010, Bausch and Sandoz began to coordinate and conspire to raise the price of Neomycin Polymyxin Hydrocortisone to supra-competitive levels in close succession. Both Defendants again increased prices in lockstep in the fall of 2012. Finally, in the summer of 2015, both Defendants imposed very large price increases in concert with one another.

3114.   There were no legitimate market reasons for these unprecedented and dramatic price increases. There were no known supply shortages, demand spikes, or other competitive market conditions. There were also no relevant labelling changes or reported drug shortages to explain the coordinated price increases.

3115.   Executives from Bausch and Sandoz communicated regularly during the time period that each was raising the price of Neomycin Polymyxin Hydrocortisone to supra-competitive levels, including at regularly scheduled trade association events and meetings. For example, representatives from both Bausch and Sandoz attended the ECRM Retail Pharmacy Generic Pharmaceutical Conference from February 15-18, 2010, the NACDS 2012 Pharmacy and Technology Conference in Denver, Colorado on August 25- 28, 2012, and multiple conferences together during the summer of 2015. These conferences took place right before both Defendants raised the price of Neomycin Polymyxin Hydrocortisone in concert with one another.

3116.  As a result of Defendants' coordination and conspiracy, Defendants were able to charge Walmart supra-competitive prices for Neomycin Polymyxin Hydrocortisone in the United States.

**26.     Oxycodone/Acetaminophen**

3117.  Oxycodone/Acetaminophen, also known by the brand name Percocet, is a narcotic medication used to treat moderate to moderately severe pain. During the Relevant Time Period, Defendants Actavis, Alvogen, Amneal, Aurobindo, Mallinckrodt, Mayne, and co-conspirator Par manufactured and sold Oxycodone/Acetaminophen.

3118.  Throughout 2011 and 2012, Oxycodone/Acetaminophen cost roughly $18 for a 100-tablet bottle of 10/325 mg pills. By December 2013, Defendants conspired and colluded to increase that price to $80 per 100-tablet bottle, a more than 400 percent increase (4x) in price. Mallinckrodt led the price increase, and Actavis, Alvogen, Amneal, and Par quickly followed. There were no known supply shortages, demand spikes, or other competitive market conditions to explain this increase.

3119.  Even as new competitors, such as Defendants Alvogen and Mayne, entered the Oxycodone/Acetaminophen market, prices remained supra-competitive because of coordination and communication between Defendants in furtherance of the conspiracy. Indeed, between July and December 2013, Marc Falkin of Actavis spoke with Alvogen's Executive Vice President of United States Commercial Sales, Amneal's Vice President of Sales, Aurobindo's CEO, and Mallinckrodt's Vice President and General Manager, Walt Kaczmarek. Falkin also spoke to a representative at Par at least 10 times between May 2 and 19, 2014.

3120.  Defendants' "fair share" coordination of the Oxycodone/Acetaminophen market can also be seen in Par's refusal to bid to supply Econdisc with Oxycodone/Acetaminophen on or about November 19, 2013. Once Par/Qualitiest learned that Econdisc was seeking a bid because the

incumbent supplier had increased the price of Oxycodone/Acetaminophen, Par/Qualitiest refused to bid to ensure that the "fair share" conspiracy stayed in place.

3121.  Defendants' "fair share" coordination of the Oxycodone/Acetaminophen market can also be seen in Mayne's entry into the market in late 2014. Internal Mayne communications reveal that Mayne's President encouraged his sales team to coordinate with competitors to determine which customers Mayne should target. Indeed, when Mayne entered the Oxycodone/Acetaminophen market, it received several customers at the same supra-competitive price that had been set in motion in December 2013.

3122.  As a result of Defendants' coordination and conspiracy, Defendants were able to charge Walmart supra-competitive prices for Oxycodone/Acetaminophen in the United States.

### 27.  <u>Oxycodone HCL</u>

3123.  Oxycodone HCL, also known by the brand name Roxicodone (among others), is a narcotic medication used to treat moderate to severe pain. During the Relevant Time Period, Defendants Glenmark and Lannett manufactured and sold Oxycodone HCL as a 20mg/ml oral solution while Defendants Actavis and Mallinckrodt, and Co-conspirators Par and Sun sold Oxycodone HCL in 5mg, 15mg, and 30mg tablets.

3124.  For several years, the price for Oxycodone HCL was relatively stable, both as a 20mg/ml oral solution and in tablet form. However, in spring 2010, Glenmark and Lannett began to coordinate and conspire to raise the price of Oxycodone HCL 20 mg/ml to supra-competitive levels. Similarly, Actavis, Mallinckrodt, Par, and Sun began to collusively raise prices for Oxycodone HCL as a tablet in the fall of 2013. For example, the 30 mg dosage spiked in price as follows:



3125.   There were no legitimate market reasons for these unprecedented and dramatic price increases. There were no known supply shortages, demand spikes, or other competitive market conditions. There were also no relevant labelling changes or reported drug shortages to explain the coordinated price increases.

3126.   Executives from Glenmark and Lannett, on the one hand, and Actavis, Mallinckrodt, Par, and Sun, on the other hand, communicated regularly during the time period that each was raising the price of Oxycodone HCL to supra-competitive levels, including at regularly scheduled trade association events and meetings. For example, shortly before coordinating large price increases for Oxycodone HCL tablets, representatives of Actavis, Mallinckrodt, Par, and Sun all attended the NACDS 2013 Total Store Expo in Las Vegas, Nevada from August 10-13, 2013.

3127.   The Defendants also communicated directly by phone during the period of their price increases on Oxycodone HCL. For example, on October 18, 2013, days before Actavis announced price increases on Oxycodone HCL, Actavis's Vice President of Sales, and Kaczmarek, Mallinckrodt Vice President and General Manager, communicated multiple times by phone. They would communicate a number of additional times over the next month. Actavis's Vice President of Sales was also in contact with the Vice President of National Accounts at Par in late 2013, speaking for

641

approximately 5 minutes on October 30, 2013, and again for nine minutes on November 13, 2013. Also on November 13, 2103, Actavis's Vice President of Sales also spoke to Kaczmarek at Mallinckrodt.

3128.   Actavis also communicated with Sun during this period. After Actavis, Mallinckrodt and Par had all implemented price increases in October 2013, Falkin, Actavis Vice President of Marketing, communicated by phone with Sun's President multiple times in November and December. After the calls, Sun began to raise customer prices before the end of 2013 and announced a list WAC price increase in February 2014.

3129.   As a result of Defendants' coordination and conspiracy, Defendants were able to charge Walmart supra-competitive prices for Oxycodone HCL in the United States.

### 28.    Permethrin

3130.   Permethrin, also known by the brand name Nix, is an insecticide used to treat scabies and lice. During the Relevant Time Period, Defendants Actavis, Mylan, and Perrigo manufactured and sold Permethrin.

3131.   Prior to 2010, Perrigo and Actavis both sold Permethrin for pennies per dose, but on May 27, 2010, the Directors of National Accounts at both Actavis and Perrigo spoke via phone and shortly thereafter—in July 2010—both Defendants doubled their WAC pricing for Permethrin. There were no known supply shortages, demand spikes, or other competitive market conditions to explain both companies increasing their price.

3132.   After successfully doubling the price of Permethrin, the Directors of National Accounts at both Actavis and Perrigo began speaking again in August 2011 to discuss another price increase. The two spoke twice on August 5, and at least four times on August 8, 2011. These conversations resulted in an agreement that both companies would double their Permethrin pricing again.

3133.   In early 2013, Perrigo and Actavis learned that Mylan would be entering the market. Rather than see this as an opportunity to be more competitive on pricing, Defendants Perrigo and Actavis saw this as an opportunity to further increase the Permethrin pricing before having to cede market share to newcomer Mylan under the "fair share" conspiracy. The Directors of National Accounts at both Actavis and Perrigo spoke on March 12, 14, and 18, 2013 and again on April 11, 2013 to coordinate a further 100 percent increase as follows:



3134.   When Mylan entered the Permethrin market in June 2013, it did so at pricing that was even higher than either Actavis or Perrigo; regardless, pursuant to the "fair share" conspiracy, Actavis and Perrigo conceded market share to Mylan. This coordination was accomplished through a series of calls between Jim Nesta at Mylan and multiple individuals at Perrigo—there were multiple calls on August 21, 23, 27, and 28; September 6, 9, 10, and 11; and November 15, 2013.

3135.   As a result of Defendants' coordination and conspiracy, Defendants were able to charge Walmart supra-competitive prices for Permethrin in the United States.

29.    **Perphenazine**

3136.    Perphenazine, also known by the brand name Trilafon, is an antipsychotic medication used to treat schizophrenia as well as severe nausea and vomiting in adults. During the Relevant Time Period, Defendant Sandoz and Co-conspirator Par manufactured and sold Perphenazine.

3137.    Prior to 2009, the price of Perphenazine cost pennies per dose. However, Par left the market in 2009 due to a disruption in supply, and Sandoz utilized the opportunity to dramatically increase prices. Yet, when Par reentered the market in the summer of 2009, pricing did not go back down to its pre-monopoly levels. Instead, rather than compete, Par matched Sandoz' monopoly pricing.

3138.    In exchange for not competing on price, Sandoz ceded market share to Par. As of May 2010, Qualitest had less than 14 percent market share of Perphenazine compared to Sandoz's 86.1 percent share of the market. But over the next year, Sandoz conceded approximately 20 percent market share to Qualitest, and by May 2011, Qualitest's share was more than 33 percent compared to 66 percent for Sandoz. Although market share was shifting, the price for Perphenazine remained the same.

3139.    Between May 2011 and May 2014, the respective market shares of Qualitest and Sandoz remained essentially fixed, with Par supply roughly one third of the market, and Sandoz supplying the remaining two thirds. Qualitest and Sandoz utilized their dominance over the market for Perphenazine to increase pricing twice—once in 2011 and again in 2013—which resulted in average prices for Perphenazine doubling from the supra- competitive price established by Sandoz in 2009. Throughout this time period, executives at both Qualitest and Sandoz communicated regularly.

3140.    In mid-2014, Qualitest and Sandoz re-allocated the Perphenazine market to that each company's market share was closer to 50/50. Following this reallocation, Sandoz and Qualitest maintained market share within a few percentage points of 50 percent until at least the end of 2016.

3141.   As a result of Defendants' coordination and conspiracy, Defendants were able to charge Walmart supra-competitive prices for Perphenazine in the United States.

**30.     Pilocarpine HCL**

3142.   Pilocarpine HCL, also known by the brand name Salagen, is a medication used to treat dryness of the mouth associated with Sjogren's syndrome (an immune disease), and also to treat saliva gland damage after radiation treatment for cancer. During the Relevant Time Period, Defendants Actavis, Impax, and Lannett manufactured and sold Pilocarpine HCL.

3143.   Prior to 2014, Pilocarpine tablets cost pennies per dose. However, when Impax claimed it suffered a brief supply disruption in late 2013, Lannett and Actavis conspired to increase Pilocarpine HCL prices by approximately 200 percent on or about March 2014. When Impax eventually re-entered the Pilocarpine HCL market in the fall of 2015, it matched or exceeded the prices offered by Actavis and Lannett, but was still able to recover several large customers, because Actavis and Lannett conceded these accounts back to Impax in accordance with the "fair share" conspiracy.

3144.   Senior sales executives from Actavis, Lannett and Impax communicated directly with each other in furtherance of the conspiracy. For example, when Impax suffered their alleged supply disruption, Falkin at Actavis spoke with executives at Lannett on November 10, 22, and 25, 2013, as well as December 12 and 13, 2013. They then spoke again on January 17, 2014 and February 20 and 27, 2014, just two weeks before both companies increased the price of Pilocarpine HCL. Falkin also had communications with Michael Grigsby at Impax on November 11, 2013, as Impax was exiting the Pilocarpine HCL market, and executives at Lannett spoke with executives at Impax in January 2014 as well.

3145.   As a result of Defendants' coordination and conspiracy, Defendants were able to charge Walmart supra-competitive prices for Pilocarpine HCL in the United States.

31.    **Potassium Chloride**

3146.    Potassium Chloride is an electrolyte used to manage and treat hypokalemia (low potassium levels in the blood). During the Relevant Time Period, Defendants Actavis, Mylan, Sandoz, Upsher-Smith, and Zydus manufactured and sold Potassium Chloride.

3147.    In August 2010, after the Director of Contracts and Pricing at Sandoz and Doug Zitnack, the Senior National Accounts Manager at Upsher-Smith had a series of telephone calls and representatives for Actavis, Sandoz, and Upsher-Smith met at numerous trade shows and meetings in the summer of 2010, Defendants Actavis, Sandoz, and Upsher-Smith each implemented substantial parallel price increases on Potassium Chloride.

3148.    For example, in July 2010, 100 tablet bottles of 8 MEQ strength Potassium Chloride sold for less than $7.00; those same bottles cost more than $42.00 by mid-August 2010. Pricing for 10 MEQ strength Potassium Chloride also increased dramatically as follows:



3149.    There were no known supply shortages, demand spikes, or other competitive market conditions to explain both companies increasing their price.

3150.    In mid-2011, Zydus entered the Potassium Chloride market at the supra- competitive price established by Defendants, and yet Actavis, Sandoz, and Upsher-Smith conceded market share to Zydus pursuant to the "fair share" conspiracy rules. Prior to Zydus entering the Potassium Chloride

market, Zydus's Associate Vice President of National Accounts spoke frequently with Sandoz executives.

3151.  Similarly, in late 2014, Mylan entered the Potassium Chloride market at the supra-competitive price established by Defendants and was also granted its "fair share" of the market in exchange for not competing with Defendants on price. To coordinate and effectuate Mylan's entry into the Potassium Chloride market, Nesta at Mylan communicated with Falkin at Actavis in September 2014.

3152.  As a result of Defendants' coordination and conspiracy, Defendants were able to charge Walmart supra-competitive prices for Potassium Chloride in the United States.

### 32.    Prednisolone Acetate

3153.  Prednisolone Acetate, also known by the brand names Omnipred and Pred Forte (among others), is a steroid medication used to treat eye swelling. During the Relevant Time Period, Defendants Greenstone and Sandoz manufactured and sold Prednisolone Acetate.

3154.  Prior to late 2013, Prednisolone Acetate cost approximately $1 per package. However, in July 2013, Sandoz increased its WAC pricing by approximately 500 percent (5x), and Greenstone followed this price increase in September 2013. There were no known supply shortages, demand spikes, or other competitive market conditions to explain both companies increasing their price.

3155.  Instead, there were a series of communications between Kellum at Sandoz and Jill Nailor at Greenstone in furtherance of the "fair share" conspiracy during this time period—a total of 360 communications between 2011 and 2014, in fact (which affected not only Prednisolone Acetate, but also Clindamycin, Latanoprost, and Eplerenone). Through these communications, Defendants Greenstone and Sandoz were able to coordinate bids and price for Prednisolone Acetate,

3156.   For example, on January 22, 2014, OptiSource approached Sandoz about bidding for its Prednisolone Acetate business. Rather than competitively bid for this business, Kellum instructed his team at Sandoz not to do so to ensure that Sandoz did not increase its market share any further.

3157.   As a result of Defendants' coordination and conspiracy, Defendants were able to charge Walmartsupra-competitive prices for Prednisolone Acetate in the United States.

### 33.   **Prednisone**

3158.   Prednisone is a corticosteroid used to treat a variety of different conditions associated with inflammation and swelling. During the Relevant Time Period, Defendants Actavis, Cadista, Hikma/Roxane, and West-Ward, and Co-conspirator Qualitest manufactured and sold Prednisone.

3159.   Prior to 2013, Prednisone cost pennies per pill, but beginning in January 2013, Defendants Actavis, Cadista, Hikma/Roxane, and West-Ward, and Co-conspirator Qualitest, colluded to raise the price of Prednisone by 200 percent (2x).

3160.   To do so, Defendants re-allocated the Prednisone market according to "fair share" principals. In early March 2013, Qualitest submitted revised pricing on Prednisone to Rite Aid knowing that it was too high and would be rejected so that Roxane would get the Rite Aid account and support increased pricing on Prednisone in the future.

3161.   Starting in April 2013 and continuing through June 2013, Actavis, Roxane, Qualitest, and West-Ward each increased their prices on Prednisone by approximately 200 percent. When Cadista re-entered the Prednisone market in August 2013 (after a temporary exit), it, too, set its pricing at the new, supra-competitive level and, in accordance with the "fair share" conspiracy, was granted market share by the other Defendants.

3162.   Senior sales executives at the Defendants continually communicated to implement the "fair share" conspiracy as to Prednisone. Falkin at Actavis communicated with Cadista's Vice

President of Sales in July 2013 to coordinate Cadista's reentry into the Prednisone market. Falkin also regularly spoke to executives at Qualitest, including in September 2013 and May 2014.

3163.   As a result of Defendants' coordination and conspiracy, Defendants were able to charge Walmart supra-competitive prices for Prednisone in the United States.

### 34.    Spironolactone HCTZ

3164.   Spironolactone HCTZ, also known by the brand name Aldactadize, is a medication used to treat hypertension (high blood pressure) and edema. During the Relevant Time Period, Defendants Greenstone and Mylan and Co-conspirator Sun manufactured and sold Spironolactone HCTZ.

3165.   Prior to 2013, Spironolactone HCTZ tablets cost pennies per pill. However, beginning in February 2013, Defendants Greenstone and Mylan and Co-conspirator Sun coordinated and conspired to increase pricing on Spironolactone HCTZ twice in the span of 18 months. The result was that Spironolactone HCTZ cost approximately 500 percent (5x) more at the end of 2014 than it did in early 2013. There were no known supply shortages, demand spikes, or other competitive market conditions to explain both companies increasing their price.

3166.   Rather, the price increase on Spironolactone HCTZ was the result of a series of collusive communications between Defendants in furtherance of the conspiracy. As noted elsewhere, Nesta at Mylan was in constant communication with Jill Nailor and other executives at Greenstone, including during the time period Defendants were implementing their price increases on Spironolactone HCTZ. For example, Nesta spoke at least 12 times between February and April 2013 to an executive at Greenstone. Nailor was also in frequent contact with executives (including Aprahamian) at Sun's subsidiary, Taro, during this time period. Gary Tighe at Mylan also spoke with Chris Urbanski of Sun/Taro for 25 minutes on March 17, 2014 and for an additional five minutes on March 18, 2014. Additionally, executives at Mylan and at Sun/Taro (including Aprahamian) spoke

several times during the time period pricing for Spironolactone HCTZ was being raised by Defendants—there were calls on March 18; June 4, 6, and 9; July 2 and 10, 2014.

3167.  As a result of Defendants' coordination and conspiracy, Defendants were able to charge Walmart supra-competitive prices for Spironolactone HCTZ in the United States.

### 35.    Timolol Maleate

3168.  Timolol Maleate is a beta-blocker used to treat high pressure inside the eye due to glaucoma or other eye diseases. During the Relevant Time Period, Defendants Sandoz and Bausch manufactured and sold Timolol Maleate.

3169.  Rather than openly compete with each other, Sandoz and Bausch conspired and coordinated to keep market share consistent between them and to raise the price of Timolol Maleate over time. For example, in May 2013, Sandoz declined to bid for one of Bausch's accounts pursuant to the "fair share" conspiracy.

3170.  Beginning in November 2013, Sandoz and Bausch coordinated to increase their prices on Timolol Maleate. Bausch first initiated a modest WAC price increase of approximately 25 percent in November 2013. In January 2014, Sandoz responded with a WAC increase of more than 200 percent. Rather than undercut Sandoz and take its business, Bausch raised its prices again and matched Sandoz's price increase a month later.

3171.  Bausch and Sandoz communicated directly with each other in furtherance of the conspiracy. For example, both companies sent representatives to the February 2014 ECRM Retail Pharmacy Efficient Program Planning Session in Amelia Island, Florida, which took place just after Sandoz had raised its WAC pricing on Timolol Maleate and just before Bausch matched that price increase.

3172.  As a result of Defendants' coordination and conspiracy, Defendants were able to charge Walmart supra-competitive prices for Timolol Maleate in the United States.

36.    **Tobramycin Dexamethasone**

3173.    Tobramycin Dexamethasone, also known by the brand name Tobradex, is an antibiotic medication used to treat and prevent bacterial eye infections. During the Relevant Time Period, Defendants Bausch and Sandoz manufactured and sold Tobramycin Dexamethasone.

3174.    For several years, the price for Tobramycin Dexamethasone was relatively stable. However, on or about September 2012, Bausch and Sandoz utilized their dominance in the Tobramycin Dexamethasone market to coordinate and conspire to raise the price of Tobramycin Dexamethasone to supra-competitive levels as follows:



3175.    There were no legitimate market reasons for these unprecedented and dramatic price increases. There were no known supply shortages, demand spikes, or other competitive market conditions. There were also no relevant labelling changes or reported drug shortages to explain the coordinated price increases.

3176.    Executives from Bausch and Sandoz communicated regularly during the time period that each was raising the price of Tobramycin Dexamethasone to supra- competitive levels, including at regularly scheduled trade association events and meetings. These included, but were not limited to, the NACDS 2012 Pharmacy and Technology Conference in Denver, CO (August 25-28, 2012); GPhA

Board of Directors Meeting: in Washington, D.C. (November 29, 2012); and GPhA Annual Meeting in Orlando, Florida (February 20-22, 2013).

3177.  As a result of Defendants' coordination and conspiracy, Defendants were able to charge Walmart supra-competitive prices for Tobramycin Dexamethasone in the United States.

### 37.    Trazodone HCL

3178.  Trazodone HCL is a medication used to treat severe depression and has been available as a generic in the United States for over a decade. During the Relevant Time Period, Defendant Teva and Co-conspirators Par, Apotex, and Sun manufactured and sold Trazodone HCL.

3179.  For several years, the price for Trazodone HCL was relatively stable. However, in or about April 2015, Apotex, Par, Sun, and Teva began to coordinate and conspire to raise the price of Trazodone HCL to supra-competitive levels as follows:



3180.  There were no legitimate market reasons for these unprecedented and dramatic price increases. There were no known supply shortages, demand spikes, or other competitive market conditions. There were also no relevant labelling changes or reported drug shortages to explain the coordinated price increases.

3181.  Executives from Apotex, Par, Sun, and Teva communicated regularly during the time period that each was raising the price of Trazodone HCL to supra- competitive levels, including at regularly scheduled trade association events and meetings. These included, but were not limited to,

the GPhA 2015 Annual Meeting in Miami, Florida from February 9-11, 2015 and the NACDS 2015 Annual Meeting in Palm Beach, Florida from April 25-28, 2015.

3182. The companies also communicated directly during the summer of 2015, when they began to impose large price increases on Trazodone HCL. For example, Apotex's National Sales Director, communicated by phone with Par's Vice President of Sales, on June 30 and July 1, 2015, as well as with Nisha Patel at Teva on June 12, 2015. Sun's National Account Manager also communicated via telephone with Par's Vice President of National Accounts on July 10, 2015.

3183. As a result of Defendants' and Co-conspirators' coordination and conspiracy, Defendants were able to charge Walmart supra-competitive prices for Trazodone HCL in the United States.

### 38.    Triamterene HCTZ

3184. Triamterene HCTZ, also known by the brand name Dyrenium, is a medication used to treat high blood pressure and edema. During the Relevant Time Period, Defendants Actavis, Lannett, Mylan, and Sandoz and Co-conspirator Apotex manufactured and sold Triamterene HCTZ. Sandoz and Mylan manufactured the drug in both tablet and capsule formulations, while Actavis and Apotex made just tablets, and Lannett made just capsules.

3185. In late 2011, Mylan led price increases on both capsules and tablets, and Sandoz and Actavis followed shortly thereafter. Mylan's price increases were between 100 percent and 300 percent, depending on the strength and formulation. Throughout this time period, executives at Sandoz were in constant contact with Mylan's Director of National Accounts, Edgar Escoto—there were hundreds of calls between Sandoz and Mylan's Escoto during 2011 and 2012. Additionally, Kellum at Sandoz spoke with Rogerson at Actavis on May 5, July 28, and September 28, 2011, and executives at Mylan and Sandoz spoke in November 2011. As a result of this coordination, each of

the three companies announced their price increases on their formulations of Triamterene HCTZ by November 2011.

3186.   Prior to 2012, neither Apotex nor Lannett manufactured Triamterene HCTZ. However, in a familiar pattern, both entered the market in early 2012 after the existing manufacturers imposed large price increases. Both Apotex and Lannett received share of the Triamterene HCTZ market—their "fair share"—even though they entered the market at supra-competitive prices. Indeed, to determine which Triamterene HCTZ tablet customers it should bid on, a National Account Manager at Apotex spoke with an executive at Actavis on March 8 and 16, 2012. Similarly, Lannett's Vice President of Sales coordinated with Mylan's Vice President of Sales to determine which customers Lannett should bid for on April 19, 20, and 23, 2012.

3187.   As a result of Defendants' coordination and conspiracy, Defendants were able to charge Walmart supra-competitive prices for Triamterene HCTZ in the United States.

**39.    Ursodiol**

3188.   Ursodiol, also known by the brand names URSO Forte and Actigall, is a medication used to dissolve gallstones and treat primary biliary cirrhosis. During the Relevant Time Period, Defendants Actavis, Lannett, and Epic manufactured and sold Ursodiol.

3189.   Prior to 2014, the average price for Ursodiol was generally stable. Beginning on or about May 2014, however, Defendants increased their prices for Ursodiol in coordination and concert with one another. Whereas Epic and Actavis had a WAC price for Ursodiol of between .45 and .77 cents for the 300 mg formulation of Ursodiol before May 2014, when Lannett entered the market on May 1, 2014, it set its WAC pricing at $5.11. Epic matched this price increase on or about May 6, 2014 and Actavis matched it on or about June 24, 2014:

| Product cap | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 300 mg | Lannett | 00527132601 | * | $5.11 | 1-May-14 | * |
| 300 mg | Epic | 42806050301 | $0.45 | $5.10 | 6-May-14 | 1,034% |
| 300 mg | Actavis | 00591315901 | $0.77 | $5.11 | 24-Jun-14 | 562% |

3190.   NADAC data confirms that the average market price for Ursodiol rose dramatically on or about May 2014 and remained supra-competitive thereafter:



3191.   There were no legitimate market reasons for these unprecedented and dramatic price increases. There were no known supply shortages, demand spikes, or other competitive market conditions. There were also no relevant labelling changes or reported drug shortages to explain the lock-step price increases.

3192.   There were, however, a series of collusive communications between representatives for Defendants Actavis, Lannett, and Epic, in advance of the supra- competitive price increases for Ursodiol, including at the following industry meetings and events:

- August 10-13, 2013: NACDS Total Store Expo in Las Vegas, NC

- October 28-30, 2013: GPhA Fall Technical Conference in Bethesda, MD

- May 12-15, 2014: MMCAP National Member Conference in Bloomington, MN;

655

- June 1-4, 2014: HDMA Business and Leadership Conference in Phoenix, AZ; and

- June 3-4, 2014: GPhA CMC Workshop in Bethesda, MD.

3193.  On information and belief, it was during this series of communications that Defendants Actavis, Lannett, and Epic agreed to increase pricing and restrain competition for the sale of Ursodiol in the United States.

3194.  Defendants Actavis, Lannett, and Epic continued to meet and coordinate the supra-competitive pricing of Ursodiol at various trade association meetings and events, and to otherwise meet and coordinate regarding the pricing of Ursodiol, after 2014.

3195.  As a result of Defendants' coordination and conspiracy, Defendants were able to charge Walmart supra-competitive prices for Ursodiol in the United States.

## VII.  TRADE AND COMMERCE

3196.  During the Relevant Time Period, the activities of Defendants in manufacturing, selling, and distributing, or causing to be manufactured, sold, and distributed, including, but not limited to, those described herein, among others, were in the regular, continuous, and substantial flow of interstate and/or foreign commerce and have had, and continue to have, a substantial effect upon interstate and/or foreign commerce, including in this District, as Defendants intended.

3197.  The effect of Defendants' anticompetitive conduct on United States commerce gives rise to Walmart's claims.

## VIII.  MARKET EFFECTS

3198.  The acts and practices of Defendants have had the purpose or effect, or the tendency or capacity, of unreasonably restraining competition and injuring competition by preventing competition for the numerous generic pharmaceutical drugs identified herein and have directly resulted in Walmart paying supra-competitive prices for those drugs.

656

3199.  By unreasonably and illegally restraining competition for the Operative Generic Drugs, Defendants have deprived Walmart of the benefits of competition that the federal antitrust laws are designed to promote, preserve, and protect.

3200.   As a direct and proximate result of the unlawful conduct alleged above, Walmart was not and is not able to purchase the Operative Generic Drugs at prices determined by a market unhindered by the impact of Defendants' anticompetitive behavior. Instead, Walmart has been forced to pay artificially high prices. Consequently, Walmart has suffered substantial injury in its business and property in that, among other things, it has paid more for the Operative Generic Drugs than it would have paid in an otherwise competitive market.

3201.  Because of the unlawful conduct alleged herein, Walmart has sustained injury to its business or property, and, as a result, has suffered damages in an amount presently undetermined. This is an antitrust injury of the type the antitrust laws were meant to punish and prevent.

3202.  All conditions precedent to the filing of this action have been fulfilled, waived, or excused.

## IX.    THE STATUTE OF LIMITATIONS ARE TOLLED

3203.  The applicable statutes of limitations do not bar any of Walmart's claims.

3204.  Under *American Pipe Construction Co. v. Utah*, 414 U.S. 538, 552–55 (1974), the statutes of limitations on Walmart's claims were tolled by the filing of the initial Direct Purchaser Plaintiff class action complaint and subsequent amended and consolidated Direct Purchaser Plaintiff complaints. Walmart is a putative member of the Direct Purchaser class and the statute of limitations on each of Walmart's claims is tolled so long as Walmart remains a putative class member. *See also Aly v. Valeant*, 1 F.4th 168, 175 (3rd Cir. 2021); 28 U.S.C. § 1367(d).

3205.  By operation of federal statute, civil and criminal enforcement proceedings instituted by the Unites States relating to Defendants' conspiracy toll the statutes of limitation on all of

Walmart's claims during the pendency of each such proceeding and for one year thereafter. *See* 15 U.S.C. § 16(i).

3206.   On February 4, 2020, the United States brought a criminal enforcement action against Ara Aprahamian, *United States v. Aprahamian* (E.D. Pa. No. 2:20-cr-0064- RBS). The United States moved for dismissal of the action, and the Court granted dismissal on November 29, 2023. In August 2020, the United States brought a criminal enforcement action against Glenmark Pharmaceuticals Inc. and Teva Pharmaceuticals USA Inc., *United States v. Glenmark Pharmaceuticals Inc. and Teva Pharmaceuticals USA Inc.*, Case No. 20-CR-200- RBS (E.D. Pa.). On August 21, 2023, the United States announced that it had entered into Deferred Prosecution Agreements with Glenmark and Teva; the United States subsequently filed those agreements on the public docket. Each of these proceedings tolled and continues to toll Walmart's claims.

3207.   Prior to the Direct Purchaser Plaintiff class action litigation and the governmental enforcement actions referenced above, the applicable statutes of limitations were tolled by Defendants' affirmative misrepresentations and fraudulent concealment of their conspiracy. The misrepresentations and concealment took various forms, going back well over a decade, as set forth below in summary and pled in greater detail throughout this Complaint.

3208.   Defendants repeatedly misled the public, including Walmart, by falsely stating on their websites and elsewhere that they would not engage in the type of collusion alleged in this Complaint. Defendants' misleading representations that they would obey antitrust and other laws included as least the following examples.

3209.   Dr. Reddy's Code of Conduct states that Dr. Reddy's "believe[s] in free and open competition and never engage[s] in improper practices that may hamper fair competition," including "gain[ing] competitive advantages through unethical or unlawful business practices" and "enter[ing]

into agreements with competitors to engage in any anticompetitive behavior, including colluding or cartelization, fixing prices, [and] dividing up customers, suppliers or markets."

3210.   Hikma's Code of Conduct provides: "Hikma will engage in free and fair competition and not seek competitive advantage through unlawful means. Hikma will not collude with competitors on prices, bids or market allocations, nor exchange information with third parties in a way that could improperly influence  business outcomes."

3211.   Mylan's Code of Conduct and Business Ethics states: "Mylan is committed to complying with applicable antitrust and fair competition laws."

3212.   Perrigo's Code of Conduct provides: "We will succeed based on the quality and value of our products and not by illegal or otherwise improper business practices. Competition laws, also known as 'antitrust' laws, generally prohibit agreements with competitors, suppliers or customers that could unfairly limit free and open competition."

3213.   Teva's Code of Conduct provides: "We believe that customers and society as a whole benefit from fair, free and open markets. Therefore, we compete on the merits of our products and services and conduct business with integrity. We recognize that the potential harm to Teva's reputation and the penalties for breaching competition laws are severe, and can subject Teva, members of the Board of Directors and employees to severe civil fines and criminal penalties."

3214.   Defendants also repeatedly and expressly misled the public, including Walmart, by providing knowingly false explanations for the collusive price increases they imposed on the market. As pled in greater detail throughout this Complaint, at various times when Defendants announced price increases, customers would ask why the increases were being imposed. Defendants consistently lied and provided false explanations. For example, Defendants would say that they were facing API supply shortages, or dealing with production slowdowns, or seeking to recover their own increased costs, or adjusting their price to the current market price. However, those explanations were mere

pretexts for the actual reason: Defendants were increasing prices because they were engaged in a market- wide conspiracy with their fellow generic manufacturers that allowed them to set supra-competitive prices.

3215.    Through their misleading and false statements, Defendants effectively concealed their conspiracy, thereby causing economic harm to Walmart. Defendants' misrepresentations regarding their price changes were intended to lull market participants, including Walmart, into accepting the price hikes as a normal result of competitive and economic market trends rather than the consequences of Defendants' collusive acts.

3216.    In addition to these misrepresentations, Defendants took numerous steps to conceal their illegal and anticompetitive activity. For example, Defendants routinely choreographed the bidding process to make it appear as if they were competing for customer contracts, when in fact they had already agreed among themselves which Defendant would get the contract and at what price. Defendants created the illusion of competition by coordinating their bids so that the agreed Defendant was the low bidder, with other Defendants either declining to bid for a contract or submitting "cover" bids that were intentionally too high to win the contract. Defendants also staggered the announcement and effective date of their price increases to make it appear as if one Defendant was only responding to another Defendant's price increases, when in fact both Defendants had agreed in advance to coordinate their price increases.

3217.    Also, as pled in greater detail throughout this Complaint, Defendants attempted to implement their conspiracy primarily through telephone calls or face-to-face meetings, to avoid leaving a record of their illegal activity. Individual conspirators were instructed not to put incriminating evidence in writing and not to use email for sensitive communications, but instead to speak by telephone. There were also numerous collusive communications at trade shows, customer events, and smaller, more intimate dinners and meetings, which allowed Defendants to avoid leaving

an electronic reference to the fact of their communications (such as a record that a telephone conversation or text occurred) and avoid any record of the content of these communications. When circumstances forced Defendants' employees to put their communications in writing in an email or text message, Defendants often deleted those communications to attempt to eliminate evidence that any communications had occurred.

3218.   In light of this history of misrepresentations and concealment, it was reasonable for Walmart to believe Defendants' false assertions and to believe that Defendants were following their stated policy of respecting national and state antitrust and fair competition law. The truth about Defendants' conspiracy only began to come to light as a result of the investigations initiated by federal and state governmental authorities.

3219.   Walmart had no knowledge of the Defendants' overarching conspiracy until late 2016, when the Department of Justice filed its first criminal charges relating to the conspiracy and the State Attorneys General filed their first complaint against generic drug manufacturers. Information about the full extent of the conspiracy became publicly available only with the filing of the State Attorneys General's two subsequent complaints in 2019 and 2020. Because of the deceptive practices employed by Defendants and their co- conspirators to conceal their illicit conduct, Walmart could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence.

3220.   For as long as the price of the Operative Generic Drugs remains above the competitive level because of Defendants' illegal conduct, Walmart continues to incur new damages as a result of Defendants' conduct. The applicable statutes of limitation do not bar a claim for these continuing damages.

## X.    ANTITRUST VIOLATIONS

### A.    Count One – Overarching Conspiracy on all Operative Generic Drugs Against all Defendants

3221.   Walmart incorporates by reference ¶¶ 1 through 3220 above.

661

3222.   By 2010, as alleged above, the market for manufacture, pricing, and sale of Price-Fixed Generic Drugs had become conducive to cartelization. The Defendants' efforts to manipulate the pricing and sale of some Operative Generic Drugs, as alleged above, infected and over time spread to the pricing and sale of all Operative Generic Drugs, as alleged above. Beginning at a time yet to be determined, but no later than June 2011, and continuing in force or effect, or both, through the date of filing of this Complaint, the Defendants and Co-conspirators engaged in a continuing agreement, understanding, and conspiracy not to compete on the sale of the Operative Generic Drugs in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

3223.   Each Defendant consciously committed to a common scheme, the ultimate objective of which was to cartelize the Operative Generic Drugs in order to achieve substantial supra-competitive profits. This objective was a common goal among all the Defendants. In furtherance of the scheme, each Defendant consciously committed to an overarching market allocation agreement that governed each of their respective market shares for the Operative Generic Drugs.

3224.   Each Defendant had knowledge of the conspiracy to increase prices, allocate markets, rig bids, and decrease production for each of the Operative Generic Drugs, and each Defendant knowingly participated in the conspiracy's common goal of cartelizing the Operative Generic Drugs in order to achieve supra-competitive profits. Defendants were able to reach this common goal by adopting a set of "rules" that all Defendants followed. These rules – the "fair share" principles – involved an agreement or understanding as to the market allocation for each Defendant for each generic drug identified in this Complaint. Each Defendant's knowledge of the overarching conspiracy is demonstrated by the fact that the numerous collusive agreements reached in furtherance of the conspiracy were discussed at the same meetings and social gatherings. Each Defendant's knowledge of the overarching conspiracy is further established by the fact that each Defendant identified in this

Complaint followed the "fair share" rules of the Conspiracy, both by applying the fair share market allocation principles, and also by agreeing not to undercut each other's price increases by adding customers when a competitor's price increase was pending. Further, this overarching conspiracy contemplated a continuous result that would not continue without the continuous cooperation of all Defendants.

3225.    For example, consistent with their ongoing understandings, Taro's competitors uniformly declined opportunities to bid on Taro's customers after the May 2013 Increases. Taro's competitors understood that to do so would violate the "rules of the road" and would disrupt the market-share balance that they had worked so hard to achieve. Indeed, rather than compete, these competitors began working on implementing price increases of their own.

3226.    Every Defendant intended to join the all-Operative Generic Drugs conspiracy. All Defendants named in this Complaint engaged in the conduct alleged in this Complaint and were active participants in the overarching conspiracy, despite the fact that some Defendants sold fewer Operative Generic Drugs than others. However, the participation of all Defendants in the all-Price Fixed Generic Drugs conspiracy was necessary to increase the prices of the generic drugs that they manufactured. Absent the participation of all Defendants, the conspiracy would have been thwarted because it would have been in the independent interests of each manufacturers to increase their market share by competing on price. A single overarching market allocation agreement facilitated all of the collusive agreements alleged in this Complaint, and this overarching agreement was negotiated and policed through the industry meetings attended by all Defendants. In this way, and for the reasons explained below, there was substantial overlap between all Defendants in the overarching conspiracy.

3227.    By joining the all-Operative Generic Drugs conspiracy, the Defendants became interdependent upon one another, in that their respective benefit depended on the success of the all-

Operative Generic Drugs Conspiracy. Indeed, each of the conspiratorial price increases and price-fixing agreements alleged in this Complaint were interdependent for at least six reasons.

3228.  **First**, every agreement on each of the Operative Generics was interdependent because every agreement was the byproduct of the same overlapping overarching market allocation agreement. Indeed, the interdependent nature of these agreements was what allowed the Defendants to enforce and police every agreement reached in furtherance of the all-Operative Generics Conspiracy. For example, Defendants with a proportionately smaller market shares of certain drugs agreed not to compete for additional market share in return for an agreement that their competitors would not compete for additional market share of other drugs for which they enjoyed a proportionately larger market share. Further, because each Defendant knew that its market share was safe from competition, market share itself became a fungible commodity that could be traded. For example, as alleged above, Mylan agreed to concede market share for Doxycycline to Heritage in consideration for Heritage conceding market share to Mylan for a second generic drug.

3229.  The overarching all-Operative Generic Drugs conspiracy also benefitted Defendants and Co-conspirators that manufactured just a few, or even just one, of the Operative Generics. For example, as alleged above, when Strides sought to reenter the market for Hydralazine in 2014, it knew to approach Heritage and arrange to receive market share. Because Strides knew that Heritage would concede a customer to Strides, Strides was able to put in a bid to that customer at a supra-competitive price, comfortable in the knowledge that Heritage would concede the account, and the inflated bid would be accepted. Similarly, when Mayne entered the Doxy DR market that had been cartelized by Heritage and Mylan, the overarching conspiracy allowed Defendants to reach an agreement that allocated to Mayne a percentage of the market and prevented price competition that would have disturbed the prevailing supra-competitive prices on Doxy DR. The portion of Doxy DR sales

664

allocated to Mayne by agreement with Heritage and Mylan yielded profits sufficient to compensate Mayne for not competing on price to gain sales of Doxy DR at the supra-competitive price level.

3230.  In this manner, the existence of the overarching conspiracy was what enabled it to continue. Each member of the conspiracy was able to allocate sufficient sales to the extremely high-margin drugs identified in this Complaint as subject to the conspiracy, which incentivized each conspirator's adherence to the scheme. Absent this incentive, non-conspiring manufacturers would have acted in their unilateral self-interests by competing on price and gaining market share. For example, the existence of the overarching conspiracy allowed Actavis to persuade Breckenridge to lead a series of collusive price increases on Propranolol capsules and to persuade Epic to raise its prices by more than 1000% on Ursodiol, notwithstanding the fact that the actions taken by Breckenridge and Epic were against their respective self-interests and would not have been taken absent collusion. Similarly, the existence of the overarching conspiracy facilitated the ability of Defendants and Co-conspirators, including Actavis, Mylan, and Teva, to reach an agreement with Lupin to triple its prices on Pravastatin. The overarching conspiracy facilitated the collusive agreement of Defendants Morton Grove and Wockhardt to raise prices on Clobetasol. The overarching conspiracy facilitated Teligent's collusive agreement to raise prices on Econazole. Although some Defendants were the primary facilitators of the collusive conduct alleged in this Complaint, the success of the overarching conspiracy was also dependent on the agreement (or understanding) that the other Defendants or Co-conspirators would participate in the overarching conspiracy as well. For example, Breckenridge's participation in the conspiracy was dependent on its knowledge – gained in part from attending many industry events – that each of the Defendants would follow the conspiracy's supra-competitive pricing and market allocation agreements in the event that any entered the market for Propranolol.

3231.   **<u>Second</u>**, the success of each conspiratorial price increase, each rigged bid, and/or each individual market allocation agreement was interdependent, because a given Defendant's commitment to one price increase helped solidify and protect other conspiracy price increases that were implemented. For example, as alleged above, Teva declined to offer a competitive bid to a customer that sought Glyburide based not only on its agreement with Heritage on Glyburide, but also based on its collusion with Heritage on other drugs discussed in this Complaint. In other words, Teva knew that undercutting the conspiratorial price increase on Glyburide would impact not only Glyburide, but also the conspiratorial price increases on other drugs. Because most Defendants manufactured multiple Operative Generic Drugs, a manufacturer who cheated on the conspiracy as to one Operative Generic Drug would be subject or susceptible to punishment by the cartel with respect to accounts for that drug, along with each of the other Operative Generic Drugs that the cheater manufactured. Thus, the overarching conspiracy enhanced Defendants' ability to enforce the conspiracy, both for conspirators that manufactured many Operative Generic Drugs, and for those that manufactured just one. For example, Mayne (which manufactured only Doxycycline and Oxy/APAP) knew that Mylan and Heritage had an added incentive to follow through on the unlawful agreements on Doxycycline, which helped to ensure that Mayne also committed to the conspiracy. Indeed, Mylan and Heritage shared a strong incentive to reward Mayne for its adherence to the overarching conspiracy.

3232.   **<u>Third</u>**, and along the same lines, the coordination of price increases and market allocation agreements across multiple Operative Generic Drugs allowed Defendants to police individual conspiratorial agreements and better conceal the conspiracy from Walmart and others.

3233.   For example, Sandoz and Mylan coordinated their price increases on Amitriptyline and Levothyroxine. For Levothyroxine, Mylan increased its prices on April 25, 2014, and Sandoz increased its matching price increase on May 23, 2014. That same day, Sandoz increased its price for

Amitriptyline, an increase that Mylan matched on July 16, 2014. By staggering these price increases in a "my turn, your turn" fashion, Sandoz and Mylan were able to ensure that each would follow through with its promise to increase prices (as they had unlawfully agreed), while avoiding announcing price increases on the same day or extremely close in time. And for the same reasons explained above, the ability of Defendants such as Sandoz and Mylan to compel each other's compliance with the unlawful agreement helped to ensure that other Defendants, some of whom manufactured fewer drugs – such as Lannett or West-Ward – would also commit to the unlawful agreement, because they were promised a sufficient volume of profitable sales to compensate for their forbearance.

3234.  **Fourth**, each successful conspiratorial price fixing agreement helped the Defendants by reducing the quantity produced of the drug, which in turn reduced demand for the raw materials required to manufacture that drug. Because all of the drugs involved in the conspiracy shared common inputs such as binding agents, the reduction in supply of Propranolol (for example) helped to reduce the demand for these inputs, which reduced the cost to produce not only Propranolol, but also each of the other Operative Generic Drugs that also used the same binding agents.

3235.  **Fifth**, with each successful price increase, Defendants were able to commit a portion of their production capacity to a drug priced substantially above marginal cost. However, successful price increases also incentivized other manufacturers to substitute capacity towards the high-margin drugs.  Accordingly, it was necessary for Defendants to implement the numerous conspiratorial price increases and price-fixing agreements alleged in this Complaint, so that each member of the conspiracy could enjoy supra-competitive profits. Further, in the instances, if any, that Defendants determined that excess capacity was devoted to a particular drug, one conspirator would agree to discontinue production of that drug. For example, Fougera stopped production of Fluocinonide in January 2015, after the collusive price increase had been implemented on the drug. Similarly, Teva

667

discontinued production of Doxy Hyclate in May 2013, after the collusive price increase had been implemented on the drug.

3236. **Sixth**, certain of the Operative Generic Drugs are subject to a degree of long-run demand-side substitution. For example, the topical corticosteroids – Fluocinonide, Desonide, and Clobetasol – are all used for similar purposes. The same is true of the oral diabetes drugs (Glipizide, Glyburide, Glyburide-Metformin, and Metformin ER). Accordingly, the success of certain of the conspiratorial price increases for the Operative Generic Drugs were relevant to the long-term success of other conspiratorial price increases.

3237. The contract, combination, and conspiracy among Defendants consisted of a continuing course, pattern, and practice of conduct regarding the production, pricing, marketing, and/or sale of generic drugs in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

3238. The course, pattern, and practice of conduct described above included, among other things, a continuing agreement, understanding, and concert of action among Defendants, the substantial terms and purpose of which were one or more of the following:

    a. To fix, stabilize, maintain, and/or raise prices of the Operative Generic Drugs sold to Walmart in the United States;

    b. To allocate customers, the volume of sales, and/or market shares of the Operative Generic Drugs sold to Walmart and others in the United States;

    c. To control the production and/or sale of the Operative Generic Drugs to Walmart and others in the United States; and/or

    d. To earn supra-competitive profits on the price of the Operative Generic Drugs sold to Walmart and others in the United States that resulted from the collusion alleged in this Complaint.

3239.  In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

      a.  They agreed to exchange, and did exchange, current and future price information about the Operative Generic Drugs sold in the United States, including the prices quoted or charged to Walmart for the sale of the Operative Generic Drugs;

      b.  They agreed to coordinate, and did coordinate, price levels, price terms, and/or price movements for sale of the Operative Generic Drugs sold in the United States;

      c.  They agreed on prices, price levels, and/or production levels of the Price- Fixed Generic Drugs in the United States; and/or

      d.  They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

3240.  Defendants entered into and refined their illegal combination and conspiracy through, among other things, the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of the Operative Generic Drugs to be sold to Walmart and/or others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of the Operative Generic Drugs to Walmart and/or others in the United States.

3241.  As a result of this conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the time period relevant to Walmart's claims:

      a.  Price competition in the sale of the Operative Generic Drugs among Defendants to Walmart and others in the United States has been restrained, suppressed, and eliminated;

b. Prices for the Operative Generic Drugs sold by Defendants to Walmart and others have been raised, fixed, maintained, and/or stabilized at artificially high and supra-competitive levels throughout the United States; and

c. Walmart and other direct purchasers of the Operative Generic Drugs produced and sold by Defendants have been deprived of the benefit of free and open competition.

d. Walmart has been injured in its business or property by reason of the Defendants' antitrust violations in amounts not yet ascertained. Walmart's injury as a direct purchaser of the Operative Generic Drugs is an injury of the type the antitrust laws were designed to prevent and flows from that which makes the Defendants' conduct unlawful.

**B.    Count Two (Pled in the Alternative to Count One) Against Actavis, Amneal, Aurobindo, Dr. Reddy's, Fougera/Sandoz, Glenmark, Greenstone/Pfizer, Lannett, Lupin, Mylan, Upsher-Smith, Wockhardt, Teva, and Zydus**

3242.   Walmart incorporates by reference ¶¶ 1 through 3220 above.

3243.   For the purposes of this Count, the term "Specified Operative Generic Drugs" means:

| | | |
|---|---|---|
| Adapalene Gel | Enalapril Maleate Tablets | Mimvey (Estradiol/Norethindrone Acetate) Tablets |
| Amiloride HCL/HCTZ Tablets | Entecavir | Moexipril HCL Tablets |
| Amoxicillin/Clavulanate Chewable Tablets | Estazolam Tablets | Moexipril HCL/HCTZ Tablets |
| Amphetamine/Dextroamphetamine ER (aka Mixed Amphetamine Salts) | Estradiol Tablets | Nabumetone Tablets |
| | Ethinyl estradiol and levonorgestrel (Portia and Jolessa) | Nadolol Tablets |
| Amphetamine/Dextroamphetamine IR | | Niacin ER Tablets |
| Azithromycin Oral Suspension | Ethosuximide Capsules | Nitrofurantoin MAC Capsules |
| Azithromycin Suspension | Ethosuximide Oral Solution | Norethindrone/ethinyl estradiol (Balziva) |
| Baclofen Tablets | Etodolac ER Tablets | Norethindrone Acetate |
| Benazepril HCTZ | Etodolac Tablets | Nortriptyline Hydrochloride Capsules |
| Budesonide DR Capsules | Fenofibrate | Omega-3-Acid Ethyl Esters |
| Budesonide Inhalation | Fluconazole Tablets | Oxaprozin Tablets |
| Bumetanide | Fluocinonide Cream | Oxybutynin Chloride Tablets |
| Cabergoline | Fluocinonide Emollient Cream | Paricalcitol |
| Capecitabine | Fluocinonide Gel | Penicillin VK Tablets |
| Carbamazepine Chewable Tablets | Fluocinonide Ointment | Pentoxifylline Tablets |
| Carbamazepine Tablets | Flurbiprofen Tablets | Piroxicam |
| Celecoxib | Fluvastatin Sodium Capsules | Pravastatin Sodium Tablets |
| Cephalexin Suspension | Gabapentin Tablets | |
| Cimetidine Tablets | Glimepiride Tablets | |

| | | |
|---|---|---|
| Ciprofloxacin HCL Tablets | Glyburide | Prazosin HCL Capsules |
| Clarithromycin ER Tablets | Griseofulvin Suspension | Prochlorperazine Tablets |
| Clomipramine | Haloperidol | Propranolol HCL Tablets |
| Clonidine TTS Patch | Hydroxyzine Pamoate | Raloxifene HCL Tablets |
| Clotrimazole Topical Solution | Capsules Irbesartan | Ranitidine HCL Tablets |
| Cyproheptadine HCL Tablets | Isoniazid | Sotalol HCL Tablets |
| Desmopressin Acetate Tablets | Ketoconazole Cream | Tamoxifen Citrate Tablets |
| Desogestrel/Ethinyl Estradiol Tablets | Ketoconazole Tablets | Temozolomide |
| (Kariva) Dexmethylphenidate HCL | Ketoprofen Capsules | Tizanidine |
| ER Capsules | Labetalol HCL Tablets | Trifluoperazine HCL |
| Dextroamphetamine Sulfate ER | Lamivudine/Zidovudine | Tobramycin |
| Diclofenac Potassium Tablets | (generic Combivir) | Tolmetin Sodium |
| Doxazosin Mesylate Tablets | Levothyroxine | Tolterodine ER |
| Drospirenone and ethinyl estradiol | Loperamide HCL Capsules | Tolterodine Tartrate |
| (Ocella) | Medroxyprogesterone Tablets | Topiramate Sprinkle Capsules |
| | Methotrexate Tablets | Valsartan HCTZ |
| | | Warfarin Sodium Tablets |

3244. For the purposes of this Count, the term "Defendants" means Actavis, Amneal, Aurobindo, Dr. Reddy's, Fougera/Sandoz, Glenmark, Greenstone/Pfizer, Lannett, Lupin, Mylan, Teva, Upsher-Smith, Wockhardt, and Zydus. For the purpose of this Count, Apotex, Par, Heritage, and Heritage's officers—including Jason Malek and Jeffrey Glazer—are Co-conspirators.

3245. The market for manufacture, pricing, and sale of the Specified Operative Generic Drugs was conducive to cartelization. Beginning in 2012, and continuing in force or effect, or both, through the date of filing of this Complaint, the Defendants engaged in a continuing agreement, understanding, and conspiracy not to compete on the sale of the Specified Operative Generic Drugs in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

3246. Each Defendant consciously committed to a common scheme, the ultimate objective of which was to cartelize the Specified Operative Generic Drugs in order to achieve substantial supra-competitive profits. This objective was a common goal among all the Defendants. In furtherance of the scheme, each Defendant consciously committed to an overarching market allocation agreement that governed each of their respective market shares for the Specified Price- Fixed Generic Drugs.

3247.  Each Defendant had knowledge of the conspiracy to increase prices, allocate markets, rig bids, and decrease production for each of the Specified Operative Generic Drugs, and each Defendant knowingly participated in the conspiracy's common goal of cartelizing the Specified Operative Generic Drugs in order to achieve supra-competitive profits. Each Defendant's knowledge of the overarching conspiracy is demonstrated by the fact that the numerous collusive agreements reached in furtherance of the conspiracy were discussed at the same meetings and social gatherings. Further, this overarching conspiracy contemplated a continuous result that would not continue without the continuous cooperation of all Defendants.

3248.  Every Defendant intended to join the conspiracy to fix the prices of the Specified Operative Generic Drugs.

3249.  All Defendants and co-conspirators engaged in the conduct alleged in this Complaint and were active participants in the overarching conspiracy. The participation of all Defendants in the all-Price Fixed Generic Drugs conspiracy was necessary to increase the prices of the generic drugs that they manufactured.

3250.  By joining the conspiracy to fix the prices of the Specified Operative Generic Drugs conspiracy, the Defendants and their co-conspirators became interdependent on one another, in that their respective benefit depended on the success of the overarching conspiracy. Indeed, each of the conspiratorial price increases and price-fixing agreements alleged in this Complaint with respect to the Specified Operative Generic Drugs were interdependent for the reasons explained above in Count One.

3251.  The contract, combination, and conspiracy among Defendants and their conspirators consisted of a continuing course, pattern, and practice of conduct regarding the production, pricing, marketing, and/or sale of generic drugs in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

3252.   The course, pattern, and practice of conduct described above included, among other things, a continuing agreement, understanding, and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

     a.   To fix, stabilize, maintain, and/or raise prices of the Specified Operative Generic Drugs sold to Walmart and others in the United States;

     b.   To allocate customers, the volume of sales, and/or market shares of the Specified Operative Generic Drugs sold to Walmart and others in the United States;

     c.   To control the production and/or sale of the Specified Operative Generic Drugs to Walmart and others in the United States; and/or

     d.   To earn supra-competitive profits on the price of the Specified Operative Generic Drugs sold to Walmart and others in the United States that resulted from the collusion alleged in this Complaint.

3253.   In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

     a.   They agreed to exchange, and did exchange, current and future price information about the Specified Operative Generic Drugs sold in the United States, including the prices quoted or charged to Walmart for the sale of the Specified Operative Generic Drugs;

     b.   They agreed to coordinate, and did coordinate, price levels, price terms, and/or price movements for sale of the Specified Operative Generic Drugs sold in the United States;

     c.   They agreed on prices, price levels, and/or production levels of the Specified Operative Generic Drugs in the United States; and/or

     d.  They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

3254.  Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things, the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of the Specified Operative Generic Drugs to be sold to Walmart and/or others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of the Specified Operative Generic Drugs to Walmart and/or others in the United States.

3255.  As a result of this conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the time period relevant to Walmart's claims:

     a.  Price competition in the sale of the Specified Operative Generic Drugs among Defendants and their co-conspirators to Walmart and others in the United States has been restrained, suppressed, and eliminated;

     b.  Prices for the Specified Operative Generic Drugs sold by Defendants and their co-conspirators to Walmart and others have been raised, fixed, maintained, and/or stabilized at artificially high and supra-competitive levels throughout the United States; and

     c.  Walmart and other direct purchasers of the Specified Operative Generic Drugs produced and sold by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

3256.  Walmart has been injured in its business or property by reason of the Defendants' antitrust violations in amounts not yet ascertained.  Walmart's injury as a direct purchaser of the

Specified Operative Generic Drugs is an injury of the type the antitrust laws were designed to prevent and flows from that which makes the Defendants' conduct unlawful.

**C.    Counts Three through Two Hundred Twelve (Individual Conspiracies)**

3257.   Walmart incorporates by reference ¶¶ 1 through 3220 above.

3258.   The individual product conspiracies alleged in Counts Three through Two Hundred Twelve involve only the specified individual generic drug and the specified Defendants, as indicated on the table below. For the purposes of Counts Three through Two Hundred Twelve, the term "Defendants" refers to only those companies identified in each individual Count.

| Count | Drugs | Defendants and Co-Conspirators | Time Period |
|---|---|---|---|
| 3. | ACETAZOLAMIDE | Lannett, Taro | Spring 2012 to present |
| 4. | ACETAZOLAMIDE ER | Heritage, Teva, Zydus | April 2014 to present |
| 5. | ADAPALENE Cream | Fougera/Sandoz, Perrigo | April 2013 to present |
| 6. | ADAPALENE Gel | Taro, Teva, Glenmark | May 2013 to present |
| 7. | ALBUTEROL | Mylan, Sun | March 2013 to present |
| 8. | ALCLOMETASONE DIPROPIONATE (Cream and Ointment) | Fougera/Sandoz, Glenmark, Taro | May 2013 to present |
| 9. | ALLOPURINOL | Actavis, Dr. Reddy's, Mylan, Par/Qualitest/Endo/DAVA | May 2014 to present |
| 10. | AMANTADINE HCL | Banner, Fougera/Sandoz, Lannett, Mylan, Upsher-Smith, | December 2011 to present |
| 11. | AMILORIDE HCL/HCTZ | Mylan, Teva | May 2013 to present |
| 12. | AMITRIPTYLINE | Fougera/Sandoz, Mylan, Par/Qualitest/Endo/DAVA | May 2014 to present |
| 13. | AMMONIUM LACTATE (Cream and Lotion) | Actavis, Perrigo, Taro | April 2013 to present |

675

| Count | Drugs | Defendants and Co-Conspirators | Time Period |
|---|---|---|---|
| 14. | AMOXICILLIN/CLAVULANATE Chewable Tablets | Fougera/Sandoz, Teva | August 2014 to present |
| 15. | AMPHETAMINE/DEXTROAMPHETAMINE ER (MAS) (ADDERALL) | Actavis, Teva | June 2012 to present |
| 16. | AMPHETAMINE/DEXTROAMPHETAMINE IR (MAS) (ADDERALL) | Actavis, Aurobindo, Teva | April 2012 to present |
| 17. | ATENOLOL/CHLORTHALIDONE | Actavis, Mylan | March 2014 to present |
| 18. | ATROPINE SULFATE | Bausch, Fougera/Sandoz | January 2010 to present |
| 19. | AZITHROMYCIN (Oral Suspension & Suspension) | Greenstone/Pfizer, Teva | November 2013 to present |
| 20. | BACLOFEN | Lannett, Teva, Upsher-Smith | February 2014 to present |
| 21. | BALSALAZIDE DISODIUM | Apotex, Mylan, West-Ward | January 2014 to present |
| 22. | BENAZEPRIL HCTZ | Fougera/Sandoz, Mylan, Rising | August 2013 to present |
| 23. | BETAMETHASONE DIPROPIONATE Cream | Fougera/Sandoz, Taro | November 2010 to present |
| 24. | BETAMETHASONE DIPROPIONATE Lotion | Fougera/Sandoz, Perrigo | November 2010 to present |
| 25. | BETAMETHASONE VALERATE Cream | Fougera/Sandoz, Taro | November 2010 to present |
| 26. | BETAMETHASONE VALERATE Lotion | G&W, Fougera/Sandoz | November 2010 to present |
| 27. | BETAMETHASONE VALERATE Ointment | Actavis, Fougera/Sandoz | November 2010 to present |
| 28. | BETHANECHOL CHLORIDE | Amneal, Rising, Teva, Wockhardt | October 2014 to present |

| Count | Drugs | Defendants and Co-Conspirators | Time Period |
|---|---|---|---|
| 29. | BROMOCRIPTINE MESYLATE | Fougera/Sandoz, Mylan, Perrigo | December 2012 to present |
| 30. | BUDESONIDE DR | Mylan, Par/Qualitest/Endo/DAVA, Teva | April 2014 to present |
| 31. | BUDESONIDE Inhalation | Actavis, Teva | February 2015 to present |
| 32. | BUMETANIDE | Fougera/Sandoz, Teva | August 2013 to present |
| 33. | BUSPIRONE HCL | Mylan, Teva | July 2012 to present |
| 34. | BUTORPHANOL TARTRATE | Apotex, Mylan, West-Ward | December 2013 to present |
| 35. | CABERGOLINE | Greenstone/Pfizer, Par, Teva | December 2014 to present |
| 36. | CALCIPOTRIENE | Fougera/Sandoz, G&W | June 2011 to present |
| 37. | CALCIPOTRIENE BETAMETHASONE DIPROPIONATE Ointment | Fougera/Sandoz, Perrigo | February 2014 to present |
| 38. | CAPECITABINE | Mylan, Teva | January 2014 to present |
| 39. | CAPTOPRIL | Mylan, West-Ward, Wockhardt | May 2013 to present |
| 40. | CARBAMAZEPINE Chewable Tablets | Taro, Teva | May 2013 to present |
| 41. | CARBAMAZEPINE ER | Fougera/Sandoz, Taro | March 2009 to present |
| 42. | CARISOPRODOL | Fougera/Sandoz, Heritage | April 2014 to present |
| 43. | CEFDINIR | Lupin, Teva | 2013 to present |
| 44. | CEFPODOXIME PROXETIL | Aurobindo, Fougera/Sandoz | January 2013 to present |
| 45. | CEFUROXIME AXETIL | Aurobindo, Citron, Lupin | December 2013 to present |

| Count | Drugs | Defendants and Co-Conspirators | Time Period |
|---|---|---|---|
| 46. | CELECOXIB | Actavis, Teva | November 2014 to present |
| 47. | CEPHALEXIN Suspension | Lupin, Teva | October 2013 to present |
| 48. | CHLORPROMAZINE HCL | Fougera/Sandoz, Mylan, Upsher-Smith | August 2011 to present |
| 49. | CHOLESTYRAMINE | Fougera/Sandoz, Par/Qualitest/Endo/DAVA, Upsher-Smith | May 2013 to present |
| 50. | CICLOPIROX Cream | G&W, Glenmark, Perrigo | September 2011 to present |
| 51. | CICLOPIROX Shampoo | Actavis, Fougera/Sandoz, Perrigo | September 2012 to present |
| 52. | CICLOPIROX Solution | Fougera/Sandoz, G&W, Perrigo, Versapharm | April 2013 to present |
| 53. | CIMETIDINE | Mylan, Teva | May 2013 to present |
| 54. | CIPROFLOXACIN HCL Tablets | Actavis, Dr. Reddy's, Teva | August 2014 to present |
| 55. | CLARITHROMYCIN ER | Actavis, Teva | April 2014 to present |
| 56. | CLINDAMYCIN PHOSPHATE | Actavis, Fougera/Sandoz, Greenstone/Pfizer | November 2010 to present |
| 57. | CLOBETASOL | Fougera/Sandoz, Hi-Tech, Taro, Wockhardt | June 2014 to present |
| 58. | CLOMIPRAMINE HCL | Fougera/Sandoz, Mylan, Taro | May 2013 to present |
| 59. | CLONIDINE-TTS Patch | Mylan, Teva | October 2012 to present |
| 60. | CLOTRIMAZOLE | Fougera/Sandoz, Glenmark, Taro | May 2014 to present |
| 61. | CLOTRIMAZOLE BETAMETHASONE DIPROPIONATE | Actavis, Fougera/Sandoz, Taro | March 2011 to present |
| 62. | CYPROHEPTADINE HCL Tablets | Breckenridge, Teva | November 2013 to present |

| Count | Drugs | Defendants and Co-Conspirators | Time Period |
|---|---|---|---|
| 63. | DESMOPRESSIN ACETATE | Actavis, Teva | August 2014 to present |
| 64. | DESOGESTREL/ETHINYL ESTRADIOL Tablets (KARIVA) | Glenmark, Teva | May 2014 to present |
| 65. | DESONIDE Cream | Actavis, Perrigo, Taro | May 2013 to present |
| 66. | DESONIDE Lotion | Actavis, Fougera/Sandoz | August 2012 to present |
| 67. | DESONIDE Ointment | Fougera/Sandoz, Perrigo, Taro | May 2013 to present |
| 68. | DESOXIMETASONE | Fougera/Sandoz, Glenmark, Taro | August 2012 to present |
| 69. | DEXMETHYLPHENIDATE HCL ER (DEXMETH ER) (FOCALIN) | Fougera/Sandoz, Par/Qualitest/Endo/DAVA, Teva | February 2014 to present |
| 70. | DEXTROAMPHETAMINE SULFATE ER (DEX SULFATE ER) | Actavis, Teva | June 2014 to present |
| 71. | DICLOFENAC POTASSIUM | Fougera/Sandoz, Mylan, Teva | May 2014 to present |
| 72. | DIFLUNISAL Tablets | Teva, Rising | April 2014 to present |
| 73. | DIGOXIN | Impax, Lannett, Mylan, Par/Qualitest/Endo/DAVA, Sun, West-Ward | October 2013 to present |
| 74. | DILTIAZEM HCL | Mylan, Teva | May 2013 to present |
| 75. | DIPHENOXYLATE/ATROPINE | Greenstone/Pfizer, Mylan | April 2014 to present |
| 76. | DISOPYRAMIDE PHOSPHATE | Actavis, Teva | June 2013 to present |
| 77. | DIVALPROEX ER | Dr. Reddy's, Mylan, Par/Qualitest/Endo, Zydus | June 2013 to present |
| 78. | DOXAZOSIN MESYLATE | Apotex, DAVA, Mylan, Teva | May 2013 to present |
| 79. | DOXYCYCLINE HYCLATE DR | Heritage, Mayne, Mylan | October 2012 to present |
| 80. | DOXYCYCLINE HYCLATE IR | Actavis, Par/Qualitest/Endo/DAVA, Sun, Teva, West-Ward | November 2012 to present |

679

| Count | Drugs | Defendants and Co-Conspirators | Time Period |
|---|---|---|---|
| 81. | DOXYCYCLINE MONOHYDRATE | Heritage, Lannett, Mylan, Par/Qualitest/Endo/DAVA | February 2013 to present |
| 82. | DROSPIRENONE/ETHINYL ESTRADIOL (OCELLA) | Actavis, Lupin, Teva | May 2013 to present |
| 83. | ECONAZOLE | Fougera/Sandoz, Perrigo, Taro, Teligent | June 2014 to present |
| 84. | ENALAPRIL MALEATE | Mylan, Teva, Wockhardt | June 2013 to present |
| 85. | ENTECAVIR | Par/Qualitest/Endo/DAVA, Teva | September 2014 to present |
| 86. | EPLERENONE | Fougera/Sandoz, Greenstone/Pfizer | April 2014 to present |
| 87. | ERYTHROMYCIN Solution | Fougera/Sandoz, Perrigo, Wockhardt | May 2011 to present |
| 88. | ESTAZOLAM Tablets | Actavis, Teva | April 2014 to present |
| 89. | ESTRADIOL/NORETHINDRONE ACETATE (MIMVEY) | Breckenridge, Teva | July 2012 to present |
| 90. | ETHAMBUTOL HCL Tablets | G&W, Lupin, Teva, VersaPharm | November 2012 to present |
| 91. | ETHINYL ESTRADIOL/LEVONORGESTREL (PORTIA, JOLESSA) | Fougera/Sandoz, Teva | May 2012 to present |
| 92. | ETHINYL ESTRADIOL/NORETHINDRONE [BALZIVA] Tablets | Lupin, Teva | January 2014 to present |
| 93. | ETHOSUXIMIDE | Teva, Versapharm | April 2014 to present |
| 94. | ETODOLAC | Fougera/Sandoz, Taro, Teva | July 2013 to present |
| 95. | ETODOLAC ER | Taro, Teva, Zydus | August 2013 to present |
| 96. | EXEMESTANE | Alvogen, Greenstone/Pfizer, West-Ward | Late 2013 to present |
| 97. | FENOFIBRATE | Lupin, Mylan, Teva, Zydus | February 2013 to present |
| 98. | FLUCONAZOLE | Glenmark, Greenstone/Pfizer, Teva | May 2013 to present |

| Count | Drugs | Defendants and Co-Conspirators | Time Period |
|---|---|---|---|
| 99. | FLUOCINOLONE ACETONIDE | Fougera/Sandoz, G&W | December 2011 to present |
| 100. | FLUOCINONIDE | Actavis, Fougera/Sandoz, Teva, Taro | March 2013 to present |
| 101. | FLURBIPROFEN Tablets | Mylan, Teva | May 2013 to present |
| 102. | FLUTICASONE PROPIONATE | Fougera/Sandoz, Glenmark, Perrigo | July 2012 to present |
| 103. | FLUVASTATIN SODIUM Capsules | Mylan, Teva | April 2014 to present |
| 104. | FOSINOPRIL HCTZ | Aurobindo, Citron, Fougera/Sandoz, Glenmark, Heritage | April 2014 to present |
| 105. | GABAPENTIN | Glenmark, Teva | October 2014 to present |
| 106. | GLIMEPIRIDE | Dr. Reddy's, Teva | August 2014 to present |
| 107. | GLIPIZIDE/METFORMIN | Heritage, Mylan, Teva | April 2014 to present |
| 108. | GLYBURIDE | Aurobindo, Citron, Heritage, Teva | April 2014 to present |
| 109. | GLYBURIDE/METFORMIN | Actavis, Aurobindo, Heritage, Teva | April 2014 to present |
| 110. | GRISEOFULVIN | Fougera/Sandoz, Rising | September 2014 to present |
| 111. | HALOBETASOL PROPIONATE | Fougera/Sandoz, G&W, Perrigo, Taro | September 2012 to present |
| 112. | HALOPERIDOL | Fougera/Sandoz, Mylan | August 2013 to present |
| 113. | Hydralazine HCL | Camber, Glenmark, Heritage, Par, Strides, Teva | August 2014 to present |
| 114. | HYDROCODONE/ACETAMINOPHEN | Amneal, Mallinckrodt, Par/Qualitest/Endo/DAVA, Teva | Mid-2014 to present |
| 115. | HYDROCORTISONE ACETATE | G&W, Perrigo | June 2013 to present |

681

| Count | Drugs | Defendants and Co-Conspirators | Time Period |
|---|---|---|---|
| 116. | HYDROCORTISONE VALERATE | G&W, Perrigo, Taro | August 2013 to present |
| 117. | HYDROXYZINE PAMOATE Capsules | Rising/Citron, Teva | October 2013 to present |
| 118. | IMIQUIMOD | Fougera/Sandoz, Perrigo, Taro | April 2010 to present |
| 119. | IRBESARTAN | Lupin, Teva | March 2012 to present |
| 120. | ISONIAZID | Fougera/Sandoz, Teva | June 2013 to present |
| 121. | ISOSORBIDE DINITRATE | Fougera/Sandoz, Par/Qualitest/Endo/DAVA, West-Ward | July 2012 to present |
| 122. | KETOCONAZOLE Cream | Fougera/Sandoz, G&W, Taro, Teva | February 2014 to present |
| 123. | KETOCONAZOLE Tablets | Apotex, Mylan, Taro, Teva | February 2014 to present |
| 124. | KETOPROFEN | Mylan, Teva | July 2013 to present |
| 125. | KETOROLAC TROMETHAMINE | Mylan, Teva | July 2013 to present |
| 126. | LABETALOL HCL | Fougera/Sandoz, Teva | July 2012 to present |
| 127. | LAMIVUDINE/ZIDOVUDINE (COMBIVIR) | Aurobindo, Lupin, Teva | May 2012 to present |
| 128. | LATANOPROST | Bausch, Fougera/Sandoz, Greenstone/Pfizer | March 2012 to present |
| 129. | LEFLUNOMIDE | Apotex, Heritage, Teva | April 2014 to present |
| 130. | LEVOTHYROXINE | Fougera/Sandoz, Lannett, Mylan | August 2013 to present |
| 131. | LIDOCAINE HCL | Lanett, Teligent, West-Ward | November 2011 to present |
| 132. | LIDOCAINE Ointment | Hi-Tech, Fougera/Sandoz, Taro | November 2011 to present |
| 133. | LIDOCAINE/PRILOCAINE | Akorn, Fougera/Sandoz, Hi-Tech, Impax | March 2014 to present |

| Count | Drugs | Defendants and Co-Conspirators | Time Period |
|---|---|---|---|
| **134.** | LOPERAMIDE HCL | Mylan, Teva | April 2014 to present |
| **135.** | MEDROXYPROGESTERONE Tablets | Greenstone/Pfizer, Teva | November 2013 to present |
| **136.** | MEPROBAMATE | Dr. Reddy's Teva | March 2013 to present |
| **137.** | METFORMIN ER | Actavis, Amneal, Lupin, Sun, Teva | July 2015 to present |
| **138.** | METHADONE HCL | Mallinckrodt, West-Ward | October 2014 to present |
| **139.** | METHAZOLAMIDE | Fougera/Sandoz, Perrigo | June 2014 to present |
| **140.** | METHOTREXATE | DAVA, Mylan, Teva | June 2014 to present |
| **141.** | METHYLPHENIDATE HCL ER | Fougera/Sandoz, Mallinckrodt | February 2014 to present |
| **142.** | METHYLPHENIDATE HCL IR | Actavis, Fougera/Sandoz, Mallinckrodt | February 2013 to present |
| **143.** | METHYLPREDNISOLONE | Breckenridge, Cadista, Fougera/Sandoz, Greenstone/Pfizer, Par/Qualitest/Endo/DAVA | February 2011 to present |
| **144.** | METOPROLOL SUCCINATE | Mylan, Teva | July 2013 to present |
| **145.** | METRONIDAZOLE | Fougera/Sandoz, G&W, Taro | Summer 2011 to present |
| **146.** | METRONIDAZOLE 0.75% Cream (MetroCream) & Lotion (MetroLotion) | Actavis, Fougera/Sandoz, G&W | July 2011 to present |
| **147.** | METRONIDAZOLE 1% Gel (Metro Gel 1%) | Fougera/Sandoz, Taro | Summer 2014 to present |
| **148.** | MOEXIPRIL HCL | Glenmark, Teva | May 2013 to present |
| **149.** | MOEXIPRIL HCL/HCTZ | Glenmark, Teva | May 2013 to present |
| **150.** | MOMETASONE FUROATE | G&W, Glenmark | May 2013 to present |

| Count | Drugs | Defendants and Co-Conspirators | Time Period |
|---|---|---|---|
| 151. | NABUMETONE Tablets | Fougera/Sandoz, Glenmark, Teva | May 2013 to present |
| 152. | NADOLOL | Fougera/Sandoz, Mylan, Teva | May 2013 to present |
| 153. | NAFCILLIN | Aurobindo, Sandoz | December 2012 to present |
| 154. | NAPROXEN SODIUM | Amneal, Glenmark | April 2015 to present |
| 155. | NEOMYCIN/POLYMYXIN/HYDROCORTISONE | Bausch, Fougera/Sandoz | March 2010 to present |
| 156. | NIACIN ER | Lupin, Teva, Zydus | March 2014 to present |
| 157. | NITROFURANTOIN/MACROCRYSTALLINE | Alvogen, Mylan, Teva | July 2012 to present |
| 158. | NORETHINDRONE ACETATE | Amneal, Glenmark, Teva | September 2014 to present |
| 159. | NORTRIPTYLINE HCL | Actavis, Taro, Teva | November 2013 to present |
| 160. | NYSTATIN | Heritage, Teva, Sun | Summer 2011 to present |
| 161. | NYSTATIN/TRIAMCINOLONE | Fougera/Sandoz, Taro | November 2012 to present |
| 162. | OMEGA 3 ACID ETHYL ESTERS | Apotex, Par/Qualitest/Endo/DAVA, Teva | June 2014 to present |
| 163. | ONDANSETRON | Glenmark, Teva | May 2013 to present |
| 164. | OXAPROZIN | Dr. Reddy's, Greenstone/Pfizer, Teva | July 2012 to present |
| 165. | OXYBUTYNIN CHLORIDE | Teva, Upsher-Smith | April 2013 to present |
| 166. | OXYCODONE HCL | Actavis, Glenmark, Lannett, Mallinckrodt, Par/Qualitest/Endo/DAVA, Sun, | Spring 2010 to present |

| Count | Drugs | Defendants and Co-Conspirators | Time Period |
|---|---|---|---|
| **167.** | OXYCODONE/ACETAMINOPHEN | Actavis, Alvogen, Amneal, Aurobindo, Endo, Mallinckrodt, Mayne, Pai, Par/Qualitest/Endo/DAVA | June 2012 to present |
| **168.** | PARICALCITOL | Dr. Reddy's, Teva, Zydus | March 2014 to present |
| **169.** | PAROMOMYCIN | Heritage, Sun | April 2014 to present |
| **170.** | PENICILLIN VK Tablets | Fougera/Sandoz, Teva | August 2014 to present |
| **171.** | PENTOXIFYLLINE Tablets | Apotex, Mylan, Teva, Bausch | April 2014 to present |
| **172.** | PERMETHRIN | Actavis, Perrigo, Mylan | May 2010 to present |
| **173.** | PERPHENAZINE | Fougera/Sandoz, Par/Qualitest/Endo/DAVA | May 2010 to present |
| **174.** | PHENYTOIN SODIUM ER | Amneal, Mylan, Sun, Taro | April 2014 to present |
| **175.** | PILOCARPINE HCL | Actavis, Lannett, Impax | December 2013 to present |
| **176.** | PIOGLITAZONE HCL Metformin | Aurobindo, Fougera/Sandoz, Mylan, Teva | February 2013 to present |
| **177.** | PIROXICAM | Greenstone/Pfizer, Teva | March 2014 to present |
| **178.** | POTASSIUM CHLORIDE ER | Actavis, Fougera/Sandoz, Mylan, Upsher-Smith, Zydus | July 2010 to present |
| **179.** | PRAVASTATIN | Apotex, Glenmark, Lupin, Teva, Zydus | May 2013 to present |
| **180.** | PRAZOSIN HCL | Mylan, Teva | May 2013 to present |
| **181.** | PREDNISOLONE ACETATE | Fougera/Sandoz, Greenstone/Pfizer | August 2013 to present |
| **182.** | PREDNISONE | Actavis, Cadista, Hikma, Par/Qualitest/Endo/DAVA, West-Ward | Spring 2013 to present |

685

| Count | Drugs | Defendants and Co-Conspirators | Time Period |
|---|---|---|---|
| 183. | PROCHLORPERAZINE | Cadista, G&W, Mylan, Perrigo, Teva | May 2014 to present |
| 184. | PROMETHAZINE HCL | Actavis, G&W, Perrigo | September 2012 to present |
| 185. | PROPRANOLOL HCL | Actavis, Teva, Mylan | November 2013 to present |
| 186. | RALOXIFENE HCL | Actavis, Teva, Camber, | September 2014 to present |
| 187. | RANITIDINE HCL | Fougera/Sandoz, Glenmark, Teva | May 2013 to present |
| 188. | SOTALOL HCL | Mylan, Teva | April 2014 to present |
| 189. | SPIRONOLACTONE/HCTZ | Greenstone/Pfizer, Mylan, Sun | February 2013 to present |
| 190. | TACROLIMUS | Fougera/Sandoz, Perrigo | August 2014 to present |
| 191. | TAMOXIFEN CITRATE | Actavis, Teva | March 2014 to present |
| 192. | TEMOZOLOMIDE | Fougera/Sandoz, Teva | July 2013 to present |
| 193. | TERCONAZOLE | Actavis, Fougera/Sandoz, Taro | May 2013 to present |
| 194. | THEOPHYLLINE ER | Heritage, Teva | February 2014 to present |
| 195. | TIMOLOL MALEATE | Bausch, Fougera/Sandoz | January 2014 to present |
| 196. | TIZANIDINE HCL | Fougera/Sandoz, Dr. Reddy's Mylan, | May 2013 to present |
| 197. | TOBRAMYCIN | Fougera/Sandoz, Teva | October 2013 to present |
| 198. | TOBRAMYCIN/DEXAMETHASONE | Bausch, Fougera/Sandoz | September 2012 to present |
| 199. | TOLMETIN SODIUM | Mylan, Teva | May 2013 to present |

| Count | Drugs | Defendants and Co-Conspirators | Time Period |
|---|---|---|---|
| 200. | TOLTERODINE ER | Mylan, Teva | December 2013 to present |
| 201. | TOLTERODINE TARTRATE | Greenstone/Pfizer, Teva | January 2014 to present |
| 202. | TOPIRAMATE SPRINKLE Capsules | Actavis, Teva, Zydus | April 2014 to present |
| 203. | TRAZODONE HCL | Apotex, Par/Qualitest/Endo/DAVA, Sun, Teva | April 2015 to present |
| 204. | TRIAMCINOLONE ACETONIDE (Cream & Ointment) | Fougera/Sandoz, Perrigo | July 2010 to present |
| 205. | TRIAMCINOLONE ACETONIDE (Paste) | Rising/Citron, Taro | July 2010 to present |
| 206. | TRIAMTERENE/HCTZ | Actavis, Apotex, Fougera/Sandoz, Lannett, Mylan | 2011 to present |
| 207. | TRIFLUOPERAZINE HCL | Fougera/Sandoz, Mylan | January 2013 to present |
| 208. | URSODIOL | Actavis, Epic, Lannett | May 2014 to present |
| 209. | VALSARTAN HCTZ | Fougera/Sandoz, Mylan | September 2012 to present |
| 210. | VERAPAMIL | Actavis, Heritage, Mylan | April 2014 to present |
| 211. | WARFARIN SODIUM | Taro, Teva, Zydus | June 2014 to present |
| 212. | ZOLEDRONIC ACID | Dr. Reddy's, Heritage | January 2013 to present |

3259. Beginning on or about the time referenced in the table above, and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co- conspirators engaged in a continuing agreement, understanding, and conspiracy not to compete on the sale of the generic drug referenced on the table above in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

3260.  The contract, combination, and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern, and practice of conduct regarding the production, pricing, marketing, and/or sale of the specified generic drug in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

3261.  The course, pattern, and practice of conduct described above included, among other things, a continuing agreement, understanding, and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

    a.  To fix, stabilize, maintain, and/or raise prices of the specified generic drug sold to Walmart and others in the United States;

    b.  To allocate customers, the volume of sales, and/or market shares of the specified generic drug sold to Walmart and others in the United States;

    c.  To control the production and/or sale of the specified generic drug and others in the United States; and/or

    d.  To earn supra-competitive profits on the price of the specified generic drug sold to Walmart and others in the United States that resulted from Defendants' collusion.

3262.  In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

    a.  They agreed to exchange, and did exchange, current and future price information about the specified generic drug sold in the United States, including the prices quoted or charged to Walmart for the sale of the specified generic drug;

    b.  They agreed to coordinate, and did coordinate, price levels, price terms, and/or price movements for sale of the specified generic drug sold in the United States;

    c.  They agreed on prices, price levels, and/or production levels of the specified generic drug sold in the United States; and/or

    d.  They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

3263.  As a result of Defendants and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the time period relevant to Walmart's claims:

    a.  Price competition in the sale of the specified generic drug among Defendants and their co-conspirators to Walmart and others in the United States has been restrained, suppressed, and eliminated;

    b.  Prices for the specified generic drug sold by Defendants and their co- conspirators to Walmart and others have been raised, fixed, maintained, and/or stabilized at artificially high and supra-competitive levels throughout the United States; and

    c.  Walmart and other direct purchasers of the specified generic drug produced and sold by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

3264.  Walmart has been injured in its business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained. Walmart's injury as a direct purchaser of the specified generic drug is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants and their co-conspirators' conduct unlawful.

## XI.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Walmart prays for the following relief:

  A.  A jury verdict in the amount of the compensatory damages sustained by Walmart.

B.  A judgment against Defendants, jointly and severally, by the Court, in treble the amount of the

jury verdict, in accordance with Section 4 of the Clayton Act, 15 U.S.C. § 15, and for attorney's

fees, costs, and interest as allowable by law.

C.  Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Walmart demands a trial by jury of all issues so triable.

Dated: March 14, 2025                          Respectfully submitted,

*/s/ Neal S. Manne*
Neal S. Manne
nmanne@susmangodfrey.com
Johnny W. Carter
jcarter@susmangodfrey.com
SUSMAN GODFREY LLP
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
(713) 651-9366 (office)
(713) 654-6666 (fax)

Shawn J. Rabin
srabin@susmangodfrey.com
Shauli Bar-On
sbar-on@susmangodfrey.com
SUSMAN GODFREY LLP
One Manhattan West
New York, New York 10001
(212) 336-8330 (office)
(212) 336-8340 (fax)

*/s/ Patrick J. McDonnell*
Patrick J. McDonnell (Attorney ID No.: 62310)
pmcdonnell@mcda-law.com
MCDONNELL & ASSOCIATES PC
860 1st Ave, suite 5B
King of Prussia, Pennsylvania 19406
(610) 337-2087 (office)
(610) 337-2575 (fax)

*Counsel for Walmart, Inc.*

690